# DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| CLIFFORD BOYNES, et al., | |
| Plaintiffs, | Civil Action No. 2021-0253 |
| v. | |
| LIMETREE BAY VENTURES, LLC, et al., | |
| Defendants. | |

| | |
|---|---|
| HELEN SHIRLEY, et al., | |
| Plaintiffs, | Civil Action No. 2021-0259 |
| v. | |
| LIMETREE BAY VENTURES, LLC, et al., | |
| Defendants. | |

| | |
|---|---|
| FRANCIS E. CHARLES and THERESA J. CHARLES, | |
| Plaintiffs, | Civil Action No. 2021-0260 |
| v. | |
| LIMETREE BAY VENTURES, LLC, et al., | |
| Defendants. | |

| | |
|---|---|
| BEECHER COTTON, et al., | |
| Plaintiffs, | Civil Action No. 2021-0261 |
| v. | |
| LIMETREE BAY VENTURES, LLC, et al., | |
| Defendants. | |

**Attorneys:**

**John K. Dema, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I.
**Jennifer Jones, Esq.,**
St. Thomas, U.S.V.I.
**Hugh P. Lambert, Esq.,**
**Brian James Mersman, Esq.,**
**Kerry J. Miller, Esq.,**
**C. Hogan Paschal, Esq.,**
**Paul C. Thibodeaux, Esq.,**
**Rebekka C. Veith, Esq.,**
**J. Christopher C. Zainey, Jr., Esq.,**
New Orleans, Louisiana
      *For the Boynes Plaintiffs*

**Vincent A. Colianni, II, Esq.,**
**John-Russell Bart Pate, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I.
**Warren T. Burns, Esq.,**
**Daniel H. Charest, Esq.,**
Dallas, Texas
**Charles Jacob Gower, Esq.,**
**Hugh. P. Lambert, Esq.,**
**Korey A. Nelson, Esq.,**
**Harry Richard Yelton, Esq.,**
New Orleans, Louisiana
      *For the Shirley Plaintiffs*

**John K. Dema, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I
**Hugh. P. Lambert, Esq.,**
**Brian James Mersman, Esq.,**
**J. Christopher C. Zainey, Jr., Esq.,**
New Orleans, Louisiana
      *For the Charles Plaintiffs*

**Vincent A. Colianni, II, Esq.,**
**Rhea Lawrence, Esq.,**
**Marina Leonard, Esq.,**
**Lee J. Rohn, Esq.,**
St. Croix, U.S.V.I
**Shanon Jude Carson, Esq.,**
**Daniel H. Charest, Esq.,**
**Quinn Burns, Esq.,**
**Warren T. Burns, Esq.,**
Dallas, Texas
**John Quin Kerrigan, I, Esq.,**
Doylestown, Pennsylvania
**John Albanese, Esq.,**
Minneapolis, Minnesota
**Dena R. Young, Esq.,**
Philadelphia, Pennsylvania
**Charles Jacob Gower, Esq.,**
**Hugh. P. Lambert, Esq.,**
**Harry Richard Yelton, Esq.,**
New Orleans, Louisiana
      *For the Cotton Plaintiffs*

**Carl A. Beckstedt, III, Esq.,**
**Robert J. Kuczynski, Esq.,**
**Ryan C. Stutzman, Esq.,**
St. Croix, U.S.V.I.
**Kevin J. Bruno, Esq.,**
New York, New York
**Melanie S. Carter, Esq.,**
Philadelphia, Pennsylvania
      *For Defendant Limetree Bay*
      *Terminals, LLC*

## MEMORANDUM OPINION

**Lewis, District Judge**

THIS MATTER comes before the Court on Plaintiffs' "Amended Motion[s] for Temporary Restraining Order and Preliminary Injunction;"[1] Defendant Limetree Bay Terminals' Response;[2] Plaintiffs' Reply;[3] and the parties' Supplemental Briefs.[4] Plaintiffs request that the Court order Defendant to remediate the cisterns and property of, and establish a program to provide free bottled water to, Plaintiffs and other similarly situated residents during the pendency of this litigation. A first phase evidentiary hearing was held over four days from March 2-7, 2023, and the parties filed their Supplemental Briefs on April 3, 2023.

For the reasons that follow, the Court finds that Plaintiffs have met their burden to establish that some, but not all, members of the group on behalf of whom they seek preliminary relief are entitled to such relief. Specifically, the Court finds that Plaintiffs have satisfied the four preliminary injunction factors with respect to those Plaintiffs and putative class members who cannot afford to purchase water without trading off other basic necessities, but that Plaintiffs have satisfied these factors with respect to this population only. The Court also finds that preliminary injunctive relief for a water provision program is warranted, while such relief for the remediation of Plaintiffs' cisterns and property is not.

---

[1] Civ. No. 2021-0253 ("*Boynes*"), Dkt. Nos. 141, 142 ("Mot."); Civ. No. 2021-0260 ("*Charles*"), Dkt. Nos. 68, 68-1; Civ. No. 2021-0261 ("*Cotton*"), Dkt. Nos. 170, 171; Civ. No. 2021-0259 ("*Shirley*"), Dkt. No. 41.

[2] *Boynes*, Dkt. No. 168 ("Resp."); *Charles*, Dkt. No. 100; *Cotton*, Dkt. No. 226.

[3] *Boynes*, Dkt. No. 180 ("Rep."); *Charles*, Dkt. No. 107; *Cotton*, Dkt. No. 240.

[4] *Boynes*, Dkt. Nos. 144, 267 ("LBT Supp. Br."), 269 ("Pls. Supp Br."); *Charles*, Dkt. Nos. 86, 195, 197; *Cotton*, Dkt. Nos. 206, 331, 332.

# I.  BACKGROUND

On the south shore of St. Croix sits an oil refinery. The refinery began production in the 1960s and increasingly expanded its operations over the next fifty years, becoming one of the largest refineries in the United States. Following a series of environmental violations, in 2011 the refinery's then-owner, HOVENSA, agreed to pay millions of dollars in fines and expend hundreds of millions of dollars in new pollution controls.[5] The refinery ceased production shortly thereafter, in the spring of 2012, and HOVENSA declared bankruptcy three years later.[6] Ownership of the refinery then passed to Limetree Bay Terminals, LLC ("Terminals"), one of the defendants in these four associated cases.

Beginning in 2018, Terminals began maintenance and repair work on the refinery with the goal of restarting operations. After three years of this "startup" work—much of which Terminals shared with its "sister company," Limetree Bay Refining, LCC ("Refining")—production resumed on February 1, 2021.[7] Three days later, a flare at the refinery—in essence, a large smokestack intended to safely dispose of excess gas—exceeded its operating capacity and released what a refinery representative later characterized as a "mist with heavy oil in it."[8] Within hours, the refinery began receiving calls from residents of

---

[5] *See United States v. HOVENSA, LLC*, No. 11-CV-00006, Dkt. No. 6 (D.V.I. Jun. 7, 2011) (order granting motion to enter consent decree).

[6] *See In re HOVENSA, LLC*, No. 15-BK-10003, Dkt. No. 1 (Bankr. D.V.I. Sep. 15, 2015) (Chapter 11 petition).

[7] LBT Ex. 15 (Air Permitting Letter); Mar. 6 Tr. at 159-60.

[8] Pls. Ex. 21 (Clean Air Act Emergency Order, dated May 14, 2021, addressed to Terminals and Refining) at 12 (hereinafter "Emergency Order"); *see also* Pls. Ex. 20 (Notice of Violation, dated April 30, 2021, addressed to Terminals) (hereinafter "Terminals Notice of Violation"); LBT Ex. 1 (Notice of Violation, dated June 16, 2021, addressed to Refining) (hereinafter "Refining Notice of Violation"). The background that the Court provides in this introduction is principally drawn from witness testimony and the Environmental Protection Agency's ("EPA") descriptions of the 2021 events in the Emergency Order and Notices of Violation, insofar as those descriptions rely on quotes the EPA attributes to Terminals and/or Refining representatives, or third-party characterizations of the same. Although the Court accepts these EPA descriptions for purposes of these preliminary injunction proceedings— where the rules of evidence are relaxed, *see Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700,

4

St. Croix's Clifton Hill neighborhood complaining of oil droplets on their vehicles and homes, and refinery representatives later reported to the Environmental Protection Agency ("EPA") that nearly 200 residences were potentially contaminated by the event. (Hereinafter, the "first release event.")

The remainder of February and March passed without incident, but on April 19, 2021 the same flare, Flare 8, began emitting hydrogen sulfide—a colorless gas that smells like rotten eggs—over regulatory limits. Flare 8 exceeded these limits over the next week, prompting the Virgin Islands Department of Planning and Natural Resources ("DPNR") to issue a press release addressing a "foul, gaseous smell permeating throughout the Frederiksted area," and the Virgin Islands Department of Health ("DOH") to issue a release warning residents of potential health risks associated with the same.[9] (Hereinafter, the "second release event.") Similar emissions exceedances occurred the following month, on May 5 and May 7, leading the Governor of the Virgin Islands to mobilize the National Guard and Virgin Islands Territorial Emergency Management Agency ("VITEMA") after residents sought medical attention for nausea and headaches. (Hereinafter, the "third release event.")

The refinery's operations continued unabated from the first to third release events, except for a brief period in early April during which the refinery temporarily halted production to make "operational adjustments."[10] However, in what the EPA later characterized as a "flare rainout" event, on May 12, 2021, Flare 8 began spewing flames dozens of feet high, resulting in a long plume of smoke trailing off to the northwest of the refinery.[11] Refinery representatives later confirmed that this incident deposited droplets of oil

---

718-19 (3d. Cir. 2004)—they do not constitute findings of fact established by a preponderance of the evidence.

[9] Pls. Ex. 21 (Emergency Order) at 15-16.

[10] Pls. Ex. 21 (Emergency Order) at 13.

[11] Pls. Ex. 21 (Emergency Order) at 12, 24.

on residences at least as far as the Enfield Green neighborhood, and residents to the west of the refinery also reported witnessing a large "black cloud" heading toward Frederiksted, smelling noxious odours, and observing numerous specks of oil on their homes and in their cisterns.[12] (Hereinafter, the "fourth release event.") Two days later, the EPA issued an emergency order addressed to Terminals and Refining, requiring—among other things—that the refinery cease operations.[13] The refinery has not resumed production since that time.

***

The 44 plaintiffs in these four associated cases—which have been consolidated for purposes of these preliminary injunction proceedings—allege injuries stemming from the release events, principally relating to contamination of their properties and cisterns with petroleum products. Plaintiffs bring over a dozen causes of action against over a dozen defendants, including Terminals, Refining, and their investors.[14] Plaintiffs bring these claims on behalf of both themselves and other yet-to-be-identified St. Croix residents affected by the release events.[15]

Although two years have elapsed since the release events, Plaintiffs' cases remain in their very earliest stages. This is largely due to the fact that a number of companies associated with the refinery declared bankruptcy in the summer of 2021, resulting in a stay of proceedings in this Court.[16] While Plaintiffs and various debtors associated with the refinery

---

[12] *See infra*, Section III.B.2.

[13] Pls. Ex. 21 (Emergency Order) at 32-42.

[14] Refining is now a nominal defendant in the case. *See infra*, note 16.

[15] The *Boynes*, *Shirley*, and *Cotton* cases are putative class actions; the *Charles* case is not.

[16] *See In re Limetree Bay Services LLC,* No. 21-BK-32351, Dkt. No. 1454 (Bankr. S.D. Tex. May 20, 2022) (order confirming Chapter 11 plan). The six debtors in the Bankruptcy Court action were Refining; Limetree Bay Services, LLC; Limetree Bay Refining Holdings, LLC; Limetree Bay Refining Holdings II, LLC' Limetree Bay Refining Operating, LLC; and Limetree Bay Refining Marketing, LLC. Following the Bankruptcy Court's approval of the debtors' proposed Chapter 11 Plan in May 2022, the debtors were succeeded in interest by LBR Liquidating Trust, which is not a defendant in these cases.

attempted to mediate an agreement in the Bankruptcy Court, the debtors agreed to expand a pre-existing program providing free bottled water to residents during the pendency of the mediation.[17] Under the expanded program, the debtors agreed to provide free bottled water to the approximately 20,000 persons residing in the Frederiksted, Southcentral, Northcentral, and Southwest subdistricts of St. Croix, subject to limits on the amount of water individual residents could receive and a monthly cap on total expenses, among other conditions.[18] Both the expanded program and its predecessor program ended in September 2022—days after Plaintiffs terminated the Bankruptcy Court mediation—and this Court subsequently returned the four associated cases to the active trial docket.

