**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX**

| | |
|---|---|
| CLIFFORD BOYNES, MARGARET THOMPSON, DELIA ALMESTICA, EDNA SANTIAGO, GUIDRYCIA WELLS, MARY L. MOORHEAD, SIRDRINA ISAAC-JOSEPH, ESTHER CLIFFORD, ALVINA JEAN-MARIE ILARRAZA, RYAN ALLEYNE, AGNES AUGUSTUS, HELEN SHIRLEY, CRISTEL RODRIGUEZ, JOHN SONSON, ISIDORE JULES, VIRGINIE GEORGE, and MINOR CHILD "O.N.", individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> LIMETREE BAY VENTURES, LLC; LIMETREE BAY ENERGY, LLC; LIMETREE BAY HOLDINGS, LLC; LIMETREE BAY PREFERRED HOLDINGS, LLC; LIMETREE BAY REFINING, LLC; LIMETREE BAY TERMINALS, LLC (D.B.A. OCEAN POINT TERMINALS); ARCLIGHT CAPITAL PARTNERS, LLC; ARCLIGHT ENERGY PARTNER FUND VI, L.P.; ARCLIGHT LIMETREE AIV, L.P.; EIG GLOBAL ENERGY PARTNERS, LLC; FREEPOINT COMMODITIES, LLC; BP PRODUCTS NORTH AMERICA, INC.; UNIVERSAL PLANT SERVICES, (VI), LLC; EXCEL CONSTRUCTION AND MAINTENANCE VI, INC.; ELITE TURNAROUND SPECIALISTS, LTD.; PINNACLE SERVICES LLC; VERSA INTEGRITY GROUP, INC.; and NATIONAL INDUSTRIES SERVICES, LLC, <br><br> Defendants. | **Case Nos.** 1:21-cv-00253; 2021-cv-00259; 2021-cv-00260; 2021-cv-00261 <br><br><br> **PLAINTIFFS' CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs and Class Representatives CLIFFORD BOYNES, MARGARET THOMPSON,

DELIA ALMESTICA, EDNA SANTIAGO, GUIDRYCIA WELLS[1], MARY L. MOORHEAD,

---

[1] Additional named plaintiffs include minor child "O.N.", by and through his mother Guidrycia Wells.

SIRDRINA ISAAC-JOSEPH, ESTHER CLIFFORD, ALVINA JEAN-MARIE ILARRAZA, RYAN ALLEYNE, AGNES AUGUSTUS, HELEN SHIRLEY, CRISTEL RODRIGUEZ, JOHN SONSON, ISIDORE JULES, and VIRGINIE GEORGE (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), bring this Consolidated Second Amended Class Action Complaint (the "Complaint") against Defendants LIMETREE BAY VENTURES, LLC, LIMETREE BAY ENERGY, LLC, LIMETREE BAY HOLDINGS, LLC, LIMETREE BAY PREFERRED HOLDINGS, LLC, LIMETREE BAY REFINING, LLC, LIMETREE BAY TERMINALS, LLC (D.B.A. OCEAN POINT TERMINALS), ARCLIGHT CAPITAL PARTNERS, LLC, ARCLIGHT ENERGY PARTNER FUND VI, L.P., ARCLIGHT LIMETREE AIV, L.P., EIG GLOBAL ENERGY PARTNERS, LLC, FREEPOINT COMMODITIES, LLC, BP PRODUCTS NORTH AMERICA, INC., UNIVERSAL PLANT SERVICES (VI), LLC, EXCEL CONSTRUCTION AND MAINTENANCE VI, INC., ELITE TURNAROUND SPECIALISTS, LTD., PINNACLE SERVICES LLC, VERSA INTEGRITY GROUP, INC., and NATIONAL INDUSTRIAL SERVICES, LLC (collectively, "Defendants") for violations of law. The allegations herein are made based on each Plaintiff's personal knowledge as to the allegations pertaining to himself/herself, and upon information, belief, and investigation by counsel as to all other matters.

## I.    INTRODUCTION

1.    This case stems from the catastrophic failed restart of Limetree Bay Refinery located on St. Croix, United States Virgin Islands (the "Refinery"), which caused the emission, release, and discharge—on multiple occasions—of hazardous and toxic chemicals, substances, gases, and odors, including, without limitation, oil, hydrogen sulfide, sulfur dioxide, polycyclic aromatic hydrocarbons, including naphthalenes, other petroleum hydrocarbons, and other

chemicals, toxins, and particulates (collectively, the "Toxins") from February 2021 until the Refinery was forced to shut down.

2.      The Refinery's failed restart is a direct consequence of rushed, inadequate, intentional, reckless and/or negligent actions taken by each Defendant named herein. Specifically, on February 1, 2021, Defendants restarted the long-dormant 55-year-old Refinery that had been closed due, in part, to other environmental disasters that previously harmed St. Croix residents. While Defendants assured the public that "[i]ndustry leading safety performance was maintained throughout the restart project,"[2] reality shows that the opposite was indeed true. Defendants' restart of the Refinery was anything but safe.

3.      Defendants Limetree Bay Ventures, LLC, Limetree Bay Energy, LLC, Limetree Bay Holdings, LLC, Limetree Bay Preferred Holdings, LLC, Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC (collectively, the "Limetree Defendants") were undercapitalized, understaffed, and entirely reliant on certain backers—Defendants ArcLight Capital Partners, LLC, ArcLight Energy Partner Fund VI, LP, ArcLight Limetree AIV, L.P., EIG Global Energy Partners, Freepoint Commodities, LLC, and BP Products North America, Inc. (collectively, the "Restart Defendants")—for their management and operations in restarting the Refinery.

4.      The Restart Defendants, however, were not concerned about proper management or safe operation of the Refinery. Their only objective was to capitalize quickly on an emerging fuel market. As delays plagued the Refinery restart and put the Defendants' window of profitability in the emerging market at risk, the Restart Defendants waged their power and control to usher in the Refinery's restart as quickly and cheaply as possible.

---

[2]    https://eigpartners.com/limetree-bay-ventures-commences-refinery-startup-operations/    (last accessed Aug. 4, 2025).

3

5.      With only profits in mind, the Limetree Defendants and Restart Defendants succeeded in avoiding millions of dollars in environmental safeguards, avoided extensive inspections and audits of the dilapidated Refinery equipment, and bypassed necessary timelines for an adequate review of environmental permits affecting the Refinery. Had the Restart Defendants and Limetree Defendants implemented those safeguards, underwent those inspections, and/or adhered to the ordinary regulatory process to obtain permits necessary to the Refinery's restart, the deficiencies plaguing the Refinery would have been revealed, and the disastrous results of the restart, avoided.

6.      Without the costs and delay imposed by refurbishing the Refinery in accordance with regulatory standards and best practices, the Restart Defendants and Limetree Defendants forged ahead with the restart, and together with Defendants Universal Plant Services, LLC, Excel Construction and Maintenance VI, Inc., Elite Turnaround Specialists, Ltd., Pinnacle Services, LLC, Versa Integrity Group, Inc, and National Industries Services, LLC (collectively, the "Contractor Defendants"),  as well as other contractors, vendors, and entities that will be identified through the discovery process, haphazardly restarted the previously mothballed Refinery without critically necessary improvements and repairs, far before it was ready to safely operate.

7.      Defendants' premature restart of the Refinery immediately, and predictably, resulted in an onslaught of significant contamination incidents that had devastating consequences for the local communities, including severe impacts to the property, health, safety, and well-being of persons in those communities and property owners.

8.      Within four days of the Refinery's restart, on February 4, 2021, the Refinery malfunctioned. In April and May 2021, the Refinery again severely malfunctioned on multiple occasions, culminating in a "flare out" of unprecedented scale (together with the February 4, 2021

4

incident, the "Incidents").[3] The U.S. Environmental Protection Agency ("EPA") found that the Incidents showered oil on local residents twice, spewed sulfuric gases into the surrounding area, and released hydrocarbons into the air, subjecting downwind communities to "immediate and significant" impact on people and their property.[4] The EPA found that the St. Croix communities downwind of the Refinery suffered through "at least four incidents [that] occurred at the Facility that each ha[d] an immediate and significant health impact on multiple downwind communities."[5] Further, even prior to the official restart, the Refinery reported non-compliance with the EPA's regulations nearly every day from December 15, 2020 up until the final May 12, 2021 Incident.

9.      The Incidents and the daily onslaught of emissions from the Refinery were so harmful to the health and human safety of surrounding communities, that within just over three months, the EPA shut the Refinery down pursuant to its emergency powers under the Clean Air Act—an action the EPA had taken only three times before—and warned that the Refinery's continued operation was an "imminent" threat to the health of the people on the island.[6]

10.      The Incidents caused harm to the Plaintiffs and Class Members as defined below. The release of the Toxins from the Refinery impacted Plaintiffs and Class Members, including their health, real property and personal property. This harm has among other things negatively affected property values, contaminated and harmed the local water supply, is a blight and nuisance on Plaintiffs' and the Class Members' communities, and has deprived Plaintiffs and Class

---

[3] Specifically, as used herein, the "Incidents" refer to the Refinery releases, including, without limitation, the releases that occurred on or about February 4, 2021, April 23, 2021, May 5, 2021, and May 12, 2021.

[4] *In the matter of Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC*, Clean Air Act Emergency Order, CAA-02-2021-1003 (EPA, Region 2) (May 14, 2021) ("*In re Limetree*").

[5] *Id.* at ¶ 33.

[6] *Id.* at ¶ 111.

Members of their free use and enjoyment of their real and personal property, including the ability to safely use their cisterns for potable water and damage to foliation and crops.

11.    The Toxins have been and continue to be sources of hazardous substance emissions into, onto, within, and surrounding real property and personal property, as well as persons in the affected geographic areas, and Defendants have refused to accept responsibility and remediate the contamination.

12.    As such, Plaintiffs, individually and on behalf of all others similarly situated, bring this Complaint in order to seek redress for all of the harms caused by Defendants' negligent, intentional, reckless, and careless ownership, restarting, operation, maintenance, hiring, investment and/or work performed at and regarding the Refinery, and Plaintiffs seek to, among other things, hold accountable all entities and persons who are responsible for the Incidents and releases of Toxins from the Refinery.[7]

## II.    JURISDICTION AND VENUE

13.    This Court has federal question jurisdiction over Plaintiffs' claims arising under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), pursuant to 28 U.S.C. § 1331 because those claims arise under a federal statute. This Court also has jurisdiction pursuant to 28 U.S.C. § 1453. This Court has supplemental jurisdiction over Plaintiffs' territorial law claims pursuant to 28 U.S.C. § 1367 because those claims arise out of a common nucleus of facts with the federal claims alleged herein.

---

[7] Plaintiffs only seek claims against Limetree Bay Refining as a nominal defendant for the purpose of (a) establishing Claims against Limetree Bay Refining and its bankruptcy estate, and (b) preserving rights with respect to insurance coverage for such Claims, if any, and for no other purpose.

14.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District and a substantial part of property and injuries that are the subject of this action are situated in this District. Venue is also proper pursuant to 42 U.S.C. § 9613(b) because the unlawful releases and damages occurred within this District.

## III.    PARTIES

15.    Named Plaintiffs and Class Representatives ("Plaintiffs" or "Class Representatives") are all persons or entities: a) who owned or rented property (real and/or personal) in the Affected Geographic Area on or after February 3, 2021; or b) who resided in, worked in, operated a business in, or were present in the Affected Geographic Area during the time period from February 3, 2021 to May 26, 2021.[8]

16.    Excluded are the Court, Defendants and their officers, and counsel.

17.    Class Representative Clifford Boynes, a former Hess Oil Refinery worker, is a resident of St. Croix, United States Virgin Islands (77A Estate Whim, Frederiksted), and was impacted by the Incidents. After the Incidents, oil was found on his vehicle and on the windows and roof of his house. Limetree conducted an inspection of his house and found oil. In order for Limetree to conduct cleanup of his cistern, he was forced to sign a release. When he tried to retrieve the release, he was told it was too late. He suffers from nasal allergies, which were exacerbated by the strong smell of sulfur and gas he observed between late April and mid-May 2021. He recognized the odors from his work at the Refinery. He also experienced burning in his nose and more sneezing than usual.

---

[8] The term Affected Geographic Area, as used herein, means the western portion of the Island of St. Croix, more particularly described as bounded by 64.74 degrees West Longitude and the sea.

7

18.     Class Representative Margaret Thompson is a resident of St. Croix, United States Virgin Islands (9402 (94B) Smithfield, Frederiksted), and was impacted by the Incidents. She observed oil around the exterior of her home. Limetree inspected and acknowledge the presence of oil on her property and promised to clean up her property. She was told she would have to sign a release before it would make any effort to clean her property, but she has not heard from Limetree since that time. At the time of the Incidents, Ms. Thompson smelled a heavy scent of gas for several days. The fumes penetrated the windows of her home and kept her up at night. She suffered from burning eyes and a sore and scratchy throat for weeks between April and May 2021.

19.     Class Representative Delia Almestica is a resident of St. Croix, United States Virgin Islands (175 Williams Delight, Frederiksted), and was impacted by the Incidents. In early March 2021, Ms. Almestica found oil on her vehicle and the walls of her home. A sheen appeared on the surface of her cistern water. When she bathed, the oil residue remained on her skin. She smelled fumes of gas and oil and had difficulty breathing. She is asthmatic, which was aggravated by the Incidents. Ms. Almestica owns a home business where she grows and sells fruit and vegetable plants. Following the incidents, her plants began to die off rapidly. She also has a sewing business that she operates out of her home. Her sewing equipment and materials were covered in dark brown soot from the heavy smoke released during the Incidents.

20.     Class Representative Edna Santiago is a resident of St. Croix, United States Virgin Islands (Who lived at No. 107 Cane Bay Apt. A, Frederiksted), and was impacted by the Incidents. She smelled the strong odor of gasoline resulting from Defendants' operations of the Refinery. Significant amounts of oil were found on the exterior of her home, several fruit trees, car, home, and furnishings which were also damaged by Defendants' release of Toxins. As a result, she suffered headaches, sore throat, itchy eyes and nausea.

21.     Class Representative Guidrycia Wells is a resident of St. Croix, United States Virgin Islands (Who lived at 19B Lorraine Village, Frederiksted), and was impacted by the Incidents. Ms. Wells returned from the hospital on May 4, 2021, after giving birth. The contents of her residence were damaged by the Incidents. Within days she started to smell strong orders of gasoline, sulfur and rotten eggs. She had difficulty sleeping as a result of the odors. She had to close the windows to her residence but could still smell the heavy odor. She experienced severe headaches and nausea.

22.     Class Representative Mary L. Moorhead is a resident of Estate Whim, St. Croix, United States Virgin Islands, and was impacted by the Incidents. Ms. Moorhead's property, including her roof, cistern, and fruit trees, was covered in oil droplets. Ms. Moorhead also experienced adverse health effects, including headaches and cracked, peeling fingers.

23.     Class Representative Sirdrina Isaac-Joseph is a resident of St. Croix and a homeowner who lives downwind from the Refinery in the Mount Pleasant, Fredricksted neighborhood. Following the Incidents, Ms. Isaac-Joseph noticed a light brown substance appearing to be oil residue on her property. In addition, Ms. Isaac-Joseph experienced watery and itchy eyes, shortness of breath, headaches, and nausea because of the foul odors released into the air from the Refinery. In addition, Ms. Isaac-Joseph, who suffers from asthma, had to use her Albuterol inhaler more than usual following the Incidents. Some days the foul smell was so bad that Ms. Isaac-Joseph had to leave her home. When she returned home, she had to close all the windows and doors and run the air-conditioning, which caused her to incur increased electrical costs. Plaintiff Isaac-Joseph suffers from stress and emotional distress from her experience and the worry of long-term health impacts from the Incidents. She is also in distress and fear due to the potential for ammonia and other toxic leaks or fires that could be catastrophic.

9

24.     Class Representative Esther Clifford is a resident of St. Croix and owns her residence at 128 Estate Diamond. Following the Incidents, Clifford experienced burning inside her nostrils, itchy, watery eyes, and headaches because of the foul odor arising from the Refinery. Ms. Clifford had to buy air purifiers, Odo Ban spray, and Lysol to alleviate the foul and horrible smell emanating from the Refinery. In addition, Ms. Clifford observed a dark, brown mist on her house, cars, and in her yard. Representatives from Limetree came to Ms. Clifford's residence and informed her that the mist was oil. For a period, Limetree representatives delivered cases of water for Plaintiff to use because her water supply was contaminated with oil. Ms. Clifford suffers from stress and emotional distress from her experience and the worry of long-term health impacts resulting from the Incidents. Further, she lives in fear and distress of a catastrophic discharge of toxic chemicals or fires erupting at the Refinery.

25.     Class Representative Alvina Jean-Marie Ilarraza is a resident of St. Croix who rented a home located at 305 Enfield Green. As a result of the Incidents, a foul and noxious odor from the Refinery forced Ms. Ilarraza to evacuate her home for two days and check in to the King Christian Hotel in Christiansted. In addition, Ms. Ilarraza suffered nausea and headaches because of the foul odor. Further, Ms. Ilarraza was unable to engage in her usual routine of sitting and relaxing on her porch because of the poor air quality and the unknown effects it would have on her health long-term.

26.     Class Representative Ryan Alleyne is a resident of St. Croix who resides at 6 Enfield Green. In late April 2021, Mr. Alleyne noticed a powerful odor emanating from the Refinery, which remained in the air for weeks and permeated throughout Mr. Alleyne's home. Mr. Alleyne also noticed a substance on his residence and vehicle that appeared to be black oil. His home was covered in black spots and the entirety of his vehicle was covered with the black oil-

like substance. In addition to the damage to his property, as a result of the foul odor produced by the Refinery, Mr. Alleyne suffered from a burning sensation and pain in his throat, hoarseness and nausea that led to multiple instances of vomiting.

27.    Class Representative Agnes Augustus is a resident of St. Croix who resides at 165 Clifton Hill. Ms. Augustus first noticed an odor emanating from the Refinery on April 28, 2021, and continued to smell the foul odor for weeks afterward, including in her home, where the odor was especially strong inside her bedroom. The odor was so strong, and its effects so unpleasant, that Ms. Augustus had to leave her home to seek reprieve from the odor and its effects. Moreover, Ms. Augustus's residence was coated in what appeared to be black oil, including on the roof and cistern. In addition to the contamination of her property as a result of the Incidents, Ms. Augustus also experienced headaches, eye pain and irritation, chest pain, an aching back, throat pain and irritation, difficulty breathing, nausea, and stomach pain. Ms. Augustus's symptoms led her to seek medical attention. She visited the hospital on April 23, 2021, and was told to consume fluids to help the symptoms.

28.    Class Representative Helen Shirley is a citizen of the United States Virgin Islands and a resident of St. Croix (340 Barren Spot), which was impacted by the Incidents. During the Incidents alleged herein, Ms. Shirley noticed a strong odor and experienced headaches, nausea and shortness of breath. Ms. Shirley had to seek medical treatment for these symptoms. Further, Ms. Shirley's outdoor plants and roof were covered in shiny, black sports that appeared to be oil.

29.    Class Representative Cristel Rodriguez is a citizen of the United States Virgin Islands and a resident of St. Croix (#5E Estate La Grange, Frederiksted), and was impacted by the Incidents. Ms. Rodriguez had to leave her home and relocate numerous times to avoid the overpowering odor that was present there. During the Incidents alleged herein, Ms. Rodriguez

11

experienced severe headaches, coughing, dizziness, irritated eyes, difficulty breathing, stomach and chest pain, weakness, nausea and a burning sensation in the eyes, nose and throat. She had to seek medical treatment for these symptoms.

