# EXHIBIT 1

# UNREDACTED EXCERPT OF PRODUCT OFFTAKE AGREEMENT

*Execution Version*

**Product Offtake Agreement**

This product offtake agreement (this "Agreement") is made, effective as of November 15, 2018 (the "Effective Date"), between BP Products North America Inc. ("Buyer"), a Maryland corporation, and Limetree Bay Refining Marketing, LLC ("Seller"), a U.S. Virgin Islands limited liability company, for the purchase and sale of certain Products (as defined herein) produced at the St. Croix refinery (the "Refinery"), currently owned and operated by Limetree Bay Refining, LLC, a U.S. Virgin Islands limited liability company, and/or its Affiliate, all on the terms and conditions set forth below.  Seller and Buyer are individually referred to herein as a "Party" and collectively, as the "Parties."  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in Schedule D attached hereto.

A.    Seller has agreed to deliver and sell, and Buyer has agreed to purchase and take delivery of, all of the marketable Products produced at the Refinery in volumes of up to eighty two percent (82%) of the Refinery's production, excluding Excluded Volumes, during the Commercial Term.

B.    Seller, Buyer and certain of their Affiliates have entered into a Tolling Agreement of even date herewith (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Tolling Agreement").

C.    Seller and Buyer have entered into a Feedstock Supply Agreement of even date herewith (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Feedstock Supply Agreement"), pursuant to which Buyer shall supply all of the Refinery's non-fuel feedstock requirements (subject to the provisions thereof) for processing pursuant to the Tolling Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual promises and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, and intending hereby to be legally bound, Buyer and Seller hereby agree and stipulate as follows:

**Section 1.    General Provisions**

1.1    This Agreement and transactions for the purchase and sale of Products pursuant to the terms of this Agreement shall be governed by this Agreement and the BP Global Oil – Americas General Provisions for Purchases and Sales 2015, subject to the amendments attached hereto as Schedule A (as so amended, the "General Provisions") which shall be incorporated herein by reference.  In the event of any conflict between the terms of this Agreement and the General Provisions, the terms of this Agreement shall govern.  In the event of any conflict between the terms of a transaction and the General Provisions, the terms of such transaction, as set forth in the relevant Confirmation or other writings agreed by the Parties, shall govern.

1.2    Capitalized terms used in this Agreement and not defined in the main body have the meanings given to them in the attached Schedule D.  Any capitalized terms not defined in Schedule D shall have the meaning assigned to them in the General Provisions.

**Section 2.    Purchase and Sale**

Confidential

**HIGHLY CONFIDENTIAL**                    **BP_Limetree_0000001**

10.1    The Parties will have monthly reviews to evaluate performance of this Agreement. Such reviews are expected to include the following:

(i)    Review agreed key performance metrics as mutually designated by the Parties (volumes, qualities planned vs lifted, dates lifted, logistics parameters (delays, costs etc.), market price of Product during the period of production relative to agreed price);

(ii)    Discuss material changes in Refinery production or operating parameters (including with respect to quality of product, product and intermediate inventory levels, planned maintenance/ operational changes, throughputs, etc.);

(iii)    Discuss market trends and price accuracy;

(iv)    Address any outstanding disputes between the Parties; and

(v)    Review past month cargo movements.

**Section 11.    Financial Assurances and Credit Support**

Financial assurances and credit support will be as provided in Part 1- Section 7 of the General Provisions; *provided*, that so long as (i) the Tolling Agreement is in effect and (ii) Buyer has provided Seller with a BP Guaranty meeting the requirements of Section 7.3 of the Tolling Agreement, Seller shall have no right to call for financial assurances or credit support except as provided in Section 7.3 of the Tolling Agreement.

**Section 12.    Representations, Warranties and Covenants**

12.1    Buyer and Seller each represent and warrant to the other that:

(i)    This Agreement has been duly authorized, executed and delivered, and represents the binding obligation of the representing party, enforceable against it in accordance with its terms except as limited by principles of equity and the laws relating to bankruptcy and insolvency.

(ii)    It has all permits, licenses and authorizations needed to perform its obligations under this Agreement, other than permits, licenses and authorizations that it reasonably expects to obtain in the ordinary course of business by the time required for performance hereunder.

12.2    Seller further represents and warrants to Buyer that Seller shall deliver good title to the Product to Buyer free and clear of liens, claims and encumbrances that are not created by Buyer, and that Product shall comply with Applicable Law and meet the Specifications at the Delivery Point.

**Section 13.    Term**

This Agreement shall be effective as of the Effective Date.  Seller's obligation to deliver and sell, and Buyer's obligation to purchase and take delivery of, Product under this Agreement

US-DOCS\101636583.45

Confidential

**HIGHLY CONFIDENTIAL**                    **BP_Limetree_0000017**

shall take effect as of the first day of the Commissioning Period.  This Agreement shall run for an initial term (the "Initial Term") of five (5) years after the Toll Start Date, unless earlier terminated pursuant to the terms of this Agreement.  After the Initial Term, this Agreement shall renew for successive terms of one (1) year each (each a "Renewal Term"), unless a Party elects to terminate by written notice to the other Parties at least three (3) months prior to the end of such Initial Term or the then current Renewal Term, as applicable.  The Initial Term and all Renewal Terms, if any, shall constitute the "Commercial Term" of this Agreement.  Upon a Qualifying Change of Control without either a Toll Redemption or a Deemed Toll Redemption (as each such term is defined in the Tolling Agreement), the Commercial Term of this Agreement shall be extended to run through the date on which the Toll Balance (as defined under the Tolling Agreement) is equal to zero dollars ($0).

## Section 14.    Termination

14.1        The provisions of this Section 14 supersede the default provisions of Part 1 - Section 11.3 of the General Provisions.

14.2        Seller may terminate this Agreement after the Effective Date upon the occurrence of any of the following (each, a "Buyer Event of Default"):

(i)    a Customer Event of Default (as defined in the Tolling Agreement) has occurred and is continuing under the Tolling Agreement;

(ii)    two (2) Adverse Price Determinations occur, as provided in Section 23.2;

(iii)    Buyer (a) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due or (b) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditor's rights, or a petition is presented for its winding-up or liquidation, and in the case of an involuntary filing, such proceeding has not been dismissed within thirty (30) days;

(iv)    Buyer fails to perform a material obligation hereunder other than payment, and such failure remains uncured after thirty (30) days' written notice thereof by Seller to Buyer, except that to the extent Buyer has commenced cure and is diligently pursuing cure to completion, the cure period shall be extended for an additional thirty (30) days;

(v)    Buyer fails to make an undisputed payment(s) in an amount exceeding $1,000,000 at any one time or $2,000,000 in the aggregate during the Commercial Term, and such failure remains uncured after ten (10) Business Days following written notice by Seller to Buyer; or

(vi)    the BP Guaranty ceases to be in effect and, after at least ten (10) Business Days' notice by Seller to Buyer that the BP Guaranty has ceased to be in effect, Buyer (a) fails to renew the BP Guaranty or (b) does not provide Seller with other financial assurances or credit support acceptable under the Tolling Agreement.

18

Confidential

HIGHLY CONFIDENTIAL

BP_Limetree_0000018