# EXHIBIT 2

# UNREDACTED EXCERPT OF FEEDSTOCK SUPPLY AGREEMENT

*Execution Version*

**Feedstock Supply Agreement**

This feedstock supply agreement (this "Agreement") is made effective as of November 15, 2018 (the "Effective Date"), between BP Products North America Inc. ("Seller"), a Maryland corporation, and Limetree Bay Refining Marketing, LLC ("Buyer"), a U.S. Virgin Islands limited liability company, for the sale to Buyer of all Feedstocks used by the St. Croix refinery (the "Refinery") currently owned and operated by Limetree Bay Refining, LLC ("LBR"), a U.S. Virgin Islands limited liability company, and/or its Affiliate, all on the terms and conditions set forth below.  Each of Seller and Buyer are referred to as a "Party" or collectively as the "Parties." Capitalized terms used herein and not otherwise defined shall have the meanings set forth in Schedule C attached hereto.

A.      Seller has agreed to sell, and Buyer has agreed to purchase, all Feedstocks used by the Refinery during the term of this Agreement, subject to the terms and provisions of this Agreement.

B.      Seller, Buyer, and LBR have entered into a Tolling Agreement of even date herewith (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Tolling Agreement").

C.      Seller and Buyer have entered into a Product Offtake Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Product Offtake Agreement") of even date herewith, pursuant to which Seller has agreed to purchase liquid products produced at the Refinery.

D.      Buyer and Limetree Bay Terminals, LLC ("LBT") shall enter into the Terminal Services Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, "Terminal Services Agreement") on or around November 30, 2018, pursuant to which LBT provides storage, loading and unloading services to Buyer subject to the terms thereof, which agreement is attached hereto as Exhibit 2.

THE PARTIES HEREBY AGREE THAT:

**Section 1.      General Provisions**

This Agreement and transactions for the purchase and sale of Feedstock entered into pursuant to the terms of this Agreement shall be governed by this Agreement and the BP Global Oil – Americas General Provisions for Purchases and Sales 2015, subject to the amendments attached hereto as Schedule A (as so amended, the "General Provisions") which shall be incorporated herein by reference.  In the event of any conflict between the terms of this Agreement and the General Provisions, the terms of this Agreement shall govern.  In the event of any conflict between the terms of a transaction and the General Provisions, the terms of a transaction, as set forth in the relevant Confirmation or other writings agreed by the Parties, shall govern.

**Section 2.      Purchase and Sale**

(a)      During the Commercial Term of this Agreement, Seller shall sell and deliver, and Buyer shall purchase and accept, all Feedstock used by the Refinery, except as otherwise expressly provided in this Agreement.  Feedstock shall meet the initial

US-DOCS\103612611.15

**HIGHLY CONFIDENTIAL**                                    **BP_Limetree_0000189**

**Section 3.    Delivery Point**

Seller shall deliver Feedstock to Buyer, delivered ex ship at the Refinery Docks (the "Delivery Point").  Title and risk of loss shall pass from Seller to Buyer as indicated in Part 7 of the General Provisions.

**Section 4.    Forecast and Nominations**

(a)    Market and Feedstock Volume Forecast.

(i)    Buyer will share its forward annual operational plan with Seller as soon as reasonably possible, but no later than sixty (60) days after the Toll Start Date, and thereafter, February 1 of each year, including any changes or modifications as they are made.

(ii)    Buyer shall provide Seller with a four (4) month rolling forecast of its anticipated requirements for Feedstock ("Refinery Slate") from the Approved Feedstocks.  The Refinery Slate shall be non-binding and shall include estimates of:

i.    Grade, Quality and Volume;

ii.    The price index and differential (the "Indicative Prices");

iii.    Seven (7) to ten (10) day delivery windows for each cargo; and

iv.    The pecking order and switching economics for alternative Feedstocks.

Buyer makes no representations or warranties as to the forecasts provided by it in this Section 4, except that such forecasts were provided in good faith and derived in a commercially reasonable manner.

(iii)    Buyer shall provide Seller with periodic information on Refinery operating conditions, inventory levels and updates to the forward operational plan (including throughput and planned maintenance). The Parties acknowledge that LBR, with input from Buyer, is the operator of the Refinery, and that Seller is not the operator of the Refinery.  The Parties acknowledge that Seller is not familiar with the Refinery or the capabilities or process or safety limitations of its equipment and units as of the Effective Date.  If Seller does provide any suggestions, these are nonbinding and final decisions are made solely by Buyer and LBR.

(iv)    Seller shall provide Buyer with periodic assessments of relevant information regarding available Feedstocks including the quality and quantity available, anticipated delivery window of such Feedstocks to Buyer, and Indicative Prices (intended to reflect the then current market and

**HIGHLY CONFIDENTIAL**                    **BP_Limetree_0000192**

(c)     Discuss market trends and price accuracy;

(d)     Discuss value created by Refinery from the Feedstocks supplied;

(e)     Review the relative numbers and prices of cargoes priced at Market Price versus those priced at Actual Purchase Price;

(f)     Discuss optimization opportunities captured and those that were missed or considered and dropped; and

(g)     Address any outstanding disputes between the Parties.

