# EXHIBIT 3

# UNREDACTED EXCERPT OF 2018 TOLLING AGREEMENT

*Execution Version*

# TOLLING AGREEMENT

BY AND AMONG

LIMETREE BAY REFINING, LLC,

LIMETREE BAY REFINING MARKETING, LLC,

AND

BP PRODUCTS NORTH AMERICA INC.

November 15, 2018

US-DOCS\101395733.65

Confidential

**HIGHLY CONFIDENTIAL**

**BP_Limetree_0000213**

"**Toll Balance**" means, as of any given date, the Restart Cost Payment Amount less the cumulative total of (x) each prior Monthly Toll Payment (if any) *multiplied* by the MF Index for the month in which such payment is made and (y) each prior Excess Toll Payment (if any), *multiplied by* the MF Index for the month in which such payment is made, which Restart Cost Payment Amount, as reduced pursuant to the foregoing, shall be *divided by* the MF Index applicable to the month in which such calculation is made.  Examples of this calculation are set forth in Appendix 4.

"**Toll End Date**" means the date falling seven (7) years after the Toll Start Date.

"**Toll Payment Period**" means the period commencing on the Toll Start Date and ending on the earliest of (i) the date on which Customer pays the entire Toll Balance to LBRM, (ii) the Toll End Date and (iii) the date of a Refinery Shutdown.

"**Toll Payments**" means, collectively, the Monthly Toll Payments, the Excess Toll Payments and the Final Toll Payments.

"**Toll Rate**" means $2.45 per Barrel.

"**Toll Redemption**" means (a) prior to the Toll Start Date, the Net Sale Proceeds shall be paid (i) *first*, to LBR in an amount equal to the Adjusted Restart Cost and (ii)  *second*, (x) fifteen percent (15%) to Customer and (y) eighty-five percent (85%) to LBR and (b) following the Toll Start Date, the Net Sale Proceeds shall be allocated (i) subject to the proviso below, the sum of (1) forty percent (40%) *plus* (2) an amount equal to two million Dollars ($2,000,000) for each calendar year (prorated for any portion thereof) for which Customer has made Toll Payments through the date of the Toll Redemption, up to an aggregate maximum of ten million Dollars ($10,000,000), to Customer and (ii) sixty percent (60%) *minus* the amount paid to Customer under clause (b)(i)(2) to LBR; *provided*, that the forty percent (40%) of Net Sale Proceeds *plus* two million Dollars ($2,000,000) per calendar year (prorated for any portion thereof) otherwise allocable to Customer pursuant to the immediately preceding clause (b)(i) shall, prior to any payment to Customer, be applied to pay LBRM the remaining Toll Balance. In each case, the Net Sale Proceeds to be subject to a Toll Redemption shall be first subject to application of Section 8.4(f).

"**Toll Start Date**" means the date on which the Refinery achieves Stable Commercial Operations, as determined in accordance with the definition thereof.

"**Transfer**" has the meaning set forth in Section 8.3.

"**Turn-around Reserve**" has the meaning set forth in Section 5.5(a)(ii).

"**US GAAP**" means generally accepted accounting principles in the United States promulgated by the Financial Accounting Standards Board, or its predecessors or successors, consistently applied.

"**US Internal Revenue Code**" has the meaning set forth in Section 12.7.

"**Value Range**" has the meaning set forth in Section 8.6(f).

US-DOCS\101395733.65

Confidential

**HIGHLY CONFIDENTIAL**                    **BP_Limetree_0000228**

"**West Refinery**" means the area described as the "West Refinery" in <u>Appendix 3-B</u>.

**Section 2.    <u>Initial Term and Renewal Terms; Effectiveness; Early Termination.</u>**

Section 2.1    <u>Term</u>.

This Agreement shall become binding upon the Parties on the date on which the Parties have executed and delivered this Agreement; *provided*, that the performance obligations of the Parties shall commence on the date (the "**Effective Date**") upon which, unless waived by the Limetree Parties in writing, the Limetree Parties obtain debt and equity financing for the Refinery and the conditions to initial disbursement of funds under each such financing are satisfied or waived in accordance with the terms thereof.  This Agreement shall, unless earlier terminated pursuant to its terms, remain in effect until the earliest of (a) the failure of such financing condition to be satisfied or waived by the Limetree Parties before May 24, 2019 (as such date may be extended by the Limetree Parties by prior written notice to Customer), (b) a Refinery Shutdown, (c) a Toll Redemption in connection with a Qualifying Change of Control and (d) a Deemed Toll Redemption (the "**Term**").

