# EXHIBIT 6

# UNREDACTED EXCERPT OF FEBRUARY 2021 TOLLING AGREEMENT

*Execution Version*

**AMENDED AND RESTATED TOLLING AGREEMENT**

BY AND AMONG

LIMETREE BAY REFINING, LLC,

LIMETREE BAY REFINING MARKETING, LLC,

AND

BP PRODUCTS NORTH AMERICA INC.

February 22, 2021

**HIGHLY CONFIDENTIAL**                                    **BP_Limetree_0001062**

## AMENDED AND RESTATED TOLLING AGREEMENT

This AMENDED AND RESTATED TOLLING AGREEMENT ("**Agreement**") is made as of February 22, 2021, by and among Limetree Bay Refining, LLC, a limited liability company existing under the laws of the U.S. Virgin Islands ("**LBR**"), Limetree Bay Refining Marketing, LLC, a limited liability company existing under the laws of the U.S. Virgin Islands ("**LBRM**") and BP Products North America Inc., a corporation organized under the laws of Maryland ("**Customer**"), sometimes referred to individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

**WHEREAS**, the Government of the U.S. Virgin Islands (the "**Government**") and LBR have entered into a Refinery Operating Agreement, dated as of July 2, 2018, attached hereto as Exhibit A (as amended, restated, amended and restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "**Refinery Operating Agreement**") pursuant to which LBR, as inducement to take ownership of, develop, operate, and maintain the Refinery (as defined below) and related facilities, located at Limetree Bay, St. Croix, U.S. Virgin Islands, is, together with its subsidiaries, including LBRM, granted rights to conduct the business of the Refinery and related facilities;

**WHEREAS**, the Government and Limetree Bay Terminals, LLC, a limited liability company existing under the laws of the U.S. Virgin Islands ("**Terminal Operator**"), have entered into an Amended and Restated Terminal Operating Agreement, dated as of July 2, 2018, attached hereto as Exhibit B (as amended, restated, amended and restated, supplemented or otherwise modified from time to time subject to the terms of Section 7.7, the "**Terminal Operating Agreement**") pursuant to which Terminal Operator, as inducement to maintain ownership of, develop, operate, and maintain the Terminal (as defined below) and related facilities, located at Limetree Bay, St. Croix, U.S. Virgin Islands, is granted rights to conduct the business of the Terminal and related facilities;

**WHEREAS**, the Limetree Parties (as defined below) and Customer have evaluated the prospects of, and have determined to take certain measures to facilitate, a Refinery Restart (as defined below) to, *inter alia*, process various crude oil feedstocks and effectuate the marketing and sale of refined products;

**WHEREAS**, Customer and LBRM have entered into (i) a Feedstock Supply Agreement pursuant to which Customer and/or its Affiliates will supply crude oil and other refining feedstock to LBRM for processing at the Refinery (as amended, restated, amended and restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "**Feedstock Supply Agreement**") and (ii) an offtake agreement pursuant to which Customer and/or its Affiliates will lift refined products product from LBRM (as amended, restated, amended and restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "**Product Offtake Agreement**");

**WHEREAS**, Customer agrees to pay the Limetree Parties (as defined below) and its Affiliates the Initial Toll Balance (as defined below) incurred in connection with the implementation of the Refinery Restart through the payment by Customer to LBRM of the Toll

**HIGHLY CONFIDENTIAL**          **BP_Limetree_0001066**

Payments (as defined below) and other consideration subject to the terms and conditions set forth herein;

WHEREAS, Guarantor (as defined below), an Affiliate of Customer, has entered into the Guaranty (as defined below) pursuant to which Guarantor guarantees all payment obligations of Customer under this Agreement, the Feedstock Supply Agreement and the Product Offtake Agreement;

WHEREAS, subject to Applicable Law, LBRM agrees to operate on a reasonably "open book" basis with Customer to ensure that Customer has access to all relevant Refinery and entity records to confirm that (i) Adjusted Free Cash Flow and its components, and any Net Sale Proceeds, are being accurately calculated and (ii) the Limetree Parties are operating the Refinery as a prudent operator in accordance with good industry practice and Applicable Law, including Environmental Law and otherwise in accordance with this Agreement;

WHEREAS, the Parties have entered into the Tolling Agreement, dated as of November 15, 2018, as modified by Waiver, dated as of November 27, 2019, and as amended by Amendment to Tolling Agreement, dated as of February 25, 2020, Amendment No. 2 to Tolling Agreement, dated as of September 16, 2020, and Amendment No. 3 to Tolling Agreement, dated as of January 5, 2021 (as amended, the "Original Agreement"); and

