# APPENDIX A

Amended and Restated Terminal Operating Agreement by and Among the Government of the Virgin Islands and Limetree Bay Terminals, LLC

*Execution Copy*

# AMENDED AND RESTATED TERMINAL OPERATING AGREEMENT

## BY AND AMONG

## THE GOVERNMENT OF THE U.S. VIRGIN ISLANDS

## AND

## LIMETREE BAY TERMINALS, LLC

### July 2, 2018

# TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS AND CONSTRUCTION ............................................. 4

    Section 1 1    Definitions ...................................................................... 4
    Section 1 2    Agreement Components ................................................ 15
    Section 1 3    Agreement Interpretation ............................................. 16

ARTICLE 2 TERM OF AGREEMENT .......................................................... 16

    Section 2 1    Effective Date ............................................................. 16
    Section 2 2    Initial Term ................................................................. 16
    Section 2 3    Extension of Term ....................................................... 16
    Section 2 4    End of Term ................................................................ 17

ARTICLE 3 CLOSING, CLOSING CONDITIONS; TERMINATION BEFORE
    CLOSING ................................................................................. 17

    Section 3 1    Time and Place of Closing ........................................... 17
    Section 3 2    Conditions to Closing .................................................. 17
    Section 3 3    Closing Deliveries ...................................................... 18
    Section 3 4    Termination Before Closing ......................................... 19

ARTICLE 4 COMMENCEMENT OF OPERATIONS .......................................... 20

    Section 4 1    Permits ...................................................................... 20
    Section 4 2    Operations Commencement .......................................... 21

ARTICLE 5 OPERATION OF THE TERMINAL, EXPANSION ............................. 22

    Section 5 1    Independent Operation and Non-Interference .................. 22
    Section 5 2    Terminal Operations .................................................... 22
    Section 5 3    Expansion and Enhancement of Facilities ....................... 23

ARTICLE 6 ADDITIONAL OPERATING PROVISIONS ..................................... 23

    Section 6 1    Operation of the Fuel Loading Rack ............................... 23
    Section 6 2    Navigational Access .................................................... 24
    Section 6 3    Submerged Lands ....................................................... 25
    Section 6 4    Certain Obligations ..................................................... 27
    Section 6 5    Land And Housing Transfer .......................................... 27
    Section 6 6    Bitumen Tank And Storage ........................................... 28

ARTICLE 7 EMPLOYMENT .................................................................... 28

    Section 7 1    Minimum Commitment ................................................ 28
    Section 7 2    Residency Requirement ................................................ 29
    Section 7 3    Non-Discrimination ..................................................... 29
    Section 7 4    Training and Continuing Education ................................. 29

ARTICLE 8 FINANCIAL OBLIGATIONS OF TERMINAL OPERATOR ................. 29

Section 8.1    Closing Payments and Related Payments ... 29
Section 8.2    Annual Payment ... 30
Section 8.3    Adjusted Variable Payment ... 31
Section 8.4    Charitable Commitments ... 31
Section 8.5    Financial Assurance ... 31
Section 8.6    Government Carried Interest in Terminal Operator ... 32
Section 8.7    Capital Expenditures ... 33

ARTICLE 9 SECURITY INTEREST ... 33

Section 9.1    Payments Secured By Lien ... 33
Section 9.2    All Necessary Actions ... 34
Section 9.3    No Encumbrances ... 35

ARTICLE 10 INSURANCE ... 35

Section 10.1    General Insurance ... 35
Section 10.2    Additional Insurance ... 35

ARTICLE 11 TAX AND FEE EXEMPTIONS ... 37

Section 11.1    Scope of Exemption ... 37
Section 11.2    Exemptions ... 37
Section 11.3    Limitations on Exemption ... 39
Section 11.4    Tax Return Filings ... 40
Section 11.5    No Adverse Actions ... 40

ARTICLE 12 REPRESENTATIONS AND WARRANTIES ... 40

Section 12.1    Government Representations ... 40
Section 12.2    Terminal Operator Representations ... 41

ARTICLE 13 COVENANTS OF TERMINAL OPERATOR ... 42

Section 13.1    Environmental ... 42
Section 13.2    Consents and Approvals ... 44
Section 13.3    Indemnification ... 44
Section 13.4    Intercompany Agreements ... 45

ARTICLE 14 GOVERNMENT COVENANTS ... 45

Section 14.1    Assistance with Permits ... 45
Section 14.2    Consents and Approvals ... 46
Section 14.3    Beneficial Use ... 46
Section 14.4    Other Legislation ... 46
Section 14.5    Change in Law ... 47
Section 14.6    Other Benefits ... 47
Section 14.7    No Additional Cost to Terminal Operator ... 47
Section 14.8    Zoning; Legal Descriptions ... 47
Section 14.9    Sale/Lease of Certain Real Estate ... 48
Section 14.10   Security ... 48

ARTICLE 15 REPORTING, AUDIT AND INSPECTION .......................................... 48

    Section 15.1.    Reporting ....................................................................... 48
    Section 15.2.    Annual Audit ................................................................... 49
    Section 15.3.    Inspection ...................................................................... 49

ARTICLE 16 DEFAULT AND TERMINATION ................................................... 50

    Section 16.1    Payment Default ................................................................ 50
    Section 16.2    Operating Default, Liquidated Damages ............................... 50
    Section 16.3    Termination ..................................................................... 50
    Section 16.4    Rights and Remedies Cumulative ........................................ 52

ARTICLE 17 CONFIDENTIALITY ............................................................... 52

    Section 17.1.    Confidentiality ................................................................. 52

ARTICLE 18 FORCE MAJEURE ................................................................. 53

    Section 18.1    Force Majeure Events ....................................................... 53
    Section 18.2    Burden of Proof .............................................................. 53
    Section 18.3    Excused Performance ....................................................... 54
    Section 18.4    Applicability ................................................................... 54

ARTICLE 19 MISCELLANEOUS ................................................................ 54

    Section 19.1    Notices, Requests and Communications ............................... 54
    Section 19.2    Assignment ..................................................................... 56
    Section 19.3    Governing Law ................................................................ 57
    Section 19.4    Dispute Resolution ........................................................... 57
    Section 19.5.    Commercial Act ............................................................... 58
    Section 19.6    Limitation on Liability ...................................................... 59
    Section 19.7    Entire Agreement, Subsequent Amendments .......................... 59
    Section 19.8    Severability of Provisions .................................................. 59
    Section 19.9.    Payment Terms and Interest Calculation ............................... 59
    Section 19.10    Public Announcements ...................................................... 59
    Section 19.11    Parties in Interest ............................................................. 60
    Section 19.12    Waiver .......................................................................... 60
    Section 19.13    Performance Extended to Next Business Day ......................... 60
    Section 19.14    Negotiation and Preparation Costs ...................................... 60
    Section 19.15    Further Assurances ........................................................... 60
    Section 19.16    Counterparts ................................................................... 60
    Section 19.17    Amendment and Restatement .............................................. 60

*Execution Copy*

## AMENDED AND RESTATED TERMINAL OPERATING AGREEMENT

THIS AMENDED AND RESTATED OPERATING AGREEMENT (the "*Agreement*") is hereby made as of July 2, 2018, by and among the Government of the U.S. Virgin Islands (the "*Government*") and Limetree Bay Terminals, LLC, a limited liability company existing under the laws of the U.S. Virgin Islands ("*Terminal Operator*") The Government and Terminal Operator are hereinafter sometimes individually referred to as a "*Party*" and sometimes hereinafter collectively referred to as "*Parties*".

## RECITALS

**WHEREAS**, the Government, Hess Oil Virgin Islands Corp. ("*HOVIC*"), PDVSA V I, Inc. ("*PDVSA*") and HOVENSA L L C ("*HOVENSA*"), have entered into that certain Concession Agreement, dated and approved by the Legislature of the U.S. Virgin Islands September 1, 1965, as amended and extended by the Extension and Amendment Agreement, dated April 24, 1981 and approved by the Legislature of the U.S. Virgin Islands May 7, 1981, as further amended and extended by the Restated Second Extension and Amendment Agreement, dated July 27, 1990 and approved by the Legislature of the U.S Virgin Islands on August 22, 1990, as further amended by the Technical Clarifying Amendment to Restated Second Extension and Amendment Agreement, dated November 17, 1993 and approved by the Governor and the Legislature of the U.S. Virgin Islands, as further amended and extended by the Third Extension and Amendment Agreement, to which PDVSA VI and later HOVENSA were added as parties, dated April 15, 1998 and approved by the Legislature of the U.S. Virgin Islands on May 18, 1998, and as further amended by the Fourth Amendment Agreement, dated April 3, 2013, as ratified by the Legislature of the U S Virgin Islands on November 4, 2013 and approved by the Governor of the U.S. Virgin Islands on November 4, 2013, as Act No. 7566 (such ratification including that certain letter, dated October 16, 2013, from George H.T. Dudley to the Governor of the U.S. Virgin Islands incorporated as part of Act No. 7566) (all of the foregoing, collectively, the "*Concession Agreement*").

**WHEREAS**, under the Concession Agreement, HOVIC, PDVSA, and HOVENSA (and their predecessors in interest), as inducement to construct, operate, and maintain the refinery and related facilities, and in order to promote the public interest in the economic growth and development of the U S Virgin Islands, were granted rights to conduct the business of the Oil Refinery and Related Facilities (as defined below) and were exempted from certain taxes, duties, and other fees,

**WHEREAS**, the Government, the U S Virgin Islands Port Authority (the "*Port Authority*"), and HOVIC entered into that certain Contract dated as of September 22, 1976 (as amended, supplemented or modified from time to time, the "*1976 Contract*"), which was approved by the Legislature of the U.S Virgin Islands (the "*Legislature*") on September 29, 1976, which 1976 Contract memorialized the agreements by and between HOVIC and the

Government with respect to HOVIC's agreement to construct a container port on the south shore of St. Croix, U.S. Virgin Islands;

WHEREAS, among the documents exchanged between the Government and HOVIC in connection with the 1976 Contract was that certain Lease entered into by and between the Government and HOVIC, dated as of October 16, 1976, (the "*Submerged Land Lease*"), pursuant to which the Government leased to HOVIC certain reclaimed submerged lands specified therein;

WHEREAS, the Concession Agreement was amended pursuant to the Third Amendment Agreement dated April 15, 1998 to allow construction of a delayed coking unit and to modify the prior Concession Agreement to include PDVSA as a 50% Member in HOVENSA;

WHEREAS, pursuant to that certain Letter Agreement entered into by and between HOVIC and the Government, dated October 14, 1998 (the "*1998 Letter Agreement*"), the Government approved: (i) the assignment and delegation to HOVENSA of HOVIC's rights and obligations under the 1976 Contract, including the right to use the lands filled as authorized by Submerged Lands Permit No. 3 and Amendments 1, 2, and 3 thereto, and Submerged Lands Permit Nos. 23 and 52 (which right shall continue for the term of the Submerged Land Lease, as such term is extended), and (ii) the assignment of the leasehold estate under the Submerged Land Lease to HOVENSA;

WHEREAS, by their terms, the rights and obligations of the parties to the Concession Agreement arising under or related to the Concession Agreement continue until the year 2022;

WHEREAS, on or about January 18, 2012, HOVENSA announced its intention to idle refining operations at the Oil Refinery and Related Facilities, and thereafter began idling such operations on or about February 16, 2012;

WHEREAS, the Government, HOVENSA, HOVIC and PDVSA entered into that certain Fourth Amendment Agreement as of April 3, 2013 (the "*Fourth Amendment*") which was approved by the Legislature on November 4, 2013, which provides, among other things, for HOVIC and PDVSA to undertake a bona fide process to facilitate the sale, directly or indirectly, of the Oil Refinery and Related Facilities on an arm's length basis (the "*Sales Process*");

WHEREAS, the Sales Process and subsequent action in connection with proceedings in the United States District Court of the Virgin Islands, Bankruptcy Division, St. Croix, U.S. Virgin Islands, resulted in HOVENSA having reached an understanding with Terminal Operator and the Government whereby HOVENSA and HOVIC agreed to transfer to Terminal Operator certain assets constituting the Oil Refinery and Related Facilities pursuant to an Amended and Restated Asset Purchase Agreement by and among HOVENSA, HOVIC, and an Affiliate of Terminal Operator, dated as of December 1, 2015 (the "*Purchase Agreement*");

WHEREAS, the Government has determined that continued economic activity at the Oil Refinery and Related Facilities is critical to the economic well-being of the U.S. Virgin Islands, and will bring tax revenues, employment, and increased commercial activity that will benefit the Government and the people of the U.S. Virgin Islands;

WHEREAS, the Government has determined that the U.S. Virgin Islands' long-term interests will be best served by entering into an agreement with a financially and commercially reputable entity that will refurbish, restart, and operate the oil storage terminal located at the Oil Refinery and Related Facilities, explore available options for resuming petroleum processing operations at the facility, and identify strategies for further expanding and enhancing the economic activity at the facility going forward;

WHEREAS, Terminal Operator has agreed to refurbish, operate, and explore expansion of the Terminal, and to undertake best efforts to identify and pursue potential uses of the Refinery, subject to Terminal Operator's reasonable business judgment;

WHEREAS, the Government and Terminal Operator have entered into that certain Operating Agreement, dated December 1, 2015 and approved by the Legislature of the U.S. Virgin Islands on December 29, 2015 as Bill No. 31-0283 (as supplemented and clarified by letter agreements dated December 30, 2015 and January 26, 2016, the "*Original Terminal Operating Agreement*");

WHEREAS, under the Original Terminal Operating Agreement, Terminal Operator, as an inducement to take ownership of, develop, operate, and maintain the Oil Refinery and Related Facilities, located at Limetree Bay, St. Croix, U.S. Virgin Islands, and in order to promote the public interest in the economic growth and development of the U.S. Virgin Islands, was granted rights to conduct the business of the Oil Refinery and Related Facilities and was exempted from certain taxes, duties, and other fees;

· WHEREAS, Terminal Operator resumed commercial operations and is currently operating, the Terminal at the Oil Refinery and Related Facilities;

WHEREAS, in the Original Terminal Operating Agreement, Terminal Operator committed to devote not fewer than eighteen (18) months to "evaluate the prospects" of a Refinery Restart, and to "take all commercially reasonable efforts to facilitate" such Refinery Restart;

WHEREAS, in January 2018, Terminal Operator informed the Government that Terminal Operator had identified and entered into negotiations with one or more large petroleum companies interested in feedstock supply, product offtake and financial participation in a Refinery Restart;

WHEREAS, in order to facilitate a Refinery Restart, Terminal Operator will enter into on or around the date hereof a transfer and assignment agreement (the "*Refinery Transfer Agreement*") with Refinery Operator, which is an indirect subsidiary of Limetree Bay Ventures, LLC and an Affiliate under common ownership with Terminal Operator, pursuant to which Terminal Operator will transfer certain rights granted to it under the Original Terminal Operating Agreement in connection with the Refinery and the Refinery Site to Refinery Operator;

WHEREAS, to further facilitate a Refinery Restart, Terminal Operator has asked the Government to enter into a new Refinery Operating Agreement to reflect that the Refinery and the Refinery Site will be acquired, held and operated by Refinery Operator, rather than by

3

Terminal Operator, and to govern the contractual relationship by and between the Government and the Refinery Operator in its capacity as owner of the Refinery and the Refinery Site;

WHEREAS, Terminal Operator and Refinery Operator and certain Affiliates thereof shall enter into a new shared services agreement with respect to certain facilities, access, use, permits and services to be shared by or provided by Terminal Operator to Refinery Operator or by Refinery Operator to Terminal Operator, as the case may be (either directly or through a third party) in respect of, *inter alia*, the Shared Services Systems, including but not limited to fire control system management, power supply and process and potable water supply (the "*Shared Services Systems Agreement*");

WHEREAS, Terminal Operator and HOVENSA entered into a shared services agreement with respect to certain services to be provided by Terminal Operator (either directly or through a third party) from Shared Services Systems, including but not limited to fire control system management, power supply and process and potable water supply, and an environmental response trust created in connection with HOVENSA's Chapter 11 insolvency succeeded to HOVENSA's rights and obligations thereunder;

WHEREAS, Terminal Operator has entered into contracts or memoranda of understanding for the storage of petroleum and petroleum products with multiple reputable third parties, including a subsidiary of China Petroleum & Chemical Corporation and Freepoint Commodities LLC, which contracts have established a baseline for the economic performance of the Terminal, and certain of those entities have acquired a minority equity stake;

WHEREAS, in order to protect the interests of the U.S. Virgin Islands, and to reflect the importance of the Government's role in facilitating the successful operation of the Terminal, the Government took a financial stake in the success of the new venture under the Original Terminal Operating Agreement, which is in the form of a fee payable upon a Terminal Change of Control (as defined below) and does not include any governance or management role, and such financial stake shall continue; and

NOW, THEREFORE, in consideration of the premises and the mutual promises and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, and intending hereby to be legally bound, the Government and Terminal Operator hereby agree to amend and restate the Original Terminal Operating Agreement as follows:

ARTICLE I
DEFINITIONS AND CONSTRUCTION

Section 1.1.  **Definitions**.  As used in this Agreement, the following terms have the respective meanings set forth below or set forth in the Articles referenced below.

"*1976 Contract*" shall have the meaning set forth in the Recitals.

"*1998 Letter Agreement*" shall have the meaning set forth in the Recitals.

"*Adjusted Variable Payment*" shall have the meaning set forth in Section 8.3.

4

"*Affiliate*" or "*Affiliates*" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person; provided that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract (including, a shareholders' agreement or a members' agreement between Persons who have an interest in an Affiliate) or otherwise.

"*Agreement*" shall have the meaning set forth in the Preamble.

"*Annual Audit*" shall have the meaning set forth in Section 15.2(A).

"*Annual Audit Report*" shall have the meaning set forth in Section 15.2(B).

"*Annual Payment*" shall have the meaning set forth in Section 8.2.

"*Applicable Law*" shall mean any present or future constitution, law, statute, ordinance, order, injunction, administrative and/or judicial order or decree, code, rule, regulation, or Authorization, or any amendments thereto, and any voluntary cleanup program and/or brownfields program of any Governmental Authority (excluding any such legislative, judicial or administrative body or instrumentality acting in any capacity as a lender, guarantor or mortgagee) applicable to a Party or its Affiliate or the subject matter of this Agreement.

"*Authorization*" shall mean any licenses, certificates, permits, orders, approvals, consents, determinations, variances, franchises, and authorizations from any Governmental Authority.

"*Business Day*" shall mean Monday through Friday of each week, except that a legal holiday recognized as such by the Government (including, for the avoidance of doubt, any administrative leave day granted by the Government for the entire U.S. Virgin Islands) shall not be regarded as a Business Day, and a "*Day*" shall be any calendar day.

"*Carried Interest*" shall have the meaning set forth in Section 8.6(A).

"*Change in Law*" shall mean any of the following events occurring after the date of execution of this Agreement:

(a)     a change to, or repeal of, any existing Applicable Law;

(b)     the promulgation of any new Applicable Law; or

(c)     any withdrawal or amendment of any Authorization other than:

(i)     in accordance with the terms upon which it was originally granted;

(ii)     as a result of a material failure by Terminal Operator to comply with a material condition of the applicable Authorization; or

(iii)    as a result of any unlawful act or omission of Terminal Operator.

"*Clean Air Act Consent Decree*" shall mean the Consent Decree entered on June 7, 2011 in *United States of America and The United States Virgin Islands v. HOVENSA, L.L.C.* (Civ. No 1:11-cv-00006) (D.V.I., St. Croix Div.), as may be amended by the court from time to time.

"*Closing*" shall have the meaning set forth in Section 3.1(A).

