# APPENDIX B

Refinery Operating Agreement by and Among the Government of the Virgin Islands and Limetree Bay Refining, LLC

*Execution Copy*

# REFINERY OPERATING AGREEMENT

## BY AND AMONG

## THE GOVERNMENT OF THE U.S. VIRGIN ISLANDS

## AND

## LIMETREE BAY REFINING, LLC

July 2, 2018

## TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS AND CONSTRUCTION ................................................................. 9

    Section 1.1.    Definitions .......................................................................................... 9

    Section 1.2.    Agreement Components ................................................................. 21

    Section 1.3.    Agreement Interpretation .............................................................. 21

ARTICLE 2 TERM OF AGREEMENT ..................................................................................... 22

    Section 2.1.    Effective Date ................................................................................. 22

    Section 2.2.    Initial Term .................................................................................... 22

    Section 2.3.    Extension of Term.......................................................................... 22

    Section 2.4.    End of Term.................................................................................... 22

ARTICLE 3 CLOSING; CLOSING CONDITIONS; TERMINATION BEFORE CLOSING ............................................................................................................ 22

    Section 3.1.    Time and Place of Closing. ............................................................ 22

    Section 3.2.    Conditions to Closing..................................................................... 23

    Section 3.3.    Closing Deliveries.......................................................................... 24

    Section 3.4.    Termination Before Closing ........................................................... 25

ARTICLE 4 REFINERY PERMITS ........................................................................................... 26

    Section 4.1.    Permits............................................................................................ 26

ARTICLE 5 OPERATION OF THE REFINERY ........................................................................ 28

    Section 5.1.    Independent Operation and Non-Interference ............................... 28

    Section 5.2.    Refinery Operations ....................................................................... 29

ARTICLE 6 ADDITIONAL OPERATING PROVISIONS........................................................... 29

    Section 6.1.    [RESERVED]................................................................................ 29

Section 6.2.    [RESERVED] ........................................................................... 29

Section 6.3.    Submerged Lands ...................................................................... 29

Section 6.4.    Refinery Obligations ................................................................ 31

ARTICLE 7 EMPLOYMENT .......................................................................... 33

Section 7.1.    Minimum Commitment ............................................................. 33

Section 7.2.    Resident Employment .............................................................. 34

Section 7.3.    Hiring Preferences ................................................................... 34

Section 7.4.    Non-Discrimination .................................................................. 34

Section 7.5.    Training and Continuing Education ......................................... 35

ARTICLE 8 FINANCIAL OBLIGATIONS OF REFINERY OPERATOR .......... 35

Section 8.1.    Closing Payment and Related Payments. ................................. 35

Section 8.2.    Quarterly Refinery Payment .................................................... 35

Section 8.3.    Payment Recalibration ............................................................. 39

Section 8.4.    Charitable Commitments .......................................................... 40

Section 8.5.    Financial Assurance ................................................................. 40

Section 8.6.    Government Carried Interest in Refinery Operator .................. 40

Section 8.7.    Fuel Oil Pricing ....................................................................... 41

ARTICLE 9 SECURITY INTEREST ............................................................... 41

Section 9.1.    Payments Secured By Lien ....................................................... 41

Section 9.2.    All Necessary Actions .............................................................. 43

Section 9.3.    No Encumbrances ..................................................................... 43

ARTICLE 10 INSURANCE ............................................................................. 43

Section 10.1.   General Insurance .................................................................... 43

Section 10.2.   Insurance Requirements ........................................................... 44

3

ARTICLE 11 TAX AND FEE EXEMPTIONS ................................................................. 46

    Section 11.1.  Scope of Exemption ................................................................. 46

    Section 11.2.  Exemptions ................................................................. 46

    Section 11.3.  Limitations on Exemption ................................................................. 48

    Section 11.4.  Tax Return Filings ................................................................. 48

    Section 11.5.  No Adverse Actions ................................................................. 48

ARTICLE 12 REPRESENTATIONS AND WARRANTIES ................................................................. 49

    Section 12.1.  Government Representations ................................................................. 49

    Section 12.2.  Refinery Operator Representations ................................................................. 50

ARTICLE 13 COVENANTS OF REFINERY OPERATOR ................................................................. 51

    Section 13.1.  Environmental ................................................................. 51

    Section 13.2.  Consents and Approvals ................................................................. 53

    Section 13.3.  Indemnification ................................................................. 53

    Section 13.4.  Intercompany Agreements ................................................................. 54

ARTICLE 14 GOVERNMENT COVENANTS ................................................................. 54

    Section 14.1.  Assistance with Permits ................................................................. 54

    Section 14.2.  Consents and Approvals ................................................................. 55

    Section 14.3.  Beneficial Use ................................................................. 55

    Section 14.4.  Other Legislation ................................................................. 56

    Section 14.5.  Change in Law ................................................................. 56

    Section 14.6.  Other Benefits ................................................................. 56

    Section 14.7.  No Additional Cost to Refinery Operator ................................................................. 57

    Section 14.8.  Zoning; Legal Descriptions ................................................................. 57

    Section 14.9.  Security ................................................................. 57

4

ARTICLE 15 REPORTING, AUDIT AND INSPECTION .......................................... 58

    Section 15.1.  Reporting .......................................................................... 58

    Section 15.2.  Annual Audit ..................................................................... 58

    Section 15.3.  Inspection ......................................................................... 58

ARTICLE 16 DEFAULT AND TERMINATION .................................................... 59

    Section 16.1.  Payment Default ............................................................... 59

    Section 16.2.  RESERVED ...................................................................... 59

    Section 16.3.  Termination ...................................................................... 59

    Section 16.4.  Rights and Remedies Cumulative ...................................... 61

ARTICLE 17 CONFIDENTIALITY ...................................................................... 61

    Section 17.1.  Confidentiality .................................................................. 61

ARTICLE 18 FORCE MAJEURE .......................................................................... 62

    Section 18.1.  Force Majeure Events ........................................................ 62

    Section 18.2.  Burden of Proof ................................................................ 63

    Section 18.3.  Excused Performance ........................................................ 63

    Section 18.4.  Applicability ..................................................................... 64

ARTICLE 19 MISCELLANEOUS ........................................................................ 64

    Section 19.1.  Notices, Requests and Communications ............................. 64

    Section 19.2.  Assignment ....................................................................... 65

    Section 19.3.  Governing Law .................................................................. 67

    Section 19.4.  Dispute Resolution ........................................................... 67

    Section 19.5.  Commercial Act ................................................................ 68

    Section 19.6.  Limitation on Liability ...................................................... 68

    Section 19.7.  Entire Agreement; Subsequent Amendments ..................... 69

Section 19.8.   Severability of Provisions.................................................................. 69

Section 19.9.   Payment Terms and Interest Calculation......................................... 69

Section 19.10. Public Announcements.................................................................... 69

Section 19.11. Parties in Interest........................................................................... 69

Section 19.12. Waiver ............................................................................................ 70

Section 19.13. Performance Extended to Next Business Day.................................. 70

Section 19.14. Negotiation and Preparation Costs................................................. 70

Section 19.15. Further Assurances......................................................................... 70

Section 19.16. Counterparts................................................................................... 70

## REFINERY OPERATING AGREEMENT

THIS OPERATING AGREEMENT (the "*Agreement*") is hereby made as of July 2, 2018, by and among the Government of the U.S. Virgin Islands (the "*Government*") and Limetree Bay Refining, LLC, a limited liability company existing under the laws of the U.S. Virgin Islands ("*LB Refining*", and as further defined herein, "*Refinery Operator*"). The Government and Refinery Operator are hereinafter sometimes individually referred to as a "*Party*" and sometimes hereinafter collectively referred to as "*Parties*".

### RECITALS

**WHEREAS**, the Government and Limetree Bay Terminals, LLC ("*Terminal Operator*") have entered into that certain Operating Agreement, dated December 1, 2015 and approved by the Legislature of the U.S. Virgin Islands on December 30, 2015 (as supplemented and clarified by letter agreements dated December 30, 2015 and January 26, 2016, the "*Original Terminal Operating Agreement*");

**WHEREAS**, under the Original Terminal Operating Agreement, Terminal Operator, as inducement to take ownership of, develop, operate, and maintain the Oil Refinery and Related Facilities, located at Limetree Bay, St. Croix, U.S. Virgin Islands, and in order to promote the public interest in the economic growth and development of the U.S. Virgin Islands, was granted rights to conduct the business of the Oil Refinery and Related Facilities and was exempted from certain taxes, duties, and other fees;

**WHEREAS**, Terminal Operator has restarted and is currently operating the Terminal at the Oil Refinery and Related Facilities;

**WHEREAS**, in the Original Terminal Operating Agreement, Terminal Operator committed to devote not fewer than eighteen (18) months to "evaluate the prospects" of a Refinery Restart, and to "take all commercially reasonable efforts to facilitate" such Refinery Restart;

**WHEREAS**, in January 2018, Terminal Operator informed the Government that Terminal Operator had identified and entered into negotiations with one or more large petroleum companies interested in participating in feedstock supply, product offtake and financial participation in a Refinery Restart ;

**WHEREAS**, in order to facilitate a Refinery Restart, Terminal Operator will enter into a transfer and assignment agreement (the "*Refinery Transfer Agreement*") with Refinery Operator, an indirect subsidiary of Limetree Bay Ventures, LLC, and an Affiliate under common ownership with Terminal Operator, pursuant to which Terminal Operator will transfer certain rights granted to it under the Original Terminal Operating Agreement in connection with the Refinery and the Refinery Site to Refinery Operator;

7

WHEREAS, to further facilitate a Refinery Restart, Terminal Operator has asked the Government to enter into a new Refinery Operating Agreement to reflect that the Refinery and the Refinery Site will be acquired, held and operated by Refinery Operator, rather than by Terminal Operator, and to govern the contractual relationship between the Government and Refinery Operator in its capacity as owner of the Refinery and the Refinery Site;

WHEREAS, the Government has determined that the Refinery Restart is critical to the economic well-being of the Territory, and will bring tax revenues, employment, and increased commercial activity that will benefit the Government and the people of the U.S. Virgin Islands;

WHEREAS, Refinery Operator has agreed to evaluate further the prospects of a Refinery Restart and to take all commercially reasonable measures to facilitate such Refinery Restart, and in furtherance of this objective has been engaged in discussions with one or more qualified and experienced international companies for feedstock supply, product offtake and financial participation in a Refinery Restart;

WHEREAS, Refinery Operator has agreed that if no such use for the Refinery can be identified within sixty (60) months following the closing of the transactions contemplated by this Agreement (as such period may be extended pursuant to the terms hereof), it will (at the Government's option) dismantle the Refinery in accordance with this Agreement, and Terminal Operator has agreed to perform such dismantling in the event that Refinery Operator fails to do so for any reason;

WHEREAS, Refinery Operator and Terminal Operator and certain Affiliates thereof shall enter into a shared services agreement with respect to certain facilities, access, use, permits and services to be shared by, or provided by Refinery Operator to, Terminal Operator, or by Terminal Operator to Refinery Operator, as the case may be (either directly or through a third party) in respect of, *inter alia*, the Shared Services Systems, including but not limited to fire control system management, power supply and process and potable water supply (the "*Shared Services Systems Agreement*");

WHEREAS, in order to protect the interests of the Territory, and to reflect the importance of the Government's role in facilitating the successful operation of the Refinery, the Government wishes to take a financial stake in the success of the new venture, which shall be in the form of a fee payable upon a Refinery Change of Control and shall not include any governance or management role; and

NOW, THEREFORE, in consideration of the premises and the mutual promises and covenants contained herein, the receipt and sufficiency of which are hereby acknowledged, and intending hereby to be legally bound, the Government and Refinery Operator hereby agree and stipulate as follows:

8

## ARTICLE 1
## DEFINITIONS AND CONSTRUCTION

Section 1.1.    **Definitions**. As used in this Agreement, the following terms have the respective meanings set forth below or set forth in the Articles referenced below.

"*1998 Letter Agreement*" shall mean that certain Letter Agreement entered into by and between HOVIC and the Government, dated October 14, 1998.

"*Affiliate*" or "*Affiliates*" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person; provided that, for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract (including, a shareholders' agreement or a members' agreement between Persons who have an interest in an Affiliate) or otherwise.

"*Agreement*" shall have the meaning set forth in the Preamble.

"*Amended Terminal Operating Agreement*" shall mean that certain Amended and Restated Terminal Operating Agreement, dated as of the date hereof, by and between Terminal Operator, as Terminal Operator, and the Government of the U.S. Virgin Islands, as the Government, as further amended, amended and restated, supplemented or modified from time to time.

"*Annual Audit*" shall have the meaning set forth in Section 15.2(A).

"*Annual Audit Report*" shall have the meaning set forth in Section 15.2(B).

"*Applicable Law*" shall mean any present or future constitution, law, statute, ordinance, order, injunction, administrative and/or judicial order or decree, code, rule, regulation, or Authorization, or any amendments thereto, and any voluntary cleanup program and/or brownfields program of any Governmental Authority (excluding any such legislative, judicial or administrative body or instrumentality acting in any capacity as a lender, guarantor or mortgagee) applicable to a Party or its Affiliate or the subject matter of this Agreement.

"*Applicable Product Price*" shall have the meaning set forth in Section 8.2(F)

"*Argus*" shall have the meaning set forth in Section 8.2(F).

"*Argus Indices*" shall have the meaning set forth in Section 8.2(F).

"*ASCI Price*" shall have the meaning set forth in Section 8.2(C).

9

"*Authorization*" shall mean any licenses, certificates, permits, orders, approvals, consents, determinations, variances, franchises, and authorizations from any Governmental Authority.

"*Base Margin*" shall have the meaning set forth in Section 8.2(C).

"*Business Day*" shall mean Monday through Friday of each week, except that a legal holiday recognized as such by the Government (including, for the avoidance of doubt, any administrative leave day granted by the Government for the entire U.S. Virgin Islands) shall not be regarded as a Business Day, and a "*Day*" shall be any calendar day.

"*Castilla Blend Price*" shall have the meaning set forth in Section 8.2(C).

"*Carried Interest*" shall have the meaning set forth in Section 8.6(A).

"*Change in Law*" shall mean any of the following events occurring after the date of execution of this Agreement:

(a)    a change to, or repeal of, any existing Applicable Law;

(b)    the promulgation of any new Applicable Law; or

(c)    any withdrawal or amendment of any Authorization other than:

(i)    in accordance with the terms upon which it was originally granted;

(ii)    as a result of a material failure by Refinery Operator to comply with a material condition of the applicable Authorization; or

(iii)    as a result of any unlawful act or omission of Refinery Operator.

"*Clean Air Act Consent Decree*" shall mean the Consent Decree entered on June 7, 2011 in *United States of America and The United States Virgin Islands v. HOVENSA, L.L.C.* (Civ. No. 1:11 -cv-00006) (D.V.I., St. Croix Div.), as may be amended by the court from time to time.

"*Closing*" shall have the meaning set forth in Section 3.1(A).

"*Closing Date*" shall have the meaning set forth in Section 3.1(B).

"*Closing Payment*" shall have the meaning set forth in Section 8.1

"*Closing Payment Balance*" shall be determined at the end of each calendar quarter and shall be equal to (a) as of the end of the first calendar quarter during which Closing occurs, (i) the product of (x) the Closing Payment and (y) the Closing Payment Interest Rate (prorated for the actual days in that time period relative to a full calendar quarter), *plus* (ii) the Closing Payment and (b) as of the end of each calendar quarter thereafter, (i) the product of (x) the

10

Closing Payment Balance at the end of the previous calendar quarter and (y) the Closing Payment Interest Rate, *plus* (ii) the Closing Payment Balance at the end of the previous calendar quarter, *less* (iii) any Quarterly Refinery Payments or portions thereof retained by Refinery Operator during such calendar quarter as described in Article 8 of this Agreement.

"*Closing Payment Interest Rate*" shall mean an interest rate of 2.41% per calendar quarter, except that in the event the Refinery Restart does not occur prior to the end of the initial Refinery Evaluation Period, the Closing Payment Interest for such period shall be 1% per calendar quarter.

"*Coastal Zone Management permit*" shall mean a permit obtained under the Virgin Islands Coastal Zone Management Act, as amended.

"*Commissioner of Labor*" shall mean the Commissioner of Labor of the U.S. Virgin Islands.

"*Confidential Information*" shall mean information or data proprietary to the Government and/or Refinery Operator including:

(a)    books, records and documentation;

(b)    information regarding any aspect of the Oil Refinery and Related Facilities and the operation thereof;

(c)    information from and relating to Customers, Supply and Offtake Counterparties, stakeholders and any contractor of the applicable Party;

(d)    written information that is clearly marked as confidential or proprietary by a Party;

(e)    oral information identified in writing as confidential after disclosure, or as so stated when made, regardless of whether such written or oral information originated with the disclosing Party or any third party, which is provided to the receiving Party after the date hereof; and

(f)    all written information generated by a Party or its representatives that contains, reflects or is derived from furnished Confidential Information,

provided, however, that such information or data shall exclude information already in the public domain, or which may subsequently become part of the public domain through no fault of the Government or Refinery Operator. For the avoidance of any doubt, Confidential Information includes any information recorded or stored in any digital format on electronic, optical or magnetic media or any other material that contains or otherwise reflects Confidential Information.

11

"*Contaminant*" shall include but not be limited to any contaminant, air contaminant, solid or hazardous waste, hazardous material, infectious waste, waste, pollutant, air pollutant, hazardous air pollutant, regulated air pollutant, pollution, air pollution, radioactive material, hazardous or toxic substance, crude oil, any fraction thereof, petroleum product, petroleum byproduct, and/or fuel additive, defined or regulated as such now or in the future in or under any Environmental Laws or voluntary cleanup or brownfields program.

"*Contract*" shall mean any note, bond, mortgage, indenture, guaranty, license, franchise, permit, agreement (including, a shareholders' agreement, a members' agreement, or both), contract, commitment, lease, purchase order, or other instrument or obligation, and any amendments thereto.

"*Contract Year*" shall have the meaning set forth in Section 8.2(C).

"*Customers*" shall have the meaning set forth in Section 11.1.

"*Decommissioned Equipment*" shall have the meaning set forth in Section 16.3(B)(1).

"*Deemed Margin*" shall have the meaning set forth in Section 8.2(C).

"*Discharge Date*" shall have the meaning set forth in Section 9.1(A).

"*Dispute*" shall have the meaning set forth in Section 19.4.

"*Distributions*" shall mean any distribution to a member, shareholder or its Affiliates in respect of any ownership interest (including any membership interest) in Refinery Operator (excluding, for the avoidance of doubt, any distribution to LB Refining from its subsidiaries), whether in cash or property, or the redemption, purchase or acquisition of any interest of such member, shareholder or Affiliate.

"*District Court*" shall have the meaning set forth in Section 4.1(B).

"*DPNR*" shall have the meaning set forth in Section 4.1(B).

"*Easements*" shall have the meaning set forth in Section 9.1(A).

"*Effective Date*" shall have the meaning set forth in Section 2.1.

"*Environmental Laws*" shall mean any Applicable Law, Order or other requirement of Applicable Law (including environmental Authorizations) that relates to (a) the protection of human health or the environment, including but not limited to threatened or endangered species, federally-jurisdictional wetlands, ambient air, surface water, groundwater, land surface or subsurface strata, natural resources, natural resource damages, and the restoration and replacement of natural resources, or (b) the presence, Release, threatened Release, generation, recycling, disposal or treatment of Contaminants, or the arrangement for any such activities.

"*EPA*" shall have the meaning set forth in Section 4.1(B).

"*Equity Holders*" shall include the direct and indirect owners of (i) the stock of a corporation, (ii) the equity of the membership interests of a limited liability company, and (iii) the ownership interest of any other entity.

"*Excluded Lands*" shall mean the real property described as excluded lands in Appendix A.