Plaintiffs now seek a preliminary injunction ordering Terminals to: (1) "remediate [the] contaminated roofs, pipes, and cisterns" of Plaintiffs and putative class members (hereinafter, "remedial relief); and (2) "supply [] safe, clean, and potable water" to Plaintiffs and putative class members during the pendency of this litigation (hereinafter, "programmatic relief").[19] By Order dated February 2, 2023, this Court determined that the complexity of Plaintiffs' Motions warranted dividing the evidentiary hearing in this matter into two phases:

---

[17] *See* LBT Ex. 5 (Stipulation and Agreed Order Adopting Water Distribution Program, dated October 29, 2021) at 3 (hereinafter, "Agreed Order"); *see also id.* at 6 (listing other conditions subsequent).

[18] LBT Ex. 5 (Agreed Order) at 2-5. Under the expanded program, residents of these four subdistricts could pick up water not only at the Limetree Distribution Center but at Sunshine Mall and Frederiksted Ball Park as well—two locations that had not been part of the initial, non-expanded program. Although not a debtor in the Bankruptcy Court action, Terminals was involved in establishing the predecessor program and also participated in the expanded program. Terminals, like the debtors, has expressly stated that its participation in the expanded program in no way functioned as an admission of wrongdoing, nor as an admission that all or even anyone in the four subdistricts was impacted by the release events. *Id.* at 3. Plaintiffs likewise reserved rights to later argue that areas outside the four subdistricts were affected by the release events. *Id.*

[19] *Boynes*, Dkt. Nos. 141, 142; *Charles*, Dkt. Nos. 68, 68-1; *Cotton*, Dkt. Nos. 170, 171; *see also Shirley*, Dkt. No. 41 (*Shirley* Plaintiffs' Not. of Joinder in *Cotton* Plaintiffs' Am. Mot.). The *Charles* Plaintiffs also request a third form of relief—namely, that the Court appoint a special master to oversee any programmatic relief. Plaintiffs withdrew their request for a TRO at the February 1, 2023 status conference.

a first phase "entitlement" hearing, to determine whether Plaintiffs are entitled to the preliminary injunctive relief they now seek; and—provided that the Court determined that any such relief was warranted following the first phase hearing—a second phase hearing to determine the precise scope and structure of such relief and the appropriate bond.[20] The first phase hearing was held over four days from March 2-7, 2023, during which the Court received testimony from fourteen witnesses—specifically, four former or current employees of Terminals and Refining; five expert witnesses; and five residents reporting that their cisterns were contaminated by the first and fourth release events.

***

The Court has reviewed the parties' principal briefing and exhibits; the testimony and evidence presented at the first-phase hearing; and the parties' supplemental briefs, filed on April 3, 2023. For the reasons that follow, the Court finds that Plaintiffs have met their burden to establish that some, but not all, members of the group on behalf of whom they seek preliminary injunctive relief are entitled to such relief. Specifically, the Court finds that Plaintiffs have satisfied the four preliminary injunction factors with respect to those Plaintiffs and putative class members who cannot afford to purchase water without trading off other basic necessities, but that Plaintiffs have satisfied these factors with respect to this population only. The Court also finds that, while Plaintiffs have demonstrated entitlement to a preliminary injunction affording programmatic relief, they have not done so with respect to remedial relief.

Accordingly, the Court will convene a status conference on May 8, 2023, at which the Court will: (1) schedule the second phase hearing to address the precise contours of the population the Court here finds is entitled to programmatic relief and the logistics surrounding the provision of the same; and (2) set the corresponding briefing deadlines in

---

[20] *Boynes*, Dkt. No. 136; *Charles*, Dkt. No. 42; *Shirley*, Dkt. No. 79; *Cotton*, Dkt. No. 196.

consultation with the parties. The Court will deny Plaintiffs' Motions insofar as Plaintiffs seek remedial relief, and the Court will also deny Plaintiffs' Motions insofar as Plaintiffs seek programmatic relief with respect to those Plaintiffs and putative class members who can afford to purchase water without trading off basic necessities.

## II.  APPLICABLE LEGAL PRINCIPLES

Preliminary injunctions provide a mechanism through which courts may enjoin a party either to perform a particular act or to refrain from performing the same during the pendency of litigation. *United States v. Price,* 688 F.2d 204, 212 (3d Cir. 1982). To obtain a preliminary injunction, the movant must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20; *Swartzwelder v. McNeilly*, 297 F.3d 228, 234 (3d Cir. 2002). The first and second factors are "gateway factors" that the movant must establish. *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 102-103 (3d Cir. 2022). If these two gateway factors are satisfied, a court then determines whether "all four factors, taken together, balance in favor of granting the requested preliminary relief." *Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020).

Because a preliminary injunction necessarily issues before the parties have had a full opportunity to present their claims and defenses, it is an "extraordinary remedy," which may only be awarded upon a "clear showing" that the movant is entitled to preliminary relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Additionally, where, as here, a movant seeks mandatory injunctive relief,[21] the movant's burden is "particularly heavy," *Punnett v. Carter,* 621 F.2d 578, 582 (3d Cir.1980), meaning the movant must "show a

---

[21] "An injunction is mandatory if the injunction will . . . 'alter the status quo by commanding some positive act'[.]" *Coast to Coast Entm't, LLC v. Coastal Amusements, Inc.*, No. 05-CV-03977, 2005 WL 7979273, at *9 (D.N.J. Nov. 7, 2005) (quoting *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 33-34 (2d Cir. 1995)), *aff'd*, 931 F.3d 215 (3d Cir. 2019).

substantial likelihood of success on the merits and that its 'right to relief [is] indisputably clear.'" *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (alteration in original) (quoting *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013)).

### III.   DISCUSSION

#### A.   Likelihood of Success on the Merits

Plaintiffs argue that they are likely to succeed on the merits of at least four of their claims: negligence *per se*, nuisance, negligent trespass, and intentional trespass. (Mot. at 13-17). The Court must determine whether Plaintiffs "can likely meet" the elements of one or more of these claims. *Fres-co Sys. USA, Inc. v. Hawkins*, 690 F. App'x 72, 76 (3d Cir. 2017). While a "likelihood" of success "does not mean more likely than not," *Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc), "more than a mere possibility of relief is required," which means that Plaintiffs' "chance of success on the merits [must] be better than negligible." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal quotations omitted). In other words, Plaintiffs must show that they have a substantial "probability of success" on these claims, but not a "certainty" that they will ultimately prevail. *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001); *Hope*, 972 F.3d at 320.

The Court begins with Plaintiffs' negligence *per se* claims. To succeed on a claim of negligence *per se* under Virgin Islands law, a plaintiff must demonstrate that the defendant "had a duty to follow the law, failed to follow the law, and that such failure caused damages to the plaintiff as a person within the class intended to be protected by the statute or regulation." *Antilles Sch., Inc. v. Lembach*, 64 V.I. 400, 423 (2016). Plaintiffs initially argued that Terminals violated duties imposed upon it by two federal statutes—the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, and the Comprehensive Environmental Response, Compensation, and

Liability Act, 42 U.S.C. § 9601 *et seq.*—as well as duties imposed by the Virgin Islands' Air Pollution Control Act, 12 V.I.C. § 201 *et seq.*, and Water Pollution Control Act, 12 V.I.C. § 181 *et seq.* (Mot. at 13-16). The arguments and evidence presented at the first phase evidentiary hearing, however, focused primarily on the Clean Air Act, and in particular on the duties Terminals allegedly assumed as a permittee for the refinery's "Clean Air Act Title V Permit." The Court will therefore focus its analysis on the same.

Terminals does not dispute that Plaintiffs and the putative class members fall within the scope of persons Congress intended the Clean Air Act to protect. *See* 42 U.S.C. § 7401(b) (noting purpose of statute is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare," among other things). Terminals also does not dispute that the exceedances Flare 8 experienced during the release events constituted breaches of the Clean Air Act,[22] or that Plaintiffs' injuries are traceable to those violations.[23] Indeed, Terminals does not specifically contest any element of Plaintiffs' negligence *per se* claims, nor does it contest specific elements of the other three claims on which Plaintiffs rely. Instead, Terminals stresses that it "is and has always been a separate and distinct legal entity from Refining," and that it "sold the [r]efinery to Refining prior to the release events." (Resp. at 4). On these bases, Terminals argues that it does not bear responsibility for the release events and accuses Plaintiffs of exploiting Terminals' and Refining's "common ownership,

---

[22] *See* 40 C.F.R. § 63.670 (regulating flare control devices); *see also* Pls. Ex. 21 (Emergency Order) at 29-41 (detailing violations of Clean Air Act); Pls. Ex. 20 (Terminals Notice of Violation) at 16-17 (similar); LBT Ex. 1 (Refining Notice of Violation) at 17-18 (similar); Pls. Exs. 8-12 (representatives of Terminals and Refining reporting various exceedances to DPNR relating to the second, third, and fourth release events).

[23] The Court notes that Terminals has argued in passing that Plaintiffs' expert evidence does not conclusively establish a link between the refinery and any contamination reflected in the relevant samples. (Resp. at 14). The Court does not view this argument as sufficient to raise any legitimate challenge that the Clean Air Act violations were themselves not causally connected to Plaintiffs' alleged injuries. As the Third Circuit has held, "mere allusion or reference is not enough" to raise an issue and "it is not enough" for a party "to mention relevant facts without explaining how they relate to [an] argument[.]" *Seifert v. Pennsylvania Hum. Rels. Comm'n*, 301 F. App'x 194, 196-97 (3d Cir. 2008).

similar names and close proximity to each other" to "improperly lump Terminals with the now-insolvent [Refining]," which—Terminals strongly implies—is the entity that really bears responsibility for the release events.[24] *Id.* at 2, 4, 28-31.

Plaintiffs do not dispute that Terminals sold the refinery's refining grounds and equipment to Refining prior to the release events or that Terminals owned only the refinery's terminal grounds and equipment during the events. Instead, Plaintiffs argue: (1) that, in reality, Terminals and Refining did not function as separate and distinct entities; and (2) that Terminals assumed—and, as of the release events, had not relinquished—a duty to ensure that the refinery, as a whole, complied with the Clean Air Act. (Rep. at 10-13).

*** 

The Court begins with the first of Plaintiffs' arguments: that Terminals and Refining are not meaningfully distinct entities. (*See* Rep. at 14 ("The corporate separateness that [Terminals] emphasizes . . . simply does not exist.")). Much of the evidence Plaintiffs introduced at the first phase evidentiary hearing appears to have been directed to this point. This evidence establishes the following:

> ➤ That, during the startup process, Terminals and Refining employed various "shared services" and "shared facilities," including the refinery's Maintenance Department and "Health Safety and Environmental" Department ("HS&E").[25]

---

[24] While Plaintiffs initially sought preliminary injunctive relief not only from Terminals but also from Refining and the trust into which its interests were liquidated, the Bankruptcy Court has since clarified that its May 20, 2022 Order confirming Refining and the other debtors' Chapter 11 plan bars Plaintiffs from seeking relief from the latter entities at this time. *See In re Limetree Bay Services, LLC,* No. 21-BK-32351, Dkt. No. 1681-1 (Bankr. S.D. Tex. Feb. 17, 2023) (order granting liquidating trustees' emergency motion to enforce May 20, 2022 confirmation order). Plaintiffs subsequently withdrew their Motions insofar as they seek relief from Refining, the liquidating trust, and the liquidating trustee. (*See Boynes*, Dkt. No. 161; *Shirley,* Dkt. No. 54; *Charles*, Dkt. Nos. 99; *Cotton*, Dkt. Nos. 169, 223).

[25] *See* Mar. 2 Tr. at 100-102, 112-116 (Sales); Mar. 3 Tr. at 53-56 (McKowen); Mar. 6 Tr. at 140-42 (Elizee), 185-92 (Charles); Pls. Ex 101 (Chart, "Process Units By Area"); Pls. Ex. 106 (Map, "Limetree Bay Refinery Restart Project"); LBT Ex. 4 (Shared Services Agreement).

- ➢ That employees from the refinery's HS&E Department would communicate with DPNR and the EPA while making representations on behalf of both Terminals and Refining.[26]
- ➢ That Terminals employees in the Maintenance Department were part of Refining's Organization Chart and reported to Refining employees in the course of their duties.[27]
- ➢ That employees of Terminals would identify issues with, and perform maintenance on, Refining property, and vice versa.[28]
- ➢ That Terminals' equipment and property were necessary for the refinery to resume operations in the spring of 2021.[29]

Despite the emphasis Plaintiffs have placed on this evidence, it remains unclear as to what relevant conclusion follows. In their initial briefing, Plaintiffs argued that the HS&E Department was understaffed, that the Department was responsible for approving whether the refinery could restart after each release, and that the Department should not have authorized any restarting of operations. (Rep. at 13). However, Plaintiffs failed to introduced evidence sufficient to corroborate these contentions.[30] Nor have Plaintiffs explained how Terminals' liability somehow follows from the mere fact that its equipment was necessary for the refinery's restart.[31]

Plaintiffs' first argument, then, appears to reduce to the contention that the mere existence of shared facilities and services establishes that Terminals and Refining are not distinct legal entities such that the actions or omissions of one may be properly attributed to

---

[26] *See* Mar. 6 Tr. at 70-78 (Elizee); Pls. Exs. 8-12 (Limetree-DPNR Correspondence).