30.    Class Representative John Sonson is a citizen of the United States Virgin Islands and a resident of St. Croix (259 Grove Place) and was impacted by the Incidents. During the Incidents alleged herein, Mr. Sonson noticed a strong odor. Mr. Sonson is a farmer who experienced problems with his vegetables as a result of the Incidents.

31.    Class Representative Isidore Jules is a citizen of the United States Virgin Islands and a resident of St. Croix (99F Estate Whim, Frederiksted), and was impacted by the Incidents. During the Incidents alleged herein, Mr. Jules noticed a strong odor. Further, Mr. Jules noticed oil on his roof, on his Jeep, in his cistern, and on his porch, patio, exterior walls, and outdoor plants.

32.    Class Representative Virginie George is a citizen and resident of Texas who owns three (3) houses at the 43 Cane Estate, which were impacted by the Incidents. For Limetree to conduct cleanup, Mr. George was told to sign a release. Each of his homes was damaged by oil on the roofs, walls, cisterns and perimeter walls.

33.    **Other Plaintiffs.**    Plaintiff Minor Child "O.N.", by and through his mother Guidrycia Wells, is a resident of St. Croix, United States Virgin Islands (who lived at 19B Lorraine Village, Frederiksted), and was impacted by the Incidents. Plaintiff O.N. was a newborn baby when the Incidents occurred. After exposure to the heavy gas fumes released by Defendants' conduct at his home, his mother took him to the clinic out of concern that the fumes impacted the child. She was told there was nothing that could be done since he was a newborn. The aforementioned ailments were a direct result of physical impacts to the residence caused by the Incidents.

12

34.    **Defendants.** Defendants Limetree Bay Ventures, LLC, Limetree Bay Energy, LLC, Limetree Bay Holdings, LLC, Limetree Bay Preferred Holdings, LLC, Limetree Bay Refining, LLC, Limetree Bay Terminals, LLC (D.B.A. Ocean Point Terminals), ArcLight Capital Partners, LLC, ArcLight Energy Partner Fund VI, L.P., ArcLight Limetree AIV, L.P., EIG Global Energy Partners, LLC, Freepoint Commodities, LLC, BP Products North America, Inc., Universal Plant Services (VI), LLC, Excel Construction And Maintenance VI, Inc., Elite Turnaround Specialists, Ltd., Pinnacle Services LLC, Versa Integrity Group, Inc., and National Industrial Services, LLC own, operate and/or performed work at or regarding the aforementioned Limetree Bay Refinery which has caused harm to the Plaintiffs and Class Members.

35.    Defendant Limetree Bay Ventures, LLC ("Limetree Bay Ventures") is a holding company that consisted of several companies, including Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC, and was owned by ArcLight (as described and defined below), Freepoint Commodities, LLC, and EIG (as described and defined below) during part of the time period giving rise to the Incidents. In or around April 20, 2021, the Limetree entities, including Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC, transferred from Limetree Bay Ventures to the newly formed Limetree Bay Energy, LLC ("Limetree Bay Energy"). Limetree Bay Ventures is a Delaware limited liability company with its headquarters located in the United States Virgin Islands. Limetree Bay Ventures avails itself to this Court by way of the fact that it did business in the United States Virgin Islands.

36.    Limetree Bay Energy is a holding company that consisted of several companies, including Limetree Bay Refining, LLC and Limetree Bay Terminals, LLC, and was owned by EIG (as described and defined below) during part of the time period giving rise to the Incidents. Limetree Bay Energy is a Delaware limited liability company with its headquarters located in the

13

United States Virgin Islands. Limetree Bay Energy avails itself to this Court by way of the fact that it did business in the United States Virgin Islands.

37.    Defendant Limetree Bay Holdings, LLC ("Limetree Bay Holdings") was an entity involved in purchasing the Limetree Bay Facility, which consists of the Limetree Bay Terminal and Limetree Bay Refinery (the "Facility") out of the HOVENSA bankruptcy (as described and defined below). Upon information and belief, at the time of the purchase of the Facility, ArcLight (as defined below) and Freepoint Commodities, LLC owned Limetree Bay Holdings. Limetree Bay Holdings is a Delaware limited liability company with its headquarters in the United States Virgin Islands. Limetree Bay Holdings avails itself to this Court by way of the fact that it does business in the United States Virgin Islands.

38.    Defendant Limetree Bay Preferred Holdings, LLC ("LBPH") was a United States Virgin Islands limited liability company with its headquarters located in the United States Virgin Islands. LBPH holds or held an ownership stake in Defendant Limetree Bay Ventures.

39.    Limetree Bay Refining, LLC ("Limetree Bay Refining") was organized under the laws of the United States Virgin Islands and was doing business in the United States Virgin Islands at all times relevant hereto. Limetree Bay Refining was one of the entities responsible for operating the Refinery at the time of the Incidents referenced in this Complaint. Limetree Bay Refining filed for Chapter 11 bankruptcy on July 14, 2021, in the United States Bankruptcy Court for the Southern District of Texas (the "Limetree Bay Refining Bankruptcy"). Because of its prior bankruptcy, Limetree Bay Refining is a nominal defendant "for the purpose of (a) establishing Claims against the Debtors and their Estates, and (b) preserving rights with respect to insurance coverage for such Claims, if any, and for no other purpose." *See* Order Approving Disclosure Statement on a Final Basis and Confirming Chapter 11 Plan Liquidation of Limetree Bay Services,

14

LLC and Affiliated Debtors, *In re: Limetree Bay Services, LLC, et al.*, No. 21-32351, Docket No. 1454 (Bankr. S.D. Tex. May 20, 2022) ("Confirmation Order").

40.    Defendant Limetree Bay Terminals, LLC (d.b.a. Ocean Point Terminals) ("Limetree Bay Terminals") is responsible for operating the Limetree Bay Terminal, is a co-permittee to the Facility's Title V operating permit, and, during the time of the Incidents, had merged with Limetree Bay Refinery. Limetree Bay Terminals is a United States Virgin Islands limited liability company with its headquarters located in the United States Virgin Islands. During the time period at issue in this Complaint, Limetree Bay Terminals was owned by ArcLight and Freepoint Commodities, LLC. Limetree Bay Terminals avails itself to this Court by way of the fact that it does business in the United States Virgin Islands.

41.    Defendant ArcLight Capital Partners, LLC ("ArcLight Capital") is a direct or indirect member of the joint venture that, during the time period at issue in this Complaint, owned and operated the Facility. ArcLight Capital shares this joint venture with Defendant Freepoint Commodities, LLC. ArcLight Capital identifies itself as the "contractual investment advisor" to Defendant ArcLight Energy Partners Fund VI, L.P. and Defendant ArcLight Limetree AIV, L.P. ArcLight Capital is a Delaware limited liability company with its headquarters located in Massachusetts. ArcLight Capital avails itself to this Court by way of the fact that it does business in the United States Virgin Islands.

42.    Defendant ArcLight Energy Partners Fund VI, L.P. ("AEPF") is a Delaware limited partnership. Defendant AEPF's general partner is ArcLight PEF GP VI, LLC, and is a Delaware limited liability company with its headquarters located in Massachusetts. AEPF previously held an ownership interest in Defendant Limetree Bay Preferred Holdings, LLC and currently holds an

ownership interest in Defendant Limetree Bay Holdings, LLC. With $5.6 billion in assets, AEPF is ArcLight Capital's largest fund to date by nearly 200%.

43.    Defendant ArcLight Limetree AIV, L.P. ("AAIV") is a limited partnership with its office and headquarters in Massachusetts. The citizenship of its partners is presently unknown. AAIV previously held an ownership interest in Defendant Limetree Bay Preferred Holdings, LLC and currently held an ownership interest in Defendant Limetree Bay Holdings, LLC.

44.    ArcLight Capital, AEPF, and AAIV are collectively referenced in this Complaint as "ArcLight," unless otherwise specified.

45.    Defendant EIG Global Energy Partners, LLC ("EIG") is a Delaware limited liability company with its principal place of business in Washington, DC. EIG purports to specialize in private investments in energy and energy-related infrastructure. EIG Global Energy Partners controls various EIG entities that "although organized as separate legal entities, conduct a single advisory business (typically under the name '**EIG**')."[9] In November 2018, funds and accounts managed by EIG led the preferred equity portion ($550 million) of a $1.25 billion financing package secured for initial funding of the Refinery restart. EIG led an additional capital contribution in November 2019 when the Refinery faced major cost overruns and budgetary constraints. As a result of this additional capital contribution, EIG and other preferred investors took 49% of common equity in the Limetree Bay Refinery and the right to board control if the Refinery faced further cost overruns. By March 2020, EIG assumed control of the board of directors amid additional cost overruns. In a press release issued on February 1, 2021, EIG stated that "Limetree Bay Ventures, LLC ("Limetree" or "the Company"), a world-class refinery,

---

[9] EIG Management Company, LLC Form ADV Part 2 Brochure (Mar. 30, 2024) (emphasis in original).

terminal and logistics hub **controlled by [EIG]**, today announced that Limetree Bay Refining ("the Refinery") has successfully resumed operations and begun production and commercial sales of refined products."[10] EIG avails itself to this Court by way of the fact that it does business in the United States Virgin Islands.

46.    Defendant Freepoint Commodities, LLC ("Freepoint") is a member of the joint venture that owned and operated the Facility during the time period at issue in this Complaint. Freepoint shared this joint venture with Defendant ArcLight. Freepoint is a Delaware limited liability company with its headquarters located in Connecticut. Freepoint avails itself to this Court by way of the fact that it does business in the United States Virgin Islands.

47.    Defendant BP Products North America, Inc. ("BP Products") is incorporated in the State of Delaware with its principal place of business located in Chicago, Illinois. BP Products had significant involvement with the operation of the Refinery, was a heavily involved partner in the Refinery restart, and was "integral" in developing the Refinery restart strategy and facility design. BP Products' involvement included: inspecting the Refinery (particularly the mechanical integrity of the Refinery piping and machinery impacted by corrosion) after the bankruptcy acquisition, designing the restart configuration, determining a refinery operating scenario that best captured the MARPOL opportunity (discussed below), developing a timeline and budget to achieve the restart, and providing dedicated resources (*i.e.* technical experts) to progress the Restart. BP Products maintained a presence at the Limetree Bay Refinery during the restart and was directly responsible for pushing the Refinery to achieve commercial production prematurely. BP Products also provided liquidity to fund the Refinery through its long-term tolling, supply, and offtake

---

[10]    https://eigpartners.com/limetree-bay-ventures-commences-refinery-startup-operations/ (emphasis added) (last accessed Aug. 4, 2025).

agreements entered into with certain of the Defendants. Specifically, in or about November 2018, BP Products entered into agreements governing the supply of crude oil and additional investments in the Refinery, including a feedstock agreement, a product off-take agreement, and a tolling agreement. Under the terms of the feedstock agreement, BP Products agreed to provide crude oil (*i.e.*, feedstock) and other materials to the Refinery. Per the off-take Agreement, BP Products agreed to market refined petroleum products from the Refinery. As consideration for a share in the net margin of the Refinery, BP Products agreed to invest up to $533 million in the Refinery to complete improvements and expansions related to the manufacture of certain petroleum products, including low-sulfur transportation fuel. BP Products was to recoup its investment under the tolling agreement via its share in the net margin generation of the Refinery.

48.    Defendant Universal Plant Services, (VI), LLC ("UPS") is a United States Virgin Islands limited liability company with its headquarters located in the United States Virgin Islands. Defendant UPS performed certain work refitting the Refinery prior to its restart in February 2021. Specifically, on or about February 21, 2019, Defendants UPS and Limetree Bay Refining entered into a contract pursuant to which UPS performed certain services at the Refinery, including "engaging over 250 personnel on-site at the [] refinery to install, uninstall, repair, and overhaul plant equipment, including fixed, rolling, rotating, reciprocating, and electrical equipment (including steam turbines)."[11] UPS indicated that "such services improved the real property of [Limetree Bay Refining]."[12] In the Limetree Bay Refining Bankruptcy, Defendant UPS is listed among the creditors that have the largest claims and are not insiders (Official Form 204) and is

---

[11] Statement in Support of Proof of Claim of Universal Plant Services (VI), LLC, *In re: Limetree Bay Services, LLC, et al.*, No. 21-32351, ECF No. 1404-10 (Bankr. S.D. Tex. May 16, 2022).
[12] *Id.*

noted to have an unsecured claim of $24,423,282.42 related to work that is performed at or for the Refinery.[13]

49.    Defendant Excel Construction and Maintenance VI, Inc. ("Excel") is an industrial contractor incorporated and headquartered in the United States Virgin Islands. Defendant Excel performed certain work refitting the Refinery prior to its restart in February 2021. Specifically, Excel entered into a $240 million 24-month contract for work relating to the "restoration and restart" of the Limetree Bay Terminal.[14] The project consisted of two phases. The first phase established an "API-653 Tank Inspection Program, which set forth the requirements to inspect the assigned and report discoveries."[15] The reports were to identify "all the repairs to restore the storage tanks to operational services" and establish subsequent inspection intervals. In phase two, Excel purportedly developed the "repair execution strategy" and "performed the construction work to recondition the[] tanks."[16] In the Limetree Bay Refining Bankruptcy proceeding, Excel is listed among the creditors who have the 30 largest claims and are not insiders (Official Form 204) and is noted to have an unsecured claim of $22,325,200.82 related to work that it performed at or for the Refinery.[17]

---

[13] *See* Chapter 11 Voluntary Petition, *In re: Limetree Bay Services, LLC, et al.*, No. 21-32351, ECF No. 1 (Bankr. S.D. Tex. July 12, 2021) ("Chapter 11 Petition").
[14] Excel USA, Limetree Bay Terminal Restoration and Restart, available at https://www.excelusa.com/projects/limetree-bay-terminal-restoration-and-restart (last accessed Aug. 4, 2025); *see also* Notice of Maintenance of Lien Pursuant to Section 546(B) of the Bankruptcy Code, *In re: Limetree Bay Services, LLC, et al.*, No. 21-32351, ECF No. 310 (Bankr. S.D. Tex. Aug. 5, 2021) ("Excel is a contractor to Debtor providing labor and materials incorporated into the work done by Debtor and the Property on a project generally known as the Limetree Refinery Restart Project . . . .").
[15] *Id.*
[16] *Id.*
[17] *See* Chapter 11 Petition.

19

50. Defendant Elite Turnaround Specialists, Ltd. ("ETS") is a Texas limited partnership. Defendant ETS's sole general partner is Stronghold Specialty General, LLC, a Texas limited liability company. Defendant ETS is a part of the Stronghold Companies ("Stronghold"), which "work together to provide refining, petrochemical, and tank services."[18] ETS provides "complete turnaround and fabrication services."[19] ETS performed certain work refitting the Refinery prior to its restart in February 2021. In the Limetree Bay Refining Bankruptcy proceeding, ETS is listed among the creditors who have the 30 largest claims and are not insiders (Official Form 204) and is noted to have an unsecured claim of $15,330,475.03 related to work that it performed at or for the Refinery.[20]

51. Defendant Pinnacle Services LLC ("Pinnacle") is a United States Virgin Islands limited liability company with its headquarters located in the United States Virgin Islands. The company was formed in 2002 to specifically "provide a comprehensive set of services to the HOVENSA refinery, now owned and operated by Limetree Bay Terminals, LLC, and its sub-contractors under a shared services delivery model which utilizes the simple concept of centralizing commonly used, non-core services and providing them from a third party."[21] Starting in 2016, Pinnacle "supported Limetree Bay Energy in the restart of the 32 million barrel terminal and the 200,000 barrel per day refinery."[22] In the course of its work on this project, Pinnacle "filled over 350 management, supervision and craft positions during the engineering, procurement,

---

[18] *Stronghold Companies*, available at https://www.thestrongholdcompanies.com/about-us/companies/ (last accessed Aug. 4, 2025); *About Stronghold Companies*, https://www.thestrongholdcompanies.com/about-us/ (last accessed Aug. 4, 2025).
[19] *About Elite Turnaround Specialists*, https://www.thestrongholdcompanies.com/about-us/companies/companies-ets-efl/ (last accessed Aug. 4, 2025).
[20] *See* Chapter 11 Petition.
[21] *Pinnacle Services Company Overview*, https://pinnaclevi.com/company/about-our-company/ (as accessed Feb. 18, 2025).
[22] *Id.*

construction and commissioning" of the restart project, and thus was responsible for a significant portion of the hiring at the Refinery.[23] In the Limetree Bay Refining Bankruptcy proceeding, Pinnacle is listed among the creditors who have the 30 largest claims and are not insiders (Official Form 204) and is noted to have an unsecured claim of $2,986,320.12 related to work that it performed at or for the Refinery.[24]

52.     Defendant Versa Integrity Group, Inc. ("Versa") is a Delaware corporation with its headquarters located in Louisiana. Defendant Versa provides industrial services consisting of inspection, advanced non-destructive testing, asset integrity, heat treatment and rope access.[25] Defendant Versa performed certain work at the Refinery prior to its restart in February 2021. In the Limetree Bay Refining Bankruptcy proceeding, Versa is listed among the creditors who have the 30 largest claims and are not insiders (Official Form 204) and is noted to have an unsecured claim of $4,196,472.15 related to work that it performed at or for the Refinery.[26]

53.     Defendant National Industrial Services, LLC ("NIS") is a United States Virgin Islands limited liability company with its headquarters located in the United States Virgin Islands. Defendant NIS is a construction company that focuses on building and improving industrial facilities. Defendant NIS performed work prior to and in connection with the Refinery's restart in February 2021. In the Limetree Bay Refining Bankruptcy proceeding, NIS is listed among the creditors who have the 30 largest claims and are not insiders (Official Form 204) and is noted to

---

[23] *Id.*
[24] *See* Chapter 11 Petition.
[25] Versa Services, formerly available at https://www.versaintegrity.com/services/ (last accessed Feb. 2, 2022).
[26] *See* Chapter 11 Petition.

have an unsecured claim of $12,052,033.76 related to work that it performed at or for the Refinery.[27]

54.    Defendants UPS, Excel, ETS, Pinnacle, Versa and NIS are collectively referenced in this Complaint as "Contractor Defendants."

## IV.    FACTUAL ALLEGATIONS

### A.    Refineries

55.    Refineries "separate crude oil into a wide array of petroleum products through a series of physical and chemical separation techniques. These techniques include fractionation, cracking, hydrotreating, combination/blending processes, and manufacturing and transport."[28]

56.    According to the EPA, "[r]efineries in general emit a whole host of pollutants, ranging from nitrous oxides ("NOX"), sulfur dioxide ("SO2"), and carbon monoxide ("CO") to volatile organic compounds ("VOC"), hydrogen sulfide ("H2S"), and particulate matter "(PM")."[29] Additionally, the EPA has stated that "[e]missions … may include carbon particles (soot), unburned hydrocarbons, CO, partially burned and altered hydrocarbons, NOX and, if sulfur containing material such as hydrogen sulfide is flared, SO2."[30] The EPA regulates these pollutants to prevent the emission of toxic levels of these pollutants into nearby communities.

### B.    The Limetree Bay Refinery

57.    Prior to the Restart Defendants' purchase and reopening of the Facility, it was called HOVENSA[31] and was one of the world's largest oil refineries.