**Section 11.    Financial Assurances and Credit Support**

Financial assurances and credit support will be as provided in Part 1- Section 7 of the General Provisions.

**Section 12.    Representations, Warranties and Covenants**

(a)     Buyer and Seller each represent and warrant to the other that:

(i)     This Agreement has been duly authorized, executed and delivered, and represents the binding obligation of the representing party, enforceable against it in accordance with its terms except as limited by principles of equity and the laws relating to bankruptcy and insolvency.

(ii)    It has all permits, licenses and authorizations needed to perform its obligations under this Agreement, other than permits, licenses and authorizations that it reasonably expects to obtain in the ordinary course of business by the time required for performance hereunder.

(b)     Seller further represents and warrants to Buyer that it shall deliver good title to the Feedstock, free and clear of liens, claims and encumbrances that are not created by Buyer, and that the Feedstock shall conform to the Specifications agreed for a transaction at the time of delivery, shall be free of contaminants other than those commonly found in Feedstock transported by pipeline, rail, barge or ship and shall comply with applicable law at the Delivery Point.

**Section 13.    Term**

This Agreement shall be effective as of the Effective Date.  Seller's obligation to deliver and sell, and Buyer's obligation to purchase and take delivery of, Feedstocks under this Agreement shall take effect from the Effective Date of this Agreement and shall run for an initial term (the "Initial Term") of five (5) years after the Toll Start Date, unless earlier terminated pursuant to the terms of this Agreement.  After the Initial Term, this Agreement shall renew for successive terms of one (1) year each (each a "Renewal Term"), unless a Party elects to terminate by written notice to the other Parties at least three (3) months prior to the end of such Initial Term or the then current Renewal Term, as applicable.  The Initial Term and all Renewal Terms, if any, shall constitute the

US-DOCS\103612611.15

**HIGHLY CONFIDENTIAL**                                          **BP_Limetree_0000200**

"Commercial Term" of this Agreement.  Upon a Qualifying Change of Control without either a Toll Redemption or a Deemed Toll Redemption (as each such term is defined in the Tolling Agreement), the Commercial Term of this Agreement shall be extended to run through the date on which the Toll Balance (as defined under the Tolling Agreement) is equal to zero dollars ($0).

**Section 14.     Termination**

 (a) The provisions of this Section 14 supersede the default provisions of Part 1 - Section 11.3 of the General Provisions.

 (b) Buyer may terminate this Agreement after the Effective Date upon the occurrence of any of the following (each, a "Seller Event of Default"):

  (i) a Customer Event of Default (as defined in the Tolling Agreement) has occurred and is continuing under the Tolling Agreement;

  (ii) two (2) Adverse Price Determinations occur, as provided in Section 23;

  (iii) Seller (a) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due or (b) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditor's rights, or a petition is presented for its winding-up or liquidation, and in the case of an involuntary filing, such proceeding has not been dismissed within thirty (30) days;

  (iv) Seller fails to perform a material obligation hereunder other than payment, and such failure remains uncured after thirty (30) days' written notice thereof by Buyer to Seller, except that (x) to the extent Seller has commenced cure and is diligently pursuing cure to completion, the cure period shall be extended for an additional thirty (30) days and (y) Seller's refusal or inability to perform under this Agreement due to a Buyer Event of Default or Buyer's failure to fulfill its obligations under the Product Offtake Agreement shall not constitute a Seller Event of Default.  If in Buyer's view a breach remains uncorrected after fifteen (15) days, Buyer shall give Seller a second notice of breach at least ten (10) days prior to the expiration of the cure period, identifying the uncorrected breach; or

  (v) Seller fails to make any undisputed payment(s) in an amount exceeding $1,000,000 at any one time or $2,000,000 in the aggregate during the Commercial Term, and such failure remains uncured after ten (10) Business Days following written notice by Buyer to Seller.

 (c) Seller may terminate this Agreement after the Effective Date upon the occurrence of any of the following (each, a "Buyer Event of Default"):

Confidential

**HIGHLY CONFIDENTIAL**    **BP_Limetree_0000201**

**Section 26.    General**

This Agreement, including the incorporated schedules and exhibits, forms a single Agreement.   This Agreement, together with the schedules and exhibits and the expressly incorporated provisions of the Tolling Agreement, expresses the entire and integrated agreement of the Parties with respect to the subject matter hereof.  This Agreement may only be amended by the mutual written agreement of the Parties.  Any waiver under this Agreement must be made in writing by the party against whom the waiver is to be enforced, and no waiver on one or more occasions shall be considered a continuing waiver of any provision.

**[Signature Page Follows]**

Confidential

US-DOCS\103612611.15

**HIGHLY CONFIDENTIAL**                                    **BP_Limetree_0000211**

INTENDING TO BE LEGALLY BOUND, the Parties have executed this Agreement through their duly authorized representatives.

**BP Products North America Inc.**

By: _____

Title:

**Limetree Bay Refining Marketing, LLC**

By: _____

Title:  Brian Lever, President

*Signature Page to Feedstock Supply Agreement*

Confidential

**HIGHLY CONFIDENTIAL**

**BP_Limetree_0000212**