Section 2.2    <u>Termination or Abandonment Before Stable Commercial Operations</u>.

(a)    *Restart Long-Stop Date*.

(i)    Either Party may terminate this Agreement if the Toll Start Date has not occurred by December 31, 2020 (the "**Restart Long-Stop Date**") by providing thirty (30) Days' advance written notice to the other Party of its intent to terminate.

(ii)    For each month that Stable Commercial Operations are delayed beyond June 30, 2020 until the Restart Long-Stop Date, LBRM shall pay to Customer, pursuant to <u>Section 2.2(a)(iii)</u> below, an amount equal to  the Monthly Delay Penalty *plus* interest accruing at a rate of eleven percent (11%) per annum (the "**Delay Penalty**"), prorated for the relevant portion of any applicable month.  The "**Monthly Delay Penalty**" means an amount equal to twenty-three million Dollars ($23,000,000); *provided*, that for any period following the achievement of Interim Commercial Operations, the Monthly Delay Penalty shall be reduced to fifteen million Dollars ($15,000,000).

(iii)    The Delay Penalty shall be paid to Customer by deducting, from the Toll Start Date until the date on which the Delay Penalty is reduced to zero Dollars ($0), from the LBR Cash Flow Sharing Payments payable to LBR pursuant to <u>Section 5.3</u> an amount equal to the lesser of (A) the then-remaining Delay Penalty and (B) fifty percent (50%) of  the amount to which LBR would otherwise be entitled pursuant to <u>Section 5.3</u> and paying such deducted amount to Customer.

(iv)    If either Party elects to terminate the Agreement under <u>Section 2.2(a)(i)</u>, Customer shall not be entitled to any Cash Flow Sharing Payments.  Customer's sole and exclusive remedy for the Limetree Parties' failure to achieve Stable Commercial Operations by the Restart Long-Stop Date shall be its termination rights pursuant to <u>Section 2.2(a)(i)</u>.

13

**HIGHLY CONFIDENTIAL**                                      **BP_Limetree_0000229**

(b)     *Refinery Operator Abandonment*.  The Limetree Parties may terminate this Agreement with no liability to Customer if the Limetree Parties unilaterally Abandon the Refinery Restart at any time before the Toll Start Date. For purposes of this Section 2.2(b), "**Abandon**" means the Limetree Parties have notified Customer of their intention to terminate the Refinery Restart, have initiated a wind-down of construction activity with respect to the Refinery Restart and such wind-down continues for a period of at least twelve (12) months from the date of such notification.

(c)     *Joint Abandonment*.  If the Parties jointly decide to cancel or abandon the Refinery Restart by mutual written election for reasons other than a Party's breach of this Agreement, Customer will promptly pay LBRM an amount equal to:

(i)  fifty percent (50%) of the lesser of (1) the Actual Restart Costs incurred to date and (2) the Expected Restart Cost,

*multiplied* by

(ii)  the Restart Period MF Index,

*divided* by

(iii) the MF Index for the month in which the Parties decide to Abandon the Refinery Restart.

**Section 3.     Commissioning and Testing; Stable Refinery Operations**.

Section 3.1     Notice of Commissioning Start Date.

LBRM shall provide to Customer (a) a written notice at least two (2) months prior to the date on which the Limetree Parties will begin the startup and commissioning of the Refinery setting forth an estimate for such date and (b) a written notice at least fifteen (15) Days prior to the date on which the Limetree Parties will begin the startup and commissioning of the Refinery setting forth the final date thereof.

Section 3.2     Stable Commercial Operations.

(a)     The Refinery shall achieve "**Stable Commercial Operations**" when each of the following has occurred and LBRM shall have certified in writing to Customer the achievement of such operations:

(i)     The units of the Refinery set forth in the table below shall have simultaneously achieved the operating rates shown below on average (without any unit going off-line or failing to operate unless otherwise provided for in the start-up testing procedure) during a period of fourteen (14) consecutive Days.

|  | **Stable Commercial Operations** |
| --- | --- |
| Crude | 115,000 bpd |

14

US-DOCS\101395733.65

Confidential

**HIGHLY CONFIDENTIAL**                                        **BP_Limetree_0000230**

| Vacuum | 61,000 bpd |
|---|---|
| Coker | 32,000 bpd |
| DD7 + DD9 | 32,000 bpd (combined) |
| DD6 | 32,000 bpd |
| Platformer | 33,000 bpd |
| SRU Stack | Meeting required permit limits with proper Continuous Emission Monitoring at specified rates or with a Reasonable Accuracy Test Audit |

(ii)     The Refinery's units are producing merchantable Products.