WHEREAS, the Parties wish to amend and restate the Original Agreement as set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual promises and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, and intending hereby to be legally bound, the Limetree Parties and Customer hereby agree and acknowledge, and hereby amend and restate the Original Agreement in its entirety, as follows:

## SECTION 1.  DEFINITIONS.

In this Agreement (including the recitals above), unless the context requires otherwise, the following terms will have the meanings indicated below:

"**Acceptable Letter of Credit**" means a standby letter of credit in substantially the form set forth in the BP Global Oil Americas General Provisions 2015, a copy of which form of letter of credit is attached as Exhibit F.

"**Adjusted Free Cash Flow**" has the meaning set forth in Section 5.3(a).

"**Adjusted Toll Balance**" means the Initial Toll Balance minus the sum of (i) the FCT Toll Reduction Amount, if any, (ii) the amount of the Platformer Capital True-Up Amount, if any, paid by Customer through Adjusted Free Cash Flow if the Platformer Outage occurs after the Toll Start Date and (iii) forty-percent (40%) of the Working Capital True-Up Amount, if any, paid by Customer to LBRM pursuant to Section 5.2(d).

2

Confidential

**HIGHLY CONFIDENTIAL**                                        **BP_Limetree_0001067**

"**Default Interest Rate**" means the lower of (i) the "prime rate" per annum as listed in the Wall Street Journal, *plus* two percent (2%), and (ii) the maximum interest rate permitted under Applicable Law.

"**Dollars**" means U.S. Dollars, the legal tender of the United States of America.

"**Early Termination Date**" has the meaning set forth in Section 11.2(b).

"**East Refinery**" means the area described as **"East Refinery"** in Appendix 3-A.

"**Effective Date**" has the meaning set forth in Section 2.1.

"**Election Notice**" has the meaning set forth in Section 8.4(c).

"**Emergency**" means any sudden or unexpected event or circumstance (which shall include storms or other severe weather events) that (a) causes, or risks causing, damage to the Refinery or other property or injury to any Person and (b) is of such a nature that responding to the event cannot, in the reasonable discretion of the Limetree Parties, await the decision or consent of Customer.

"**Environmental Laws**" means any Applicable Law, Order or other requirement of Applicable Law (including environmental Authorizations) that relates to (a) the protection of the environment, including but not limited to threatened or endangered species, federally jurisdictional wetlands, ambient air, surface water, groundwater, land surface or subsurface strata, natural resources, natural resource damages, and the restoration and replacement of natural resources, or of human health, or (b) the presence, Release, threatened Release, generation, recycling, disposal or treatment of Contaminants, or the arrangement for any such activities.

"**Event of Default**" means a Refinery Operator Event of Default or a Customer Event of Default, as applicable.

"**Excess Toll Payment**" has the meaning set forth in Section 5.1(b).

"**Excess Working Capital**" has the meaning set forth in Section 8.4(f).

"**Expansion Project**" has the meaning set forth in Section 16.1.

"**FCF Maximization**" has the meaning set forth in Section 7.11.

"**FCT Stop Date**" means August 15, 2021.

"**FCT Toll Reduction Amount**" means an amount equal to (i) the FCT True-Up Amount, if any, calculated without regard to any changes in working capital or reserves for the period between the date that Stable Commercial Operations is deemed achieved under Section 3.1 and the Toll Start Date, and paid by Customer to LBRM pursuant to Section 5.2(c) plus (ii) the product of (a) one million Dollars ($1,000,000) and (b) the number of Days between the date

5

Confidential

**HIGHLY CONFIDENTIAL**

**BP_Limetree_0001070**

million Dollars ($10,000,000), (x) *first*, to pay LBRM the Toll Balance and (y) *second*, to Customer; and

(ii)    sixty percent (60%) of such Net Sale Proceeds *minus* the amount paid to Customer under clause (b)(i)(2), (x) *first*, to the extent that the Net Sales Proceeds payable to LBR pursuant to clauses (b)(i) or (b)(ii) of this definition are sufficient to cause the Obligations to be paid in full in cash (or the Lenders have agreed in writing that the Obligations are not required to be repaid in connection with such Toll Redemption), to Customer to pay any Toll Redemption Adjustment Amount and (y) *second* to LBR;

In each case, the Net Sale Proceeds to be subject to a Toll Redemption shall be first subject to application of Section 8.4(f).