"*Closing Date*" shall have the meaning set forth in Section 3.1(B).

"*Closing Payment*" shall have the meaning set forth in Section 8.1.

"*Coastal Zone Management permit*" shall mean a permit obtained under the Virgin Islands Coastal Zone Management Act, as amended.

"*Commissioner of Labor*" shall mean the Commissioner of Labor of the U S  Virgin Islands.

"*Concession Agreement*" shall have the meaning set forth in the Recitals.

"*Confidential Information*" shall mean information or data proprietary to the Government and/or Terminal Operator including

(a)    books, records and documentation.

(b)    information regarding any aspect of the Terminal and the operation thereof,

(c)    information from and relating to Customers, stakeholders and any contractor of the applicable Party;

(d)    written information that is clearly marked as confidential or proprietary by a Party;

(e)    oral information identified in writing as confidential after disclosure, or as so stated when made, regardless of whether such written or oral information originated with the disclosing Party or any third party, which is provided to the receiving Party after the date hereof, and

(f)    all written information generated by a Party or its representatives that contains, reflects or is derived from furnished Confidential Information,

provided, however, that such information or data shall exclude information already in the public domain, or which may subsequently become part of the public domain through no fault of the Government or Terminal Operator  For the avoidance of any doubt, Confidential Information includes any information recorded or stored in any digital format on electronic, optical or magnetic media or any other material that contains or otherwise reflects Confidential Information.

"*Consumer Price Index*" shall mean the Consumer Price Index for All Urban Consumers, U.S. City Average as published by the U.S. Department of Labor, Bureau of Labor Statistics.

"*Contaminant*" shall include but not be limited to any contaminant, air contaminant, solid or hazardous waste, hazardous material, infectious waste, waste, pollutant, air pollutant, hazardous air pollutant, regulated air pollutant, pollution, air pollution, radioactive material, hazardous or toxic substance, crude oil, any fraction thereof, petroleum product, petroleum byproduct, and or fuel additive, defined or regulated as such now or in the future in or under any Environmental Laws or voluntary cleanup or brownfields program.

"*Contract*" shall mean any note, bond, mortgage, indenture, guaranty, license, franchise, permit, agreement (including, a shareholders' agreement, a members' agreement, or both), contract, commitment, lease, purchase order, or other instrument or obligation, and any amendments thereto.

"*Customers*" shall have the meaning set forth in Section 11.1.

"*Discharge Date*" shall have the meaning set forth in Section 9.1(A).

"*Dispute*" shall have the meaning set forth in Section 19.4.

"*Distributions*" shall mean any distribution to a member, shareholder or its Affiliates in respect of any ownership interest (including any membership interest) in Terminal Operator, whether in cash or property, or the redemption, purchase or acquisition of any interest of such member, shareholder or Affiliate.

"*DPNR*" shall have the meaning set forth in Section 4.1(B).

"*Easements*" shall have the meaning set forth in Section 9.1(A).

"*EBITDA*" shall have the meaning set forth in Section 8.3.

"*Effective Date*" shall have the meaning set forth in Section 2.1.

"*Environmental Laws*" shall mean any Applicable Law, Order or other requirement of Applicable Law (including environmental Authorizations) that relates to (a) the protection of human health or the environment, including but not limited to threatened or endangered species, federally-jurisdictional wetlands, ambient air, surface water, groundwater, land surface or subsurface strata, natural resources, natural resource damages, and the restoration and replacement of natural resources, or (b) the presence, Release, threatened Release, generation, recycling, disposal or treatment of Contaminants, or the arrangement for any such activities.

"*EPA*" shall have the meaning set forth in Section 4.1(B).

"*Equity Holders*" shall include the direct and indirect owners of (i) the stock of a corporation, (ii) the equity of the membership interests of a limited liability company, and (iii) the ownership interest of any other entity.

"*Excluded Lands*" shall mean the real property described as excluded lands in Appendix A.

"*Exempted Assets*" shall haveb the meaning set forth in Section 19.5.

"*Exemptions*" shall have the meaning set forth in Section 11.2.

"*Extension*" shall have the meaning set forth in Section 2.3.

"*Financial Assurance*" shall have the meaning set forth in Section 8.5.

"*Force Majeure Event*" shall have the meaning set forth in Section 18.1.

"*Fourth Amendment*" shall have the meaning set forth in the Recitals.

"*Fuel Loading Rack*" shall have the meaning set forth in Section 6.1(A)(1).

"*Full-Time Employee*" shall mean an individual employed by Terminal Operator for work in the U.S. Virgin Islands on the Terminal who works no less than 32 hours per week and is covered by employer-provided health insurance. The number of Full-Time Employees on any given date shall be calculated as the three-month trailing average of the number of Full-Time Employees at the Terminal on such date, and include contractors for the first twelve (12) months after the Original Closing Date and exclude contractors thereafter.

"*Government*" shall have the meaning set forth in the Preamble.

"*Government Indemnified Party*" shall have the meaning set forth in Section 13.3.

"*Governmental Authority*" shall mean any foreign, federal, territorial, state or local governmental entity, authority or agency, court, tribunal, regulatory commission or other body, whether legislative, judicial or executive (or a combination or permutation thereof) having jurisdiction as to the matter in question.

"*Governmental Function*" shall mean any regulatory, legislative, permitting, zoning, enforcement (including police power), licensing or other functions which the Government is authorized or required to perform in its capacity as a Governmental Authority in accordance with Applicable Law.

"*Governor*" shall have the meaning set forth in Section 3.2(C)(1).

"*Guaranteed Amount*" shall have the meaning set forth in Section 8.5.

"*HERT*" shall mean the HOVENSA environmental response trust created pursuant to that certain Environmental Response Trust Agreement, having an effective date of February 17, 2016, made by and between HOVENSA, as Settlor and Project Navigator, Ltd., as Trustee.

"*HOVENSA*" shall have the meaning set forth in the Recitals.

"*HOVIC*" shall have the meaning set forth in the Recitals.

8

"*Initial Term*" shall have the meaning set forth in Section 2.2.

"*Internal Revenue Code*" shall mean, as applicable, the Internal Revenue Code of 1986, as amended, and/or the Internal Revenue Code of 1986, as amended and as mirrored in the U.S. Virgin Islands and applicable thereto pursuant to the Naval Service Appropriation Act of 1922, 48 U.S.C. 1397.

"*International Standards*" shall mean with respect to any engineering, construction or operations work conducted by or on behalf of a Party, that such work is performed in accordance with professional practices and standards generally accepted by the international marine terminalling community and that such work is provided by an experienced and competent professional organization generally recognized by that community as competent in its respective service area.

"*LB Refining*" shall mean Limetree Bay Refining, LLC, a limited liability company existing under the laws of the U.S. Virgin Islands.

"*Legislature*" shall have the meaning set forth in the Recitals.

"*Lender*" shall mean any Person providing debt, bond or capital market financing or refinancing or credit support or interest rate hedging for such financing or refinancing, including any agent or trustee for such Person or Persons.

"*Liabilities*" shall mean any and all indebtedness, Taxes, liabilities and obligations, whether accrued or fixed, known or unknown, absolute or contingent, matured or unmatured, or determined or determinable.

"*LNG*" shall mean liquefied natural gas.

"*Losses*" shall mean all suits, actions, Liabilities, legal proceedings, claims, demands, losses, costs, and expenses of whatsoever kind or character, including reasonable attorneys' fees and expenses and case costs and expenses.

"*Minimum Payment*" shall have the meaning set forth in Section 8.2(B).

"*Notice*" shall have the meaning set forth in Section 19.1.

"*NRD Settlement and Release Agreement*" shall mean the Settlement and Release Agreement fully executed on and with an effective date of May 29, 2014, by and among the Commissioner of the U.S. Virgin Islands Department of Planning and Natural Resources, the Government of the U.S. Virgin Islands, Hess Oil Virgin Islands Corp., and HOVENSA, LLC, which resolved the litigation among the parties in *Commissioner of the Dep't of Planning and Natural Resources v. Century Alumina Co., et al.*, Civ No. 2005-0062 (attached hereto as Appendix C).

"*Oil Refinery and Related Facilities*" shall mean the Refinery, the Terminal, and all other related facilities, equipment, and real and personal property associated with petroleum import, export, processing, storage and related activities at the Refinery, the Terminal, the

9

container port, the dock, and certain rights to occupy and use all Submerged Lands (including lands on or under the surface of any kind of water), whether or not covered by the Submerged Land Lease or Submerged Lands Permits, and all facilities and property now or in the future related thereto on St. Croix, U.S. Virgin Islands, but excluding the Excluded Lands.

"*Operating Default*" shall have the meaning set forth in Section 16.2.

"*Operations Commencement Date*" shall mean March 28, 2016.

"*Option Parcel*" shall have the meaning set forth in Section 6.5(B).

"*Order*" shall mean any judgment, order, injunction, decree, writ, permit or license issued or entered by or with any Governmental Authority or any arbitrator, whether preliminary, interlocutory or final.

"*Original Closing Date*" shall mean January 4, 2016.

"*Original Effective Date*" shall mean December 29, 2015.

"*Original Terminal Operating Agreement*" shall have the meaning set forth in the Recitals.

"*Owners*" shall mean ArcLight Energy Partners, Fund VI, L.P., Freepoint Commodities LLC, and their respective Affiliates (exclusive of Terminal Operator).

"*Parcel*" shall have the meaning set forth in Section 6.5(A).

"*Parties*" and "*Party*" shall have the meaning set forth in the Preamble.

"*Payment Default*" shall have the meaning set forth in Section 16.1.

"*Payment Obligations*" shall have the meaning set forth in Section 9.1.

"*PDVSA*" shall have the meaning set forth in the Recitals.

"*Person*" shall mean and include an individual, a partnership, a limited partnership, a limited liability partnership, a limited liability limited partnership, a joint venture, a joint stock company, a corporation, a limited liability company, an association, a trust, an unincorporated organization, a group, any governmental entity or any other form of entity or organization.

"*Port Authority*" shall have the meaning set forth in the Recitals.

"*Pre-Existing Contamination*" shall have the meaning set forth in the NRD Settlement and Release Agreement.

"*Proceeding*" shall mean a proceeding, arbitration, action, claim, suit, pending settlement, or other legal proceeding of any kind or nature before or by any Governmental Authority, arbitrator or panel.

"*Property Acquired for Closing Payment*" shall mean the real property being acquired by Terminal Operator from the Government for the Closing Payment as set forth in Section 8.1 hereof, which real property is further described in Appendix A.

"*Purchase Agreement*" shall have the meaning set forth in the Recitals.

"*Qualifying Change in Law*" shall mean (1) any Change in Law of the U.S. Virgin Islands that (a) becomes effective as a result of an express and affirmative legislative or rulemaking act of the Government, (b) is not required by a Change in Law of the United States, and (c) is not required to conform to any requirements of any federally-delegated program, or (2) any Change in Law the terms of which apply expressly to (a) the Terminal and/or the Terminal Site or operations thereon, or the Shared Services Systems, and not to facilities, sites, or operations that are similar in whole or in part, and/or (b) Terminal Operator or its Affiliates disproportionately in relation to other similarly situated persons.

"*RCRA*" shall have the meaning set forth in Section 13.1(B)(7).

"*RCRA Corrective Action*" shall have the meaning set forth in Section 13.1(B)(7).

"*Refinery*" shall mean all petroleum processing equipment and related facilities, equipment, and real and personal property associated with petroleum processing and related activities, including certain Shared Services Systems and housing for employees and contractors of Refinery Operator, exclusive in each case of the Terminal, as contemplated by the Original Terminal Operating Agreement, this Agreement and the Refinery Operating Agreement and in each case now or hereafter located on the Refinery Site

"*Refinery Closing Payment*" shall mean the Closing Payment provided for in Section 8.1(A) of the Refinery Operating Agreement

"*Refinery Closing Payment Balance*" shall have the meaning given to the term "Closing Payment Balance" in the Refinery Operating Agreement

"*Refinery Closing Payment Interest*" shall have the meaning given to the term "Closing Payment Interest" in the Refinery Operating Agreement

"*Refinery Evaluation Period*" shall have the meaning set forth in the Refinery Operating Agreement.

"*Refinery Operating Agreement*" shall mean that certain Refinery Operating Agreement, dated as of July 2, 2018, by and between the Government and Refinery Operator, as amended, amended and restated, supplemented or modified from time to time.

"*Refinery Operations*" shall mean the processing at the Refinery of crude oil and other feedstock into refined petroleum products or biofuels (including renewable diesel) and the commercialization thereof, including Shared Services Systems operations

11

"*Refinery Operator*" shall mean LB Refining and any wholly-owned subsidiaries thereof that are engaged in acquiring, owning (directly or indirectly) or operating, in whole or material part, the Refinery as set forth in the Refinery Operating Agreement.

"*Refinery Property Option Agreement*" means the Option Agreement, dated January 4, 2016, by and between Limetree Bay Terminals, LLC and HERT, as successor in interest to HOVENSA L.L.C.

"*Refinery Restart*" shall have the meaning set forth in the Refinery Operating Agreement.

"*Refinery Site*" shall mean the real property at the Site on which the Refinery and various Shared Services Systems are now or hereafter located as further described in Appendix A, together with all other real property now or hereafter owned, occupied or leased by Refinery Operator at the Site and used in each case in connection with the Refinery, including Refinery Submerged Lands and excluding the Excluded Lands.

"*Refinery Submerged Lands*" shall have the meaning set forth in the Refinery Operating Agreement.

"*Refinery Transfer Agreement*" shall have the meaning set forth in the Recitals.

"*Release*" shall mean any release, spill, emission, leaking, dumping, injection, pouring, pumping, placing, emptying, injecting, escaping, discarding, abandoning, deposit, disposal, discharge, migrating, or disposal into, on, under, or through the environment (including, but not limited to, ambient air, surface water, groundwater, soil, land surface, or subsurface strata).

"*Respond*" or "*Response*" shall mean all actions, including but not limited to removal actions, remedial actions, corrective actions, enforcement actions, and natural resource restorations, mitigations, and replacements, taken or ordered by or on behalf of the U.S. or the Government, ordered by a court of competent jurisdiction, or otherwise required by Applicable Law, pursuant to any Environmental Laws in response to any Release or threatened Release of a Contaminant.

"*Return*" shall mean all returns, statements, forms and reports for Taxes.

"*Sales Process*" shall have the meaning set forth in the Recitals.

"*Senior Management Employees*" shall mean the ten (10) most highly compensated Full-Time Employees employed by Terminal Operator.

"*Senior Obligations*" shall have the meaning set forth in Section 9.1(A).

"*Shared Services Systems*" shall mean the various support systems (including, without limitation, the fire control system management, power supply and process, waste, and storm water conveyance or treatment systems and potable water supply) currently available or to be expanded or built in the future on the Site for the provision of shared services by and between

Terminal Operator, Refinery Operator and HERT, including as contemplated from time to time in the Shared Services Systems Agreement.

"*Shared Services Systems Agreement*" shall have the meaning set forth in the Recitals

"*Site*" shall mean the real property on which the Oil Refinery and Related Facilities are located, including but not limited to land, "*submerged and filled lands*" and "*trust lands*", within the meaning of 12 V.I.C. § 902(cc) and (dd), respectively, waterways, groundwater, and coastal zones, as further delineated in Appendix A, with respect to those assets and certain lands and rights to land acquired by Terminal Operator or Refinery Operator under or as contemplated by the Purchase Agreement, this Agreement, or the Refinery Operating Agreement and including the Terminal Site, Refinery Site, Property Acquired for Closing Payment and Option Parcels, together with all other real property now or hereafter owned or leased by Terminal Operator or Refinery Operator adjacent or in close proximity to the Terminal Site, Refinery Site, Property Acquired for Closing Payment or Option Parcels and used in connection with the Terminal or Refinery, but excluding the Excluded Lands.

"*Submerged Lands*" shall mean such portions of the Site that are subject to the Submerged Land Lease, a Submerged Lands Permit, or occupancy or development rights to trust lands or other submerged or filled lands in Coastal Zone Management permits as modified and assigned to Terminal Operator or Refinery Operator, as applicable.

"*Submerged Land Lease*" shall have the meaning set forth in the Recitals.

"*Submerged Lands Permits*" means all permits issued by a Governmental Authority in connection with the Submerged Lands, as set forth in Section 6.3

"*Surface Impoundment No. 3*" shall have the meaning given to it in Module IV.A of the 1999 RCRA Part B Permit, EPA Facility I.D. Number VID980536080 (the "*RCRA Part B Permit*") and as shown on Figure 1 to the RCRA Part B Permit and Attachment IV-1, Figure D-3.

"*Taxes*" shall mean all taxes, assessments, charges, duties, fees, levies or other governmental charges imposed by a taxing authority, including all U.S. federal, state, territory, local, foreign, and other income, franchise, annual report fees, profit, gross receipts, capital gains, capital stock, transfer, sales, use, value added, occupation, property, excise, severance, windfall profits, stamp, license, payroll, social security, withholding, and other taxes, assessments, charges, duties, fees, levies, and other governmental charges imposed by a taxing authority of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Return) all estimated taxes, deficiency assessments, additions to tax, penalties, and interest.

"*Term*" shall mean the Initial Term and any Extensions

"*Terminal*" shall mean all storage and blending equipment, docks, tanks, and all other related facilities, equipment, and real and personal property associated with petroleum import, export, mixing, storage, and related activities, including certain Shared Services Systems and

13

housing for employees and contractors of Terminal Operator, exclusive of the Refinery, and in each case, now or hereafter located on the Terminal Site.

"*Terminal Change of Control*" shall mean, with respect to Terminal Operator, consummation of a transaction or series of transactions whereupon (i) the Owners cease to hold, either directly or indirectly, a majority of the equity interests in Terminal Operator following the consummation of such transaction or series of transactions, (ii) the Owners cease directly or indirectly to control Terminal Operator following consummation of such transaction or series of transactions or (iii) the Owners cause Terminal Operator to sell, transfer or dispose of all or substantially all of its assets, or all or substantially all of the assets constituting the Terminal by asset sale, stock sale, merger or otherwise; *provided, however*, that no Terminal Change of Control shall be deemed to have occurred in the event of any direct or indirect transfer of a majority of the equity interests in Terminal Operator to an Affiliate thereof or a transfer under clause (iii) above to an Affiliate of Terminal Operator

"*Terminal Operations*" shall mean the trading, blending, storing, sale, offloading and loading of crude oil, refined products or byproducts such as sulfur or petroleum coke, liquid or compressed petroleum gases, import or storage of LNG and other hydrocarbons and related activities, including Shared Services Systems operations

"*Terminal Operator*" shall have the meaning set forth in the Preamble.

"*Terminal Revenues*" shall mean all revenues generated by or attributable to Terminal Operations, realized by Terminal Operator, less the cost of fuel or additives used to provide services to Customers and excluding any gross receipts arising in connection with Shared Services Systems

"*Terminal Secured Assets*" shall have the meaning set forth in Section 9.1.

"*Terminal Security Documents*" shall have the meaning set forth in Section 9.1

"*Terminal Site*" shall mean the real property at the Site on which the Terminal and certain Shared Services Systems are now located as further described in Appendix A, together with all other real property at the Site now or hereafter owned, occupied or leased by Terminal Operator and used in connection with the Terminal, including Terminal Submerged Lands, Property Acquired for Closing Payment and Option Parcels and excluding the Excluded Lands.

"*Terminal Site Restoration*" shall have the meaning set forth in Section 16.3(B).

"*Terminal Subordinate Security Interest*" shall have the meaning set forth in Section 9.1.