"*Exempted Assets*" shall have the meaning set forth in Section 19.5.

"*Exemptions*" shall have the meaning set forth in Section 11.2.

"*Existing Terminal Financial Assurance*" shall have the meaning set forth in Section 8.5(A).

"*Expert*" shall have the meaning set forth in Section 8.2(F).

"*Extension*" shall have the meaning set forth in Section 2.3.

"*Financial Assurance*" shall have the meaning set forth in Section 8.5(B).

"*Force Majeure Event*" shall have the meaning set forth in Section 18.1.

"*Full-Time Employee*" shall mean an individual employed by Refinery Operator for work in the U.S. Virgin Islands on the Refinery who works no less than 32 hours per week and is covered by employer-provided health insurance. The number of Full-Time Employees on any given date shall be calculated as the three-month trailing average of the number of Full-Time Employees at the Refinery on such date.

"*Government*" shall have the meaning set forth in the Preamble.

"*Government Indemnified Party*" shall have the meaning set forth in Section 13.3.

"*Governmental Authority*" shall mean any foreign, federal, territorial, state or local governmental entity, authority or agency, court, tribunal, regulatory commission or other body, whether legislative, judicial or executive (or a combination or permutation thereof) having jurisdiction as to the matter in question.

"*Governmental Function*" shall mean any regulatory, legislative, permitting, zoning, enforcement (including police power), licensing or other functions which the Government is authorized or required to perform in its capacity as a Governmental Authority in accordance with Applicable Law.

"*Governor*" shall have the meaning set forth in Section 3.2(C)(1).

13

"*Guaranteed Amount*" shall have the meaning set forth in Section 8.5(B).

"*HERT*" shall mean the HOVENSA environmental response trust created pursuant to that certain Environmental Response Trust Agreement, having an effective date of February 17, 2016, made by and between HOVENSA, as Settlor and Project Navigator, Ltd., as Trustee.

"*HOVENSA*" shall mean HOVENSA L.L.C.

"*HOVIC*" shall mean Hess Oil Virgin Islands Corp.

"*HSFO Price*" shall have the meaning set forth in Section 8.2(C).

"*I-1*" shall have the meaning set forth in Section 12.1(E).

"*Initial Term*" shall have the meaning set forth in Section 2.2.

"*Intercompany Agreement*" shall have the meaning set forth in Section 13.4.

"*Internal Revenue Code*" shall mean, as applicable, the Internal Revenue Code of 1986, as amended, and/or the Internal Revenue Code of 1986, as amended and as mirrored in the U.S. Virgin Islands and applicable thereto pursuant to the Naval Service Appropriation Act of 1922, 48 U.S.C. 1397.

"*International Standards*" shall mean with respect to any engineering, construction or operations work conducted by or on behalf of a Party, that such work is performed in accordance with professional practices and standards generally accepted by the international refining and community and that such work is provided by an experienced and competent professional organization generally recognized by that community as competent in its respective service area.

"*LB Refining*" shall have the meaning set forth in the Preamble.

"*Legislature*" shall mean the Legislature of the U.S. Virgin Islands.

"*Lender*" shall mean any Person providing debt, bond or capital market financing or refinancing or credit support or interest rate hedging for such financing or refinancing, including any agent or trustee for such Person or Persons.

"*Lessor*" shall have the meaning set forth in Section 11.1.

"*Liabilities*" shall mean any and all indebtedness, Taxes, liabilities and obligations, whether accrued or fixed, known or unknown, absolute or contingent, matured or unmatured, or determined or determinable.

"*Losses*" shall mean all suits, actions, Liabilities, legal proceedings, claims, demands, losses, costs, and expenses of whatsoever kind or character, including reasonable attorneys' fees and expenses and case costs and expenses.

14

"*Margin Adjustment*" shall have the meaning set forth in Section 8.2(C).

"*Maximum Payment*" shall have the meaning set forth in Section 8.2(A).

"*Minimum Payment*" shall have the meaning set forth in Section 8 2(A).

"*Notice*" shall have the meaning set forth in Section 19.1.

"*NRD Settlement and Release Agreement*" shall mean the Settlement and Release Agreement fully executed on and with an effective date of May 29, 2014, by and among the Commissioner of the U.S. Virgin Islands Department of Planning and Natural Resources, the Government of the U.S. Virgin Islands, Hess Oil Virgin Islands Corp., and HOVENSA, LLC, which resolved the litigation among the parties in *Commissioner of the Dep't of Planning and Natural Resources v. Century Alumina Co., et al.*, Civ. No. 2005-0062 (attached hereto as Appendix C).

"*NYH RBOB Price*" shall have the meaning set forth in Section 8.2(C).

"*NYH ULSD Price*" shall have the meaning set forth in Section 8.2(C).

"*Oil Refinery and Related Facilities*" shall mean the Refinery, the Terminal, and all other related facilities, equipment, and real and personal property associated with petroleum import, export, processing, storage and related activities at the Refinery, the Terminal, the container port, the dock, and certain rights to occupy and use all Submerged Lands (including lands on or under the surface of any kind of water), whether or not covered by the Submerged Land Lease or Submerged Lands Permits, and all facilities and property now or in the future related thereto on St. Croix, U.S. Virgin Islands, but excluding the Excluded Lands.

"*Option Parcels*" shall mean the real property described as option parcels on Appendix A.

"*Order*" shall mean any judgment, order, injunction, decree, writ, permit, or license issued or entered by or with any Governmental Authority or any arbitrator, whether preliminary, interlocutory, or final.

"*Original Terminal Operating Agreement*" shall have the meaning set forth in the Recitals.

"*Owners*" shall mean ArcLight Energy Partners, Fund VI, L.P, Freepoint Commodities LLC, and their respective Affiliates (exclusive of Refinery Operator).

"*Parties*" and "*Party*" shall have the meaning set forth in the Preamble.

"*Payment Default*" shall have the meaning set forth in Section 16.1.

"*Payment Obligations*" shall have the meaning set forth in Section 9.1.

15

"*Payment Recalibration Election*" shall have the meaning set forth in Section 8.3.

"*Person*" shall mean and include an individual, a partnership, a limited partnership, a limited liability partnership, a limited liability limited partnership, a joint venture, a joint stock company, a corporation, a limited liability company, an association, a trust, an unincorporated organization, a group, any governmental entity or any other form of entity or organization.

"*Pre-Existing Contamination*" shall have the meaning set forth in the NRD Settlement and Release Agreement.

"*Proceeding*" shall mean a proceeding, arbitration, action, claim, suit, pending settlement, or other legal proceeding of any kind or nature before or by any Governmental Authority, arbitrator or panel.

"*Processed Volume*" shall have the meaning set forth in Section 8.2(C).

"*Qualifying Change in Law*" shall mean (1) any Change in Law of the U.S. Virgin Islands that (a) becomes effective as a result of an express and affirmative legislative or rulemaking act of the Government, (b) is not required by a Change in Law of the United States, and (c) is not required to conform to any requirements of any federally-delegated program, or (2) any Change in Law the terms of which apply expressly to (a) the Refinery and/or the Refinery Site or operations thereon, and not to facilities, sites, or operations that are similar in whole or in part and/or (b) Refinery Operator or its Affiliates disproportionately in relation to other similarly situated persons.

"*Quarterly Refinery Payment*" shall have the meaning set forth in Section 8.2.

"*RCRA*" shall have the meaning set forth in Section 13.1(B)(7).

"*RCRA Corrective Action*" shall have the meaning set forth in Section 13.1(B)(7).

"*Recalibration Amount*" shall mean, with respect to any period, an amount equal to any U.S. Virgin Islands corporate net income tax that Refinery Operator would be required to pay on its earnings for such period if (a) Refinery Operator were classified as a corporation for U.S. Virgin Islands income tax purposes, (b) solely for purposes of the calculation under this definition, the exemptions from U.S. Virgin Islands corporate net income taxes in Article 11 did not apply to Refinery Operator, except to the extent such exemptions would otherwise apply to a U.S. Virgin Islands corporate income taxpayer, (c) such U.S. Virgin Islands corporate net income tax were determined under the Internal Revenue Code and other Applicable Law, in each case, in effect for such period, and (d) Refinery Operator were not permitted to carry back net operating losses to any of its prior taxable periods. For the avoidance of doubt, references in this definition to taxes and the Internal Revenue Code are solely for purposes of calculating the amount of the Recalibration Amount, and the Recalibration Amount is not intended to be a tax.

16

"*Refinery*" shall mean all petroleum processing equipment and related facilities, equipment, and real and personal property associated with petroleum processing and related activities, including certain Shared Services Systems and housing for employees and contractors of Refinery Operator, exclusive in each case of the Terminal, as contemplated by the Original Terminal Operating Agreement, this Agreement and the Amended Terminal Operating Agreement and in each case now or hereafter located on the Refinery Site.

"*Refinery Change of Control*" shall mean, with respect to Refinery Operator, consummation of a transaction or series of transactions whereupon (i) the Owners cease to hold, either directly or indirectly, a majority of the equity interests in Refinery Operator following the consummation of such transaction or series of transactions, (ii) the Owners cease to directly or indirectly control Refinery Operator following consummation of such transaction or series of transactions or (iii) the Owners cause Refinery Operator to sell, transfer or dispose of all or substantially all of its assets, or all or substantially all of the assets constituting the Refinery by asset sale, stock sale, merger or otherwise; *provided, however*, that no Refinery Change of Control shall be deemed to have occurred in the event of any direct or indirect transfer of a majority of the equity interests in Refinery Operator to an Affiliate thereof or a transfer under clause (iii) above to an Affiliate of Refinery Operator.

"*Refinery Deconstruction*" shall have the meaning set forth in Section 6.4(B).

"*Refinery Evaluation Period*" shall have the meaning set forth in Section 6.4(A).

"*Refinery Operations*" shall mean the processing at the Refinery of crude oil and other feedstock into refined petroleum products or biofuels (including renewable diesel) and the commercialization thereof, including Shared Services Systems operations.

"*Refinery Operator*" shall mean LB Refining and any wholly-owned subsidiaries thereof that are engaged in acquiring, owning (directly or indirectly) or operating, in whole or material part, the Refinery as set forth in this Agreement.

"*Refinery Property Option Agreement*" means the Option Agreement, dated January 4, 2016, by and between Limetree Bay Terminals, LLC and HERT, as successor in interest to HOVENSA L.L.C.

"*Refinery Restart*" shall mean the resumption or initiation on the Site of existing or after constructed petroleum processing units and achievement of (a) an average throughput of at least eighty-five thousand (85,000) barrels per day for a period of at least fourteen (14) consecutive days (without any of the processing units in a minimum configuration consisting of a crude unit, a vacuum unit, the coker, DD6, DD7, DD9, and a platformer going off-line or failing to operate unless otherwise provided for in the start-up testing procedure) or (b) a cumulative Processed Volume of two million (2,000,000) barrels. "Petroleum processing units," for purposes of this definition, shall include (i) physical processes for separating hydrocarbon compounds based on physical characteristics such as distillation, and (ii) chemical processes for transforming the

17

structure of petroleum molecules, including without limitation cracking, coking, and hydrotreating. For the avoidance of doubt, the Refinery Restart may occur only once.

"*Refinery Secured Assets*" shall have the meaning set forth in Section 9.1.

"*Refinery Security Documents*" shall have the meaning set forth in Section 9.1.

"*Refinery Site*" shall mean the real property at the Site on which the Refinery and various Shared Services Systems are now or hereafter located as further described in Appendix A, together with all other real property now or hereafter owned, occupied, or leased by Refinery Operator at the Site and used in each case in connection with the Refinery, including Refinery Submerged Lands and excluding the Excluded Lands.

"*Refinery Site Restoration*" shall have the meaning set forth in Section 16.3(B).

"*Refinery Submerged Lands*" shall have the meaning set forth in Section 6.3(A).

"*Refinery Subordinate Security Interest*" shall have the meaning set forth in Section 9.1.

"*Refinery Transfer Agreement*" shall have the meaning set forth in the Recitals.

"*Release*" shall mean any release, spill, emission, leaking, dumping, injection, pouring, pumping, placing, emptying, injecting, escaping, discarding, abandoning, deposit, disposal, discharge, migrating, or disposal into, on, under, or through the environment (including, but not limited to, ambient air, surface water, groundwater, soil, land surface, or subsurface strata).

"*Respond*" or "*Response*" shall mean all actions, including but not limited to removal actions, remedial actions, corrective actions, enforcement actions, and natural resource restorations, mitigations, and replacements, taken or ordered by or on behalf of the U.S. or the Government, ordered by a court of competent jurisdiction, or otherwise required by Applicable Law, pursuant to any Environmental Laws in response to any Release or threatened Release of a Contaminant.

"*Return*" shall mean all returns, statements, forms and reports for Taxes.

"*RINS Price*" shall have the meaning set forth in Section 8.2(C).

"*Senior Management Employees*" shall mean the ten (10) most highly compensated Full-Time Employees employed by Refinery Operator.

"*Senior Obligations*" shall have the meaning set forth in Section 9.1(A).

"*Severe Turn-down Year*" shall have the meaning set forth in Section 8.2(C).

"*Shared Services Systems*" shall mean the various support systems (including, without limitation, the fire control system management, power supply, and process, waste, and storm

18

water conveyance or treatment systems and potable water supply) currently available or to be expanded or built in the future on the Site for the provision of shared services by and between Refinery Operator, Terminal Operator, and the HERT, including as contemplated from time to time in the Shared Services Systems Agreement.

"*Shared Services Systems Agreement*" shall have the meaning set forth in the Recitals.

"*Site*" shall mean the real property on which the Oil Refinery and Related Facilities are located, including but not limited to land, "*submerged and filled lands*" and "*trust lands*", within the meaning of 12 V.I.C. § 902(cc) and (dd), respectively, waterways, groundwater, and coastal zones, as further described and delineated in Appendix A with respect to those assets and certain lands and rights to land acquired by Terminal Operator or Refinery Operator under or as contemplated by the Amended Terminal Operating Agreement, this Agreement and the Purchase Agreement (as defined in the Amended Terminal Operating Agreement) and including the Terminal Site, Refinery Site, and Option Parcels, together with all other real property now or hereafter owned or leased by Terminal Operator or Refinery Operator adjacent or in close proximity to the Terminal Site, Refinery Site, or Option Parcels and used in connection with the Terminal or Refinery, but excluding the Excluded Lands.

"*Submerged Lands*" shall mean such portions of the Site that are subject to the Submerged Land Lease, a Submerged Lands Permit, or occupancy or development rights to trust lands or other submerged lands in Coastal Zone Management permits as modified and assigned to Terminal Operator or Refinery Operator, as applicable.

"*Submerged Land Lease*" shall mean that certain Lease, dated as of October 16, 1976, by and between the Government and HOVIC.

"*Submerged Lands Permits*" means all permits issued by a Governmental Authority in connection with the Submerged Lands, as set forth in Section 6.3.

"*Subordinate Security Interest*" shall have the meaning set forth in Section 9.1.

"*Supply and Offtake Counterparties*" shall have the meaning set forth in Section 11.1.

"*Surface Impoundment No. 3*" shall have the meaning given to it in Module IV.A of the 1999 RCRA Part B Permit, EPA Facility I.D. Number: VID980536080 (the "*RCRA Part B Permit*") and as shown on Figure 1 to the RCRA Part B Permit and Attachment IV-1, Figure D-3.

"*Taxes*" shall mean all taxes, assessments, charges, duties, fees, levies or other governmental charges imposed by a taxing authority, including all U.S. federal, state, territory, local, foreign, and other income, franchise, annual report fees, profit, gross receipts, capital gains, capital stock, transfer, sales, use, value added, occupation, property, excise, severance, windfall profits, stamp, license, payroll, social security, withholding, and other taxes, assessments, charges, duties, fees, levies, and other governmental charges imposed by a taxing

19

authority of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Return) all estimated taxes, deficiency assessments, additions to tax, penalties, and interest.

"*Term*" shall mean the Initial Term and any Extensions.

"*Terminal*" shall mean all storage and blending equipment, docks, tanks, and all other related facilities, equipment, and real and personal property associated with petroleum import, export, mixing, storage, and related activities, including certain Shared Services Systems and housing for employees and contractors of Terminal Operator, exclusive of the Refinery, and in each case, now or hereafter located on the Terminal Site.

"*Terminal Operator*" shall have the meaning set forth in the recitals.

"*Terminal Site*" shall mean the real property at the Site on which the Terminal and certain Shared Services Systems are now located as further described in Appendix A, together with all other real property at the Site now or hereafter owned, occupied, or leased by Terminal Operator and used in connection with the Terminal, including Terminal Submerged Lands (as defined in the Amended Terminal Operating Agreement) and Option Parcels and excluding the Excluded Lands.

"*Termination*" shall have the meaning set forth in Section 16.3(A).

"*Termination Event*" shall have the meaning set forth in Section 16.3(A).

"*Total Realized Refinery Profit*" shall mean, as of any date of calculation and without double counting, (i) Refinery Operator's total Distributions through such date, *plus* (ii) consideration received by the Owners for the Refinery in a Refinery Change of Control transaction on or prior to such date, *less* (iii) all capital contributions to Refinery Operator through such date. Total Realized Refinery Profit shall exclude any amounts associated with the transfer of the Refinery to Refinery Operator.

"*Transaction Value*" shall have the meaning set forth in Section 8.6(B).

"*Turn-down Year*" shall have the meaning set forth in Section 8.2(C).

"*U.S. Virgin Islands Resident*" shall mean (i) any United States citizen currently domiciled in the U.S. Virgin Islands for one year or more; (ii) an individual who has attended a school in the U.S. Virgin Islands for at least six years or is a high school or UVI graduate and who is registered to vote in the U.S. Virgin Islands; or (iii) the holder of a permanent resident card (United States Department of Justice Form No. I-551, or appropriate successor form(s)) domiciled in the U.S. Virgin Islands for one year or more. An individual shall demonstrate that he or she has been a resident for one year or more for the purpose of this definition using documents that demonstrate the commencement of the individual's residency in the USVI. Such documents may include, without limitation, a residential lease, a deed, a W-2VI Form issued by

20

an employer, a W-4 form timely completed by an employee, a voter registration card, a permanent resident card, and a U.S. Virgin Islands driver's license.

"*USDOJ*" shall have the meaning set forth in Section 4.1(B).

"*USGC VGO Price*" shall have the meaning set forth in Section 8.2(C).

"*UVI*" shall have the meaning set forth in Section 7.4.

"*VIWAPA*" shall have the meaning set forth in Section 8.7.

Section 1.2.    **Agreement Components**. This Agreement consists of the body of this Agreement and the following attachments:

Appendices:

Appendix A    Terminal Site and Refinery Site

Appendix B    List of Claims and Litigations

Appendix C    NRD Settlement and Release Agreement

Appendix D    Base Margin

Appendix E    Memorandum of Understanding with UVI

Appendix F    Form of Special Warranty Deed

Each Appendix referred to in this Agreement is part of this Agreement and is hereby incorporated into the body of the Agreement as if set forth in full therein.

Section 1.3    **Agreement Interpretation**. In construing this Agreement: (a) no consideration shall be given to the captions of the articles, sections, subsections or clauses, which are inserted for convenience in locating the provisions of this Agreement and not as an aid to construction and shall not be interpreted to limit or otherwise affect the provisions of this Agreement or the rights and other legal relations of the Parties; (b) no consideration shall be given to the fact or presumption that either Party had a greater or lesser hand in drafting this Agreement; (c) examples shall not be construed to limit, expressly or by implication, the matter they illustrate; (d) the word "includes" and its syntactic variants mean, unless otherwise specified, "includes, but is not limited to" and corresponding syntactic variant expressions; (e) words such as "herein", "hereby", "hereafter", "hereof", "hereto" and "hereunder" refer to this Agreement as a whole and not to any particular article, section or provision of this Agreement; (f) whenever the context requires, the plural shall be deemed to include the singular, and vice versa; (g) each gender shall be deemed to include the other gender, when such construction is appropriate; (h) references to a Person are also to its permitted successors and permitted assigns; (i) all references in this Agreement to Appendices, Exhibits, Schedules,

21

Sections and Articles refer to the corresponding Appendices, Exhibits, Schedules, Sections and Articles of this Agreement unless expressly provided otherwise; (j) references to the "U.S." mean to the United States of America; (k) references to "$" or "Dollars" mean U.S. Dollars; and (1) unless otherwise expressly provided herein, any agreement, instrument or Applicable Law defined or referred to herein means such agreement, instrument or Applicable Law as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of Applicable Laws) by succession of comparable successor Applicable Laws and reference to all attachments thereto and instruments incorporated therein.