[27] *See* Mar. 3 Tr. at 56, 66, 72, 92-95 (McKowen); Mar. 6 Tr. at 185-92 (Charles); Pls. Ex 104 (Chart, "Shared Services Limetree Facility Maintenance").

[28] *See* Mar. 3 Tr. at 92-95 (McKowen); Mar. 6 Tr. at 185-92 (Charles).

[29] Mar. 2 Tr. at 112-16, 126 (Sales); Pls. Ex 101 (Chart, "Process Units By Area").

[30] Plaintiffs' submission—after their supplemental briefing—of a filing by Terminals in an Equal Employment Opportunity proceeding in which Terminals stated that "the Terminal Division and the Refinery Division were merged" does not add any real substance beyond what was already provided at the first phase hearing. (*See Boynes*, Dkt. No. 271-1 (Letter from Terminals to Equal Employment Opportunity Commission, dated February 2, 2021) at 4). Specifically, testimony was elicited at the hearing in the context of shared services, reflecting that the Maintenance Department included both Terminals and Refining maintenance employees.

[31] *See* Mar. 7 Tr. at 106-17.

the other. While the shared services evidence indicates that there was some degree of interconnectedness between the two companies as to those services, that evidence, standing alone, is insufficient—both legally and factually—to establish that Terminals and Refining are not distinct legal entities.

***

Plaintiffs' second argument in response to Terminals' contention that it does not bear any responsibility for the release events is that Terminals was legally obligated, as of the release events, to ensure that the refinery as a whole complied with the Clean Air Act. This argument fares significantly better.

In January 2016, Terminals entered into a purchase agreement with HOVENSA, pursuant to which Terminals acquired assets relating to the refinery, including the refinery's Title V Permit, which sets forth emissions controls and other air quality compliance requirements.[32] DPNR then transferred the Title V Permit to Terminals in May 2016.[33] As the sole permittee at this time, Terminals assumed responsibility for the entire refinery, including both its terminal and refining operations.[34] Among many other requirements, the Title V Permit provides that the permittee shall "not cause or permit the discharge from any source whatsoever such quantities of air contaminants or other material which cause injury, detriment, nuisance, annoyance to persons or to the public or which endanger the comfort, repose, health, or safety of any such persons or the public or which cause or have tendency to cause injury or damage to business or property."[35]

Catherine Elizee, a former employee of both Terminals and Refining who was responsible for ensuring that the refinery complied with the Title V Permit during the

---

[32] Pls. Ex. 5 (Title V Permit) at 4; Mar. 6 Tr. at 30-37 (Elizee).

[33] See LBT Ex. 15 (Air Permitting Letter) at 1-2 (summarizing history of Title V Permit).

[34] Mar. 6 Tr. at 25; Pls. Ex. 5 (Title V Permit) at 8-10 (Part 1, "Facility Description").

[35] See Pls. Ex. 5 (Title V Permit) at 39-51 (Part 2, "Facility Wide Requirements").

14

"startup" period, confirmed that the Title V Permit is necessary to operate the refinery and that the Permit was in effect at the time of the release events.[36] Terminals argues, however, that the Title V permit did not actually obligate Terminals with respect to the refinery's refining operations as of the release events. In support of this contention, Terminals highlights that, in July 2019, Terminals and Refining each entered into separate "operating agreements" with the Government of the Virgin Islands, and that, at this time, Refining elected to be added as a co-permittee under the Title V Permit—a request DPNR subsequently approved.[37] The two operating agreements delineate, among other things, the respective "environmental" responsibilities of Terminals and Refining, in essence making Terminals responsible for its property and equipment and Refining responsible for its property and equipment.[38] Terminals argues that the refining operation's compliance with the Title V permit became the sole responsibility of Refining at this time

Based on the evidence presently before it, the Court disagrees. In electing to become a co-permittee under the Title V Permit, it appears that Refining assumed the same obligations under the permit as Terminals—in other words, for the refinery's operations as a whole. But there is nothing to indicate that Refining's assumption of this responsibility as a co-permittee affected Terminals' obligations under the Title V Permit. Notably, Refining elected to become a co-permittee to the Title V permit, not the "sole holder" of the same—an option that its operating agreement contemplates and which seemingly would have extinguished Terminals' obligations under the permit.[39] Moreover, the operating agreements were not

---

[36] Mar. 6 Tr. at 32, 36.

[37] *See* LBT Ex. 15 (Air Permitting Letter) at 2.

[38] Mar. 6 Tr. at 144-64; LBT Ex. 2 (Amended and Restated Terminal Operating Agreement) at 47-50 (Article 13, "Covenants of Terminal Operator"); LBT Ex. 3 (Refinery Operating Agreement) at 52-55 (Article 13, "Covenants of Refinery Operator").

[39] *See* LBT Ex. 15 (Air Permitting Letter) at 2 (explaining that DPNR recognized Refining as a co-permittee to the Title V Permit under Section 14.1 of Refining's Operating Agreement); LBT Ex. 3 (Refinery Operating Agreement) at 56 (Section 14.1, providing that Refining

addended to the Title V Permit or otherwise shared with the EPA, nor did the EPA's administration of the Title V Permit appear to be affected by the operating agreements given that the EPA addressed its May 14, 2021 Emergency Order to both Refining and Terminals as respondents.[40] Indeed, the Emergency Order documents that Terminals is "responsible for [the refinery's] Clean Air Act compliance obligations, including for its Refinery Operations, in multiple air permits," including the Title V permit, which "covers the [refinery's] Refinery Operations," as well as three Prevention of Significant Deterioration ("PSD") Permits, "some or all of [which] encompass Refinery Operations."[41]

In short—and as confirmed by Jeffery Charles, Terminals' Chief Operating Officer—it appears that the Title V Permit was never amended to make Terminals responsible for "anything less than the entire facility."[42] The Court therefore finds that Plaintiffs have adequately demonstrated, for preliminary injunction purposes, that Terminals had a duty to ensure that the refinery, as a whole, complied with the Clean Air Act and the requirements imposed by the Title V Permit, and that Terminals failed to ensure the refinery complied with the same. Accordingly, the Court rejects Terminals' contention that it bears no responsibility for the release events and concludes that Plaintiffs are substantially likely to succeed on the merits of their negligence *per se* claims.

\*\*\*

While Plaintiffs are not required to demonstrate that they are substantially likely to succeed on the merits of all four of the claims that they identify, *see New Jersey Retail*

---

"may elect to be added as a co-permittee, co-holder, or sole holder of any environmental Authorization issued to [Terminals] by [DPNR] by giving Notice to the Government," provided that "any election by [Refining] to be added as a sole holder of an environmental Authorization shall be subject to the consent of [DPNR]").

[40] Pls. Ex. 21 (Emergency Order) at 31-41; Mar. 6 Tr. at 171-72 (Elizee).

[41] Pls. Ex. 21 (Emergency Order) at 3-4; *see also* Pls. Ex. 20 (Terminals Notice of Violation) at 1 (noticing Terminals for violations of Title V Permit and PSD Permits).

[42] Mar. 6 Tr. at 211 (Charles).

*Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 400 (3d Cir. 2012), the Court will briefly address Plaintiffs' three remaining claims.[43]

Pursuant to *Banks* analyses, the Superior Court of the Virgin Islands has recognized Negligent Trespass as a cause of action distinct from Intentional Trespass and has defined both causes of action as set forth in the Second Restatement of Torts. *Alleyne v. Diageo USVI, Inc.*, 63 V.I. 384, 407-18 (V.I. Super Ct. 2015). Accordingly, under Virgin Islands law, a defendant is "subject to liability to another for [intentional] trespass, irrespective of whether [the defendant] thereby causes harm to any legally protected interest of the other, if [the defendant] intentionally (a) enters land in possession of the other, or causes a thing or third person to do so, or (b) remains on the land, or (c) fails to remove from the land a thing which [the defendant] is under a duty to remove." *Id.* at 410 (quoting *Restatement (Second) of Torts* § 158). In addition, a defendant "who recklessly or negligently . . . enters land in the possession of another or causes a thing or third person so to enter is subject to liability [for negligent trespass] to the possessor if, but only if, [the defendant's] presence or the presence of the thing or the third person upon the land causes harm to the land, to the possessor, or to a thing or a third person in whose security the possessor has a legally protected interest." *Id.* at 417 (quoting *Restatement (Second) of Torts* § 165). Virgin Islands courts have also consistently applied the definition of private nuisance set forth in the Second Restatement of Torts, under which a defendant is "subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities." *Restatement (Second) of Torts* § 821D; *see Alleyne* 63 V.I. at 404-06 (adopting this rule and collecting cases).

---

[43] While the *Shirley* Plaintiffs joined the *Cotton* Plaintiffs' Motion, the *Shirley* Plaintiffs do not bring claims of negligence *per se* or trespass against Terminals.

At this stage, Plaintiffs have not provided evidence sufficient to demonstrate that Terminals' conduct was intentional, and Plaintiffs' argument that they are substantially likely to succeed on the merits of their intentional trespass claims must therefore fail. However, for the reasons discussed in the context of Plaintiffs' negligence *per se* claims above, the Court finds that Plaintiffs have provided adequate evidence for the Court to conclude that Terminals negligently caused a thing—namely, petroleum products—to enter Plaintiffs' land, and that the presence of the same caused harm to Plaintiffs and their property.[44] Accordingly, the Court concludes that Plaintiffs are also substantially likely to prevail on the merits of their private nuisance and negligent trespass claims.

### B.   Irreparable Harm

A preliminary injunction "must protect a plaintiff from the cause of irreparable harm and nothing more." *I.M. Wilson, Inc. v. Grichko*, No. 18-CV-05194, 2019 WL 5394113, at *4 (E.D. Pa. Oct. 22, 2019). Irreparable harm is "potential harm [that] cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. V. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). To satisfy this gateway factor, a movant must show a "significant risk that he or she will experience harm that cannot be adequately compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000). "This is not an easy burden." *Id.* at 485. It requires that the movant demonstrate both a "presently existing actual threat," *Holiday Inns of America, Inc. v. B & B Corporation,* 409 F.2d 614, 618 (3d Cir. 1969), and that the threatened harm is "of a peculiar nature, [such] that compensation in money cannot atone for it" after the fact. *Acierno v. New Castle Cnty.,* 40 F.3d 645, 653 (3d Cir. 1994).

Relying on the testimony of both expert and lay witnesses, Plaintiffs argue that the release events discharged petroleum and other contaminants across much of the western

---

[44] The Court elaborates on the precise nature of this harm below.

portion of the island, and that the resulting contamination of Plaintiffs' and putative class members' cisterns—coupled with the financial realties faced by this population—places them in an impossible position. As Plaintiffs frame the matter, they "must either use water that they have no reasonable basis to believe is safe [and] cope with the mental and potential physical injuries that come from doing so," or "go without the single-most essential requirement for human health and comfort." (Pls. Supp. Br. at 3-4).

Terminals makes three arguments in response. First, Terminals argues that the Third Circuit's decision in *Adams v. Freedom Forge Corporation* categorically precludes Plaintiffs from seeking preliminary injunctive relief on behalf of putative class members. (Resp. at 21-22 (citing 203 F.3d at 475)). Second, Terminals argues that Plaintiffs have failed to show *any* harm—let alone irreparable harm—because Plaintiffs' experts' sampling "fails to demonstrate any environmental or public health emergency[.]" *Id.* at 26. Third, Terminals argues that even if Plaintiffs have shown harm, they have failed to demonstrate that such harm cannot be compensated after the fact by money damages.[45] *Id.* at 20.

### 1. Whether *Adams* Precludes Plaintiffs' Requested Relief

The Court begins with the procedural question raised by Terminals: whether *Adams* necessarily limits Plaintiffs' requested relief to the 44 Plaintiffs named in these four associated cases. This question is presented because Plaintiffs' Motions arise in a somewhat unusual posture, insofar as Plaintiffs seek relief on behalf not only of themselves but on

---

[45] Terminals also argues that Plaintiffs slept on their rights by waiting some four months from the date that the pre-existing water provision program terminated to seek a preliminary injunction, and that this delay nullifies any showing of irreparable harm. (Resp. at 27-28). The Court is unpersuaded. The two cases upon which Terminals relies concern delays of more than twice the length at issue here. Moreover, Plaintiffs have represented that they were also negotiating for the resumption of the water provision program during this period—which Terminals' counsel could neither confirm nor deny—and that they were also "working to bolster their evidence and otherwise coordinate this exceedingly complex matter" at the same time. (Rep. at 18). The Court therefore finds that this four-month "delay" is immaterial. *Cf. Concerned Pastors for Soc. Action v. Khouri*, 217 F. Supp. 3d 960, 971-72 (E.D. Mich. 2016) (rejecting a similar argument where the movants took "the prudent step of requesting limited discovery to ensure the relief they sought was still needed").

behalf of putative class members as well, in advance of any motion for class certification or ruling on the same. *See Rosenfeld v. Time Inc.,* No. 17-CV-09886, 2018 WL 4177938, at *4 (S.D.N.Y. Aug. 30, 2018) ("Generally, district courts addressing preliminary injunction motions on behalf of a putative class simultaneously address a class certification motion.").