---

[27] *See id.*

[28] *In the matter of Limetree Bay Terminals, LLC and Limetree Bay Refining, LLC*, Clean Air Act Emergency Order, CAA-02-2021-1003 (EPA, Region 2) (May 14, 2021) ("*In re Limetree*").

[29] *Id.* at ¶ 19.

[30] *Id.* at ¶ 23.

[31] https://www.epa.gov/hwcorrectiveactionsites/hazardous-waste-cleanup-hovensa-llc-christiansted-us-virgin-islands (last accessed Aug. 4, 2025).

58.      According to the EPA, "[t]he HOVENSA facility … is located at Limetree Bay, St. Croix, U.S. Virgin Islands. It is a petroleum refinery covering 1,500 acres in what is known as South Industrial Complex, on the south-central coast of St. Croix. Operations at the facility began in 1965 under Hess Oil Virgin Islands Corporation ("HOVIC"). On October 30, 1998, Amerada Hess Corporation, the parent company of HOVIC, and Petroleos de Venezuela, S.A. (PDVSA) formed a joint venture named HOVENSA LLC, which acquired ownership and operational control of the HOVIC facility. The facility's maximum design capacity was 545,000 barrels (1 barrel = 42 gallons) of crude oil per day. Over 60 different types of crude oil were processed at the facility. By means of distillation and other refining processes, crude oil is separated into various components. Light ends (fuel gas) are sent to the facility's fuel system; naphtha, jet fuel, kerosene and No. 2 oil are further processed to remove sulfur."[32]

59.      During its operation, HOVENSA subjected St. Croix and its residents to environmental disasters, giving rise to multiple violations of the Clean Air Act and releasing approximately as much petroleum into St. Croix's groundwater as four times that of the 1989 Exxon Valdez spill.[33] In part because of this contamination, residents of St. Croix have come to rely on private cisterns as a primary source of safe, potable water, a fact of which Defendants were at all times aware. Thus, Defendants understood that if the Limetree Bay Facility was responsible for any further events that impacted cisterns on the island, this would effectively take away the residents' primary access to safe, potable water on St. Croix.

---

[32] *Id.*
[33]      https://www.justice.gov/opa/pr/nation-s-second-largest-refinery-pay-700-million-upgrade-pollution-controls-us-virgin-islands (last accessed Aug. 4, 2025); https://stcroixsource.com/2008/03/11/hovensa-cleanup-comes-42-million-gallons-so-far/ (last accessed Aug. 4, 2025).

60.    On January 26, 2011, the EPA, along with the U.S. Department of Justice ("DOJ"), announced that HOVENSA had agreed to pay a civil penalty of $5.375 million and spend more than $700 million in new pollution controls to resolve Clean Air Act violations by HOVENSA at the refinery, and prevent future Clean Air Act violations, pursuant to a consent decree (the "Consent Decree").[34] The pollution controls required by the Consent Decree included:

- Compliance with $SO_2$ standards of Subpart J for all combustion devices burning refinery fuel gas, and with Subparts J and Ja for refinery flares;

- Compliance with $SO_2$ standards of Subpart J or Ja at sulfur recovery processes, including the sulfur pit;

- Comply with NSPS Subpart A, General Provisions, 40 C.F.R. § 60.11 (d), by conducting root cause analyses for all flaring events exceeding 500 lb/day of $SO_2$; and

- Installation of flare gas recovery systems.

The Consent Decree further required that the refinery comply with a Coker Steam Vent depressurization standard of 2 pounds per square in gauge (psig).

61.    The EPA acknowledged at the time that "[h]igh concentrations of SO2 and NOX, two key pollutants emitted from refineries, can have adverse impacts on human health, and are significant contributors to acid rain, smog, and haze"[35] and estimated that, once the pollution controls required by the Consent Decree had been installed and implemented, NOX, SO2, VOCs, PM, and H2S emissions would be significantly reduced in compliance with applicable law.

62.    Rather than invest the $700 million needed to implement these pollution controls, HOVENSA shut down its refinery operations in 2012.

---

[34]    https://www.justice.gov/opa/pr/nation-s-second-largest-refinery-pay-700-million-upgrade-pollution-controls-us-virgin-islands (last accessed Aug. 4, 2025).
[35]https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/2e321f78933fa2e685257824005812cd.html (last accessed Aug. 4, 2025).

63.    Three years later, HOVENSA's owners declared bankruptcy ("HOVENSA bankruptcy").[36] Accordingly, the pollution controls required by the Consent Decree, as well as other necessary refurbishment of the Facility, were never undertaken, much less, completed.

### C.    The Restart Defendants' Takeover and Catastrophic Restart of the Refinery

64.    In or around January 2016, Defendants ArcLight and Freepoint, through Limetree Bay Holdings, purchased the Limetree Bay Facility in the HOVENSA bankruptcy.[37] The Restart Defendants entirely funded this purchase. Indeed, at the same time that Limetree Bay Holdings entered into the Initial Purchase Agreement with HOVENSA, Limetree Bay Holdings simultaneously "delivered to Seller . . . an executed Equity Commitment Letter from ArcLight Energy Partners Fund, VI, L.P. (the 'Equity Financing Source') to provide equity financing to Purchaser in an amount sufficient to complete the transactions contemplated by th[e] [Purchase] Agreement."[38] All notices sent pursuant to the Agreement were addressed to Limetree Bay Holdings through the care of ArcLight Capital Partners, LLC.[39] After the acquisition of the Facility from HOVENSA, Dan Revers, the Managing Partner and co-Founder of ArcLight Capital, stated that "[c]losing on the St. Croix Facility represents the culmination of an innovative and complex transaction *executed by ArcLight* in conjunction with its partner Freepoint."[40] Approximately, two years later, in or around November 2018, Limetree Bay Ventures secured financing to restart

---

[36]    https://www.reuters.com/article/bankruptcy-hovensa/hovensa-faces-bankruptcy-owes-1-86-billion-to-owners-idUSL1N11N20A20150917 (last accessed Aug. 4, 2025).

[37] Upon information and belief, ArcLight and Freepoint held a majority equity interest in Limetree Bay Ventures and Limetree Bay Holdings, the holding companies of Limetree Bay Refining and Limetree Bay Terminals, during a portion of the relevant time period giving rise to this Complaint.

[38] Order Approving the Sale of the Debtor's Assets, ECF No. 394, *In re: Hovensa, L.L.C.*,,No. 1:15-bk-10003-MFW (Bankr. D.V.I. Dec. 1, 2015).

[39] *Id.*

[40]    https://www.prnewswire.com/news-releases/arclight-capital-partners-and-freepoint-commodities-close-acquisition-of-st-croix-refinery-assets-from-hovensa-300201346.html    (last accessed Aug. 4, 2025) (emphasis added).

refinery operations, which included $550 million of preferred equity led by EIG-managed funds and accounts. Revers indicated that "[t]he closing of the financing provides the resources necessary to complete the refinery restart."[41]

65.     ArcLight, Freepoint, EIG, and BP Products dominate their industries. ArcLight describes itself as a "leading middle market, value added, infrastructure investment firm focused on sustainable infrastructure,"[42] and with nearly $10 billion in assets under management, ArcLight is a power player in that niche space. Freepoint, too, wields tremendous influence in the industry "by leveraging [its] relationships, breadth of expertise, and responsiveness" and "[u]sing [its] intellectual capital and unique marketing platform to 'connect the dots' on an opportunity [to] acquire the highest production value asset and execute premium market deals tailored to [relevant] risk/return profiles."[43] EIG, which at the time had "committed over $29.1 billion to 341 portfolio investments in 36 countries," is likewise a power player and "has been one of the leading providers of institutional capital to the global energy industry, providing financing solutions across the balance sheet for companies and projects in the oil and gas, midstream, infrastructure, power and renewables sectors globally" since 1982.[44] "To provide context on EIG's scale, in April [2021] the company signed a $12.4 billion infrastructure deal with Aramco." Likewise, BP Products' webpage for the "BP group" touts itself as a "global energy business with wide reach across the world's energy system."[45]

---

[41]      https://www.prnewswire.com/news-releases/limetree-bay-ventures-closes-1-25-billion-financing-to-restart-its-refinery-in-st-croix-300758220.html (last accessed Aug. 4, 2025).

[42] https://arclight.com/about/ (as accessed Feb. 18, 2025).

[43] https://www.freepoint.com/what-we-do/ (last accessed Aug. 4, 2025).

[44]      https://www.prnewswire.com/news-releases/limetree-bay-ventures-closes-1-25-billion-financing-to-restart-its-refinery-in-st-croix-300758220.html (last accessed Aug. 4, 2025).

[45]      https://www.bp.com/en_us/united-states/home/who-we-are/bp-group-at-a-glance.html    (as accessed Feb. 18, 2025).

66.      Neither ArcLight Capital nor Freepoint nor EIG nor BP Products is a passive investor. Each typically operates or otherwise critically, affirmatively, and integrally supports the infrastructure in which it invests. Indeed, ArcLight Capital touts its "over two decades of experience **owning and operating** infrastructure investments across the entire value chain, from the turbine to the wall socket."[46] Freepoint "strive[s] to be **the long-term partner**" in the projects it pursues and "actively develops opportunities that disrupt . . . markets in a transitioning energy landscape."[47] EIG explains that its "investment approach . . . emphasizes capital preservation and **the opportunity to participate in the upside of projects**" in which it invests, to which it brings "deep sector expertise and internal technical capabilities [which] permit [it] to structure creative solutions for [its] industry partners in complex situations."[48] The "BP group" describes that one of its main businesses, "production & operations," "*operate*[s] oil and gas production assets, as well as refineries, pipelines and terminals around the world."[49]

67.      The Refinery was no different. Indeed, ArcLight Capital and Freepoint recognized significant risks associated with the Refinery restart, and their direct liability if something were to go wrong, such that they ensured that they were added as ***named insureds*** on certain policies in Limetree Bay Refining's pollution and liability insurance tower–an act indicative of a role far more involved than a mere passive investor. ArcLight additionally served as the point of contact on other policies in Limetree Bay Refining's insurance tower.

68.      ArcLight Capital itself confirmed its role as a direct participant in the Refinery restart. In ArcLight's own words, ArcLight served as a "hands-on" owner and operator of the

---

[46] https://arclight.com/about/ (as accessed Feb. 18, 2025) (emphasis added).
[47] https://www.freepoint.com/what-we-do/merchant-finance/ (as accessed Sept. 21, 2023).
[48] https://eigpartners.com/about-us/ (last accessed Aug. 4, 2025) (emphasis added).
[49] https://www.bp.com/en/global/corporate/who-we-are/our-organization.html (last accessed Aug. 4, 2025) (emphasis added).

Limetree Bay Facility.[50] After the acquisition of the Limetree Bay Facility, ArcLight proudly announced its prominent role in the restart of the Refinery operations. Revers, the Managing Partner and co-Founder of ArcLight Capital, indicated that ArcLight's involvement in the Refinery's restart ". . . ma[de] full use of ArcLight's suite of specialized capabilities including financial structuring, construction management, implementation of operational best practices, commodity management, human resources, and environmental management."[51] Similarly, in a press release issued on February 1, 2021, EIG stated that "Limetree Bay Ventures, LLC ("Limetree" or "the Company"), a world-class refinery, terminal and logistics hub **controlled by [EIG]**, today announced that Limetree Bay Refining ("the Refinery") has successfully resumed operations and begun production and commercial sales of refined products."[52]

69.    As evidenced by the horrific restart of the Refinery, however, the Restart Defendants' use of their "specialized capabilities" served only to create an unprecedented disaster generated by the implementation of the worst practices possible.

### i. *The Restart Defendants Set Their Sights on MARPOL Profits at the Expense of St. Croix and its People*

70.    Upon their 2016 purchase of the Limetree Bay Facility, ArcLight and Freepoint engaged only the Facility's terminal operations, not the Refinery. Oil terminals, like the Facility's terminal, are essentially storage units, and their operation requires far less expertise, regulatory compliance, and capital to adequately and safely run the Facility.

---

[50]    https://www.prnewswire.com/news-releases/limetree-bay-ventures-closes-1-25-billion-financing-to-restart-its-refinery-in-st-croix-300758220.html (last accessed Aug. 4, 2025).
[51] *Id.*
[52]    https://eigpartners.com/limetree-bay-ventures-commences-refinery-startup-operations/ (emphasis added) (last accessed Aug. 4, 2025).

71.     It was not until 2018, at the time EIG led the $550 million fundraise for Limetree, that the Restart Defendants focused their full attention on restarting the Refinery operations, and they did so for a specific reason: the United Nations' International Maritime Organization ("MARPOL") had mandated a cap of 0.5% sulfur in ship fuels used worldwide, effective January 2020.

72.     The new MARPOL rule presented a tremendous money-making opportunity to the Restart Defendants. Because of the Refinery's location and size, the Restart Defendants believed that they could enjoy early entry into an emerging fuel market and capture the "highest profit [in] the initial years of the new sulfur cap," *provided* the Refinery could begin production as soon as possible.[53]

73.     The Restart Defendants recognized that, to capture this new market, they needed to act quickly. To capture the market first, the Restart Defendants' final investment decision in November 2018 projected a target date for stable commercial operations for the Refinery by November 2019. In correspondence with the EPA, ArcLight acknowledged that "Limetree believe[d] it has a short window to begin producing the new [MARPOL] compliant marine fuel and capture the market in South America." Jake Erhard, one of ArcLight's founding partners, confirmed this urgency in testimony before the U.S.V.I. legislature, noting that "[t]his MARPOL opportunity is critical to the underwriting of capital investment for the refinery restart, making it very important that we work to bring the refinery back online by the end of 2019."[54]

---

[53]    https://stthomassource.com/content/2019/09/26/company-limetree-bay-on-schedule-to-start-refining/ (last accessed Aug. 4, 2025).
[54]    https://viconsortium.com/VIC/?p=65372 (last accessed Aug. 4, 2025); *see also* https://stthomassource.com/content/2019/09/26/company-limetree-bay-on-schedule-to-start-refining/ (last accessed Aug. 4, 2025).

74.    There were, however, several obstacles standing between the Restart Defendants and the enormous profits they expected to reap because of the MARPOL sulfur cap. Most relevant here, the Refinery had been idled since 2012, had received significant damage from two Category Five hurricanes, and was still in need of the $700 million in pollution controls and other refurbishments that the EPA ordered HOVENSA to implement by way of the Consent Decree, but that HOVENSA never completed.

75.    Rather than take the time to implement the $700 million controls themselves (which would have delayed the production of MARPOL-compliant fuel), the Restart Defendants wielded their power and influence to sidestep those requirements, through a series of misrepresentations to the U.S. Virgin Islands' government and by pulling political strings at the U.S. EPA.

ii.    ***The Restart Defendants' Won the U.S. Virgin Islands' Approval with False Promises of Economic Growth and Environmental Stewardship***

76.    In pursuit of the MARPOL project, the Restart Defendants first needed to persuade the U.S. Virgin Islands' government to back the Refinery restart. On July 2, 2018, Governor Kenneth Mapp announced an agreement (the "Amended Operating Agreement") between the Government of the Virgin Islands and ArcLight to expand the Facility's operations and reopen the Refinery.[55]

77.    Per the terms of this agreement, ArcLight and Freepoint were listed as ***the owners*** of the Refinery:

---

[55] Formerly available at https://siteselection.com/theEnergyReport/2018/jul/oil-and-gas-refinery-restart-awaits-legislative-approval-in-the-us-virgin-islands.cfm, (last accessed Sept. 21, 2023).

# APPENDIX B

**Refinery Operating Agreement by and Among the Government of the Virgin Islands and
Limetree Bay Refining, LLC**

"*Owners*" shall mean ArcLight Energy Partners, Fund VI, L.P, Freepoint Commodities
LLC, and their respective Affiliates (exclusive of Refinery Operator).

78.    In lobbying for approval from the Virgin Islands Government, ArcLight most likely touted its professed commitment to environmental stewardship, which ArcLight has repeatedly, and vociferously, publicized. ArcLight reports that it operates in accordance with "ESG [environmental, social, and governance] investment guidelines for ESG issues," in addition to a formal "ESG policy," which it established in 2011.[56] ArcLight formed a "cross-functional ESG committee" to spearhead its purported commitment to environmental concerns.[57] Jake Erhard, a partner and founding member of ArcLight, chairs the committee, which according to ArcLight, "enables integration of ESG at the highest levels of [the] firm."[58]

79.    According to Erhard, ArcLight's "integrated approach to ESG underpins two strategic goals for ArcLight: safe, reliable, environmentally conscious stewardship, and proactive capital allocation to the energy transition."[59] Erhard has promised, "[w]e believe our commitment to deliver on those goals positions us to source, execute, finance, and enhance differentiated investment opportunities **in ways that benefit all of our stakeholders together with the broader communities in which we operate.**"[60] In short, ArcLight claims "[a]fter two decades of owning and operating infrastructure investments, we appreciate the need for responsible and transparent

---

[56] https://arclight.com/esg/, (as accessed Feb. 18, 2025).
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.* (emphasis added).

stewardship that integrates the principles of sustainability, equity, and inclusion."[61] Mr. Erhard directly led negotiations of the Amended Operating Agreement and joined the government at press conferences and in other outlets promoting the deal.[62]

80.    In addition to its (now empty) promises to take care of St. Croix and its people, ArcLight also promised that the Refinery's return would be a boom to St. Croix's economy. In a press release announcing the deal, Governor Mapp announced that "during the legislative process [to approve the Amended Operating Agreement] ArcLight will detail its strategy and its schedule to employ more than 1,200 workers during the accelerated construction period," and that, if the Refinery were restarted, the Facility would bring "$775 million in revenues to the government over the next 10 years … in addition to the massive economic benefits that will be conferred upon the Territory in general, and St. Croix in particular, by the infusion of $1.4 billion in direct capital investment and the creation of as many as 700 new full-time permanent jobs."[63]

81.    ArcLight succeeded in persuading Governor Mapp that the Refinery's restart would be safe and economically beneficial to St. Croix.

82.    Governor Mapp held a press conference with ArcLight and Limetree officials announcing the proposed deal, calling the U.S. Virgin Islands legislature into special session on July 25, 2018 to consider and ratify the agreement. Governor Mapp underscored ArcLight's extensive and long-standing involvement in the Refinery's restart, telling the legislature:

> This landmark agreement did not happen overnight. **It is the result of much hard work by the owners of ArcLight Capital** and my Administration over the past two years. It is the product of complex negotiations with major players in the global oil industry. It required tremendous teamwork with the Trump Administration and

---

[61]  *Id.*

[62]    https://www.vi.gov/u-s-virgin-islands-governor-announces-1-4-billion-landmark-deal-to-restart-refinery-in-st-croix/ (last accessed Aug. 4, 2025).

[63]  *Id.*

the President's Council of Environmental Quality, the EPA and the U.S. Department of Justice.[64]

83.     Governor Mapp was right that the Refinery restart required complex negotiations with the Trump Administration and federal agencies, and that ArcLight Capital was critical to that effort, as further detailed herein. But on July 25, 2018, ArcLight's focus was winning over the U.S. Virgin Island's legislature, and ArcLight partner Jack Erhard answered questions, offered testimony, and otherwise came out in full force at the legislative session in furtherance of that objective.