(b)     The date on which Stable Commercial Operations has been achieved will be deemed retroactively to have occurred at the end of the first (1st) Day of the fourteen (14) Day period referred to in clause (a)(i) of this Section 3.2.

(c)     If LBR has not Abandoned the Refinery Restart, LBR shall work diligently to complete the entire Refinery Restart scope as set forth in Appendix 2. This includes but is not limited to achieving Stable Commercial Operations. LBR shall use commercially reasonable efforts to put all elements of the Refinery Restart scope as set forth in Appendix 2 in operation as soon as practical after achieving Stable Commercial Operations.

**Section 4.     Customer's Review and Participation Rights; Budget; Reporting**.

Section 4.1     Refinery Management.

(a)     Except as otherwise expressly provided in Section 4.1(b) of this Agreement, all management powers in respect of the business and affairs of the Refinery shall be exclusively vested in the Limetree Parties and neither Customer nor its Affiliates shall have any management power or authority over the business and affairs of the Refinery. The Limetree Parties shall have full power and authority to do all things on such terms as they, in their sole discretion, may deem necessary or appropriate to conduct the business of the Refinery and to exercise the powers and to effectuate the purposes set forth in this Agreement, the Refinery Operating Agreement and any other contractual obligation between any Limetree Party and its Affiliates or third parties in connection with the Refinery and related facilities.

(b)     Notwithstanding Section 4.1(a), after the Toll Start Date, LBR shall not, and shall cause each other Limetree Party not to, take the actions listed in clauses (i) through (x) of Section 4.1(c) below without the prior consent of Customer, not to be unreasonably delayed, withheld or conditioned. Such consent (or decision not to consent) shall be delivered in writing to LBR within fifteen (15) Business Days of receipt of (x) LBR's written proposal in respect of the subject matter thereof or (y) an indication as to whether, in connection with any such matter, LBR is entering into any transaction with an Affiliate (the "**Decision Period**"). During the Decision Period, Customer may reasonably request additional information to supplement or clarify the proposal. If such additional information is available to or, using commercially reasonable efforts,

15

Confidential

**HIGHLY CONFIDENTIAL**                                    **BP_Limetree_0000231**

intended in each case to improperly reduce the amounts that would otherwise be payable to Customer under this Agreement.

(d)    The Parties agree that lost profits are not the direct, natural, probable and reasonably foreseeable consequence of (i) a failure to start up and operate the Refinery in accordance with Section 7.4 or (ii) a failure to achieve the full Refinery Restart scope as set forth in Section 3.2(c), in each case, absent gross negligence or willful misconduct of a Limetree Party.

Section 6.2    Express Remedies.

(a)    The Parties confirm that the express remedies and measures of damages provided in Sections 2.2 and 8.6 of this agreement satisfy the essential purposes hereof. For breach of Section 2.2, or any valuation dispute under Section 8.6, such express remedy or measure of damages shall be the sole and exclusive remedy, the obligor's liability shall be limited as set forth in such provision and all other remedies or damages at law or in equity are waived.

(b)    Notwithstanding anything to the contrary in Section 6.2(a) above, either Party may exercise any rights or remedies available to it under this Agreement, at law or in equity in connection with any claims of fraud or fraudulent acts committed by the other party.

Section 6.3    DISCLAIMER OF WARRANTIES

OTHER THAN THOSE REPRESENTATIONS, WARRANTIES AND GUARANTIES EXPRESSLY SET FORTH IN THE TERMS OF THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATIONS, WARRANTIES OR GUARANTIES OF ANY KIND WHATSOEVER, EXPRESS, IMPLIED, ORAL, WRITTEN OR OTHERWISE, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR WARRANTIES ARISING BY CUSTOM, TRADE USAGE, PROMISE, EXAMPLE, OR DESCRIPTION, ALL OF WHICH ARE EXPRESSLY DISCLAIMED AND WAIVED BY EACH PARTY.

**Section 7.    Other Covenants of the Parties**.

Section 7.1    Inspections and Access Rights.