"**Toll Redemption Adjustment Amount**" means, as of any date of determination, the amount equal to (i) the Toll Balance minus (ii) the Toll Balance calculated as if the Toll Balance Increase Amount was and always had been zero ($0).

"**Toll Start Date**" means the date on which the Refinery has successfully completed the Final Completion Test.

"**Total Debt**" means the sum of (a) the aggregate outstanding principal amount of the advances and any term loans under the Term Loan Credit Agreement and any Permitted Refinancing Facility (as defined in the Term Loan Credit Agreement) in respect thereof (excluding any Incremental Facility (as defined in the Term Loan Credit Agreement) that is subordinated to the Secured Obligations (as defined in the Term Loan Credit Agreement)) *plus* (b) the aggregate amount of the commitments under the Revolving Credit Agreement, without giving effect to any extensions of credit thereunder and any commitments under any Permitted Refinancing Facility (as defined in the Revolving Credit Agreement) in respect thereof, without giving effect to any extensions of credit thereunder *plus* (c) from and after the date of incurrence of (i) any Additional Term Debt (as defined in the Term Loan Credit Agreement), the aggregate outstanding principal amount (and commitments in respect thereof) of any Additional Term Debt (as defined in the Term Loan Credit Agreement) and (ii) any Additional Revolving Debt (as defined in the Term Loan Credit Agreement) permitted by the terms of the LBR Financing Documents (as defined in the Term Loan Credit Agreement), the aggregate amount of the commitments thereunder without giving effect to any extensions of credit thereunder.

"**Transfer**" has the meaning set forth in Section 8.3.

"**Turn-around Reserve**" has the meaning set forth in Section 5.5(a)(ii).

"**U.S. GAAP**" means generally accepted accounting principles in the United States promulgated by the Financial Accounting Standards Board, or its predecessors or successors, consistently applied.

"**U.S. Internal Revenue Code**" has the meaning set forth in Section 12.7.

"**Value Range**" has the meaning set forth in Section 8.6(f).

14

Confidential

**HIGHLY CONFIDENTIAL**                    **BP_Limetree_0001079**

"**West Refinery**" means the area described as the **"West Refinery"** in <u>Appendix 3-B</u>.

"**Working Capital True-Up Amount**" has the meaning set forth in <u>Section 5.2(d)</u>.

**SECTION 2.  INITIAL TERM AND RENEWAL TERMS; EFFECTIVENESS; EARLY TERMINATION.**

Section 2.1    <u>Term</u>.

This Agreement shall become binding upon the Parties on the date on which all of the Parties have executed and delivered this Agreement (the "**Effective Date**").  This Agreement shall, unless earlier terminated pursuant to its terms, remain in effect until the earliest of (a) a Refinery Shutdown, and (b) a Toll Redemption in connection with a Qualifying Change of Control (the "**Term**").

**SECTION 3.  TESTING AND STABLE REFINERY OPERATIONS.**

Section 3.1    <u>Stable Commercial Operations</u>.

(a)    The Parties agree that, as of the Effective Date and without regard to whether the requirements have been met pursuant to the Original Agreement, the Refinery is deemed to have achieved "**Stable Commercial Operations.**"

(b)    LBR shall work diligently to complete the Refinery Restart scope of work as set forth in Appendix 2 as soon as practical in accordance with prudent industry practice.

Section 3.2    <u>Final Completion Test</u>.

(a)    The testing protocol and criteria for the "Final Completion Test" is set forth in Appendix 7.  LBR shall work diligently to complete the Final Completion Test as soon as practical in accordance with prudent industry practice.

(b)    If the Toll Start Date has not occurred by the FCT Stop Date, Customer shall have the right to terminate this Agreement at any time thereafter.  Customer's sole and exclusive remedy for the Limetree Parties' failure to achieve the Toll Start Date by the FCT Stop Date shall be its right to terminate this Agreement pursuant to this <u>Section 3.2(b)</u>.

(c)    If the Toll Start Date has not occurred by the FCT Stop Date and this Agreement has not been terminated pursuant to <u>Section 3.2(b)</u>, above, (i) Customer's share of any Commissioning Margin Share and (ii) the Initial Toll Balance or Adjusted Toll Balance, as the case may be, shall each be deemed to be zero Dollars ($0) from and after the FCT Stop Date.

Confidential

**HIGHLY CONFIDENTIAL**                              **BP_Limetree_0001080**

(d)      In the event that the Toll Start Date has not occurred by the FCT Stop Date and Customer has not exercised its right to terminate this Agreement as set forth in Section 3.2(b), above, the Limetree Parties' shall have the right to terminate this Agreement no earlier than fourteen (14) Days after the FCT Stop Date.