"*Terminal Submerged Lands*" shall have the meaning set forth in Section 6.3(A)

"*Termination*" shall have the meaning set forth in Section 16.3(A)

"*Termination Event*" shall have the meaning set forth in Section 16.3(A)

"*Total Realized Terminal Profit*" shall mean, as of any date of calculation and without double counting, (i) Terminal Operator's total Distributions through such date, *plus* (ii) consideration received by the Owners for the Terminal in a Terminal Change of Control transaction on or prior to such date, *less* (iii) all capital contributions to Terminal Operator through such date. Total Realized Terminal Profit shall exclude any amounts associated with the transfer of the Refinery to Refinery Operator.

"*Transaction Value*" shall have the meaning set forth in Section 8.6(B).

"*U.S. Virgin Islands Resident*" shall mean (i) any United States citizen currently domiciled in the U.S. Virgin Islands for one year or more; (ii) an individual who has attended a school in the U.S. Virgin Islands for at least six years or is a high school or UVI graduate and who is registered to vote in the U.S. Virgin Islands; or (iii) the holder of a permanent resident card (United States Department of Justice Form No. I-551, or appropriate successor form(s)) domiciled in the U.S. Virgin Islands for one year or more. An individual shall demonstrate that he or she has been a resident for one year or more for the purpose of this definition using documents that demonstrate the commencement of the individual's residency in the USVI. Such documents may include, without limitation, a residential lease, a deed, a W-2VI Form issued by an employer, a W-4 form timely completed by an employee, a voter registration card, a permanent resident card, and a U.S. Virgin Islands driver's license.

"*USDOJ*" shall have the meaning set forth in Section 4.1(B).

"*UVI*" shall have the meaning set forth in Section 7.4.

"*Variable Terminal Payment*" shall have the meaning set forth in Section 8.2(A).

Section 1.2.    **Agreement Components** This Agreement consists of the body of this Agreement and the following attachments.

Appendices:

Appendix A    Terminal Site and Refinery Site

Appendix B    List of Claims and Litigations

Appendix C    NRD Settlement and Release Agreement

Appendix D    Memorandum of Understanding with UVI

Appendix E    Form of Special Warranty Deed

Appendix F    Form of Construction License Agreement

Appendix G    USVI Harbor Regulations

Each Appendix referred to in this Agreement is part of this Agreement and is hereby incorporated into the body of the Agreement as if set forth in full therein.

15

Section 1.3    **Agreement Interpretation**. In construing this Agreement: (a) no consideration shall be given to the captions of the articles, sections, subsections or clauses, which are inserted for convenience in locating the provisions of this Agreement and not as an aid to construction and shall not be interpreted to limit or otherwise affect the provisions of this Agreement or the rights and other legal relations of the Parties; (b) no consideration shall be given to the fact or presumption that either Party had a greater or lesser hand in drafting this Agreement; (c) examples shall not be construed to limit, expressly or by implication, the matter they illustrate; (d) the word "includes" and its syntactic variants mean, unless otherwise specified, "includes, but is not limited to" and corresponding syntactic variant expressions, (e) words such as "herein", "hereby", "hereafter", "hereof", "hereto" and "hereunder" refer to this Agreement as a whole and not to any particular article, section or provision of this Agreement; (f) whenever the context requires, the plural shall be deemed to include the singular, and vice versa; (g) each gender shall be deemed to include the other gender, when such construction is appropriate, (h) references to a Person are also to its permitted successors and permitted assigns; (i) all references in this Agreement to Appendices, Exhibits, Schedules, Sections and Articles refer to the corresponding Appendices, Exhibits, Schedules, Sections and Articles of this Agreement unless expressly provided otherwise; (j) references to the "U.S." mean to the United States of America; (k) references to "$" or "Dollars" mean U.S. Dollars; and (l) unless otherwise expressly provided herein, any agreement, instrument or Applicable Law defined or referred to herein means such agreement, instrument or Applicable Law as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of Applicable Laws) by succession of comparable successor Applicable Laws and reference to all attachments thereto and instruments incorporated therein.

## ARTICLE 2
## TERM OF AGREEMENT

Section 2.1    **Effective Date**. The Original Terminal Operating Agreement became effective on December 29, 2015 and this Agreement shall become effective (the "*Effective Date*") upon the first day on which (i) this Agreement has been executed by all Parties and (ii) this Agreement has been duly ratified by the Legislature of the U.S. Virgin Islands.

Section 2.2    **Initial Term**. The initial term of this Agreement (the "*Initial Term*") shall commence on the Effective Date and continue in effect until January 4, 2041, unless extended pursuant to Section 2.3 below.

Section 2.3.    **Extension of Term**. The Term may be extended for up to one (1) period of fifteen (15) additional years (the "*Extension*") upon (a) the delivery of written notice to the Government by Terminal Operator no later than eighteen (18) months prior to the expiration of the Initial Term, (b) certification by Terminal Operator that as of the date of such notice and as of the expiration of the Initial Term, Terminal Operator is in material compliance with its obligations under this Agreement, and (c) within forty-five (45) Days of receipt of such certification, the Government shall confirm that Terminal Operator's certification is correct, such confirmation not to be unreasonably withheld, conditioned or delayed.

Section 2.4.    **End of Term**. Not fewer than two (2) years prior to the end of the Term (as it may be extended by the Extension), Terminal Operator and the Government shall negotiate in good faith to reach a commercially reasonable agreement on a further extension of this Agreement. If Terminal Operator and the Government are unable to reach such an agreement, then the expiration of the Term shall constitute a Termination Event for purposes of Section 16.3(A)(3).

## ARTICLE 3
## CLOSING; CLOSING CONDITIONS; TERMINATION BEFORE CLOSING

Section 3.1.    Time and Place of Closing.

(A)    Closing. Unless this Agreement shall have been terminated and the transactions herein contemplated shall have been abandoned pursuant to this Article 3, and subject to the satisfaction or waiver of the conditions set forth in Section 3.2 (other than conditions, the fulfillment of which, by their nature, are to occur at the completion of the transactions contemplated by this Agreement (the "*Closing*")), the Closing shall occur when all conditions precedent to Closing have been satisfied or waived by the appropriate party, but in any event no later than three (3) months following the Effective Date, unless otherwise extended for an additional three (3) month' period by mutual agreement of the Governor and Terminal Operator.

(B)    Closing Date. The date on which the Closing occurs is herein referred to as the "*Closing Date*".

Section 3.2.    Conditions to Closing.

(A)    Condition Precedent. This Agreement, the Refinery Operating Agreement and all of their terms shall be subject to the ratification and approval of the Legislature and the placement of the signature of the Governor thereon.

(B)    Conditions of the Government to Closing. The obligations of the Government to consummate the transactions contemplated by this Agreement are subject, at the option of the Government, to the satisfaction or waiver by the Government, on or prior to Closing, of each of the following conditions.

(1)    The transactions contemplated under the Refinery Transfer Agreement shall have been consummated.

(2)    No order, writ, injunction or decree shall have been entered (and be in effect) by any Governmental Authority of competent jurisdiction prohibiting the transaction from proceeding, and no statute, rule, regulation or other legal requirement shall have been promulgated or enacted (and be in effect) by any Governmental Authority, that, on a temporary or permanent basis, restrains, enjoins or invalidates the transactions contemplated hereby.

(3)    Each of the representations and warranties of Terminal Operator contained in this Agreement shall be true and correct in all material respects.

17

(4)     Terminal Operator shall have performed and observed, in all material respects, all covenants and agreements to be performed or observed under this Agreement prior to or on the Closing Date

(5)     Terminal Operator shall have delivered to the Government the items identified in Section 3.3(A).

(C)     **Conditions to Terminal Operator Closing.** The obligations of Terminal Operator to consummate the transactions contemplated by this Agreement are subject, at the option of Terminal Operator, to the satisfaction or waiver by Terminal Operator, on or prior to Closing, of each of the following conditions:

(1)     The Legislature shall have ratified and approved the transactions contemplated by, and the terms of, this Agreement and the Refinery Operating Agreement and the signature of the Governor of the U S Virgin Islands (the "*Governor*") shall have been placed thereon

(2)     The transactions contemplated by the Refinery Transfer Agreement shall have been consummated.

(3)     No order, writ, injunction or decree shall have been entered (and be in effect) by any Governmental Authority of competent jurisdiction prohibiting the transaction from proceeding, and no statute, rule, regulation or other legal requirement shall have been promulgated or enacted (and be in effect) by any Governmental Authority, that, in each case, on a temporary or permanent basis, restrains, enjoins or invalidates the transactions contemplated hereby  For the avoidance of doubt, nothing herein is intended to negate or obviate any condition or use restriction set forth in any permit, consent decree, or Environmental Law

(4) .   Each of the representations and warranties of the Government contained in this Agreement shall be true and correct in all material respects

(5)     The Government shall have performed and observed, in all material respects, all covenants and agreements to be performed or observed by the Government under this Agreement prior to or on the Closing Date.

(6)     The Closing pursuant to the Refinery Operating Agreement shall have occurred

Section 3 3     **Closing Deliveries**

(A)     **Closing Deliveries of Terminal Operator.** At the Closing, upon the terms and subject to the conditions of this Agreement, Terminal Operator shall deliver, or cause to be delivered, to the Government, or perform or cause to be performed, the following:

(1)     A certificate duly executed by an authorized officer of Terminal Operator dated as of the Closing Date, certifying on behalf of Terminal Operator that the conditions set forth in Section 3.2(B)(5) have been fulfilled;

18

(2)    A certificate duly executed by an authorized officer of Terminal Operator dated as of the Closing Date, (i) attaching and certifying on behalf of Terminal Operator complete and correct copies of (x) the organizational documents of Terminal Operator, as in effect as of the Closing Date, and (y) the resolution of Terminal Operator authorizing the execution, delivery and performance by Terminal Operator of this Agreement and the transactions contemplated hereby and (ii) certifying the incumbency of each authorized representative of Terminal Operator executing this Agreement or any document delivered in connection with the Closing;

(3)    Evidence of payment of the Closing Payment by wire transfer in immediately available funds to a Government account at Bank of New York identified in advance by the Government in writing;

(4)    Certificates of insurance evidencing the insurance Terminal Operator has obtained, or caused to be obtained, as required pursuant to Article 10; and

(5)    The executed Terminal Security Documents.

(B)    **Closing Deliveries of the Government.** At the Closing, upon the terms and subject to the conditions of this Agreement, the Government shall deliver, or cause to be delivered to Terminal Operator the documentation required pursuant to this Agreement, as well as to perform or cause to be performed its obligations under this Agreement, including evidence of the ratification and approval of the Legislature of the transactions contemplated by, and the terms of, this Agreement and the Refinery Operating Agreement, including the necessary signature of the Governor.

Section 3.4.    **Termination Before Closing.**

(A)    **Termination.** This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing, upon fifteen (15) days' written notice to the non-terminating party.

(1)    By mutual written consent of the Government and Terminal Operator;

(2)    By Terminal Operator, if (i) there shall be any statutes, laws, rules, regulations, ordinances, orders, and codes of or by any Governmental Authority that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited; or, (ii) a Governmental Authority shall have issued an order, decree, or ruling or taken any other action permanently restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated hereby, and such order, decree, ruling, or other action shall have become final and non-appealable; or (iii) any of the representations and warranties of the Government contained in this Agreement shall not be true and correct in all material respects at time of Closing; or (iv) the other party shall have failed to fulfill, in any material respect, any of its obligations under this Agreement required to be performed prior to or at Closing; or

(3)    By the Government, if (i) there shall be any statutes, laws, rules, regulations, ordinances, orders, and codes of or by any Governmental Authority (other than a

19

U.S. Virgin Islands Governmental Authority) that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited; or (ii) a Governmental Authority (other than a U.S. Virgin Islands Governmental Authority) shall have issued an order, decree, or ruling or taken any other action permanently restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated hereby, and such order, decree, ruling, or other action shall have become final and non-appealable; or (iii) any of the representations and warranties of Terminal Operator contained in this Agreement shall not be true and correct in all material respects at time of Closing; or (iv) Terminal Operator shall have failed to fulfill, in any material respect, any of its obligations under this Agreement required to be performed prior to or at Closing.

(B)    **Effect of Termination.** If (i) this Agreement is terminated pursuant to Section 3.4(A) or (ii) the Closing does not occur by the date provided in the proviso of Section 3.1(A), this Agreement shall become void and of no further force or effect and the Original Terminal Operating Agreement shall remain in full force and effect unless otherwise terminated in accordance with its terms.

## ARTICLE 4
## COMMENCEMENT OF OPERATIONS

Section 4.1.    Permits.

(A)    Terminal Operator shall continue to use commercially reasonable efforts to (i) obtain all necessary federal, territorial, and local Authorizations, and necessary modification(s) thereof, including but not limited to those under Environmental Laws, to maintain Terminal Operations as contemplated in this Agreement as and when required and (ii) thereafter maintain such Authorizations. The Government shall use commercially reasonable efforts to assist Terminal Operator in obtaining all such Authorizations. Notwithstanding the foregoing, the Parties shall cooperate with each other and use commercially reasonable efforts to support, and shall not interfere with or delay, any effort by the other Party or any other party to obtain and maintain all necessary federal, territorial, and local Authorizations, and necessary modification(s) thereof, including but not limited to those under Environmental Laws, to maintain Terminal Operations.

(B)    Terminal Operator shall use commercially reasonable efforts to obtain and maintain all necessary approvals, including but not limited to, approvals (if necessary to maintain Terminal Operations as contemplated in this Agreement) from the U.S. Department of Justice ("*USDOJ*"), the U.S. Environmental Protection Agency ("*EPA*"), the U.S. Virgin Islands Department of Planning and Natural Resources ("*DPNR*") and the District Court for the District of the U.S. Virgin Islands ("*District Court*") to, among other things, add Terminal Operator as a named party defendant to the Clean Air Act Consent Decree and modify the Clean Air Act Consent Decree to restart Refinery Operations. Such efforts with regard to the Consent Decree shall include, but not be limited to, (i) working with the Government (and, if applicable, third parties) and negotiating with USDOJ, EPA, and DPNR the terms and conditions of one or more filings to add Refinery Operator as a named party defendant to the Clean Air Act Consent Decree and to so modify the Clean Air Act Consent Decree (and any proposed order(s) modifying the Clean Air Act Consent Decree), (ii) cooperating with USDOJ, EPA, and DPNR and taking such

actions necessary to finalize and lodge with the District Court such filings and proposed orders, (iii) cooperating with and assisting as reasonably necessary USDOJ, EPA, and DPNR in responding to any public comments, and (iv) filing of any papers, provision of testimony, participating in any public meetings or hearings or court proceedings, or taking other actions reasonably necessary to support and seek District Court approval and entry of such modification. To the extent the Government is not directly involved in any aspect of Terminal Operator's efforts pursuant to this Section 4.1(B), Terminal Operator shall timely inform the Government of the status and outcome of such efforts.

(C)    The Government shall, to the extent permissible under Applicable Law, provide at no cost (other than any non-discriminatory environmental permit application fees and other costs normally charged to similarly-situated applicants) such Authorizations, permits and rights as may be required to enable Terminal Operator to install one or more offshore buoy, platform or berth and loading system installations capable of servicing very large crude carrier vessels, including any new pipeline delivery or offloading systems, subsea or surface installations as may be required, including, without limitation, validation and assignment of Submerged Land Permit No. 167 as set forth in Section 6.3(A)(1) hereof. The Government shall facilitate any required Authorizations from the U.S. Coast Guard, U.S. Army Corps of Engineers, U.S. Department of Homeland Security, or other Governmental Authority. Terminal Operator will timely file and diligently prosecute any such applications.

(D)    Notwithstanding any other provision in this Agreement, the Government hereby acknowledges and agrees that Terminal Operator may surrender all or part of existing permits issued under Environmental Law for the Terminal (i) in order to achieve compliance with the Clean Air Act Consent Decree, provided that Terminal Operator shall use commercially reasonable efforts to achieve compliance with the Clean Air Act Consent Decree that do not require surrender of the permit or part thereof, or (ii) to the extent done in conjunction with the permanent shut down of the portions of the Terminal for which such permits or parts thereof are surrendered.

(E)    The Government shall cooperate with and assist Terminal Operator (if added as a party to the Clean Air Act Consent Decree) and Refinery Operator with respect to a modification to the Clean Air Act Consent Decree to toll or exempt Terminal Operator and Refinery Operator from fines, penalties and liabilities thereunder prior to the Original Closing Date or that accrue from and after Original Closing Date during periods when Refinery process units or equipment are idled.

Section 4.2.    **Operations Commencement.**

(A)    The Parties acknowledge that the Operations Commencement Date has occurred.

(B)    The Government shall cooperate with and assist Terminal Operator with respect to a modification to the Clean Air Act Consent Decree to toll or exempt Terminal Operator from fines, penalties and liabilities thereunder prior to the Original Closing Date or that accrue from and after the Original Closing Date during periods when refinery process units or equipment are idled

21

## ARTICLE 5
## OPERATION OF THE TERMINAL; EXPANSION

Section 5.1.  **Independent Operation and Non-Interference.**  Terminal Operator shall own, restart, operate and maintain the Terminal as a standalone facility from the Original Closing Date until completion of the Term.

(A)    The Government agrees and shall ensure that Terminal Operator shall have the right to (i) occupy and use the Terminal Site, including the Terminal Submerged Lands in accordance with the Submerged Lands Lease and Submerged Lands Permits as assigned and approved pursuant to Section 6.3 and Applicable Law, (ii) operate the Terminal as set forth herein as an independent terminal facility, and (iii) perform its obligations hereunder without regard to any judicial proceedings with respect to previous owners of the Oil Refinery and Related Facilities or their Affiliates prior to or after the Original Closing Date, or without regard to the rights or claims of any successor in interest to or trustee of any such previous owner's or the Government's interests in the Refinery.

(B)    Terminal Operator shall perform all of its obligations under this Agreement and the other agreements or transactions related thereto, and shall use commercially reasonable efforts to cause its contractors, subcontractors and agents or employees and their authorized representatives to perform their obligations under the relevant Contracts, in a manner that does not unduly interfere with a Refinery Restart or any future Refinery Operations.

(C)    The Government shall perform all of its obligations under this Agreement and the other agreements or transactions related thereto, and shall use commercially reasonable efforts to cause its contractors, subcontractors and agents or employees and their authorized representatives to perform their obligations, in a manner that does not unduly interfere with the Terminal Operations or a Refinery Restart and any future Refinery Operations.

(D)    The Government agrees that Terminal Operator shall not be nor be deemed a "public utility" under Applicable Law in connection with the operation of the Terminal or any agreement to provide services to HERT or any other person or entity with operations at the Site or to the Government after Closing.

(E)    The Government acknowledges that Terminal Operator and Refinery Operator shall have the right to modify, expand, replace and operate the power generation and transmission facilities at the Site as they determine is necessary to provide appropriate power generation resources to the Terminal and, as appropriate, the Refinery. Terminal Operator agrees that (1) to the extent there is excess power generation capacity at the Site, it will, upon the Government's request, work in good faith with the Government to identify means of utilizing that excess capacity for the benefit of the U.S. Virgin Islands on terms to be embodied in a customary power purchase agreement, and (2) to the extent new or additional power generation capacity is required, Terminal Operator shall, consistent with its reasonable business judgment, take into consideration alternative sources of power such as wind, solar, or other non-fossil fuel based power generation facilities.

Section 5.2.  **Terminal Operations.**

22

(A)    **Continuing Obligation to Conduct Terminal Operations.** Terminal Operator shall continue Terminal Operations through the completion of the Term, subject only to performance by the Government of its obligations hereunder, Force Majeure Events, any earlier termination of this Agreement pursuant to Section 16.1 and ordinary maintenance, upgrades or repairs.