## ARTICLE 2
## TERM OF AGREEMENT

Section 2.1.   **Effective Date.** This Agreement shall become effective (the "*Effective Date*") upon the first day on which (i) this Agreement has been executed by all Parties and (ii) this Agreement has been duly ratified by the Legislature of the U.S. Virgin Islands.

Section 2.2.   **Initial Term.** The initial term of this Agreement (the "*Initial Term*") shall commence on the Effective Date and continue in effect until January 4, 2041, unless extended pursuant to Section 2.3 below.

Section 2.3.   **Extension of Term.** The Term may be extended for up to one (1) period of fifteen (15) additional years (the "*Extension*") upon (a) the delivery of written notice to the Government by Refinery Operator no later than eighteen (18) months prior to the expiration of the Initial Term, (b) certification by Refinery Operator that as of the date of such notice and as of the expiration of the Initial Term, Refinery Operator is in material compliance with its obligations under this Agreement, and (c) within forty-five (45) Days of receipt of such certification, the Government shall confirm that Refinery Operator's certification is correct, such confirmation not to be unreasonably withheld, conditioned or delayed.

Section 2.4.   **End of Term.** Not fewer than two (2) years prior to the end of the Term (as it may be extended by the Extension), Refinery Operator and the Government shall negotiate in good faith to reach a commercially reasonable agreement on a further extension of this Agreement. If Refinery Operator and the Government are unable to reach such an agreement, then the expiration of the Term shall constitute a Termination Event for purposes of Section 16.3(A)(3).

## ARTICLE 3
## CLOSING; CLOSING CONDITIONS; TERMINATION BEFORE CLOSING

Section 3.1.   **Time and Place of Closing.**

(A)   **Closing.** Unless this Agreement shall have been terminated and the transactions herein contemplated shall have been abandoned pursuant to this Article 3, and subject to the satisfaction or waiver of the conditions set forth in Section 3.2 (other than

22

conditions, the fulfillment of which, by their nature, are to occur at the completion of the transactions contemplated by this Agreement (the "*Closing*")), the Closing shall take place at the same time and place as the closing under the Refinery Transfer Agreement, <u>provided</u> that all conditions precedent to Closing have been satisfied or waived by the appropriate party, but in any event no later than three (3) months following the Effective Date, unless otherwise extended for an additional three (3) months' period by mutual agreement of the Governor and Refinery Operator.

(B)     **Closing Date.** The date on which the Closing occurs is herein referred to as the "*Closing Date*".

Section 3.2.     <u>Conditions to Closing</u>.

(A)     **Condition Precedent.** This Agreement and all of its terms shall be subject to the ratification and approval of the Legislature and the placement of the signature of the Governor thereon.

(B)     **Conditions of the Government to Closing.** The obligations of the Government to consummate the transactions contemplated by this Agreement are subject, at the option of the Government, to the satisfaction or waiver by the Government, on or prior to Closing, of each of the following conditions:

(1)     All conditions precedent and other closing requirements pursuant to the Refinery Transfer Agreement have been satisfied or waived.

(2)     No order, writ, injunction or decree shall have been entered (and be in effect) by any Governmental Authority of competent jurisdiction prohibiting the transaction from proceeding; and no statute, rule, regulation or other legal requirement shall have been promulgated or enacted (and be in effect) by any Governmental Authority, that, on a temporary or permanent basis, restrains, enjoins or invalidates the transactions contemplated hereby.

(3)     Each of the representations and warranties of Refinery Operator contained in this Agreement shall be true and correct in all material respects.

(4)     Refinery Operator shall have performed and observed, in all material respects, all covenants and agreements to be performed or observed under this Agreement prior to or on the Closing Date.

(5)     Refinery Operator shall have delivered to the Government the items identified in <u>Section 3.3(A)</u>.

(C)     **Conditions to Refinery Operator Closing.** The obligations of Refinery Operator to consummate the transactions contemplated by this Agreement are subject, at the

23

option of Refinery Operator, to the satisfaction or waiver by Refinery Operator, on or prior to Closing, of each of the following conditions:

(1)    The Legislature shall have ratified and approved the transactions contemplated by this Agreement, and the terms and conditions of this Agreement and the signature of the Governor of the U.S. Virgin Islands (the "*Governor*") shall have been placed thereon.

(2)    The transactions contemplated by the Refinery Transfer Agreement and Amended Terminal Operating Agreement shall have closed.

(3)    No order, writ, injunction or decree shall have been entered (and be in effect) by any Governmental Authority of competent jurisdiction prohibiting the transaction from proceeding; and no statute, rule, regulation or other legal requirement shall have been promulgated or enacted (and be in effect) by any Governmental Authority, that, in each case, on a temporary or permanent basis, restrains, enjoins or invalidates the transactions contemplated hereby.  For the avoidance of doubt, nothing herein is intended to negate or obviate any condition or use restriction set forth in any permit, consent decree, or Environmental Law.

(4)    Each of the representations and warranties of the Government contained in this Agreement shall be true and correct in all material respects.

(5)    The Government shall have performed and observed, in all material respects, all covenants and agreements to be performed or observed by the Government under this Agreement prior to or on the Closing Date.

(6)    Terminal Operator shall have assigned or transferred its rights and obligations with respect to the Refinery Submerged Lands to Refinery Operator, as approved herein by the Government as set forth in Section 6.3 hereof, including the transfer of certain rights and obligations with respect to certain Refinery Submerged Lands currently occupied by Terminal Operator that appear on Appendix A as Refinery Submerged Lands for which the right to occupy and use is set forth in the Original Terminal Operating Agreement and included in the Refinery Transfer Agreement but for which it is understood by the Government no separate lease or permit exists for Terminal Operator to assign or transfer.

(7)    Refinery Operator shall have entered into definitive and comprehensive commercial documentation with one or more qualified and experienced companies for feedstock supply, product offtake and financial participation in the Refinery Restart and the conditions to effectiveness of such documentation shall have been satisfied or waived in accordance with the terms thereof.

Section 3.3    **Closing Deliveries**.

24

(A)    **Closing Deliveries of Refinery Operator.** At the Closing, upon the terms and subject to the conditions of this Agreement, Refinery Operator shall deliver, or cause to be delivered, to the Government, or perform or cause to be performed, the following:

(1)    A certificate duly executed by an authorized officer of Refinery Operator dated as of the Closing Date, certifying on behalf of Refinery Operator that the conditions set forth in Section 3.2(B)(5) have been fulfilled;

(2)    A certificate duly executed by an authorized officer of Refinery Operator dated as of the Closing Date, (i) attaching and certifying on behalf of Refinery Operator complete and correct copies of (x) the organizational documents of Refinery Operator, as in effect as of the Closing Date, and (y) the resolution of Refinery Operator authorizing the execution, delivery and performance by Refinery Operator of this Agreement and the transactions contemplated hereby and (ii) certifying the incumbency of each authorized representative of Refinery Operator executing this Agreement or any document delivered in connection with the Closing;

(3)    Evidence of payment of the Closing Payment by wire transfer in immediately available funds to a Government account at Bank of New York identified in advance by the Government in writing;

(4)    Certificates of insurance evidencing the insurance Refinery Operator has obtained, or caused to be obtained, as required pursuant to Article 10;

(5)    The executed Refinery Security Documents; and

(6)    The Financial Assurance identified in Section 8.5.

(B)    **Closing Deliveries of the Government.** At the Closing, upon the terms and subject to the conditions of this Agreement, the Government shall deliver, or cause to be delivered to Refinery Operator the documentation required pursuant to this Agreement, as well as to perform or cause to be performed its obligations under this Agreement, including evidence of the ratification and approval of the Legislature of the transactions contemplated by this Agreement and the terms of this Agreement, including the necessary signature of the Governor.

Section 3.4.    **Termination Before Closing**

(A)    **Termination.** This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing, upon fifteen (15) days' written notice to the non-terminating party:

(1)    By mutual written consent of the Government and Refinery Operator;

25

(2)    By Refinery Operator, if (i) there shall be any statutes, laws, rules, regulations, ordinances, orders, and codes of or by any Governmental Authority that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited; or (ii) a Governmental Authority shall have issued an order, decree, or ruling or taken any other action permanently restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated hereby, and such order, decree, ruling, or other action shall have become final and non-appealable; or (iii) any of the representations and warranties of the Government contained in this Agreement shall not be true and correct in all material respects at time of Closing; or (iv) the other party shall have failed to fulfill, in any material respect, any of its obligations under this Agreement required to be performed prior to or at Closing; or

(3)    By the Government, if (i) there shall be any statutes, laws, rules, regulations, ordinances, orders, and codes of or by any Governmental Authority (other than a U.S. Virgin Islands Governmental Authority) that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited; or (ii) a Governmental Authority (other than a U.S. Virgin Islands Governmental Authority) shall have issued an order, decree, or ruling or taken any other action permanently restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated hereby, and such order, decree, ruling, or other action shall have become final and non-appealable; or (iii) any of the representations and warranties of Refinery Operator contained in this Agreement shall not be true and correct in all material respects at time of Closing; or (iv) Refinery Operator shall have failed to fulfill, in any material respect, any of its obligations under this Agreement required to be performed prior to or at Closing.

(B)    **Effect of Termination.** · If (i) this Agreement is terminated pursuant to Section 3.4(A) or (ii) the Closing does not occur by the date provided in the proviso of Section 3.1(A), this Agreement shall become void and of no further force or effect, and the Original Terminal Operating Agreement shall remain in full force and effect unless otherwise terminated in accordance with its terms.

## ARTICLE 4
## REFINERY PERMITS

Section 4.1.    **Permits.**

(A)    Refinery Operator shall use commercially reasonable efforts to (i) obtain all current federal, territorial, and local Authorizations that are currently held by or issued to Terminal Operator, and any necessary modification(s) thereof, including but not limited to those under Environmental Laws, required to restart and maintain Refinery Operations as contemplated by the Agreement as soon as commercially reasonable and (ii) thereafter maintain such Authorizations. Refinery Operator shall use commercially reasonable efforts to obtain and maintain any other federal, territorial, and local Authorizations, and any necessary modification(s) thereof, including but not limited to those under Environmental Laws, in each case which, as of any date of determination, are necessary to be obtained by or on behalf of Refinery Operator at such time in light of the then current stage of development, construction

26

and/or operation of the Refinery to enable restart and maintain Refinery Operations in accordance with this Agreement as soon as commercially reasonable. The Government shall use commercially reasonable efforts to assist Refinery Operator in obtaining all such Authorizations. Notwithstanding the foregoing, the Parties shall cooperate with each other and use commercially reasonable efforts to support, and shall not interfere with or delay, any effort by the other Party or any other party to obtain and maintain all necessary federal, territorial, and local Authorizations, and necessary modification(s) thereof, including but not limited to those under Environmental Laws, to enable the Refinery Restart as soon as commercially reasonable.

(B)    Refinery Operator shall use commercially reasonable efforts to obtain and maintain all necessary approvals in order to restart Refinery Operations as soon as commercially reasonable, including approvals from the U.S. Department of Justice ("*USDOJ*"), the U.S. Environmental Protection Agency ("*EPA*"), the U.S. Virgin Islands Department of Planning and Natural Resources ("*DPNR*"), and the District Court for the District of the U.S. Virgin Islands ("*District Court*") to, among other things, add Refinery Operator as a named party defendant to the Clean Air Act Consent Decree and modify the Clean Air Act Consent Decree to restart Refinery Operations. Such efforts with regard to the Consent Decree shall include, but not be limited to, (i) working with the Government (and, if applicable, third parties) and negotiating with USDOJ, EPA, and DPNR the terms and conditions of one or more filings to add Refinery Operator as a named party defendant to the Clean Air Act Consent Decree and to so modify the Clean Air Act Consent Decree (and any proposed order(s) modifying the Clean Air Act Consent Decree), (ii) cooperating with USDOJ, EPA, and DPNR and taking such actions necessary to finalize and lodge with the District Court such filings and proposed orders, (iii) cooperating with and assisting as reasonably necessary USDOJ, EPA, and DPNR in responding to any public comments, and (iv) filing of any papers, provision of testimony, participating in any public meetings or hearings or court proceedings, or taking other actions reasonably necessary to support and seek District Court approval and entry of such modification. To the extent the Government is not directly involved in any aspect of Refinery Operator's efforts pursuant to this Section 4.1(B), Refinery Operator shall timely inform the Government of the status and outcome of such efforts.

(C)    Notwithstanding any other provision in this Agreement, the Government hereby acknowledges and agrees that Refinery Operator may surrender all or part of existing permits under the Clean Air Act for the Refinery in order to achieve (i) compliance with the Clean Air Act Consent Decree, provided that Refinery Operator shall use commercially reasonable efforts to achieve compliance that do not require surrender of the permit or part thereof or (ii) to the extent done in conjunction with the permanent shut down of the portions of the Refinery for which such permits or parts thereof are surrendered.

(D)    The Government shall cooperate with and assist Refinery Operator and Terminal Operator (if added as a party to the Clean Air Act Consent Decree) with respect to a modification to the Clean Air Act Consent Decree to toll or exempt Refinery Operator and Terminal Operator from fines, penalties and liabilities thereunder prior to the Closing or that

27

accrue from and after the Original Closing Date (as defined in the Amended Terminal Operating Agreement) or during periods when Refinery process units or equipment are idled.

## ARTICLE 5

## OPERATION OF THE REFINERY

Section 5.1.   **Independent Operation and Non-Interference.**

(A)   Refinery Operator and/or its permitted successors and assigns shall own and maintain the Refinery as a standalone facility pursuant to the terms and conditions of this Agreement from the Closing Date until completion of the Term.

(B)   The Government agrees and shall ensure that Refinery Operator shall have the right to (i) occupy and use the Refinery Site, including the Refinery Submerged Lands in accordance with the Submerged Lands Lease and Submerged Lands permits as assigned and approved pursuant to Section 6.3, and Applicable Law, (ii) operate the Refinery as set forth herein as an independent refinery facility, and (iii) perform its obligations hereunder without regard to any judicial proceedings with respect to previous owners of the Oil Refinery and Related Facilities or their Affiliates prior to or after the Closing, or the rights or claims of any successor in interest to or trustee of any such previous owner's or the Government's interests in the Refinery.

(C)   Refinery Operator shall perform all of its obligations under this Agreement and the other agreements or transactions related thereto, and shall use commercially reasonable efforts to cause its contractors, subcontractors and agents or employees and their authorized representatives to perform their obligations under the relevant Contracts, in a manner that does not unduly interfere with Terminal Operations (as defined in the Amended Terminal Operating Agreement).

(D)   The Government shall perform all of its obligations under this Agreement and the other agreements or transactions related thereto, and use commercially reasonable efforts to cause its contractors, subcontractors and agents or employees and their authorized representatives to perform their obligations, in a manner that does not unduly interfere with the Refinery Restart and the Refinery Operations.

(E)   The Government agrees that Refinery Operator shall not be nor be deemed a "public utility" under Applicable Law in connection with the operation of the Refinery or any agreement to provide services to any person or entity with operations at the Site or to the Government after Closing.

(F)   The Government acknowledges that Refinery Operator and Terminal Operator shall have the right to modify, expand, replace and operate the power generation and transmission facilities at the Site as they determine is necessary to provide appropriate power generation resources to the Terminal and, as appropriate, the Refinery. Refinery Operator

28

agrees that (1) to the extent there is excess power generation capacity at the Site, it will, upon the Government's request, work in good faith with the Government and the Terminal Operator to identify means of utilizing that excess capacity for the benefit of the U.S. Virgin Islands on terms to be embodied in a customary power purchase agreement, and (2) to the extent new or additional power generation capacity is required, Refinery Operator shall, consistent with its reasonable business judgment, take into consideration alternative sources of power such as wind, solar, or other non-fossil fuel based power generation facilities.

Section 5.2.   **Refinery Operations**. Refinery Operator shall perform all operations of or related to the Refinery and carry out its responsibilities under this Agreement, and shall use commercially reasonable efforts to ensure that its subcontractors perform all operations of or related to the Refinery, (i) in accordance with International Standards, (ii) as a reasonable and prudent refinery operator, in a sound and workmanlike manner, with due diligence and dispatch; (iii) in accordance with sound, workmanlike and prudent practices of the oil refining industry; and (iv) in compliance with Applicable Law. Refinery Operator shall develop safety and access procedures and policies of general application for access to the Refinery Site, including appropriate requirements for insurance to be carried by parties, vessels, and vehicles accessing the Refinery Site.

## ARTICLE 6
## ADDITIONAL OPERATING PROVISIONS

Section 6.1.   [RESERVED].

Section 6.2.   [RESERVED].

Section 6.3.   **Submerged Lands**.

(A)   Refinery Operator shall have exclusive rights and obligations (except as provided in the Shared Systems Services Agreement) with respect to certain Submerged Lands that are part of the Refinery Site as set forth in Appendix A as updated from time to time to the extent permitted under, or in furtherance of, this Agreement, and as transferred to Refinery Operator under the Refinery Transfer Agreement ("*Refinery Submerged Lands*"), in each case with respect to the occupancy and use of said land, rights and easements as contemplated herein, as follows:

(1)   the Government consents to and hereby approves the assignment by Terminal Operator to Refinery Operator of Terminal Operator's rights and obligations under the 1998 Letter Agreement, the Submerged Land Lease, and certain Submerged Lands Permits (as described below) to the extent such rights and obligations relate to Refinery Submerged Lands, so that upon such assignment Refinery Operator at Closing shall have all the rights and obligations as regards the occupancy and use of Refinery Submerged Lands (a) as the Lessee under the Submerged Land Lease and (b) as the Permittee under Submerged Lands Permit No. 3 and Amendments 1, 2, and 3 thereto, and under Submerged Lands Permit Nos. 23 and 52 issued by the United States Department of the Interior, and under Submerged

29

Lands Permit No. 167 issued by the Department of Conservation and Cultural Affairs of the Government of the U.S. Virgin Islands, as amended (which permit shall be considered current and valid), and the Government will execute whatever documents are necessary to make sure any Submerged Lands currently used by Terminal Operator which are not covered by any lease or permit can be occupied and used by Refinery Operator on the same conditions and terms as Submerged Lands Permit No. 3 and Amendments 1, 2, and 3 thereto, and under Submerged Lands Permit Nos. 23 and 52, which rights and obligations shall continue for the term of this Agreement, as such term is extended, and under Submerged Lands Permit No. 167 issued by the Department of Conservation and Cultural Affairs of the Government of the U.S. Virgin Islands, as amended, (which permit shall be considered current and valid and assigned to Refinery Operator) which rights and obligations shall continue for the term of this Agreement, as the term is extended, and under Coastal Zone Management permits CZX-24-93W, CZX-8-06W, and CZX-6-99W, and in each case the relevant permit and lease shall be hereby modified to the extent required to reflect the scope of Refinery Submerged Lands set forth in Appendix A (and for the avoidance of doubt, the Government acknowledges and agrees that Refinery Operator is granted and assigned and retains all of the rights and obligations under the Submerged Land Lease and Submerged Land permits as they relate to the occupancy and use of the Refinery Submerged Lands, except for that portion of the Refinery Submerged Lands on which Surface Impoundment No. 3 is located);

(2)    subject to Section 6.3(B), at Closing, the Government hereby recognizes and agrees that (i) as regards the Refinery Submerged Lands, Refinery Operator shall owe to the Government the indemnifications of Lessee as set forth in the Submerged Land Lease, and (ii) Terminal Operator shall be released by the Government, and the Government shall be released by Terminal Operator, with respect to such indemnities as regards the Refinery Submerged Lands;

(3)    subject to Section 6.3(B), at Closing, Refinery Operator shall be substituted for Terminal Operator, and Terminal Operator shall be released, and shall release the Government, under the 1998 Letter Agreement as regards the Refinery Submerged Lands;

(4)    subject to Section 6.3(B), as regards the Refinery Submerged Lands, the Government shall allow Refinery Operator to continue to use Submerged Lands Permit No. 3, Submerged Lands Permit No. 23, Submerged Lands Permit No. 52, and Submerged Lands Permit No. 167 on the terms set forth in the Amended Terminal Operating Agreement, and

(5)    subject to Section 6.3(B), as regards the Refinery Submerged Lands, Refinery Operator shall have the right to extend the term of the Submerged Land Lease for additional terms co-terminous with this Agreement.