*Adams* concerned 136 plaintiffs seeking to enjoin their former employer from altering health care benefits that it had provided to the plaintiffs since they retired. 204 F.3d at 479. The district court granted a preliminary injunction requiring the former employer to continue to fund the health plans of all 136 plaintiffs. *Id.* As characterized by the Third Circuit, the question presented on appeal was "whether a district court, faced with a large group of plaintiffs whom the court determines are reasonably likely to succeed on the merits, may grant a preliminary injunction to the entire group of plaintiffs if there is evidence that some, but not all, of the plaintiffs will suffer irreparable harm." *Id.* at 479. The Third Circuit concluded that the answer to this question is no. *Id.* at 480.

The Third Circuit began by distinguishing between two types of scenarios: (1) those in which the evidence presented provides the court with an "adequate foundation" from which to infer that "all (or virtually all) members of a group" will be irreparably harmed; and (2) those in which the evidence presented provides the court only with enough information to infer that some or most members of the group—but not all or virtually all members—will be irreparably harmed. *Id.* at 487. The Third Circuit then held that, while courts may properly issue preliminary injunctions in the former scenario, they may not do so in the latter. *Id.* As the Third Circuit explained, this prohibition is nothing more or less than a recognition that harm contemplated by the second factor of the preliminary injunction analysis must not be "speculative"—a corollary of which is that "the preliminary injunction device should not be exercised unless the moving party shows that it *specifically and personally* risks irreparable harm." *Id.* at 487-88 (emphasis added); *see also Marxe v. Jackson*, 833 F.2d 1121, 1127 (3d

Cir. 1987) ("Courts have long required that a party seeking preliminary relief produce affirmative evidence indicating that he or she will be irreparably harmed should that relief be denied[.]"). The Third Circuit ultimately determined that the evidence that the *Adams* plaintiffs offered—through the testimony of eleven plaintiffs—could not justify a preliminary injunction protecting all of the *Adams* plaintiffs because the testimony of those eleven plaintiffs did not provide an adequate foundation from which to infer that "all (or virtually all)" of the *Adams* plaintiffs would suffer irreparable harm absent an injunction. *Id.* at 488.

Contrary to Terminals' contention, there is nothing in this holding that precludes Plaintiffs from seeking, or this Court from entering, a preliminary injunction affording relief to putative class members. Terminals takes critical portions of *Adams* out of context, noting that *Adams* condemned "uncritically treat[ing] a group as a collective when a would-be class has petitioned for certification," and arguing that Plaintiffs seek to be treated as precisely such a collective here. (Resp. at 21 (quoting *Adams*, 204 F.3d at 490)). But the Third Circuit simply held that the mere fact that the plaintiffs in *Adams* had petitioned for class certification did not afford them the right to be treated collectively—that is, that such a petition did not exempt the plaintiffs from the general rule that plaintiffs must demonstrate individualized harm. The Third Circuit did not hold that any and all putative class members are necessarily part of some improper collective, as Terminals argues.

Were there any residual doubt, the Supreme Court has itself acknowledged the propriety of preliminary injunctions affording relief to members of a putative class in advance of class certification, as have sister circuits. *See Elrod v. Burns,* 427 U.S. 347, 348, 373-74 (1976) (observing that the Court of Appeals "might properly have held that the District Court abused its discretion in denying preliminary injunctive relief" to putative class members "who allege that they were discharged or threatened with discharge solely because of their partisan political affiliation"); *LaForest v. Former Clean Air Holding Co.*, 376 F.3d

48, 56 (2d Cir. 2004) (discussing *Adams* in depth and holding that the district court did not abuse its discretion "in concluding that the then-putative class suffered irreparable harm warranting a preliminary injunction."); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) ("An injunction may extend benefit or protection to nonparties if such breadth is necessary to give prevailing parties the relief to which they are entitled." (quotation marks omitted)). District courts in the Third Circuit have also entered preliminary injunctions affording relief to putative class members post-*Adams*. *See, e.g., Augustin v. City of Philadelphia*, 897 F.3d 142, 147 (3d Cir. 2018) (noting that the district court "entered a preliminary injunction barring the City from filing new liens or collecting on old ones against members of the putative class"); *Gilliam v. United States Dep't of Agric.*, 486 F. Supp. 3d 856, 881 (E.D. Pa. 2020) (entering preliminary injunction enjoining the United States Department of Agriculture from denying certain emergency allotments with respect to "all persons living in Pennsylvania who are, were or will be eligible for SNAP benefits during the period for which Congress has authorized the issuance of emergency allotments during the COVID-19 emergency and who were not provided an emergency allotment").

In short, *Adams* does not preclude Plaintiffs from seeking relief on behalf of putative class members. Instead, *Adams* presents the question here as to whether Plaintiffs have provided an adequate basis from which this Court can infer that the putative class members (and Plaintiffs themselves) "specifically and personally" risk irreparable harm absent an injunction. *Id.* at 487-88. This is necessarily a fact bound inquiry. *See id.* at 490-91 (observing that irreparable harm "depends in many cases on . . . the particular resources available to each member of the class to weather hardships pending a trial"); *see also Groupe SEB USA, Inc. v. Euro-Pro Operating, LLC*, 774 F.3d 192, 205 (3d Cir. 2014) (noting that courts "considering whether to grant injunctive relief must exercise their equitable discretion in a case-by-case, fact specific manner," and that a "critical aspect" of courts' fact-finding is

"drawing reasonable inferences from facts in the record."). The Court will therefore return to this question after addressing the parties' evidence.

### 2. Whether Plaintiffs Have Shown Harm

The Court begins with the expert evidence. Plaintiffs called three expert witnesses: Dr. Erno Sajo, who performed air modelling to map the areas likely impacted by each of the four release events;[46]  Dr. Marco Kaltofen, who led a small team that conducted sampling of various properties thought to be impacted by the release events;[47] and Dr. Michael Henry, who assisted Dr. Kaltofen with the sampling.[48] In total, it appears that Dr. Kaltofen and his team collected and tested 82 samples from July to November 2021.[49] Of these 82 samples, 23[50] were "water samples" taken from cisterns; 41[51] were "soil samples" taken from various

---

[46] The Court accepted Dr. Sajo as an expert in "aerosol dispersion air modelling" for purposes of these preliminary injunction proceedings only. (Mar. 3 Tr. at 154).

[47] The Court accepted Dr. Kaltofen as an expert in "environmental science," "environmental engineering," and the "fate and transport of petroleum and chemical releases" for purposes of these preliminary injunction proceedings only. (Mar. 2 Tr. at 154).

[48] The Court accepted Dr. Henry as an expert in "physical science and inspections" for purposes of these preliminary injunction proceedings only. (Mar. 3 Tr. at 139).

[49] The parties have reached slightly different totals. After parsing through the sampling records—which are somewhat disorganized—the Court reaches its total of 82 samples as follows: Dr. Kaltofen's "summary sheet" (Pls. Ex. 80) lists 84 samples and reflects that 80 of these 84 samples were tested. (The four untested samples are "STX 006D" (Pls. Ex 80, Row 6), "STX 009S" (Row 9), "STX 013S" (Row 13), and "STX 2021-32S" (Row 84)). Plaintiffs have provided the underlying lab reports (Pls. Ex. 69-77) for all but one of these samples— "STX-005S" (Pls. Ex. 80, Row 5)—and the Court disregards this sample. In addition, the lab reports reflect that three additional samples—which do not appear on the summary sheet— were also tested, for a total of 82 samples that the Court considers here. (The three additional samples are "STX-2021-01-SWB1" (Pls. Ex. 73 at 5), "STX-2021-01-SWB2" (Pls. Ex 73 at 6), and "STX-2021-21 W1" (Pls. Ex 74 at 5)).

[50] This consists of the 22 water samples listed in the summary sheet (Pls. Ex. 80), plus one additional water sample, "STX-2021-21 W1," which is not listed in the summary sheet but appears in the lab reports (Pls. Ex. 74 at 5).

[51] This consists of all 42 soil samples listed in the summary sheet (Pls. Ex. 80), except soil sample "STX-005S" (Row 5), which the Court disregards because no underlying lab report was provided.

locations; and eighteen[52] were "swab samples," with the swabs taken principally from cistern interiors. A brief summary of the results of this sampling is as follows.

### Water Samples

Dr. Kaltofen and his team had a laboratory test the vast majority of the 23 water samples for two types of substances: total petroleum hydrocarbons with a carbon range of ten to 28 atoms, which are called diesel range organics ("TPH-DRO"); and total petroleum hydrocarbons with a carbon range of 28 to 40 atoms, which are called oil range organics ("TPH-ORO"). The equipment that the laboratory used to test the water samples for TPH-DRO and TPH-ORO content had a lower limit of 0.1 parts-per-million ("ppm"), meaning that any TPH-DRO or TPH-ORO below this level would not be detected. One of the 23 water samples detected TPH-DRO of a sufficient quantity to exceed this "non-detect" threshold (at 0.66 ppm), and two samples detected TPH-ORO of a sufficient quantity to exceed the non-detect threshold (at 0.14 ppm and 0.19 ppm).[53] The three positive water samples are from the Frederiksted (Hesselberg), Mount Pleasant, and Williams Delight neighborhoods, which Dr. Sajo's air modelling identifies as areas likely impacted by the release events.[54]

### Soil Samples

Of the 41 soil samples, five were what Dr. Kaltofen has referred to as "background" samples, and 36 were what the Court will call "illustrative" samples. As with the water samples, Dr. Kaltofen and his team also had the laboratory test the 36 illustrative soil samples for TPH-DRO and TPH-ORO content. The lower limit of this sampling generally varied

---

[52] This consists of all sixteen swab samples listed in the summary sheet (Pls. Ex. 80), plus two additional swab samples, "STX-2021-01-SWB1" and "STX-2021-01-SWB2," which are not listed in the summary sheet but appear in the lab reports (Pls. Ex. 73 at 5-6).

[53] "STX 2021 02 W1" (Pls. Ex. 80, Row 18) (0.66 ppm TPH-DRO); "STX-003W" (Pls. Ex. 80, Row 3) (0.19 ppm TPH-ORO); and "STX-010W" (Pls. Ex. 80, Row 10) (0.14 ppm TPH-ORO).

[54] Pls. Ex. 57 (figure illustrating Dr. Sajo's estimate for area impacted by first release event); Pls. Ex. 60 (same, for fourth release event); Pls. Ex. 61 (same, for all four release events).

between approximately 10-15 ppm. Seventeen of the 36 illustrative samples detected TPH-DRO of a sufficient quantity to exceed the non-detect threshold, and the average amount of TPH-DRO detected across these seventeen samples was approximately 25 ppm, with amounts ranging as low as 12 ppm and as high as 53 ppm. 35 of the 36 illustrative samples detected TPH-ORO of a sufficient quantity to exceed the non-detect threshold, and the average amount of TPH-ORO detected across these 35 samples was approximately 86 ppm, with amounts ranging as low as 21 ppm and as high as 260 ppm.

### Swab Samples

Dr. Kaltofen and his team tested the eighteen swab samples for TPH-DRO and TPH-ORO content. Unlike the water and soil samples, the swab samples could not accurately render an analog result measured in parts-per-million, but rather indicate only whether TPH-DRO and/or TPH-ORO are present or not. One of the swab samples detected both TPH-DRO and TPH-ORO;[55] two of the swab samples detected TPH-DRO only;[56] and two of the swab samples detected TPH-ORO only.[57] The five positive samples are from the Frederiksted (Smithfield), Good Hope, Mount Pleasant, Whim, and Williams Delight neighborhoods, which Dr. Sajo's air modelling identifies as areas likely impacted by the release events.[58]

*** 

In addition to the aforementioned expert evidence, Plaintiffs also called five residents who testified that their cisterns have been contaminated since the release events. All five testified that they and their families cannot afford to have their cisterns or roofs—which

---

[55] "STX-2021-17SW" (Pls. Ex. 80, Row 52).

[56] "STX-2021-22SW" (Pls. Ex. 80, Row 62) and "STX-2021-30SW1" (Row 77).