84.     In response to constituent concerns that the Refinery restart would wreak similar, or worse, environmental and economic harm than that by HOVENSA, Erhard promised that Limetree would be different. For one, he suggested that Limetree's management would be better equipped to avoid such disasters, testifying that "I think a lot has changed from the HOVENSA mode of operation to our plan of operation" and explaining that HOVENSA, as a Venezuela-Hess joint venture, created management challenges that made it difficult to make the facility more fuel efficient, or make it more efficient generally.[65]

85.     ArcLight and Limetree Bay Terminals officials further represented to the Virgin Islands Government and its constituents that the $700 million in pollution controls required by the HOVENSA Consent Decree would not be required before the Refinery was restarted, because the Restart Defendants were not seeking a "full restart," and were instead planning to restart only some of the Refinery units. Those officials suggested that the refurbishments needed for the restart were

---

[64] Formerly available at https://siteselection.com/theEnergyReport/2018/jul/oil-and-gas-refinery-restart-awaits-legislative-approval-in-the-us-virgin-islands.cfm (as accessed Sept. 21, 2023) (emphasis added).

[65] https://stthomassource.com/content/2018/07/21/un-sulfur-regs-may-briefly-boost-stx-refinery-profitability/ (last accessed Aug. 4, 2025).

much more limited, and that the Restart Defendants were financing all needed modifications. Based on these and other representations by ArcLight, the Virgin Islands legislature ratified the Amended Operating Agreement.

86.    In truth, however, ArcLight did not refurbish the mothballed Refinery in accordance with the HOVENSA Consent Decree and industry standards. Instead, ArcLight milked its close connections to the Trump Administration to get out from under the Consent Decree obligations, as further detailed herein.

> **iii.    *The Restart Defendants Lobby the Federal Government for Special Treatment of the Refinery and Exemption from the HOVENSA Consent Decree***

87.    To affect their end run of industry standards and regulatory obligations, the Limetree and Restart Defendants looked to ArcLight to cash in on political capital with the Trump Administration, which ArcLight promptly deployed to procure exemptions for, and other special treatment of, the Refinery.

88.    ArcLight developed its close ties to the Trump Administration in large part through its managing partner, Dan Revers, a long-time political donor. So close was Mr. Revers's relationship with President Trump that, in November 2017, he was one of only 29 businesspeople invited by President Trump to accompany him on an official visit to China, a select group that included Lloyd Blankfein, CEO of Goldman Sachs, Steve Mollenkopf, CEO of Qualcomm, and industry heads from Boeing and General Electric.[66]

89.    ArcLight's relationship with the Trump Administration played out away from the public eye, too, and appeared certain to return dividends to the Limetree and Restart Defendants.

---

[66] *See, e.g.*, https://www.cnbc.com/2017/11/02/here-are-the-corporate-dealmakers-joining-trump-in-china.html (last accessed Aug. 4, 2025).

34

Shortly after Revers accompanied President Trump on the trade mission to China, in December 2017, Evan Schwartz, a Principal at ArcLight Capital, along with LeAnn Johnson Koch and Chris Colman, attorneys at Perkins Coie providing outside counsel to Limetree, met with Bill Wehrum, the deputy head of EPA's air division, to discuss "working with EPA on [an] important project for the Virgin Islands."[67] That "important project" was the Refinery restart, and ArcLight was seeking the EPA's assistance in side-stepping the Consent Decree and other regulatory obligations, and in quickly approving various permits required for the Refinery restart, in order to complete the restart before the new MARPOL standard took effect.

90.    ArcLight quickly succeeded in escalating these issues to the attention of Andrew Wheeler, Acting Administrator of the EPA, who, according to internal EPA documents, directed more than 30 of the EPA's top personnel to serve on the "Limetree Bay team" and provide them with "anything they need." Wheeler deputized Robert Tomiak, Director of the Office of Federal Activities, to serve as the "primary point of contact for Limetree in helping connect them with the federal programs and offices they must involve to resume operations." EPA personnel were instructed "to fully cooperate with Rob in these efforts." Patrick Taylor, the EPA's deputy enforcement chief, recalled the priority, and the urgency, that Wheeler attached to the Refinery restart, noting "Andrew [Wheeler] made the restart an important part of [the assistant administrators'] meeting. He asked all of us with a piece of the work to do it quickly and correctly, and **to let him know personally of any fatal flaws that might appear.**"

91.    Heeding this directive from the EPA's top official, Tomiak quickly assembled "contacts within ArcLight specific to this project" and sought to "establish contact with ArcLight

---

[67]    *See* https://www.eenews.net/articles/trump-admin-provides-customer-service-to-troubled-refinery/ (last accessed Aug. 4, 2025).

and seek alignment on perceptions of what is needed from us (and others)." Upon establishing that contact, Tomiak reported that he "communicated that I'll serve as their front door and switchboard operator for anything they need." Tomiak further organized bi-weekly meetings for the purpose of summarizing the status of the restart for Acting Administrator Wheeler.

92.    ArcLight's treatment by the EPA was not normal. "'It's inappropriate,' said Judith Enck, who oversaw the [R]efinery as a regional administrator in the Obama-era EPA. '[ArcLight] should not be considered a customer. EPA is supposed to be the regulator.'"[68] But that did not stop ArcLight from leveraging its close ties with the Trump Administration, and its preferential treatment by the EPA, to rush the Refinery restart and negligently resume its operations.

93.    In particular, the Limetree and Restart Defendants relied on ArcLight to secure the EPA's assistance to address concerns that (1) the HOVENSA consent decree would apply to the Refinery; and (2) certain of the EPA's policies, further detailed herein, would thwart the Refinery's restart, if they were to apply.

94.    *First,* ArcLight (along with Limetree Bay Terminals) called on the EPA for help in unraveling the Consent Decree obligations, which were binding on the Refinery as a result of the Restart Defendants' purchase of the Refinery in the HOVENSA bankruptcy. The Consent Decree appears to have been discussed at the November 2017 meeting between Bill Wehrum, the deputy head of EPA's air division, Evan Schwartz, a principal at ArcLight Capital, and LeAnn Johnson Koch and Chris Colman, outside counsel to Limetree. Writing to the EPA in advance of that meeting, Ms. Koch underscored that "Consent Decree modification is the quickest vehicle to clarify and address the[] issues" hindering the Refinery restart and warned that the failure to

---

[68] https://www.eenews.net/articles/trump-admin-provides-customer-service-to-troubled-refinery/, (last accessed Aug. 4, 2025).

quickly resolve those issues "would both substantially delay the project, jeopardizing the window for the business opportunity," to capitalize on the new MARPOL rule, and "change the economic viability of the project."

95.     In May 2018, ArcLight (in conjunction with Limetree Bay Terminals) submitted to the EPA's Office of Air and Radiation *twenty-seven* proposed modifications to the Consent Decree. In internal documents tracking the modifications, the EPA noted the unusual nature of the modification requests, acknowledging that ArcLight and Limetree Bay Terminals submitted the requests to the Office of Air and Radiation, in EPA headquarters, "even though the [Consent Decree] modification negotiations are an enforcement matter under the purview of the EPA's Office of Enforcement and Compliance and the DOJ," and "even though the DOJ had contacted [ArcLight's and/or Limetree Bay Terminals'] attorney to resume [Consent Decree] modification negotiations." But ArcLight apparently did not have the same relationship with the DOJ as it did the EPA, so it re-routed the negotiations to the EPA Limetree Bay team.

96.     *Second,* in tandem with the Consent Decree modification requests, ArcLight and Limetree Bay Terminals sought to sidestep EPA regulatory requirements by way of special exemptions from EPA permitting processes and policies.

97.     When the Limetree Defendants and Freepoint, ArcLight, and EIG first purchased the Facility through the HOVENSA bankruptcy, they leveraged their power and influence on officials to convince them to allow Limetree Bay Terminals to be grandfathered into the previous HOVENSA permits, including HOVENSA's Title V Air Permits previously issued by the EPA and the Virgin Islands Department of Planning and Natural Resources ("DPNR"). In May 2016, at the behest of the Limetree and Restart Defendants, DPNR transferred the HOVENSA Title V

Permit to Limetree Bay Terminals,[69] and thereby avoided a re-permitting process that those Defendants knew would have revealed serious deficiencies in the Facility.

98.    Then, when the Limetree and Restart Defendants focused their attention on the Refinery restart in or around 2018, those Defendants once again leveraged their power to demand that the Refinery restart be "given top priority" and "concluded as quickly as possible." The EPA yielded to Limetree and ArcLight's demands and designated the Limetree project as a "priority file." The Limetree and Restart Defendants took advantage of, and abused, the EPA's "priority file" designation, along with the 30-person "Limetree Bay" team and other valuable resources that the EPA devoted to the Refinery restart, and made unreasonable and reckless requests to minimize permitting review of the Refinery.

99.    To start, ArcLight, along with Limetree Bay Terminals, lobbied the EPA to not treat the Refinery's decades-long idled units as new stationary sources and to not aggregate the emissions from the MARPOL project with another "Renewable Diesel" Project at the Facility. In doing so, the Limetree and Restart Defendants sought a work around for EPA policies that would have delayed the Refinery restart and made the project economically unworkable. On April 5, 2018, the EPA, in an unprecedented move, capitulated to Limetree and the Restart Defendants' demands and almost immediately granted their requests, allowing the Refinery to avoid significant environmental regulations and review.

100.    After securing these important concessions from the EPA, the Limetree and Restart Defendants sought more. On November 27, 2018, the Limetree Defendants submitted an

---

[69] In July 2019, Limetree Bay Terminals and Limetree Bay Refining each entered into separate "operating agreements" with the Virgin Islands' government in which Terminals and Refining became co-permittees under the Title V Permit. As co-permittees, each entity was responsible for the entirety of the Limetree Bay Facility, including the Refinery.

application that was over 300 pages for seven plantwide applicability limit permits ("PAL Permits"). The Limetree Defendants and ArcLight then demanded that the EPA issue these permits by June 30, 2019—five months less than the Clean Air Act's one year review period and, in the EPA's own words, "an unreasonably short time frame for [its] review of the more than 300 page application." At the incessant pressure of the Limetree and Restart Defendants, the EPA again capitulated to these demands and rushed through the PAL Permits without meaningful review.

101. Yet again, in December 2020, the Limetree and Restart Defendants sought to side-step all safe environmental management of the Refinery by refusing to install air monitoring equipment that the EPA required as a condition for an additional PAL Permit for the Refinery. Instead of following safe environmental practices, Defendants appealed the EPA's requirements and, upon information and belief, never installed the equipment on which issuance of the PAL permit was conditioned.

102. In short, from their takeover of the Facility in 2016, and their race to restart its Refinery operations before the new MARPOL rule took effect, the Limetree and Restart Defendants devoted every effort to dodging their regulatory obligations and industry best practices, rather than properly refurbishing the Refinery and installing necessary pollution controls in accordance with the HOVENSA Consent Decree, the Clean Air Act and other applicable law.

103. Upon information and belief, if the Limetree and Restart Defendants had not recklessly ignored safe environmental management of the Refinery and had not demanded these unprecedented exceptions to the normal processes and policies for a project of this magnitude, the disastrous problems with the Refinery would have been identified and avoided prior to its restart. Instead, the Limetree and Restart Defendants' relentless objective to avoid as much environmental regulation as possible led to the catastrophic harm caused by the failed restart of the Refinery.

39

**D.      The Doomed Restart of the Limetree Bay Refinery**

104.    At some point in 2018, after learning of the new MARPOL rule that presented a tremendous money-making opportunity, the Limetree and Restart Defendants began maintenance and repair work on the Refinery with the help of the Contractor Defendants. In addition to sitting idle for nearly a decade, the Refinery had also experienced severe damage from Category Five Hurricanes Maria and Irma. Defendants knew that these problems meant that the Refinery was in a deplorable condition that would require extensive repairs for it to function safely and properly. To be sure, LeAnn Johnson Koch, outside counsel acting on behalf of the Limetree Defendants and ArcLight, acknowledged the extensive damage to the Refinery caused by Hurricanes Maria and Irma, in a November 2017 letter to the EPA.

105.    The deplorable condition of the Refinery, however, did not stop the Limetree and Restart Defendants from pushing forward with their plans to seize the MARPOL opportunity. Nor did the deplorable condition of the Refinery prompt these Defendants to exercise caution and conduct necessary repairs to ensure that the Refinery could safely operate. Instead, the Limetree Defendants' and BP Products' "joint objective" set forth in the Statement of Requirements for the Limetree Bay Refinery Restart 2018 instructed that the Refinery recommissioning was to be done "with the least amount of capital expense (capex) and on-going operating expenses (opex), while minimizing unit modifications and the overall facility footprint – i.e. simple, low life-cycle cost, and high value return." In other words, the Limetree and Restart Defendants aimed to restart the Refinery with minimal expense and maximum urgency, prioritizing profit over safety and environmental responsibility. Indeed, Defendants were "guided by the following over-arching principles" for the Refinery restart:

1. "Maximum use of existing Equipment" (*i.e.* use equipment that had been mothballed for nearly a decade and had significant corrosion);

2. "Minimize customizing of existing assets" (*i.e.* use out-of-date equipment that had already wreaked havoc on St. Croix residents);

3. "Assume no requirement for BACT / MACT unless identified as required from Environmental permitting study or direction from client" (*i.e.* ignore environmental technology for controlling pollution from the Refinery);

4. "No new SIS instrumentation for additional levels of protection unless current systems fail to meet minimum codes (US)" (*i.e.* avoid installation of safety instruments that would protect against potential accidents);

5. "For the purpose of the cost estimate development, the project will defer to HOVENSA specs . . ." (*i.e.* use outdated specifications to determine the capital required for the restart);

6. "The restart turnaround (TAR) will target a 5 year run before next major turnaround. Refurbishment or replacement costs which can be delayed over 3, but not 5 years should be identified for total cost impact if they cannot be delayed to the next major turnaround. This approach aims to spread some of the refurbishment costs between the two turnarounds . . ." (*i.e.* push as much repair costs off until the next turnaround in five years).

106.    With these guiding principles in mind, the Limetree Defendants worked with BP Products and ArcLight to assess the condition of the Refinery in 2018. This assessment was markedly insufficient and failed to provide an accurate and complete requirement of the work needed to be undertaken for a safe restart, particularly as related to corroded piping. As a result,

41

BP Products, ArcLight, and the Limetree Defendants used an inadequate assessment of the Refinery's condition to establish a wholly inadequate initial budget and scope of work for the Refinery restart.

107.    By November 2019—the Defendants' initial target date for stable commercial operations—major cost overruns on pipe replacement had surged to four times greater than initially estimated (300,000 feet needed replacement compared to 70,000 as initially estimated by the BP, ArcLight, and Limetree Defendants), and costs and delays continued to plague the Refinery restart. At the same time, the Defendants faced significant financial constraints in the Refinery restart because the initial infusion of direct capital investment had gone almost exclusively to the restart of the terminal operation. Moreover, as the restart scope and need for additional capital continued to balloon because of the inadequate initial assessment, the COVID-19 Pandemic brought more significant delays and challenges, including a sharp deterioration in market conditions.

108.    As the Refinery restart began to fall further behind schedule and began to go excessively over budget, the Restart and Limetree Defendants continuously revised the target date for reopening the Refinery, indicating their awareness that the Refinery was not ready to properly and safely operate. However, despite knowing that the Refinery restart needed both more time and more money, and in order to capitalize on the fleeting MARPOL opportunity, the Restart Defendants continuously pressured the Contractor Defendants and Limetree Defendants to achieve stable commercial operations and commence and complete certain 14-day final completion tests for certain refining units, as required under the BP Products tolling agreement.

109.    By March 2020, certain investors (including ArcLight) recognized the danger of the situation and elected to no longer fund the Restart project. Given the misalignment among the investor group, (EIG's own words), Defendant EIG took control of the restart by funding a

42

disproportionate amount of capital in exchange for control of the Refinery through its Board of Directors. Leveraging its newly found authority, EIG exercised its board control to reshape senior management, appointing individuals committed to pushing forward with a Refinery restart at any cost. With this new power and the "misaligned" investors concerned about safe restart operations out of the way, EIG and BP Products continued to press on with a haphazard restart.

110.    By November 2020, the Refinery restart continued to face significant challenges in the start-up of the Refinery's largest units, including the Coker unit, that significantly impacted the overall timeline of the restart and the ability to achieve stable commercial operations as required under the BP Products tolling agreement.

111.    At some point in the fall of 2020—despite knowing the significant threats operation of the refinery, and in particular the Coker unit, posed—Defendant BP Products engaged even more pressure for a premature restart by threatening to pull out of its deal with the Refinery to supply the Refinery's crude and market its fuels. BP Products, despite knowing that the Refinery was not in a safe condition to do so, leveraged this pressure knowing that the Refinery's existence relied on its agreements and knowing that its withdrawal would have been fatal to the Refinery restart. BP Products' importance to the Refinery cannot be overstated. When the agreement was initially reached with BP Products in 2018, Government House issued a statement indicating: "Limetree Bay Refining announced Friday that it has reached a 'definitive agreement' with British Petroleum to *operate* the refinery on St. Croix's south shore."[70] Facing this significant mounting

---

[70]  https://stthomassource.com/content/2018/11/17/bp-signs-to-supply-arclight-refinery-no-word-on-70-million-promised-on-closing/ (last accessed Aug. 4, 2025) (emphasis in original); *see also* https://www.prnewswire.com/news-releases/limetree-bay-ventures-closes-1-25-billion-financing-to-restart-its-refinery-in-st-croix-300758220.html (last accessed Aug. 4, 2025) ("Limetree Bay Ventures announced today that it has closed a $1.25 billion financing to restart its refinery located at Limetree Bay, St. Croix, U.S. Virgin Islands. The company is undertaking the

pressure from the Restart Defendants, now led by Defendants EIG and BP Products, the Limetree Defendants and Contractor Defendants knowingly pushed forward with a hurried and substandard Refinery restart that did not adequately repair the deplorable condition of the Refinery, all at the expense of the residents of St. Croix.

112.    Through their varied work at and/or for the Refinery, the Limetree and Contractor Defendants failed to repair the Refinery in any proper manner and caused the Refinery to fall into a perilous and unsafe condition, ripe for the inevitable, but entirely preventable, Incidents that immediately followed. Such work included, without limitation, negligent and reckless: (a) mechanical, piping, and other work performed by Defendant ETS; (b) pumps, machinery, and other work performed by Defendant UPS; (c) electrical, instrumentation, and other work performed by Defendant Excel; (d) inspection and other work performed by Defendant Versa; (e) hiring, staffing, and other work performed by Defendant Pinnacle; (f) construction and other work performed by Defendant NIS; and (g) general oversight, supervision, quality check, maintenance work, and sign-off on various aspects of the overall refitting project by the Contractor Defendants.

113.    On or around January 16, 2021, as a result of the relentless pressure from BP Products and EIG, the Limetree and Contractor Defendants rushed forward with commencing a fourteen-day stable commercial operations test for certain Refinery equipment, as required by the BP Products tolling agreement. But because of continuous problems with the Coker unit, the Restart Defendants were not able to start the Coker unit for its final completion test. Achieving fourteen days of stable operations of the Coker unit, however, was imperative for the Refinery to reach profitability and for the Restart Defendants to recoup their investment on the project. Despite

---

project **in conjunction** with the tolling, supply and offtake agreements that it entered into with BP Products North America earlier this month.").

44

the significant risks it posed, Defendants (at the behest of EIG and BP Products) continued to push forward with attempting to operate the Coker unit, despite the unit suffering from continuous failures that should have triggered a pause in operation to understand and mitigate the root causes.