(a)    Customer and the Customer Representatives and alternates shall have the right to enter the Refinery from time to time upon three (3) Business Days' prior notice to LBRM if for an audit, and one (1) Business Day's prior notice to LBRM if for routine ordinary course purposes. Customer's Representatives and alternates may elect to remain at the Refinery for such duration, or permanently, as Customer may from time to time elect at Customer's sole cost and expense, and the Limetree Parties shall use commercially reasonable efforts to provide, at no cost, office facilities onsite for up to three Customer's Representatives and alternates. Customer may designate visits for any purpose reasonably related to this Agreement, including without limitation (i) in order to reasonably observe LBRM's performance hereunder and (ii) during normal business hours and upon reasonable prior notice, for purposes of examination relevant to this Agreement of Refinery records and discussions with relevant Refinery management pertaining to the receipt, handling, storage and delivery of Customer Feedstock and Product, LBRM's operational procedures and practices, the basis for all payments and all purchase and sales of goods or services

26

**HIGHLY CONFIDENTIAL**                                          **BP_Limetree_0000242**

to or from parties other than Customer, the accuracy and sufficiency of LBRM's financial and other reporting, LBRM's calculation of Adjusted Free Cash Flow and Cash Flow Sharing Payments and other relevant accounts, and generally to promote the collaboration between the Parties and assess LBRM's performance under this Agreement and the Project Agreements.  If LBRM has a board of directors, board of managers or other management forum, a Customer Representative or alternate shall be entitled to attend any meetings thereof (other than any meeting or the portion thereof where the subject matter of such meeting or portion thereof is dedicated for discussion of any dispute with, or otherwise matters that raise a conflict of interest in a material respect of, Customer and/or its Affiliates) as a nonvoting observer, and shall receive reasonable advance notice of such meetings with copies of the meeting materials and agenda, and prompt copies of all board (or other governing body) minutes (in each case, redacted as necessary to remove any materials, deliberations and decisions related in any material respect to any dispute with, or otherwise matters that raise a conflict of interest in a material respect of, Customer and/or its Affiliates). Information which is not related in a material respect to a dispute or conflict shall continue to be provided to Customer.  If Customer addresses conflicts of interest as to some or all information by implementing appropriate internal information barriers or other similar mechanisms, and provides reasonable evidence thereof to LBRM and the names of the representatives subject to such controls and such controls are acceptable to LBRM (acting reasonably), then, in the case of a conflict of interest, but not a dispute, LBRM will continue to provide such information to the designated Customer representatives.  In exercising its inspection and access rights under this Agreement, Customer, its designees and representatives shall comply with Applicable Law and site rules and regulations, and shall use reasonable efforts in coordination with the Limetree Parties to minimize interference with the Limetree Parties' control over or operation of the Refinery.  Customer shall cause its designees and representatives to sign a visitor acknowledgment form prior to their first visit to the Refinery in substantially the form of Appendix 6 and shall provide copies thereof to LBRM upon request.  The Limetree Parties shall not adopt site rules and regulations intended to unreasonably frustrate access of the Customer Representatives and alternates.  Customer acknowledges that any grant of the right of access to the Refinery under this Agreement or under any document related to this Agreement is a contractual right and conveys no interest in or to the Refinery or any part of the Refinery.

(b)    Customer and the Limetree Parties agree that the Customer Representatives and alternates shall have the right to observe the work at the Refinery, assess progress on projects, and provide input on projects; *provided*, *however*, that the Customer Representatives and alternates shall have no operational control over, or oversight responsibilities regarding, construction or operations at the Refinery and the Limetree Parties shall have no obligation to accept any such input, except as otherwise provided in this Agreement.  Customer acknowledges and agrees that all control and oversight over construction and operational matters at the Refinery shall be conducted by the Limetree Parties, in their sole discretion.  The Customer Representatives and alternates will work in good faith to cause all information provided on construction and operational matters ("**Operational Information**") to the Limetree Parties in whatever form to be reasonably accurate; provided, however, that neither Customer nor the Customer Representatives or alternates make any claims, promises, or guarantees about the accuracy, completeness or adequacy of any Operational Information provided to the Limetree Parties, and expressly disclaim liability for errors and omissions in any such Operational Information.  The Limetree Parties agree that they shall not rely on any Operational Information received from the Customer Representatives and alternates, and shall consult their own experts for advice in the conduct of their business.

27

Confidential

**HIGHLY CONFIDENTIAL**                    **BP_Limetree_0000243**