**SECTION 4.  CUSTOMER'S REVIEW AND PARTICIPATION RIGHTS; BUDGET; REPORTING.**

Section 4.1      Refinery Management.

(a)      Except as otherwise expressly provided in Section 4.1(b) of this Agreement, all management powers in respect of the business and affairs of the Refinery shall be exclusively vested in the Limetree Parties and neither Customer nor its Affiliates shall have any management power or authority over the business and affairs of the Refinery.  The Limetree Parties shall have full power and authority to do all things on such terms as they, in their sole discretion, may deem necessary or appropriate to conduct the business of the Refinery and to exercise the powers and to effectuate the purposes set forth in this Agreement, the Refinery Operating Agreement and any other contractual obligation between any Limetree Party and its Affiliates or third parties in connection with the Refinery and related facilities.

(b)      Notwithstanding Section 4.1(a), after the Toll Start Date, LBR shall not, and shall cause each other Limetree Party not to, take the actions listed in clauses (i) through (x) of Section 4.1(c) below without the prior consent of Customer, not to be unreasonably delayed, withheld or conditioned.  Such consent (or decision not to consent) shall be delivered in writing to LBR within fifteen (15) Business Days of receipt of (x) LBR's written proposal in respect of the subject matter thereof or (y) an indication as to whether, in connection with any such matter, LBR is entering into any transaction with an Affiliate (the "**Decision Period**").  During the Decision Period, Customer may reasonably request additional information to supplement or clarify the proposal.  If such additional information is available to or, using commercially reasonable efforts, can be obtained by LBR within the Decision Period, LBR or the other Limetree Parties shall provide such information to Customer (including by conducting a review session with the Customer Representative if requested by Customer) as soon as reasonably practicable during the Decision Period.

(c)      If Customer fails to notify LBR of its consent or decision not to consent within the Decision Period, Customer shall be deemed to have consented to the applicable proposal to the extent such proposal was presented to Customer, unless the proposal is made in connection with a transaction described under subsection (ix) below, in which case Customer shall be deemed to have objected unless it responds affirmatively; *provided*, *however*, to the extent LBR or the Limetree Parties failed to provide additional directly relevant, material

16

Confidential

                    **BP_Limetree_0001081**

OR WARRANTIES ARISING BY CUSTOM, TRADE USAGE, PROMISE, EXAMPLE, OR DESCRIPTION, ALL OF WHICH ARE EXPRESSLY DISCLAIMED AND WAIVED BY EACH PARTY.

**SECTION 7.  OTHER COVENANTS OF THE PARTIES.**

Section 7.1    <u>Inspections and Access Rights</u>.

(a)    Customer and the Customer Representatives and alternates shall have the right to enter the Refinery from time to time upon three (3) Business Days' prior notice to LBRM if for an audit, and one (1) Business Day's prior notice to LBRM if for routine ordinary course purposes.  Customer's Representatives and alternates may elect to remain at the Refinery for such duration, or permanently, as Customer may from time to time elect at Customer's sole cost and expense, and the Limetree Parties shall use commercially reasonable efforts to provide, at no cost, office facilities onsite for up to three Customer's Representatives and alternates.  Customer may designate visits for any purpose reasonably related to this Agreement, including without limitation (i) in order to reasonably observe LBRM's performance hereunder and (ii) during normal business hours and upon reasonable prior notice, for purposes of examination relevant to this Agreement of Refinery records and discussions with relevant Refinery management pertaining to the receipt, handling, storage and delivery of Customer Feedstock and Product, LBRM's operational procedures and practices, the basis for all payments and all purchase and sales of goods or services to or from parties other than Customer, the accuracy and sufficiency of LBRM's financial and other reporting, LBRM's calculation of Adjusted Free Cash Flow and Cash Flow Sharing Payments and other relevant accounts, and generally to promote the collaboration between the Parties and assess LBRM's performance under this Agreement and the Project Agreements.  If LBRM has a board of directors, board of managers or other management forum, a Customer Representative or alternate shall be entitled to attend any meetings thereof (other than any meeting or the portion thereof where the subject matter of such meeting or portion thereof is dedicated for discussion of any dispute with, or otherwise matters that raise a conflict of interest in a material respect of, Customer and/or its Affiliates) as a nonvoting observer, and shall receive reasonable advance notice of such meetings with copies of the meeting materials and agenda, and prompt copies of all board (or other governing body) minutes (in each case, redacted as necessary to remove any materials, deliberations and decisions related in any material respect to any dispute with, or otherwise matters that raise a conflict of interest in a material respect of, Customer and/or its Affiliates).  Information which is not related in a material respect to a dispute or conflict shall continue to be provided to Customer.  If Customer addresses conflicts of interest as to some or all information by implementing appropriate internal information barriers or other similar mechanisms, and provides reasonable evidence thereof to LBRM and the names of the representatives subject to such controls and such controls are acceptable to LBRM (acting reasonably), then, in the case of a conflict of interest, but not a