(B)    **Operation Work Standards.** Terminal Operator shall perform all operations of the Terminal and carry out its responsibilities under this Agreement, and shall use commercially reasonable efforts to ensure that its subcontractors perform all operations of or related to the Terminal, (i) in accordance with International Standards, (ii) as a reasonable and prudent Terminal Operator, in a sound and workmanlike manner, with due diligence and dispatch; (iii) in accordance with sound, workmanlike and prudent practices of the oil and gas storage and terminalling industry; and (iv) in compliance with Applicable Law. Terminal Operator shall develop safety and access procedures and policies of general application for access to the Terminal Site, including appropriate requirements for insurance to be carried by parties, vessels, and vehicles accessing the Terminal Site.

Section 5.3.    **Expansion and Enhancement of Facilities.** Terminal Operator shall, for a minimum of eighteen (18) months following the Original Closing Date, use commercially reasonable efforts, consistent with its reasonable business judgment, to expand and enhance the operations conducted at the Site, by (for example) increasing the storage capacity of the Terminal; and constructing new facilities for skimming, blending, or other value-adding activities; and increasing dock and port capacity.

## ARTICLE 6
## ADDITIONAL OPERATING PROVISIONS

Section 6.1.    **Operation of the Fuel Loading Rack.**

(A)    To ensure a reliable source of supply of fuel in the U.S. Virgin Islands, for the duration of the Term, Terminal Operator shall perform the following:

(1)    maintain and operate (or engage a responsible third Person vendor acceptable to the Government to maintain and operate) the fuel loading rack of the Terminal (the "*Fuel Loading Rack*") on a commercially reasonable basis;

(2)    enter into commercial arrangements with third parties to supply the Fuel Loading Rack with gasoline, diesel, and jet fuel and make available to the Government and the public on a priority basis at the Fuel Loading Rack such fuel for purchase in tanker truck quantities, at prices that shall be (a) equal to or below the sum of all actual arms-length costs of procuring such fuel plus a margin of ten percent (10%) of the Gulf Coast spot price, and (b) in the event a state of emergency is declared under 23 V.I.C. §1005, shall not, for a period of up to six (6) months, exceed the sum of all actual arms-length costs of procuring fuel. For the avoidance of doubt, fuel procurement costs shall include, but are not limited to, the following: (i) wholesale purchase price; (ii) inventory carrying costs at a cost of capital not to exceed ten percent (10%); (iii) transportation; (iv) handling; (v) storage; (vi) third-party marketing; (vii) third-party branding (if applicable); and (viii) any applicable taxes;

(3)    enter into commercial arrangements with third parties to maintain in storage at the Terminal not less than the average monthly liquid fuel needs of the U.S. Virgin Islands (including gasoline, diesel, and jet fuel);

*except that* to the extent Terminal Operator is engaged in the business of buying, selling, or trading refined fuel products for its own account, Terminal Operator shall supply the Fuel Loading Rack with gasoline, diesel, and jet fuel at prices equal to or below the lowest price at which Terminal Operator sells comparable fuels in comparable quantities to third-party purchasers on a retail basis. Further, to the extent Refinery Operator supplies the fuel to the Fuel Loading Rack to fulfil Terminal Operator's obligations under this Section 6.1, the prices that would be charged will be no more than the prices charged if the fuel were procured by Terminal Operator from a source other than Refinery Operator pursuant to this Section 6.1.

(B)    Terminal Operator and the Government acknowledge that Terminal Operator's specific obligations set forth above in Section 6.1(A) are material provisions of this Agreement, and that closure of the Fuel Loading Rack (except in connection with routine maintenance or repair or a Force Majeure Event) or elimination of storage for local fuels may be determined by the Government to constitute a material impairment of the economy of the Virgin Islands, permitting the Government to avail itself of all available remedies under Applicable Law. Terminal Operator shall inform and consult promptly with the Government in respect of potentially disruptive market conditions, including the availability of third party commercial supplies, Force Majeure Events and other matters that may impact the Fuel Loading Rack as source of supply for the U.S. Virgin Islands.

(C)    To further evaluate the options available for lowering the cost of fuel on St. Thomas to the public, Terminal Operator agrees to conduct, and deliver to the Government no later than six (6) months after the Effective Date, a study at its expense to (1) analyze why costs on St. Thomas are higher than St. Croix and (2) provide detailed options that could be considered to address how the fuel costs to the public in St. Thomas could be lowered.

Section 6.2    Navigational Access

(A)    Terminal Operator shall permit commercially reasonable navigational access to the Limetree Bay Channel (but not the Terminal loading docks, buoys or other marine installations) to commercial vessels en route to and from the Gordon E. Finch Molasses Pier and the Wilfred "Bomba" Allick Port and Transshipment Terminal, subject to:

(1)    all such commercial vessels possessing any necessary Authorizations by the U.S. Coast Guard, U.S. Department of Homeland Security, or other Governmental Authority;

(2)    vessels in transit to or from the Terminal and Terminal marine installations shall have first priority at all times over any other vessels wishing to access the Limetree Bay Channel;

(3)    all vessels complying with the same channel rules and vetting requirements required by Terminal Operator for all commercial vessels seeking access to the channel, as may be amended from time to time; and

24

(4)     reimbursement by such commercial vessels of Terminal Operator's reasonable cost and expense of providing any services requested by commercial vessels, provided that such cost and expense shall in no case exceed the charges applicable under the Limetree Bay port tariff.

(B)     The Government acknowledges and ratifies its approval of the assignment by HOVENSA to Terminal Operator of (i) all rights of HOVIC and/or HOVENSA with respect to the Limetree Bay channel as set forth in paragraph 3 of the 1976 Contract and (ii) those rights set forth in the Virgin Islands Port Authority's Harbor Regulations for the South Coast of St Croix, Sub-Section "A" attached hereto as Appendix G (it being understood that, in the event of any inconsistency between the contents of such Harbor Regulations and this Section 6.2, this Section 6.2 shall prevail).

Section 6.3     **Submerged Lands**

(A)     Terminal Operator shall have exclusive rights and obligations (except as provided in the Shared Systems Services Agreement) with respect to certain Submerged Lands that are part of the Terminal Site as set forth in Appendix A as updated from time to time to the extent permitted under, or in furtherance of, this Agreement, and as acquired under the Purchase Agreement (the "*Terminal Submerged Lands*"), in each case with respect to the occupancy and use of said land, rights and easements as contemplated herein, as follows:

(1)     the Government acknowledges that it consented to and approved the assignment by HOVENSA to Terminal Operator of HOVENSA's rights and obligations under the 1998 Letter Agreement, the Submerged Land Lease, and certain Submerged Lands Permits (as described below), so that Terminal Operator as of the Original Closing Date had and has all the rights and obligations as regards the occupancy and use of Terminal Submerged Lands (a) as Lessee under the Submerged Land Lease, and (b) as Permitee under Submerged Lands Permit No 3 and Amendments 1, 2, and 3 thereto, and under Submerged Lands Permit Nos 23 and 52 issued by the United States Department of the Interior, and under Submerged Lands Permit No. 167 issued by the Department of Conservation and Cultural Affairs of the Government of the U S. Virgin Islands, as amended, (which permit shall be considered current and valid and assigned to Terminal Operator) and the Government will execute whatever documents are necessary to make sure that any Terminal Submerged Lands that are not covered by any lease or permit can be occupied and used by Terminal Operator on the same conditions and terms as Submerged Lands Permit No. 3 and Amendments 1, 2, and 3 thereto, and under Submerged Lands Permit Nos 23 and 52, which rights and obligations shall continue for the term of this Agreement, as such term is extended, and under Submerged Lands Permit No 167 issued by the Department of Conservation and Cultural Affairs of the Government of the U S Virgin Islands, as amended, (which permit shall be considered current and valid and assigned to Terminal Operator) which rights and obligations shall continue for the term of this Agreement, as the term is extended, and under Coastal Zone Management permits CZX-24-93W (which permit shall be considered current and valid and assigned to Terminal Operator), CZX-8-06W, and CZX-6-99W, and in each case the relevant permit and lease shall be hereby modified to the extent required to reflect the scope of such lands set forth in Appendix A. For the avoidance of doubt, each of Terminal Operator and the Government acknowledges and agrees that Refinery Operator is granted and assigned and retains all of the rights and obligations as lessee under the

Submerged Land Lease and as permittee under the Submerged Lands Permits, subject to the Shared Services Systems Agreement, as they relate to occupancy and use of the Refinery Submerged Lands, except for that portion of the Refinery Submerged Lands on which Surface Impoundment No. 3 is located;

(2)     the Government hereby recognizes and agrees that as regards the Terminal Submerged Lands, Terminal Operator shall owe to the Government the indemnifications of Lessee as set forth in the Submerged Land Lease, and HOVIC and HOVENSA have been released by the Government, and the Government has been released by HOVIC and HOVENSA, with respect to such indemnities as regards the Terminal Submerged Lands;

(3)     the Government agrees that HOVIC and HOVENSA have been released from their obligations, and have released the Government from any obligations of the Government, under the 1976 Contract as regards the Terminal Submerged Lands;

(4)     Terminal Operator shall be substituted for HOVIC and HOVENSA under the 1998 Letter Agreement as regards to the Terminal Submerged Lands, and HOVIC and HOVENSA have been released, and have released the Government, under the 1998 Letter Agreement as regards to the Terminal Submerged Lands;

(5)     as regards the Submerged Lands, the Parties acknowledge that, as of the Original Closing Date, the Submerged Land Lease has been extended through October 16, 2036, and the Government has allowed and shall allow Terminal Operator to continue to use Submerged Lands Permit No. 3, Submerged Lands Permit No. 23, Submerged Lands Permit No 52, and Submerged Lands Permit No. 167 (and any additional Submerged Lands for which Terminal Operator has a right of occupancy for operation of an offshore loading facility pursuant to Permit CZX-29-17), for an aggregate rental payment of one hundred fifty thousand Dollars ($150,000) annually, which payment shall, beginning on January 5, 2019, be annually adjusted for inflation on the basis of the percentage change in the Consumer Price Index every three (3) years; and

(6)     as regards the Terminal Submerged Lands, Terminal Operator shall have the right to extend the term of the Submerged Land Lease for additional terms co-terminous with this Agreement.

(B)     For the avoidance of doubt, except as otherwise contemplated by this Agreement, the Parties acknowledge that the releases effected by Section 6.3(A) are not intended to release HOVENSA or HOVIC from any environmental contamination of the property previously covered by the Submerged Land Lease and the Submerged Land Permits that occurred before the Original Closing Date, whether now known or hereafter discovered, and that Terminal Operator is not required to assume any liability for any such unreleased contamination or damage obligations or environmental liability of HOVENSA or HOVIC or to assume liability for property previously covered by the Submerged Land Lease and the permits set forth in Section 6.3(A) not identified as the Terminal Site or the Refinery Site in Appendix A. Nothing in this Section 6.3(B) shall change, modify or alter Terminal Operator's or Refinery Operator's liability for, or obligations with respect to (i) environmental contamination or damage to any

properties at the Site prior to the Closing Date (as regards Refinery Operator) or the Original Closing Date (as regards Terminal Operator), or (ii) any entity's liability for, or obligations with respect to, RCRA Corrective Action.

(C)    Notwithstanding the provisions of Section 6.3(A) above, the term of the Submerged Land Lease and the use rights granted to Terminal Operator, including those granted under Permit No. 3, Permit No. 23, Permit No. 52, and Permit No. 167, to use or occupy any Terminal Submerged Lands or other lands shall not extend beyond the Term of this Agreement.

Section 6.4.    **Certain Obligations and Options.**

(A)    **Terminal Operator Obligations.** In the event Refinery Operator fails to perform the obligations set forth in Section 6.4(B) of the Refinery Operating Agreement, Terminal Operator shall be required to undertake such obligations with respect to the Refinery; provided that Terminal Operator will have no obligation to deconstruct any parts of the Refinery that may be useful to the Terminal, in its reasonable judgment.

(B)    **Purchase Options.** Following the Closing and, for the avoidance of doubt, irrespective of whether any Refinery Deconstruction (as defined in the Refinery Operating Agreement) has occurred, to the extent Terminal Operator does not own or have interests in certain real or personal property or Submerged Lands necessary to the operation of the Terminal, the Government acknowledges that (x) Terminal Operator or an Affiliate thereof shall be permitted to acquire from Refinery Operator, its Affiliates or HERT (or the successors in interest thereto) (i) all or a portion of such property utilized, or to be utilized upon acquisition, primarily in connection with the Terminal for the purpose of expanding the Terminal, conducting terminalling or other related operations, or other related commercial endeavors and (ii) rights, property and interests contemplated by the Shared Services Systems Agreement, and (y) Refinery Operator shall have a similar purchase option under the Refinery Operating Agreement. The purchase price of such land shall be one Dollar ($1) per acre. The Government acknowledges that Terminal Operator may assign from time to time all or any portion of its rights under the Refinery Property Option Agreement, and that Refinery Operator may accept assignment of and exercise on its own behalf the Terminal Operator's rights, pursuant to Section 6.5(B) of the Amended Terminal Operating Agreement, to acquire some or all of the Option Parcels and include them within the Refinery Site.

(C)    The Government acknowledges and agrees that (i) Terminal Operator has the right to grant to Refinery Operator or any of its subsidiaries such easements, licenses and other rights as it deems necessary or appropriate over, across and under the Terminal Site (including over, across and under any Terminal Submerged Lands) on such terms as Terminal Operator and Refinery Operator may reasonably agree and (ii) Refinery Operator has the right to grant to Terminal Operator or any of its subsidiaries such easements, licenses and other rights as it deems necessary or appropriate over, across and under the Refinery Site (including over, across and under any Refinery Submerged Lands) on such terms as Terminal Operator and Refinery Operator may reasonably agree.

Section 6.5.    **Land And Housing Transfer.**

(A)    The Government acknowledges and agrees that Terminal Operator has satisfied its obligations under Section 6.5(A) of the Original Terminal Operating Agreement and that HOVENSA transferred to the Government fee simple title to (i) the three hundred and thirty (330) acre parcel of land located to the east of the Refinery (the "*Parcel*"), (ii) the one hundred and twenty two (122) housing units located in Estate Cottage and Estate Blessing and surrounding land, and land in Estate Hope, (iii) the community center located on the Site, and (iv) the St. Croix Vocational Training Center located on the Site.

(B)    The Government grants to Terminal Operator an option, exercisable within ten (10) years following the Original Closing Date, to purchase some or all of the real property, including all improvements and personal property located thereon, identified in Appendix A as the "Option Parcel" (the "*Option Parcel*") for the price of ten thousand Dollars ($10,000) per acre for the purpose of expanding, improving or enhancing the operation of the Terminal and, upon exercise of such option, the Parties shall execute and deliver such documents as are necessary or desirable to effectuate the sale and conveyance of the Option Parcel from the Government to Terminal Operator, including without limitation the Special Warranty Deed in the form set forth in Appendix E and the Construction License Agreement in the form set forth in Appendix F. The Government acknowledges and agrees that Terminal Operator may assign, in whole or in part and from time to time, its rights to acquire the Option Parcels to Refinery Operator. Any Option Parcels acquired by Terminal Operator from the Government shall be automatically included within the definition of Terminal and Terminal Site.

(C)    The Government acknowledges and agrees that Terminal Operator is entitled to lease from time to time all or any portion of the property acquired in connection with the Closing Payment to Refinery Operator or any of its subsidiaries for such period and on such terms that Terminal Operator and Refinery Operator may reasonably agree.

Section 6.6.    **Bitumen Tank And Storage**. The Government acknowledges the satisfaction of Terminal Operator's obligation for the construction of a bitumen tank and storage for use by the U.S. Virgin Islands Department of Public Works ("*DPW*") by virtue of Terminal Operator's previous payment of six million Dollars ($6,000,000).

## ARTICLE 7
## EMPLOYMENT

Section 7.1.    **Minimum Commitment**. Terminal Operator acknowledges that the commitment to increased long-term employment at the Terminal is a material goal of the Government's entry into this Agreement, and accordingly for the period from the Operations Commencement Date through the remainder of the Term of this Agreement:

(A)    Terminal Employment. The Terminal shall employ not fewer than eighty (80) full-time equivalent workers, which shall include not less than sixty (60) Full-Time Employees.

(B)    Vacancies. All employment vacancies shall be posted with the U.S. Virgin Islands Department of Labor.

28

Section 7.2    **Residency Requirement**. Not later than nine (9) months after the Operations Commencement Date and thereafter for the remainder of the Term, not less than eighty percent (80%) of the Full-Time Employees and equivalents (meaning two or more persons collectively working the hours equal to one full-time position) at the Terminal, and not less than fifty percent (50%) of the Senior Management Employees shall be bona fide U.S. Virgin Islands Residents, such residency to be confirmed annually by the Commissioner of Labor for the remainder of the Term. For the purposes of this Article 7, individuals formerly employed by HOVENSA, HOVIC, or Pinnacle Services, LLC, for work at or regarding the Terminal in the U.S. Virgin Islands in the five (5) years preceding the Original Effective Date shall be considered U.S. Virgin Islands Residents.

Section 7.3    **Non-Discrimination**. Terminal Operator hereby agrees that no person, employee or applicant shall be excluded from participating in, or shall be subject to, discrimination in the performance of duties relating to or arising from this Agreement or the operations contemplated herein, on account of race, creed, color, sex, sexual orientation, religion, disability, national origin or veteran status. Terminal Operator shall not discriminate in employment decisions, including but not limited to upgrading, demotion, transfer, recruitment, layoff, termination, rates of pay or other forms of compensation and selection for training. Terminal Operator shall comply with Applicable Laws relating to employment matters, including those regarding posting of notices relating to workplace rights.

Section 7.4    **Training and Continuing Education**. Terminal Operator shall annually contribute not less than two hundred thousand dollars ($200,000) for training and scholarships for residents of the U.S. Virgin Islands. That contribution shall include (A) resuming support for the University of the Virgin Islands' ("UVI") degree program in Applied Science of Process Technology, on substantially the terms set forth in Appendix D, provided, however that Terminal Operator shall no longer be required to satisfy any obligations set forth in paragraph 9 of Appendix D that require Terminal Operator to provide the UVI with access to the training school referred to therein (now owned by the Government); and (B) providing college scholarships to U.S. Virgin Islands students. In addition, throughout the Term of this Agreement, Terminal Operator shall use commercially reasonable efforts to create and operate at Terminal Operator's own cost and expense additional training programs for the purpose of maximizing employment opportunities at the Terminal for U.S. Virgin Islands Residents, including establishing training programs that will teach terminalling services related skills to qualified U.S. Virgin Islands Residents including terminal safety, terminal operations, general terminal maintenance, environmental management, welding, instrument fitting, pipe fitting and electrical maintenance. Terminal Operator shall cooperate with UVI with respect to such programs.

## ARTICLE 8
## FINANCIAL OBLIGATIONS OF TERMINAL OPERATOR

Section 8.1.    **Closing Payments and Related Payments**

(A)    The Government acknowledges that (i) Terminal Operator has made all of the Closing Payments (as defined in the Original Terminal Operating Agreement) and (ii) the

Government has received all of the contemplated related payments pursuant to Section 8.1 of the Original Terminal Operating Agreement.

(B)    At Closing, Terminal Operator shall pay to the Government thirty million dollars ($30,000,000) (the "*Closing Payment*") in consideration of the conveyance to Terminal Operator of the Property Acquired for Closing Payment and the granting of easements for access and utilities by delivery of appropriately executed deed(s), complete for recording purposes, in the form substantially set forth in Appendix E. The Closing Payment is in addition to the amount of forty million dollars ($40,000,000) to be paid to the Government by Refinery Operator pursuant to Section 8.1(A) of the Refinery Operating Agreement.