(B)    For the avoidance of doubt, the Parties acknowledge that the releases effected by Section 6.3(A) are not intended to release Terminal Operator with respect to any environmental contamination of or damage to any properties or the Site that occurred during the period commencing on the "Closing Date" as defined in the Original Terminal Operating

30

Agreement and the Closing Date hereunder, whether now known or hereafter discovered, and that Refinery Operator is not required to assume liability for any such unreleased contamination or damage and related environmental liability of Terminal Operator. Nothing in this Section 6.3(B) shall change or modify (i) Refinery Operator's or Terminal Operator's liability for, or obligations with respect to, environmental contamination or damage to any properties prior to the Closing Date hereunder or (ii) any entity's liability for, or obligations with respect to, the RCRA Corrective Action.

(C)    Notwithstanding the provisions of Section 6.3(A) above, the term of the Submerged Land Lease and the use rights granted to Refinery Operator, including those granted under Permit No. 3, Permit No. 23, Permit No. 52, and Permit No. 167, to use or occupy any Refinery Submerged Lands or other lands shall not extend beyond the Term of this Agreement.

Section 6.4.    **Refinery Obligations**. Following the Effective Date, Refinery Operator shall undertake the following with respect to the Refinery:

(A)    **Refinery Evaluation Period**. For a period of not less than thirty-six (36) months following the Effective Date, as such period may be extended for successive one (1) year periods by Refinery Operator by ninety (90) days' written notice to the Government prior to its expiration (collectively, the "*Refinery Evaluation Period*"), Refinery Operator shall evaluate the prospects of the Refinery Restart, and shall take all commercially reasonable measures to facilitate such Refinery Restart. Refinery Operator shall certify, in writing, to the Government any achievement of a Refinery Restart within five (5) Business Days thereof. Without prejudice to the rehabilitation, construction, start-up and future operation of any existing or new units that are initiated prior to the completion of the Refinery Evaluation Period, in no event shall the Refinery Evaluation Period exceed five (5) years following the Effective Date. If Refinery Operator would be subject to material liability under the Clean Air Act Consent Decree notwithstanding Refinery Operator and the Government's efforts pursuant to Section 4.1(A), the Refinery Evaluation Period shall, at the option of Refinery Operator, be terminated for all or a subset of the Refinery prior to the end of the then-current Refinery Evaluation Period within ten (10) days of a written notice by Refinery Operator of termination of such Refinery Evaluation Period, to minimize any such liability.

(B)    **Refinery Deconstruction**. If (x) by the end of the Refinery Evaluation Period, no Refinery Restart has occurred or is planned to occur, Refinery Operator shall, within three (3) years following the end of such period, upon the Government's request in writing to so deconstruct (or at such earlier date as Refinery Operator may choose), undertake and complete the deconstruction of such parts of the above-grade Refinery as Refinery Operator determines, acting reasonably and in coordination with Terminal Operator, are unutilized and not necessary for the operation of the Terminal or (y) at any time during the implementation of, or following, the Refinery Restart, Refinery Operator, acting reasonably and in coordination with Terminal Operator, determines that parts of the above-grade Refinery, are unutilized and not necessary for the operation of the Refinery or the Terminal, then Refinery Operator may

31

undertake and complete the deconstruction of the parts of the above-grade Refinery so identified (in each case, the "*Refinery Deconstruction*"), subject to the following:

(1)    The Refinery Deconstruction shall be developed and implemented by Refinery Operator and shall include decommissioning and dismantling the portions of the Refinery that are the subject of a Refinery Deconstruction, using commercially reasonable precautions for the protection of human health or the environment (including, but not limited to, all precautions required by Applicable Law) and in each case consistent with continued industrial use of the Refinery Site, including any remaining above-grade structures, fixtures, equipment, and machinery comprised by the Refinery, and removing such above-grade structures, fixtures, equipment, and machinery from the Refinery Site, except for (i) any portions of the Refinery necessary to the Terminal, including the Shared Services Systems, and (ii) subject to Applicable Law, in connection with a Refinery Deconstruction pursuant to Section 6.4(B)(x) above any portions of the Refinery identified in writing by the Government on a schedule to be provided to Refinery Operator by the Government not less than sixty (60) days after the end of the Refinery Evaluation Period.

(2)    The Refinery Deconstruction shall be conducted at Refinery Operator's sole expense. To the extent the Refinery Deconstruction results in proceeds from the sale of structures, fixtures, equipment, or machinery, such proceeds will be distributed as follows:

(a)    For any Refinery Deconstruction occurring prior to the Refinery Restart, Refinery Operator shall retain one hundred percent (100%) of the net proceeds received by it in connection with any such sales and reinvest such proceeds to fund capital expenditures incurred or to be incurred by Refinery Operator and its Affiliates in connection with such Refinery Restart and, to the extent that a positive balance of any such proceeds remains with Refinery Operator following Refinery Restart, Refinery Operator shall pay to the Government 50% of any such remaining net proceeds in excess of five million Dollars ($5,000,000), after giving effect to the payment of the costs of such Refinery Deconstruction; and

(b)    For any Refinery Deconstruction occurring after the Refinery Restart, Refinery Operator shall retain the first five million dollars ($5,000,000) of net proceeds, and shall pay promptly to the Government fifty percent (50%) of any net proceeds in excess of five million dollars ($5,000,000), after giving effect to the payment of or irrevocable reserve for the costs of such Refinery Deconstruction.

(3)    Refinery Operator will assume no liability for the remediation of any environmental contamination that occurred prior to the Closing Date.

(4)    Nothing in this Section 6.4(B) or elsewhere in this Agreement shall prevent Refinery Operator from deconstructing or selling individual processing units or other assets of the Refinery prior to the end of the Refinery Evaluation Period, where Refinery

32

Operator has evaluated such unit or asset and determined that it is not necessary or appropriate for use in the Refinery Restart.

(5)    For the avoidance of doubt, Refinery Deconstruction shall not include any obligation to remove concrete pads or foundations.

(C)    **Purchase Options.**  Following the Closing and for the avoidance of doubt irrespective of whether any Refinery Deconstruction has occurred, to the extent Refinery Operator does·not own or have interests in certain real or personal property or Submerged Lands necessary to the operation of the Refinery, the Government acknowledges that (x) Refinery Operator or an Affiliate thereof shall be permitted to acquire from Terminal Operator, its Affiliates, or HERT (or the successors in interest thereto) (i) all or a portion of such property utilized primarily in connection with the Refinery for the purpose of expanding the Refinery, conducting refining or other processing operations, or other related commercial endeavors and (ii) rights, property and interests contemplated by the Shared Services Systems Agreement and (y) Terminal Operator shall have a similar purchase option under the Amended Terminal Operating Agreement.  The purchase price of such land shall be one Dollar ($1) per acre. The Government acknowledges that upon assignment by Terminal Operator of all or any portion of its rights under the Refinery Property Option Agreement, Refinery Operator may exercise the option to purchase Option Refinery Property as set forth in the Refinery Property Option Agreement, and that Refinery Operator may accept assignment of and exercise on its own behalf the Terminal Operator's rights, pursuant to Section 6.5(B) of the Amended Terminal Operating Agreement, to acquire some or all of the Option Parcels and have them included within the Refinery and the Refinery Site. Upon exercise of such option, the Parties shall execute and deliver such documents as are necessary or desirable to effectuate the sale and conveyance of the Option Refinery Property (as set forth in the Refinery Property Option Agreement) from the Government to Refinery Operator, including without limitation the Special Warranty Deed in the form set forth in Appendix F..

(D)    **Terminal Operator Obligations.**    Refinery Operator and the Government hereby acknowledge that in the event Refinery Operator fails to perform its obligations under paragraph (B) of this Section 6.4, Terminal Operator shall be required to undertake those obligations, as provided in the Amended Terminal Operating Agreement. Refinery Operator and the Government hereby acknowledge that Terminal Operator shall retain certain above-grade Shared Services Systems for the benefit of the Site.

### ARTICLE 7
### EMPLOYMENT

Section 7.1.    **Minimum Commitment.**

(A)    Refinery Operator acknowledges that the commitment to increased long-term employment at the Refinery is a material goal of the Government's entry into this Agreement.

33

(B)    Promptly upon Closing and for at least thirty (30) days after the Closing Date, and, thereafter, for at least one hundred and eighty (180) days prior to any planned Refinery Restart, Refinery Operator shall use commercially reasonable efforts to solicit U.S. Virgin Islands Residents for employment at the Refinery, including by (i) advertising all employment vacancies in appropriate local newspapers, television stations, radio stations, and online news outlets, and (ii) posting all such vacancies with the U.S. Virgin Islands Department of Labor.

Section 7.2.    **Resident Employment.**  Not later than eleven (11) months following the Refinery Restart and during any period of Refinery Operations, Refinery Operator shall use commercially reasonable efforts to ensure that not less than eighty percent (80%) of the Full-Time Employees at the Refinery, and not less than fifty percent (50%) of the Senior Management Employees at the Refinery shall be U.S. Virgin Islands Residents, such residency to be confirmed annually by the Commissioner of Labor for the remainder of the Term; *provided,* in each case, that such applicants are, in the reasonable opinion of Refinery Operator, qualified for purposes of the Refinery Operations.  For the purposes of this Article 7, individuals formerly employed by Terminal Operator, HOVENSA, HOVIC, or Pinnacle Services, LLC, for work at or regarding the Refinery or Terminal in the U.S. Virgin Islands in the ten (10) years preceding the Closing Date shall be considered U.S. Virgin Islands Residents.

Section 7.3.    **Hiring Preferences.**  To the extent that fewer than eighty percent (80%) of the Refinery's employees are U.S. Virgin Islands Residents for a particular calendar quarter, Refinery Operator shall (1) use commercially reasonable efforts to seek applicants for open positions from persons who are U.S. Virgin Islands Residents (and others who have demonstrable ties to such residents) and (2) in making hiring decisions, give preference for such positions to applicants who are U.S. Virgin Islands Residents; *provided,* that such applicants are, in the reasonable opinion of Refinery Operator, qualified for purposes of the Refinery Operations.  If, at the end of the following calendar quarter, after making such efforts and providing such preferences, fewer than eighty percent (80%) of the Refinery's employees are U.S. Virgin Islands Residents, Refinery Operator shall certify in writing to the Commissioner of Labor that meeting the eighty percent (80%) target was impracticable for the preceding calendar year and that Refinery Operator shall continue to make best efforts to meet the target in the succeeding calendar year.

Section 7.4.    **Non-Discrimination.**  Refinery Operator hereby agrees that no person, employee or applicant shall be excluded from participating in, or be subject to, discrimination in the performance of duties relating to or arising from this Agreement or the operations contemplated herein, on account of race, creed, color, sex, sexual orientation, religion, disability, national origin or veteran status.  Refinery Operator shall not discriminate in employment decisions, including but not limited to upgrading, demotion, transfer, recruitment, layoff, termination, rates of pay or other forms of compensation and selection for training.  Refinery Operator shall comply with Applicable Laws relating to employment matters, including those regarding posting of notices relating to workplace rights.

34

Section 7.5.    **Training and Continuing Education**. Refinery Operator shall annually contribute not less than two hundred thousand dollars ($200,000) for training and scholarships for residents of the U.S. Virgin Islands. That contribution shall include, without limitation, (A) increasing financial support for the University of the Virgin Islands' ("*UVI*") degree program in Applied Science of Process Technology, on substantially the terms set forth in Appendix E, *provided, however*, that (1) Refinery Operator shall be deemed to have satisfied its obligations set forth in Appendix E so long as Terminal Operator is satisfying its obligations under Section 7.4 of the Amended Terminal Operating Agreement, and (2) Refinery Operator shall no longer be required to satisfy any obligations set forth in paragraph 9 of Appendix E that require Refinery Operator to provide the UVI with access to the training school referred to therein (now owned by the Government) and (B) providing college scholarships to U.S. Virgin Islands students. In addition, throughout the Term of this Agreement, Refinery Operator shall use commercially reasonable efforts to create and operate at Refinery Operator's own cost and expense additional training programs for the purpose of maximizing employment opportunities at the Refinery for U.S. Virgin Islands Residents, including establishing training programs that will teach refining-related skills to qualified U.S. Virgin Islands Residents including: refinery safety, refinery operations, general refinery maintenance, environmental management, welding, instrument fitting, pipe fitting and electrical maintenance. Refinery Operator shall cooperate with UVI with respect to such programs.

## ARTICLE 8
## FINANCIAL OBLIGATIONS OF REFINERY OPERATOR

Section 8.1.    **Closing Payment and Related Payments.** At Closing, Refinery Operator shall pay to the Government forty million dollars ($40,000,000), constituting a partial prepayment of future Quarterly Refinery Payments (as provided in Section 8.2 below) (the "*Closing Payment*"), in addition to the thirty million dollars ($30,000,000) to be paid to the Government by Terminal Operator pursuant to Section 8.1(B) of the Amended Terminal Operating Agreement.

Section 8.2.    **Quarterly Refinery Payment**.

Subject to Section 8.2(D) and the occurrence of the Refinery Restart, Refinery Operator agrees to pay to the Government a quarterly amount (the "*Quarterly Refinery Payment*"), in lieu of payment of certain taxes exempted in accordance with Article 11, as follows:

(A)    Each Quarterly Refinery Payment shall be the sum of (x) the product of (i) twenty-two million five hundred thousand dollars ($22,500,000), and (ii) the fraction of the Contract Year covered by the applicable calendar quarter (or portion thereof, with respect to the calendar quarter during which the Refinery Restart occurs and the calendar quarter during which this Agreement terminates), *plus* (y) the applicable Margin Adjustment (which may be positive or negative), *provided*, that

(1)    except as provided in paragraph (B) of this Section 8.2, the sum of the Quarterly Refinery Payments for each Contract Year shall not be less than fourteen

35

million dollars ($14,000,000) (the *"Minimum Payment"*) or more than seventy million dollars ($70,000,000) (the *"Maximum Payment"*) (pro-rated to any portion of such Contract Year), and

(2)   all Quarterly Refinery Payments shall be retained by Refinery Operator and applied to reduce the Closing Payment Balance until the Closing Payment Balance is zero dollars ($0).

(B)   Notwithstanding any contrary provision of this Section 8.2:

(1)   if a Contract Year is a Turn-Down Year, then the Minimum Payment for such Contract Year shall be ten million dollars ($10,000,000). If in such Contract Year the Closing Payment Balance is greater than zero, all Quarterly Refinery Payments for such year shall be retained by Refinery Operator and applied to reduce the Closing Payment Balance until the Closing Payment Balance is zero dollars ($0);

(2)   if a Contract Year is a Severe Turn-Down Year, then the Minimum Payment for such Contract Year shall be zero dollars ($0); and

(3)   if during a Contract Year Refinery Operator provides three (3) months' advance written notice to the Government of its intent to discontinue Refinery Operations specifying a discontinuation date and, during such three (3) month period, proceeds to discontinue Refinery Operations, then each Quarterly Refinery Payment shall be reduced to zero dollars ($0) with effect from and after such discontinuation date, *provided*, that if Refinery Operator subsequently resumes Refinery Operations during the Term, the Quarterly Refinery Payment shall be calculated in accordance with this Section 8.2 from and after the date of such resumption of Refinery Operations.

(C)   **Certain Defined Terms**. As used in this Section 8.2, the following terms shall have the meanings set forth below:

(1)   *"ASCI Price"* shall be the simple average over the applicable quarter of the daily price per barrel quoted by Argus (on days when quoted) as "Argus Sour Crude Index (ASCI) month" (PA0006594).

(2)   *"Base Margin"* shall be the margin per barrel shown in Appendix D, it being understood that Appendix D shall include (i) a Base Margin for the Castilla Deemed Margin formula and (ii) a Base Margin for the ASCI Deemed Margin formula.

(3)   *"Castilla Blend Price"* shall be the simple average over the applicable quarter of the daily price per barrel quoted by Argus (on days when quoted) as "Castilla Blend diff to Ice Brent" (PA0010780) plus, if applicable, the ICE Brent index.

36

(4)    "*Contract Year*" shall mean a period of twelve (12) consecutive months starting on the date on which a Refinery Restart occurs and each twelve (12) consecutive month period thereafter, except that the Contract Year during which this Agreement terminates shall end on the date of such termination.

(5)    "*Deemed Margin*" shall be equal to (1) 0.1959 x NYH RBOB Price, *plus*, (2) 0.2434 x NYH ULSD Price, *plus*, (3) 0.3888 x USGC VGO Price, *less* (4) 1.00x Castilla Blend Price; *provided*, that, if for any period of at least two consecutive calendar quarters, (i) the volume of Castilla Blend exported from Covenas averages less than 200,000 barrels per day (as determined by reputable publications or sources to be agreed upon by the Refinery Operator and the USVI Government) and/or (ii) the average sulfur content of Castilla Blend increases to 2.25% or greater, Deemed Margin shall instead be thereafter equal to (1) 0.2094 x NYH RBOB Price, *plus*, (2) 0.3212 x NYH ULSD Price, *plus*, (3) 0.3410 x USGC VGO Price, *less* (4) 0.9187 x ASCI Price, *less* (5) 0.0813 x HSFO Price.

(6)    "*HSFO Price*" shall be the simple average over the applicable quarter of the daily price per barrel quoted by Argus (on days when quoted) as "Fuel oil 3% fob USGC" (PA0000829).

(7)    "*Margin Adjustment*" shall be equal to the product of (1) 18.4%, (2) (a) the Deemed Margin *less* (b) the Base Margin and (3) the Processed Volume. The Margin Adjustment may be positive or negative. In the event that the prices used in the Margin Adjustment formula are no longer available, the Margin Adjustment formula will first rely on any successor index for the same crude or product with the same specifications under the same terms at the same location. If such a successor index is not available, then Section 8.2(F) shall apply.

(8)    "*NYH RBOB Price*" shall be (i) the simple average over the applicable quarter of the daily price quoted by Argus (on days when quoted) for "Gasoline reg RBOB NYH barge fob prompt continuous" ( PA0002332) converted (as necessary) to dollars per barrel *less* (ii) the RINs Price.

(9)    "*NYH ULSD Price*" shall be (i) the simple average over the applicable quarter of the daily price quoted by Argus (on days when quoted) for "Diesel ULSD NYH barge fob prompt" (PA0004080) converted (as necessary) to dollars per barrel *less* (ii) the RINs Price.

(10)    "*Processed Volume*" shall be equal to the product of (a) the average actual daily volume of crude oil, fuel oil, and any residual oil processed (i) through any crude distillation unit, (ii) through any fractionator that feeds into the coker or (iii) directly through the coker at the Refinery Site, and (b) the number of days in the applicable calendar quarter. In the event that any volume is processed more than one time through a crude distillation unit, any fractionator that feeds into the coker or the coker or is processed through more than one of a crude distillation unit, any fractionator that feeds into the coker and/or coker, such volume shall be deemed to have been processed only once.