[57] "STX-2021-25SW" (Pls. Ex. 80, Row 67) and "STX-2021-28SW" (Row 73).

[58] Pls. Ex. 57; Pls. Ex. 60; Pls. Ex. 61.

function as the water catchment systems for the cisterns—cleaned.[59] A brief summary of the testimony of each follows.

### JoAnne Allen-Murphy

Ms. Allen-Murphy and her husband live in a housing complex in the Good Hope neighborhood.[60] The complex contains 90 units and houses approximately 85 people, many of whom are senior citizens, struggle financially, and receive government assistance.[61] Ms. Allen-Murphy testified that in the aftermath of the release events, the roofs of the complex had "oily specks all over them;" that she found oil specks on cars in the area; and that the toilets and water filters in her units were covered in an "oily dark substance" that "continued to accumulate" for a significant period of time.[62] Asked about the condition of the complex's two large cisterns, Ms. Allen-Murphy responded that, following the release events, she found a "very large amount" of "oily specks, dark specks" in the water, which changed its color to "very dark . . . grayish dirty color," and that the water was "shiny" and "dirty."[63] She represented that she and the complex's other residents have increasingly added more and more clean water to the cisterns in an attempt to dilute the oil, which has improved matters "significantly."[64] However, the water is still not "a hundred percent clear," with the most recent test indicating that the water is not recommended to drink.[65]

Ms. Allen-Murphy testified that she used her cistern water for cooking, bathing, brushing her teeth, and other ordinary household uses prior to the release events, but that she

---

[59] Mar. 2 Tr. at 77 (Allen-Murphy), 303 (Urgent), 314 (Webster); Mar. 3 Tr. at 101 (Carino), 128 (Thompson).

[60] Mar. 2 Tr. at 36 (Allen Murphy).

[61] Mar. 2 Tr. at 37-39, 50-52, 79-80 (Allen-Murphy); *see also id.* at 39 (explaining that the complex housed approximately 150 people at the time of the release events).

[62] Mar. 2 Tr. at 41-43, 66 (Allen-Murphy).

[63] Mar. 2 Tr. at 41, 46-48, 66 (Allen-Murphy).

[64] Mar. 2 Tr. at 47-49, 74-76 (Allen-Murphy).

[65] Mar. 2 Tr. at 74-76 (Allen-Murphy).

and "most people" at the complex purchased bottled drinking water before the release events.[66] She explained that she no longer "trust[s]" the cistern water and now purchases additional water to cook, brush her teeth, and bathe her husband, who is disabled and suffered an adverse reaction after bathing in the post-release cistern water, but that she personally uses the post-release cistern water to bathe and for other household uses.[67] She stressed, however, that her neighbors' financial circumstances are such that many of them "have no choice" but to use the cistern water for cooking and bathing, among other things.[68]

### Carloyn Urgent

Ms. Urgent lives with her son and elderly parents in a three-bedroom home in the Whim neighborhood.[69] Following the release events, she noticed oil on the walls and windows of her home and that the water coming from her faucet was "oily."[70] She testified that two refinery representatives visited her home shortly after the events, and that the representatives confirmed the presence of oil on her walls and roof and offered her mother $4,600 to remediate the property if she signed a release.[71]

Asked how the release events had impacted her family, Ms. Urgent explained that, as a result of the contamination, she and her family began purchasing water through the Virgin Islands Water and Power Authority ("WAPA") for approximately $125.00 per month to use in place of their cistern water, but that they eventually stopped using WAPA water for two reasons.[72] First, the WAPA water cannot be used for drinking or many household purposes like cooking, brushing teeth, or doing laundry because it is "rusty and red [and] dirty," which

---

[66] Mar. 2 Tr. at 78-79 (Allen-Murphy).

[67] Mar. 2 Tr. at 37, 50-53, 77-79 (Allen-Murphy).

[68] Mar. 2 Tr. at 51-52 (Allen-Murphy).

[69] Mar. 2 Tr. at 295 (Urgent).

[70] Mar. 2 Tr. at 296 (Urgent).

[71] Mar. 2 Tr. at 297-98 (Urgent).

[72] Mar. 2 Tr. at 299 (Urgent).

meant that her family had to purchase significant amounts of additional bottled water in addition to their WAPA bill.[73] Second, the expense of the WAPA water—combined with the cost of purchasing additional bottled water and having to use a laundromat—placed significant financial stress on her family, interfering with their ability to pay the bills and pay for a caretaker for her elderly father, who has dementia.[74] Ms. Urgent testified that she now visits a friend's house to bathe, but purchases bottled water for her family to bathe because of her parents' limited mobility.[75] She estimated that her family currently purchases twenty single gallon bottles of water per day, and explained that these circumstances mean that there is a "great pain in our family right now."[76]

### Marisela Webster

Ms. Webster lives in a home in the Williams Delight neighborhood with her husband and two young children.[77] She testified that, following the release events, her property smells like "old gasoline and old oil . . . every so often;" that the water that comes from her faucet contains oil; and that whenever her family looks at their cisterns, they "always see like a gray [glaze] over the water," which she attributes to "oil or gas."[78] She also testified that two refinery representatives came to her home shortly after the fourth release event and confirmed the presence of oil on the walls of her home, and that the representatives offered her $4,000 to clean her cisterns and roof.[79] She explained that, prior to the release events, she and her family used their cistern water for drinking, cooking, bathing, washing, gardening, and other

---

[73] Mar. 2 Tr. at 299-301 (Urgent).

[74] Mar. 2 Tr. at 299-302 (Urgent).

[75] Mar. 2 Tr. at 301-02, 306 (Urgent).

[76] Mar. 2 Tr. at 303, 306 (Urgent).

[77] Mar. 2 Tr. at 307, 315, 327 (Webster).

[78] Mar. 2 Tr. at 311-13 (Webster).

[79] Mar. 2 Tr. at 309-11, 324-25 (Webster).

household uses, but that they no longer feel safe using the water for anything.[80] Her family now purchases bottled water for cooking and drinking, but they continue to use the cistern water for at least some other purposes because they have "no choice."[81] They also purchase WAPA water.[82] She testified that her family does not feel "safe," and that they cannot afford to have their cistern cleaned because she and her husband live paycheck to paycheck and have bills to pay.[83]

### Julio Carino

Mr. Carino lives in a home in the Estate Whim neighborhood and his mother lives next door.[84] Following the release events, he noticed oil spots on windows and walls of their homes and that his neighbors experienced the same issues; as he characterized it, "oil was everywhere."[85] He described experiencing chest pains, difficulty breathing, and flu-like symptoms in the immediate aftermath of the release events, which a doctor attributed to "chemical exposure."[86] Like Ms. Urgent and Ms. Webster, he testified that two refinery representatives came to his home shortly after the fourth release event and confirmed the presence of oil on both his and his mother's properties, ultimately offering him $14,000 to remediate both properties.[87] He explained that, since the release events, he and his mother "don't use the cistern water at all;" that they purchase drinking water; and that they collect rainwater to use for washing the dishes, bathing, and other household uses.[88]

---

[80] Mar. 2 Tr. at 308-09 (Webster).

[81] Mar. 2 Tr. at 316, 321-23 (Webster).

[82] Mar. 2 Tr. at 314 (Webster).

[83] Mar. 2 Tr. at 314-15 (Webster).

[84] Mar. 3 Tr. at 97-98 (Carino).

[85] Mar. 3 Tr. at 98 (Carino).

[86] Mar. 3 Tr. at 98, 103-04 (Carino).

[87] Mar. 3 Tr. at 99-100 (Carino).

[88] Mar. 3 Tr. at 102 (Carino).

**Margaret Thompson**

Ms. Thompson lives in the Frederiksted (Smithfield) neighborhood of St. Croix.[89] She testified that, following the release events, she noticed a lot of little black spots on the walls and windows of her home, and that she saw oil in water she drew from her cistern.[90] She also testified that two refinery representatives came to her home shortly after the fourth release event and confirmed the presence of oil on the walls of her home, and that the representatives offered her $4,500 to remediate her property.[91] Prior to the release events, Ms. Thompson purchased water for drinking and cooking, but did "everything" else with cistern water, including bathing, brushing her teeth, and washing clothes and dishes.[92] She reported that she got "sick" and had a "rash" on her skin after using the "filthy" water to bathe, and that she now buys water for all her household uses.[93] She uses her social security benefits to pay for this water, and she cannot pay to have her cistern cleaned because she does not have "any money."[94]

\*\*\*

The parties vigorously contest what follows from the evidence described above. Plaintiffs argue that "Dr. Sajo's zone of impact establishes that the contaminants at issue were dispersed across multiple communities on the western side of St. Croix," and that "the Court can reasonably infer that *every* [resident] in this zone of impact risks irreparable harm caused by [Terminals'] contamination" based on Dr. Kaltofen's sampling and the testimony of the five resident witnesses. (Pls. Supp. at 20 (emphasis in original)). Conversely,

---

[89] Mar. 3 Tr. at 118-19 (Thompson).

[90] Mar. 3 Tr. at 121-22 (Thompson).

[91] Mar. 3 Tr. at 122-25 (Thompson).

[92] Mar. 3 Tr. at 120-21 (Thompson).

[93] Mar. 3 Tr. at 129-30 (Thompson).

[94] Mar. 3 Tr. at 128-30 (Thompson).

Terminals argues: (1) that Plaintiffs have not shown contamination; (2) that, even if Plaintiffs have shown contamination at the time Dr. Kaltofen and his team conducted sampling, they have not shown there is a *present* threat; and (3) that even if Plaintiffs have shown present contamination, they have not shown that the same rises to unsafe levels. (LBT Supp. Br. at 2-4).

### Whether Plaintiffs Have Shown Contamination

Terminals argues that Plaintiffs' evidence does not establish contamination. The Court concludes that, while there are certainly some deficiencies in the expert evidence and/or its presentation, Plaintiffs' evidence as a whole is indicative of contamination.

Some of the deficiencies are particularly evident in the water and soil samples. The water sampling returned very few results that exceeded the "non-detect" threshold. Further, while, by the numbers, the soil samples appear indicative of contamination, Dr. Kaltofen was unable to satisfactorily explain the relationship between the background samples and the illustrative samples or how the differences between the two sets of samples indicated contamination. In particular, Dr. Kaltofen did not consistently explain whether the soil sampling data should be understood to reflect contamination only where the illustrative samples exceeded the TPH content in the background samples, or whether the data should be understood to reflect contamination even where the TPH content in the illustrative samples was less than the TPH content in the background samples.[95]

The Court finds the swab samples to be indicative of contamination, particularly in light of the fact that Dr. Henry testified that he and the other members of Dr. Kaltofen's team did not specifically sample or swab cisterns with a visible sheen or properties that they

---

[95] *See* Mar. 2 Tr. at 186-89, 261-63 (Kaltofen) (explaining that Dr. Kaltofen's team purposefully took background samples from locations they believed would reflect high levels of petroleum hydrocarbons related to transportation).

believed to be contaminated.[96] The Court also finds that the testimony of the resident witnesses corroborated contamination. Ms. Allen-Murphy testified that she has observed specks of oil on her roof, on cars, and "all over" her toilet and water filters, as well as in her cistern.[97] Ms. Urgent testified that she has observed oil on the walls, windows, and roof of her property, as well as coming out of her faucet.[98] Ms. Webster testified that she recurrently smells oil on her property and that she has also observed oil coming from her faucet, as well as a "glaze" over the water in her cistern, "[l]ike a shadow was on the top."[99] Mr. Carino testified that he has observed oil "everywhere," including on his walls and windows of his house, on his mother's house, and on his neighbors' properties, as well as on plants and vehicles in the neighborhood.[100] Ms. Thompson testified that she has observed oil and "black spots" on her walls, windows, and roof, as well as in the water in her cistern and coming from her faucet.[101] In addition to the resident witnesses' personal observations, Terminals and Refining also issued multiple press releases noting that a number of neighborhoods were contaminated by the release events.[102]

In view of the foregoing, the Court finds that the totality of the evidence is indicative of contamination, and rejects Terminals' argument to the contrary.

---

[96] Mar. 3 Tr. at 201 (Henry) ("[W]e swabbed every cistern whether or not we saw any . . . visual signs of potential oil deposits"); *see also id.* at 146-47 (explaining that samples were taken from properties both to the west and east of the refinery).

[97] Mar. 2 Tr. at 40-46, 48, 66-69, 72, 92-93 (Allen-Murphy).

[98] Mar. 2 Tr. at 296-98, 303 (Urgent).

[99] Mar. 2 Tr. at 309-13, 317 (Webster).

[100] Mar. 3 Tr. at 98-99, 111-15 (Carino).

[101] Mar. 3 Tr. at 121-24, 129-33 (Thompson).