114.    As expected, the Refinery experienced emission events violative of the Refinery's environmental permits nearly every day after the Limetree and Restart Defendants began their initial testing for stable commercial operations. Despite this, on February 1, 2021—three years after Defendants began the maintenance and repair work on the Refinery that was significantly interrupted by COVID-19—the Limetree Defendants and EIG announced that the Refinery restarted operations for the first time since its closure in 2012.[71] Approximately, three days later, the first of four significant Incidents occurred at the Refinery, starting an unprecedented sequence of events that caused the harm and damage alleged herein.

115.    The Refinery was obviously not properly refurbished and/or refitted to function in a safe manner as Defendants proclaimed, in part because of the significant pressure from the Restart Defendants, and in part because of the negligent and reckless manner in which the Refinery was owned, restarted, operated, and/or maintained, including, without limitation, the negligent and reckless hiring, supervision, and oversight implemented by Defendants, including the Contractor Defendants.

---

[71]    *See*   https://eigpartners.com/limetree-bay-ventures-commences-refinery-startup-operations/, (last accessed Aug. 4, 2025).

**E.    The Incidents Caused by the Limetree Bay Refinery**

116.    In addition to being non-compliant with EPA regulations and the HOVENSA Consent Decree almost every day since December 15, 2020, four significant Incidents occurred on February 4, 2021, in late April 2021, on May 5, 2021, and on May 12, 2021—all of which caused harm to the Plaintiffs and the members of the putative Class.

**i.    Incident One**

117.    On February 4, 2021, only a few days after restarting the Refinery, Toxic Incident One occurred when a flare at the Refinery caused the release of oil to rain down on over a hundred homes, vegetation and cars in the adjacent neighborhood of Clifton Hill and beyond (the "February 4 Incident"). Residents noted a "mist of oil" emitting from the Refinery that coated their homes. One media account described the flaring incident as having "spewed a plume of steam and fuel residue into the air, covering more than 130 homes with specks of oil and contaminating the drinking water of more than 60 residents."

118.    According to the EPA, "a mixture of oil and water, in the form of an oily mist, was emitted as air emissions from Flare #8 at the Limetree Bay Facility."[72] These emissions included liquid droplets of oil and other toxins.

119.    Within hours, the Limetree Defendants began receiving calls from residents in the nearby Clifton Hill community reporting the presence of oil on their vehicles and homes. Limetree was certainly aware of the environmental impacts the February 4 Incident had on the surrounding communities and residents, but a press release dated March 3, 2021 issued by Limetree downplayed the incident to the public, stating as follows:

> St. Croix, U.S. Virgin Islands (March 3, 2021) – Last month, Limetree Bay experienced an upset in the refinery at Flare Unit #8. This incident resulted in a

---

[72] *In re Limetree* at ¶ 34.

release of steam and oil which traveled northwest. The release occurred while Operations was quenching one of the Coke drums, and the quenching operation was stopped to end the release.

Initial investigations did not reveal any impact beyond the refinery's fence line. Once Limetree was made aware that there was impact to the community, our environmental teams were immediately dispatched to neighboring areas to assess that impact.

After further investigation, Limetree's environmental team was able to field verify the area impacted by the release, which was determined to be the Clifton Hill community. While the release did not present a health hazard to the public, Limetree determined that oil droplets were present on some vehicles and roofs in the area, and implemented a plan to clean those roofs and vehicles.

Limetree executed its response plan and began cleaning cars immediately. The response plan included inspection and assessment of cars, roofs and properties, and assisting in disconnecting cisterns from roofs. In addition, Limetree retained a third party to sample cistern water for oil and grease, and this data is being analyzed in an EPA-certified lab in Florida (PACE Lab). To the residents whose cisterns were disconnected, Limetree provided drinking water on a daily basis, which was delivered to their door. Limetree also went door-to-door to all the residents in Clifton Hill and responded to all the complaints received. An area of impact was delineated on a map, and the plan for cisterns is to empty, clean and refill with potable water all cisterns whose lab results show a detection. Residents whose lab results show non-detect, will have their cisterns topped off with potable water.

All applicable regulatory agencies were notified at the time of the incident, and Limetree continues to work with both local and federal agency partners to ensure the continued safety of its personnel, the public and environment.[73]

120.    The Limetree Defendants confirmed that the Incident contaminated residents' property. Immediately following the Incident, Limetree Bay Terminals and Refining employees canvassed the Clifton Hill community, which involved employees inspecting over 200 properties and sampling at least 160 residents' cisterns. Limetree reported that as of March 16, 2021, of 135 cistern samples that had been tested, 70 were identified as contaminated. Limetree further paid for various cleaning and decontamination work and provided bottled water to the community. As

---

[73] Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Response to Flare Incident" (Mar. 3, 2021), formerly available at https://www.limetreebayenergy.com/limetree-bay-response-to-flare-incident/ (last accessed January 17, 2023).

reported to the EPA, 148 roofs and 245 cars required cleaning because of contamination from the Incident.

121. The Limetree Defendants ultimately admitted to the severity of the February 4 Incident: "during an April 30, 2021, site visit to the Facility by staff from EPA…, Limetree representatives said that Limetree believes that the release was a mist with heavy oil in it."[74]

122. The EPA indicated that the February 4 Incident could have been caused by the Refinery's "knockout drums" that were "not designed with sufficient capacity."[75]

123. The EPA specified that "[t]his type of event is *not common* for a refinery startup."[76] In other words, this type of event is an unprecedented, egregious deviation of refinery operational norms all done under the control of the Restart Defendants, and through the actions of BP Products, the Limetree Defendants and the Contractor Defendants.

124. As a result of the February 4 Incident, and as a result of the Defendants' conduct, the Plaintiffs and members of the putative Class suffered personal harm and harm to their property.

125. According to the EPA, "[i]n early April, the Refinery stopped operations for a period of time due to undisclosed operational issues. [Limetree Bay Refining] stated in a letter to the EPA that the 'refinery is shut down while we make operational adjustments.'"[77] These "operational adjustments" did not, however, resolve the Refinery's issues.

126. Despite the extensive and severe contamination that resulted from the February 4 Incident, residents whose cisterns were impacted were not told of the contamination by the

---

[74] *In re Limetree* at ¶ 42.
[75] *Id*. at ¶ 44.
[76] *Id.* (emphasis added).
[77] *Id*. at ¶ 45.

Limetree Defendants for several weeks, and information concerning the extent of the contamination was concealed from residents and the public.

127.    Any similar release forms that were obtained by the Defendants, including via its claims administrator contractor Sedgwick Claims Management Services ("Sedgwick"), are legally unenforceable for numerous reasons.

### ii.    Incident Two

128.    In late April of 2021, around the same time the Limetree and Restart Defendants began the restart of the problematic Coker unit in order to achieve profitability, Incident Two occurred.[78]

129.    Between April 19 and April 23, 2021, "Limetree reported … exceedances for the 162 parts per million ("ppm") emission standard for H2S [hydrogen sulfide] concentrations … at the facility."[79]

130.    The EPA stated, "H2S is a flammable, colorless gas that smells like rotten eggs. People can usually smell H2S at low concentrations in air when H2S concentrations are in the range of from 0.0005 to 0.3 ppm. Exposure to low concentrations of H2S may cause irritation to the eyes, nose, or throat. It may also cause difficulty in breathing for some asthmatics. Respiratory distress or arrest has been observed in people exposed to very high concentrations of H2S."[80]

---

[78] During this time, the Limetree Defendants were undergoing significant personnel changes, as reflected by the fact that on April 19, 2021, Limetree Bay Terminals issued a press release announcing "that Neil Morgan has been named as Refinery General Manager, effective today. Mr. Morgan succeeds Robert Weldzius, who joined Limetree Bay primarily to lend his deep refining expertise during the Company's early formation and through the restart process." *See* Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Names Neil Morgan as Refinery General Manager" (Apr. 19, 2021), formerly available at https://www.limetreebayenergy.com/limetree-bay-names-neil-morgan-as-refinery-general-manager/ (last accessed January 17, 2023).

[79] *In re Limetree* at ¶ 46.

[80] *Id*. at ¶ 47.

131.    From April 19-22, 2021, "hydrogen sulfide concentrations measured at the Flare #8 flare header rose to orders of magnitude above the limit of 162 ppm … High hydrogen sulfide readings on each of those four days, measured between 5 AM on April 19 and 5 PM on April 22, rose as high as 31,546.5, 39,475.7, 2,272.4, and 4,046.5 ppm, respectively[.]"[81]

132.    Additionally, "Limetree continued to measure high levels of hydrogen sulfide in excess of the 162 ppm limit at the flare header for Flare #8 . . . during the evening of April 22 and into April 23, 2021. Hydrogen sulfide readings rose throughout the evening on April 22, 2021 and peaked at a three-hour average of 91,649.0 ppm around 11 AM on April 23—over <u>565 times higher</u> than the concentration limit of 162 ppm."[82]

133.    In addition to the hydrogen sulfide release, the EPA confirmed the presence of "emissions plumes,"[83] which makes it highly likely that aerosolized oil droplets formed due to the chemical reaction with atmospheric constituents, including water.

134.    On April 23, 2021, Limetree Bay Terminals issued a press release stating:

**Limetree Bay Responding to Site Incident**

ST. CROIX, U.S. Virgin Islands (April 23, 2021) – The Limetree Bay refinery experienced an operating upset overnight and into the early morning hours which created a strong odor detectable outside the facility. Limetree has corrected the problem and will continue to monitor any additional impact to the outside community.

The executive management of Limetree Bay sincerely apologizes for any impact to the public.[84]

---

[81] *Id*. at ¶ 49.
[82] *Id*. at ¶ 51 (emphasis in original).
[83] *Id*. at ¶ 62.
[84] Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Responding to Site Incident" (Apr. 23, 2021), formerly available at https://www.limetreebayenergy.com/limetree-bay-responding-to-site-incident/ (last accessed January 17, 2023).

135.    As a result of the April 23 Incident, multiple St. Croix schools and businesses were forced to shut down, and U.S. Virgin Islands officials issued stay-indoors orders. Further, St. Croix's Covid-19 vaccination center was forced to close.

136.    On April 24, 2021, the Virgin Islands Department of Health ("VIDOH") issued a press release alerting St. Croix residents to potential health effects from the Facility's Refinery emissions:

**VI Government Alerts St. Croix Residents About Potential Health Effects Caused By Refinery Emissions**

St. Croix, US Virgin Islands (April 24, 2021)— Commissioner Jean-Pierre L. Oriol of the Department of Planning and Natural Resources (DPNR) advises the community that the department has confirmed that there were elevated concentrations of H2S (Hydrogen Sulfide) in the No. 8 flare header at the Limetree Bay Facility. The department is in close communications with the facility, and an investigation is ongoing to determine necessary corrective measures.

This foul, gaseous smell, which can smell similar to rotten eggs, has permeated throughout the Frederiksted area for the past few days.

Health Commissioner Justa Encarnacion, RN, added, "any potential threat to the health of the public is always a concern of mine. As DPNR continues to monitor environmental effects, I encourage you to report symptoms like headaches, nausea, and especially those of a respiratory nature to your healthcare provider."

According to the Agency for Toxic Substances and Disease Registry, hydrogen sulfide can have mild to severe health impacts. Studies in humans suggest that the respiratory tract and nervous system are the most sensitive targets of hydrogen sulfide toxicity.

Exposure to low concentrations of hydrogen sulfide may irritate the eyes, nose, or throat. It may also cause difficulty in breathing for some asthmatics. Respiratory distress or arrest has been observed in people exposed to extremely high concentrations of hydrogen sulfide.

Exposure to low concentrations of hydrogen sulfide may cause headaches, poor memory, tiredness, and balance problems. Brief exposures to high concentrations of hydrogen sulfide can cause loss of consciousness. In most cases, the person regains consciousness without any other effects. However, some individuals may have permanent or long-term effects, such as headaches, poor attention span, poor memory, and poor motor function.

51

Individuals with respiratory ailments such as allergies, lung disease, or asthma should consider taking protective actions such as staying indoors or temporarily relocating to areas less affected.

The Department of Planning and Natural Resources (DPNR) and the Department of Health will monitor this situation and advise the community accordingly. If you have any questions or concerns, please call DPNR at (340) 773-1082 ext. 2221 or Environmental Health division at (340) 718-1311 ext. 3709.[85]

137.    The VIDOH's press release specifically noted the potential physical health effects resulting from breathing hydrogen sulfide and encouraged residents to report symptoms such as headaches, nausea, and symptoms of a respiratory nature to their healthcare providers.

138.    That same day, on April 24, 2021, Limetree issued a false press release denying any release of hydrogen sulfide occurred from April 22 to 23, 2021. Limetree falsely claimed that the Incident involved only an unusually high level of sulfur dioxide emissions, and that the odor of sulfur dioxide (similar to a struck match) can be smelled in amounts far below the level normally considered dangerous to health. The text of this press release is below:

**Limetree Continues to Investigate Flare Incident; Clarifies Media Reports**

ST. CROIX, U.S. Virgin Islands (April 24, 2021) – Late evening April 22nd through the morning of April 23rd, the refinery experienced an operating upset in the sulfur processing part of the refinery. Limetree investigated and determined that this upset caused a pressure increase in some equipment, resulting in the opening of a pressure relief valve, and sending an unusually high amount of sulfur-containing gases to the flare, where they were safely burned. The pressure relief valve and flare are designed to work this way to protect the refinery workers and community.

When the sulfur-containing gases burned in the flare, sulfur dioxide was produced. This unusually high level of sulfur dioxide coming from the flare unfortunately resulted in an odor that was evident to parts of the neighboring community. Sulfur dioxide has an odor similar to a struck match and can be smelled even at a very low

---

[85] Press Release, United States Virgin Islands Department of Health, "VI Government Alerts St. Croix Residents About Potential Health Effects Caused By Refinery Emission" (Apr. 24, 2021), formerly available at https://doh.vi.gov/news/vi-government-alerts-st-croix-residents-about-potential-health-effects-caused-refinery (last accessed Sept. 21, 2023).

> concentration level, which is far below the level normally considered dangerous to health.
>
> The refinery workers took action to correct the upset condition, which eliminated the source of the bad odor by late morning April 23rd. After a few more hours, all traces of the odor dissipated on Friday.
>
> We would further like to clarify that the refinery did not experience a gas leak of hydrogen sulfide during this incident, as some media reports indicated. Hydrogen sulfide was a component in the gases that were safely burned in the flare, generating the sulfur dioxide that resulted in the odor.
>
> The executive management of Limetree Bay sincerely apologizes on behalf of the entire organization for the unpleasant odor that came from the refinery yesterday and for its impact on our neighbors and the community. We are committed to investigating fully the reasons for this event in cooperation with local regulators, and to implement improvements to prevent it from happening again.
>
> For more information or to report an issue, please contact the Limetree Bay Command Center at (340) 692-3000.[86]

139.    During an April 30, 2021 site visit to the Facility by staff from EPA and other regulators, "Limetree staff explained that the April 23, 2021 incident was related to the main sulfur recovery unit #4's fire eye detecting a lack of flame, and thus diverting the acid gas to the flare rather than treating it. The flare itself had a flame burning at the time that would have burned the hydrogen sulfide, producing sulfur dioxide."[87]

140.    Problematically, Limetree did not have the appropriate environmental safeguards in place to monitor sulfur dioxide or hydrogen sulfide. According to the EPA, "Limetree also does not conduct any fenceline monitoring for SO2 or H2S; it only conducts fenceline monitoring for benzene. Limetree's predecessor, HOVENSA, operated five SO2 monitors near the perimeter of

---

[86] Press Release, Limetree Bay Terminals, LLC, "Limetree Continues to Investigate Flare Incident; Clarifies     Media     Reports"     (Apr.     24,     2021),     formerly     available     at https://www.limetreebayenergy.com/ limetree-continues-to-investigate-flare-incident-clarifies-media-reports/ (last accessed Jan. 17, 2023).
[87] *In re Limetree* at ¶¶ 58-60.

the Facility, but those monitors have not been operated since 2013, after HOVENSA stopped operating the Facility's Refinery. Limetree has not restarted those SO2 monitors."[88]

### iii.   Incident Three

141.   On May 5, 2021, during the Limetree and Restart Defendants' final completion test of the Coker unit, Incident Three occurred (the "May 5 Incident").[89]

142.   This time, a "gaseous leak" resulted in at least 200 known reports from residents complaining of the odor and serious health effects including "[n]ausea, vomiting, stomach aches, itching, irritated eyes, and rash."

143.   While St. Croix does not currently have a fully operational hospital, at least nine residents visited emergency rooms because of the May 5 Incident. Many others sought treatment from private providers.

144.   In addition, local schools were forced to shut down and send children home for the second time in less than a month.

145.   According to the EPA, "On May 5, 2021, community members began calling EPA to report that an odor was emitting from the Facility. They described the odor as 'sulfur,' 'gassy,' 'burnt eggs,' and 'rotten.' On May 6, 2021, community members continued to report odor emitting from the Facility. At 7:08 PM est, a citizen caller reported that the odor was continuing and described the fumes as 'noxious.' The caller also stated that the 'materials in the air were causing

---

[88] *Id.* at ¶ 66.

[89] The upheaval in major personnel changes among leadership at the Refinery continued, *see supra note* 71, in early May 2021 with the replacement of Forgan McIntosh, the Chief Financial Officer ("CFO"), with Steve Tompsett, as described in a press release issued by Limetree Bay Terminals, LLC, stating that Tompsett would become the CFO of Limetree Bay Energy, pursuant to the press release appearing to encompass Limetree Bay Refining and Limetree Bay Terminals. *See* Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Appoints New Chief Financial Officer" (May 3, 2021), formerly available at https://www.limetreebayenergy.com/limetree-bay-appoints-new-chief-financial-officer/ (last accessed Jan. 17, 2023).

54

health problems' for community members, including 'head ache, sore throat, ear ache, nausea, and lips and tongue tingling.'"[90]

146.    Despite these warnings, on May 5, 2021, Limetree issued an initial statement on Facebook once again falsely "denying that there were any problems at the Facility." Limetree stated in its Facebook post that Facility personnel had conducted a preliminary investigation, and Limetree had concluded that "units are operating normally, and there is no activity that would result in an odor."[91]

147.    That same day, Limetree admitted environmental violations to the EPA and other agencies, in direct contradiction to its false statements to the public. Per the EPA, "On May 5, 2021, Limetree environmental personnel reported to DPNR and EPA that the Facility had exceeded the H2S limit at Flare #8 at approximately 9 PM est on May 5. At the time the email notification was sent to DPNR and EPA at 10:12 PM est, Limetree environmental personnel stated that H2S was back below the limit."[92]

148.    On the next day, May 6, 2021, Defendants released the following statement: "Limetree Bay has become aware of an odor affecting areas west of the facility. We are conducting maintenance activity at the Coker unit, which has resulted in light hydrocarbon odors. We will continue to monitor the situation, but there is the potential for additional odors while maintenance continues. We apologize for any impacts this may have caused the community. Thank you."[93]

---

[90] *In re Limetree* at ¶ 69.
[91] *Id.* at ¶¶ 69, 71.
[92] *Id.* at ¶ 72.
[93] *Id.* at ¶ 73.