29

Confidential

**HIGHLY CONFIDENTIAL**                                        **BP_Limetree_0001094**

dispute, LBRM will continue to provide such information to the designated Customer representatives.  In exercising its inspection and access rights under this Agreement, Customer, its designees and representatives shall comply with Applicable Law and site rules and regulations, and shall use reasonable efforts in coordination with the Limetree Parties to minimize interference with the Limetree Parties' control over or operation of the Refinery.  Customer shall cause its designees and representatives to sign a visitor acknowledgment form prior to their first visit to the Refinery in substantially the form of Appendix 6 and shall provide copies thereof to LBRM upon request.  The Limetree Parties shall not adopt site rules and regulations intended to unreasonably frustrate access of the Customer Representatives and alternates.  Customer acknowledges that any grant of the right of access to the Refinery under this Agreement or under any document related to this Agreement is a contractual right and conveys no interest in or to the Refinery or any part of the Refinery.

       (b)    Customer and the Limetree Parties agree that the Customer Representatives and alternates shall have the right to observe the work at the Refinery, assess progress on projects, and provide input on projects; *provided, however*, that the Customer Representatives and alternates shall have no operational control over, or oversight responsibilities regarding, construction or operations at the Refinery and the Limetree Parties shall have no obligation to accept any such input, except as otherwise provided in this Agreement.  Customer acknowledges and agrees that all control and oversight over construction and operational matters at the Refinery shall be conducted by the Limetree Parties, in their sole discretion.  The Customer Representatives and alternates will work in good faith to cause all information provided on construction and operational matters ("**Operational Information**") to the Limetree Parties in whatever form to be reasonably accurate; provided, however, that neither Customer nor the Customer Representatives or alternates make any claims, promises, or guarantees about the accuracy, completeness or adequacy of any Operational Information provided to the Limetree Parties, and expressly disclaim liability for errors and omissions in any such Operational Information.  The Limetree Parties agree that they shall not rely on any Operational Information received from the Customer Representatives and alternates, and shall consult their own experts for advice in the conduct of their business.

       (c)    The Limetree Parties shall give notice in substantially the form below to all LBR or LBRM employees whose duties involve the receipt of Operational Information from Customer Representatives and alternates:

> *"BP Products North America Inc. ("**BP**") will have certain representatives observe construction and operational work at the Limetree refinery from time to time.  The BP representatives may offer input on construction or refinery operations, but any suggestions are not binding on you.  Limetree retains full operational control and oversight of the refinery at all times.  BP*

Confidential

**HIGHLY CONFIDENTIAL**           **BP_Limetree_0001095**

**IN WITNESS WHEREOF**, this Agreement has been executed by the authorized representatives of each Party as indicated below effective as of the date first written above.

**LIMETREE BAY REFINING, LLC**

By: *Jeffrey E Rinker*

Name: Jeffrey E. Rinker

Title:  CEO

**LIMETREE BAY REFINING MARKETING, LLC**

By: *Jeffrey E Rinker*

Name: Jeffrey E. Rinker

Title:  CEO

**BP PRODUCTS NORTH AMERICA INC**.

By:      _____

Name:

Title:

*Signature Page to Tolling Agreement*

**HIGHLY CONFIDENTIAL**                    **BP_Limetree_0001118**

DocuSign Envelope ID: C850FF40-C0E0-4535-8808-D52809418D6E

**IN WITNESS WHEREOF**, this Agreement has been executed by the authorized representatives of each Party as indicated below effective as of the date first written above.

**LIMETREE BAY REFINING, LLC**

By: _____

Name: Brian Lever

Title: President

**LIMETREE BAY REFINING MARKETING, LLC**

By: _____

Name: Brian Lever

Title: President

**BP PRODUCTS NORTH AMERICA INC**.

By: *Janet Kong* [DS MAS]
7E0247398958433...

Name: Janet Kong

Title: Vice President, BPPNA

*Signature Page to Tolling Agreement*

**HIGHLY CONFIDENTIAL**                    **BP_Limetree_0001119**