Section 8.2    **Annual Payment.**    Terminal Operator agrees to pay to the Government annually for the duration of the Term the following payments (the "*Annual Payment*"):

(A)    **Variable Payments.** Following the Closing Date, (i) Terminal Operator shall annually make to the Government a variable payment (the "*Variable Terminal Payment*") in lieu of payment of certain taxes exempted in accordance with Article 11, in the amount of (x) ten percent (10%) of Terminal Revenues.

(B)    **Minimum Payment.** Notwithstanding Section 8.2(A) above, in no event shall the amount of the Variable Terminal Payment be less than the following (the "*Minimum Payment*"):

(1)    from the Original Closing Date until the first anniversary thereof, four million Dollars ($4,000,000);

(1)    from the day following the first anniversary of the Original Closing Date until the second anniversary of the Original Closing Date, five million Dollars ($5,000,000);

(2)    from the day following the second anniversary of the Original Closing Date until the third anniversary of the Original Closing Date, six million Dollars ($6,000,000); and

(3)    after the third anniversary of the Original Closing Date until the Agreement is terminated, seven million Dollars ($7,000,000).

(C)    Payment Terms.

(1)    Each Variable Terminal Payment shall be payable in equal quarterly installments on the final day of the first, second, third, and fourth fiscal quarters of each calendar year. Amounts owed in excess of the Minimum Payment shall be paid no later than thirty (30) days after the end of each calendar year. To the extent that the revenues upon which such calculations are not determined within such quarterly periods, Terminal Operator shall make a provisional payment on such payment dates and thereafter, when revenues for the relevant period are finally determined, make such adjustments to the immediately following

quarterly payment as may be required to ensure that Terminal Operator pays the appropriate Variable Terminal Payment.

(2)    Quarterly installments of the Variable Terminal Payment or the Adjusted Variable Payment to be made pursuant to Section 8.2(B) in any year shall be made at the Variable Terminal Payment or the Adjusted Variable Payment rate applicable to Terminal Revenues for the immediately preceding year, and the difference between the amounts of Variable Terminal Payments or Adjusted Variable Payments received by the Government in any year and the amount owed by Terminal Operator in respect of Terminal Revenues for such year shall, following the receipt of Terminal Operator's audited financial statements for such year be (a) repaid by the Government to Terminal Operator or (b) paid by Terminal Operator to the Government, as applicable, within thirty (30) Days following the receipt of Terminal Operator's audited financial statements for such year.

(D)    The Variable Terminal Payment shall be deemed operating expenses by the parties making such payments and are in lieu of certain Exemptions identified in Article 11.

(E)    In the event that (x) Refinery Operator (i) fails, despite good-faith and commercially reasonable efforts, to achieve a Refinery Restart prior to the termination of the initial Refinery Evaluation Period and (ii) certifies in writing to the Government its intention to cease attempting to achieve a Refinery Restart, or (y) following a Refinery Restart, Refinery Operator notifies the Government in writing of its intention to permanently discontinue Refinery Operations, in either case, while the Refinery Closing Payment Balance is greater than zero dollars ($0), the Government shall reduce each succeeding quarterly Variable Terminal Payment by an amount equal to fifty percent (50%) of the Variable Terminal Payment that would otherwise be due until the aggregate amount of such reductions is equal to the Refinery Closing Payment Balance at the time of the certification or notification described in this paragraph (E).

Section 8.3.    **Adjusted Variable Payment**    For the first year following the Original Closing Date and any following year in which Terminal Operator's earnings before interest, taxes, depreciation, and amortization ("*EBITDA*") are lower than one hundred and twenty million Dollars ($120,000,000) (as determined by its audited financial statements for such year), adjusted for inflation on the basis of the percentage change in the Consumer Price Index, the rate of the Variable Terminal Payment shall be nine percent (9%) of Terminal Revenues rather than ten percent 10% (the "*Adjusted Variable Payment*").

Section 8.4.    **Charitable Commitments**    Terminal Operator shall contribute a minimum of three hundred thousand Dollars ($300,000) per year (in addition to the two hundred thousand Dollars ($200,000) to be contributed to training and scholarships under Section 7.4) to charitable causes in St. Croix (which shall be charitable entities that consider themselves non-profit charitable entities under Section 501(c)(3) of the Internal Revenue Code). The beneficiaries of such contributions shall be subject to approval by the Office of the Governor, such approval not to be unreasonably withheld.

Section 8.5.    **Financial Assurance**

31

(A)    The Government acknowledges that Terminal Operator has provided financial assurance (the "*Financial Assurance*") in an amount (the "*Guaranteed Amount*") equal to fifty million Dollars ($50,000,000) and agrees that, until Refinery Operator provides separate financial assurance pursuant to Section 8.5(B) of the Refinery Operating Agreement and Terminal Operator reduces the Financial Assurance hereunder, Terminal Operator shall be permitted to reduce such Financial Assurance to, if lower than fifty million Dollars ($50,000,000), the net present value of the Minimum Payment for the balance of the Initial Term (discounted at the interest rate for Government-issued 30-year bonds for the year in which an Operating Default occurs, or, if no such bonds are issued that year, for the most recent year in which such bonds were issued), provided that notwithstanding the forgoing, the Financial Assurance will never be less than fifteen million Dollars ($15,000,000) Prior to any issuance of separate financial assurance by Refinery Operator pursuant to Section 8.5(B) of the Refinery Operating Agreement, Refinery Operator shall be entitled to benefit from the Financial Assurance hereunder The Financial Assurance will be available to support Terminal Operator's obligations under the Agreement with respect to Terminal Site Restoration and Payment Default

(B)    The Financial Assurance shall be in the form of (x) an irrevocable stand-by letter of credit covering the Guaranteed Amount to be issued by an international bank reasonably acceptable to the Government or (y) a guaranty from a parent company of Terminal Operator to the extent such parent company has an investment grade credit rating, in the case of each of clauses (x) and (y), in form and substance consistent with the terms of this Section 8.5 At such time as Refinery Operator issues financial assurance under Section 8.5(B) of the Refinery Operating Agreement, Terminal Operator shall be entitled to reduce its Financial Assurance hereunder to the lesser of (a) twenty five million Dollars ($25,000,000) and (b) the net present value of the Minimum Payment for the balance of the Initial Term (discounted at the interest rate for Government-issued 30-year bonds for the year in which an Operating Default occurs, or, if no such bonds are issued that year, for the most recent year in which such bonds were issued), provided that notwithstanding the forgoing, the Financial Assurance will never be less than fifteen million Dollars ($15,000,000) To the extent the Financial Assurance is in the form of an irrevocable stand-by letter of credit covering the Guaranteed Amount issued by an international bank reasonably acceptable to the Government, the letter of credit will be issued, renewed or replaced on an annual basis to reflect the then-applicable Guaranteed Amount (which consistent with this Section 8.5 shall never be (1) more than fifty million Dollars ($50,000,000) or less than fifteen million Dollars ($15,000,000) if no separate Financial Assurance (as defined in the Refinery Operating Agreement) is provided under the Refinery Operating Agreement pursuant to Section 8.5(B) thereof and (2) more than twenty five million Dollars ($25,000,000) or less than fifteen million Dollars ($15,000,000) if separate Financial Assurance (as defined in the Refinery Operating Agreement) is provided under the Refinery Operating Agreement pursuant to Section 8.5(B) thereof)

Section 8.6.    **Government Carried Interest in Terminal Operator.**

(A)    Carried Interest. On the Closing Date, Terminal Operator shall grant to the Government the right to receive a fee (the "*Carried Interest*") from Terminal Operator or an Affiliate upon a Terminal Change of Control under this Agreement  The Carried Interest shall carry no governance rights, and shall entitle the Government to no distributions or other payments, except that upon the occurrence of such a Terminal Change of Control under this

Agreement, Terminal Operator shall pay to the Government ten percent (10%) of the Transaction Value, calculated as set forth in clause (B) below).

(B)    **Transaction Value.** In the event of a Terminal Change of Control, the "Transaction Value" shall mean the greater of (x) the following amounts, and (y) zero (0), in each case expressed in Dollars:

(1)    In the event of a Terminal Change of Control, the Transaction Value shall be calculated as Terminal Operator's Total Realized Terminal Profit upon completion of the Terminal Change of Control transaction. For the avoidance of doubt, the Total Realized Terminal Profit from any Terminal Change of Control transaction shall be the same value used to calculate returns on capital to Terminal Operator's Owners.

(2)    In no event shall the Government's share of the Transaction Value be less than twelve million seven hundred fifty thousand Dollars ($12,750,000) so long as Terminal Operator's Total Realized Terminal Profit is greater than zero Dollars ($0).

Section 8.7.    **Capital Expenditures.** The Government acknowledges that in the first two (2) years following the Original Closing Date, Terminal Operator expended more than one hundred twenty-five million Dollars ($125,000,000) on projects that resulted in improvements to the Site.

## ARTICLE 9
## SECURITY INTEREST

Section 9.1.    **Payments Secured By Lien.** Terminal Operator shall secure all of its payment obligations under Article 8 and Article 16 (the "*Payment Obligations*"), by granting to the Government, on the Closing Date, a mortgage lien on the Terminal related assets acquired under the Purchase Agreement (the "*Terminal Secured Assets*") pursuant to a Mortgage and Security Agreement to be entered into between the parties consistent with the terms of this Article 9, and the notice of such lien on said personal property shall be reflected in a UCC-1 Financing Statement, fixture filing, or other similar document reasonably necessary to give notice (collectively, the "*Terminal Security Documents*"). Such security interest is hereinafter referred to as the "*Terminal Subordinate Security Interest*", provided that the Terminal Subordinate Security Interest shall only be enforceable on the terms and conditions provided herein and in the Terminal Security Documents and only to the extent there are any payment obligations under Article 8 or Article 16 which are due and payable at the time of any such enforcement, and provided that:

(A)    **Subordination.** (i) The lien of the Terminal Security Documents, and the payment and enforcement thereof, shall be subordinate and junior in all respects to any and all financing (except financing provided by Terminal Operator's Affiliates) incurred in connection with the acquisition, recapitalization (except for recapitalization with funds from Affiliates), development, construction, rehabilitation, expansion, or enhancement or operation of the Terminal and any easements between Terminal Operator and Refinery Operator, the burdened land of which is encumbered pursuant to a Refinery Security Document (as defined in the Refinery Operating Agreement) (the "*Easements*") (such financings and any obligations relating

33

thereto, including the unpaid principal of and interest on the loans and all other obligations and liabilities owed to the Lenders thereunder, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses or otherwise being collectively referred to as the "*Senior Obligations*") (ii) The Government expressly undertakes and agrees that, until such time as the Senior Obligations, together with all accrued and unpaid interest thereon and all other sums due and owing in respect thereof, shall have been paid in full in cash and all commitments thereunder shall have been terminated (such date being referred to herein as the "*Discharge Date*"), it shall not bring any legal action to enforce the Terminal Security Documents, including, without limitation, (x) foreclose, execute, levy, or collect on, take possession or control of (other than for purposes of perfection), sell or otherwise realize upon (judicially or non-judicially), or lease, license, or otherwise dispose of (whether publicly or privately), the Terminal Secured Assets or Easements, or otherwise exercise or enforce remedial rights with respect to thereto, (y) solicit bids from third Persons, approve bid procedures for any proposed disposition of the Terminal Secured Assets, conduct the liquidation or disposition of Terminal Secured Assets or Easements or engage or retain sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers, or other third Persons for the purposes of valuing, marketing, promoting, and selling the Terminal Secured Assets, or (z) enforce a security interest or exercise another right or remedy, as a secured creditor or otherwise, pertaining to the Terminal Secured Assets at law, in equity, or pursuant to the Terminal Security Documents. (iii) The Government expressly undertakes and agrees that, in addition to the self-operative provisions contained in this Section, it shall enter into a subordination agreement in recordable form with respect to the Terminal Secured Assets and the Easements if requested by Terminal Operator.

(B)     **No Remedy Prior To Discharge.**   Prior to the Discharge Date, the Government may not exercise any of its remedies under the Terminal Security Documents.

(C)     **Intercreditor Agreements.**   In the event that any lender granting any Senior Obligations requires an intercreditor agreement, subordination agreement or other customary documentation to confirm the subordination of the Terminal Security Documents and the agreement of the parties that the Government shall not enforce any of the remedies allowed pursuant the Terminal Security Documents, the Government shall execute and deliver to such lender such intercreditor agreement and other customary documentation.

(D)     **Refinancing.**   In the event of the refinancing of any of the Senior Obligations described above, the Terminal Subordinate Security Interest shall be subordinate to such refinancing, and the Government shall enter into such intercreditor agreement and customary documentation to confirm the subordination of the refinancing and the agreement of the parties that the Government shall not enforce any of its remedies allowed pursuant to the Terminal Security Documents prior to the Discharge Date.

Section 9.2     **All Necessary Actions.** Terminal Operator shall take all actions, and execute all documents necessary, to grant, perfect, validate and provide notice of the Terminal Subordinate Security Interest, subject to those matters set forth on a Title Commitment to be obtained and delivered by Terminal Operator at or within a reasonable and customary after Closing.   To the extent permitted by Applicable Law, Terminal Operator authorizes the

34

Government to file financing statements naming the Government as a subordinated secured party, and describing the Terminal, in any appropriate filing office.

Section 9.3.    **No Encumbrances**. In providing these liens and entering into this Agreement, Terminal Operator hereby represents and warrants that as of the date of delivery of any Title Commitment, such portions of the Terminal as are owned by Terminal Operator are owned free and clear of liens, charges, encumbrances, or defects created by or through Terminal Operator or its Affiliates on the Terminal, including charges, claims, deeds of trust, community property interests, pledges, equitable interests, liens (statutory or other), options, security interests, mortgages, or rights of first refusal, except (i) as otherwise disclosed in the Title Commitment, (ii) Permitted Liens as set forth in the Purchase Agreement or any easements, licenses, rights, liens and interests of Refinery Operator pursuant to the Shared Services Systems' Agreement and separate easement or license agreement, and (iii) any liens, charges and encumbrances imposed by the Government or pursuant to Environmental Law.

## ARTICLE 10
## INSURANCE

Section 10.1.    **General Insurance**. Terminal Operator shall maintain or cause to be maintained at its own cost and expense, in full force and effect commencing on the Effective Date and throughout the Term, with responsible insurance companies authorized to do business in the U.S. Virgin Islands, the types and limits of insurance as set forth in this Article 10. Such companies shall have an A.M. Best Insurance Reports rating of A- or better or otherwise be reasonably acceptable to the Government. Such insurance required to be maintained by Terminal Operator hereunder shall be primary without, in the case of commercial general liability, the right of contribution of any other insurance carried by or on behalf of the Government and any additional insured. The Government shall be named as an additional insured on all policies required under this Section 10.1 and on all policies required under Section 10.2.

Section 10.2.    **Additional Insurance**. In addition to any insurance or demonstration of financial assurance or financial responsibility required under Applicable Law, Terminal Operator shall maintain in effect insurance of the following types and amounts of insurance coverage set forth below:

(A)    **Property Insurance.** Property Insurance, including physical damage and business interruption on the terms set forth below. The Property Insurance policy shall contain the following terms: coverage shall be provided in an amount not less than $250,000,000, for physical loss or damage except as hereinafter provided, including coverage for boiler and machinery (electrical and mechanical breakdown), transit, and off-site storage exposure, but excluding coverage for earthquake, flood and named wind for which coverage shall be provided in an amount not less than $75,000,000. In addition to the Property Insurance, Terminal Operator shall maintain pollution legal liability coverage for the Terminal Site in an amount not less than $20,000,000, and first party and third-party cleanup coverage for any Response in an amount not less than $100,000,000, in excess of any financial assurance demonstration pursuant to the federal Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, et seq., and any financial responsibility demonstration pursuant to the federal Oil Pollution Act of 1990, as amended, 33 U.S.C. §§ 2701, et seq., and the U.S. Virgin Islands Oil Spill Prevention and

Pollution Control Act, 12 V.I.C. §§ 701, et seq., in effect or required for the Terminal or any portion thereof. Any required payment of the deductible shall be the responsibility of Terminal Operator unless indemnified pursuant to this Agreement.

(B)    **Workers' Compensation Insurance.** Workers' compensation insurance, to the extent the exposure exists, to comply with statutory limits of the Workers' Compensation laws of the U.S. Virgin Islands, including coverage under the U.S. Longshore and Harbor Workers Compensation Act, where applicable, and Employer's Liability (including Occupational Disease) coverage with limits of not less than $1,000,000 each accident, $1,000,000 disease limit per employee and $1,000,000 disease policy limit. Workers' compensation insurance shall cover all of Terminal Operator's employees, contractors and subcontractors providing services to the Terminal.

(C)    **Commercial General Liability Insurance.** Commercial General Liability Insurance on an "occurrence" basis with a combined single limit of liability not less than $1,000,000 per occurrence, $2,000,000 general aggregate limit and $2,000,000 products completed operations aggregate limit (which includes pollution liability coverage for products). Subject to the terms of the policy, coverage shall include premises, operations, blanket contractual liability, independent contractors, products and completed operations and personal injury coverages. The policy shall contain no exclusion for punitive or exemplary damages, unless excluded by law.

(D)    **Automobile Liability Insurance.** Automobile liability insurance, to the extent the exposure exists, covering any automobiles used in connection with the Terminal in an amount not less than $1,000,000 per accident for combined bodily injury, property damage or death.

(E)    **Umbrella or Excess Liability Insurance.** Umbrella/Excess Insurance covering claims in excess of the underlying insurance described in this Article 10, with a $20,000,000 minimum per occurrence and $20,000,000 annual aggregate, in excess of liability insurance set forth in this Article 10.

(F)    **Endorsements.** All policies of liability insurance to be maintained by Terminal Operator shall be written or endorsed to include the following:

(1)    Severability. A severability of interest and cross liability clause, with respect to Commercial General Liability, Automobile Liability and Umbrella or Excess Liability only.

(2)    Terminal Operator Certificates. Terminal Operator shall furnish to the Government certificates of insurance from each insurance carrier showing that the insurance required from Terminal Operator under this Agreement is in full force and effect. Terminal Operator or its insurer will provide the Government thirty (30) calendar days advance written notice (or 10 calendar days' notice in the case of cancellation due to non-payment of premiums) in the event of any material change to, nonrenewal of or cancellation of the required insurance. Certificates of insurance submitted under this Article 10 shall be in form and content reasonably acceptable to the Government. Certificates of each renewal of the insurance shall also be

36

delivered to the Government promptly after received. Should any of the policies required to be maintained become unavailable or be canceled for any reason during the period of this Agreement, Terminal Operator shall immediately procure replacement coverage. In the event that Terminal Operator shall fail to provide proof of insurance as provided in this Section 10.2(F)(4) within thirty (30) days' receipt of written notice from the Government, advising of such failure to provide proof of insurance, Terminal Operator shall promptly provide such proof of insurance to the Government. In the event that Terminal Operator fails to provide such proof of insurance then the Government may elect to file an action in specific performance to compel Terminal Operator to demonstrate proof of insurance, and to recover its reasonable attorneys' fees and costs in connection with such action.

(3)    Descriptions Not Limitations. The coverages referred to above are set forth in full in the respective policy forms, and the foregoing descriptions of such policies are not intended to be complete, nor to alter or amend any provision of the actual policies and in matters, if any, in which the said description may be conflicting with such instruments, the provisions of the policies of the insurance shall govern; provided, however, that neither the content of any insurance policy or certificate nor approval thereof shall relieve Parties of any of their obligations under this Agreement.

(4)    Contractors. Terminal Operator shall require all of its contractors and subcontractors (of any tier) to maintain insurance in the form and amount commensurate with the nature of the work or services that such contractor is providing on behalf of Terminal Operator.