37

(11)    *"RINs Price"* shall be the simple average over the applicable quarter of the daily price quoted by Argus (on days when quoted) for "RIN Argus Renewable Volume Obligation year" (PA0012358) converted (as necessary) to dollars per barrel.

(12)    *"Severe Turn-down Year"* shall be any Contract Year in which the Processed Volume is less than ten thousand (10,000) barrels per day.

(13)    *"Turn-down Year"* shall be any Contract Year in which the Processed Volume is less than eighty-five thousand (85,000) barrels per day.

(14)    *"USGC VGO Price"* shall be the simple average over the applicable quarter of the daily per barrel price quoted by Argus (on days when quoted) for "VGO 0.5% USGC cargo del vs WTI" (PA0001097) plus, if applicable, the relevant WTI index.

(D)  ·  **Payment Terms.** Quarterly Refinery Payments shall be payable on the final day of the first, second, third, and fourth fiscal quarters of each calendar year. Any amounts owed at the end of the calendar year shall be paid within thirty (30) days after the end of such calendar year. To the extent that the relevant calculations are not determined within such quarterly periods, Refinery Operator shall make a provisional payment on such payment dates and thereafter, when the relevant calculations are finally determined, make such adjustments to the immediately following quarterly payment as may be required to ensure that Refinery Operator pays the appropriate Quarterly Refinery Payment.

(E)    **Operating Expense.** The Quarterly Refinery Payment shall be deemed an operating expense by Refinery Operator and shall be paid in lieu of the taxes, fees, and other payments that are Exemptions identified in Article 11.

(F)    **Replacement Index.**

(1)    All references in this Agreement to "Castilla Blend diff to Ice Brent (PA0010780)", "Gasoline reg RBOB NYH barge fob prompt continuous ( PA0002332)", "VGO 0.5% USGC cargo del vs WTI (PA0001097)", "RIN Argus Renewable Volume Obligation year (PA0012358)", "Fuel oil 3% fob USGC (PA0000829)", "Argus Sour Crude Index (ASCI) month (PA0006594)", and "Diesel ULSD NYH barge fob prompt (PA0004080)" (together, the *"Argus Indices"*) shall refer to the prices for such products as published by Argus Media Ltd or a successor thereof (*"Argus"*) on the relevant day.

(2)    In the event that (i) any of the Argus Indices ceases to exist or contain any of the data necessary to determine the Castilla Blend Price, the NYH RBOB Price, USGC VGO Price, the RINs Price, the HSFO Price, the ASCI Price, and/or the NYH ULSD Price (each, the *"Applicable Product Price"*), as applicable, (ii) Argus changes the basis for the determination of any of such data in a manner that is materially adverse to either of the Parties or (iii) there is a variation in the applicable products and Argus does not publish a price for such product, then, in any such case, the Applicable Product Price in question shall be based on

38

such alternative publication, index or manner as most closely approximates the pricing methods then adopted by firms in the refining and marketing industry for deliveries of comparable products at relevant locations and as reasonably acceptable to both Parties. In the event that no agreement is reached regarding an alternative pricing method in such a situation, then the matter shall be referred to an expert ("*Expert*") for determination in accordance with Section 8.2(G) below.

(G)    **Expert Resolution Procedures**. If a matter which arises under Section 8.2(F) is submitted to an Expert for determination or the Parties mutually agree in writing that any other matter should be referred to an Expert for determination, the following provisions shall apply:

(1)    For any matter submitted to an Expert pursuant to the provisions of this Agreement, the Parties hereby agree that the proceedings shall be conducted and the decisions rendered by the Expert within forty-five (45) days of the Expert's selection. Each Party shall propose a firm having appropriate expertise in the refining and marketing industry, and the firms selected by the Parties shall jointly select a third-party firm having appropriate expertise in the refining and marketing industry to serve as the Expert. The Expert may not have a material ongoing relationship with either Party; provided, however, that each of Refinery Operator or, in the case of the Government, the Governor, may waive such requirement in its sole discretion. The Expert, once appointed, shall have no *ex parte* communications with either Party concerning the matter before him or her. Within ten (10) days of the selection of the Expert, each Party will present to the Expert and to the other Party any information the Party believes relevant to its position, along with a proposed resolution of the matter. The Expert shall have ten (10) days to review the submissions and to make a single request of each Party for any additional information the Expert believes relevant to the determination of the matter. The Parties will have ten (10) days to respond to the Expert's request. The Expert shall then have fifteen (15) days to make his or her decision.

(2)    The Expert shall not be authorized to award costs, fees or expenses to the prevailing party. The Expert's decision shall be final and binding on the Parties save in the case of fraud or manifest error. The Parties shall bear their respective costs and expenses related to, or arising in connection with, any proceedings before an Expert. Each Party shall bear 50% of the fees and expenses of the Expert.

Section 8.3.    **Payment Recalibration**. The payment obligations provided for in Section 8.2 shall apply for the first ten (10) years of this Agreement. At the end of the tenth (10th) year, and again at the beginning of any extension of the Term, either Party may elect to either (A) maintain the payment obligations set forth in Section 8.2 or (B) recalibrate the payment obligations provided in Section 8.2 (a "*Payment Recalibration Election*"). If either Party makes a Payment Recalibration Election, then for each period beginning on or after the date such Payment Recalibration Election is made, the Quarterly Refinery Payment definition in Section 8.2(A) shall no longer apply and the Quarterly Refinery Payment shall thenceforth be an

39

amount equal to the Recalibration Amount with respect to such period (treating the applicable quarter as the relevant "period" for this purpose).

Section 8.4.   **Charitable Commitments**.   In any year in which it conducts Refinery Operations, Refinery Operator shall contribute a minimum of three hundred thousand Dollars ($300,000) per year (in addition to the $200,000 to be contributed to training and scholarships under Section 7.5) to charitable causes in St. Croix (which shall be charitable entities that consider themselves non-profit charitable entities under Section 501(c)(3) of the Internal Revenue Code). The beneficiaries of such contributions shall be subject to approval by the Office of the Governor, such approval not to be unreasonably withheld.

Section 8.5.   **Financial Assurance**

(A)   The Government acknowledges that Terminal Operator has provided financial assurance under the Original Terminal Operating Agreement in an amount of fifty million Dollars ($50,000,000) (the "*Existing Terminal Financial Assurance*") and agrees that, until separate Financial Assurance is provided as set forth in Section 8.5(B), Refinery Operator shall be entitled to benefit from such Existing Terminal Financial Assurance to support its obligations under this Agreement with respect to Refinery Site Restoration and Payment Default hereunder.

(B)   As soon as reasonably practicable after the Refinery Restart, Refinery Operator shall provide evidence of financial assurance (the "*Financial Assurance*") in an amount (the "*Guaranteed Amount*") equal to the lesser of (i) twenty five million Dollars ($25,000,000) and (ii) the net present value of the Minimum Payment for the balance of the Initial Term, discounted at ten percent (10%); provided, that notwithstanding the foregoing, the Financial Assurance will never be less than fifteen million Dollars ($15,000,000). The Financial Assurance will be available to support Refinery Operator's obligations under the Agreement with respect to Refinery Site Restoration and Payment Default. The Financial Assurance shall be in the form of (x) an irrevocable stand-by letter of credit covering the Guaranteed Amount to be issued by an international bank reasonably acceptable to the Government or (y) a guaranty from a parent company of Refinery Operator to the extent such parent company has an investment grade credit rating, in each case, in form and substance consistent with the terms of this Section 8.5.

Section 8.6.   **Government Carried Interest in Refinery Operator**.

(A)   **Carried Interest.**   Upon Closing, Refinery Operator shall grant to the Government the right to receive a fee (the "*Carried Interest*") from Refinery Operator or an Affiliate upon a Refinery Change of Control under this Agreement. The Carried Interest shall carry no governance rights, and shall entitle the Government to no distributions or other payments, except that upon the occurrence of such a Refinery Change of Control under this Agreement, Refinery Operator shall pay to the Government ten percent (10%) of the Transaction Value, calculated as set forth in clause (B) below.

40

(B)    **Transaction Value.** In the event of a Refinery Change of Control, the "*Transaction Value*" shall mean the greater of (x) the following amounts, and (y) zero (0), in each case expressed in Dollars:

(1)    In the event of a Refinery Change of Control, the Transaction Value shall be calculated as Refinery Operator's Total Realized Refinery Profit upon completion of the Refinery Change of Control transaction. For the avoidance of doubt, the Total Realized Refinery Profit from any Refinery Change of Control transaction shall be the same value used to calculate returns on capital to Refinery Operator's Owners.

(2)    In no event shall the Government's share of the Transaction Value be less than twelve million seven hundred fifty thousand Dollars ($12,750,000) so long as Refinery Operator's Total Realized Refinery Profit is greater than zero Dollars ($0).

Section 8.7.    **Fuel Oil Pricing.** If during the Term, the Refinery produces for sale or export fuel oil products then in use for power generation by the Virgin Islands Water and Power Authority or any public power generation entity of the USVI that is a successor thereto ("VIWAPA"), upon the request of VIWAPA the Parties shall enter into good faith negotiations for the sale of such fuel oil products of the same specification to VIWAPA at product prices for spot market cash sales that are (x) equal to or below the lowest prices at which Refinery Operator at the time provides products of the same specification to third-party purchasers on an FOB, spot basis, adjusted to reflect any additional costs (including logistics, storage, blending, processing and other refining costs) incurred by Refinery Operator and Terminal Operator in connection with any such sales or exports and (y) on terms reasonably similar to those of such third-party sales; *provided, however*, that (x) Refinery Operator shall not be required to extend any credit to VIWAPA in connection with any such sales or exports and (y) neither VIWAPA nor any Governmental Authority shall be permitted to resell any such fuel oil products.

## ARTICLE 9
## SECURITY INTEREST

Section 9.1.    **Payments Secured By Lien.**

Refinery Operator shall secure all of its payment obligations under Article 8 and Article 16 (the "*Payment Obligations*"), by granting to the Government, on the Closing Date, a mortgage lien on the assets transferred to Refinery Operator under the Refinery Transfer Agreement (the "*Refinery Secured Assets*") pursuant to a Mortgage and Security Agreement to be entered into between the parties consistent with the terms of this Article 9, and the notice of such lien on said personal property shall be reflected in a UCC-1 Financing Statement, fixture filing, or other similar document reasonably necessary to give notice (collectively, the "*Refinery Security Documents*"). Such security interest is hereinafter referred to as the "*Refinery Subordinate Security Interest*", provided that the Refinery Subordinate Security Interest shall only be enforceable on the terms and conditions provided herein and in the Refinery Security Documents and only to the extent there are any payment obligations under Article 8 or Article 16 which are due and payable at the time of any such enforcement, and provided that:

41

(A)    **Subordination.** (i) The lien of the Refinery Security Documents, and the payment and enforcement thereof, shall be subordinate and junior in all respects to any and all financing (except financing provided by Refinery Operator's Affiliates) incurred in connection with the acquisition, recapitalization (except for recapitalization with funds from Affiliates), development, construction, rehabilitation, expansion, or enhancement or operation of the Refinery (such financings and any obligations relating thereto, including the unpaid principal of and interest on the loans and all other obligations and liabilities owed to the Lenders thereunder, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses or otherwise being collectively referred to as the "*Senior Obligations*") and any easements between Refinery Operator and Terminal Operator, the burdened land of which is encumbered pursuant to a Refinery Security Document (the "*Easements*"). (ii) The Government expressly undertakes and agrees that, until such time as the Senior Obligations, together with all accrued and unpaid interest thereon and all other sums due and owing in respect thereof, shall have been paid in full in cash and all commitments thereunder shall have been terminated (such date being referred to herein as the "*Discharge Date*"), it shall not bring any legal action to enforce the Refinery Security Documents, including, without limitation, (x) foreclose, execute, levy, or collect on, take possession or control of (other than for purposes of perfection), sell or otherwise realize upon (judicially or non-judicially), or lease, license, or otherwise dispose of (whether publicly or privately), the Refinery Secured Assets or Easements, or otherwise exercise or enforce remedial rights with respect to thereto, (y) solicit bids from third Persons, approve bid procedures for any proposed disposition of the Refinery Secured Assets, conduct the liquidation or disposition of Refinery Secured Assets or Easements or engage or retain sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers, or other third Persons for the purposes of valuing, marketing, promoting, and selling the Refinery Secured Assets, or (z) enforce a security interest or exercise another right or remedy, as a secured creditor or otherwise, pertaining to the Refinery Secured Assets at law, in equity, or pursuant to the Refinery Security Documents. (iii) The Government expressly undertakes and agrees that, in addition to the self-operative provisions contained in this Section, it shall enter into a subordination agreement in recordable form with respect to the Easements if requested by Refinery Operator. Any such subordination agreement shall be . in form and substance reasonably acceptable to the Government.

(B)    **No Remedy Prior To Discharge.** Prior to the Discharge Date, the Government may not exercise any of its remedies under the Refinery Security Documents.

(C)    **Intercreditor Agreements.** In the event that any lender granting any Senior Obligations requires an intercreditor agreement or other customary documentation to confirm the subordination of the Refinery Security Documents and the agreement of the parties that the Government shall not enforce any of the remedies allowed pursuant to the Refinery Security Documents, the Government shall execute and deliver to such lender such intercreditor agreement and other customary documentation.

42

(D)  **Refinancing.** In the event of the refinancing of any of the Senior Obligations described above, the Refinery Subordinate Security Interest shall be subordinate to such refinancing, and the Government shall enter into such intercreditor agreement and customary documentation to confirm the subordination of the refinancing and the agreement of the parties that the Government shall not enforce any of its remedies allowed pursuant to the Refinery Security Documents prior to the Discharge Date.

Section 9.2.  **All Necessary Actions.** Refinery Operator shall take all actions, and execute all documents necessary, to grant, perfect, validate and provide notice of the Refinery Subordinate Security Interest, subject to those matters set forth on a Title Commitment to be obtained and delivered by Refinery Operator at or within a reasonable and customary after Closing.  To the extent permitted by Applicable Law, Refinery Operator authorizes the Government to file financing statements naming the Government as a subordinated secured party, and describing the Refinery, in any appropriate filing office.

Section 9.3.  **No Encumbrances.** In providing these liens and entering into this Agreement, Refinery Operator hereby represents and warrants that as of the date of delivery of any Title Commitment, such portions of the Refinery as are owned by Refinery Operator are owned free and clear of liens, charges, encumbrances, or defects created by or through Refinery Operator or its Affiliates on the Refinery, including charges, claims, deeds of trust, community property interests, pledges, equitable interests, liens (statutory or other), options, security interests, mortgages, or rights of first refusal, except (i) as otherwise disclosed in the Title Commitment, (ii) permitted liens as set forth in the Refinery Transfer Agreement or any easements, licenses, rights, liens and interests of Terminal Operator pursuant to the Shared Services Systems Agreement and separate easement or license agreements, and (iii) any liens, charges and encumbrances imposed by the Government or pursuant to Environmental Law.

## ARTICLE 10
## INSURANCE

Section 10.1.  **General Insurance.** Refinery Operator shall maintain or cause to be maintained at its own cost and expense, in full force and effect throughout the Term, with responsible insurance companies authorized to do business in the U.S. Virgin Islands, the types and limits of insurance as set forth in this Article 10. Such companies shall have an A.M. Best Insurance Reports rating of A- or better or otherwise be reasonably acceptable to the Government. Such insurance required to be maintained by Refinery Operator hereunder shall be primary without, in the case of commercial general liability, the right of contribution of any other insurance carried by or on behalf of the Government and any additional insured. The Government shall be named as an additional insured on all policies required under this Article 10. Notwithstanding anything to the contrary in this Agreement, Refinery Operator shall be deemed to have satisfied its obligations with respect to insurance policies required from it under this Article 10 if Refinery Operator is included as "additional insured" under the corresponding insurance policies maintained by Terminal Operator pursuant to the Amended Terminal

Operating Agreement and those policies provide coverage appropriate to and commercially adequate for the Refinery and Refinery Operations.

Section 10.2. **Insurance Requirements**. In addition to any insurance or demonstration of financial assurance or financial responsibility required under Applicable Law, Refinery Operator shall maintain in effect insurance of the following types and amounts of insurance coverage set forth below, *provided*, that, in each case, as of any date of determination, Refinery Operator shall be required to maintain or cause to be maintained solely such insurance requirements as are necessary to be maintained at such time in light of the then-current stage of development, construction and/or operation of the Refinery:

(A)    **Property Insurance**. Property Insurance, including physical damage and business interruption on the terms set forth below. The Property Insurance policy shall contain the following terms: coverage shall be provided in an amount not less than $250,000,000, for physical loss or damage except as hereinafter provided, including coverage for boiler and machinery (electrical and mechanical breakdown), transit, and off- site storage exposure, but excluding coverage for earthquake, flood and named wind for which coverage shall be provided in an amount not less than $75,000,000. Such policy shall include provisions for first-party and third-party pollution legal liability coverage for the Site in an amount not less than $20,000,000, and first party and third-party cleanup coverage for any Response in an amount not less than $100,000,000, in excess of any financial assurance demonstration pursuant to the federal Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901, et seq., and any financial responsibility demonstration pursuant to the federal Oil Pollution Act of 1990, as amended, 33 U.S.C. §§ 2701, et seq., and the U.S. Virgin Islands Oil Spill Prevention and Pollution Control Act, 12 V.I.C. §§ 701, et seq., in effect or required for the Oil Refinery and Related Facilities or any portion thereof. Any required payment of the deductible shall be the responsibility of Refinery Operator unless indemnified pursuant to this Agreement.

(B)    **Workers' Compensation Insurance.** Workers' compensation insurance, to the extent the exposure exists, to comply with statutory limits of the Workers' Compensation laws of the U.S. Virgin Islands, including coverage under the U.S. Longshore and Harbor Workers Compensation Act, where applicable, and Employer's Liability (including Occupational Disease) coverage with limits of not less than $1,000,000 each accident, $1,000,000 disease limit per employee and $1,000,000 disease policy limit. Workers' compensation insurance shall cover all of Refinery Operator's employees, contractors and subcontractors providing services to the Refinery.

(C)    **Commercial General Liability Insurance.** Commercial General Liability Insurance on an "occurrence" basis with a combined single limit of liability not less than $1,000,000 per occurrence, $2,000,000 general aggregate limit and $2,000,000 products completed operations aggregate limit (which includes pollution liability coverage for products). Subject to the terms of the policy, coverage shall include premises, operations, blanket contractual liability, independent contractors, products and completed operations and personal

44

injury coverages. The policy shall contain no exclusion for punitive or exemplary damages, unless excluded by law.

(D)    **Automobile Liability Insurance.** Automobile liability insurance, to the extent the exposure exists, covering any automobiles used in connection with the Refinery in an amount not less than $1,000,000 per accident for combined bodily injury, property damage or death.

(E)    **Umbrella or Excess Liability Insurance.** Umbrella/Excess Insurance covering claims in excess of the underlying insurance described in this Article 10, with a $20,000,000 minimum per occurrence and $20,000,000 annual aggregate, in excess of liability insurance set forth in this Article 10.

(F)    **Endorsements.** All policies of liability insurance to be maintained by Refinery Operator shall be written or endorsed to include the following:

(1)    **Severability.** A severability of interest and cross liability clause, with respect to Commercial General Liability, Automobile Liability and Umbrella or Excess Liability only.