[102] Pls. Ex. 115 (Press Release, "Limetree Bay Responding to Flare Incident," dated May 12, 2021); Pls. Ex. 116 (Press Release, "Limetree Bay Response to Flare Incident," dated March 2, 2021).

## Whether Plaintiffs Have Shown *Present* Contamination

Relying principally on the testimony of Dr. Erin Murray,[103] Terminals argues that even if Dr. Kaltofen's samples provide evidence of contamination, the samples are "not reflective of the present-day circumstances" because the chemical composites of petroleum tend to degrade over time. (LBT Supp. Br. at 15). Dr. Murray testified that she would expect "concentration from any petroleum that might have been in the environment in the middle of 2021 to dissipate," such that she would expect "current environmental conditions to contain less petroleum" and the "concentrations to be lower today."[104] Her testimony aligns with Dr. Kaltofen's, insofar as Dr. Kaltofen noted that "the petroleum hydrocarbons that are present [today] are unlikely to be at exactly the same concentration" as they were at the time of sampling, such that if he and his team were to perform the sampling again today they would "probably get a different result."[105]

Contrary to Terminals' suggestion, the Court does not view this testimony as undermining Plaintiffs' case. While both Dr. Murray and Dr. Kaltofen testified that they would expect less petroleum to be present in cisterns today, both experts also testified that various chemical compounds emitted by the release events tend to persist over time. Acknowledging that the fourth release event emitted "pitch oil," Dr. Murray explained that pitch oil is a "heavier fraction of oil . . . relative to something like gasoline" that is "harder to break down" and persists longer in the environment.[106] Dr. Kaltofen likewise explained that while some of the chemical compounds emitted by the release events "will slowly dissipate

---

[103] The Court accepted Dr. Murray as an expert in "environmental chemistry," "environmental forensics," and the "fate and transport of contaminants" for purposes of these preliminary injunction proceedings only. (Mar. 7 Tr. at 14). Terminals withdrew its request to proffer Dr. Murray as an expert in "public health and safety." *Id.* at 56.

[104] Mar. 7 Tr. at 54 (Murray).

[105] March 2, 2023 Tr. at 287-88 (Kaltofen).

[106] Mar. 7 Tr. at 68 (Murray).

and degrade," there "are [also] other compounds that are extremely long lasting that are present for decades," which "degrade very, very slowly" because they tend to be "absorbed by and interact with" the porous concrete walls of cisterns and the "normal biological materials that you might find in a cistern."[107] The testimony of the resident witnesses also corroborates Dr. Kaltofen's observation that it is "not in the nature of the chemical[s] involved" for them to disappear completely absent cleaning.[108] For example, Ms. Allen-Murphy testified that, while cistern water at her complex has improved over the last two years as clean water has been added, it is still "not a hundred percent clear."[109] And Ms. Webster testified she "always see[s] . . . a gray [glaze] over the water" in her cistern and that the "oil is still there."[110]

In view of the foregoing, the Court finds that Terminals has failed to dispel the notion that there is present contamination, and Terminals' argument to that effect is rejected.

### Whether Plaintiffs Have Shown Contamination Poses Health Risks

Terminals argues that the Court "can and should apply regulatory health screening levels in assessing whether any of the samples with positive detects for possible petroleum creates a human health risk requiring injunctive relief," and that Plaintiffs have not demonstrated that contamination levels exceed these thresholds. (LBT Supp Br. at 14-16). Terminals' argument is based principally on the testimony of Dr. Charles Menzie.[111] Dr. Menzie testified that the relevant regulatory thresholds for the Virgin Islands are 5 ppm for

---

[107] Mar. 2 Tr. at 214-15 (Kaltofen).

[108] Mar. 2 Tr. at 214-15 (Kaltofen).

[109] Mar. 2 Tr. at 47-49, 74-76 (Allen-Murphy).

[110] Mar. 2 Tr. at 311-13, 317 (Webster).

[111] The Court accepted Dr. Menzie as an expert in "risk analysis," "causal analysis," and "human health and ecological risk assessment" for purposes of these preliminary injunction proceedings only. (Mar. 6 Tr. at 284).

total TPH in water and 460 ppm for TPH-DRO in soil.[112] Dr. Murray's declaration also specifies these same thresholds.[113]

Dr. Menzie and Dr. Murray are correct that none of Dr. Kaltofen's samples exceed either of these two thresholds. However, three principal considerations lead the Court to reject Terminals' argument.

First, neither Dr. Menzie nor Dr. Murray have satisfactorily explained how or from where these safety thresholds were derived, and Terminals has not adequately corroborated the screening thresholds upon which its two experts relied. Following Dr. Menzie's testimony, the Court requested that Terminals provide sources for these thresholds given the emphasis that both Dr. Menzie and Terminals had placed on them.[114] In response, Terminals provided documentation purporting to corroborate the 460 ppm threshold for TPH-DRO in soil, but did not provide any documentation or citation for the 5 ppm threshold for TPH in water, nor an explanation of how that number was derived.[115] Further, the documentation that Terminals provided with respect to the soil threshold, and upon which Dr. Menzie and Dr. Murray relied, consists of two documents published by the Virgin Islands Government in 2014 titled "Underground Storage Tanks," and "Underground Storage Tank Closure Guidance Document."[116] These two documents set standards applicable to the containment and remediation of industrial petroleum storage.

Neither Terminals nor its experts have offered any reason to suggest that the threshold for underground storage tanks upon which Terminals' experts relied is applicable to

---

[112] Mar. 6 Tr. at 297-30 (Menzie). Dr. Menzie represented that the Virgin Islands does not have a relevant threshold for TPH-ORO in soil. *Id.*

[113] *Boynes*, Dkt. No. 168-5 (Murray Dec.) at 7, 9. While Dr. Murray referenced these thresholds in her declaration and testimony, she testified that Dr. Menzie "provided" them. (Mar. 7 Tr. at 22 (Murray)).

[114] Mar. 6 Tr. at 332.

[115] Mar. 7 Tr. at 84.

[116] LBT Ex. 20 at 27; LBT Ex. 21 at 113-120.

residential properties. The Court agrees with Plaintiffs that "the pathways of exposure to humans and the level of migration of the contaminants [in the two contexts] are entirely different." (Pls. Supp. Br. at 331). The Court therefore assigns this threshold no weight. The seemingly inapplicable threshold proffered by Terminals for TPH-DRO in soil renders the Court even less willing to assign any weight to the wholly uncorroborated threshold that its two experts cite for TPH content in water.[117]

Second, the testimony of the resident witnesses leads the Court to reject the notion that there are no health effects associated with the presence of petroleum in residents' cisterns. Ms. Thompson testified that after bathing in her post-release cistern water she experienced a rash on her skin, and Ms. Allen-Murphy likewise testified that she is forced to purchase water to bathe her husband because he had an adverse reaction to the post-release cistern water.[118] Another resident witness also reported health issues associated with the release events that were attributed to the presence of petroleum products in the air. Mr. Carino testified that, in the days following the fourth release event, he sought medical attention after experiencing difficulty breathing, a sore throat and chest, and other "flu symptom[s]," which his doctor attributed to "chemical exposure."[119]

Third, while the Court does not necessarily agree with Plaintiffs that any amount of contamination is inherently hazardous and detrimental to human health simply because the

---

[117] The Court also rejects Terminals attempts to conflate the purported threshold levels offered by its experts with the EPA's Maximum Contaminant Level Goals and Maximum Contaminant Levels, which the EPA defines as "the level of a contaminant in drinking water below which there is no known or expected risk to health," and "the highest level of a contaminant that is allowed in drinking water," respectively. (LBT Supp. Br. at 17; LBT Ex. 18 at 15-17 (excerpting the EPA's National Primary Drinking Water Regulations ("NPDWR"), a link to which is found in Pls. Ex. 122); *see also* 40 C.F.R. § 141.61 (setting forth "maximum contaminant levels for organic compounds")). Neither the NPDWR nor the relevant regulations appear to directly address TPH, TPH-DRO, or TPH-ORO.

[118] Mar. 3 Tr. at 130 (Thompson); Mar. 2 Tr. at 37, 51-53 (Allen-Murphy).

[119] Mar. 3 Tr. at 103-04 (Carino); *see also* Pls. Ex. 21 (Emergency Order) at 18-20 (noting that residents sought medical attention following the third release event).

substances contained therein are carcinogenic, the Court does not believe that the level of scientific certainty that Terminals demands is appropriate, at least at this stage of the litigation. *See Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 613-14 (D.C. Cir. 1980) (finding children were likely to suffer irreparable harm in the absence of an injunction enjoining the Department of Labor from implementing rules that would permit children to work with certain "pesticides and chemicals" during "short season agricultural harvesting" because the substances were "highly toxic," notwithstanding that "current scientific information" was insufficient to establish safety standards and it was unclear whether exposure would harm children); *AquAlliance v. United States Bureau of Reclaimation*, No. 21-CV-01533, 2021 WL 4168534, at *2 (E.D. Cal. Sept. 14, 2021) ("The court does not expect plaintiffs to be able to predict with scientific exactitude the harm which will result if defendants are not enjoined."). Plaintiffs are correct to highlight that "absent proper clean-up, [Plaintiffs and putative class members] have no reason to believe that their cistern water is safe to use for drinking or any other household purposes," and—in effect— that this population must therefore purchase water regardless of whether or not the contamination conclusively rises to unsafe levels. (Pls. Supp. Br. at 3, 5, 22). In this regard, the Court finds the Supreme Court's decision in *Friends of the Earth v. Laidlaw Environmental Services* instructive, notwithstanding that it arises in a slightly different context than that presented here. 528 U.S. 167 (2000).

In *Friends of the Earth*, the defendant—Laidlaw—established a wastewater treatment plant on the banks of the North Tyger River in South Carolina, and the state government authorized Laidlaw to discharge water containing certain pollutants into the river provided that the discharges met certain criteria, including that the discharged water did not contain more than trace amounts of mercury. *Id.* at 167. Evidence emerged that Laidlaw had repeatedly exceeded the mercury discharge limit, and various environmental organizations

representing members residing near the river brought suit seeking to enjoin further excess discharges. *Id.* The question before the Supreme Court was whether the plaintiff organizations had established that they and their members had suffered an "injury in fact" such as to confer standing to bring suit.[120] *Id.* Laidlaw argued that the plaintiff organizations had failed to demonstrate such an injury, highlighting that the district court had expressly found that there was "no demonstrated harm to the environment." *Id.* at 184-85. The plaintiff organizations, on the other hand, argued that it was their members' "reasonable concerns about the effects of [the] discharges" that "directly affected [their] recreational, aesthetic, and economic interests" and established injury. *Id.* at 198.

The Supreme Court began its analysis by looking to the affidavits of six residents of the area, each of whom attested that they had used the river for various recreational activities in the past, and that they no longer used the river because they were concerned that the water was polluted by Laidlaw's discharges and the potential harmful effects of that pollution. *Id.* at 181-84. The Supreme Court then concluded that these affiants' "conditional statements" (to the effect that they would use the river for recreation "if Laidlaw were not discharging pollutants into it") were sufficient to establish the harm required to show injury in fact. *Id.* at 185. In reaching this conclusion, the Supreme Court stressed that at issue was the "reasonableness of [the] fear" that led the residents to respond to Laidlaw's demonstrated discharges "by refraining from use of the North Tyger River and surrounding areas." *Id.* at 184 (alterations in original). The Supreme Court ultimately concluded that it was "entirely reasonable" that "a company's continuous and pervasive illegal discharges of pollutants into

---

[120] To show injury in fact, a plaintiff must show "a harm suffered by the plaintiff that is 'concrete' and 'actual or imminent, not conjectural or hypothetical.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 149 (1990) (additional quotation marks omitted)).

a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms."[121] *Id.* at 184-85.