149.    On May 6, 2021, due to the noxious odor released by the Refinery, the U.S. Virgin Islands' Bureau of Motor Vehicles closed due to the presence of a "gas like odor."[94] On the same day, the Virgin Islands' Department of Education closed three schools.[95]

150.    On May 7, 2021, Virgin Islands Governor Albert Bryan "activated the … National Guard … to address continuing reports of odor and heightened concern from the community."[96] The government "advised residents with respiratory ailments to avoid going outside or to temporarily relocate to areas of the island that were less affected by the odors."[97]

151.    On that same day, the Defendants reported to the EPA that yet another spike of H2S was released into the environment as a result of the Refinery and Defendants' operations thereof.[98]

152.    Because of the visible plume, it is highly likely that aerosolized oil droplets formed due to the chemical reaction with atmospheric constituents, including water. These droplets then fell to the ground, contaminating Plaintiffs' and Class Members' residences, property and water supplies.

153.    On May 9, 2021, Limetree Bay Terminals issued another press release, stating:

**Limetree Bay Continues to Work with Government to Identify Odor**

ST. CROIX, U.S. Virgin Islands (May 9, 2021) – Limetree Bay Refining, LLC ("Limetree Bay" or the "Company") continues to work with local and federal regulators to determine the source of recent odors affecting areas in the western part of St. Croix.

In response to community concerns and to support efforts by the U.S. Virgin Islands Government to identify the source of recent odor complaints, industrial hygiene specialists at Limetree Bay conducted air monitoring beginning Friday and continuing through Saturday evening at five locations immediately to the West and Northwest of the refinery. This air monitoring detected zero concentration of

---

[94] *Id.* at ¶ 76.
[95] *Id.* at ¶ 75.
[96] *Id.* at ¶ 77.
[97] *Id.*
[98] *Id.* at ¶ 78.

hydrogen sulfide, zero concentration of sulfur dioxide and zero concentration of hydrocarbons. The results of this monitoring have been shared with the Department of Planning and Natural Resources (DPNR).

Limetree Bay remains committed to cooperating fully with the local and federal government to identify the source of the odor and will work to immediately address any findings identified from the odor investigation that are attributable to the refinery.[99]

### iv.    Incident Four

154.    On May 12, 2021, halfway through the Coker unit's field completion test, Incident Four occurred.

155.    Incident Four involved a "flare rainout" event, in which Flare #8 spewed a heavy "pitch oil" on downwind communities. According to the EPA, "[o]n May 12, 2021 at approximately 5:30 PM, Limetree reported to EPA that around 3:15 PM EST a flaring incident occurred at the Refinery when the pressure in the coker drum rose, causing fire or flames. At the time, Limetree was still unsure what specifically caused the flaring incident. Limetree reported that during its investigation of the fire, Limetree discovered that liquid droplets of oil were on the road west of the Facility."[100] "Liquid droplets of oil" were also reported on properties in the surrounding neighborhood.[101]

156.    Additionally, "[a]t 8:50 PM on May 12, 2021, Limetree staff told EPA staff by phone that Limetree was stopping production after such a 'big' incident. This would not be a full shutdown of the Refinery, but Limetree would stop production. Limetree would run some units on

---

[99] Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Continues to Work with Government to Identify Odor" (May 9, 2021), formerly available at https://www.limetreebayenergy.com/ limetree-bay-continues-to-work-with-government-to-identify-odor/ (last accessed Jan. 17, 2023).
[100] *In re Limetree* at ¶ 79.
[101] *Id*.

circulation and the utilities/wastewater would still be in operation. The Limetree staff was not sure how long production would be suspended."[102]

157.    The EPA once again indicated that "this type of event—let alone two such events in a few months—is *not common* for a refinery startup."[103] Or, in other words, such an incident was not common for an operation other than one controlled by the Restart Defendants.

158.    In response to this Incident, Limetree issued its own press release indicating that "[t]his incident resulted in a release of oil droplets which traveled directly west." **Limetree further advised certain residents to "disconnect downspouts to cisterns if accessible."** Specifically, the press release stated, in pertinent part:

> **Limetree Bay Responding to Flare Incident**
>
> St. Croix, U.S. Virgin Islands (May 12, 2021) – On Wednesday, Limetree activated its Incident Command in response to an upset in the refinery at Flare Unit #8. This incident resulted in a release of oil droplets which traveled directly west.
>
> Preliminary investigations have revealed that there has been an impact to the Enfield Green community, as well as some industrial sites. Residents in Enfield Green are asked to disconnect downspouts to cisterns if accessible. Residents are also asked not to consume the water. Water distribution will be established for affected communities.
>
> In response to today's incident, Limetree Bay has decided to temporarily suspend production activities until further notice. All processing units will be brought to a safe, stable condition.
>
> Limetree will continue to assess the impact and advise if additional neighborhoods are affected. If you think you may have been impacted by the release, please contact Limetree's Incident hotline at (340) 692-3199.

---

[102] *Id.* at ¶ 84.
[103] *Id.* at ¶ 89 (emphasis added).

All applicable regulatory agencies were notified at the time of the incident, and Limetree's top priority is the safety and well-being of its personnel, the community and environment.[104]

159.    The EPA called the May 12 Incident "a serious incident that led to exceedance of the emission limit for sulfur dioxide, a toxic gas."

160.    In the wake of the May 12 Incident, the Virgin Islands Territorial Emergency Management Agency warned residents about a "gaseous odor" and urged those with respiratory illnesses to stay inside.

161.    Limetree issued another press release dated May 13, 2021, the following day, regarding the cause of the May 12 Incident:

**Limetree Bay Continues Flare Incident Investigation**

Company dispatches field teams *to assess Community Impact*

St. Croix, U.S. Virgin Islands (May 13, 2021) – Limetree Bay continues to investigate Wednesday's flaring incident and assess the condition of the refinery's equipment. ***Upon further investigation, it was determined that the flaring incident was caused by an upset at the Coker unit***.

As of noon Thursday, production at all of the process units were discontinued, and Limetree is nearing completion to bring them to a safe, stable condition.

Limetree deployed teams to several communities west of the facility to assess the impact of Wednesday's release, and field representatives have begun information gathering and property inspections. ***Thus far, investigations have revealed there are scattered impacts to neighborhoods as far west as Estate Whim.***

***Residents who may have been affected by the oil release are reminded not to consume the water from their cisterns.*** Daily water distribution has been established for affected communities.

Limetree sincerely apologizes for the impact this has caused the community and will continue to assess the impact and advise if additional neighborhoods are

---

[104] Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Responding to Flare Incident" (May 12, 2021), formerly available at https://www.limetreebayenergy.com/limetree-bay-responding-to-flare-incident/ (last accessed Jan. 17, 2023).

affected. If you think your property may have been impacted by the release, please contact Limetree's Incident hotline at (340) 692-3199.[105]

162.    Limetree issued yet another press release dated May 18, 2021, stating that operations at the Refinery had been suspended:

**Limetree Bay Confirms Refinery Operations Suspended**

St. Croix, U.S. Virgin Islands (May 18, 2021) – Limetree Bay Energy ("Limetree Bay" or the "Company") is aware of persistent odor complaints across St. Croix and would like to reaffirm that the refinery has ceased operating.

Limetree Bay immediately suspended operations after last Wednesday's flare incident, which resulted in a release of oil to several Frederiksted neighborhoods, and all refining had been discontinued by Thursday morning. …

The Company would like to assure residents that the refinery's shutdown activities are not likely to cause such widespread odors detectable outside of the facility. Limetree Bay will continue to cooperate with the EPA and local regulators to identify and address the source of any odor attributable to refinery activities.

Residents who think their property may have been impacted by the recent release should contact Limetree Bay's Incident Hotline at (340) 692-3199.[106]

163.    Like the first Incident in February, Limetree established water distribution centers and began conducting its own investigation. Indeed, because the event was significantly larger than previous Incidents, Limetree hired the catastrophic response team of Sedgwick claims administrators to inspect properties for contamination. Sedgwick physically inspected these properties for contamination. Approximately 2,200 of the 2,300-2,400 homes inspected by Sedgwick were identified as contaminated by the Releases. This number is notably underinclusive.

---

[105] Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Continues Flare Incident Investigation" (May 13, 2021), formerly available at https://www.limetreebayenergy.com/limetree-bay-continues-flare-incident-investigation/ (last accessed Jan. 17, 2023) (emphasis in bold and italics added).

[106] Press Release, Limetree Bay Terminals, LLC, "Limetree Bay Confirms Refinery Operations Suspended" (May 18, 2021), formerly available at https://www.limetreebayenergy.com/limetree-bay-confirms-refinery-operations-suspended/ (last accessed Jan. 17, 2023).

Sedgwick abruptly stopped its work after a few weeks, before completing all inspections, because Limetree failed to pay Sedgwick for its services.

**v.    EPA Intervention**

164.    Because of the ongoing violations and the seemingly never-ending Incidents at the Refinery, the EPA had no choice but to intervene.

165.    On March 25, 2021, amid concerns raised by non-governmental organizations and members of the community, the EPA withdrew the PAL permit granted to the Refinery in December 2020, which had never gone into effect due to a number of appeals. Though the permit was withdrawn, the Refinery's operations were permitted to continue pursuant to the dozen other Clean Air Act permits issued to HOVENSA and transferred to the Refinery.

166.    On April 30, 2021 and June 16, 2021, the EPA issued Notices of Violations to Limetree Bay Terminals and Limetree Bay Refining, respectively, for their failure to operate five sulfur dioxide ("SO2") ambient air monitors as required by the Title V Permit issued to the Refinery. The Notice of Violations also cited Limetree Bay Terminals' and Refining's failure to operate a meteorological tower used to monitor, collect and report wind direction data as required by the Refinery's permits.

167.    And most importantly, on May 14, 2021, two days after the catastrophic Fourth Incident, the EPA issued an Emergency Order addressed to Limetree Bay Terminals and Refining, requiring that the Refinery immediately cease operations—an action the EPA had taken only three times in the history of the Clean Air Act.

168.    The Refinery has not resumed operations since the issuance of the EPA's Emergency Order, but the damage to the surrounding people, the island of St. Croix and the property on the island continues unabated.

169.    The harms caused by Defendants were a direct result of Defendants' negligent and reckless restart of the Refinery. Indeed, in finding that Limetree Bay Terminals and Refining had violated the Clean Air Act, the EPA noted that, "Limetree has a single Environmental Department, known as the Health, Safety, and Environmental ("HSE") Department, serving the entire Facility, including the Refinery and marine loading terminal operations. In addition to managing environmental compliance at the Facility, the HSE department also oversees safety and implementation of COVID-19-related procedures. The entire HSE department consists of 5 employees . . . A Refinery of this size and complexity would be expected to have 10-20 full time onsite staff in its health, safety and environment department."[107]

170.    These findings show that Defendants were not adequately staffed or otherwise capitalized to run a Refinery of this size—especially given the Refinery's history and proclivity to cause environmental disasters.

171.    Further, following the EPA intervention and subsequent bankruptcy of Limetree Bay Refining, West Indies Petroleum and Port Hamilton Refining and Transportation bought the Refinery in December 2021.[108] By September 2022, less than a year after ownership passed, the EPA conducted an inspection of the Refinery under new ownership and observed "significant corrosion" of equipment, including corrosion of vessels, piping and valves.[109] The deplorable state of the Refinery shows that it was in a similarly deplorable state during the Refinery's previous brief operation and further demonstrates that the restart was not executed in any kind of safe or cautious manner.

---

[107] *In re Limetree* at ¶ 91-92.
[108]    https://www.reuters.com/business/energy/corrosion-st-croix-refinery-risks-explosion-catastrophic-releases-epa-2022-10-25/ (last accessed Aug. 4, 2025).
[109]    https://www.washingtonpost.com/climate-environment/2022/10/28/refinery-st-croix-epa-limetree/ (last accessed Aug. 4, 2025).

**F.    The Corporate Façades**

172.    No corporate separateness existed between the Limetree Defendants in the restart of the Refinery. At various times between the purchase of the Refinery out of the HOVENSA bankruptcy and the restart of Refinery operations in early 2021, Limetree Bay Ventures, Limetree Bay Energy, Limetree Bay Preferred Holdings and Limetree Bay Holdings functioned as mere alter egos of Limetree Bay Refining and Limetree Bay Terminals. These entities served no separate existence or function outside of the corporate interests of Limetree Bay Refining and Limetree Bay Terminals, as evidenced by the companies': (i) maintenance of insurance coverage for the Refinery, (ii) lack of employees and (iii) shared officers with Limetree Bay Refining and Limetree Bay Terminals.

173.    Limetree Bay Refining and Limetree Bay Terminals also operated as mere alter egos of each other. For example, Limetree Bay Refining and Limetree Bay Terminals were parties to a Shared Services Systems Agreement ("Agreement") pursuant to which both entities "share[d] services (e.g., water, power, wastewater, etc.), facilities (e.g. on-site office space, employee housing, parking lots, etc.), employees, and insurance coverage."[110] Additionally, Limetree Bay Refining and Limetree Bay Terminals had a single HSE Department that served the *entire* facility. This sharing of services, assets and personnel resulted in an excessive comingling that far exceeds any norms that characterize a sister-company relationship.

174.    In addition to agreeing to share costs, employees and a HSE Department, Limetree Bay Refining and Limetree Bay Terminals also blurred all physical separation between the two entities by sharing property as well. The two entities reciprocally conveyed an undivided interest

---

[110] Declaration of Mark Shapiro in Support of Chapter 11 Petitions and First Day Motions at p. 9-10 ¶ 26, ECF No. 8, *In re Limetree Bay Refining*, No. 21-32351 (Bankr. S.D. Tex. July 12, 2021).

63

of all properties and facilities owned by each entity to the other entity, such that each entity "jointly own as tenants in common" all properties and facilities owned by both entities.[111]

175.    Upon information and belief, Limetree Bay Terminals also siphoned funds from Limetree Bay Refining by way of charging Limetree Bay Refining nearly $5.5 million in "storage costs" each month for storage at a facility that both entities shared and co-owned.

176.    Further, ArcLight, Freepoint and EIG dominated and controlled the Limetree Defendants through yet another corporate façade. These Restart Defendants were the primary entities responsible for capitalizing, and profiting from, the recommissioning of the Limetree Bay Facility. The entities operating the Facility—Limetree Bay Ventures, Limetree Bay Energy, Limetree Bay Holdings, Limetree Bay Preferred Holdings, Limetree Bay Refining and Limetree Bay Terminals—were set up as entities merely existing to create layers of separation between the Restart Defendants. The Limetree Defendants had no money or financial resources but for that given by the Restart Defendants, and the separation of these entities is fictitious and an abuse of the privilege of incorporation.

177.    The Restart Defendants woefully undercapitalized the refurbishment and recommissioning of the Facility, specifically the Refinery, for an undertaking of its magnitude. The entity's undercapitalization is evidenced by, among other things, the four significant environmental disasters that occurred in less than four months of operation (one occurring within the first three days of operation), the wholly inadequate staffing at the Refinery in the short time it operated, particularly in the HSE Department, and the Refinery's current deplorable condition. The Restart Defendants intentionally incurred risk that the Refinery would cause more

---

[111] *See* Objection and Reservation of Rights to Debtors' Emergency Motion for Entry of Interim and Final Orders at p. 5, ECF No. 252, *In re Limetree Bay Refining*, No. 21-32351 (Bankr. S.D. Tex. July 31, 2021).

environmental damage to the neighboring community, fully knowing that Limetree Bay Ventures, Limetree Bay Energy, Limetree Bay Preferred Holdings, Limetree Bay Holdings, Limetree Bay Refining and Limetree Bay Terminals were undercapitalized and could not support such an operation.

178.    Upon information and belief, the Restart Defendants and BP Products were directly involved in the decision to continue Refinery operations after the first, second, *and third* Incidents. These entities were also aware of the Refinery's continuous non-compliance with EPA regulations and the Consent Decree nearly every day since December 15, 2020. After each environmental disaster, the Limetree Defendants, Restart Defendants, and BP Products had the opportunity to comprehensively evaluate the safety of continued Refinery operations, as expected in operational best practices of environmental management. Despite the clear warnings that the Facility was not safe, and should not be operated, these Defendants refused to close operations and instead continued to serve their own profit motives. Any stateside refinery would have been immediately shut down after just *one* of these toxic incidents. The Refinery operations were not restricted until so ordered by the EPA—after the occurrence of *four* Incidents and a daily onslaught of emissions from the Refinery.

### vi.    Plaintiffs and the Class Were Devastated by the Toxic Incidents

179.    The Incidents at the Refinery, which were purposefully, falsely, and massively understated in the press releases issued by the Limetree Defendants, caused a severe, ongoing, and well-documented human health crisis in St. Croix, in that the actions of Defendants and the Refinery poisoned the environment, homes, real property, gardens, vegetation, soil, personal property, water, cisterns, and plumbing systems of Plaintiffs and the Class, and exposed them to

hazardous, toxic, and carcinogenic material that can and has caused serious bodily injury and/or death.

180.    The Incidents have had and continue to have a far-reaching impact on the people living and working near the Limetree Bay Refinery, the majority of whom are Black, Brown, or Latino, and many of whom are poor.

181.    At a virtual town hall meeting held on May 13, 2021, St. Croix resident ChenziRa Davis-Kahina stated emphatically, "[o]ur children are suffering. This is becoming uncomfortable to a point that we have to put out a hashtag like, 'We can't breathe.' We have to put out hashtags like, 'Stop killing us.' We have to put out hashtags to get people to hear what's happening here in a place that's supposed to be America's paradise."

182.    Jennifer Valiulis, who directs the St. Croix Environmental Association, underscored the effect of the Incidents on the local community and the need for immediate action stating, "[l]ately we are seeing incidents happening nearly daily with this refinery: Fires, flares, spills, noxious emissions, oil raining down into neighborhoods. Each one of these events has impacted our community in disastrous ways — severe illness, loss of food, loss of drinking water. At some point, we need to say that enough is enough and demand accountability from Limetree."

183.    Plaintiffs and Class members were desperate for answers and relief. The St. Croix Environmental Association noted "[w]e are receiving more and more calls each day from people that are frustrated with the lack of information and desperate for some relief from the air pollution that is making them sick."

184.    According to Frandelle Gerard, a local business leader and the executive director of the Crucian Heritage and Nature Tourism Foundation, "People are suffering, hospital admissions are up, and we don't know how long this will continue."

185. As a result of the Incidents, in addition to the substantial economic harms that arise from the need for massive remediation of the pollution caused by the Refinery, as detailed above, including, without limitation, the cleaning of all affected roofs, cisterns and plumbing systems to assure the delivery of safe water, (certain) Plaintiffs and many Class members also suffered personal injuries including, for example, loss of consciousness, death, becoming bedridden, suffering from swelling, stabbing pain and irritation of the eyes, a burning sensation in the nose and on the tongue, sore throat, nausea, vomiting, upset stomach, diarrhea, nose bleeds, rashes, fatigue, uncontrollable coughing, shortness of breath, chest pains, dizziness, headaches, discomfort from unsettling odors, sleeplessness, difficulty sleeping, aggravation of preexisting respiratory conditions and stress, mental anguish, anxiety and depression resulting from their experience and fear concerning the long-term health implications of their exposure to the Toxins.

186. Many Class members, including children, were hospitalized or sought medical care from clinics on St. Croix, and some residents even had to leave St. Croix to seek additional health care.

187. In issuing its May 14 Order, the EPA noted the significant health impact that exposure to certain Toxins could have on the affected Class members of St. Croix. In particular, with respect to hydrogen sulfide, exposure to even low concentrations is known to cause irritation to the eyes, nose, or throat and may cause difficulty in breathing for some asthmatics. People exposed to high concentrations of hydrogen sulfide can suffer respiratory distress or arrest and neurological effects.