(G)    **Modification of Coverage Limits**. The coverage limits set forth in this Article 10 shall be subject to reasonable revision by mutual agreement of the Parties every five years, if necessary, to reflect inflation and changes in conditions or circumstances.

## ARTICLE 11
## TAX AND FEE EXEMPTIONS

Section 11.1. Scope of Exemption. Following the Effective Date, Terminal Operator, each of its Affiliates and Equity Holders that are engaged in acquiring, owning (directly or indirectly) or operating, in whole or in material part, the Terminal for the import, storage, processing, sale within the Terminal, and export and sale of petroleum products, and their respective customers with respect thereto (the "*Customers*"), shall be exempt from payment of the taxes, fees, and other payments described in Section 11.2. In addition, to the extent any other party owns any portion of the Terminal Site or other real property and leases said portion to Terminal Operator or its Affiliates for use in operating the Terminal as contemplated in this Agreement (a "*Lessor*"), such Lessor shall be exempt from taxes imposed under Section 11.2(H).

Section 11.2. Exemptions. For purposes of this Agreement, "*Exemptions*" shall include all Taxes, fees, excises, customs, duties, rents, royalties, withholdings, lease payments, permit fees, imposts and exactions, whether now existing or enacted hereafter, imposed by, with the consent of, or otherwise payable to, the Government, or any subdivision, agency or instrumentality thereof, on the acquisition, rehabilitation, construction, ownership (whether direct or indirect), operation, maintenance, expansion, transfer, sale of products, or any other

activity contemplated by this Agreement, in respect of (i) the Terminal, (ii) the Terminal Site, (iii) the Terminal Submerged Lands (other than rental payments as set forth in this Agreement), (iv) the Limetree Bay Channel and any buoys or other marine installations, (v) the Fuel Loading Rack, (vi) the sale or transfer of any assets or rights or real estate to Affiliates, the Government or its designees and (vii) the Shared Services Systems Agreement and the systems, rights and access contemplated thereby, or any portion of such properties and assets, including materials, work in process and products thereof, including importing, exporting, loading, unloading, discharging, storing, processing, blending, sale or purchase of oil, oil products or by-products and including hydrocarbons, petrochemicals, biofuels or any other raw material or products thereof, or any equipment or machinery imported for lease to or use in Terminal Operations For the avoidance of doubt, the foregoing exemptions shall include specifically exemption from all:

(A)     income Taxes (including all Taxes measured by reference to income);

(B)     excise Taxes;

(C)     customs duties,

(D)     fuel Taxes;

(E)     gross receipts Taxes;

(F)     highway users' Taxes,

(G)·    production Taxes,

(H)     property Taxes;

(I)     franchise Taxes and annual report fees;

(J)     license fees,

(K)     withholding Taxes (including any backup withholding) on any allocations or distributions to preferred or common Equity Holders of Terminal Operator or any of its Affiliates, or on any sale, transfer or other disposition by Terminal Operator or any of its Affiliates or Equity Holders of assets or equity interests relating to the activities referred to in the foregoing provisions of this Section 11.2;

(L)     withholding Taxes (including any backup withholding) with respect to the transactions performed pursuant to the Purchase Agreement;

(M)     transfer Taxes;

(N)     recording fees; and

(O)     hotel room and lodging Taxes with respect to hotel rooms and lodging located at the Site

For the avoidance of doubt, the Exemptions shall include any taxes, fees, or duties that would otherwise be payable by Customers of Terminal Operator for the import, storage, blending, sale within the Terminal or export of petroleum products.

The Exemptions shall also include any taxes, fees, or duties that would otherwise be payable by Terminal Operator or its Customers in connection with sales anywhere within the U.S. Virgin Islands of bunker fuel or other marine fuel (including LNG) that is refined at the Refinery or stored at the Terminal, provided that such fuel is sold in a parcel exceeding 25 Metric Tons.

Moreover, all persons importing building or process materials, furnishings, applications, tools, consumables, supplies, feedstock, vehicles (leased or owned), mobile equipment (leased or owned) or manufactured process equipment and other equipment specifically for use in the construction, operation, maintenance, or expansion of the Oil Refinery and Related Facilities, or importing materials for leasing to, consumption, processing, manufacturing, blending, or storage at the Oil Refinery and Related Facilities, shall be exempt from import duties and excise taxes on those imports upon presentation of a certificate of import duties and excise taxes exemption from an authorized representative of Terminal Operator. Such certificate shall be signed and dated by an authorized representative of Terminal Operator and specifically represent that the materials, furnishings, applications, tools, consumables, supplies, feedstock, vehicles (leased or owned), mobile equipment (leased or owned) or manufactured process equipment and other equipment as shall be set forth in this invoice is being brought into the U.S. Virgin Islands for use in the construction, operation, maintenance, or expansion of the Oil Refinery and Related Facilities or is being leased to, consumed, processed, manufactured, blended, or stored at, the Oil Refinery and Related Facilities and is therefore exempted from the imposition of import duties and excise taxes (and similar taxes) as set forth in Section 11.2 of the Amended and Restated Terminal Operating Agreement By and Among the Government of the U.S. Virgin Islands and Limetree Bay Terminals, LLC, dated July 2, 2018.

Section 11.3  **Limitations on Exemption.**  For the avoidance of doubt, the foregoing Exemptions shall not be applicable to:

(A)   the employer portion of any and all payroll and employment taxes, including wage income withholding taxes, with respect to Terminal Operator's employees;

(B)   taxes owed under the Federal Insurance Contributions Act;

(C)   any user fees of general application for use of public facilities;

(D)   any tax or fee collected by the United States Federal Government that is not payable to the Government or any subdivision, agency or instrumentality thereof;

(E)   withholding taxes of general application imposed directly under Workmen's Compensation, unemployment insurance and other similar employee-benefit legislation with respect to Terminal Operator's employees; and

(F)   the tire tax imposed by 33 V.I.C. §80 and the container tax imposed by 33 V.I.C. §75.

Section 11.4. **Tax Return Filings** Terminal Operator shall file any tax returns it is required to file with the Virgin Islands Bureau of Internal Revenue, but except for the limitations on Exemptions set out in Section 11.3 above, shall not have any payment obligations as provided in this Agreement.

Section 11.5. **No Adverse Actions** The Government hereby agrees and covenants with Terminal Operator that, except as otherwise provided in this Agreement and to the fullest extent permitted by Applicable Law, the Government shall not take or fail to take any action, nor permit any action within its control to be taken or fail to be taken, which would or could cause Terminal Operator and each of its Affiliates, Equity Holders and Customers to lose any applicable tax exemptions granted to such parties pursuant to this Agreement.

## ARTICLE 12
## REPRESENTATIONS AND WARRANTIES

Section 12.1. **Government Representations** The Government hereby represents and warrants to Terminal Operator as of the Effective Date and as of the Closing Date that:

(A)    The Government is not prohibited from consummating the transactions contemplated in this Agreement by any law, regulation, agreement, instrument, restriction, order, or judgment;

(B)    The Government has, upon ratification and approval of this Agreement by the Legislature: (i) the legal power, due authority and necessary and adequate funding ability to make the representations and perform its obligations set forth in this Agreement, or shall take all legally permitted and feasible actions necessary to obtain such legal power, due authority and necessary funding; and (ii) duly obtained such approvals, Authorizations, or consents in accordance with Applicable Law and procedures to the extent that the approval, Authorization, or consent of the federal or any other territorial or local government or agency or any third Person to make the representations and perform its obligations contained herein as required;

(C)    The Government knows of no impediment which would prevent, impede, diminish or delay its timely performance of its obligations hereunder;

(D)    There are no actions, suits or proceedings pending or, to the best of the Government's knowledge, threatened against or affecting the Government before any court or administrative body or arbitral panel that could reasonably be expected to have a material adverse effect on the ability of the Government to meet and carry out the obligations of this Agreement, other than those identified in Appendix B to this Agreement.

(E)    The Government confirms that the Terminal is zoned Industrial-1 ("I-1)" under the U.S. Virgin Islands zoning laws and that the improvements constructed on the property and the use of the property comply with the requirements of I-1 zoning. Any resurvey of the property and the filing of new OLG maps with Cadastral will not affect the property's compliance with the I-1 zoning requirements, will not result in new zoning requirements being imposed upon the Terminal, or result in the existing improvements constructed as part of the

Terminal, and the use of the property as Terminal, no longer complying with the requirements of I-1.

Section 12 2.  **Terminal Operator Representations**  Terminal Operator hereby represents and warrants to the Government as of the Effective Date and as of the Closing Date that:

(A)  **Organization and Authority.** It has been duly organized and is validly existing and in good standing under the laws of the U.S. Virgin Islands, with all necessary power and authority to enter into, deliver and perform all its obligations under this Agreement (including a valid license to do business in the U.S. Virgin Islands)

(B)  **Due Authorization; Enforceability.** This Agreement has been duly authorized and constitutes the legal, valid and binding obligations of it, and assuming the due authorization, execution and delivery of this Agreement by the Government, is enforceable against it in accordance with its terms  It has the absolute and unrestricted right, power, authority and capacity to execute and deliver this Agreement and to perform its obligations under this Agreement

(C)  **No Conflict.** Neither the execution and delivery of this Agreement nor the consummation or performance of any of the transactions contemplated by this Agreement will, directly or indirectly (with or without notice or lapse of time) (1) contravene, conflict with or result in a violation of (i) any provision of its organizational documents, (ii) any Contract or other agreement by which it is bound, or (iii) any resolutions adopted by its board of directors, members or its stockholders or (2) contravene, conflict with, or result in a violation of Applicable Law (other than Applicable Law of the U.S. Virgin Islands) to which it or its Affiliates may be subject  There are no actions, suits or Proceedings pending or, to the best of its knowledge, threatened against or affecting it or its Affiliates before any court or administrative body or arbitral panel that could reasonably be expected to have a material adverse effect on its ability to perform its obligations of this Agreement

(D)  **Consents and Notices.** It is not required to give any notice to or obtain any approval, consent, ratification, waiver or other authorization of any person (including any Authorization of any Governmental Authority other than the Government) in connection with the execution and delivery of this Agreement or the consummation or performance of any of the transactions contemplated by this Agreement

(E)  **No Litigation.** Neither Terminal Operator nor any of its Affiliates is involved in any litigation, arbitration, or claim against the Government, except for claims arising in the ordinary course of Terminal Operator's business

(F)  **Solvency.** There are no bankruptcy, reorganization or receivership proceedings pending against, being contemplated by, or, to its actual knowledge, threatened against Terminal Operator or any of the shareholders of Terminal Operator  Terminal Operator is solvent

41

(G)   Contaminants. Terminal Operator has not disposed, stored or treated, or arranged for the disposal, storage, or treatment, of any Contaminant that has come to be located at or on the Excluded Lands as described in Appendix A prior to the Closing Date.

## ARTICLE 13
## COVENANTS OF TERMINAL OPERATOR

Section 13.1.  Environmental.

(A)    Compliance.   Terminal Operator shall comply, and shall cause the Terminal and Terminal Site and all operations, activities, and conditions at the Terminal Site to comply with all applicable Environmental Laws.  Terminal Operator shall not take, allow, or suffer any action, inaction, or condition at or in connection with the Terminal and Terminal Site that causes or results in a Release or threatened Release that requires a Response or restoration, assessment, mitigation, or replacement of any natural resource at or in connection with the Terminal and Terminal Site, or constitutes a violation of any Environmental Laws.  In the event of such a Release or threatened Release of a Contaminant at or from the Terminal Site, Terminal Operator at its own cost shall promptly take all appropriate Responses and other actions required by applicable Environmental Laws to investigate, contain, clean up, remove, remediate, and otherwise respond to such Release or threatened Release, assess, restore, replace, or mitigate damaged natural resources, and otherwise protect human health and the environment and consistent with continued industrial use of the affected portions of the Terminal Site. For the avoidance of doubt, the Government's reasonable out-of-pocket costs and expenses it incurs (i) in oversight by DPNR of such actions, or (ii) if Terminal Operator fails promptly to conduct such Responses and the Government elects to conduct such Responses, shall be considered "Losses" for purposes of the indemnification obligation in Section 13.3(C) hereof. Nothing in this Agreement limits or precludes the Government from exercising its authorities under Environmental Laws or other Applicable Law in connection with any such Release or threatened Release.

(B)    Due Care; Cooperation

(1)    Terminal Operator shall exercise due care with respect to all Contaminants at the Terminal and Terminal Site, including but not limited to Pre-Existing Contamination, and all Contaminants Released or threatened to be Released at or from the Terminal Site or otherwise in connection with operations at the Terminal and Terminal Site, shall take commercially reasonable precautions against foreseeable acts or omissions of any third party and the consequences that could foreseeably result from such acts or omissions, and shall comply with all Environmental Laws applicable thereto.

(2)    Terminal Operator shall cooperate and provide commercially reasonable assistance and access (where Terminal Operator possesses the legal authority to grant such assistance or access) to persons authorized by the Government to conduct Responses and/or natural resource restoration at the Terminal Site (including such reasonable cooperation and access necessary for the installation, integrity, operation, and maintenance of any complete or partial Responses or natural resource restoration at the Terminal Site)

(3) Terminal Operator shall (i) comply with land use restrictions established pursuant to Applicable Law in connection with Responses at the Terminal and Terminal Site, (ii) not unreasonably interfere with or impede the effectiveness or integrity of any institutional or engineering control employed at the Terminal and Terminal Site in connection with a Response, and (iii) comply with all reasonable requests for information or administrative subpoenas issued by the Government pursuant to Environmental Laws.

(4) Terminal Operator shall, consistent with continued industrial use of the Terminal Site, take commercially reasonable measures, including at a minimum all measures required by Applicable Law, to (a) stop Releases at the Terminal or the Terminal Site; (b) prevent threatened or future Releases at the Terminal or the Terminal Site; (c) prevent or limit human, environmental, or natural resource exposure to Pre-Existing Contamination or other contamination at or from the Terminal or the Terminal Site; and (d) fund (through insurance, the Financial Assurance, and all other financial resources available to Terminal Operator) clean-up of all Releases occurring following the Original Closing Date and restoration of affected third-Person property and the environment.

(5) Terminal Operator, and not the Government, shall have responsibility to comply with Environmental Laws regarding the Terminal and Terminal Site as now or hereafter used or occupied by Terminal Operator, its Affiliate(s), or its designee(s), and Terminal Submerged Lands.

(6) Terminal Operator shall comply with all Applicable Laws, including but not limited to Environmental Laws, with respect to the loading, unloading, and berthing of vessels at the Terminal, and shall use commercially reasonable efforts to ensure that all vessels, trucks and equipment loading or unloading at, or otherwise located at or using the Terminal Site, comply with all Applicable Laws, including but not limited to insurance laws and Environmental Laws.

(7) Terminal Operator shall on behalf of HERT take all actions and perform all obligations required to comply with the Resource Conservation and Recovery Act ("*RCRA*") and the Site's RCRA permit(s) and any modifications thereto and extensions thereof, including but not limited to all current and future treatment, storage, disposal, transportation, closure, post-closure, recordkeeping, reporting, financial assurance, corrective action, and remediation requirements thereunder or required by RCRA or any unilateral or consent order or decree relating to the facility or any contamination related thereto to the extent that such performance is funded by HOVENSA or HERT or, to the extent such funds prove inadequate, by amounts made available pursuant to the RCRA financial assurance demonstration for the Terminal Site, but only to the extent agreed to in writing by both EPA and DPNR. In no event shall Terminal Operator incur any liability for the environmental contamination that is the subject of the RCRA permit ("*RCRA Corrective Action*"), except to the extent that such liability or responsibility results from a breach of Terminal Operator's representation in Section 12.2(G). Notwithstanding anything in this Section 13.1(B)(7) or elsewhere in this Agreement, the ongoing RCRA Corrective Action on the Site shall be operated by HERT and shall not be the responsibility of Terminal Operator.

(C)    Notification. In the event that Terminal Operator becomes aware of any action or occurrence which causes or threatens a Release of a Contaminant at or from the Terminal or Terminal Site that constitutes an emergency situation or may present an imminent endangerment to human health or welfare or the environment, Terminal Operator shall immediately take commercially reasonable action (including at a minimum all action required by applicable Environmental Laws) to prevent, abate, or minimize such Release or threat of Release, and shall, in addition to complying with any applicable notification requirements under 42 U.S.C. § 9603 and any other Environmental Laws, promptly notify the Government of such Release or threatened Release.

(D)    **Permits.** Throughout the Term, Terminal Operator shall take all commercially reasonable actions, to the extent required by Applicable Law, promptly to file all applications for and obtaining, maintaining, modifying, and renewing all permits and other Authorizations required for Terminal Operator compliance with this Agreement.

(E)    Applicable Law. For the avoidance of doubt, subject to Sections 6.3 and 14.1, nothing in this Agreement is intended to, or shall, relieve Terminal Operator of its obligation to comply with Environmental Laws.

Section 13.2. **Consents and Approvals.** Terminal Operator shall take all commercially reasonable actions, to the fullest extent permitted by law, to obtain promptly any Authorizations or other actions on the part of Governmental Authorities or of any officials, departments, agencies, or other instrumentalities thereof that may be necessary or appropriate in connection with rehabilitating and operating the Terminal and Terminal Site.

Section 13.3. **Indemnification.** Terminal Operator shall defend, indemnify, and hold harmless and pay on a current basis the Government and its agents, officers, directors and employees and other representatives (each, a "*Government Indemnified Party*") from and against any and all Losses incurred by a Government Indemnified Party arising out of or relating to Terminal Operator's obligations under this Article 13:

(A)    to the extent caused by any negligent act or omission (including strict liability), gross negligence or willful misconduct of Terminal Operator, its subcontractors or any of their respective agents or employees (but only with respect to Losses for injury, illness or death to any individual or damage to any property of any Person); or

(B)    to the extent caused by breach of Applicable Law by Terminal Operator, its contractors, or any of their respective agents or employees; or

(C)    to the extent caused by or arising out of a Release or threatened Release of a Contaminant, a Response, or an obligation under any Environmental Laws at, under, on, or with respect to the Terminal or Terminal Site;

provided, however, that Terminal Operator shall not be required to indemnify any Government Indemnified Party for Losses to the extent that such Losses suffered by the Government Indemnified Party arose out of any grossly negligent act or omission (including strict liability) or willful misconduct of any Government Indemnified Party.

44

Section 13.4.  **Intercompany Agreements.**

(A)    Terms         Any material intercompany agreements between Terminal Operator and Refinery Operator, other than the Refinery Transfer Agreement, Shared Services Systems Agreement or land and asset transfer, easement, joint use or lease agreements expressly contemplated by this Agreement (such agreements being "*Intercompany Agreements*"), shall be negotiated on arm's length, market based terms, except as would not have a material adverse impact on the Government or its rights or interests in this Agreement or the Amended Terminal Operating Agreement.

(B)    Disclosure.    Terminal Operator shall disclose to the Government upon request all material Intercompany Agreements, including any amendments thereto    The Government agrees that the terms of Intercompany Agreements shall constitute Confidential Information.