(2)    **Refinery Operator Certificates.** Refinery Operator shall furnish to the Government certificates of insurance from each insurance carrier showing that the insurance required from Refinery Operator under this Agreement is in full force and effect. Refinery Operator or its insurer will provide the Government thirty (30) calendar days advance written notice (or 10 calendar days' notice in the case of cancellation due to non-payment of premiums) in the event of any material change to, nonrenewal of or cancellation of the required insurance. Certificates of insurance submitted under this Article 10 shall be in form and content reasonably acceptable to the Government. Certificates of each renewal of the insurance shall also be delivered to the Government promptly after received. Should any of the policies required to be maintained become unavailable or be canceled for any reason during the period of this Agreement, Refinery Operator shall immediately procure replacement coverage. In the event that Refinery Operator shall fail to provide proof of insurance as provided in this Section 10.2(F)(2) within thirty (30) days' receipt of written notice from the Government advising of such failure to provide proof of insurance, Refinery Operator shall promptly provide such proof of insurance to the Government. In the event that Refinery Operator fails to provide such proof of insurance then the Government may elect to file an action in specific performance to compel Refinery Operator to demonstrate proof of insurance, and to recover its reasonable attorneys' fees and costs in connection with such action.

(3)    **Descriptions Not Limitations.** The coverages referred to above are set forth in full in the respective policy forms, and the foregoing descriptions of such policies are not intended to be complete, nor to alter or amend any provision of the actual policies and in matters, if any, in which the said description may be conflicting with such instruments, the provisions of the policies of the insurance shall govern; provided, however,

45

that neither the content of any insurance policy or certificate nor approval thereof shall relieve Parties of any of their obligations under this Agreement.

(4) **Contractors.** Refinery Operator shall require all of its contractors and subcontractors (of any tier) to maintain insurance in the form and amount commensurate with the nature of the work or services that such contractor is providing on behalf of Refinery Operator.

(G) **Modification of Coverage Limits.** The coverage limits set forth in this Article 10 shall be subject to reasonable revision by mutual agreement of the Parties every five years, if necessary, to reflect inflation and changes in conditions or circumstances.

## ARTICLE 11
## TAX AND FEE EXEMPTIONS

Section 11.1. **Scope of Exemption.** Following the Effective Date, Refinery Operator and each of its Affiliates and Equity Holders that are engaged in acquiring, owning (directly or indirectly) or operating, in whole or in material part, the Refinery as set forth in this Agreement, as well as their respective customers, including Refinery processing services customers (the "*Customers*"), counterparties engaged in the supply of feedstock to, and/or offtake of products from the Refinery (the "*Supply and Offtake Counterparties*") with respect to (i) such Customers' and Supply and Offtake Counterparties' activities at the Site and (ii) any transactions with Refinery Operator and its wholly-owned subsidiaries relating to the Refinery or Refinery Operations, shall be exempt from payment of the taxes, fees, and other payments described in Section 11.2. In addition, to the extent any other party owns any portion of the Site or other real property adjacent or in close proximity to the Site and leases said portion to Refinery Operator or its Affiliates for use in operating the Refinery as contemplated in this Agreement (a "*Lessor*"), such Lessor shall be exempt from taxes imposed under Section 11.2(viii).

Section 11.2. **Exemptions.** For purposes of this Agreement, "*Exemptions*" shall include all Taxes, fees, excises, customs, duties, rents, royalties, withholdings, lease payments, permit fees, imposts and exactions, whether now existing or enacted hereafter, imposed by, with the consent of, or otherwise payable to, the Government, or any subdivision, agency or instrumentality thereof, on the acquisition, rehabilitation, construction, ownership (whether direct or indirect), operation, maintenance, expansion, transfer, sale of products, or any other activity contemplated by this Agreement, in respect of (i) the Refinery, (ii) the Refinery Site, (iii) the Refinery Submerged Lands (other than rental payments as set forth in this Agreement), (iv) the sale or transfer of any assets or rights or real estate to Affiliates, the Government or its designees, (v) the Shared Services Systems Agreement and the systems, rights and access contemplated thereby and (vi) property and assets acquired by the Refinery Operator as set forth herein, or any portion of such properties and assets, including materials, work in process and products thereof, and including importing, exporting, loading, unloading, discharging, storing, processing, blending, sale or purchase of oil, oil products or by-products including hydrocarbons, petrochemicals, biofuels or any other raw material or products thereof,

46

or any equipment or machinery imported for lease to or use in Refinery Operations. For the avoidance of doubt, the foregoing exemptions shall include specifically exemption from all:

(i)     income Taxes (including all Taxes measured by reference to income);

(ii)    excise Taxes;

(iii)   customs duties;

(iv)    fuel Taxes;

(v)     gross receipts Taxes;

(vi)    highway users' Taxes;

(vii)   production Taxes;

(viii)  property Taxes;

(ix)    franchise Taxes and annual report fees;

(x)     license fees;

(xi)    withholding Taxes (including any backup withholding) on any allocations or distributions to preferred or common Equity Holders of Refinery Operator or any of its Affiliates, profit sharing payments, or on any sale, transfer or other disposition by Refinery Operator or any of its Affiliates or Equity Holders of assets or equity interests relating to the activities referred to in the foregoing provisions of this Section 11.2;

(xii)   withholding Taxes (including any backup withholding) with respect to the transactions contemplated by the Refinery Transfer Agreement;

(xiii)  transfer Taxes;

(xiv)   recording fees; and

(xv)    hotel room and lodging Taxes with respect to hotel rooms and lodging located on the Site.

For the avoidance of doubt, the Exemptions shall include any taxes, fees, or duties that would otherwise be payable by Customers and Supply and Offtake Counterparties of Refinery Operator for the import, storage, blending, sale within the Refinery or export of petroleum products.

Moreover, all persons importing building or process materials, furnishings, applications, tools, consumables, supplies, feedstock, vehicles (leased or owned), mobile equipment (leased or

47

owned) or manufactured process equipment and other equipment specifically for use in the construction, operation, maintenance, or expansion of the Oil Refinery and Related Facilities, or importing materials for leasing to, consumption, processing, manufacturing, blending, or storage at the Oil Refinery and Related Facilities, shall be exempt from import duties and excise taxes on those imports upon presentation of a certificate of import duties and excise taxes exemption from an authorized representative of Refinery Operator. Such certificate shall be signed and dated by an authorized representative of Refinery Operator and specifically represent that "the materials, furnishings, applications, tools, consumables, supplies, feedstock, vehicles (leased or owned), mobile equipment (leased or owned) or manufactured process equipment and other equipment as shall be set forth in this invoice is being brought into the U.S. Virgin Islands for use in the construction, operation, maintenance, or expansion of the Oil Refinery and Related Facilities or is being leased to, consumed, processed, manufactured, blended, or stored at, the Oil Refinery and Related Facilities and is therefore exempted from the imposition of import duties and excise taxes (and similar taxes) as set forth in Section 11.2 of the Refinery Operating Agreement By and Among the Government of the U.S. Virgin Islands and Limetree Bay Refining, LLC dated July 2, 2018."

Section 11.3. **Limitations on Exemption**. For the avoidance of doubt, the foregoing Exemptions shall not be applicable to:

(i)     the employer portion of any and all payroll and employment taxes, including wage income withholding taxes, with respect to Refinery Operator's employees;

(ii)  ·  taxes owed under the Federal Insurance Contributions Act;

(iii)    any user fees of general application for use of public facilities;

(iv)    any tax or fee collected by the United States Federal Government that is not payable to the Government or any subdivision, agency or instrumentality thereof;

(v)     withholding taxes of general application imposed directly under Workmen's Compensation, unemployment insurance and other similar employee-benefit legislation with respect to Refinery Operator's employees; and

(vi)    the tire tax imposed by 33 V.I.C. § 80 and the container tax imposed by 33 V.I.C. § 75.

Section 11.4. **Tax Return Filings**. Refinery Operator shall file any tax returns it is required to file with the Virgin Islands Bureau of Internal Revenue, but except for the limitations on Exemptions set out in Section 11.3 above, shall not have any payment obligations as provided in this Agreement.

Section 11.5 **No Adverse Actions**. The Government hereby agrees and covenants with Refinery Operator that, except as otherwise provided in this Agreement and to

48

the fullest extent permitted by Applicable Law, the Government shall not take or fail to take any action, nor permit any action within its control to be taken or fail to be taken, which would or could cause Refinery Operator and each of its Affiliates, Equity Holders, Customers and Supply and Offtake Counterparties to lose any applicable tax exemptions granted to such parties pursuant to this Agreement.

## ARTICLE 12
## REPRESENTATIONS AND WARRANTIES

Section 12.1. **Government Representations**. The Government hereby represents and warrants to Refinery Operator as of the Effective Date and as of the Closing Date that:

(A)     The Government is not prohibited from consummating the transactions contemplated in this Agreement by any law, regulation, agreement, instrument, restriction, order, or judgment;

(B)     The Government has, upon ratification and approval of this Agreement by the Legislature: (i) the legal power, due authority and necessary and adequate funding ability to make the representations and perform its obligations set forth in this Agreement, or shall take all legally permitted and feasible actions necessary to obtain such legal power, due authority and necessary funding; and (ii) duly obtained such approvals, Authorizations, or consents in accordance with Applicable Law and procedures to the extent that the approval, Authorization, or consent of the federal or any other territorial or local government or agency or any third Person to make the representations and perform its obligations contained herein as required;

(C)     The Government knows of no impediment which would prevent, impede, diminish or delay its timely performance of its obligations hereunder;

(D)     There are no actions, suits or proceedings pending or, to the best of the Government's knowledge, threatened against or affecting the Government before any court or administrative body or arbitral panel that could reasonably be expected to have a material adverse effect on the ability of the Government to meet and carry out the obligations of this Agreement, other than those identified in Appendix B to this Agreement.

(E)     The Government confirms that the Refinery is zoned Industrial-1 ("I-1") under the U.S. Virgin Islands zoning laws. The improvements constructed on the property and the use of the property as an oil refinery comply with the requirements of I-1 zoning. Any resurvey of the property and the filing of new OLG maps with Cadastral will not affect the property's compliance with the I-1 zoning requirements, will not result in new zoning requirements being imposed upon the Refinery, or result in the existing improvements constructed as part of the Refinery, and the use of the property as an oil refinery, no longer complying with the requirements of I-1.

49

Section 12.2. **Refinery Operator Representations.** Refinery Operator hereby represents and warrants to the Government as of the date hereof and as of the Closing Date that:

(A)    **Organization and Authority.** It has been duly organized and is validly existing and in good standing under the laws of the U.S. Virgin Islands, with all necessary power and authority to enter into, deliver and perform all its obligations under this Agreement (including a valid license to do business in the U.S. Virgin Islands).

(B)    **Due Authorization; Enforceability.** This Agreement has been duly authorized and constitutes the legal, valid and binding obligations of it, and assuming the due authorization, execution and delivery of this Agreement by the Government, is enforceable against it in accordance with its terms. It has the absolute and unrestricted right, power, authority and capacity to execute and deliver this Agreement and to perform its obligations under this Agreement.

(C)    **No Conflict.** Neither the execution and delivery of this Agreement nor the consummation or performance of any of the transactions contemplated by this Agreement will, directly or indirectly (with or without notice or lapse of time) (1) contravene, conflict with or result in a violation of (i) any provision of its organizational documents, (ii) any Contract or other agreement by which it is bound, or (iii) any resolutions adopted by its board of directors, members or its stockholders or (2) contravene, conflict with, or result in a violation of Applicable Law (other than Applicable Law of the U.S. Virgin Islands) to which it or its Affiliates may be subject. There are no actions, suits or Proceedings pending or, to the best of its knowledge, threatened against or affecting it or its Affiliates before any court or administrative body or arbitral panel that could reasonably be expected to have a material adverse effect on its ability to perform its obligations of this Agreement.

(D)    **Consents and Notices.** It is not required to give any notice to or obtain any approval, consent, ratification, waiver or other authorization of any person (including any Authorization of any Governmental Authority other than the Government) in connection with the execution and delivery of this Agreement or the consummation or performance of any of the transactions contemplated by this Agreement.

(E)    **No Litigation.** Neither Refinery Operator nor any of its Affiliates is involved in any litigation, arbitration, or claim against the Government, except for claims arising in the ordinary course of Refinery Operator's business.

(F)    **Solvency.** There are no bankruptcy, reorganization or receivership proceedings pending against, being contemplated by, or, to its actual knowledge, threatened against Refinery Operator or any of the shareholders of Refinery Operator. Refinery Operator is solvent.

50

(G)    **Contaminants.** Refinery Operator has not disposed, stored or treated, or arranged for the disposal, storage or treatment, of any Contaminant that has come to be located at or on the Excluded Lands as described in Appendix A prior to the Closing Date.

## ARTICLE 13
## COVENANTS OF REFINERY OPERATOR

Section 13.1.  **Environmental.**

(A)    **Compliance.**  Refinery Operator shall comply, and shall cause the Refinery and the Refinery Site and all operations, activities and conditions at the Refinery Site to comply with all applicable Environmental Laws.  Refinery Operator shall not take, allow, or suffer any action, inaction, or condition at or in connection with the Refinery or the Refinery Site that causes or results in a Release or threatened Release that requires a Response or restoration, assessment, mitigation, or replacement of any natural resource at or in connection with the Refinery or the Refinery Site, or constitutes a violation of any Environmental Laws. In the event of such a Release or threatened Release of a Contaminant at or from the Refinery Site, Refinery Operator at its own cost shall promptly take all appropriate Responses and other actions required by applicable Environmental Laws to investigate, contain, clean up, remove, remediate, and otherwise respond to such Release or threatened Release, assess, restore, replace, or mitigate damaged natural resources, and otherwise protect human health and the environment and consistent with continued industrial use of the affected portions of the Refinery Site. For the avoidance of doubt, the Government's reasonable out-of-pocket costs and expenses it incurs (i) in oversight by DPNR of such actions, or (ii) if Refinery Operator fails promptly to conduct such Responses and the Government elects to conduct such Responses, shall be considered "Losses" for purposes of the indemnification obligation in Section 13.3(C) hereof. Nothing in this Agreement limits or precludes the Government from exercising its authorities under Environmental Laws or other Applicable Law in connection with any such Release or threatened Release.

(B)    **Due Care; Cooperation.**

(1)    Refinery Operator shall exercise due care with respect to all Contaminants at the Refinery and the Refinery Site, including but not limited to Pre-Existing Contamination, and all Contaminants Released or threatened to be Released at or from the Site or otherwise in connection with operations at the Refinery and the Refinery Site, shall take commercially reasonable precautions against foreseeable acts or omissions of any third party and the consequences that could foreseeably result from such acts or omissions, and shall comply with all Environmental Laws applicable thereto.

(2)    Refinery Operator shall cooperate and provide commercially reasonable assistance and access (where Refinery Operator possesses the legal authority to grant such assistance or access) to persons authorized by the Government to conduct Responses and/or natural resource restoration at the Site (including such reasonable

51

cooperation and access necessary for the installation, integrity, operation, and maintenance of any complete or partial Responses or natural resource restoration at the Site).

(3)    Refinery Operator shall (i) comply with land use restrictions established pursuant to Applicable Law in connection with Responses at the Refinery and the Refinery Site; (ii) not unreasonably interfere with or impede the effectiveness or integrity of any institutional or engineering control employed at the Site in connection with a Response; and (iii) comply with all reasonable requests for information or administrative subpoenas issued by the Government pursuant to Environmental Laws.

(4)    Refinery Operator shall, consistent with continued industrial use of the Refinery Site, take commercially reasonable measures, including at a minimum all measures required by Applicable Law, to (a) stop Releases at the Refinery or the Refinery Site; (b) prevent threatened or future Releases at the Refinery or the Refinery Site; (c) prevent or limit human, environmental, or natural resource exposure to Pre-Existing Contamination or other contamination at or from the Refinery or the Refinery Site; and (d) fund (through insurance, the Financial Assurance, and all other financial resources available to Refinery Operator) clean-up of all Releases occurring following the Closing Date and restoration of affected third-Person property and the environment.

(5)    Refinery Operator, and not the Government, shall have responsibility to comply with Environmental Laws regarding the Refinery and the Refinery Site as now or hereafter used or occupied by Refinery Operator, its Affiliate(s), or its designee(s), and Refinery Submerged Lands.

(6)    Refinery Operator shall comply with all Applicable Laws, including but not limited to Environmental Laws, with respect to the Refinery Operations and all other operations and activities conducted at the Refinery and Refinery Site.

(7)    To the extent not taken or performed by Terminal Operator, Refinery Operator shall, on behalf of HERT, take all actions and perform all obligations required to comply with the Resource Conservation and Recovery Act ("*RCRA*") and the Site's RCRA permit(s) and any modifications thereto and extensions thereof, including but not limited to all current and future treatment, storage, disposal, transportation, closure, post-closure, recordkeeping, reporting, financial assurance, corrective action, and remediation requirements thereunder or required by RCRA or any unilateral or consent order or decree relating to the facility or any contamination related thereto to the extent that such performance is funded by HOVENSA or HERT or, to the extent such funds prove inadequate, by amounts made available pursuant to the RCRA financial assurance demonstration for the Site, but only to the extent agreed to in writing by both EPA and DPNR. In no event shall Refinery Operator incur any liability for the environmental contamination that is the subject of the RCRA permit ("*RCRA Corrective Action*"), except to the extent that such liability results from a breach of Refinery Operator's representation in Section 12.2(G). Notwithstanding anything in this Section 13.1(B)(7) or elsewhere in this Agreement, the ongoing RCRA Corrective Action on

the Refinery Site shall be operated by HERT and shall not be the responsibility of Refinery Operator.

(C)    **Notification.** In the event that Refinery Operator becomes aware of any action or occurrence which causes or threatens a Release of a Contaminant at or from the Refinery or Refinery Site that constitutes an emergency situation or may present an imminent endangerment to human health or welfare or the environment, Refinery Operator shall immediately take commercially reasonable action (including at a minimum all action required by applicable Environmental Laws) to prevent, abate, or minimize such Release or threat of Release, and shall, in addition to complying with any applicable notification requirements under 42 U.S.C. § 9603 and any other Environmental Laws, promptly notify the Government of such Release or threatened Release.

(D)    **Permits.** Throughout the Term, Refinery Operator shall take all commercially reasonable actions, to the extent required by Applicable Law, promptly to file all applications for and obtaining, maintaining, modifying, and renewing all permits and other Authorizations required for Refinery Operator compliance with this Agreement.

(E)    **Applicable Law.** For the avoidance of doubt, nothing in this Agreement is intended to, or shall, relieve Refinery Operator of its obligation to comply with Environmental Laws.

Section 13.2. **Consents and Approvals.** Refinery Operator shall take all commercially reasonable actions, to the fullest extent permitted by law, to obtain promptly any Authorizations or other actions on the part of Governmental Authorities or of any officials, departments, agencies, or other instrumentalities thereof that may be necessary or appropriate in connection with rehabilitating and operating the Refinery and the Refinery Site.

Section 13.3. **Indemnification.** Refinery Operator shall defend, indemnify, and hold harmless and pay on a current basis the Government and its agents, officers, directors and employees and other representatives (each, a *"Government Indemnified Party"*) from and against any and all Losses incurred by a Government Indemnified Party arising out of or relating to Refinery Operator's obligations under this Article 13:

(A)    to the extent caused by any negligent act or omission (including strict liability), gross negligence or willful misconduct of Refinery Operator, its subcontractors or any of their respective agents or employees (but only with respect to Losses for injury, illness or death to any individual or damage to any property of any Person); or

(B)    to the extent caused by breach of Applicable Law by Refinery Operator, its contractors, or any of their respective agents or employees; or

(C)    to the extent caused by or arising out of a Release or threatened Release of a Contaminant, a Response, or an obligation under any Environmental Laws at, under, on, or with respect to the Refinery or the Refinery Site;

provided, however, that Refinery Operator shall not be required to indemnify any Government Indemnified Party for Losses to the extent that such Losses suffered by the Government Indemnified Party arose out of any grossly negligent act or omission (including strict liability) or willful misconduct of any Government Indemnified Party.