The evidence before the Court leaves the Court with no doubt that it is reasonable for those in the impacted communities to purchase water instead of relying on their cistern water as they had done before the release events. This evidence includes:

➢ That the refinery issued press releases in the aftermath of the release events warning affected residents not to consume their cistern water.[122]

➢ That a local paper advised residents whose cisterns were impacted by the release events not to consume their cistern water.[123]

➢ That multiple government agencies—including DPNR, DOH, VITEMA, and the Virgin Islands Department of Education—issued numerous press releases warning residents of potential health effects associated with the release events; reporting that members of the community had sought medical attention due to the release events; and advising residents with pre-existing health conditions to consider "protective actions, including staying indoors or relocating to less affected areas of the island."[124]

---

[121] *Maine People's Alliance and National Resources Defense Council v. Mallinckrodt* presents circumstances similar to those that arose in *Friends of the Earth*. 471 F.3d 277 (1st Cir. 2006). In *Mallinckrodt*, various environmental organizations brought suit against the defendant—Mallinckrodt, a chemicals company—seeking to enjoin the company to fund a scientific study to determine the "nature and extent of the endangerment" created by the company's discharge of "mercury-laden waste" into Maine's Penobscot River. *Id.* at 276. As in *Friends of the Earth*, the question before the Court was whether the plaintiff organizations had established injury in fact, particularly since one of the organizations' "principal experts" had opined that, while "there might be a serious endangerment to both human health and the environment resulting from mercury contamination," he had not yet "done the right research" to determine as much. *Id.* at 281. The First Circuit noted that "neither a bald assertion of [] harm nor a purely subjective fear that an environmental hazard may have been created is enough to ground standing"—that is, to establish injury in fact—and further noted that Plaintiffs' expert had admitted he was ultimately uncertain "if there is a problem" or "what the problem is." *Id.* at 283-84; *see also id.* at 284 (noting that "concern about pollution will constitute a cognizable injury only when the concern is premised upon a realistic threat."). However, notwithstanding that Plaintiff's expert could not establish the extent of any contamination or the level of any threat posed by the same, the First Circuit concluded that the evidence of contamination and the toxic effects of mercury "rendered reasonable the actions of the [plaintiff organizations'] members in abstaining from their desired enjoyment of the Penobscot" such as to establish the harm required to show injury in fact.

[122] Pls. Ex. 115 (Press Release, "Limetree Bay Responding to Flare Incident," dated May 12, 2021); Pls. Ex. 116 (Press Release, "Limetree Bay Response to Flare Incident," dated March 2, 2021).

[123] Mar. 2 Tr. at 51 (Allen-Murphy).

[124] Pls. Ex. 21 (Emergency Order) at 15-16, 20, 24-25.

39

➢ That the EPA issued an emergency shut down order to Terminals and Refining following the fourth release event, documenting potential health risks associated with the release events and reporting that "flare rainout can create both environmental and physical safety hazards," and that "[o]il contamination of soil and water bodies creates environmental and public health hazards."[125]

➢ That refinery representatives visited affected residents' homes, confirmed the presence of contaminants, and offered to remediate cisterns and facilitate clean-up of affected properties.[126]

➢ The pre-existing water provision program, which was put in place following the release events.[127]

➢ Resident witnesses' observations of petroleum products in their cisterns and in their water filters, plumbing, and tap water.[128]

➢ That resident witnesses and their loved ones have experienced health effects from the release events and/or from bathing in the post-release water.[129]

In view of the foregoing, the Court concludes that Plaintiffs and the putative classes are presently suffering harm and are likely to continue suffering this harm in the absence of an injunction. The question therefore becomes whether this harm is irreparable or compensable after the fact by money damages.

### 3.  Whether Plaintiffs Have Shown *Irreparable* Harm

As a general matter, costs expended to purchase bottled water or secure an alternative source of water in response to contamination may be compensated by money damages after the fact. *See, e.g., McKeesport Mun. Water Auth. v. McCloskey*, 690 A.2d 766, 773 (Pa. Comm. Ct. 1997) (awarding the plaintiffs damages for expenses they incurred in purchasing bottled water in response to contamination); *Kusnir v. City of Yonkers*, 497 N.Y.S.2d 582,

---

[125] Pls. Ex. 21 (Emergency Order) at 11, 25-29.

[126] Mar. 2 Tr. at 297-98 (Urgent), 309-11, 324-25 (Webster); Mar. 3 Tr. at 99-100 (Carino), 122-25 (Thompson); Pls. Ex. 21 (Emergency Order) at 10, 23.

[127] Mar. 2 Tr. at 53-54 (Allen-Murphy), 301-02 (Urgent), 316-17 (Webster); Mar. 3 Tr. at 102-03 (Carino), 126-27 (Thompson).

[128] *See* Mar. 2 Tr. at 41-49, 74-76 (Allen-Murphy), 296 (Urgent), 309-17 (Webster); Mar. 3 Tr. at 98-103, 114 (Carino), 121-123, 129 (Thompson); Pls. Exs. 91, 92, 96 (photographs of Ms. Allen-Murphy's plumbing and water filtration systems).

[129] Mar. 2 Tr. at 53 (Allen-Murphy); Mar. 3 Tr. at 98, 103-04 (Carino), 129-30 (Thompson).

585-86 (City Ct. 1985) (same).[130] Plaintiffs acknowledge that this is the case, but argue—on two principal grounds—that the harm they and putative class members will suffer in the absence of a preliminary injunction is of a sufficiently "peculiar nature" that it cannot be compensated after the fact in money damages.

First, Plaintiffs argue that the environmental impact of the release events gives rise to an inference that they and putative class members will suffer irreparable harm in the absence of an injunction. (*See* Rep. at 17). It is true that the Supreme Court has observed, in dicta, that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 545 (1987). However, neither of the two forms of relief that Plaintiffs seek would address the type of irreversible environmental harms that undergird the Supreme Court's observation. Here, Plaintiffs seek affirmative relief that addresses their individual personal needs; they do not seek to restrain Terminals in such a way as to prevent future pollution or other harm to the environment. Simply stated, this is not the type of case where the focus of the injunctive relief that Plaintiffs seek is on irreversible harm to the environment.

Second, Plaintiffs stress that the financial realities faced by Plaintiffs and the putative class members mean that they are unable to access enough safe and reliable water, and that they are consequently forced to use water from their contaminated cisterns. (Pls. Supp. 1-2, 5-6). Terminals, in contrast, argues that the fact that the resident witnesses each testified that they are currently buying water means that they "are not in danger of being compelled to drink any cistern water alleged to contain petroleum hydrocarbons," and that none of the

---

[130] *See also North Carolina v. McDevitt,* 142 F. Supp. 2d 710, 716 (W.D.N.C. 2001) (holding that state's costs of providing bottled water to residents affected by release of petroleum are proper response costs under the Resource Conservation and Recovery Act); *Woodman v. United States*, 764 F. Supp. 1467, 1470 (M.D. Fla. 1991) (holding that residents' expenses for bottled water they purchased in response to contamination from landfill is proper response costs under the Comprehensive Environmental Response, Compensation, and Liability Act).

resident witnesses testified that purchasing substitute water caused them to "suffer consequences like not being able to buy needed medicine because they had to instead spend their limited financial resources on water." (LBT Supp. at 18). Terminals' arguments echo those raised by the defendants in two comparable cases cited by Plaintiffs.

In *Concerned Pastors for Social Action v. Khouri,* the plaintiffs sought to enjoin the City of Flint, Michigan to establish a program to provide door-to-door delivery of bottled water to residents following revelations of lead contamination in the city's water system. 217 F. Supp. 3d 960, 962 (E.D. Mich. 2016). Flint argued that the steps it had already taken— including distributing water filters to residents and establishing distribution centers to provide free bottled water to residents—meant that no residents were in danger of consuming tainted water, thus negating any showing of irreparable harm. *Id.* at 970-71. The district court disagreed, concluding that the plaintiffs had shown irreparable harm "even in the face of the defendants' evidence of the availability of bottled water and filters," because the measures in place were not "completely effective in providing safe drinking water" to residents. *Id.* at 975. As the district court explained:

> The fact that [free bottled water and water filters] are *available* does not mean that they are reliably accessible or effective in furnishing safe drinking water to every household. Bottled water is heavy, and not all of Flint's residents are capable of transporting the cases of water effectively. Indeed, the endeavor of hunting for water has become a dominant activity in some Flint residents' daily lives. The initial surge of volunteer support last winter aided greatly in the distribution efforts, but as that effort wanes, for any number of reasons, access to water becomes more difficult. Furthermore, leaving water filters at residents' doorsteps—even if the instructions are provided in multiple languages—does not ensure proper installation and maintenance. The likelihood that some of the filters are installed improperly and Flint residents are continuing to consume lead is quite high under the circumstances.

*Id.* at 977.

Likewise, in *Lyda v. City of Detroit,* the plaintiffs sought to enjoin the City of Detroit from shutting off their water because of the plaintiffs' unpaid water bills. No. 13-CV-53846,

2014 WL 6474081, at *1 (Bankr. E.D. Mich. Nov. 19, 2014), *aff'd sub nom. In re City of Detroit*, No. 15-CV-10038, 2015 WL 5461463 (E.D. Mich. Sept. 16, 2015), *aff'd in part, vacated in part sub nom. In re City of Detroit, Mich.*, 841 F.3d 684 (6th Cir. 2016). Detroit argued that the plaintiffs had not shown irreparable harm because "alternative sources" of water were "available" to the plaintiffs, "including purchasing containers of water at local stores." *Id.* at *12. The bankruptcy court rejected this argument, concluding that the plaintiffs had shown irreparable harm for two reasons: (1) because "those sources are much more expensive, and many of the affected people are already in poverty;" and (2) "it is challenging to commit the time and energy necessary to purchase and transport sufficient quantities of water." *Id.*

Plaintiffs argue that here—as in *Khouri*—the status quo is not proving "completely effective" in providing safe and reliable water to residents. (Pls. Supp. at 14 (citing *Khouri*, 217 F. Supp. 3d at 975)). The Court agrees in part. Contrary to Terminals' characterization, the Court does not view the evidence before it as establishing that *all* persons in the affected community have sufficient financial resources such that no one is in danger of using contaminated water. The resident witnesses described that they and other residents continue to use their cistern water for some household uses despite believing it to be unsafe. For example, Ms. Thompson testified that she used her "filthy" cistern water to bathe before getting sick and experiencing a rash, and that she now uses her social security benefits to purchase water for all of her household uses.[131] Ms. Allen-Murphy testified that she used her cistern water to bathe her husband until he also had an adverse reaction, and that—while she now purchases water for her husband to bathe—she herself continues to bathe in the cistern water despite not believing it is safe to do so.[132] Ms. Webster testified that her family uses

---

[131] Mar. 3 Tr. at 128-30 (Thompson).

[132] Mar. 2 Tr. at 37, 50-53, 77-79 (Allen-Murphy).

cistern water for household uses other than drinking and cooking.[133] As Plaintiffs argue, these would appear quintessential examples of residents who "must use water that they have no reasonable basis to believe is safe [and] cop[e] with the mental and potential physical injuries that come from doing so[.]" (Pls. Supp. Br. at 3-4).

It is true that, for the most part, the resident witnesses did not expressly attribute their conduct in response to the seemingly contaminated water to financial constraints or to the difficulties associated with securing and transporting sufficient quantities of water. However, the conclusion that financial constraints are a predominant factor can be readily inferred. For example, Ms. Allen-Murphy testified that her neighbors—many of whom are senior citizens, struggle financially, and receive government assistance—use cistern water to cook and for other household uses because they have "no choice."[134] Ms. Webster also testified that she has "no choice" but to use her cistern water for some household uses.[135] Ms. Thompson testified that she purchases water using her social security benefits.[136] Ms. Urgent testified that she was forced to stop purchasing WAPA water as an alternative to cistern water because doing so interfered with her family's ability to pay the bills and pay for a caretaker for her elderly father.[137] And all of the resident witnesses testified that their personal finances make the costs of professionally cleaning their cisterns prohibitive.[138]

The resident witnesses also described taking unusual steps to satisfy their water needs to the extent they could. Ms. Urgent described visiting a friend's apartment to bathe and

---

[133] Mar. 2 Tr. at 308-09 (Webster).

[134] Mar. 2 Tr. at 51-52 (Allen-Murphy).

[135] Mar. 2 Tr. at 316 (Webster).

[136] Mar. 3 Tr. at 128-30 (Thompson).

[137] Mar. 2 Tr. at 299-302 (Urgent).

[138] Mar. 2 Tr. at 77 (Allen-Murphy), 303 (Urgent), 314 (Webster); Mar. 3 Tr. at 101 (Carino), 128 (Thompson).

collecting rainwater in buckets.[139] Mr. Carino testified that he and his mother collect rainwater for washing the dishes, bathing, and other household uses.[140] And all five of the resident witnesses also described using the pre-existing water provision program to secure free water despite the inconvenience of doing so.[141] As Ms. Thompson described the program, water would typically begin to be distributed at 7:30 a.m., but she would arrive as early as 6:00 a.m. "at least twice a week" because there would not be enough water to go around.[142] Others would arrive even earlier to wait in line.[143]

Plaintiffs argue that the Court can infer, based on this testimony and the demographics and poverty rates in the affected areas, that *everyone* in these areas will suffer irreparable harm in the absence of an injunction. (Pls. Supp. at 20). However, the breadth of Plaintiffs' assertion renders this argument unavailing. The evidence described above does not provide an adequate foundation from which this Court can infer that "all (or virtually all)" residents affected by the release events are struggling to meet their water needs. *Adams*, 204 F.3d at 487. Thus, the "mass injunction" that Plaintiffs urge the Court to enter here relies on precisely the type of inference that *Adams* squarely prohibits.[144] *Id.*

At the same time, however, the Court concludes that the evidence before it establishes that a meaningful proportion of the population on behalf of whom Plaintiffs seek relief do not

---

[139] Mar. 2 Tr. at 301-02, 306 (Urgent).