188. Similarly, exposure to very high levels of sulfur dioxide is considered immediately dangerous to life and health. In addition, burning of the nose and throat, breathing difficulties, and severe airway obstructions may occur.

189. Moreover, the oil released by the Incidents is composed of hydrocarbons. Adverse health impacts have been associated with the inhalation or ingestion of, or dermal contact with, petroleum hydrocarbons or residue or water effected by petroleum hydrocarbons. Short-term exposures have caused skin and eye irritation, while longer term oral exposures have shown liver effects. In addition, some oil constituents have been classified as known or possible carcinogens.

190. Making things far worse, thousands of Class members still do not have access to adequate clean and safe water at their homes to survive.

191. In the days, weeks, and months that followed the Incidents, Class members discovered that their homes, cisterns, gardens, vegetation, cars, and other personal property were contaminated with oil and other Toxins. Specifically, Plaintiffs and Class members, and their property, were unnecessarily exposed to Refinery Contaminants because of Defendants' failure to operate the Refinery responsibly and lawfully, and Plaintiffs and Class members were also subjected to unreasonable odors, gases, vapors, and fumes because of Defendants' conduct in operating the Refinery.

192. The Toxins resulting from Defendants' operations at the Refinery, as well as the odors, gases, vapors, and fumes, impacted Plaintiffs' and Class members' properties and property values, are a blight and nuisance on Plaintiffs' and the Class members' communities, and have deprived Plaintiffs and Class members of their free use and enjoyment of their property.

193. In particular, cisterns are used on St. Croix to catch and store rainwater to use for drinking, bathing, washing dishes, brushing teeth, feeding livestock, and watering crops, plants, and vegetation.

194. Following the Incidents, (certain) Plaintiffs and members of the Class observed a distinctive sheen on the surface of their cistern water, felt an oily residue on their skin after bathing,

and noted the strange taste that their cistern water now has. They have also lost crops and watched livestock die due to the Toxins.

195.    Over 17,000 cisterns are located within the geographic zone impacted by the Incidents, including over 11,000 residences that have a cistern as the only source of clean water and over 5,000 residences that have a cistern and also access to public water for supplemental or emergency needs.

196.    Many Class members are poor and do not have the money to remediate the pollution from the Incidents. Many families impacted by the pollution and contamination have been forced to shower at the homes of friends or relatives that live outside the affected geographic area and have been forced to use laundromats for washing clothes. Some residents are forced to wash their clothes in the contaminated water because it is prohibitively expensive and time-consuming to do otherwise. Class members have had to buy bottled water to drink and cook with ever since the discharges. In short Plaintiffs and the Class have been unable to access clean and safe water to secure the basic necessities of their daily lives. This has gone on for several years with no end in sight, as Defendants have utterly failed to remediate the problems that they caused, notwithstanding the availability of insurance.

197.    Underscoring the seriousness of the conditions faced by Plaintiffs and the Class, following the Incidents, researchers from Bennington College in Vermont conducted a Community Impact Survey of area residents. Based on the survey, the researchers concluded that every neighborhood west and north of the Refinery was impacted by the Toxic Incidents, and the impacts of these events were particularly severe in predominantly low-income Black and Brown

69

neighborhoods downwind of the Refinery.[112] A review of just some of the survey responses lays bare the devastating impact on the community's health and property that resulted from the Incidents.[113] The summary of findings from the Bennington College researchers include, for example:

---

[112] Bennington College, *Environmental Justice Begins in St. Croix*, available at https://www.bennington.edu/center-advancement-of-public-action/environment-and-public-action/environmental-justice-begins-st (last accessed Aug. 4, 2025).

[113] *See id.* ("There was a period leading up to the time when the refinery closed where every single day was difficult to breathe. It was as if we were inhaling oil with each breath." (resident of **Frederiksted**); "The inside of our home was filled with visible dense 'fog' that hung on everything." (resident of **Whim**); "In April I was affected by the smell of oil and sulfur that caused headaches and nausea, In May, specifically May 12th and 13th, the smell was overwhelming causing me to cough, have severe headaches and difficulty breathing. Because I live in Whim, it affected me at night but during the day at my work in downtown Frederiksted, it was even more severe." (resident of **Whim**); "Our cistern has been contaminated, and multiple people in our house have thrown up from the gaseous fumes." (resident of **Williams Delight**); "There has been a nauseating and noxious sulphuric smell in the area. The smell has been impacting myself and my family, making our eyes, noses, and throats burn. In addition to this it causes dizziness and makes it hard to breathe. Our cistern water has been impacted and following an episode of rain that followed a flaring event, there were gelatin-like black globs in our water. We can no longer use our water for cooking or brushing our teeth. The water irritates my daughter's skin, who is affected significantly because she is allergic to sulphur. I am a farmer and I am concerned about my crops and my animals. I now have to purchase water, sometimes several times weekly, for uses that normally I would use my cistern water for." (resident of **Williams Delight**); "Headaches, nausea, vomiting at times, difficulty breathing, lethargic. My 2 dogs and cat have also been impacted too, very lethargic at times, runny eyes, itchy skin. I had to bring them inside. When the refinery was fully operation something was going on between 1 am and 3 am, I would be awaken with coughing and gagging, and a severe headache. My sinus would also be irritated. I would have to wash my face with cold water and rinse my nostrils out for relief. On occasion I had to use my inhalant." (resident of **Adventure Hill**); "We experienced dizziness and nausea. I was light headed and generally ill. Once it rained, it intensified the smell and I was going to pass out. We had to cover our faces with towels just to be able to walk around. My cat experienced diarrhea and irregular symptoms that day that I believe are an effect of the poisonous gas." (resident of **Frederiksted**); "Strong vapors that caused headache, sore throat, tight chest, coughing. Even the animals were having symptoms." (resident of **Mars Hill**); "The kids lay on the ground in my room complaining about headaches and stomach pain. They do not want to go outside whenever it's happening. I also do a lot of fishing and can only imagine how much is getting in the ocean. Fishing from shore has been terrible like nothing is there." (resident of **Two Williams**); "I woke up in the middle if the night coughing. My throat was sore. I tried to breathe through my pillow. A strong metallic odor

**SUMMARY OF FINDINGS**

Community Impact Survey was conducted June 17 to July 11, 2021 and elicited 681 responses from 120 different neighborhoods in St. Croix, US Virgin Islands.

Every neighborhood downwind of Limetree reported significant impacts to health and environment. Many of these impacts have not previously been reported.

Impacts were severe in predominantly low-income Black and Brown neighborhoods that line the northwest side of the refinery.

95% of responses from frontline neighborhoods reported frequent noxious smells from Limetree Refinery.

Over 70% of responses from downwind neighborhoods reported trouble breathing during Limetree emission episodes.

143 households reported cisterns contaminated by Limetree emissions.

Over 100 households reported gardens and farms damaged by emissions.

67 residents sought medical assistance during emission episodes.

This survey also uncovered 3 untimely deaths that family members attribute to toxic emissions from Limetree.

97% of responses believe the refinery should be required to operate a state-of-the-art air monitoring system before restarting.

90% of residents polled believe EPA should have a full-time employee at Limetree.

80% of residents polled do not trust Limetree to disclose environmental problems.[114]

198.     Indeed, the Incidents affected practically the entire western portion of St. Croix. Soil samples taken from areas west of the Refinery were found to be highly contaminated, while those taken from areas east of the Refinery were not. Similarly, cistern drinking water samples taken from areas west of the Refinery (*i.e.*, downwind), were found to be contaminated with oil-

---

prevailed early around 4 a.m. My trees leaves turned yellow along with the fruit. Some fruit had black spots. The water in my toilet bowl from the cistern has black sediment on the bottom." (resident of **Whim**).

[114] *Id.*

range (C28 – C40) petroleum hydrocarbons also deposited by the Incidents. Such a compound was not found in samples taken from the area east of the Refinery.

### vii. The Disproportionate Effects of Defendants' Conduct on Minority Communities

199. Plaintiffs and members of the putative Class were disproportionately harmed because of the Defendants' conduct alleged herein.

200. As the EPA has recognized repeatedly, "Limetree Bay is in a community predominantly made up of people of color and low-income populations who are already disproportionately affected by environmental burdens," and "[t]hese disproportionate burdens present environmental justice concerns."[115]

201. Indeed, the EPA found that in the neighborhoods adjoining the Refinery, 27% of residents live below the poverty line and 75% are people of color, and the EPA concluded that "in light of the burden already experienced by the nearby low income and minority populations, [the EPA] is requiring Limetree to resume an ambient air monitoring network that will measure $NO_2$, $SO_2$ and $PM_{2.5}$." [116]

202. But Defendants balked at those requirements and refused to implement the necessary monitoring to protect these minority populations, as evidenced by the EPA's April 30 Notice of Violation to the Refinery for failing to install the monitors.

203. This is not the first time that Defendant ArcLight has exploited vulnerable communities of color. According to data analyzed by the University of Massachusetts, ArcLight

---

[115] https://www.epa.gov/newsreleases/epa-notifies-limetree-bay-clean-air-act-violations (last accessed Aug. 4, 2023).

[116] U.S. EPA Region 2 Office, *Final Environmental Justice Analysis for Limetree Bay Terminal and Refining (Limetree) PAL Permit*, at p. 14 (Sept. 19, 2019), https://context-cdn.washingtonpost.com/notes/prod/default/documents/993fcf3f-f029-4915-aec6-a6232778de70/note/7b883ce9-4bca-4ca6-84e8-e143c39a3748 (last accessed Jan. 5, 2023).

has incurred millions of dollars in penalties for environmental violations, with minority communities accounting for more than 35% of the impact of those violations.[117]

204.    This data shows that ArcLight preys on communities of color, where environmental laws are underenforced, by refusing to implement the necessary protective and remedial measures in place to prevent harmful, toxic incidents—like those endured by Plaintiffs and Class Members—on the assumption that these vulnerable communities lack the resources to seek recourse for the harm caused by ArcLight's exploitation.

## V.    CLASS ACTION ALLEGATIONS

205.    Class Representatives bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a) and (b)(3), as representatives of a Class defined as follows:

> All persons or entities: (a) who owned or rented property (real and/or personal) in the Affected Geographic Area on or after February 3, 2021; or (b) who resided in, worked in, operated a business in, or were present in the Affected Geographic Area during the time period from February 3, 2021 to May 26, 2021.[118]

206.    **Numerosity.** Members of the Class are so numerous that joinder is impracticable. Plaintiffs do not know the exact size of the Class but believe that there are at least tens of thousands of class members. As such, a class action is superior to other methods of adjudication due to its capacity for efficiency and its preservation of judicial economy, more specifically.

207.    **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.

---

[117]https://grconnect.com/tox100/ry2018/index.php?search=yes&company1=535&chemfac=chem fac&advbasic=adv&sortp=city (last accessed Aug. 4, 2025).
[118] The term Affected Geographic Area means the western portion of the Island of St. Croix, more particularly described as bounded by 64.74 degrees West Longitude and the sea.

73

208.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving their own claims, Plaintiffs will prove other class members' claims as well.

209.    **Adequacy of Representation.** Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action chemical/toxin(s) contamination litigation. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

210.    **Commonality and Predominance.** There are questions of law and fact common to the Class that predominate over any individual issue, including, but not limited to:

- Whether Defendants' conduct alleged herein violates the laws as stated in the Cause of Action section, *supra*, at VI;

- Whether Defendants owed a duty to the Class;

- Whether Defendants breached any duties owed to the Class;

- Whether Defendants were negligent in failing to properly maintain and operate the Limetree Bay Refinery, including without limitation, prior to and following its reopening;

- Whether Defendants were reckless in failing to properly maintain and operate the Limetree Bay Refinery, including without limitation, prior to and following its reopening;

74

- Whether the Defendants allowed a "release" or "threatened release" of a hazardous substance from the Refinery within the meaning of 42 U.S.C. § 9607(a)(4);

- Whether the Limetree Bay Refinery constituted a public nuisance;

- Whether the Limetree Bay Refinery constituted a private nuisance;

- Whether the contamination that resulted from the Incidents constituted a trespass to the Class Members;

- Whether Class Members are entitled to medical monitoring and early detection of disease;

- The appropriate nature of class-wide equitable relief; and,

- The appropriate measurement of restitution and/or measure of damages to the Class Members.

211. The questions of law and fact common to Class members predominate over any questions that may affect only individual Class members, because Defendants acted on grounds generally applicable to the entire Class.

212. **Superiority.** Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that likely would be impracticable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

75

## VI.    CAUSES OF ACTION

213.    As to Defendant Limetree Bay Refining only, the claims in each count below are asserted against Limetree Bay Refining as a nominal defendant for the purpose of (a) establishing Claims against Limetree Bay Refining and its bankruptcy estate, and (b) preserving rights with respect to insurance coverage for such Claims, if any, and for no other purpose.

## COUNT I

## NEGLIGENCE

## (Against All Defendants)

214.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

215.    The actions of Defendants were negligent.

216.    Defendants ArcLight, EIG, Freepoint, and BP Products were "hands-on" in the acquisition, rehabilitation, permitting and operation of the Refinery. Through Defendants' ArcLight, EIG and Freepoint's subsidiaries, including Limetree Bay Ventures, Limetree Bay Holdings, Limetree Bay Refining and Limetree Bay Terminals, Defendants bought the Limetree Bay Facility out of the HOVENSA bankruptcy. These Defendants, the Limetree and Contractor Defendants, and BP Products then made repairs and retrofits to the Limetree Bay Facility, sought permitting and waiver of the significant HOVENSA fine levied by the EPA as a means to protect the St. Croix community, and operated the Refinery.

217.    Defendants ArcLight, EIG, Freepoint and BP Product's direct involvement in the acquisition, rehabilitation, permitting and operation of the Refinery, and the Restart Defendants reckless pressure for a premature restart, makes these Defendants responsible for the negligent restart of the Refinery.

76

218.  Defendants failed to properly store, use, refine and/or dispose of oil and other Toxins.

219.  Defendants failed to ensure that the Refinery was safe to reopen when they knew or should have known that it was not. Defendants also failed to hire and/or train personnel to conduct the reopening in a safe and effective manner.

220.  Despite Defendant ArcLight's acclaimed guidance on "environmental management," Defendants continued the Refinery operations after the first, second, *and third* Incidents. After each Incident, Defendants had the opportunity to comprehensively evaluate the safety of continued Refinery operations. Despite the clear warnings that the Refinery was not safe, and should not be operated, Defendants refused to close or limit operations and instead continued to serve their own profit motives. Any stateside refinery would have been immediately shut down after just *one* of these toxic incidents. The Refinery operations were not restricted until so ordered by the EPA—after the occurrence of *four* toxic incidents. Defendants not only failed to implement best practices; Defendants failed to adhere to any inkling of reasonable practices.

221.  Defendants' conduct fell below the standard of care of a reasonable property owner and/or operator in similar circumstances.

222.  Defendants knew and/or should have known that their failure to properly store, use, refine, and/or dispose of oil and other chemicals, Toxins, and particulates at the Limetree Bay Refinery would allow these dangerous materials to contaminate nearby neighborhoods and cause their residents personal injuries and property damages, including but not limited to diminution in value.

223.  Defendants failed to warn and/or provide Plaintiffs, the Class and the public at large with adequate and timely notice of the hazards and their potential impacts.

77

224.     Defendants' negligence caused both physical personal injury and real and personal property damage that also resulted in emotional distress and anxiety to Plaintiffs and Class Members.

225.     As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and Class Members have suffered damages as alleged herein.

## COUNT II
### GROSS NEGLIGENCE
### (Against All Defendants)

226.     Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

227.     In the Virgin Islands, a claim for gross negligence requires a showing that: (a) the defendant owed plaintiff a legal duty of care; (b) the defendant breached that duty in such a way to demonstrate a wanton, reckless indifference to the risk of injury to plaintiff; (c) and the defendant's breach constituted the proximate cause of (d) damages to plaintiff.

228.     Defendants owed a legal duty of care to Plaintiffs and the Class, and Defendants breached that duty.

229.     Defendants' breaches demonstrate a wanton, reckless indifference to the risk of injury to the Plaintiffs and the Class.

230.     As a result, Plaintiffs and the Class have been damaged as alleged herein.

## COUNT III
### NEGLIGENCE PER SE
**(Against Defendants Limetree Bay Refining, LLC and Defendant Limetree Bay Terminals, LLC (d.b.a. Ocean Point Terminals), as Owner of Operating Permits for the Limetree Bay Facility)**

231.     Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

78

232.    The actions of Defendant as set forth herein constitute negligence per se.

233.    Courts in the Virgin Islands have recognized negligence per se as a cause of action. *See Antilles School, Inc. v. Lembach*, 64 V.I. 400, 423 (V.I. 2016) (citations omitted). "A plaintiff suing for negligence per se relies on the doctrine that obviates the normal showings of the duty and breach-of-duty elements of an ordinary negligence claim by relying on the defendant's violation of a statute or other legally-binding regulation; that is, the plaintiff must demonstrate that the defendant had a duty to follow the law, failed to follow the law, and that such failure caused damages to the plaintiff as a person within the class intended to be protected by the statute or regulation." *Id.*

234.    Defendant had a duty to comply with numerous statutes, and subsequently failed to do so. Specifically, Defendant failed to comply with 28 V.I.C. § 331 (Private Nuisance), (*see infra* Count VII), 42 U.S.C. § 7401, *et seq.* (Clean Air Act), 42 U.S.C. § 9601, *et seq.* (CERCLA), 12 V.I.C. § 201, *et seq.* (Virgin Islands Air Pollution Control Act), 12 V.I.C. § 701, *et seq*. (Oil Spill Prevention and Pollution Control Act), and 12 V.I.C. § 181, *et seq*. (Virgin Islands Water Pollution Control Act).

235.    One of the purposes of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare…." 42 U.S.C. § 7401(b)(1).

236.    Defendant breached the standard of conduct required by the Clean Air Act when the H2S input gas concentration limit specified in 40 C.F.R. § 60.103a(h) and the Refinery's Title V Operating Permit of 162 parts per million volume determined hourly on a 3-hour rolling average basis were violated by multiple orders of magnitude.

237.    Defendant also breached the standard of conduct required by the federal Clean Air Act's National Emissions Standards of Hazardous Air Pollutants ("NESHAPs"). Specifically, 40 C.F.R. § 63.670 regulates flare control devices. These requirements create various operation limits for individual flares, including but not limited to (a) smokeless design capacity (40 C.F.R. § 63.670(c)), (b) maximum flare tip velocity (*id.* at § 63.670(d)), and (c) combustion zone operating limits (*id.* at § 63.670(e)). Flare #8 was subject to these requirements. Due to the nature of the Incidents and how they were caused by Flare #8, it is highly likely that these operating limits were exceeded.

238.    CERCLA was enacted to ensure '"those responsible for problems caused by the disposal of chemical poisons [must] bear the costs and responsibility for remedying the harmful conditions they created.'" *U.S. v. E.I. Duport De Nemours and Co. Inc.*, 423 F.3d 161, 164 (3d Cir. 2005) (quoting *In re Tutu Water Wells CERCLA Litig.,* 326 F.3d 201, 206 (3d Cir. 2003) (citation omitted)).

239.    Defendant breached the standard of conduct required by CERCLA § 107, 42 U.S.C. § 9607, when they released hazardous substances, including H2S (a listed hazardous substance pursuant to 40 C.F.R. § 302.4, Table), polynuclear aromatic hydrocarbons (same), polycyclic organic matter (same), including naphthalene (same), and waste oils into the environment.