## ARTICLE 14
## GOVERNMENT COVENANTS

Section 14.1    **Assistance with Permits** Throughout the Term, the Government shall take all commercially reasonable actions, to the fullest extent permitted by Applicable Law, to assist Terminal Operator (and, where applicable, its contractors and subcontractors), in Terminal Operator's expeditious filing of all applications for and obtaining, maintaining, and renewing all Authorizations required for Terminal Operator's compliance with this Agreement, including such appropriate Authorization, if any, as are required to maintain the exemption from the Jones Act of the current Oil Refinery and Related Facilities  The Government shall (A) take (and shall cause its relevant agencies, departments, political subdivisions and instrumentalities to take, including DPNR) all applicable actions to qualify the Terminal Site (and limit the liability of Terminal Operator) pursuant to the Virgin Islands Brownfields Revitalization and Environmental Restoration Act (Title 12, Sections 551-557), and regulations promulgated thereunder, and under any other relevant U S  Virgin Islands law, and (B) cooperate reasonably with Terminal Operator in qualifying the Terminal Site for similar brownfields treatment under applicable provisions of federal law (including without limitation RCRA)  In each case Terminal Operator will timely file and diligently prosecute any such applications  The Government shall take all feasible and lawful measures necessary to have all such Authorizations issued as soon as is practicable, and otherwise shall not delay or frustrate the application process  Without prejudice to the generality of the foregoing, the Government (without limiting its permitting or enforcement discretion and in compliance with Applicable Law) shall use reasonable efforts to minimize processing time for reviewing various permits (including any Coastal Zone Management permits) related to (i) the Terminal Site, (ii) modifications to existing units or installation of new units at the power plant at the Site, (iii) construction of additional tanks at the Terminal Site, (iv) any buoys or other marine installations at the Site and (v) exercising delegated authorities from the U.S. Government in respect of relevant matters  Notwithstanding Applicable Law in the U S  Virgin Islands, Terminal Operator may elect to be added as a co-permittee, co-holder or sole holder of any environmental Authorization issued to Refinery Operator by the Department of Planning and Natural Resources by giving Notice to the Government  Terminal Operator's election shall be effective as of the time Notice is effective under Section 19 1 and Terminal Operator shall have as of such effective time the rights and

45

obligations of a permittee or holder of such Authorization, unless such election violates federal Applicable Law, *provided that* any election by Terminal Operator to be added as a sole holder of an environmental Authorization shall be subject to the consent of DPNR, such consent not to be unreasonably withheld.

Section 14.2. **Consents and Approvals**. The Government undertakes to use its commercially reasonable efforts in good faith to assist Terminal Operator to obtain promptly any consents, approvals, clearances, determinations, or other actions on the part of the U.S. Government or of any officials, departments, agencies, or other instrumentalities thereof that may be necessary or appropriate in connection with operating the Terminal.

Section 14.3. **Beneficial Use**. Without the prior written consent of Terminal Operator, which consent may not be unreasonably withheld, conditioned or delayed, the Government, except to the extent required by Applicable Law, shall not take, approve, assist or allow any action, or fail to take, approve, assist or allow any action, if such action or failure to act, as the case may be, is reasonably likely to materially adversely affect, diminish or impair the beneficial use, operation, utility or occupancy of the Oil Refinery and Related Facilities in compliance with this Agreement or the ability of Terminal Operator in compliance with this Agreement to beneficially use, occupy, obtain, receive or otherwise enjoy any of: (i) the physical sites, facilities, improvements, programs, financial incentives or other benefits existing as of the Effective Date and/or contemplated by any portion of this Agreement, including without limitation the Shared Services Systems or (ii) the obligations or other commitments of the Government contemplated by, or set forth in, this Agreement; provided, however, that nothing in this Section 14.3 shall impair the Government's right to enact laws, regulations, or policies of general application for the preservation of public health and safety. If the Refinery Operating Agreement is suspended for any reason while this Agreement remains in effect, the Government shall allow access to and use by Terminal Operator of the Refinery as reasonably determined by Terminal Operator to be necessary or appropriate for the continued operation, maintenance and use of the Terminal; provided that Terminal Operator shall notify the Government prior to exercising such access right. If the Refinery Operating Agreement is terminated while this Agreement remains in effect, Terminal Operator shall have the right to, upon notice to the Government, access the Refinery, and assume, exercise and perform all of the rights and obligations of Refinery Operator under the Refinery Operating Agreement for the remaining term of this Agreement, provided, that Terminal Operator shall deliver a written notice of assumption to the Government agreeing to comply with the terms of the Refinery Operating Agreement (upon which the terms of the Refinery Operating Agreement shall be deemed to be effective with respect to Terminal Operator and the Government for the remaining term of this Agreement). In connection with any such assumption the Government shall provide such documentation as may reasonably be requested by Terminal Operator or its Lenders.

Section 14.4. **Other Legislation**. The Government agrees to use reasonable efforts to oppose any proposed legislation, initiative, act, event, plan, or proposal which would otherwise have the effect of avoiding or materially reducing any of the obligations or commitments as set forth in this Agreement. To the extent an initiative would negatively impact the full performance after the Effective Date of any or all of the obligations or commitments made by the Government, the Government shall take all legally and commercially appropriate steps to defend the obligations and commitments contained herein. For the avoidance of doubt,

any new taxes (but not generally applicable user fees) adopted by the Government shall be treated as exempted payments under Section 11.2.

Section 14.5. **Change in Law**: The Government acknowledges that Terminal Operator has entered into this Agreement in material reliance on each and all of the obligations and commitments of the Government under this Agreement. The Government represents, warrants and covenants to Terminal Operator that in the event of a Qualifying Change in Law, the result of which would be to materially (a) diminish, impede, impair, or prevent the full performance of any or all of the obligations and commitments made by the Government or Terminal Operator under this Agreement, (b) increase the obligations of Terminal Operator to the Government under this Agreement, or (c) reduce the rights of Terminal Operator under this Agreement, the Government, upon prompt written request of Terminal Operator, shall (i) exercise reasonable efforts to provide Terminal Operator with an exemption from the relevant Applicable Law as so changed and (ii) to the extent such an exemption would not remedy the impact of the Qualifying Change in Law, agree to such amendments to this Agreement as may be reasonably necessary. In the event of a Change in Law that is not a Qualifying Change in Law but that has any of the impacts set forth in clauses (a), (b) and (c) above, upon prompt written request of Terminal Operator the Government shall promptly engage in good faith negotiations to seek to agree and implement any reasonable amendments to the Agreement that would be reasonably necessary to remedy the negative impact of such Change in Law. Terminal Operator shall make all commercially reasonable efforts to mitigate the adverse effects of the Qualifying Change in Law or Change in Law.

Section 14.6 **Other Benefits**. Terminal Operator and its Affiliates shall not be precluded by reason of this Agreement from applying for benefits under legislation hereafter enacted for which it or they would otherwise qualify, but to the extent such benefits are inconsistent with its or their obligations and commitments under this Agreement, the terms of this Agreement shall govern.

Section 14.7. **No Additional Cost to Terminal Operator**. The Government shall fully fund and perform its obligations under this Agreement, and at no time shall Terminal Operator be responsible for or be required to incur or pay any cost, charge or expense under this Agreement relating to those obligations (or any agreement executed pursuant hereto) unless this Agreement (or the agreement executed pursuant hereto) specifically identifies a cost, charge or expense to be borne or paid by Terminal Operator.

Section 14.8. **Zoning; Legal Descriptions**. The Parties acknowledge that the legal description of parcels of land located in the U.S. Virgin Islands must be described on a survey (an official OLG map) filed with and approved by the Office of Public Surveyor, Office of the Lieutenant Governor (Cadastral). To the extent any of the official OLG maps showing all or any portion of the Terminal Site, the Terminal Submerged Lands, Property Acquired for Closing Payment, Option Parcels, Refinery Site, Refinery Submerged Lands or any other portion of the Site need to be modified to permit such lands to be properly conveyed to Terminal Operator by HOVENSA under the Purchase Agreement, to Terminal Operator by the Government under or as contemplated by this Agreement, or to Refinery Operator under or as contemplated by this Agreement or the Refinery Transfer Agreement, then the Government agrees to cooperate with Terminal Operator and the other relevant parties to have new or revised

surveys of such lands promptly reviewed and approved by the Cadastral department and to have the legal descriptions on the proposed deeds conveying such lands to be promptly reviewed and attested by the Cadastral department. The Government will provide such information and assistance as Terminal Operator may reasonably request in connection with the legal descriptions, leases and permits pertaining to the Terminal Site and the Terminal Submerged Lands. Notwithstanding any provision of chapter 3 of Title 29 of the Virgin Islands Code, the Government agrees (a) that in the event Terminal Operator or Refinery Operator exercises an option to purchase some or all of the Option Parcels, then it shall be a legally permissible use of the "Construction License Area" described in Appendix A to be used as an area for storage of construction materials and access relating to improvements to be made upon all or any of the Option Parcels; (b) that it shall be a legally permissible use of portions of the Site, including, but not limited to, plots 53 and 53-C Estate Castle Coakley to be used for housing for Terminal Operator's and Refinery Operator's employees and contractor employees, provided that such housing would qualify as permitted use under R-4 Zoning; and (c) that the use, for purposes of the Oil Refinery and Related Facilities, of the Site is hereby approved.

Section 14.9.  **Sale/Lease of Certain Real Estate**

(A)    The Government may, at the Governor's direction, enter into long-term leases, with terms up to forty (40) years, with Terminal Operator and/or sell or lease housing units located at or in proximity to the Site to Terminal Operator and/or Refinery Operator, in each case, to be used in connection with the Terminal Operations and/or Refinery Operations and on commercially reasonable terms to be mutually agreed in good faith between the Parties.

(B)    The Government represents and warrants that the Governor has the legal power, due authority and necessary ability to perform the obligations set forth in this Section 14.9 on behalf of the Government.

Section 14.10. **Security**. The Parties acknowledge that the Site is (a) a covered chemical facility for purposes of 6 CFR Part 27, (ii) regulated by 40 CFR Parts 68, 355, 370 and 372 and 33 CFR 105.305, and (b) required by regulation and International Standards to implement appropriate security measures. The Parties shall cooperate with each other and use commercially reasonable efforts to support security measures for the Site required by Applicable Law or International Standards, including, but not limited to, perimeter access, securing Site assets, screening and control of access to the Site and steps needed to deter, detect and delay security breaches. The Government undertakes to use its commercially reasonable efforts in good faith to assist Terminal Operator to obtain promptly any consents, approvals, clearances, determinations, or other actions necessary for Terminal Operator to comply with Applicable Law and International Standards relating to Site security.

## ARTICLE 15
## REPORTING, AUDIT AND INSPECTION

Section 15.1.  **Reporting**. Terminal Operator shall provide to the Government (i) not later than ninety (90) days following the close of its fiscal year, annual financial statements in accordance with Generally Accepted Accounting Principles, which shall be audited by a certified public accounting firm acceptable to the Government, and (ii) not later than forty-five

(45) days following the close of each fiscal quarter, unaudited quarterly financial statements, such deadlines subject in each case to reasonable extensions as may be required to accord with customary practice in the U.S. Virgin Islands. Terminal Operator shall provide quarterly employment information to the U.S. Virgin Islands OMB and the U.S. Virgin Islands Department of Labor for purposes of confirming compliance with Article 7.

Section 15.2.  **Annual Audit**

(A)     For the purpose of determining compliance with this Agreement and with Applicable Law, on or about March 31st of each calendar year following the Effective Date, the Government may initiate and conduct an audit of the books, accounts, and records of (a) the Terminal, and (b) Terminal Operator, to the extent such books, accounts, and records relate to the Terminal or its operations (such audit being an "*Annual Audit*").

(B)     Upon completion of any Annual Audit, the Government may prepare a report describing the results of such Annual Audit (an "*Annual Audit Report*") and shall make any such report available to Terminal Operator upon request.

(C)     Following receipt of any Annual Audit Report, Terminal Operator shall have not more than sixty (60) days in which to review such report and identify in writing any material errors or omissions therein. Any alleged material errors or omissions not so identified within the 60-day period are waived, and may not be asserted by Terminal Operator in any subsequent administrative, judicial, or quasi-judicial proceeding.

(D)     Nothing in this Section 15.2 shall constitute a waiver or limitation on the Government's tax assessment, audit, investigation, enforcement, and collection authorities.

Section 15.3   **Inspection.**

(A)     Upon fourteen (14) days' advance written notice to Terminal Operator, the Government may initiate an inspection of the Terminal for the purpose of determining compliance with this Agreement and with Applicable Law.

(B)     Terminal Operator hereby consents to such inspections and agrees to provide reasonable access and assistance to the personnel conducting such inspections.

(C)     To the extent any inspection conducted under this Section 15.3 reveals violations of this Agreement or Applicable Law, the Government hereby agrees to provide notice in writing of such violations within ten (10) days of the Government's determination of such violation.

(D)     Upon receipt of notice of violation, Terminal Operator has thirty (30) days to submit either proof that Terminal Operator has (i) remedied the violation and has restored compliance with this Agreement or Applicable Law or (ii) provided a plan and time reasonably acceptable to the Government to remedy such violations.

(E)     Nothing in this Section 15.3 shall constitute a waiver or limitation on the Government's or other Governmental Authorities', audit, investigation, inspection, enforcement,

subpoena, right of entry and access, and collection authorities or the ability to levy fines, penalties or other remedies in connection with violation of Applicable Law, consistent with this Agreement.

## ARTICLE 16
## DEFAULT AND TERMINATION

Section 16.1. **Payment Default.** In the event that Terminal Operator fails to make any payments due and owing to the Government under this Agreement, then the Government shall have the right to give written notice to Terminal Operator of such failure, and in the event that such payment is not cured within ninety (90) days of such written notice (such failure being a "*Payment Default*"), then:

(A)    The Government shall have the right to recover any outstanding payments from the issuer of the Financial Assurance; and

(B)    to the extent any of Terminal Operator's payment obligations to the Government remain outstanding after the exercise by the Government of its remedies under clause (A) above, the Government shall have the right to exercise its Terminal Subordinate Security Interest to the extent permitted by Article 9.

Section 16.2   **Operating Default; Liquidated Damages**   In the event that Terminal Operator fails to comply with its duty to operate under Article 5 and fails to cure any material breach of such failure within ninety (90) days (or if such cure cannot be reasonably achieved within such ninety (90) day period and Terminal Operator is proceeding diligently to cure such Operating Default, such longer period as may reasonably be required, but in no event longer than two hundred seventy (270) days following the breach) (an "*Operating Default*"). Terminal Operator shall pay to the Government as liquidated damages, and not as a penalty, the net present value of all Minimum Payments for the remaining years of the Term, discounted at the interest rate for Government-issued 30-year bonds for the year in which the Operating Default occurs (or, if no such bonds are issued that year, for the most recent year in which such bonds were issued).

Section 16.3   **Termination**

(A)    **Termination Events.** Notwithstanding anything herein to the contrary, upon the occurrence of any of the following events (each a "*Termination Event*"), this Agreement may be terminated upon thirty (30) days prior written notice of such termination (a "*Termination*"), as follows

(1)    By the Government, if Terminal Operator is in Payment Default, or an Operating Default that remains uncured for more than ninety (90) days (or if such cure cannot be reasonably achieved within such ninety (90) day period and Terminal Operator is proceeding diligently to cure such Operating Default, such longer period as may reasonably be required, but in no event longer than two hundred seventy (270) days following the breach);

(2)    By either party, if the other party is in breach of any material obligation hereunder and fails to cure such material breach within ninety (90) days following written notice thereof; and

(3)    Without further action by either Party, if the Initial Term of the Agreement expires without exercise of an Extension or upon expiration of such Extension

(B)    **Terminal Site Restoration.**  Upon Termination, and at the option of the Government, Terminal Operator shall, at its own expense remediate and restore the Terminal Site (the "*Terminal Site Restoration*") by undertaking the following actions:

(1)    decommissioning the Terminal to the extent required to keep it inactive and in-place in accordance with Environmental Law and regulations of the United States Coast Guard, except for (i) any portions of the Terminal reasonably necessary to meet the fuel storage and access needs of St Croix, and (ii) any other portions of the Terminal the Government may designate, each as identified in writing by the Government on a schedule to be provided by the Government within sixty (60) days of Termination (all decommissioned equipment, the "*Decommissioned Equipment*"); and

(2)    disconnecting the control and electrical systems and removing hydrocarbons and Contaminants from the Decommissioned Equipment, and otherwise ensuring that the Terminal Site is in a condition that complies in all material respects with applicable Environmental Laws for ongoing heavy industrial uses permitted on the Terminal Site

(3)    The Terminal Site Restoration shall be undertaken by Terminal Operator.  Completion of the Terminal Site Restoration shall be certified by an independent environmental engineer or environmental professional

(4)    For the avoidance of doubt, the Terminal Site Restoration shall not require Terminal Operator to remediate any environmental contamination for which it is not otherwise expressly responsible under Applicable Law or this Agreement.

(5)    Terminal Operator acknowledges and agree that in the event Refinery Operator fails to perform its obligations under Section 16.3(B) of the Refinery Operating Agreement, Terminal Operator shall be required to undertake such obligations

(C)    **Transfer of Site.**  At the Government's option, either prior to or following the decommissioning activities set forth in Section 16.3(B) following a Termination, Terminal Operator shall transfer the Terminal Site (including, for the avoidance of doubt, such parts of the Terminal on the Terminal Site or Refinery Site, subject to the rights of Refinery Operator under the Shared Services Systems Agreement) to the ownership of the Government, provided that Terminal Operator shall have all required access to the Terminal Site to complete its decommissioning obligations hereunder

(D)    **Effect on Agreement.** If this Agreement is terminated in accordance with Section 16.3(A), then this Agreement shall be of no further force and effect, except that Articles 1, 8.3, 9, 16, 17, and 19 shall survive termination of this Agreement indefinitely and the

51

provisions of Article 11 shall continue to apply without exception to all parties covered thereby as set out in Section 11.1 until the date of termination following a Termination Event.

Section 16.4    **Rights and Remedies Cumulative.** Except as expressly provided in this Agreement, all rights and remedies of any Party against any other Party and any permitted assignee of such other Party provided in this Agreement shall be deemed cumulative and not in lieu of, or exclusive of, each other or of any other right or remedy available to any Party at law or in equity, and the exercise of any right or remedy, or the existence herein of other rights or remedies, shall not prevent the exercise of any other right or remedy.

## ARTICLE 17
## CONFIDENTIALITY

Section 17.1    **Confidentiality.**

(A)    Each Party shall, from time to time, require or acquire Confidential Information.

(B)    The Government and Terminal Operator shall disclose the same to each other as required to advance their rights and obligations hereunder.

(C)    The receiving Party shall not, directly or indirectly, in any manner whatsoever, at any time whatsoever, disclose Confidential Information to any other party whatsoever, except that the receiving Party, may disclose Confidential Information to its advisors, as required by lenders, Affiliates, directors, officers, employees, agents, consultants or representatives; provided that the receiving Party, takes all reasonable steps to ensure that each of any such parties are bound by the terms and conditions of this Article 17, including the provision not to disclose any Confidential Information to any party whatsoever.

(D)    The obligations of each Party under Section 17.1(C) do not apply to the following information:

(1)    information provided to the Legislature of the U.S. Virgin Islands in connection with the submission of the Agreement to the Legislature for ratification;

(2)    information required to be disclosed or retained by each other by the laws of any applicable jurisdiction, including any law, order, subpoena or document discovery request or pursuant to a binding requirement of any regulatory or tax authority; provided that prior written notice is given to the disclosing Party, to the extent permitted under any Applicable Law, as soon as possible in order to afford the disclosing Party, an opportunity to seek a protective order;

(3)    information which enters the public domain other than through any breach of the terms and conditions of this Agreement by the receiving Party;

(4)    information lawfully made available to the receiving Party by another party free to make such disclosure without breach of any legal obligation.

52

(5)      information already in the possession of the receiving Party at the time of its receipt of the same from the disclosing Party, except to the extent that it has been unlawfully appropriated; and

(6)      information developed by the receiving Party independent of Confidential Information received from the disclosing Party.