Section 13.4.  **Intercompany Agreements.**

(A)    **Terms.**    Any material intercompany agreements between Refinery Operator and Terminal Operator, other than the Refinery Transfer Agreement, Shared Services Systems Agreement or land and asset transfer, easement, joint use or lease agreements expressly contemplated by this Agreement, including any agreements contemplated by Section 6.4(C) (such agreements being "*Intercompany Agreements*"), shall be negotiated on arm's length, market based terms, except as would not have a material adverse impact on the Government or its rights or interests in this Agreement or the Amended Terminal Operating Agreement.

(B)    **Disclosure.** Refinery Operator shall disclose to the Government upon request all material Intercompany Agreements, including any amendments thereto.    The Government agrees that the terms of Intercompany Agreements shall constitute Confidential Information.

## ARTICLE 14
## GOVERNMENT COVENANTS

Section 14.1. **Assistance with Permits.** Throughout the Term, the Government shall take all commercially reasonable actions, to the fullest extent permitted by Applicable Law, to assist Refinery Operator (and, where applicable, its contractors and subcontractors), in Refinery Operator's expeditious filing of all applications for and obtaining, maintaining, and renewing all Authorizations required for Refinery Operator's compliance with this Agreement, including such appropriate Authorization, if any, as are required to maintain the exemption from the Jones Act of the current Oil Refinery and Related Facilities. The Government shall (i) take (and shall cause its relevant agencies, departments, political subdivisions and instrumentalities to take, including DPNR) all applicable actions to qualify the Refinery Site (and limit the liability of Refinery Operator) pursuant to the Virgin Islands Brownfields Revitalization and Environmental Restoration Act (Title 12, Sections 551-557), and regulations promulgated thereunder, and under any other relevant U.S. Virgin Islands law, and (ii) cooperate reasonably with Refinery Operator in qualifying the Refinery Site for similar brownfields treatment under applicable provisions of federal law (including without limitation RCRA). In each case, Refinery Operator will timely file and diligently prosecute any such applications. The Government shall take all feasible and lawful measures necessary to have all such Authorizations issued as soon as is practicable, and otherwise shall not delay or frustrate the application process. Without prejudice to the generality of the foregoing, the Government (without limiting its permitting or enforcement discretion and in compliance with Applicable Law) shall use reasonable efforts to minimize processing time for reviewing various permits (including any Coastal Zone Management permits) related to (i) the Refinery, (ii) modifications

54

to existing units or installation of new units or tanks at the Refinery Site and (iii) exercising delegated authorities from the U.S. Government in respect of relevant matters. Refinery Operator or Terminal Operator may propose to the Government such Section 325 waivers of the Clean Air Act as either party may believe would benefit Refinery Operations, Terminal Operations or the Government, including, but not limited to, waivers of visibility implementation plan requirements or contemporaneous netting periods. Notwithstanding Applicable Law in the U.S. Virgin Islands, Refinery Operator may elect to be added as a co-permittee, co-holder, or sole holder of any environmental Authorization issued to Terminal Operator by the Department of Planning and Natural Resources by giving Notice to the Government, and Refinery Operator's election shall be effective as of the time Notice is effective under Section 19.1 and Refinery Operator shall have as of such effective time the rights and obligations of a permittee or holder of such Authorization, unless such election violates federal Applicable Law; *provided that* any election by Refinery Operator to be added as a sole holder of an environmental Authorization shall be subject to the consent of DPNR, such consent not to be unreasonably withheld.

Section 14.2. **Consents and Approvals**. The Government undertakes to use its commercially reasonable efforts in good faith to assist Refinery Operator to obtain promptly any consents, approvals, clearances, determinations, or other actions on the part of the U.S. Government or of any officials, departments, agencies, or other instrumentalities thereof that may be necessary or appropriate in connection with operating the Refinery.

Section 14.3. **Beneficial Use**. Without the prior written consent of Refinery Operator, which consent may not be unreasonably withheld, conditioned or delayed, the Government, except to the extent required by Applicable Law, shall not take, approve, assist or allow any action, or fail to take, approve, assist or allow any action, if such action or failure to act, as the case may be, is reasonably likely to materially adversely affect, diminish or impair the beneficial use, operation, utility or occupancy of the Oil Refinery and Related Facilities in compliance with this Agreement or the ability of Refinery Operator in compliance with this Agreement to beneficially use, occupy, obtain, receive or otherwise enjoy any of: (i) the physical sites, facilities, improvements, programs, financial incentives or other benefits existing as of the Effective Date and/or contemplated by any portion of this Agreement, including without limitation the Shared Services Systems or (ii) the obligations or other commitments of the Government contemplated by, or set forth in, this Agreement; provided, however, that nothing in this Section 14.3 shall impair the Government's right to enact laws, regulations, or policies of general application for the preservation of public health and safety. If the Amended Terminal Operating Agreement is suspended for any reason while this Agreement remains in effect, the Government shall allow access to and use by Refinery Operator of the Terminal as reasonably determined by Refinery Operator to be necessary or appropriate for the continued operation, maintenance and use of the Refinery; provided, that Refinery Operator shall notify the Government prior to exercising such access right. If the Amended Terminal Operating Agreement is terminated while this Agreement remains in effect, Refinery Operator shall have the right to, upon notice to the Government, access the Terminal, and assume, exercise and perform all of the rights and obligations of the Terminal Operator under the Amended Terminal Operating Agreement for the remaining term of this Agreement; provided, that Refinery

55

Operator shall deliver a written notice of assumption to the Government agreeing to comply with the terms of the Amended Terminal Operating Agreement (upon which the terms of the Amended Terminal Operating Agreement shall be deemed to be effective with respect of Refinery Operator and the Government for the remaining term of this Agreement). In connection with any such assumption the Government shall provide such documentation as may reasonably be requested by Refinery Operator or its Lenders.

Section 14.4. **Other Legislation**. The Government agrees to use reasonable efforts to oppose any proposed legislation, initiative, act, event, plan, or proposal which would otherwise have the effect of avoiding or materially reducing any of the obligations or commitments as set forth in this Agreement. To the extent an initiative would negatively impact the full performance after the Effective Date of any or all of the obligations or commitments made by the Government, the Government shall take all legally and commercially appropriate steps to defend the obligations and commitments contained herein. For the avoidance of doubt, any new taxes (but not generally applicable user fees) adopted by the Government shall be treated as exempted payments under Section 11.2.

Section 14.5. **Change in Law**. The Government acknowledges that Refinery Operator has entered into this Agreement in material reliance on each and all of the obligations and commitments of the Government under this Agreement. The Government represents, warrants and covenants to Refinery Operator that in the event of a Qualifying Change in Law, the result of which would be to materially (a) diminish, impede, impair, or prevent the full performance after the Closing Date of any or all of the obligations and commitments made by the Government or Refinery Operator under this Agreement, (b) increase the obligations of Refinery Operator to the Government under this Agreement, or (c) reduce the rights of Refinery Operator under this Agreement, the Government, upon prompt written request of Refinery Operator, shall (i) exercise reasonable efforts to provide Refinery Operator with an exemption from the relevant Applicable Law as so changed and (ii) to the extent such an exemption would not remedy the impact of the Qualifying Change in Law, agree to such amendments to this Agreement as may be reasonably necessary. In the event of a Change in Law that is not a Qualifying Change in Law but that has any of the impacts set forth in clauses (a), (b) and (c) above, upon prompt written request of Refinery Operator the Government shall promptly engage in good faith negotiations to seek to agree and implement any reasonable amendments to the Agreement that would be reasonably necessary to remedy the negative impact of such Change in Law. Refinery Operator shall make all commercially reasonable efforts to mitigate the adverse effects of the Qualifying Change in Law or Change in Law.

Section 14.6. **Other Benefits**. Refinery Operator and its Affiliates shall not be precluded by reason of this Agreement from applying for benefits under legislation hereafter enacted for which it or they would otherwise qualify, but to the extent such benefits are inconsistent with its or their obligations and commitments under this Agreement, the terms of this Agreement shall govern.

56

Section 14.7. **No Additional Cost to Refinery Operator**. The Government shall fully fund and perform its obligations under this Agreement, and at no time shall Refinery Operator be responsible for or be required to incur or pay any cost, charge or expense under this Agreement relating to those obligations (or any agreement executed pursuant hereto) unless this Agreement (or the agreement executed pursuant hereto) specifically identifies a cost, charge or expense to be borne or paid by Refinery Operator.

Section 14.8. **Zoning; Legal Descriptions**. The Parties acknowledge that the legal description of parcels of land located in the U.S. Virgin Islands must be described on a survey (an official OLG map) filed with and approved by the Office of Public Surveyor, Office of the Lieutenant Governor (Cadastral). To the extent any of the official OLG maps showing all or any portion of the Refinery Site or the Refinery Submerged Lands need to be modified to permit such lands to be properly conveyed to Refinery Operator by Terminal Operator under the Refinery Transfer Agreement or this Agreement or to the Government by Terminal Operator under this Agreement, then the Government agrees to cooperate with Terminal Operator and Refinery Operator to have new or revised surveys of such lands promptly reviewed and approved by the Cadastral department and to have the legal descriptions on the proposed deeds conveying such lands to be promptly reviewed and attested by the Cadastral department. The Government will provide such information and assistance as Refinery Operator may reasonably request in connection with the legal descriptions, leases and permits pertaining to the Refinery Site and the Refinery Submerged Lands. Notwithstanding any provision of chapter 3 of Title 29 of the Virgin Islands Code, the Government agrees (a) that in the event Terminal Operator or Refinery Operator exercises an option to purchase some or all of the Option Parcels, then it shall be a legally permissible use of the "Construction License Area" described in Appendix A to be used as an area for storage of construction materials and access relating to improvements to be made upon all or any of the Option Parcels; (b) that it shall be a legally permissible use of portions of the Site, including, but not limited to, plots 53 and 53-C Estate Castle Coakley to be used for housing for Terminal Operator's and Refinery Operator's employees and contractor employees, provided that such housing would qualify as permitted use under R-4 Zoning; and (c) that the use, for purposes of the Oil Refinery and Related Facilities, of the Site is hereby approved.

Section 14.9. **Security**. The Parties acknowledge that the Site is (i) a covered chemical facility for purposes of 6 CFR Part 27, (ii) regulated by 40 CFR Parts 68, 355, 370 and 372 and 33 CFR 105.305, and (iii) required by regulation and International Standards to implement appropriate security measures. The Parties hereby acknowledge and agree that (a) Site security is primarily the responsibility of Refinery Operator, and (b) the Parties shall cooperate with each other and use commercially reasonable efforts to support security measures for the Site required by Applicable Law or International Standards, including, but not limited to, perimeter access, securing Site assets, screening and control of access to the Site and steps needed to deter, detect and delay security breaches. The Government undertakes to use its commercially reasonable efforts in good faith to assist Refinery Operator to obtain promptly any consents, approvals, clearances, determinations, or other actions necessary for Refinery Operator to comply with Applicable Law and International Standards relating to Site security.

## ARTICLE 15
## REPORTING, AUDIT AND INSPECTION

Section 15.1.  **Reporting**. Refinery Operator shall provide to the Government (i) not later than ninety (90) days following the close of its fiscal year, annual financial statements in accordance with Generally Accepted Accounting Principles, which shall be audited by a certified public accounting firm acceptable to the Government, (ii) not later than forty-five (45) days following the close of each fiscal quarter, unaudited quarterly financial statements, and (iii) on the date of each Quarterly Refinery Payment, the documentation supporting the calculation of such Quarterly Refinery Payment (including the Margin Adjustment) for such fiscal quarter, such deadlines subject in each case to reasonable extensions as may be required to accord with customary practice in the U.S. Virgin Islands. Refinery Operator shall provide quarterly employment information to the U.S. Virgin Islands OMB and the U.S. Virgin Islands Department of Labor for purposes of confirming compliance with Article 7. Refinery Operator shall notify the Government of any material change in the direct ownership of Refinery Operator, including but not limited to any transfer of ownership to an Affiliate, within thirty (30) days of such change.

Section 15.2.  **Annual Audit**.

(A)    For the purpose of determining compliance with this Agreement and with Applicable Law, on or about March 31st of each calendar year following the Effective Date, the Government may initiate and conduct an audit of the books, accounts, and records of (a) the Refinery, and (b) Refinery Operator, to the extent such books, accounts, and records relate to the Refinery or its operations (such audit being an *"Annual Audit"*).

(B)    Upon completion of any Annual Audit, the Government may prepare a report describing the results of such Annual Audit (an *"Annual Audit Report"*) and shall make any such report available to Refinery Operator upon request.

(C)    Following receipt of any Annual Audit Report, Refinery Operator shall have not more than sixty (60) days in which to review such report and identify in writing any material errors or omissions therein. Any alleged material errors or omissions not so identified within the 60-day period are waived, and may not be asserted by Refinery Operator in any subsequent administrative, judicial, or quasi-judicial proceeding.

(D)    Nothing in this Section 15.2 shall constitute a waiver or limitation on the Government's tax assessment, audit, investigation, enforcement, and collection authorities.

Section 15.3.  **Inspection**.

(A)    Upon fourteen (14) days' advance written notice to Refinery Operator, the Government may initiate an inspection of the Refinery for the purpose of determining compliance with this Agreement and with Applicable Law.

58

(B)    Refinery Operator hereby consents to such inspections and agrees to provide reasonable access and assistance to the personnel conducting such inspections.

(C)    To the extent any inspection conducted under this Section 15.3 reveals violations of this Agreement or Applicable Law, the Government hereby agrees to provide notice in writing of such violations within ten (10) days of the Government's determination of such violation.

(D)    Upon receipt of notice of violation, Refinery Operator has thirty (30) days to submit either proof that Refinery Operator has (i) remedied the violation and has restored compliance with this Agreement or Applicable Law or (ii) provided a plan and time reasonably acceptable to the Government to remedy such violations.

(E)    Nothing in this Section 15.3 shall constitute a waiver or limitation on the Government's or other Governmental Authorities', audit, investigation, inspection, enforcement, subpoena, right of entry and access, and collection authorities or the ability to levy fines, penalties or other remedies in connection with violation of Applicable Law, consistent with this Agreement.

## ARTICLE 16
## DEFAULT AND TERMINATION

Section 16.1    **Payment Default.** In the event that Refinery Operator fails to make any payments due and owing to the Government under this Agreement, then the Government shall have the right to give written notice to Refinery Operator of such failure, and in the event that such payment is not cured within ninety (90) days of such written notice (such failure being a "*Payment Default*"), then:

(A)    the Government shall have the right to recover any outstanding payments from the issuer of the Financial Assurance; and

(B)    to the extent any of Refinery Operator's payment obligations to the Government remain outstanding after the exercise by the Government of its remedies under clause (A) above, the Government shall have the right to exercise its Subordinate Security Interest to the extent permitted by Article 9.

Section 16.2.    **RESERVED.**

Section 16.3.    **Termination.**

(A)    **Termination Events.** Notwithstanding anything herein to the contrary, upon the occurrence of any of the following events (each a "*Termination Event*"), this Agreement may be terminated upon thirty (30) days prior written notice of such termination (a "*Termination*"), as follows:

59

(1)    By the Government, if Refinery Operator is in Payment Default, or;

(2)    By either party, if the other party is in breach of any material obligation hereunder and fails to cure such material breach within ninety (90) days following written notice thereof; and

(3)    Without further action by either Party, if the Initial Term of the Agreement expires without exercise of an Extension or upon expiration of such Extension.

(B)    **Site Restoration.**    Upon Termination, and at the option of the Government, Refinery Operator shall, at its own expense, to the extent not already decommissioned pursuant to the terms hereof, remediate and restore the Refinery Site (the *"Refinery Site Restoration"*) by undertaking the following actions:

(1)    decommissioning the Refinery to the extent required to keep the Refinery inactive and in-place in accordance with Environmental Laws and regulations of the United States Coast Guard, except for (i) any portions of the Refinery reasonably necessary to meet the access needs of St. Croix, and (ii) any other portions of the Refinery the Government may designate, each as identified in writing by the Government on a schedule to be provided by the Government within sixty (60) days of Termination (all decommissioned equipment, the *"Decommissioned Equipment"*); and

(2)    disconnecting the control and electrical systems and removing hydrocarbons and Contaminants from the Decommissioned Equipment, and otherwise ensuring that the Refinery Site is in a condition that complies in all material respects with applicable Environmental Laws for ongoing heavy industrial uses permitted on the Site.

(3)    The Refinery Site Restoration shall be undertaken by Refinery Operator. Completion of the Refinery Site Restoration shall be certified by an independent environmental engineer or environmental professional.

(4)    For the avoidance of doubt, the Refinery Site Restoration shall not require Refinery Operator to remediate any environmental contamination for which it is not otherwise responsible under Applicable Law or this Agreement.

(5)    Refinery Operator and the Government hereby acknowledge that in the event Refinery Operator fails to perform its obligations under paragraph (B) of this Section 16.3, Terminal Operator shall be required to undertake those obligations, as provided in the Amended Terminal Operating Agreement.

(C)    **Transfer of Site.**    At the Government's option, either prior to or following the decommissioning activities set forth in Section 16.3(B) following a Termination, Refinery Operator shall transfer the Refinery Site (including, for the avoidance of doubt, such parts of the Refinery that remain on the Terminal Site, subject to Terminal Operator's rights

60

under the Shared Services Systems Agreement) to the ownership of the Government; provided, that Refinery Operator shall have all required access to the Refinery Site to complete its decommissioning obligations hereunder.

(D)    **Effect on Agreement.** If this Agreement is terminated in accordance with Section 16.3(A), then this Agreement shall be of no further force and effect, except that Articles 1, 9, 16, 17, and 19 shall survive termination of this Agreement indefinitely and the provisions of Article 11 shall continue to apply without exception to all parties covered thereby as set out in Section 11.1 until the date of termination following a Termination Event.

Section 16.4. **Rights and Remedies Cumulative.**    Except as expressly provided in this Agreement, all rights and remedies of any Party against any other Party and any permitted assignee of such other Party provided in this Agreement shall be deemed cumulative and not in lieu of, or exclusive of, each other or of any other right or remedy available to any Party at law or in equity, and the exercise of any right or remedy, or the existence herein of other rights or remedies, shall not prevent the exercise of any other right or remedy.

## ARTICLE 17
## CONFIDENTIALITY

Section 17.1.  **Confidentiality.**

(A)    Each Party shall, from time to time, require or acquire Confidential Information.

(B)    The Government and Refinery Operator shall disclose the same to each other as required to advance their rights and obligations hereunder.

(C)    The receiving Party shall not, directly or indirectly, in any manner whatsoever, at any time whatsoever, disclose Confidential Information to any other party whatsoever, except that the receiving Party, may disclose Confidential Information to its advisors, as required by lenders, Affiliates, directors, officers, employees, agents, consultants or representatives; provided that the receiving Party, takes all reasonable steps to ensure that each of any such parties are bound by the terms and conditions of this Article 17, including the provision not to disclose any Confidential Information to any party whatsoever.

(D)    The obligations of each Party under Section 17.1(C) do not apply to the following information:

(1)    information provided to the Legislature of the U.S. Virgin Islands in connection with the submission of the Agreement to the Legislature for ratification;

(2)    information required to be disclosed or retained by each other by the laws of any applicable jurisdiction, including any law, order, subpoena or document discovery request or pursuant to a binding requirement of any regulatory or tax authority;

provided that prior written notice is given to the disclosing Party, to the extent permitted under any Applicable Law, as soon as possible in order to afford the disclosing Party, an opportunity to seek a protective order;

(3) information which enters the public domain other than through any breach of the terms and conditions of this Agreement by the receiving Party;

(4) information lawfully made available to the receiving Party by another party free to make such disclosure without breach of any legal obligation;

(5) information already in the possession of the receiving Party at the time of its receipt of the same from the disclosing Party, except to the extent that it has been unlawfully appropriated; and

(6) information developed by the receiving Party independent of Confidential Information received from the disclosing Party.