[140] Mar. 3 Tr. at 102 (Carino).

[141] Mar. 2 Tr. at 53-54 (Allen-Murphy), 301-02 (Urgent), 316-17 (Webster); Mar. 3 Tr. at 102-03 (Carino), 126-27 (Thompson).

[142] Mar. 2 Tr. at 126 (Thompson).

[143] Mar. 2 Tr. at 126 (Thompson).

[144] *Khouri* and *Lyda* are not to the contrary. As Terminals correctly observes, there are factual dissimilarities between the cases. For example, unlike the *Khouri* and *Lyda* plaintiffs, Plaintiffs here have not provided evidence to corroborate that they and the putative class members are unable to access sufficient water because they are incapable of transporting the necessary quantities. *Khouri*, 217 F. Supp. 3d at 977; *Lyda*, 2014 WL 6474081, at *12. Most significantly, however, the Third Circuit's decision in *Adams* bound neither the *Khouri* nor *Lyda* courts.

have the requisite financial resources to secure sufficient water to meet their and their families' needs. Using water one believes to be contaminated or taking drastic steps to ensure that one does not have to do so—by collecting buckets of rainwater, visiting friends' apartments to bathe, or waiting in line for hours to secure six gallons of free water—is not the behavior of those who have feasible alternatives. Rather, it is the behavior of residents who cannot afford to purchase the amount of water they need.

In view of the foregoing, the Court finds that the appropriate line to draw is between those Plaintiffs and putative class members who cannot afford to meet their daily water needs without being forced to forgo other necessities—such that they are forced either to forgo these necessities or to use water they reasonably believe is contaminated—and those who can afford to do so. *See Tustin v. Heckler*, 591 F. Supp. 1049, 1058 (D.N.J. 1984) (finding irreparable harm where there "is a clear likelihood that, without the relief sought, a realistic danger exists that the plaintiffs seeking relief will be without the means to avail themselves of the basic needs of food, shelter, or medical care, much less the means to be self-sustaining."), *vacated in part on other grounds*, 749 F.2d 1055 (3d Cir. 1984); *Grant v. Sullivan*, 131 F.R.D. 436, 449 (M.D. Pa. 1990) (finding irreparable harm where class members "subsist on minimal public assistance payments" and "often lack basic necessities"); *Maldonado v. Houstoun*, 177 F.R.D. 311, 333 (E.D. Pa. 1997) ("[A] reduction in subsistence benefits constitutes irreparable harm to persons on the margin of subsistence."); *Garnett v. Zeilinger*, 313 F. Supp. 3d 147, 157-58 (D.D.C. 2018) (observing that "forgoing food or other necessities [is] clearly irreparable in nature").

The Court therefore concludes that those within the impacted areas who cannot afford to purchase water without trading off other basic necessities will suffer irreparable harm in the absence of an injunction. This conclusion, in turn, raises the question of whether either or

46

both forms of preliminary relief sought by Plaintiffs—programmatic relief and remedial relief—is appropriate.

### 4. Appropriate Form of Relief

"District Courts are afforded considerable discretion in framing injunctions." *Meyer v. CUNA Mut. Ins. Soc.,* 648 F.3d 154, 169 (3d Cir. 2011). However, courts must "closely tailor injunctions to the harm that they address," *ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958, 972 (D.C. Cir. 1990), such that preliminary injunctions should be "no more burdensome to the defendant than necessary" to provide relief during the pendency of the litigation. *Califano v. Yamasaki,* 442 U.S. 682, 702 (1979).

Here, the programmatic relief that Plaintiffs seek is adequate to protect those Plaintiffs and putative class members who will suffer irreparable harm absent an injunction. The programmatic relief directly addresses those elements of harm that will prove irreparable—namely, the inability to financially afford water without making impermissible sacrifices—and nothing more. As compared with remedial relief, programmatic relief is also less burdensome on Terminals. *Califano*, *442* U.S. at 682.

Accordingly, the Court finds that programmatic relief, but not remedial relief, is appropriate at this stage of the litigation.

### C. Balance of Hardships

The Court begins by considering the harm that would occur during the pendency of this litigation absent an injunction. *See Buck v. Stankovic*, 485 F. Supp. 2d 576, 586 (M.D. Pa. 2007) ("To determine which way the balance of hardship tips, a court must identify the harm to be caused by the preliminary injunction against the possibility of the harm caused by not issuing it."). Plaintiffs argue that such harm would be great because water is a basic necessity and they and the putative class members are unable to afford water without trading

off other necessities. (Mot. at 19; Pls. Supp. at 1-5). Terminals, by contrast, argues that the harm would be minimal on grounds that "[t]here is no water emergency." (Resp. at 34).

Plaintiffs have the more persuasive argument. The Court explained above that it does not take the evidence presented thus far to indicate that there is "no water emergency." To the contrary, the Court has found that the harm occasioned by the release events is significant and continuing, and that—for those who cannot afford water—the harm is irreparable absent an injunction. While the irreparability of harm does not necessarily tilt the balance of equities in Plaintiffs' favor, *see Winter*, 555 U.S. at 27, the Court finds that the seriousness and magnitude of the harm weighs strongly in favor of Plaintiffs here. *See Lyda*, 2014 WL 6474081, at *12 (observing that "water is necessary to sustain life" and that the harms occasioned by its absence "may include a host of serious and even life-threatening medical conditions, as well as adverse consequences in employment, in personal and family relations, and, for children, at school").

The question therefore becomes the harm the injunction itself would cause. Terminals makes only one argument to the effect that this harm is great—namely, that "requiring Terminals to distribute water . . . would violate Terminals' due process rights by holding Terminals accountable for alleged harm that Terminals did not cause." (Resp. at 34). This argument misses the mark.

First, while the Court has explained above that it takes the evidence presently before it as sufficient to establish a substantial likelihood that Terminals is causally connected to the release events, Terminals is incorrect to suggest that its rights would be somehow violated by the issuance of a preliminary injunction even if it were ultimately determined that the release events are not traceable to Terminals. Due process protections do not guarantee particular results, and the abbreviated nature of a preliminary injunction proceeding means the risk of error is necessarily higher at this stage than it is following a trial. It is for this very reason that

the Federal Rules governing preliminary injunctions expressly contemplate situations in which a party has been wrongfully enjoined. *See* Fed. R. Civ. P. 65(c) (requiring movants to "give security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained").

Second, at issue here is not the harm to Terminals should it be determined that Terminals was wrongfully enjoined, but rather the burdens that the injunction itself would cause Terminals to bear. *Buck,* 485 F. Supp. 2d at 586. Plaintiffs argue that such burdens are minimal because there are "vast amounts of insurance available to pay for the [relief]," and because any harm to Terminals must be discounted by the fact that any costs Terminals incurs in providing relief have been occasioned by its own fault. (Mot. at 19, 19 n.44 (citing *Kos Pharm.,* 369 F.3d at 728, for the proposition that a party "can hardly claim to be harmed [where] it brought any and all difficulties occasioned by the issuance of an injunction upon itself.")). While the Court does not find Plaintiffs' arguments in this regard particularly persuasive,[145] Terminals has not provided the Court with any reason to believe that an injunction would cause the company to bear an unacceptable burden. *Cf. Friends of Coral Bay v. Reliance Hous. Found., Inc.*, Civ. No. 07-CV-00020, 2006 WL 4012200 (D.V.I. Jan. 26, 2006) (concluding that ongoing discharge of water pollutants into Coral Bay outweighed economic hardship of more than $30 million). Moreover, Terminals' participation in the pre-existing water provision program suggests that the company can bear the costs of the injunction that the Court contemplates here.

In view of the foregoing, the Court concludes that the equities tip in favor of Plaintiffs.

---

[145] Plaintiffs have not established that Terminals' insurance carrier will cover the cost of any preliminary relief, and the Court understands that there is some dispute about this matter. Further, as most if not all parties enjoined are enjoined because they are perceived—for preliminary injunction purposes—to be in some sense at fault, the "at fault" argument can only be taken so far without effectively rendering the balance of hardships factor of the preliminary injunction analysis moot.

### D.  Public Interest

This final factor "requires the court to look beyond the parties' respective interests and to gauge the injunction's potential effects on the community as a whole." *McCahon v. Penn. Turnpike Comm'n*, 491 F. Supp. 2d 522, 528 (M.D. Pa. 2007). Plaintiffs argue that the public has a strong interest in ensuring that community members have access to safe drinking water and that an injunction "would promote the Virgin Islands legislature's public policy 'to promote health, safety and welfare' and 'to prevent injury to human, plant and animal life, and property.'" (Mot. at 19 (quoting 12 V.I.C. § 201)).[146] The Court agrees.

"It is abundantly clear that the public relies every day on the ready availability of safe drinking water at the tap." *Khouri*, 217 F. Supp. at 972. We rely on clean water not only when we drink, shower, and brush our teeth, but when we bathe our children, cook for friends and family, and wash the dishes and our favorite clothes. If we do not often talk about water, it is not because we fail to appreciate its necessity, but because we have come to presuppose access to safe and affordable water as Americans. The Virgin Islands—like all other states and territories—not only has a strong interest in ensuring that its residents have access to safe water within their means, but also a strong interest in recognizing the harmful effects of pollution on the public health and welfare. *See, e.g.,* 12 V.I.C. § 201 (providing "the pollution of the atmosphere about the United States Virgin Islands constitutes a menace to public health and welfare"); 12 V.I.C. § 181 (providing "pollution of the waters of the United States

---

[146] With one exception, Terminals makes the same arguments with regard to this factor as it makes with regard to the balance of hardships factor, which the Court has considered and rejected above. With regard to public interest only, Terminals argues that—per its interpretation of *Adams*—Plaintiffs' relief is limited to the 44 named Plaintiffs, meaning the size of the population entitled to injunctive relief is small and the public's interest in this matter is commensurately reduced. *Id.* The Court has concluded above that *Adams* does not limit Plaintiffs' relief to named Plaintiffs only, but it is true that the Court here considers the harm to a smaller population than that originally envisioned by Plaintiffs. However, the Court finds Terminals' argument unpersuasive because the Court does not view the public's interest as varying directly with population size.

Virgin Islands constitutes a menace to public health and welfare").[147] Simply stated, the public interest in safe water is "fundamental." *United States v. Alisal Water Corp.*, 431 F.3d 643, 656 (9th Cir. 2005). Further, Plaintiffs are correct to note that "members of the Virgin Islands community have an interest in knowing that, should they suffer similar harm to Plaintiffs, 'courts will be willing, under the appropriate circumstances, to step forward and grant relief.'" (Rep. at 18 (quoting *Crouch v. Prior*, 905 F. Supp. 248, 260 (D.V.I. 1995)).

In view of the foregoing, the Court concludes that the public interest favors Plaintiffs.

## IV. CONCLUSION

For the reasons discussed herein, the Court concludes: (1) that Plaintiffs have shown that they are substantially likely to succeed on the merits of three of their claims against Terminals; (2) that Plaintiffs have shown that those Plaintiffs and putative class members who cannot afford to purchase water without trading off other basic necessities are likely to suffer irreparable harm in the absence of a preliminary injunction; (3) that Plaintiffs have not shown that persons falling outside this population are likely to suffer irreparable harm absent a preliminary injunction; (4) that programmatic relief but not remedial relief is appropriate; and (5) that the balance of hardships and the public interest both favor the issuance of a preliminary injunction enjoining programmatic relief.

Accordingly, the Court will convene a status conference on May 8, 2023, at which the Court will: (1) schedule the second phase hearing to address the precise contours of the population the Court here finds is entitled to programmatic relief and the logistics surrounding the provision of the same; and (2) set the corresponding briefing deadlines in

---

[147] *See also Instant Air Freight*, 882 F.2d at 803 (legislative expressions of public policy through statutes bear on "public interest" for purposes of preliminary injunction analysis); *Gov't of Virgin Islands, Dep't of Conservation & Cultural Affs. v. Virgin Islands Paving, Inc.*, 714 F.2d 283, 286 (3d Cir. 1983) (holding district court committed reversible error where "the court did not treat the Virgin Islands statutes as reflecting the public interest" for purposes of the preliminary injunction analysis, because "[t]he enactment of a comprehensive regulatory scheme is a reflection of the Legislature's view of the importance of the interests at stake").

consultation with the parties. The Court will deny Plaintiffs' Motions insofar as Plaintiffs seek remedial relief, and the Court will also deny Plaintiffs' Motions insofar as Plaintiffs seek programmatic relief with respect to those Plaintiffs and putative class members who can afford to purchase water without trading off basic necessities.

Date: April 28, 2023                        _____/s/_____
                                            WILMA A. LEWIS
                                            District Judge