240.    Defendant breached the standard of conduct required by the Air Pollution Control Act when they emitted air pollutants in violation of 12 V.I.C. §§ 208 and 217, which prohibit emissions of air contaminants and noxious and objectionable odors.

241.    Defendant breached the standard of conduct required by the Oil Spill Prevention and Pollution Control Act when they discharged oil, petroleum or their byproducts, and other

80

pollutants into or upon coastal waters, estuaries, tidal flats, beaches and land adjoining the seacoast of the Territory in violation of 12 V.I.C. § 704.

242.  Defendant also breached the standard of conduct required by Air Pollution Control Act, 12 V.I.C. § 201, *et seq*.

243.  The Air Pollution Control Act's "declaration of purpose" indicates that it seeks "to promote health, safety and welfare" and "to prevent injury to human, plant and animal life, and property."

244.  The purpose of the Air Pollution Control Act is to protect residents of the Virgin Islands from emissions of pollutants, and Plaintiffs and Class Members are among the class of persons the Air Pollution Control Act was meant to protect.

245.  Defendant's discharge of oil and other chemicals, Toxins and particulates into and onto Plaintiffs' and Class Members' residences violated the Air Pollution Control Act.

246.  Defendant's actions constitute a violation of the Water Pollution Control Act, 12 V.I.C. § 180, *et seq*.

247.  The Water Pollution Control Act's "declaration of policy" indicates that it seeks "to promote health, and welfare" and "to protect, maintain and improve the quality thereof for public water supplies ... for domestic, recreational and other beneficial uses."

248.  The purpose of the Water Pollution Control Act is to protect residents of the Virgin Islands from the discharge of pollutants into and pollution of "any waters of the United States Virgin Islands."

249.  "'Waters of the United States Virgin Islands' means all waters within the jurisdiction of the United States Virgin Islands including … all other bodies or *accumulations of*

81

*water*…. Natural or *artificial*, public or *private*….” Class Members' cisterns and wells constitute Waters of the United States Virgin Islands, 12 V.I.C. § 182(f).

250.    Plaintiffs and Class Members are among the class of persons the Water Pollution Control Act was meant to protect.

251.    Unless a person has a current permit to discharge, “the discharge of any pollutant into the waters of the United States Virgin Islands or the causing of the waters of the Virgin Islands, by any person, shall be unlawful.” 12 V.I.C. § 185(a).

252.    The chemicals emitted from the Refinery during the four Incidents constitute “pollutants,” as defined by 12 V.I.C. § 182(b).

253.    The emissions of contaminants from the Refinery during the four Incidents caused “pollution,” which is defined to include “contamination, or other alteration of the physical [or] chemical . . . properties, of any waters of the United States Virgin Islands, including change in … taste, color, … or odor of the waters, or such discharge of any liquid, gaseous, solid…. or other substance into any waters as will or is likely to create a nuisance or render such waters harmful, detrimental, or injurious to public health, safety or welfare….” 12 V.I.C. § 182(a).

254.    Defendant's unpermitted discharge of oil and other chemicals, Toxins, and particulates into waters of the United States Virgin Islands as well as pollution of Plaintiffs' and Class Members' cisterns and wells, violated the Water Pollution Control Act.

255.    Each Incident described herein constituted a “discharge,” as defined as 12 V.I.C. § 182(i), from a “point source,” as defined at 12 V.I.C. § 182(j), as a flare stack is a “discernable, confined and discrete conveyance” and “conduit” “from which pollutants” were discharged.

256.    The purposes of the aforementioned statutes are to protect the interests of Plaintiffs and the Class Members.

82

257.    As a direct and proximate result of Defendant's conduct as set forth herein, Plaintiffs and Class Members have suffered damages as alleged herein and are entitled to injunctive relief pursuant to 12 V.I.C. § 190(a).

## COUNT IV
### ABNORMALLY DANGEROUS CONDITION
### (Against All Defendants)

258.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

259.    The actions of Defendants as set forth herein constitute maintaining an abnormally dangerous condition.

260.    The Refinery is located just south and east of certain residential communities, including the community in which Plaintiffs reside or work. Further, the natural resources of the U.S. Virgin Islands are particularly sensitive and precious.

261.    Defendants ArcLight, EIG, Freepoint, and BP Products were "hands-on" in the acquisition, rehabilitation, permitting and operation of the Refinery. Through Defendants' ArcLight, EIG and Freepoint's subsidiaries, including Limetree Bay Ventures, Limetree Bay Holdings, Limetree Bay Refining and Limetree Bay Terminals, Defendants bought the Limetree Bay Facility out of the HOVENSA bankruptcy. These Defendants, the Limetree and Contractor Defendants, and BP Products then made repairs and retrofits to the Limetree Bay Facility, sought permitting and waiver of the significant HOVENSA fine levied by the EPA as a means to protect the St. Croix community, and operated the Refinery.

262.    Defendants ArcLight, EIG and Freepoint and BP Products' direct involvement in the acquisition, rehabilitation, permitting and/or operation of the Refinery makes these Restart Defendants responsible for the failed restart of the Refinery.

263. Defendants' use, storage, refining, and/or disposal of oil and other chemicals, Toxins and particulates was solely for Defendants' business purposes.

264. Defendants knew and understood that there was a high risk that the oil and other chemicals, Toxins and particulates could contaminate nearby neighborhoods, including the risk of contaminating the only source of clean water for residents, and thereby cause residents personal injuries and property damage, including but not limited to the diminution of value.

265. Defendants' use, storage, refining and/or disposal of oil and other chemicals, Toxins and particulates at the Refinery did in fact cause serious harm to Plaintiffs' and Class Members' person, chattel and property, including both real and personal property.

266. As a direct and proximate result of Defendants' conduct as set forth herein, Plaintiffs and Class Members have suffered damages to their property and to their persons including physical injuries, expenses, pain and suffering, mental anguish and loss of enjoyment to continue into the foreseeable future.

## COUNT V

### RESPONSE COSTS UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT

**(Against Defendants Limetree Bay Refining, LLC and Defendant Limetree Bay Terminals, LLC (d.b.a. Ocean Point Terminals))**

267. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

268. The Refinery is a "facility" within the meaning of 42 U.S.C. § 9601(9).

269. Defendant is (1) a current owner or operator of the Refinery; (2) a former owner or operator of the Refinery at the time the hazardous substances described herein were released; (3)

a generator or other party who arranged for disposal of hazardous substances at the Refinery; and/or (4) a transporter of hazardous substances to the Refinery pursuant to 42 U.S.C. § 9607(a).

270.    Defendant "released" or "threatened release[s]" into the environment of hazardous substances, as defined by 42 U.S.C. § 9601(14), from the Facility within the meaning of 42 U.S.C. § 9607(a), including but not limited to H2S, polycyclic organic matter (a listed hazardous air pollutant pursuant to 42 U.S.C. § 7412), including naphthalene (same), waste, oils and other hazardous substances.

271.    To the extent regulated, such releases were in violation of Defendant's Title V Permit and other requirements of the Clean Air Act, and therefore unpermitted.

272.    As a result of the release of hazardous substances from the Refinery, Plaintiffs and Class Members have incurred response costs consistent with the national contingency plan. Response costs include testing and cleaning costs, and the cost to purchase bottled water.

273.    Plaintiffs and Class Members have suffered harm as a result of these releases and are entitled to declaratory judgment, injunctive relief and response costs incurred as a result thereof.

## COUNT VI
## PUBLIC NUISANCE
### (Against All Defendants)

274.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

275.    The actions of Defendants constitute a public nuisance as defined under 14 V.I.C. § 1461.

276.    Specifically, Plaintiffs' and Class Members' homes, bodies, and emotional well-being now and into the foreseeable future have been damaged by Defendants' release of oil and

85

other injurious chemicals, Toxins and particulates into their neighborhoods. However, the public at large has not endured such damages.

277.    Plaintiffs and the Class are entitled to damages as a result thereof.

## COUNT VII
### PRIVATE NUISANCE
### (Against All Defendants)

278.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

279.    Defendants' actions constitute a private nuisance.

280.    Defendants' discharge of oil and other chemicals, Toxins and particulates into Plaintiffs' and Class Members' residences and other properties interfered with Plaintiffs' and Class Members' use and enjoyment of their homes and properties, damaged their homes and properties and caused personal injuries including pain and suffering, mental anguish and loss of enjoyment that are expected to continue into the foreseeable future.

281.    By so doing, Defendants have wrongfully and unreasonably interfered with Plaintiffs' and Class Members' private use and enjoyment of their homes and properties.

282.    As a result, Plaintiffs and the Class have been damaged as alleged herein.

## COUNT VIII
### STATUTORY PRIVATE NUISANCE
### (Against All Defendants)

283.    Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

284.    Defendants' actions constitute a private nuisance in violation of 28 V.I.C. § 331.

285.    Defendants' discharge of oil and other chemicals, Toxins, and particulates into Plaintiffs' and Class Members' residences and other properties, interfered with Plaintiffs' and

Class Members' use and enjoyment of their homes and properties, damaged their homes and properties and caused personal injuries.

286. By so doing, Defendants have wrongfully and unreasonably interfered with Plaintiffs' and Class Members' private use and enjoyment of their homes and properties.

287. As a result, Plaintiffs and the Class have been damaged as alleged herein.

## COUNT IX
### TRESPASS
### (Against All Defendants)

288. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

289. Defendants' actions constitute a trespass.

290. Defendants' discharge of oil and other chemicals, Toxins and particulates into Plaintiffs' and Class Members' residences and other properties interfered with Plaintiffs' and Class Members' use and enjoyment of their homes and properties, damaged their homes and properties and caused personal injuries, including mental anguish, pain and suffering and loss of enjoyment that are expected to continue into the foreseeable future.

291. As a result, Plaintiffs and the Class have been damaged as alleged herein.

## COUNT X
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

292. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

293. The actions of Defendants negligently inflicted emotional distress on Plaintiffs and Class Members.

294. Defendants owed Plaintiffs and Class Members a duty of care to ensure that they did not suffer from serious emotional distress, which duty arose by operating an abnormally

hazardous condition, through the common law, and through statutory and regulatory obligations to prevent hazardous material from escaping from the Refinery.

295. Defendants breached their duty to Plaintiffs and the Class.

296. As a direct and proximate result of Defendants' breach, Plaintiffs and Class Members have suffered severe emotional injury.

297. As a result, Plaintiffs and the Class have been damaged as alleged herein.

## COUNT XI
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

298. Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

299. The actions of Defendants constitute the intentional infliction of emotional distress on Plaintiffs and Class Members.

300. In the Virgin Islands, a claim of Intentional Infliction of Emotional Distress requires a showing that a party: (1) intentionally or recklessly; (2) engaged in extreme and outrageous conduct that exceeds all possible bounds of decency such that it is regarded as atrocious and utterly intolerable in a civilized society; (3) that caused the plaintiff to suffer severe emotional distress.

301. Defendants know and understand that exposure to discharge of oil and other chemicals, Toxins and particulates and other particulates and hazardous substances presented and continues to present serious risks to the health and property of thousands of St. Croix residents.

302. Defendants knew that before Defendants' ownership, control, and operation of the Limetree Bay Refinery, the property was owned and operated by HOVENSA, LLC, a joint venture between Hess Corporation and Petroleos de Venezuela, the national oil company of Venezuela, and before that by HOVIC, a wholly-owned subsidiary of the Hess Corporation formerly known as Amerada Hess.

303.    Defendants knew that under HOVIC and HOVENSA, the Refinery exceeded allowable emissions of known harmful substances, including nitrogen oxide, sulfur dioxide, volatile organic compounds and benzene.

304.    Defendants knew that in 2011, investigators discovered that the pipes carrying the Refinery's waste product had been corroding, slowly leaking more than 43 million gallons of oil into the island's largest aquifer.

305.    Defendants knew that as a result of the massive leak, the EPA ordered HOVENSA to pay civil penalties of more than $5 million and to spend more than $700 million in new pollution controls to protect the public health and resolve Clean Air Act violations in St. Croix. The EPA required HOVENSA to implement new and upgraded pollution controls, more stringent emission limits and aggressive monitoring, and leak detection and repair practices to reduce emissions from refinery equipment and process units.

306.    Defendants knew that instead of paying its fines and undertaking the required improvement projects, the Hess Corporation shut down the HOVENSA facility in 2012.

307.    Defendants knew of the history of prior emissions at the Refinery and their impact on the community.

308.    Defendants knew or should have known that the Refinery was not in a proper condition to reopen, and that the start-up would result in discharges and dangers to Plaintiffs and Class Members.

309.    As a direct and proximate result of Defendants' actions, Plaintiffs and Class Members were harmed and suffered severe emotional injuries.

## COUNT XII

## MEDICAL MONITORING

**(Against All Defendants)**

310.   Plaintiffs' allegations are incorporated by reference as though fully set forth herein.

311.   Plaintiffs and members of the Class were significantly exposed to the Toxins that are proven to be hazardous to health because of Defendants' repeated failures to prevent the discharge of the Toxins since the February 2021 restart of the Refinery, including because of the Incidents referenced herein.

312.   The exposure to these dangerous substances is such that Plaintiffs and Class members have been placed at an increased risk of contracting latent illness and disease, including but not limited to cancer, and as such, require medical monitoring which Defendants are responsible for providing and paying for.

313.   Monitoring and testing procedures for cancer and other illnesses associated with exposure to the Toxins exist which make the early detection and treatment of the disease possible and beneficial.

314.   As a result, the Court should establish a Court-supervised and administered trust fund and medical monitoring regime to compensate Plaintiffs and members of the Class for their economic damages.

## RELIEF REQUESTED

315.   Plaintiffs and members of the putative Class seek the following relief:

   a.) An order finally naming Plaintiffs' counsel as lead counsel and executive committee members for this matter pursuant to Fed. R. Civ. P. 23 (g);

   b.) An order approving Class Representatives as named herein as Lead Plaintiffs for this matter;

   c.) Damages as alleged herein;

d.) Medical monitoring for Plaintiffs and members of the Class;

e.) Response costs pursuant to 42 U.S.C. § 9607(a);

f.) Punitive damages where allowable;

g.) Pre- and post-judgment interest as allowed by law;

h.) Declaratory judgment that Defendants are responsible for past and future costs (including response costs under 42 U.S.C. § 9607) to remedy the harm caused to Plaintiffs, Class Members and their properties;

i.) Attorneys' fees and costs pursuant to any applicable statutes and/or regulations, including but not limited to 42 U.S.C. § 7604(d), 42 U.S.C. § 7607(f), 42 U.S.C. § 9607 and 5 V.I.C. § 541; and

j.) All other relief this Court deems necessary, just and proper.[119]

## JURY TRIAL DEMAND

316.   Plaintiffs hereby demands a jury trial for all claims so triable.


Respectfully submitted,

DATED: August 4, 2025

BY: */s/ Daniel H. Charest*
Daniel H. Charest., Esq.
Warren T. Burns, Esq.
Martin D. Barrie, Esq.
Quinn M. Burns, Esq.
Anna Katherine Benedict, Esq.
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550

---

[119] The relief sought against Limetree Bay Refining is in its name only. Plaintiffs do not seek any relief from Limetree Bay Refining except for the sole purpose of (a) establishing Claims against Limetree Bay Refining and its bankruptcy estate, and (b) preserving rights with respect to insurance coverage for such Claims, if any, and for no other purpose.

dcharest@burnscharest.com
wburns@burnscharest.com
mbarrie@burnscharest.com
qburns@burnscharest.com
abenedict@burnscharest.com

DATED: August 4, 2025                    BY:    */s/ Shanon J. Carson*

Shanon J. Carson, Esq.
Yechiel Michael Twersky
John Kerrigan, Esq.
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (2150) 875-3000
scarson@bm.net
mitwersky@bm.net
jkerrigan@bm.net

Dated: August 4, 2025                    BY:    */s/ Kerry J. Miller*

Kerry J. Miller, Esq.
Paul C. Thibodeaux, Esq.
E. Blair Schilling, Esq.
Rebekka C. Veith, Esq.
C. Hogan Paschal, Esq.
Carly E. Jonakin, Esq.
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170
Telephone: (504) 586-5252
kmiller@fishmanhaygood.com
pthibodeaux@fishmanhaygood.com
bschilling@fishmanhaygood.com
rveith@fishmanhaygood.com
hpaschal@fishmanhaygood.com
cjonakin@fishmanhaygood.com

DATED: August 4, 2025                    BY:    */s/ Hugh Lambert*

Hugh Lambert, Esq.
J. Christopher Zainey, Esq.
Brian Mersman, Esq.
LAMBERT ZAINEY SMITH & SOSO, APLC
701 Magazine Street
New Orleans, Louisiana 70130
Telephone: (504) 581-1750
Facsimile: (504) 529-2931
hlambert@lambertainey.com

92

czainey@lambertzainey.com
bmersman@lambertzainey.com

DATED: August 4, 2025                 BY:  */s/ John K. Dema*
                                            JOHN K. DEMA, Esq.
                                            V.I. Bar No. 357
                                            1236 Strand Street, Suite 103
                                            Christiansted, St. Croix, VI 00820
                                            Telephone: (340) 773-6142
                                            Facsimile: (340) 773-3944
                                            Email: jdema@demalaw.com

DATED: August 4, 2025                 BY:  */s/ Lee J. Rohn*
                                            Lee J. Rohn, Esq.
                                            Rhea R. Lawrence, Esq.
                                            1108 King Street, Suite 3 (mailing)
                                            56 King Street, Third Floor (physical)
                                            Christiansted, St. Croix
                                            U.S. Virgin Islands 00820
                                            Telephone: (340) 778-8855
                                            lee@rohnlaw.com
                                            rhea@rohnlaw.com

DATED: August 4, 2025                 BY:  */s/ Korey A. Nelson*
                                            Korey A. Nelson, Esq.
                                            H. Rick Yelton, Esq.
                                            BURNS CHAREST LLP
                                            365 Canal Street, Suite 1170
                                            New Orleans, LA 70130
                                            Telephone: (504) 799-2845
                                            knelson@burnscharest.com
                                            ryelton@burnscharest.com

DATED: August 4, 2025                 BY:  */s/ Timothy W. Burns*
                                            Timothy W. Burns
                                            BURNS BAIR LLP
                                            10 E. Doty Street, Suite 600
                                            Madison, Wisconsin 53703
                                            Telephone: (608) 286-2302
                                            tburns@burnsbair.com

DATED: August 4, 2025                 BY:  */s/ Vincent Colianni II*
                                            Vincent Colianni, II, Esq.
                                            Vincent A. Colianni, Esq.
                                            Marina Leonard, Esq.
                                            COLIANNI & LEONARD LLC

93

2120 Company Street
Christiansted, VI 00820
Telephone: (340) 719-1766
vinny@colianni.com
vince@colianni.com
marina@colianni.com

DATED: August 4, 2025                    BY:   */s/ C. Jacob Gower*
                                          C. Jacob Gower, Esq.
                                          GOWER LEGAL LLC
                                          1919 Pine Street
                                          New Orleans, LA 70118
                                          Telephone: (337) 298-9734
                                          jacob@gowerlegal.com


***Counsel for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2025, a true and correct copy of the foregoing document was electronically served to all counsel of record pursuant to the Federal Rules of Civil Procedure.

/s/ Daniel H. Charest
Daniel H. Charest