(E)      Any presentations, analyses or data of Terminal Operator created, shared or conveyed in connection with this Agreement shall be deemed to constitute trade secrets of Terminal Operator and shall remain confidential pursuant to Title 3, Chapter 33, Section 881(g)(3) of the U.S. Virgin Islands Code.

## ARTICLE 18
## FORCE MAJEURE

Section 18.1.  Force Majeure Events. For the purposes of this Agreement the term "*Force Majeure Event*" shall mean any cause that is reasonably unforeseeable as of the date of this Agreement and that is beyond the reasonable control, directly or indirectly, of the Party affected and with the exercise of due diligence, could not be prevented, avoided or removed by such Party, and does not result from such Party's negligence or fault and that wholly or partly delays or prevents such Party's performance of its obligations under this Agreement, including (to the extent meeting the foregoing requirements): war (whether declared or not) or other armed conflict; terrorism; civil insurrection; declaration of martial law; piracy; nuclear accidents; widespread electrical outages; lightning strikes; earthquakes, fires; tornadoes; hurricanes, volcanic activity; accidents; strikes; lockouts or other labor actions (however, specifically excluding the labor force under the control of the Party experiencing such labor actions); actions or omissions of a Governmental Authority (including the actions of the Government in its capacity as a Governmental Authority or in the exercise of its Governmental Functions, or failure to issue an Authorization) that were not voluntarily induced or promoted by the affected Party, or brought about by the breach of its obligations under this Agreement or any Applicable Law. The Parties expressly agree and acknowledge that the list of Force Majeure Events in the foregoing sentence is intended as an inclusive list rather than an exhaustive list. Notwithstanding anything to the contrary, the term Force Majeure Event shall not be deemed to include (a) lack of funds or the availability of financing; (b) equipment failure, unless the claiming Party can point to an independent, identifiable Force Majeure Event that caused such failure, (c) acts or omissions of subcontractors (of any tier) except to the extent such subcontractors if they were a party hereto, would be able to claim a Force Majeure Event for the same or (d) changes in law other than changes in the Applicable Laws of the Government of the U.S. Virgin Islands or changes in Applicable Laws with disproportionate effect on, or targeted at, investors in the U.S. Virgin Islands. Upon the occurrence of a Force Majeure Event the Party claiming or experiencing such event shall promptly notify the other Parties and shall comply with the remaining provisions of this Article 18.

Section 18.2.  **Burden of Proof.** In the event that the Parties are unable in good faith to agree that a Force Majeure Event has occurred or whether a Party's performance is excused, such dispute shall be resolved in accordance with the arbitration dispute resolution procedures set forth in Section 19.4 and, in any proceeding to resolve the dispute, the burden of

proof as to whether a Force Majeure Event has occurred and whether performance is excused shall be upon the Party claiming a Force Majeure Event.

Section 18.3. **Excused Performance**. If a Party is rendered wholly or partially unable to perform its obligations under this Agreement because of a Force Majeure Event, that Party shall be excused from whatever performance is affected by the Force Majeure Event to the extent so affected, subject to and conditioned upon the following:

(A)    the non-performing Party, by exercise of due foresight could not reasonably have been expected to avoid, or by the exercise of due diligence could not have been able to overcome, such Force Majeure Event;

(B)    the non-performing Party gives the other Party Notice describing the nature, scope and expected duration of the Force Majeure Event, and the steps the affected Party expects to take to both mitigate the Force Majeure Event itself and the effect of such Force Majeure Event on its obligations under this Agreement. Such Notice shall be given promptly after the occurrence of the Force Majeure Event, and in no event more than seven days after the original notification of the Force Majeure Event given pursuant to Section 18.1.

(C)    the suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure Event;

(D)    the non-performing Party shall exercise all reasonable efforts to mitigate or limit damages to itself and to the other Party;

(E)    the non-performing Party shall exercise all reasonable efforts to continue to perform its obligations hereunder and to correct or cure the event or condition excusing performance; and

(F)    when the non-performing Party is able to resume performance of its obligations under this Agreement, that Party shall give the other Party written Notice to that effect and shall promptly resume performance hereunder.

Section 18.4    **Applicability**. For the avoidance of doubt and not as a limitation on the foregoing terms and conditions of this Article 18, (i) during the occurrence of a Force Majeure Event, neither Party shall be excused from any performance or payment obligation hereunder to the extent such obligation is not affected by such occurrence and is otherwise due in accordance with the terms and conditions hereof, and (ii) except as provided in clause (i), the terms and conditions of this Article 18 shall limit or condition all provisions of this Agreement whether or not so expressly stated in this Agreement.

## ARTICLE 19
## MISCELLANEOUS

Section 19.1. **Notices, Requests and Communications**. Wherever provision is made for the giving or issuance of any notice, instruction, consent, approval, certificate or determination by any Person (each, a "*Notice*"), unless otherwise specified, such communication shall be in writing and shall not be unreasonably withheld or delayed. All Notices shall be given

to a signatory at the physical address or facsimile number specified below or as such signatory hereto shall at any time otherwise specify by like notice to the other signatories hereto. Each such Notice shall be effective (a) if given by facsimile, at the time such appropriate confirmation of receipt is received by the sender (or, if such time is not during regular business hours of a Business Day, at the beginning of the next such Business Day), and (b) if given by mail or courier, upon receipt or refusal of service at the address specified for each signatory below. Notices shall be addressed as follows:

For the Government:

The Government of the U.S. Virgin Islands
Government House
Charlotte Amalie
St. Thomas, U.S. Virgin Islands
Attention: Office of the Governor

With a copy to:

Office of the Attorney General
U.S. Virgin Islands Department of Justice
34-38 Kronprindsens Gade
GERS Building, 2nd Floor
St. Thomas, U.S. Virgin Islands 00802

For Terminal Operator:

Limetree Bay Holdings, LLC
c/o ArcLight Capital Partners, LLC
200 Clarendon St., 55th Floor
Boston, Massachusetts 02117
Attention     Christine M. Miller
Fax          (617) 867-4698
Email        cmiller@arclightcapital.com

With a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 20022
Attention:    Christopher G. Cross
              Warren H. Lilien
Fax.          (212) 751-4864
Email         christopher.cross@lw.com
              warren.lilien@lw.com

And a copy to:

Nichols, Newman, Logan, Grey & Lockwood, P.C.
1131 King Street, Christiansted, St. Croix
U.S. Virgin Islands 00820-4971
Attention:      G. Hunter Logan, Jr.
                Todd H. Newman
Fax:            (340) 773-3409
Email:          hlogan@nnldlaw.com
                tnewman@nndlaw.com

Section 19.2    Assignment.

(A)    This Agreement shall not be assignable except by Terminal Operator in whole or in part to (1) an Affiliate, or (2) an entity that acquires all or substantially all of Terminal Operator's business or assets, or (3) as provided in Section 19.2(B) below. In the case of an assignment under subsection (2) of this Section 19.2(A), such assignment shall be subject to the consent of the Government, such consent not to be unreasonably withheld, conditioned, or delayed.

(B)    Financing Liens

(1)    Terminal Operator, without approval of the Government, may, by security, charge or otherwise encumber its interest under this Agreement for the purposes of financing the development, construction, rehabilitation, expansion, or enhancement or operation of the Terminal.

(2)    Not less than ten (10) Days prior to making such encumbrance, Terminal Operator shall notify the Government in writing of the name, address, and telephone and facsimile numbers of each Lender(s) to which Terminal Operator's interest under this Agreement has been pledged or assigned. Such notice shall include the names of the account managers or other representatives of the Lender(s) to whom all written and telephonic communications may be addressed.

(3)    After giving the Government such initial notice, Terminal Operator shall promptly give the Government (i) notice of any change in the information provided in the initial notice or any revised notice, and (ii) copies of documents related to such encumbrance (including final, executed copies of documents related thereto).

(C)    If Terminal Operator encumbers its interest under this Agreement as permitted by this Section 19.2(B), then (i) the Parties, except as provided by the terms of this Agreement, shall not modify or cancel this Agreement without the prior written consent of the Lender(s), (ii) the Lender(s) or their designees shall have the right, but not the obligation, to perform any act required to be performed by Terminal Operator under this Agreement to prevent or cure any Payment Default by Terminal Operator and such act performed by the Lender(s) or their designees shall be as effective to prevent or cure a Payment Default as if done by Terminal Operator; provided that, if any such Lender or its designee elects to perform any act required to be performed by Terminal Operator under this Agreement to prevent or cure a Payment Default by Terminal Operator, the Government will not be deemed to have waived or relinquished its

rights and remedies as provided in this Agreement. (iii) the Government shall upon written request by Terminal Operator or Lenders execute statements certifying that this Agreement is unmodified (or, modified and stating the nature of the modification), in full force and effect and the absence or existence (and the nature thereof) of the Payment Default hereunder by Terminal Operator known to the Government and documents of consent to such assignment to the encumbrance and any assignment to such Lender(s), in each case as reasonably requested by Terminal Operator and (iv) the Government shall, upon the receipt of a written request from Terminal Operator or any Lender, execute, or arrange for the delivery of, such certificates, opinions and other documents as may be reasonably necessary in order for Terminal Operator to consummate any financing or refinancing of the Terminal or any part thereof and will enter into reasonable agreements with such Lender (including subordination agreements, intercreditor agreements and any such instruments or documents as may be reasonably necessary to evidence and reaffirm the provisions of Section 9 hereof), which agreements will grant certain rights to the Lender(s) as more fully developed and described in such documents, including, without limitation, that (a) this Agreement shall not be terminated (except for termination pursuant to the terms of this Agreement) without the consent of Lender, which consent is not to be unreasonably withheld or delayed, (b) Lender(s) shall be given notice of any breach or default of this Agreement by Terminal Operator, (c) if a Lender forecloses, takes a deed in lieu of foreclosure or otherwise exercise its remedies pursuant to any security documents, that the Government shall, at such Lender's request, continue to perform all of its obligations hereunder, and Lender or its nominee may perform in the place of Terminal Operator, and may assign this Agreement to another Person in place of Terminal Operator, *provided* that, any party which succeeds Terminal Operator shall agree to perform Terminal Operator's obligations hereunder, including making payments to the Government consistent with those provided for hereunder, (d) in the event this Agreement is rejected or otherwise terminated as a result of any bankruptcy, insolvency, reorganization or similar proceeding affecting Terminal Operator, the Government will enter into a new agreement with the Lender or Lender's designee for the remainder of the term with substantially the same covenants, terms, provisions and limitations as are contained in this Agreement, (e) the Government shall accept performance in accordance with this Agreement by Lender or its designee, and (f) the Government shall make representations and warranties to Lender as Lender may reasonably request, but solely with regard to (1) the Government's existence, (2) the Government's authority to execute, deliver and perform this Agreement, (3) the binding nature of the document evidencing the Government's consent to assignment to Lender and this Agreement on the Government, (4) receipt of regulatory approvals by the Government with respect to its execution and performance under this Agreement and (5) such other representations and warranties as are customary in the context of a financing of projects similar to the development, construction, rehabilitation, expansion, or enhancement or operation of the Terminal

Section 19.3. **Governing Law** This Agreement and the rights and duties of the Parties arising out of this Agreement shall be governed by, and construed in accordance with, the applicable laws of the U.S. Virgin Islands without reference to the conflict of laws rules thereof that would direct the application of the laws of another jurisdiction

Section 19.4. **Dispute Resolution** Any dispute between the Parties as to the interpretation or effect of this Agreement (which shall include for the purposes of this Agreement any subsequent modification thereof unless otherwise expressly provided by such modification)

and any controversy between them or claim by either of them, whether sounding in tort or contract, arising out of or relating to this Agreement or the conduct of the Parties, their agents and/or representatives, (collectively, a *"Dispute"*) shall during the Term and within one year thereafter, notwithstanding the Government's status as such and in the same manner as similar actions, suits or proceedings to which the Government is not a Party, be the subject of the following dispute resolution procedures:

(A)    Following written notice by one Party to another of a Dispute, the Parties shall attempt to settle such Dispute in the first instance by mutual discussions between their respective designated representatives. Failing such resolution, the senior representative of the Government and the chief executive officer (or a Person holding a similar position) of Terminal Operator (or their duly appointed representatives) shall meet to resolve such Dispute. The joint decision of such individuals shall be binding upon the Parties hereto. If a settlement of any such Dispute or difference is not reached pursuant to this Section 19.4(A) within sixty (60) days after such notice of Dispute is delivered, then the provisions of Sections 19.4(B) and 19.4(C) below shall apply.

(B)    If the settlement of any Dispute is not reached pursuant to Section 19.4(A), then an action, suit or proceeding may be brought by a Party in the United States District Court of the Virgin Islands. Each of the Parties hereby irrevocably waives and shall cause its Affiliates to waive all right to a trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or the transactions contemplated hereby.

(C)    If the United States District Court of the Virgin Islands or the Third Circuit Court of the United States refuses for any reason to adjudicate such Dispute, the Parties agree that the matter shall be referred to an arbitration proceeding brought by a Party either in accord with the Rules of the American Arbitration Association or as otherwise agreed by the Parties. The arbitration will be conducted before three (3) arbitrators: one selected by the Government, another by Terminal Operator, and the third by the two selected arbitrators. The arbitrators shall determine the venue for the arbitration. Judgment upon any award rendered by the arbitrator(s) in any such proceeding may be entered in any court having jurisdiction.

Section 19.5    Commercial Act. Each Party unconditionally and irrevocably

(A)    agrees that the execution, delivery and performance by it of this Agreement and all other agreements, contracts, documents and writings relating hereto constitute private and commercial acts and not public or governmental acts;

(B)    agrees that should any proceedings be brought against it or its assets, other than the assets protected by the diplomatic and consular privileges under any law ("*Exempted Assets*") in any jurisdiction, in relation to this Agreement or any transaction contemplated hereby, no immunity, sovereign or otherwise, from such proceedings, execution, attachment or other legal process shall be claimed by or on behalf of itself or with respect to any of its assets (other than the Exempted Assets); and

(C)    subject to the Parties following the dispute resolution procedures set forth in Section 19.4, consents generally in respect of the enforcement of any judgment against it in

any proceedings in any jurisdiction to the giving of any relief or the issue of any process in connection with such proceedings including the making, enforcement or execution against or in respect of any property irrespective of its use subject to Section 19.5(B)

Section 19.6. **Limitation on Liability**. No claim may be made by one Party against the other Party for any special, indirect, consequential, incidental or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or relating to this Agreement or the development, construction, rehabilitation, expansion, or enhancement or operation of the Terminal or any act, omission or event occurring in connection therewith and the Parties hereby waive, release and agree not to sue upon any claim for such damages.

Section 19.7. **Entire Agreement; Subsequent Amendments**. This Agreement constitutes the entire agreement of the Parties and the provisions herein shall supersede any and all prior agreements or understandings relating to the same subject matter. It is intended that no Party shall have or be deemed to have any obligation under this Agreement except as the same shall be explicitly stated herein. This Agreement may not be amended, modified, or altered except by an instrument in writing signed on behalf of each Party

Section 19.8 **Severability of Provisions**. If any clause, sentence, section, or part of this Agreement or the application thereof to anyone in any circumstances, is declared invalid, the application thereof to others, or in other circumstances, and the remainder of this Agreement, shall not be affected thereby. In the event of any such holding and to the extent of any such invalidity, the Government undertakes, insofar as it may lawfully do so, to take such alternative steps (including the consent to or enactment of legislation and the consent to or promulgation of rules and regulations) as may reasonably and in good faith be required to confer upon the Parties benefits comparable in character and substantially equivalent in amount to those intended to be conferred by this Agreement, on terms and conditions not materially more burdensome to either party than those herein provided and without prejudice to any other remedies that may be available to either of them

Section 19.9. **Payment Terms and Interest Calculation**. Except as otherwise expressly provided in this Agreement, payment terms and interest calculations shall be as follows:

(A)    All payments will be made in US$ by wire transfer of immediately available funds to an account or accounts designated in writing by the Party entitled to receive payment

(B)    Late payments shall bear interest at the U.S. Prime Rate, compounded quarterly until paid in full

(C)    A wire transfer or delivery of a check shall not operate to discharge any payment under this Agreement and shall be accepted subject to collection.

Section 19.10. **Public Announcements**. No Party shall, except as required by Applicable Law or the rules of any recognized national stock exchange, cause any public announcement to be made regarding this Agreement. In the event that a Party shall be required to

cause such a public announcement to be made pursuant to any Applicable Law or the rules of any recognized national stock exchange, it shall use commercially reasonable efforts to provide the other Party at least two Business Days prior written notice of such announcement.

Section 19.11 **Parties in Interest** Unless specified in this Agreement, the terms and provisions of this Agreement shall be binding upon and inure to the benefit of each Party and its respective legal representatives, successors and assigns. No other Person shall have any right, benefit, priority or interest hereunder or as a result hereof or have standing to require satisfaction of the provisions hereof in accordance with its terms.

Section 19.12 **Waiver** By an instrument in writing, any Party may waive compliance by any other Party with respect to any term or provision of this Agreement that such other Party was or is obligated to comply with or perform or any breach hereof. The failure of a Party at any time to strictly enforce any provision of this Agreement shall in no way affect its right thereafter to require performance thereof, nor shall the waiver of any breach of any provision of this Agreement be taken or held to be a waiver of any succeeding breach of any such provision or as a waiver of the provision itself. Unless otherwise specified herein, the rights and remedies provided in this Agreement are cumulative and the exercise of any one right or remedy by any Party shall not preclude or waive its right to exercise any or all other rights or remedies.

Section 19.13 **Performance Extended to Next Business Day** Notwithstanding any deadline for payment, performance, notice, or election under this Agreement, if such deadline falls on a date that is not a Business Day, then the deadline for such payment, performance, notice, or election will be extended to the next succeeding Business Day.

Section 19.14. **Negotiation and Preparation Costs** Except as provided in Article 3, each Party shall bear the costs and expenses incurred by it in connection with the negotiation, preparation, and execution of this Agreement and other documents referred to herein.

Section 19.15 **Further Assurances** From time to time, each Party agrees to promptly execute and deliver such additional documents, and will provide such additional information and assistance, as any Party may reasonably require to effect the terms of this Agreement.

Section 19.16 **Counterparts** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute a single agreement to which no signatory hereto shall be bound until all signatories hereto have executed a counterpart. Signatures transmitted by facsimile or as emailed PDF copies shall be binding as originals so long as the Agreement is transmitted in its entirety, and each signatory hereto hereby waives any defenses to the enforcement of the terms of this Agreement sent by facsimile or emailed PDF based upon the manner of transmission or form of signature (electronic, facsimile or "ink original").

Section 19.17 **Amendment and Restatement** Each of the Parties agrees that (a) this Agreement (including all Appendices and Exhibits hereto) shall amend, restate and replace

in its entirety the Original Terminal Operating Agreement (including all appendices and exhibits attached thereto) on the Effective Date hereof, and the Original Terminal Operating Agreement (including all appendices and exhibits attached thereto) shall thereafter be of no further force and effect, except to evidence the obligations of the Parties under the Original Terminal Operating Agreement outstanding as of the Effective Date and not superseded hereby, and (b) this Agreement shall constitute an amendment of the Original Terminal Operating Agreement made under and in accordance with the terms of Section 19.7 of the Original Terminal Operating Agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

GOVERNMENT OF THE U.S. VIRGIN ISLANDS

By: _____
Name: Kenneth E. Mapp
Title:     Governor of the U.S. Virgin Islands

ATTESTED:

By: _____
Name: Osbert E. Potter
Title:  Lieutenant Governor of the U.S. Virgin Islands

Approved for Legal Sufficiency:

By: _____
Name: Claude Walker
Title:   Attorney General of the U.S. Virgin Islands

LIMETREE BAY TERMINALS, LLC

Witnesses:

By
Name: John F. Erhard
Title: manager