(E) Any presentations, analyses or data of Refinery Operator created, shared or conveyed in connection with this Agreement shall be deemed to constitute trade secrets of Refinery Operator and shall remain confidential pursuant to Title 3, Chapter 33, Section 881(g)(3) of the U.S. Virgin Islands Code.

## ARTICLE 18
## FORCE MAJEURE

Section 18.1. **Force Majeure Events**. For the purposes of this Agreement the term "*Force Majeure Event*" shall mean any cause that is reasonably unforeseeable as of the date of this Agreement and that is beyond the reasonable control, directly or indirectly, of the Party affected and with the exercise of due diligence, could not be prevented, avoided or removed by such Party, and does not result from such Party's negligence or fault and that wholly or partly delays or prevents such Party's performance of its obligations under this Agreement, including (to the extent meeting the foregoing requirements): war (whether declared or not) or other armed conflict terrorism; civil insurrection; declaration of martial law; piracy; nuclear accidents; widespread electrical outages; lightning strikes, earthquakes; fires; tornadoes; hurricanes; volcanic activity; accidents; strikes; lockouts or other labor actions (however, specifically excluding the labor force under the control of the Party experiencing such labor actions); actions or omissions of a Governmental Authority (including the actions of the Government in its capacity as a Governmental Authority or in the exercise of its Governmental Functions, or failure to issue an Authorization) that were not voluntarily induced or promoted by the affected Party, or brought about by the breach of its obligations under this Agreement or any Applicable Law. The Parties expressly agree and acknowledge that the list of Force Majeure Events in the foregoing sentence is intended as an inclusive list rather than an exhaustive list. Notwithstanding anything to the contrary, the term Force Majeure Event shall not be deemed to include (a) lack of funds or the availability of financing; (b) equipment failure, unless the claiming Party can point to an independent, identifiable Force Majeure Event that caused such

62

failure; (c) acts or omissions of subcontractors (of any tier) except to the extent such subcontractors if they were a party hereto, would be able to claim a Force Majeure Event for the same or (d) changes in law other than changes in the Applicable Laws of the Government of the U.S. Virgin Islands or changes in Applicable Laws with disproportionate effect on, or targeted at, investors in the U.S. Virgin Islands. Upon the occurrence of a Force Majeure Event the Party claiming or experiencing such event shall promptly notify the other Parties and shall comply with the remaining provisions of this Article 18.

Section 18.2. **Burden of Proof**. In the event that the Parties are unable in good faith to agree that a Force Majeure Event has occurred or whether a Party's performance is excused, such dispute shall be resolved in accordance with the arbitration dispute resolution procedures set forth in Section 19.4 and, in any proceeding to resolve the dispute, the burden of proof as to whether a Force Majeure Event has occurred and whether performance is excused shall be upon the Party claiming a Force Majeure Event.

Section 18.3. **Excused Performance**. If a Party is rendered wholly or partially unable to perform its obligations under this Agreement because of a Force Majeure Event, that Party shall be excused from whatever performance is affected by the Force Majeure Event to the extent so affected, subject to and conditioned upon the following:

(A)    the non-performing Party, by exercise of due foresight could not reasonably have been expected to avoid, or by the exercise of due diligence could not have been able to overcome, such Force Majeure Event;

(B)    the non-performing Party gives the other Party Notice describing the nature, scope and expected duration of the Force Majeure Event, and the steps the affected Party expects to take to both mitigate the Force Majeure Event itself and the effect of such Force Majeure Event on its obligations under this Agreement.  Such Notice shall be given promptly after the occurrence of the Force Majeure Event, and in no event more than seven days after the original notification of the Force Majeure Event given pursuant to Section 18.1;

(C)    the suspension of performance shall be of no greater scope and of no longer duration than is reasonably required by the Force Majeure Event;

(D)    the non-performing Party shall exercise all reasonable efforts to mitigate or limit damages to itself and to the other Party;

(E)    the non-performing Party shall exercise all reasonable efforts to continue to perform its obligations hereunder and to correct or cure the event or condition excusing performance; and

(F)    when the non-performing Party is able to resume performance of its obligations under this Agreement, that Party shall give the other Party written Notice to that effect and shall promptly resume performance hereunder.

63

Section 18.4.    **Applicability.** For the avoidance of doubt and not as a limitation on the foregoing terms and conditions of this Article 18, (i) during the occurrence of a Force Majeure Event, neither Party shall be excused from any performance or payment obligation hereunder to the extent such obligation is not affected by such occurrence and is otherwise due in accordance with the terms and conditions hereof, and (ii) except as provided in clause (i), the terms and conditions of this Article 18 shall limit or condition all provisions of this Agreement whether or not so expressly stated in this Agreement.

### ARTICLE 19
### MISCELLANEOUS

Section 19.1.    **Notices, Requests and Communications.** Wherever provision is made for the giving or issuance of any notice, instruction, consent, approval, certificate or determination by any Person (each, a *"Notice"*), unless otherwise specified, such communication shall be in writing and shall not be unreasonably withheld or delayed. All Notices shall be given to a signatory at the physical address or facsimile number specified below or as such signatory hereto shall at any time otherwise specify by like notice to the other signatories hereto. Each such Notice shall be effective (a) if given by facsimile, at the time such appropriate confirmation of receipt is received by the sender (or, if such time is not during regular business hours of a Business Day, at the beginning of the next such Business Day), and (b) if given by mail or courier, upon receipt or refusal of service at the address specified for each signatory below. Notices shall be addressed as follows:

For the Government:

The Government of the U.S. Virgin Islands
Government House
Charlotte Amalie
St. Thomas, U.S. Virgin Islands
Attention: Office of the Governor

With a copy to:

Office of the Attorney General
U.S. Virgin Islands Department of Justice
34-38 Kronprindsens Gade
GERS Building, 2nd Floor
St. Thomas, U.S. Virgin Islands 00802

For Refinery Operator:

Limetree Bay Refining, LLC
1 Estate Hope
Christiansted, St. Croix
U.S. Virgin Islands 00820-5652

64

| | |
|---|---|
| Attention: | Robert Haugen |
| Fax: | (340) 692-3480 |
| Email: | rhaugen@lbterminals.com |

With a copy to:

ArcLight Capital Partners, LLC
200 Clarendon St., 55th Floor
Boston, Massachusetts 02117

| | |
|---|---|
| Attention: | Christine M. Miller |
| Fax: | (617) 867-4698 |
| Email: | cmiller@arclightcapital.com |

Latham & Watkins LLP
885 Third Avenue
New York, New York 20022

| | |
|---|---|
| Attention: | Christopher G. Cross |
| | Warren H. Lilien |
| Fax: | (212) 751-4864 |
| Email: | christopher.cross@lw.com |
| | Warren.lilien@lw.com |

And a copy to:

Nichols, Newman, Logan, Grey & Lockwood, P.C.
1131 King Street, Christiansted, St. Croix
U.S. Virgin Islands 00820-4971

| | |
|---|---|
| Attention: | G. Hunter Logan, Jr. |
| | Todd H. Newman |
| Fax: | (340) 773-3409 |
| Email: | hlogan@nnldlaw.com |
| | tnewman@nndlaw.com |

Section 19.2. **Assignment**.

(A)     This Agreement shall not be assignable except by Refinery Operator in whole or in part to (1) an Affiliate, or (2) an entity that acquires all or substantially all of Refinery Operator's business or assets, or (3) as provided in Section 19.2(B) below.  In the case of an assignment under subsection (2) of this Section 19.2(A), such assignment shall be subject to the consent of the Government, such consent not to be unreasonably withheld, conditioned, or delayed.

(B)     **Financing Liens**.

65

(1)    Refinery Operator, without approval of the Government, may, by security, charge or otherwise encumber its interest under this Agreement for the purposes of financing the development, construction, rehabilitation, expansion, or enhancement or operation of the Refinery.

(2)    Not less than ten (10) Days prior to making such encumbrance, Refinery Operator shall notify the Government in writing of the name, address, and telephone and facsimile numbers of each Lender(s) to which Refinery Operator's interest under this Agreement has been pledged or assigned. Such notice shall include the names of the account managers or other representatives of the Lender(s) to whom all written and telephonic communications may be addressed.

(3)    After giving the Government such initial notice, Refinery Operator shall promptly give the Government (i) notice of any change in the information provided in the initial notice or any revised notice, and (ii) copies of documents related to such encumbrance (including final, executed copies of documents related thereto).

(4)    If Refinery Operator encumbers its interest under this Agreement as permitted by this Section 19.2(B), then (i) the Parties, except as provided by the terms of this Agreement, shall not modify or cancel this Agreement without the prior written consent of the Lender(s), (ii) the Lender(s) or their designees shall have the right, but not the obligation, to perform any act required to be performed by Refinery Operator under this Agreement to prevent or cure any Payment Default by Refinery Operator and such act performed by the Lender(s) or their designees shall be as effective to prevent or cure a Payment Default as if done by Refinery Operator: provided that, if any such Lender or its designee elects to perform any act required to be performed by Refinery Operator under this Agreement to prevent or cure a Payment Default by Refinery Operator, the Government will not be deemed to have waived or relinquished its rights and remedies as provided in this Agreement, (iii) the Government shall upon written request by Refinery Operator or Lenders execute statements certifying that this Agreement is unmodified (or, modified and stating the nature of the modification), in full force and effect and the absence or existence (and the nature thereof) of the Payment Default hereunder by Refinery Operator known to the Government and documents of consent to such assignment to the encumbrance and any assignment to such Lender(s), in each case as reasonably requested by Refinery Operator and (iv) the Government shall, upon the receipt of a written request from Refinery Operator or any Lender, execute, or arrange for the delivery of, such certificates, opinions and other documents as may be reasonably necessary in order for Refinery Operator to consummate any financing or refinancing of the Refinery or any part thereof and will enter into reasonable agreements with such Lender (including subordination agreements, intercreditor agreements and any such instruments or documents as may be reasonably necessary to evidence and reaffirm the provisions of Section 9 hereof), which agreements will grant certain rights to the Lender(s) as more fully developed and described in such documents, including, without limitation, that (a) this Agreement shall not be terminated (except for termination pursuant to the terms of this Agreement) without the consent of Lender, which consent is not to be unreasonably withheld or delayed, (b) Lender(s) shall be given

notice of any breach or default of this Agreement by Refinery Operator, (c) if a Lender forecloses, takes a deed in lieu of foreclosure or otherwise exercise its remedies pursuant to any security documents, that the Government shall, at such Lender's request, continue to perform all of its obligations hereunder, and Lender or its nominee may perform in the place of Refinery Operator, and may assign this Agreement to another Person in place of Refinery Operator; *provided* that, any party which succeeds Refinery Operator shall agree to perform Refinery Operator's obligations hereunder, including making payments to the Government consistent with those provided for hereunder, (d) in the event this Agreement is rejected or otherwise terminated as a result of any bankruptcy, insolvency, reorganization or similar proceeding affecting Refinery Operator, the Government will enter into a new agreement with the Lender or Lender's designee for the remainder of the term with substantially the same covenants, terms, provisions and limitations as are contained in this Agreement, (e) the Government shall accept performance in accordance with this Agreement by Lender or its designee, and (f) the Government shall make representations and warranties to Lender as Lender may reasonably request, but solely with regard to (1) the Government's existence, (2) the Government's authority to execute, deliver and perform this Agreement, (3) the binding nature of the document evidencing the Government's consent to assignment to Lender and this Agreement on the Government, (4) receipt of regulatory approvals by the Government with respect to its execution and performance under this Agreement and (5) such other representations and warranties as are customary in the context of a financing of projects similar to the development, construction, rehabilitation, expansion, or enhancement or operation of the Refinery.

Section 19.3. **Governing Law**. This Agreement and the rights and duties of the Parties arising out of this Agreement shall be governed by, and construed in accordance with, the applicable laws of the U.S. Virgin Islands without reference to the conflict of laws rules thereof that would direct the application of the laws of another jurisdiction.

Section 19.4. **Dispute Resolution**. Any dispute between the Parties as to the interpretation or effect of this Agreement (which shall include for the purposes of this Agreement any subsequent modification thereof unless otherwise expressly provided by such modification) and any controversy between them or claim by either of them, whether sounding in tort or contract, arising out of or relating to this Agreement or the conduct of the Parties, their agents and/or representatives, (collectively, a "*Dispute*") shall during the Term and within one year thereafter, notwithstanding the Government's status as such and in the same manner as similar actions, suits or proceedings to which the Government is not a Party, be the subject of the following dispute resolution procedures:

(A)    Following written notice by one Party to another of a Dispute, the Parties shall attempt to settle such Dispute in the first instance by mutual discussions between their respective designated representatives. Failing such resolution, the senior representative of the Government and the chief executive officer (or a Person holding a similar position) of Refinery Operator (or their duly appointed representatives) shall meet to resolve such Dispute. The joint decision of such individuals shall be binding upon the Parties hereto. If a settlement

67

of any such Dispute or difference is not reached pursuant to this Section 19.4(A) within sixty (60) days after such notice of Dispute is delivered, then the provisions of Sections 19.4(B) and 19.4(C) below shall apply.

(B)    If the settlement of any Dispute is not reached pursuant to Section 19.4(A), then an action, suit or proceeding may be brought by a Party in the United States District Court of the Virgin Islands. Each of the Parties hereby irrevocably waives and shall cause its Affiliates to waive all right to a trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement or the transactions contemplated hereby.

(C)    If the United States District Court of the Virgin Islands or the Third Circuit Court of the United States refuses for any reason to adjudicate such Dispute, the Parties agree that the matter shall be referred to an arbitration proceeding brought by a Party either in accord with the Rules of the American Arbitration Association or as otherwise agreed by the Parties. The arbitration will be conducted before three (3) arbitrators: one selected by the Government, another by Refinery Operator, and the third by the two selected arbitrators. The arbitrators shall determine the venue for the arbitration. Judgment upon any award rendered by the arbitrator(s) in any such proceeding may be entered in any court having jurisdiction.

Section 19.5.    **Commercial Act**. Each Party unconditionally and irrevocably:

(A)    agrees that the execution, delivery and performance by it of this Agreement and all other agreements, contracts, documents and writings relating hereto constitute private and commercial acts and not public or governmental acts;

(B)    agrees that should any proceedings be brought against it or its assets, other than the assets protected by the diplomatic and consular privileges under any law ("*Exempted Assets*") in any jurisdiction, in relation to this Agreement or any transaction contemplated hereby, no immunity, sovereign or otherwise, from such proceedings, execution, attachment or other legal process shall be claimed by or on behalf of itself or with respect to any of its assets (other than the Exempted Assets); and

(C)    subject to the Parties following the dispute resolution procedures set forth in Section 19.4, consents generally in respect of the enforcement of any judgment against it in any proceedings in any jurisdiction to the giving of any relief or the issue of any process in connection with such proceedings including the making, enforcement or execution against or in respect of any property irrespective of its use subject to Section 19.5(B).

Section 19.6.    **Limitation on Liability**. No claim may be made by one Party against the other Party for any special, indirect, consequential, incidental or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or relating to this Agreement or the development, construction, rehabilitation, expansion, or enhancement or operation of the Refinery or any act, omission or event occurring in connection therewith and the Parties hereby waive, release and agree not to sue upon any claim for such damages.

68

Section 19.7. **Entire Agreement; Subsequent Amendments**. This Agreement constitutes the entire agreement of the Parties and the provisions herein shall supersede any and all prior agreements or understandings relating to the same subject matter. It is intended that no Party shall have or be deemed to have any obligation under this Agreement except as the same shall be explicitly stated herein. This Agreement may not be amended, modified, or altered except by an instrument in writing signed on behalf of each Party.

Section 19.8. **Severability of Provisions**. If any clause, sentence, section, or part of this Agreement or the application thereof to anyone in any circumstances, is declared invalid, the application thereof to others, or in other circumstances, and the remainder of this Agreement, shall not be affected thereby. In the event of any such holding and to the extent of any such invalidity, the Government undertakes, insofar as it may lawfully do so, to take such alternative steps (including the consent to or enactment of legislation and the consent to or promulgation of rules and regulations) as may reasonably and in good faith be required to confer upon the Parties benefits comparable in character and substantially equivalent in amount to those intended to be conferred by this Agreement, on terms and conditions not materially more burdensome to either party than those herein provided and without prejudice to any other remedies that may be available to either of them.

Section 19.9. **Payment Terms and Interest Calculation**. Except as otherwise expressly provided in this Agreement, payment terms and interest calculations shall be as follows:

(A)   All payments will be made in US$ by wire transfer of immediately available funds to an account or accounts designated in writing by the Party entitled to receive payment.

(B)   Late payments shall bear interest at the U.S. Prime Rate, compounded quarterly until paid in full.

(C)   A wire transfer or delivery of a check shall not operate to discharge any payment under this Agreement and shall be accepted subject to collection.

Section 19.10. **Public Announcements**. No Party shall, except as required by Applicable Law or the rules of any recognized national stock exchange, cause any public announcement to be made regarding this Agreement. In the event that a Party shall be required to cause such a public announcement to be made pursuant to any Applicable Law or the rules of any recognized national stock exchange, it shall use commercially reasonable efforts to provide the other Party at least two Business Days prior written notice of such announcement.

Section 19.11. **Parties in Interest**. Unless specified in this Agreement, the terms and provisions of this Agreement shall be binding upon and inure to the benefit of each Party and its respective legal representatives, successors and assigns. No other Person shall have any right, benefit, priority or interest hereunder or as a result hereof or have standing to require satisfaction of the provisions hereof in accordance with its terms.

69

Section 19.12. **Waiver**. By an instrument in writing, any Party may waive compliance by any other Party with respect to any term or provision of this Agreement that such other Party was or is obligated to comply with or perform or any breach hereof. The failure of a Party at any time to strictly enforce any provision of this Agreement shall in no way affect its right thereafter to require performance thereof, nor shall the waiver of any breach of any provision of this Agreement be taken or held to be a waiver of any succeeding breach of any such provision or as a waiver of the provision itself. Unless otherwise specified herein, the rights and remedies provided in this Agreement are cumulative and the exercise of any one right or remedy by any Party shall not preclude or waive its right to exercise any or all other rights or remedies.

Section 19.13. **Performance Extended to Next Business Day**. Notwithstanding any deadline for payment, performance, notice, or election under this Agreement, if such deadline falls on a date that is not a Business Day, then the deadline for such payment, performance, notice, or election will be extended to the next succeeding Business Day.

Section 19.14. **Negotiation and Preparation Costs**. Except as provided in Article 3, each Party shall bear the costs and expenses incurred by it in connection with the negotiation, preparation, and execution of this Agreement and other documents referred to herein.

Section 19.15. **Further Assurances**. From time to time, each Party agrees to promptly execute and deliver such additional documents, and will provide such additional information and assistance, as any Party may reasonably require to effect the terms of this Agreement.

Section 19.16. **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute a single agreement to which no signatory hereto shall be bound until all signatories hereto have executed a counterpart. Signatures transmitted by facsimile or as emailed PDF copies shall be binding as originals so long as the Agreement is transmitted in its entirety, and each signatory hereto hereby waives any defenses to the enforcement of the terms of this Agreement sent by facsimile or emailed PDF based upon the manner of transmission or form of signature (electronic, facsimile or "ink original").

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

GOVERNMENT OF THE U.S. VIRGIN ISLANDS

By: _____
Name: Kenneth E. Mapp
Title:  Governor of the U.S. Virgin Islands

ATTESTED:

By: _____
Name: Osbert E. Potter
Title: Lieutenant Governor of the U.S. Virgin Islands

Approved for Legal Sufficiency:

By: _____
Name: Claude Walker
Title: Attorney General of the U.S. Virgin Islands

LIMETREE BAY REFINING, LLC

Witnesses:

By:
Name: John F. Erhard
Title: manager

2