VIRGIN ISLANDS DISTRICT COURT
DISTRICT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX


CLIFFORD BOYNES, et al          :Case No.:  1:21-00253-WAL-EAH
          Plaintiffs,           :
v                               :
                                :
LIMETREE BAY VENTURES, LLC.,    :
et al,                          :
. . . . . . . . . . . . . . . .
HELEN SHIRLEY, et al,           :Case No.:  1:21-00259-WAL-EAH
          Plaintiffs,           :
v                               :
                                :
LIMETREE BAY VENTURES, LLC, et: 
al,                             :
          Defendants.           :
. . . . . . . . . . . . . . . .
FRANCIS E. CHARLES and THERESA:Case No.:  1:21-00260-WAL-EAH
J. CHARLES,                     :
          Plaintiffs,           :
v                               :
                                :
LIMETREE BAY VENTURES, LLC, et:
al,                             :
          Defendants.           :
. . . . . . . . . . . . . . . .
BEECHER COTTON, et al,          :Case No. 1:21-cv-00261-WAL-EAH
          Plaintiffs,           :
v                               :
                                :
LIMETREE BAY VENTURES, et al  :
          Defendants.           :St. Croix, Virgin Islands
. . . . . . . . . . . . . . . .December 10, 2025


TRANSCRIPT OF SETTLEMENT CONFERENCE
BEFORE THE HONORABLE SENIOR DISTRICT JUDGE
EMILE A. HENDERSON, III

APPEARANCES:

FOR THE PLAINTIFFS

CLIFFORD BOYNES, et al: DANIEL CHAREST, ESQ.
ANNA KATHERINE BENEDICT, ESQ.
BURNS CHAREST, L.L.P.
900 JACKSON STREET, SUITE 500
DALLAS, TEXAS 75202
469-904-4550
Fax:  469-444-5002
Email:  dcharest@burnscharest.com
        abenedict@burnscharest.com

LEE J. ROHN, ESQ.
LEE J. ROHN & ASSOCIATES
1101 KING STREET
ST. CROIX, VIRGIN ISLANDS 00820
340-778-8855
Fax:  340-773-2954
Email:  lee@rohnlaw.com

JOHN K. DEMA, ESQ.
LAW OFFICES OF JOHN K. DEMA, P.C.
1236 STRAND STREET, SUITE 103
ST. CROIX, VIRGIN ISLANDS 00820
340-773-6142
Fax:  340-773-3944
Email:  jdema@demalaw.com

HUGH LAMBERT, ESQ.
BRIAN JAMES MERSMAN, ESQ.
LAMBERT ZAINEY SMITH & SOSO, PLC
701 MAGAZINE STREET
NEW ORLEANS, LOUISIANA 70130
504-581-1750
Fax:  504-529-2931
Email:  hlambert@lambertzainey.com
        bmersman@thelambertfirm.com

HOGAN PASCHAL, ESQ.
KERRY J. MILLER, ESQ.
FISHMAN HAYGOOD, LLP
201 ST. CHARLES AVENUE, SUITE 4600
NEW ORLEANS, LOUISIANA 70170
504-556-5507
Fax:  504-389-4087
Email:  hpaschal@fishmanhaygood.com

MICHAEL TWERSKY, ESQ.
FOX ROTHSCHILD, LLP
2001 MARKET STREET, SUITE 1700
PHILADELPHIA, PENNSYLVANIA 19103
215-299-2923
Fax:  215-299-2150
Email:  mtwersky@foxrothschild.com

MARINA LEONARD, ESQ.
COLIANNI & LEONARD
2120 COMPANY STREET
CHRISTIANSTED, ST. CROIX
U.S. VIRGIN ISLANDS 00820
340-719-1766
Fax:  340-200-0025

JACOB GOWER, ESQ.
GOWER LEGAL, LLC
P.O. BOX 223973
CHRISTIANSTED, VIRGIN ISLANDS 00823
340-277-2799
Email:  jacob@gowerlegal.com

FOR THE DEFENDANTS

ARCLIGHT CAPITAL
PARTNERS, LLC:            DANIEL T. DONOVAN, ESQ.
                         KIRKLAND & ELLIS, LLP
                         1301 PENNSYLVANIA AVENUE, N.W.
                         WASHINGTON D.C. 20004
                         202-389-5174
                         Email:  daniel.donovan@kirkland.com

                         MARY ELIZABETH MILLER, ESQ.
                         LEHOTSKY KELLER COHN, LLP
                         200 MASSACHUSETTS AVENUE, NW SUITE 700
                         WASHINGTON, D.C. 20001
                         202-389-5933
                         Fax:  512-727-4755
                         Email:  mary@lkcfirm.com

FREEPOINT COMMODITIES,
L.L.C.:                  FRANCIS HEALY, ESQ.
                         HOGAN LOVELLS, US., LLP
                         390 MADISON AVENUE
                         NEW YORK, NEW YORK 10017
                         212-918-3119
                         Fax:  212-918-3100
                         Email:  francis.healy@hoganlovells.com

LIMETREE BAY REFINING,
L.L.C.:                    CAROLYN O'CONNOR, ESQ.
                          WILSON ELSER
                          7 GIRALDA FARMS
                          MADISON, NEW JERSEY
                          973-735-5745
                          Fax:  973-624-0808
                          Email:  Carolyn.oconnor@wilsonelser.com

LIMETREE BAY VENTURES,
L.L.C.:                    CARL A. BECKSTEDT, ESQ.
                          BECKSTEDT & KUCZYNSKI, L.L.P.
                          2162 CHURCH STREET
                          CHRISTIANSTED, ST. CROIX 00820
                          340-719-8086
                          Fax:  800-866-6831
                          Email:  carl@beckstedtlaw.com

LIMETREE BAY TERMINALS,
L.L.C.:                    JENNIFER A. ADLER, ESQ.
                          WEINBERG WHEELER HUDGINS GUNN & DIAL
                          3344 PEACHTREE ROAD, N.E. SUITE 2400
                          ATLANTA, GEORGIA 30326
                          404-876-2700
                          Fax:  404-875-9433

                          MICHELLE CARR, ESQ.
                          BAKER MCKENZIE
                          300 EAST RANDOLPH STREET, SUITE 5000
                          CHICAGO, ILLINOIS 60601
                          312-861-8000
                          Fax:  312-861-2899

LIMETREE BAY HOLDINGS,
L.L.C.:                    ALEXANDER HEIDEMAN, ESQ.
                          THE LOCKETT LAW FIRM
                          1397 CARROLL DRIVE N.W.
                          ATLANTA, GEORGIA 30318
                          404-806-7448
                          Email:  john@lockettlawfirm.com

E.I.G. GLOBAL ENERGY
PARTNERS:                  ADAM NICHOLAS MARINELLI, ESQ.
                          BOLT NAGI, PC., ATTORNEYS AT LAW
                          MERCHANT FINANCIAL CENTER
                          4608 TUTU PARK MALL, SUITE 202
                          ST. THOMAS, VIRGIN ISLANDS 00802-1735
                          340-774-2944
                          Fax:  340-776-1639
                          Email:  amarinelli@vilaw.com

UNIVERSAL PLANT
SERVICES (VI), LLC:        MICHELLE M. BYERS, ESQ.
                          CAMPBELL, CONTROY & O'NEIL, P.C.
                          20 CITY SQUARE, SUITE 300
                          CHARLESTOWN, MASSACHUSETTS 02129
                          617-241-3000
                          Email:
                          mbyers@campbell-trial-lawyers.com

SEDGWICK CLAIMS
MANAGEMENT SERVICES:      CHIVONNE THOMAS, ESQ.
                          HAMILTON, MILLER & BIRTHISEL
                          150 SOUTHEAST 2ND AVENUE, SUITE 1200
                          MIAMI, FLORIDA 33131
                          305-379-3686
                          Fax:  305-379-3690
                          Email: cthomas@hamiltonmillerlaw.com

VERSA INTEGRITY GROUP
INC.:                     MICHAEL SHEESLEY, ESQ.
                          MICHEL L. SHEESLEY, LLC
                          CONDO TORRE DEL MAR, APT 2201
                          ASHFORD AVENUE
                          SAN JUAN, PUERTO RICO 00907
                          412-972-0412
                          Email:  michael@sheesley-law.

ELITE TURNAROUND
SPECIALISTS, LTD.:        ALEXANDER COCHRAN, ESQ.
                          GEIGER, LABORDE & LAPEROUSE
                          5151 SAN FELIPE, SUITE 750
                          HOUSTON, TEXAS 77056
                          832-255-6000
                          Email:  acochran@labordesiegel.com

                          ADAM CHRISTIAN, ESQ.
                          OGLETREE DEAKINS
                          TUNICK BUILDING
                          1336 BELTJEN ROAD, SUITE 201
                          ST. THOMAS, VIRGIN ISLANDS 00802
                          340-714-1235

CHEMICAL SERVICES, LLC:   ALEX MOSKOWITZ, ESQ.
                          DUDLEY NEWMAN FEUERZEIG, LLP
                          1000 FREDERIKSBERG GADE
                          ST. THOMAS, VIRGIN ISLANDS 00802
                          340-774-4422
                          Email:  amoskowitz@dnfvi.com

EXCEL CONSTRUCTION AND
MAINTENANCE VI, INC.:    STEFAN B. HERPEL, ESQ.
CHARLES CORRELL, ESQ.
DUDLEY NEWMAN FEUERZEIG, LLLP
1131 KING STREET, SUITE 204
ST. CROIX, VIRGIN ISLANDS 00820
340-773-3200
Email:  sherpel@dnfvi.com

NATIONAL INDUSTRIAL
SERVICES, L.L.C.:    HADLEY J. HURST, ESQ.
BARNES, D'AMOUR & VOGEL
5143 PALM PASSAGE, SUITE 18B-1
CHARLOTTE AMELIE, VIRGIN ISLANDS 40502
586-944-7807
Email:  hjhurst@hurstvilaw.com

ALSO PRESENT:    JENNIFER JONES, ESQ.
CATHERINE YOUNG, ESQ.

Court Recorder: FTR
Transcription Service:  Associated Reporters Int'l., Inc.
10 River Drive
Massena, New York 13662

Proceedings recorded by electronic sound recording;

transcript produced by transcription service.

(The hearing commenced at 9:49:09 a.m.)

THE COURT:  Persons having business before the District Court of the Virgin Islands.  The Honorable Senior District Judge Wilma A. Lewis presiding.  Draw near and give attention as this Court is now sitting.  God save the United States and this Honorable Court.  Please be seated and come to order.

COURT CLERK:  Good morning, everyone.  Today is Wednesday, December 10th, 2025.  We're here for settlement conference in cases of one colon two one C.V. two five three, Boynes et al versus Limetree Bay Ventures, L.L.C. et al; one colon two one C.V. two five nine, Shirley et al versus Limetree Bay Ventures, L.L.C. et al; one colon two one C.V. two six zero, Charles et al versus Limetree Bay Refining, L.L.C. et al and one colon two one C.V. two six one, Cotton et al versus Limetree Bay Ventures, L.L.C. et al.

THE COURT:  Good morning, everyone.

MR. MILLER:  Good morning.

MR. CHAREST:  Good morning, Your Honor.

THE COURT:  Okay.  I'm going to have appearances of counsel and let's start here to my left.

MR. CHAREST:  Good morning, Your Honor.  Nice to see you again.  Daniel Charest for the Plaintiff.

THE COURT:  Good to see you as well.  Attorney

Charest, good morning.

MS. PASCHAL:  Good morning, Your Honor.  Hogan Paschal for the Plaintiffs.

THE COURT:  Good morning.

MR. MILLER:  Good morning, Judge Lewis.  Kerry Miller for the Plaintiffs.

THE COURT:  Attorney Miller, good morning.

MS. ROHN:  Good morning, Your Honor.  Lee Rohn for the Plaintiffs.

THE COURT:  Attorney Rohn.

MR. TWERSKY:  Good morning, Your Honor.  Michael Twersky for the Plaintiffs.

THE COURT:  Okay.

MR. DEMA:  Good morning, Your Honor.  Jack Dema for the Plaintiffs.

THE COURT:  Attorney Dema.

MS. LEONARD:  Good morning, Your Honor.  Marina Leonard for the Plaintiff.

THE COURT:  Okay.

MR. GOWER:  Good morning, Your Honor.  Jacob Gower for the Plaintiffs.

THE COURT:  Okay.

MR. BECKSTEDT:  Good morning, Your Honor.  Attorney Carl Beckstedt on behalf of Limetree Bay Terminal.  Season's greetings to you and your staff.

THE COURT:  Many happy returns to you.

MR. BECKSTEDT:  Thank you, Your Honor.

MS. THOMAS:  Good morning and happy holidays, Your Honor.  Chivonne Thomas on behalf of B.P. Products North America.

THE COURT:  Many happy returns to you as well.

MS. E. MILLER:  Good morning, Your Honor. Elizabeth Miller on behalf of ArcLight.  Happy holidays to you.

THE COURT:  Many happy returns.

MR. DONOVAN:  Good morning, Your Honor.  Daniel Donovan for ArcLight as well.

THE COURT:  Okay.

MR. HEALY:  Morning, Your Honor.  Francis Healy, on behalf of Freepoint Commodities, L.L.C.

THE COURT:  Okay.

MS. BEYERS:  Good morning, Your Honor.  Michelle Byers, on behalf of Universal Plant Services, V.I., L.L.C.

THE COURT:  Okay.  Good morning.

MR. SHEESLEY:  Good morning, Your Honor. Michael Sheesley, on behalf of HRSA Integrity Group.

THE COURT:  Attorney Sheesley.  Good morning. Okay.  I know we have a number of people appearing virtually.  I am going to get you to give your appearances as well, so let me see how we'll do this.

COURT CLERK:  Attorney Cochran, can you note your appearance?

MR. COCHRAN:  Yes, Ma'am.  Good morning, Your Honor.  Alexander Cochran on behalf of Defendant Elite Turnaround Specialists, Limited.

THE COURT:  Good morning.

COURT CLERK:  Attorney Lambert, can you note your appearance, please?

MR. LAMBERT:  Good morning, Your Honor.  Hugh Lambert, on behalf of the Plaintiffs.

THE COURT:  Good morning, Attorney Lambert.

COURT CLERK:  Attorney --

THE COURT:  Moskowitz.

COURT CLERK:  -- Moskowitz, can you note your appearance, please?

MR. MOSKOWITZ:  Good morning, Your Honor and other members of the Court, Alex Moskowitz on behalf of Chemical Services, L.L.C.

THE COURT:  Good morning, Counsel.

COURT CLERK:  Attorney Herpel, please note your appearance.

THE COURT:  You -- you're muted.  Attorney Herpel, you're -- you're -- you're muted.  Not sure if he's hearing me.  Can you hear me?  Attorney Herpel.  You are muted.  Okay.  We know you're there, but you're not

coming through.

COURT CLERK:  Yeah.  He's back.

THE COURT:  Go ahead.  Go ahead.  They're not going to be speaking anyway.

COURT CLERK:  Attorney Adler, please note your appearance.

MR. ADLER:  Good morning, Your Honor.  Attorney Jennifer Adler on behalf of Defendant Limetree Bay Terminals.

THE COURT:  Good morning, Counsel.

COURT CLERK:   Attorney Heideman, please note your parents.

MR. HEIDEMAN:  Good morning.  Alex Heideman on behalf of Defendant Limetree Bay Holdings, L.L.C.

THE COURT:  Morning, Counsel.

COURT CLERK:  Attorney Jones, please note your appearance.

MS. JONES:  Good morning, Your Honor.  Jennifer Jones on behalf of Defendant.

COURT REPORTER:  Attorney Jones, good morning.

COURT CLERK:  Attorney Young, please note your appearance.

MS. YOUNG:  Good morning, Catherine Young (unintelligible) Services L.L.C.

THE COURT:  Morning, counsel.

COURT CLERK:  Attorney O'Connor, please note your appearance.

MS. O'CONNOR:  Good morning, Your Honor. Attorney Carolyn O'Connor from Wilson Elser on behalf of Limetree Bay Refining, L.L.C.

THE COURT:  Attorney O'Connor, good morning.

MR. O'CONNOR:  Morning.

THE COURT:  Attorney Marinelli, please note your appearance.

MR. MARINELLI:  Good morning, Your Honor.  Adam Marinelli on behalf of E.I.G. Global Energy Partners, L.L.C., Limetree Bay Ventures, L.L.C. and Limetree Bay Refining, L.L.C.

THE COURT:  Good morning, Counsel.

COURT CLERK:  Attorney Hurst, please note your appearance.

MS. HURST:  Good morning, Your Honor.  Hadley Hurst, on behalf of National Industrial Services, L.L.C. Thank you.

THE COURT:  Okay.  Good morning, Counsel.

COURT CLERK:  Attorney Benedict, please note your appearance.

MS. BENEDICT:  Good morning, Your Honor. Attorney Bennett on behalf of the Plaintiffs.

THE COURT:  Attorney Benedict, good morning.

COURT CLERK:  Attorney Christian, please note your appearance.

MR. CHRISTIAN:  Good morning, Your Honor.  Good morning, staff.  All present season's greetings.  Adam Christian of Ogletree, Deakins for Defendant Elite Turnaround Specialists, Limited.

THE COURT:  Attorney Christian, good morning.  Many happy returns to you.

COURT CLERK:  Attorney Mashell Carr, please note your appearance.

MS. CARR:  Good morning, Your Honor.  Attorney Mashell Carr on behalf of Limetree Bay Services.

THE COURT:  Okay.

MS. CARR:  Oh.  On behalf of Limetree Bay Terminals Michelle Carr.  Sorry.

THE COURT:  Okay.  Good morning, Counsel.

COURT CLERK:  Attorney, is it Merman?

MR. MERMAN:  Good morning, Your Honor.  Attorney Brian Merman on behalf of Plaintiffs.

THE COURT:  Good morning, Counsel.  Thank you all.  Okay.  Presently before --

MS. CHARLES:  Your Honor I'm sorry.

THE COURT:  Yes.  I'm sorry, did we miss someone?

MS.:  We did, I'm sorry.  Attorney Charles

Correll, happy season's greetings to everyone.  Along with Attorney Herpel, we represent Excel Construction and Maintenance.  Thank you.

THE COURT:  Good morning, Counsel.  Many happy returns to you.  Okay.  Presently before the Court, we have two motions for preliminary settlement approval.  The first was filed on April 3rd of this year, and that's a motion for preliminary approval of a settlement in the amount of seventeen million five hundred thousand dollars with ArcLight and Freepoint Defendants.

The ArcLight and Freepoint Defendants are as follows.  ArcLight Capital Partners, L.L.C., ArcLight Energy Partners Fund V.I., L.P., ArcLight Limetree A.I.V., L.P., Limetree Bay Holdings, L.L.C., Limetree Bay Preferred Holdings, L.L.C., and Freepoint Commodities, L.L.C.  So that's the first motion for preliminary settlement approval.

The second motion is filed on April 29th, and that is for preliminary approval of a settlement in the amount of five hundred and fifty thousand dollars with Pinnacle Services, L.L.C.  So as we go through this morning, I will be referring to the ArcLight and Freepoint Defendants and Pinnacle as the Settling Defendants.  When I'm referring to the Settling Defendants and the Plaintiffs, I refer to them collectively as the Settling

Parties.

These two proposed settlements are being presented together because the Settling Parties have indicated that they intend for the Pinnacle settlement to be jointly administered with the ArcLight settlement using same notice, notice plan, notice of settlement and the like, presumably for efficiency's sake and so they will proceed simultaneously.

As the Court understands the parties are that is -- the Settling Parties are requesting six forms of relief from the Court.  First, conditionally certifying the proposed settlement class and preliminarily approving the settlement as fair, reasonable and adequate.

Second, appointing the proposed co-lead Class Counsel to represent the settlement class.  Thirdly, approving the proposed notice plan.  Fourth, establishing the objection and opt out deadline.  Fifth, appointing Epiq Class Actions and Mass Tort Solutions Incorporated as the settlement administrator.  And sixth, setting a date for the final approval hearing.  I think I have listed everything, but if I have missed anything -- Attorney Charest --

MR. CHAREST:  Yes, Judge.

THE COURT:  -- have I missed anything?

MR. CHAREST:  No, Ma'am.

THE COURT:  Okay.  All right.  So far so good.

MR. CHAREST:  Yes, Ma'am.

THE COURT:  All right.  So what I'm going to focus on today, at least for starters, is to ask the questions that I have.  First of the Settling Parties, but principally the -- the -- the Plaintiffs and then after that we'll deal with the objections that have been lodged by the Defendants who have object -- which have objected to the -- this -- the settlement.  So we will take it in that order.

Now, just as a reminder, it's clear, I think from the law that the preliminary approval decision here is -- is not a commitment to approve the final settlement as stated in -- in Eastern District of Pennsylvania case in 2008, Gates versus Rohm and Haas Company, two forty-eight F.R.D. four thirty-four and four thirty-eight.

The preliminary approval is a determination that there are no obvious deficiencies and that the settlement falls within the range of reason.  It is not until the final approval stage, of course, that the settlements are as the words state finally approved.

So at this point it is just a preliminary approval.  There is nothing that is binding with regard to what will happen at the final approval stage.  But as indicated, it -- it looks at the matters for purposes of

identifying any -- any obvious deficiencies that might exist in the proposed settlements.  And so we will proceed with that as a backdrop for our proceedings today.

Let me start by asking, I know that there are a couple other at least settlements in the -- in the or proposed settlements on the horizon.  Tell me and who's going to be speaking Attorney Charest -- you.  Okay.

MR. CHAREST:  Yes, Ma'am.  It would be me primarily with, you know, backup from the team as -- as if I'm --

THE COURT:  That's --

MR. CHAREST:  -- if I'm running around.

THE COURT:  And that's -- that's fine.  How are you anticipating moving forward with the -- any other settlements that you might have given the fact that obviously we're going to be not having these matters in sync in terms of when they are done, how are you -- how are you planning to proceed?

MR. CHAREST:  Well, thank you, Your Honor.  We have present --

MS. E. MILLER:  You can --

MR. CHAREST:  Of course.

MS. E. MILLER:  Thank you.

MR. CHAREST:  In addition to the ArcLight Freepoint settlement for seventeen point five million and

the Pinnacle settlement for five hundred and fifty thousand dollars, we have presently settled with Elite, Excel, U.P.S., Versa, and I can announce that we are on terms with E.I.G. as well. All right. I can give you big picture. If you combine Elite, Excel, U.P.S. and Versa, that's almost enough to -- to justify another notice program.

But with E.I.G., I think of settlements like this as like an anchor tenant for building. The settlement is big enough to justify the administration. The -- the approach for the settlement agreement for the second tranche is slightly different. So in our view, the approval process might have different contours, but we plan to make the administration as similar as possible.

But -- but we very much anticipate will be two flights. The more people are welcome to join the second flight if they want, obviously, but the -- the -- the method of administration we expect will be very similar. But the -- the approval process may be a little bit different because of the terms of the settlement agreements themselves.

That's -- so that's why we a) we sort of separated them by time because that's just how they worked out. But b) as -- as things do, there was sort of a center of gravity around specific certain terms that --

that made this -- this classification make sense to us.

THE COURT:  Okay.  Well, that's -- that's good because obviously you're -- you're looking at it from the perspective of what makes sense from --

MR. CHAREST:  Yes, Ma'am.

THE COURT:  -- an efficiency perspective --

MR. CHAREST:  Yeah.

THE COURT:  -- as you go through.

MR. CHAREST:  Yeah, we are, I mean, as Plaintiffs just in our D.N.A., I think but -- but of course, we're -- we're trying to be as efficient as we can with the Plaintiff's money, which is what -- which is fundamentally what pays for the settlement.  We're absolutely cognizant of that and we're trying to be as efficient and effective and also as speedy as possible in trying to combine those three things.  Yes, Ma'am.

THE COURT:  Okay.  All right.  Okay.  I'm going to just start asking some questions about the various aspects as we go through, obviously focusing on Rule Twenty-three as a class -- class action rule and the requirements that need to be fulfilled to proceed accordingly.  Let me first ask you on the numerosity issue.  Do you have an estimate of the class size?

MR. CHAREST:  So I can tell you, Your Honor, from the class -- the class that's being proposed now.  We

break into three zones fundamentally and I can tell you with specificity that two of those zones contain over, I think it was specificity in one second, I think it's over six thousand or -- or yeah, over six thousand improved parcels.  Okay.  And what I mean by that is there's six thousand households minimum within two out of three of the zones.

So we know for sure that there's more than that with all three zones a), and then b), if you want to do, in the Courts, and the -- the cases tell you to take a common-sense approach.  If you assume four persons per household, you're in the twenty plus thousand people range.  So that's -- those are my estimates, as best as I can give you, Your Honor.  Like the real -- the real data are sixty-one hundred or something like that in two out of three zones and then from there I -- I interpolate.

THE COURT:  Okay.  So you're talking about six thousand households?

MR. CHAREST:  Yes, Ma'am.

THE COURT:  Okay.  All right.

MR. CHAREST:  Yes, Ma'am.

THE COURT:  So and the households, do you have a sense of approximate numbers in the households?

MR. CHAREST:  I don't have -- I don't have that data -- those data available, to be honest.  But again

when we use the Court -- the cases tell you take a common-sense approach. When you're talking about numerosity, of course, the lower threshold is forty or a hundred, depending on what cases you talk about.

THE COURT: All right.

MR. CHAREST: So I didn't stress too much about proving that because we have it in spades. But -- but to answer your question, I do not have data to -- to support my four to one. But that's just a common-sense approach.

THE COURT: Okay. On the issues of commonality, typicality, do you have anything to add to what's in your brief?

MR. CHAREST: Well, not to add what's in the brief. I thought the brief did the job, but you know, I would -- I think what the Court is trying to do when I endorse it is we have to make a record because the Court is looking at our proposal to see if it makes sense. And so I'm happy to talk about just real as quickly as I can. Commonality, we only need one common issue where there are several that we list in the brief.

Talking about weather reliable, the form of liability, the -- the nature of the damages, the nature of the impact, the facts that pertain to the preparation, the facts that pertain to the releases. All of those issues, all of the what I would view as the Defendant facing

issues are common to all across the entire class.

And for me, it's -- it's hard to imagine a more class worthy approach than this one because of all of these tens of thousands of people being harmed by one set of facts and -- and having those common issues around it. So that kind of bleeds into -- into predominance and we'll talk about that later but for commonality, for sure there.

And same with typicality so again, under Rule Twenty-three A, the named Plaintiffs span the types of households around.  They're in different -- they were selected in strategic geographic locations to try and represent cohesively, but also to represent whatever, you know, to make a cohesive class, but also to have the different types of people in their renters, owners, and -- and -- and the different mix of Plaintiffs that you'll have.  So we have the commonality aspect addressed as well.

And again, their injury arises from the same course of conduct by the Defendants, and we talked about numerosity, commonality, typicality and then the other one under Twenty-three A is adequacy --

THE COURT:  Adequacy.

MR. CHAREST:  -- and adequacy looks at both, of course, the counsel and -- and the class representatives. I think, you know, our -- our work is our -- our

performance in the case come -- confirms the Court's initial agreement that we were adequate counsel.  We have been working our tails off, spent a lot of money of our own money to advance this case and -- and -- and getting good results, I think uniformly.

And so that I won't go too much more into our -- our excellence, but I think that's -- that's enough.  As to the -- the class representatives, I -- I can only say that every one of them has been responsive when asked, involved at the appropriate times, aware of the case, subject to discovery.  They've all given depositions of their own free time.  They've all exposed themselves to having their medical histories examined.

And all the -- all of them -- all of those sorts of things, the private things that people don't care to talk about, they've all made that open.  They all understand they're doing it not just for themselves but for the class, every one of them we talked very heavily about the duty about that and even making the decision to settle while to be fair.  Right?

The lawyers negotiated the terms, but it doesn't become real until the clients knowingly understand and accept and agree.  And each one of them had that conversation.  They've all -- they've all joined.  So by performance, by the type of the claim, and by the effort

they're putting in, they're absolutely adequate, more than adequate, I would say.  So that's Twenty-three A.

I can just pivot on to Twenty-three B three.  If the Court likes or if you have more specific questions, I'm happy to go through that.

THE COURT:  Yeah.  Let me ask you a few more things --

MR. CHAREST:  Yes, Ma'am.

THE COURT:  -- about Twenty-three A.

MR. CHAREST:  Yes, Ma'am.

THE COURT:  There is a claim in the -- I'll refer to it as a complaint.  We know it's a second consolidated amended complaint, but I'll refer to it as a complaint.  There is a claim for medical monitoring in the complaint.

MR. CHAREST:  Yes, Ma'am.

THE COURT:  Tell me about adequacy as it relates to that claim.

MR. CHAREST:  In respect of the -- the client population?

THE COURT:  In -- in -- in -- with regard to the -- the Plaintiff representatives?

MR. CHAREST:  The named Plaintiffs.  I'm sorry.  Thank you.  Well, I think I'll start with, I don't know that we have one hundred percent coverage, but I would say

probably sixty percent coverage of named Plaintiffs having physical reactions to the -- the various releases, whether it be, you know, shortness of breath, inability to sleep, eyes watering and then and -- and the like. And we, for those with cisterns, we have, you know, obviously their -- their water had -- had the refuse in it and so there would have been exposure through that way.

And so the -- the concept behind -- so -- so on adequacy, each one of them has sort of the kernel that would lead to whether that claim is viable or not. They've all had the exposure that would then call into the question next, ought there be medical monitoring or not. And so whether any one of them actually qualifies is that there's lines -- that are dotted lines yet that have not been established. But I mean they are adequate to be included in that consideration. So we think under Twenty-three A that satisfies adequacy.

THE COURT: Okay. I'm going to -- I'm going to jump around a little bit --

MR. CHAREST: Of course.

THE COURT: -- on that particular issue.

MR. CHAREST: Yes, Ma'am.

THE COURT: I was looking at the -- the formulas that you have --

MR. CHAREST: Yes, Ma'am.

THE COURT: -- and the notice that you have and I didn't see, and tell me if I missed it, the category that I would expect to see for medical monitoring.

MR. CHAREST: So there's nothing specific for medical monitoring. There are specific -- we describe it as points for physical health manifestation. So that's -- that was the approach we tried to take there in terms of that captures both on a nuisance perspective, the -- the human impact of the nuisance, but also on a potential medical monitoring claim -- claim, the potential longer-term effects.

And so for those, and then I'm looking at, for the Court's record here and I can -- happy to show it to the Court if it's helpful. It's docket number ten ninety-nine dash three --

THE COURT: Uh-huh.

MR. CHAREST: -- which is the Exhibit C to the motion and the claimant payment formula.

THE COURT: Yes, I have.

MR. CHAREST: And again, so you have seen ten points assigned for people that had suffered physical health manifestations but did not have medical records and fifteen if there are medical records and then you also have, in addition to that mere presence within the affected area, trying to find where that is -- there it is

ten points assigned as well.

So someone that had -- was present and had a physical manifestation would have either twenty or twenty-five points, depending on their documentation supporting it and then where they are within the -- the geographic unit, that could be multiplied by one, by three or by five, depending on their location.

THE COURT:  The group that comprises a medical monitoring group, does that take into account both present injuries because that says, physical health manifestations.  So I am assuming that that means someone who is manifesting currently is manifesting symptoms --

MR. CHAREST:  Or -- or has manifested.  It does not --

THE COURT:  -- or has manifested symptoms.

MR. CHAREST:  -- it -- it does not -- if -- if someone --

THE COURT:  What about future?

MR. CHAREST:  -- it -- it does not have any -- there's no -- well, I guess the only way you can tie it to the future is to say that your presence there is the thing that would trigger your right, I suppose, to a future.

But I think to -- to answer the question that you didn't ask the -- when you have to -- when you look at whether or not medical monitoring is appropriate, you have

to have evidence of something that would cause it in the first place.

And so from -- from my perspective, sort of tying those two things together is the people that have manifested physical injuries are more likely to be a group that gets into monitoring.  That's my -- my concept of it.

THE COURT:  So if someone is not currently manifesting injuries, then that person would not be included --

MR. CHAREST:  Well, included --

THE COURT:  -- for the medical monitoring.  I mean, I was thinking that the medical monitoring included those who are currently manifesting symptoms as well as those who may not be manifesting symptoms today, but might, you know, manifest systems later on.

MR. CHAREST:  Understood.

THE COURT:  And -- and so where would those individuals fall?

MR. CHAREST:  Well, I would say two things to that.  Number one, with this settlement, you know, to be ultimately clear, like, no one's going to get medical monitoring.  They're going to get paid a cash settlement in -- in exchange for the claims.  So there's this -- there's notion of who fits into what bucket that -- that matters for adequacy.  But it doesn't matter for like

dollar for dollar if that makes sense.

But I would say that -- that from the medic to -- to respond more specifically to the Court's question, the medical monitoring claim is based on cistern exposure. Like fundamentally, though, through the -- the expert work that we've done. And so if you have cistern exposure, that is, I think the top level own and impact structure is the top level that gets thirty points.

So you're going to be capturing the same that group of people that would have been eligible for medical monitoring, assuming we go all the way and -- and achieve that result, are getting the top level of thirty points for -- for their cistern exposure.

THE COURT: Is that the way it was described in the complaint? Is that the way medical monitoring and those who were would be subject to medical monitoring? Is that the way it was described in the complaint?

MR. CHAREST: I don't -- I don't have that in my head, to be honest with you, Your Honor. I can just -- I can tell you that that is how from the expert perspective how we built out that leg of the expert work that we've done. I think the concept there is because of the more prolonged exposure to whatever the toxins were that were in the water. I think that was the scientific aspect of it. And sort of an exposure driven approach -- if that

makes sense.

MR. BECKSTEDT: Your Honor, it's Carl Beckstedt, I apologize for chiming in here. We're having a hard time hearing Plaintiff's counsel. He is not speaking directly to the microphone.

THE COURT: Okay. No, thank you for letting us know. And if at any point that's happening, feel free to -- to let us know so we can correct that.

MR. CHAREST: I'll do that. I will try to do better.

THE COURT: Okay. The reason I'm asking about this, and I was looking for where it's located here. The complaint, I believe, speaks to exposure to dangerous substances, such that Plaintiffs and class members have been placed at an increased risk of contracting latent, latent illness and disease, including, but not limited to cancer, and as such require medical monitoring, which Defendants are responsible for providing and paying for. So that's why I was asking about this issue of some form of disease resulting from the exposure, but not apparent now, a latent illness. So is --

MR. CHAREST: Yes, Ma'am.

THE COURT: -- is that no longer part of what is included?

MR. CHAREST: No, it's --

THE COURT:  That is a latent illness?

MR. CHAREST:  So that -- that is --

THE COURT:  Because that would be one that's not apparent now.

MR. CHAREST:  Yes, Ma'am.

THE COURT:  Right?

MR. CHAREST:  Understood.

THE COURT:  Okay.

MR. CHAREST:  It is very much in the live claims in the case.  All right.  But I think this gets to really the Twenty-three -- this gets really to the Twenty-three E issues.  I think to be fair is when -- when evaluating the quality of a settlement, one has to look at not only the claim, but the likelihood of success and the risk and all of the attendant issues to it.  And it's not -- so I -- I love all of my children equally.  Right?  But some claims are better than other claims, I would say.  All right.

And so when you have -- when you're taking into account how to deal with a settlement proposal, our job is to make our best assessment of a) how much can we get for the class, and b) how do we apportion it within the class equitably.  Both core issues under Rule Twenty-three  E. And -- and that's why the Court is the one to question us because we just do it our best, and the Court has to look

out for the -- the interests of the absent class members.

And obviously it's happening. But in our estimation, Your Honor, the -- while that is a pled claim, and that is, we think, a viable claim, it cannot be -- we have to be concede that it faces an uphill battle legally and factually and fundamentally, if someone has -- if someone has like a cancer claim presently, in -- in my honest assessment, they probably should opt out because they have claims that exceed what this settlement does and that's a little bit different than what the Court asked.

But you know, I'm trying to give the Court the benefit of my -- my -- why -- why I think this is just and proper, and which is really, I think, the next question, adequacy, no offense, I think it's met because the people have the same exposure. So I don't see it really as being that issue. But the underpinnings of the Court's question is, why is it fair to settle that claim and then distribute in this way? I think.

And the reason is, I think because of the strength of the claims in respect of the other claims and the -- and the -- and the sort of homogeny of the class in respect of the types of injuries that they have -- that they undertook and that's why, with the point system we developed, tried to address those two things to be fair among the class and also to allow for enhanced recoveries

when the injury was greater and less when the injury was less and that's -- sorry.

THE COURT:  And -- and I understand that and obviously, in the context of -- of engaging in settlement negotiations and discussions, you evaluate strength and weaknesses of claims, you, et cetera.  But it seems to me, and tell me where I'm wrong on this, that an entire category or group of individuals would be left out under this approach.

MR. CHAREST:  Group --

THE COURT:  Because if, to the extent that we're now saying that there -- there isn't at this point, for purposes of this settlement, a viable group that is getting relief, if you have a latent illness, which is what I think I hear you saying, then that entire group is no longer a part of what's happening here with regard to the settlement.  Is that fair or not?

MR. CHAREST:  I missed the last part of your question.  Judge, I understand the point there at the last.  I'm sorry to be dense, but I'm not going to --

THE COURT:  Okay.  What I'm saying is that it seems to the Court that what is happening here is that an entire group that was previously a part of this proposed class is no longer a part of the class for purposes of the settlement because there is no longer a group that

includes individuals that may have a latent illness, an illness that results later on as a result of the exposure that they had to, you know, the -- the various toxins and so forth, as alleged by the Plaintiffs. Is that incorrect?

MR. CHAREST: I -- I understand the question now, and I think I do defer with the Court on -- on that and I'll just want to --

THE COURT: Okay. Tell me why.

MR. CHAREST: Yes, Ma'am. I think the -- the fundamental point is it is medically impossible. I think if you have a latent injury presently that will come up years down the road to differentiate between one member or another member of the class. And so there's no -- there's no -- we've done our best with exposure through being present, exposure through or -- or manifestations of other injuries to sort of show that you had more exposure and also the cistern exposure, all of those being highlighted.

But beyond that, there's no that I can think of rational and objective way to discern one person that -- that may have a latent injury from another person that will not have a latent injury. So what we try to do is reward, if you will, or assign points for indicia of increased exposure because of the correlation, we think, between increased exposure and the likelihood of latent

future injuries.

So that's within the entire group. Imagine it's ten thousand people, right, and one-third of which owns a cistern or drank from a cistern, and one-third of which had medical manifestations. Those people, and everyone was exposed, everyone gets sort of the general ten points for exposure. Okay. Fine.

And then the people that have some sort of medical resulting from -- result from that more likely than not, had an increased exposure than those that didn't. Okay. So they get more and the people that were -- that own the cistern also had an increased likelihood and so they get more. And so that's the best answer I can give you, is that where --

MR. MILLER: I'm going to expand on that.

MR. CHAREST: No jump in.

MR. MILLER: I'd -- I'd like to amplify that point. Attorney Dema and I, Your Honor, really worked on the medical monitoring case as part of the expert reports. So the way that we envision capturing the people who may experience a latent disease because you're hundred percent right, medical monitoring goes to a risk of a potential future latent disease and the way that this settlement payment grid addresses that potentiality as part of a class is through the -- if you owned or owned an impacted

structure with a cistern in the affected geographic area. Thirty points.

Because our medical monitoring expert report by Dr. Ken Rudo places the exposure through cisterns. So it's people who were exposed dermally and who drank water through cisterns and over time, their exposure increases. Those are the ones that are at risk as part of this class and so one of the reasons why we assigned thirty points for that ownership is to address that future disease. Now, one way to deal with the potential future disease is to rid your cisterns of the contaminants.

And so as Attorney Charest said, these are money damages. These will be paid out in money. But the plan to address that component in that exposure, also recognized in the E.P.A. administrative order, the same way it was through the cistern exposure in that type of latent disease. Paragraph one fourteen of the E.P.A. administrative order covers that is through the enhanced thirty points of cistern exposure.

THE COURT: Uh-huh.

MR. MILLER: That's how we deal with that very specifically, Your Honor.

MR. CHAREST: Attorney Dema?

MR. DEMA: Attorney Miller made that point. We were very conscious of the fact that latency obviously may

not manifest itself for years and therefore, the only thing we could do is address the --

THE COURT:  The level of exposure.

MR. DEMA:  -- certain extent of exposure.

THE COURT:  Uh-huh.

MR. DEMA:  Because the more exposure there is, the more likely that that latency will manifest itself in actual disease.

MR. MILLER:  But this grid does not abandon that claim.  It captures it through the cistern exposure in thirty points.

THE COURT:  Okay.  Okay.  Thank you.

MR. CHAREST:  Your Honor, as a suggestion to maybe better address the concern, if the Court's interested, there could be an allocation of points for people that lived and drank or were expo -- you know, had exposure to cistern water that could contaminated cistern if we wanted to enhance that.

THE COURT:  Uh-huh.

MR. CHAREST:  Because as written, what I realized as I was -- as I was responding, it's thirty points for the owner and maybe you might do another enhancement for just the residents of a cistern home.  Right.  Instead of just ownership, it could be people that drank from -- used the cistern water and that could be

part of the declaration.  That, you know, that could just be another point bonus to -- to address the Court's concern.  Is that right?

THE COURT:  Yeah, right now, it's -- if you owned or own an impacted structure with a cistern in the affected geographic area.

MR. CHAREST:  Yes, Ma'am.

THE COURT:  Right?

MR. CHAREST:  And so --

THE COURT:  So --

MR. CHAREST:  What I'm -- what I'm suggest -- in the property damage section, in my mind, that effect, that pertains to the owner of the property.  Right?

THE COURT:  Uh-huh.

MR. CHAREST:  But if you're -- if you're either a renter or a resident within a home with an affected cistern, there might be an appropriate bump there to address the sort of latency and concern about go forward injuries.  So I think that's --

THE COURT:  I think that's right.

MR. CHAREST:  That's a good modification.  Thank you.

THE COURT:  Yeah.  I think that's right.

MR. CHAREST:  We would agree with that.  And we're working presently to try and find out the

configuration of owner versus renter in that area --

THE COURT: Uh-huh.

MR. CHAREST: -- in connection with the other work we're doing anyway and so with the Court's permission, we --

THE COURT: I -- I think that would make sense.

MR. CHAREST: Yeah. We can -- with the Court's permission, we can submit a new -- another point structure that would address that at that point.

THE COURT: Okay.

MR. CHAREST: Thank you.

THE COURT: Okay. You can turn to Twenty-three B.

MR. CHAREST: Thank you, Ma'am. So Twenty-three B three, there's two core issues you have predominance and superiority. Again, so we -- we touched it on, really, predominance if you -- if you track the Courts -- the jurisprudence in this, if you start with common issues, and then if the common issues predominate.

So the focus first is, are there common issues, of course, we talked about there are and the question that's posed on predominance is whether the class is sufficiently cohesive to warrant adjudication by representation.

And that even though predominance is the -- is

the watchword, it does not require absolute commonality with all issues to be across the class membership. But rather that the core issues, again, be so cohesive -- cohesive. And so here we have substantially overlapping legal -- legal claims. They all derive from, again, the same underlying facts about the Defendant's behavior, their failure to prepare, their failure to monitor, their failure to properly repair and then their rush to -- to get to production.

All those factual issues, how that gets treated at law, whether it's negligence, gross negligence and all those levels of questions. And also even like the wind patterns and the effect of having these materials deposited into your cisterns. All of those are common issues and so collectively, those predominate over any sort of individualized issues across the class. And you'll be using common evidence to deal with each one of those questions and each one of those points I just talked about.

And it's true that you'll have in one cistern more of this and then in that cistern less of that and -- but those individualized kind of issues do not put away the predominance of all the common issues that we just talked about. And that's -- that's why, again, I'm not sure you can -- you can -- this is tailor made for class

adjudication with a single source and a -- and a broad impact zone.

And then in terms of superiority, the question is you balance the -- the fairness and efficiency of the class adjudication over alter -- alternative methods. With all due respect to the complex division and -- and -- and -- and the -- the -- the you know, the cases in the superior courts dealing with ten thousand cases in one -- one -- in one event when they are so common and when the issues do predominate is undeniably a better way to do this.

There you have to balance what undesirable events. There are none, I guess, you know, obviously no one's objected. So we'll see if objectors come in and -- and identify things later. But presently we, you know, with -- in respect of our legitimately held and -- and -- and -- and -- and our best effort to meet our duties to the class, we don't see any downside to doing it through a class adjudication. And of course, the Court is here to protect the absent class members and already has done so.

So that's, we think, superiority satisfied as well. So in that respect, Twenty-three A and Twenty-three B three are both satisfied and then the next, from there, from the class settlement perspective, the next -- the next step from there is to look at the questions of notice

and the -- the substantive fairness of the proposal itself and I'm happy to go on there if the Court wants or if the Court has specific questions.

THE COURT:  You know, this -- this sort of goes back because there -- there's a common thread, I think, you know, with regard to -- to -- to commonality, and we're talking about predominance here.  Obviously, there -- there were different toxins in these different exposures, the various flares that -- that occurred.  There is -- there were differences in terms of the reach, the geographic reach of the impact of what -- what occurred on -- on -- on those dates.

Does that affect, in any regard, any of these areas where we're talking about this common thread of whether it's commonality, whether it's typicality, whether it's predominance, so does -- does -- do those things affect in any way the analysis?

MR. CHAREST:  Well, my answer is no.

UNIDENTIFIED MALE SPEAKER:  Excuse me.  I'm sorry, Your Honor, but I apologize but we can't hear anything on our end.

MR. CHAREST:  Okay.  I'll just -- so the question is whether or not the different flare events affect predominance fundamentally, I think.

THE COURT:  Hold on for one second.  Attorney

Charest, can you hear now?

UNIDENTIFIED MALE SPEAKER:  Yes, that's much better.  Thank you, Your Honor.

THE COURT:  Okay.  So remember, you have to stay close to that mic.

MR. CHAREST:  I'll do my best --

THE COURT:  Okay.

MR. CHAREST:  -- I will do my level best.

THE COURT:  Okay.

MR. CHAREST:  I like to move around, but I'll do my best.  Sorry.

THE COURT:  Okay.

MR. CHAREST:  So when -- fundamentally we have two types of releases, if that makes sense, and you have two oil rain out events of -- covering two generally different geographic areas.  But they, if -- and I can show you through a map because it really helps explain if I may.

THE COURT:  Okay.

MR. CHAREST:  So I'm going to -- is it on the monitor?  Can you see it?  Your Honor, I don't see it on mine.

THE COURT:  I -- I can see it on mine.  Yes.

MR. CHAREST:  Perfect.

THE COURT:  There we go.

MR. CHAREST: All right. So I'll start with the -- the flares. This is -- this is from one of the expert reports that has been recently exchanged, and you have basically the first flare rain out is that plume, and the second flare rain out is this plume.

THE COURT: Okay.

MR. CHAREST: And so while there are -- this little gap here that -- that -- that separates the two, they both fundamentally cover the western portion of the island.

THE COURT: Okay.

MR. CHAREST: All right. So that's the first -- first point.

THE COURT: Uh-huh.

MR. CHAREST: The intensity is slightly different. The -- the first one is less intense than the second one.

THE COURT: Uh-huh.

MR. CHAREST: All right. And I'm -- and I'm for the record, I'm circling the two plumes. And then you also have what I would describe as the -- the noxious gas releases, which when you're talking about geographic location, are more localized and will tend to go both up and downwind a bit because of the -- the timing of the wind on any particular day. And so the way we dealt with

that, Your Honor, to try and bring those claims together is like this.

We have the line of latitude, which is basically the easternmost point of the refinery.  All right.

THE COURT:  Uh-huh.

MR. CHAREST:  It's not exactly straight.  And then we had three different zones, which if the Court recalled, every individual gets points and then based on the geographic location, those points are multiplied by either one, three or five.  And so the multiplication by five is in the area, what we call the -- internally we call it the preliminary injunction area.

So the Court -- the area that the Court already heard from, and saw was supported with all the Sedgwick data.  So I'm highlighting that in red here.  And the rationale behind that is those folks is where -- those folks are where the most intense oil rain out happened.  All right.

The next level is what we call zone two, which are adjacent estates supported by both the wind modeling and also client interviews and are sort of grant suite work trying to interview people and what did you have, and this captures both part of -- of the -- of well, frankly both releases --

THE COURT:  Uh-huh.

MR. CHAREST: -- but it captures the bulk of the first release and sort of the lighter areas of the second release. So those -- these folks get multiplied by five. And then you have the third area, which is everything else to the north and then down kind of immediately to the east there. And the concept there is to capture the intermittent noxious fumes releases and any other sort of carryover.

Now those are -- that's how the points are allocated in order to try and address the lack of absolute unanimity across the -- the class. But again, from the -- from the class relief perspective, we see there's a cohesive approach and a fair allocation amongst -- amongst them. So that times five, times three, times one. And -- and if the Court -- if will indulge me, what you see is this is just a distribution of client -- clients, like their home location.

So some people are over here because they were in the area, whatever but you can see the distribution of people that were affected enough to go get a lawyer and -- and sign up. So that to me is just a data point that confirms what we're talking about. This is a map of the Sedgwick data that shows again, sort of the -- the concentration along that zone one. But also keeping in mind that Sedgwick ended, right because they weren't

getting paid.  So it's not -- it doesn't show the end, but it shows the concentration.

THE COURT:  Uh-huh.

MR. CHAREST:  All right.

THE COURT:  Uh-huh.

MR. CHAREST:  And then we have the plumes that confirm again our approach.  And then we have tested cisterns through both of these areas, you know, with confirmed presence, even all the way to this -- up in the Mon Bijou neighborhood, which is why we extended it out there even though I want to -- I want to point out something on the plumes because I think this is important.

The two plumes that I've shown the Court here, what we're talking about is with a statistical degree of certainty, the expert says, yes, they got hit.  Okay.  If you're within an area.

THE COURT:  Okay.

MR. CHAREST:  But what it doesn't mean is that if you're on the other side, right here or right here, it does not mean that you did not get hit.

THE COURT:  Uh-huh.

MR. CHAREST:  It just means he can't prove it with a statistical degree of certainty.  So what we did was we went out and talked to folks and confirmed what their -- where is it here -- you know, what their actual

lived experience was and we got confirmation from actual clients and declarations confirming the outer edges of the -- the class, the zone two class that we're proposing.  So that's the -- that's the factual basis as to why we did what we did.

THE COURT:  Uh-huh.

MR. CHAREST:  But to answer the Court's question specifically, yes, it includes different releases, but in our estimation, the impact of those releases is addressed through both the point system in itself and also the geographic multiplier from -- within the point system.

And this is the very busy map here, if the Court wants to see all of the data we put together.  But we did a lot of work to try and figure out the -- the right way to go with this, Your Honor.  And this is, I think, the best solution we could come up with.

THE COURT:  Okay.  Thank you.

MR. CHAREST:  Yes, Ma'am.

THE COURT:  Okay.  I think you discussed both predominance and superiority.

MR. CHAREST:  Yes, Ma'am.

THE COURT:  So --

MR. CHAREST:  And we touched on, I'm sorry to jump ahead of you, but we also --

THE COURT:  Go ahead.

MR. CHAREST:  -- touched a bit on Twenty-three E two, the -- the allocation aspect of the --

THE COURT:  Yes.

MR. CHAREST:  -- of the proposal.

THE COURT:  Yes.

MR. CHAREST:  I think we should talk about, for the record, notice if the Court's happy with that?

THE COURT:  Yes.  Just give me one moment.

MR. CHAREST:  Yes, Ma'am.

THE COURT:  Okay.  That's part of Twenty-three E two --

MR. CHAREST:  Twenty-three E one is really the kind of the -- the focus I notice, and two talks about the substance as I -- as I read the rule.

THE COURT:  Okay.  Yes.  Okay.

MR. CHAREST:  Yes, Ma'am.

THE COURT:  All right.

MR. CHAREST:  So Twenty-three E one basically says the parties have to give you enough information to -- to -- to -- to determine whether or not notice is valid and then you -- and then you look at what we've given you and -- and make a determination.  I would also point out that Twenty-three C two B says that for a Twenty-three B three class, there are certain aspects of notice that have to be satisfied.  So I'm going to run through Twenty-three

C two B and E one sort of collectively here.

Twenty-three B three classes require that the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort and I'm citing -- I'm reading from Twenty-three C two B.

THE COURT:  Uh-huh.

MR. CHAREST:  So that's the scope, best -- best efforts and individual notice were reasonably possible. And then in respect of the content, generally speaking, the notice should contain sufficient information to enable class members to make informed decisions on whether they should take steps to protect their rights, including objecting or opting out of the class.

So the concept there is a), who gets the notice and b), what's the substance of the notice?  All right.

THE COURT:  Uh-huh.

MR. CHAREST:  And so in terms of who gets the notice, our plan is -- is laid out and supported by the Azari Declaration, which is in the record at docket one zero nine nine dash three.  But fundamentally the estimated reach is at least eighty percent of the class, which is well above the norm, well above the norm of the class members and conceptually one hundred percent of the properties.

One hundred percent of the -- of the -- of the improved properties and I'll explain what I mean by that. The plan is to find -- to mail, to go out and get the actual address for every structure in -- in the proposed area and mail a physical short form notice to that location to the current resident or the owner of.  All right.

And -- and so that's every location will get a physically mailed notice card.  The short form the -- the -- the -- the short form notice, which I believe is at -- I've got here.  There it is.  It's in the record at -- sorry, in the record at one zero nine nine dash five.  So every --

THE COURT:  Yes.

MR. CHAREST:  -- every property will get that mailed.

THE COURT:  Uh-huh.

MR. CHAREST:  Every signed client, that -- that -- which is -- there's I think maybe four thousand people that we know of, ish, will get an email from their lawyer about the settlement.  And so they're going to get individual notice for that.

THE COURT:  And you have the email addresses already?

MR. CHAREST:  Yes, Ma'am.

THE COURT:  Okay.

MR. CHAREST:  Yeah.  So I guess I'd say I can't -- I can't promise that every lawyer has every client's email address, but for everyone that we have, they will get a note -- they will get an email.

THE COURT:  Okay.

MR. CHAREST:  And the program, as I recall, is, you know, it's designed to come from an -- what's the word, the address -- from the location that is associated with not being spam.

THE COURT:  Uh-huh.

MR. CHAREST:  So it's supposed to get past the spam filters.  It goes three times.  They're going to get notice, you know, the people that -- that have been, again, that have signed up will get notice, I think what -- I'm not sure it's in the plan, but if it isn't, I'm going to try and get it adjusted to anyone that signed up for the water program should get notice.  All right.

THE COURT:  Uh-huh.

MR. CHAREST:  Because they've also obviously been affected.  So there's -- there's efforts to do individual notice when at all possible --

THE COURT:  Uh-huh.

MR. CHAREST:  -- and that's, you know, fundamentally a massive step forward.  Aside from that,

there'll be publication notice and what that means there will be -- it'll be online, it'll be in print and on radio shows.  There are details of which are in -- in the record and I don't regrettably know the -- the radio stations.  I know S.T.X. is one of them, but beyond that, I don't know.

And then there'll be a website that -- that provides again all of the information, the key documents, whether it be the pleadings, the settlement agreements, all that will be available to the -- to the long form notice, all of that will be available to anyone that clicks into the -- into the website.

There's a toll-free number that will be answered by the same folks, if the Court agrees to appoint Epiq, which I think the Court should because they've done a really good job with the water program and are familiar with sort of the local issues here.

THE COURT:  Uh-huh.

MR. CHAREST:  They will use their same skill and abilities to -- to deal with questions about the settlement itself.  And then in addition to that, the local law firms here, the ones that are sort of typically associated with Plaintiffs' claims, will have available long form and we'll be able -- available to answer questions for people that walk in the door.

THE COURT:  Uh-huh.

MR. CHAREST:  So again, it's -- it's estimated at eighty percent reach.  I -- I cannot think of another thing we could do to make it better.  And so I'm really confident -- really confident in the scope reach.  And then in terms of the content, it has everything, not only that you ought to have, but we tried to, we did a real heavy effort to try and make it more plain language as best as simple as we could.

THE COURT:  Uh-huh.

MR. CHAREST:  So it talks about the nature of the claims, it talks about what the class is, describes the benefits of settlement and it tells about the point system, it talks about the -- the class members' rights, whether the right to opt out, to object, the consequences of each step.

It also tells them that if they don't opt out, it's binding on them and it talks about the date -- the date -- well, there's a blank for the date of the actual fairness hearing.

THE COURT:  Uh-huh.

MR. CHAREST:  So the -- the core information, again, what they're -- what they need to know to protect their rights has been amply provided in a -- in a -- in I think a pretty good plain language approach.  And that will be in the long form, in the short form and on the

website as well.

THE COURT:  Let me ask you about one item. There are several things that must be included in the notice and I'm looking at, for -- for any Twenty-three B three class, it speaks to the ability of a class member to enter an appearance through an attorney if the class member wants to, is that -- is that reflected somewhere in looking through, I did not see that.

MR. CHAREST:  It is, Your Honor.

THE COURT:  And tell me where it is.

MR. CHAREST:  Yes, Ma'am.  I'm looking right now.  On -- I just saw, the first one I looked at was the short form.

THE COURT:  Okay.

MR. CHAREST:  Which is ten ninety-nine dash five.

THE COURT:  Yes.

MR. CHAREST:  At the bottom paragraph of the first page it says, who represents me?  The last line says, you may hire your own lawyer at your expense, if you so choose.

THE COURT:  Okay.  This is a short form.

MR. CHAREST:  Yes, Ma'am.

THE COURT:  Okay.

MR. CHAREST:  And then I'll look at the long

form.  I expect it's there as well.

THE COURT:  Okay.  Okay.  Yes, I -- I definitely see it now in the short form.  I -- tell me about the long form.

MR. CHAREST:  I'm -- I'm looking for --

THE COURT:  It's there.

MR. CHAREST:  I don't have it committed to memory now.  I'm looking through it now to try and find it.

THE COURT:  Okay.  It clearly has the attorneys representing the class and that's number five.

MR. CHAREST:  Yes, Ma'am.

THE COURT:  But I didn't see the ability to be represented by other counsel if they so choose.

MR. CHAREST:  Yeah, I'll be honest on my quick read.  I -- I don't see it either.  We can absolutely add that in.

THE COURT:  Yeah.

MR. CHAREST:  It's totally fine.

THE COURT:  Okay.  And you know if you find it, then you can --

MR. CHAREST:  Yes, Ma'am.  I'll --

THE COURT:  -- you can tell me.  But when I read through that one in particular, I didn't see it.

MR. CHAREST:  We'll -- we'll either identify

where I missed it or we'll suggest an addition.

THE COURT:  Okay.

MR. CHAREST:  And I will just point out that the documents a lot of the drafts refer to, like I noticed it's on the short form.  It says seventeen point five million.

THE COURT:  Yes.

MR. CHAREST:  Obviously, that number is different because of the inclusion of the Pinnacle settlement and the -- the sort of co-administration.

THE COURT:  I -- yes --

MR. CHAREST:  So we'll have the --

THE COURT:  -- I was going to ask you about that as well.

MR. CHAREST:  Yes, Ma'am.  We're going to --

THE COURT:  Because it's -- it's -- it's one -- it's one form that you're using.

MR. CHAREST:  Yes, Ma'am.

THE COURT:  Yes.

MR. CHAREST:  So what I suggest on that point, then, is what we can do is submit red lines in a week or something like that and -- and for --

THE COURT:  And -- and that would -- that would be helpful.

MR. CHAREST:  Thank you.

THE COURT: The red line. I was going to ask you to do that.

MR. CHAREST: Okay. Yeah, we'll make sure we get it right. Let me put it that way. I'm told maybe we did already do it right on the Pinnacle submission, but --

THE COURT: Okay.

MR. CHAREST: -- I'm working from the one -- the same one the Court's working from.

THE COURT: Yes.

MR. CHAREST: And we will -- we will either submit a red line with suggestions to conform both together or point out the Court, here it is, and here's where we're good. And so far, I've got conforming Pinnacle and ArcLight, together, number one and number two, the right for absent class members to hire their own lawyers and be represented.

THE COURT: All right.

MR. CHAREST: Yes, Ma'am. No problem. I would also -- this isn't really -- given that we're talking about the nitty -- given that we're talking about the nitty gritty, this is not something that's evident. But one of the questions we've asked the Court to answer is to set a final approval date.

And reading through the papers, it wasn't clear to me how long between preliminary approval and final

approval and for the Court's benefit, there's a one hundred and fifty days pass between the preliminary approval and the submission by the class of their materials.

And then there's a twenty-one-day period between final approval and the first required submission. So if you tag those together and give no leeway for administration, it's one hundred and seventy-one days and I would suggest for the sake of good order, maybe adding two weeks gap between the submission and the time the papers are due to be filed, which would be then what, one eighty-five -- a hundred and eighty-five days from whenever the Court, assuming it does, grants preliminary approval and sets the final approval date. Just for the -- that was a question I anticipated and I think it's helpful.

THE COURT: You're anticipating correctly. Yes.

MR. CHAREST: Good. All right. So in respect to notice, I think we're good. We talked a lot already about, unless the Court has other questions about notice.

THE COURT: No, you can go ahead.

MR. CHAREST: Yeah, the -- we talked a lot about Twenty-three E two in terms of, you know, the balance of allocation and the method of allocation.

THE COURT: Uh-huh.

MR. CHAREST:  And again, I think at this point it -- it bears note that to sort of echo what the Court said from the beginning, which is preliminary approval is not a promise of final approval.  Right.  It's the Court's initial read and you know, I'm not trying to be obsequious here, like valid questions, you know, the questions the Court's raising are ones that -- that maybe we should have thought of in the first place and we're not perfect and we appreciate the guidance.

But the point is preliminary approval is about whether it could be approved finally and whether or not the Court defects, obvious defects.  And so from that perspective, I think we have to then look at the allocation plan.  Again, we've talked about the points, the draft -- the geographic multipliers, but I'll run through as fast as I can the many factors that Twenty-three E two lists.  There's like seven just for the -- that way the record is clear.

THE COURT:  Yes.

MR. CHAREST:  Thank you.  So Twenty-three E two A adequate representation by both counsel and the representatives.  We talked about that in the Twenty-three A context.  I think it's similar under this context.  So I won't do it again.  Twenty-three E two B asked whether it was an arm length's transaction.  Absolutely, there's

nothing what -- what they're looking for there, what the -- what the rule is looking for there is sort of prefabbed agreements, settle, you know, the file, settle be done, and everyone washes their hands.

This is anything but that. We've been at it for a long time. Professional mediator, multiple heavily negotiated mediation sessions. There's nothing preordained about this whatsoever. Twenty-three E two C Romanette one talks about the costs, risks and delay of trial and appeal as opposed to, you know, in light of the settlement. So of course, if we did go all the way to a final judgment, the -- the number might be higher, but we have to accept the costs and the risks, and all of those things associated with that.

And not to make this about me, but I literally came here from a trial -- a two-month trial with fifteen-day deliberation that ended in a hung jury and cost of millions of dollars by the Plaintiff's attorneys and we're not to go do it again. So anyone that doesn't think -- anyone that thinks you have a slam dunk case, you're -- you're not right. You might be -- you might be in a good shape but like, we have to recognize that the risks and similarly, I've got judgments that are on appeal that have been on appeal for years.

And so the -- the notion here is it's less money

than we might otherwise get, but that's reflective of the risks of the claim and the timeliness of it. We're talking about money today for these people. It's the first money they've seen since this happened and we're eager to get it to them. So that's my argument on Twenty-three E two C Romanette one. Romanette two -- E two C Romanette two and E two D I submit kind of talk about the same thing, method of distributing relief and the equitable treatment among the -- the parties.

We've talked about that in terms of the point system and the geographic allocations, so I won't dwell on that again. But those are all documented in both the plan -- in the notice plan and the claim form and the claim -- claimant payment formula. So that's docket numbers ten ninety-nine dash four for the long form, ten ninety-nine dash five for the short form, ten ninety-nine dash two for the claim form, and ten ninety-nine dash three for the formula, all of which we've discussed, but just making sure the record's clear for anyone that's looking over our shoulders.

THE COURT: Okay.

MR. CHAREST: Twenty-three E two C Romanette three asks about the attorney's fees terms, whether they're reasonable, we -- as a practice we don't typically negotiate fees while negotiating a settlement agreement.

We just kind of cap them and we -- we followed that practice here because we don't want to -- the lawyers don't want to make the settlement about themselves. We want to make it about the clients.

The case law in this circuit allows for recovery of a third, and that's -- and the settlement is not more than a third. Will be -- will not be objected to by the parties. And that's what we plan to -- to seek here. Our cost plus a third of the -- a third of the recovery and that's supported by the case law.

But we -- that submission, that's a projection that has not been submitted. But the point is the folks that see this notice will know that there's an upper -- what the upper limit is. And we're going to try and you know, convince the Court that we've -- we've earned our fee. But that addresses Twenty-three E two C Romanette three and the last one is Twenty-three E two C Romanette four --

THE COURT: And before you continue, the -- the attorneys' fees amount, I guess in -- in the case law sort of fluctuates quite a bit and -- and for the most part, usually the higher the recovery, the lower the fee amount, the fee percentage amount. Is that -- is that fair to say or not?

MR. CHAREST: I think there are -- there are

many different ways to skin that cat is the first way I'd answer that question, Your Honor. And I -- and I do think that when you have, I would call it in orders of magnitude variance in terms of recovery, then a lot of times you'll see a smaller fee because it's one thing to look at a percentage, but it's another thing to look at real dollars, you know.

And I think the Court in its defense of the absent class members has to do both. I think we're -- we're arguing something different yet, but -- but I think a third is -- is justified here and we'll -- we'll talk about why when the time comes.

But yes, to answer the Court directly, I think the Court looks at both the total number of dollars and -- and the time. Sorry, and the percentage and tries to make a fair determination to -- to both not compensate but also incentivize future people to come forward and protect people that can't otherwise protect themselves.

THE COURT: You know, as -- as you've indicated, that's an argument for another day.

MR. CHAREST: Yes, Ma'am.

THE COURT: The -- the amount --

MR. CHAREST: Yes, Ma'am.

THE COURT: -- but for present purposes, basically what we're saying is that it would be no higher

than thirty-three.

MR. CHAREST:  Exactly.  And that's -- that's set out and is clear.

THE COURT:  And a third --

MR. CHAREST:  I'm sorry.  Yes, Ma'am, that's exactly what's set out in the notice and that will allows the absent class members to opt out and hire their own lawyers if they think they can do a better job and -- and that's their right, of course.

And so turning to the last element there, Twenty-three E two C Romanette four that's satisfied in the docket as ten ninety-nine dash one is a settlement agreement with ArcLight and Freepoint, and in the docket is eleven ninety-nine dash one.

I'll be exactly one hundred filings later.  The Pinnacle settlement.  So we -- there are no other relevant agreements that affect the class distributions or -- or the terms.  And so that's -- that is the class certification question.

THE COURT:  Tell me a little bit before you move from there about the amount of discovery.

MR. CHAREST:  Sure.  We had, I'll call it a luxury in this case, several years of time before the case really kicked off and we had the benefit of doing the preliminary, the -- the injunction hearings in which we

got good -- good information through that, and we got good information through FOIL requests to the E.P.A. and so while this settlement was achieved before the close of discovery, it was not achieved before we had really good and solid information about the claims and about the facts behind our -- our assertions against the Defendants.

And so in an effort to try and again, be, I'll -- I'll tell the Court what I tell every client I have.  My interests are aligned with yours because I want to get as much money for you and as soon as I can and I try and balance those two things to -- to make it -- to make it right for -- for us, really, but -- but for them, you know, and the point is to try and the fact that the settlement came before the close of discovery, I think it should be celebrated not -- not -- it's not a bad thing.  It's a good thing.

Because we knew because of the early actions and because of the passage of time and because of the efforts that we undertook even before formal discovery and what path we wanted to go and that initial set of discovery we got a bunch of documents from all of the settling Defendants and deposed them, like, you know, they -- they were subject to discovery.  It wasn't the full period, but it was enough for us to confirm both the likelihood of success, but also the risks attended to it.  And so it --

it informed our -- it informed our decision for sure.

THE COURT:  Give me a sense of numbers. Depositions --

MR. CHAREST:  Oh, of ArcLight --

THE COURT:  -- interrogatories.

MR. CHAREST:  -- Pinnacle.  I'm not sure.  Yeah, I don't have those data, but Kerry Miller does.

MR. MILLER:  Your Honor, with respect to ArcLight, which is the main settling party from a financial perspective, we were engaged in active discovery with them.  They produced probably over a million documents.  I think we did use Judge Henderson on some motion to compel hearings prior to the settlement that we reached.  We then did do a Thirty B six deposition of ArcLight, a number of different topics.  Mr. Donovan can speak to that.

We negotiated over the Thirty B six topics. They produced a witness who was absolutely the most knowledgeable person within the organization.  He was actually here on Island for a couple of years during the reconstruction of the refinery and we had a full Thirty B six deposition of that gentleman.

His name is Mr. Josh Scudlarick and so we did take that deposition of ArcLight after reviewing hundreds of thousands, if not a million documents, agreeing on

Thirty B six topics, getting interrogatory answers, having meeting confers, and even having at least one conference, informal conference before Judge Henderson prior to the settlement with ArcLight.

THE COURT: Okay. Thank you.

MR. CHAREST: Pretty sure -- I'm pretty sure I deposed a Pinnacle person if not, and there may have been another one too, so I think they were subject to depositions as well.

THE COURT: Okay.

MR. CHAREST: So --

THE COURT: Go ahead.

MR. CHAREST: Yeah, thank you. I'm -- I'm going back to the list of requested relief to make sure I'm trying to cover my bases here.

THE COURT: Okay.

MR. CHAREST: The first one being to conditionally certify the settlement class, the second in our list, and then we'll skip the second one because that's actually next in terms of discussion topics. Approve the plan -- the notice plan, establish the objection, opt out deadline and -- and appoint Epiq.

I think I feel like I've covered those. If the Court has any questions as to those, I'm -- I'm happy to take them or of course, whatever the Court's discretion,

you know, desire is there.

To me, the next topic is appointment of Class Counsel and the approval date -- the approval hearing, which I kind of hinted at, but we'll get to it.

THE COURT:  Okay.

MR. CHAREST:  So the -- the appointment of Class Counsel the Court has already appointed Mr. Miller, Mr. Carson and myself as co-lead and Ms. Rohn as liaison counsel and that's in the record at docket five twenty-eight.  Under the Rules Twenty-three G, the Court must and I'm -- I don't like to tell the Court what it must do ever, but that's what the rules say --

THE COURT:  Okay.

MR. CHAREST:  -- must appoint class Counsel for settlement class unless statute provides otherwise, which I don't think it does.  And so Twenty-three G focuses on the work the Counsel has done, Counsel's experience, knowledge of applicable law and resources, the sort of things that are pretty rote at this point.

And -- and again, we think that our work to date justifies being appointed as class Counsel for the settlement class.  And -- and we had the same discussion when we -- we've moved for the initial slate of appointments.

I want to be very clear that while it is the

three lawyers and -- and well, the four lawyers, the three as co-leads and -- and one as liaison, being appointed or being offered here we are absolutely working together with an entire team and I -- and I want to make sure that the Court understands that we've worked cohesively, you know, not perfectly, but I think that's a healthy, you know, sort of legislative approach.

But there are many, many lawyers that are working, I wouldn't call it beneath, but I call it with us but to be clear. But in terms of the -- the elements, we've committed substantial resources. We've obtained relief for this -- this class through the injunction and the defense of that on -- on appeal. We've opposed the motion to dismiss. We've retained and are paid -- paying for numerous experts. We've fought and won discovery battles.

We've, you know, obtained discovery, we've exercised the depositions and in this particular case negotiated what we believe to be a favorable outcome for the class in respect of these Defendants. So with that, we submit that we should be appointed as class Counsel for the settlement class if and when the Court approves it. And that's -- so that's five out of six of the requests for relief.

The six on the setting the hearing date, I would

just again point out that I think it's probably a one hundred and eighty-five-day evolution.  I've already committed to the Court that within a week we'll give the Court either a red line of the notice forms or point out where in the notice forms it -- it addresses the Court's concerns.

So all I can say is, and I'm not the Court's -- going to take the Court's time, obviously, but we're six months out from the effectiveness of that.  So the sooner preliminary approval happens, the sooner we can do the -- the final approval hearing.

THE COURT:  Okay.

MR. CHAREST:  And with that, that is -- that is the relief we're requesting.  I can either peek around the corner and argue against what the Defendants are going to say now, or wait until they get up and say it.  I would just say that -- I'll say this at a high level, two things, and I'll sit down and -- and counterattack whatever they say.

Number one, I literally don't get it.  Like the things they say they're at risk for are protected for in the settlement agreements expressly.  And the -- and the notion that Defendant number one and Defendant number two or Defendant number one and the Plaintiffs' group could affect by contract the legal relationship between

Defendant number one and Defendant number two.

I'm waiting for the contract that can change what the law is. The law is what the law is. But more importantly, all of our settlement agreements fundamentally recognize and in some of the cases articulate exactly what the law is about contribution or -- or indemnity and all those things. So that's point number one.

Point number two, the -- the deadline to bring in or make additional claims has passed. So like this specter of we want to do these things, I realized that they moved to extend it, but that by the schedule that deadline has passed. And number three, they've not made a single argument, substantive argument, as to why Rule Twenty-three is not satisfied.

They just say maybe we'll make them later. But you know, we can't shadowbox with these vague assertions of some unknown harm. So with that, I'll listen to what they have to say and -- and come back with a rebuttal on the rest. Thank you, Your Honor.

THE COURT: Let me just make -- just make sure I -- I don't have anything else for you before you take your seat. There's an incentive award that is included?

MR. CHAREST: Yes, Ma'am.

THE COURT: Tell me about that and why that

amount was selected.

MR. CHAREST:  I think it's five thousand.

THE COURT:  Five thousand.

MR. CHAREST:  Yes, Ma'am.  So it -- it is always my practice to try and reward class -- people that are willing to take on the burden of being a class representative.  And I think it's a good practice and I think it, and in this case, the amount probably could be more and -- and shouldn't be less, I think.  We're talking about people, regular, everyday people who themselves were harmed, who then agreed to sit for a deposition.

So that's sometimes more than one.  That's preparation.  That's days off.  And then going to the deposition itself, that's being, you know, in a hot, small room being asked questions by strangers about your personal life.  That's agreeing to provide authorizations to get your medical record exposed.  It's agreeing.  It's -- it's in real terms, uncovering things that you don't want to be uncovered about yourself.

Everyone has secrets as -- as good as we think we are, and -- and the invasion on their privacy and the intrusion on their regular day life ought to be compensated, ought to be rewarded.  And I would point out that these particular class representatives, the ones that -- that -- that we kept, that -- that they've been

involved, they've been responsive, they've done their job.

And so the notion of the -- the reward for that is to thank them, frankly, for their service because it's hard and none of them asked for it at all.  But when we got -- when we -- when we asked them to be representatives, we told them that we would ask for it because I think it's just.

And so that's all it is.  It's not, you know, is five thousand dollars worth exposing yourself and -- and putting yourself through this and having to be called at trial and having to be called whenever these new motions happen.  I don't know.  It probably I might ask for more, but I think for -- I think it's -- it's a fair and in -- in light of the overall settlement in this particular case, minimal.  A -- a reward for them.

THE COURT:  Okay.  The map will be part of the notice?

MR. CHAREST:  Yes, Ma'am.

THE COURT:  Okay.  So --

MR. CHAREST:  I will definitely supply that with, sorry to cut you off.

THE COURT:  No.  Yes.  I think you were going to answer what I was going to ask.

MR. CHAREST:  Even though.  Yeah.  Even though I anticipate, I'm sorry, I apologize for cutting off.  Yes,

Ma'am.  We will submit the map in connection with our red line and or final, you know, notice -- notice forms.

THE COURT:  Are the notices going to be only in English?

MR. CHAREST:  I think that's how I understand the case to be, but I also understand that the -- that the toll-free number will have language options, and I know that I can -- all I can tell you is Epiq has been dealing with language issues as a result of the water program.

THE COURT:  Okay.

MR. CHAREST:  And let -- let me go back and make sure that that gets done.  Let me just say it that way, Your Honor and that will -- that will be in our -- our submission within a week on that as well.  I should know that, but I don't, I'm sorry.

THE COURT:  One of the ways that you anticipate providing funds to individual is through a virtual prepaid card?

MR. CHAREST:  I don't remember, yeah.

THE COURT:  I think that's one of them.  Just take my word for it.  It's one of them.

MR. CHAREST:  I -- I believe.

THE COURT:  Tell me how that works.

MR. CHAREST:  I'm trying to find where it is.  I don't have -- I don't know -- I don't know the answer to

your question.

THE COURT:  Okay.  I know how that works actually.

MR. CHAREST:  Let -- let me find the list where it offers the different options and see if I -- if I'm understanding what the Court's question is.  I show and I'm looking at for the record ten ninety-nine dash two at page eight of eight.  Oh, I see the first one.  Yeah, it's on -- on page seven of eight.  A virtual prepaid card.

THE COURT:  And my -- my question about that is just relates to the security of that.

MR. CHAREST:  Yes, Ma'am.  I --

THE COURT:  I don't know a lot about it.  I'll -- I'll be honest on -- on that front.  I just don't know a lot about it.  But I -- I'd like to hear more from you as to whether or not that is a good means through which to send out payment.

MR. CHAREST:  I totally agree and -- and what we'll do is we will -- we'll do a little blurb on what it means exactly and if -- if in our analysis we think it's risky, we might just remove that as an option.  I think it's given that you can get Venmo, Zelle, A.C.H. or physical check.  I'm not sure we need yet another option.

THE COURT:  Yeah.

MR. CHAREST:  So we'll evaluate that.

THE COURT:  I'm not sure whether it's sort of like -- like a gift card kind of thing.

MR. CHAREST:  I think -- I think it -- just reading the words --

THE COURT:  Which I don't know whether it has a name of a person on it.  I don't know.

MR. CHAREST:  Yeah, I think -- I think your point, it should be --

THE COURT:  Instead, I don't know much about it.

MR. CHAREST:  -- it should be individual specific.  I think is what your concern is.  We will find out and if we're not satisfied, we'll remove it and -- and inform the Court.  Thank you.

I would say the effort is to try and make it as seamless and -- and remove, you know, friction to allow the people to get the money and -- and make it as easy as possible.  That is obviously an -- an effort, but I appreciate the security question.

THE COURT:  Yes.  There is, I believe a provision is 28 U.S.C. Section 1715(b) that speaks about sending notice to state officials about the settlement.  Are you familiar with that?

MR. CHAREST:  Is that the CAFA notice?  Yes.  Yes, Ma'am.  That we call that --

THE COURT:  Okay.

MR. CHAREST:  -- CAFA notice.

THE COURT:  Okay.

MR. CHAREST:  Yes, Ma'am.

THE COURT:  And has that been done?

MR. CHAREST:  That's usually a Defendant obligation.  I'm pretty sure they'll been done.

THE COURT:  Okay.

MR. MILLER:  Yes, all set.

MR. CHAREST:  Okay.

MR. MILLER:  All right.

THE COURT:  Okay.  I think that's it for now.

MR. CHAREST:  Thank you, Ma'am.

THE COURT:  Why don't we take a ten-minute break?

MR. CHAREST:  Yes, Ma'am.  Thank you.

COURT CLERK:  All rise.  The Court is in recess for ten minutes.

(Off the record; 11:30 a.m.)

(On the record; 11:50 a.m.)

COURT CLERK:  The District Court of the Virgin Islands is back in session.  Please be seated.

THE COURT:  Attorney Charest?

MR. CHAREST:  Yes, Ma'am.

THE COURT:  We were just doing some calculations during the break.  And -- and I wondered if, as part of

the -- so the general assessment of fairness.  Whether you already had some sense of, for example, cost for the settlement administrator.

Because as I understand how this will work, taken off the top from the settlement fund would be about, or up to thirty-three percent for attorney's fees.  The cost of the settlement administrator.  Other out of pocket expenses, which I'm assuming would be things like experts, travel, other expenses of that nature.  So I -- I think you indicated, were we talking about like, was it twenty-four?

Well, at least twenty-four thousand in terms of the -- when you take --

MR. CHAREST:  The number of people.

THE COURT:  -- that number of -- yes.  People, you know, households six thousand about four in each.

MR. CHAREST:  Yes, Ma'am.  It's --

THE COURT:  Twenty-four thousand yeah, ballpark.  For purposes of figuring out the fairness of this, did you have an amount that you are expecting that Plaintiffs would walk away with?

MR. CHAREST:  If you mean collectively, is that the question, or -- or individually?

THE COURT:  Individually.

MR. CHAREST:  I -- I -- I -- I don't.  And I --

and I can tell you the reason why.  The -- the allocation on a per Plaintiff, per claimant, we'll call them --

THE COURT:  Uh-huh.

MR. CHAREST:  -- basis is, the individual points associated with that particular person's claim.

THE COURT:  Uh-huh, Uh-huh.

MR. CHAREST:  As the numerator.

THE COURT:  Uh-huh.

MR. CHAREST:  And the denominator is the total number of points submitted.

THE COURT:  Uh-huh.

MR. CHAREST:  So I -- we --

THE COURT:  You don't know.

MR. CHAREST:  I've done models, right, I've done estimates to be fair.  But it -- as long as what -- but -- but I can't -- I can't estimate the actual total numbers, right?  Because we don't know what people will claim, how many people will claim and what they'll claim.

And so I can -- I -- I can't give you a comparison of the numerator to the denominator.  But that -- that's -- that's why I cannot answer that question.  I can tell you the way we built, the -- the point system was sort of the inverse.

Imagine the cost to clean a cistern, imagine a reasonable settlement amount for the discomfort of, you

know, eyes and vomiting or whatever.  And -- and try to make those relative balances in terms of our expertise on what claim values are.

And then, from that is -- from that sort of perspective is how I tried to -- well, we tried to balance the different points that were allocated to -- to -- to say if points are dollars, how many -- you know, how many dollars would this be and how many dollars would that be to try and balance them.

So if someone had both exposure and physical impact, they would get both.  If someone only had the physical impact, but not a cistern, they would get something less.  But the concept being to try and make them as between each other relatively balanced in respect of their -- the -- the -- the value, if you will, of their claim.

THE COURT:  But the -- the hope, obviously, is that at the end of the day, the individual would be recouping or -- or -- or -- or getting some amount that is going to be reflective of whatever the cost is to say remediate the -- the -- the damage, is the cistern issue for example.

MR. CHAREST:  Yes.

THE COURT:  Plus whatever other injuries the individual might have sustained.

MR. CHAREST:  Yes, I agreed.  But also in portion, if you think about the client, the -- the Defendants who have settled as compared to the Defendants who have not settled.  So it's not -- we're not getting a complete relief from this one settlement.

We're getting a partial relief based on the risk attendant to these particular Defendants and all those -- all those sorts of things.  So that we -- they -- they -- the -- if you think about it from like, I don't know, a -- a net value exchange.

A claimant is giving away the claims they have as to ArcLight, Freepoint and Pinnacle in exchange for these dollars.  They're maintaining and -- and preserve the claims they have against all the other Defendants.

Of course, the other one -- some have already settled and we'll package those together eventually.  But they're not giving away their entire claim, they're giving away a portion of their claim.

So I -- I think it's a false effort to try and say, oh, well now I can go clean my cistern because of the money I'm getting.  It's a portion of the money that we think they're entitled to, right, not the whole thing.

THE COURT:  Clearly.

MR. CHAREST:  Yes, Ma'am.

THE COURT:  And understanding that it's not the

entirety of it, you could still use this as sort of a --

okay. Let's say we're talking about the amount from this particular settlement.

MR. CHAREST: Sure.

THE COURT: How would those numbers, you know, basically pan out?

MR. CHAREST: Sure. So numerically you can do on an average. I can tell you -- if you tell me the -- assume we say twenty-four thousand claimants, which I think is -- I think when you talk about the number of people in the class --

THE COURT: Yeah.

MR. CHAREST: -- that's one number, that -- what we call a take rate. The number of people that actually file claims is yet another number.

THE COURT: Right. Uh-huh.

MR. CHAREST: So say twenty-four thousand people would a take rate at fifty percent. Just --

THE COURT: Uh-huh.

MR. CHAREST: -- for whatever, I'm making those numbers up. So that'd be twelve thousand people. So let me do this real quickly. So on average, just assume a take rate of -- what I've done is, well these are -- the model I built was based on the seventeen point five.

So this is already out -- out of joint because

we have more money there. But seventeen point five, if you take away a third for the fees and a half a million dollars for administrative costs, you get to eleven million, one hundred and sixty-six thousand dollars. All right?

Just dividing that by twelve thousand people gives you an average take for the assuming a fifty percent take rate, you get nine hundred thirty dollars on average per person. But the reality is, it's a bit of a false comparison because we know that some people will be getting five X what other people will get.

So the people that are on the outer edge, on the periphery, on the -- on the -- on the -- on the -- on the margin will get, you know, one fifth of a share.

Whereas the people that are in the -- the main zone of impact will get five X the share, and the ones in the middle will get three X, right? And so it's, like that is an average number, but it doesn't -- it's not predictive of any one individual.

Because any one individual could have ticked every one of the boxes for exposure and cistern and all that. And also been in the main area and will get a month health -- much healthier number. Whereas someone that, you know, I've got -- I think strictly speaking, my house is in -- in the -- in the - in the southern area, you

know?  I'm -- I'm not making a good claim because I -- I don't think I was affected, you know.

So then, you know, that -- so that -- even if I did, the most it would be is I'm in the settlement area. So I get one, you know, one point or whatever it is.  You see what I mean?  So like, as between any individual's, it's -- it's a -- it's an impossible measure and we won't know -- actually, let me -- we won't know until the -- the claims are submitted.

And the good news is this Court will have the claim submitted in an actual answer to this question before final approval, all right?  So presently, the -- the reason I'm struggling a little bit is because we don't know how that's going to come in.

But we all will know fully what the -- what the allocation is to a person, actually by the time the final settlement approval is ready.

THE COURT:  Is there an average take rate?

MR. CHAREST:  It -- take rate is a function of quality of notice.  And really I also think it's an a -- a -- a function of notability of a case.  Notoriety of a case.

THE COURT:  Uh-huh.

MR. CHAREST:  I think -- I -- I can tell you in terms of when we did the Rum Fun -- Rum Fungus settlement,

for example, the take rate was quite high because in those neighborhoods, people knew about the --

THE COURT:  Uh-huh.

MR. CHAREST:  -- knew about the claims.

THE COURT:  Uh-huh.

MR. CHAREST:  And -- and it was also done by household instead of individuals as I recall.  And so you know, just head of household had to deal with it instead of all five people within the household.

THE COURT:  Uh-huh.

MR. CHAREST:  So the -- the take rate that -- I don't know the numbers, but it was much higher than -- than the norm.  But I mean, sadly, honestly, the take rate for sort of -- these are not cases I'm involved in I hope.

But -- but they -- the take rate is sometimes ten percent because the people don't know about it, or they, you know, these -- you know, these, you can get seventy-six cents and would release all your claims, like who bothers, you know?

THE COURT:  Uh-huh.

MR. CHAREST:  Those types of claims.

THE COURT:  Uh-huh.

MR. CHAREST:  Have a very low take rate.

THE COURT:  Uh-huh.

MR. CHAREST:  That is not this case, I don't

think.

THE COURT:  Uh-huh.

MR. CHAREST:  For both reasons, our notice program is going to be very robust.  And number two, I think this is a case that people know about and people felt it, and -- and -- and -- and care.

THE COURT:  Uh-huh.

MR. CHAREST:  All right.  So they all had -- you know, I -- I don't want to go on and on about that, but they -- the impact is much more than, you know, was my social security number exposed, which is important, but like, it's not something you feel in your heart.

THE COURT:  Uh-huh.  Do you have an estimate for the settlement administrator?

MR. CHAREST:  So the estimate I used for my internal model was a half a million dollars for the admin costs.

THE COURT:  Okay.  That -- that would be the admin costs for the work related to the settlements?

MR. CHAREST:  Yes, Ma'am.

THE COURT:  Okay.  What about the other costs incurred?

MR. CHAREST:  Other -- the -- the litigation costs?

THE COURT:  Yes.

MR. CHAREST:  I don't have those numbers on hand honestly.  They --

THE COURT:  Because that would be part of -- that would be part of it as well, right?

MR. CHAREST:  Yeah.

THE COURT:  It's all of the out of pocket costs.

MR. CHAREST:  Yes.  I think we'd have to think about as of when?  Because I think there's a -- and I don't know the answer to the question, but it's a question we will have to figure out when we do our submission.

But given the timing of the settlement, it might be appropriate to do costs as of that date.  As of today, I don't know.  You know, obviously the costs are, like we're, as we go into the expert phases, as we're in the expert phases, the costs are growing pretty rapidly.

THE COURT:  Uh-huh.

MR. CHAREST:  I think before that, you know, it doesn't.  It's not -- it's wrong to say that travel is cheap, but relatively travel is that cheap.  But the real driver in costs is experts in data housing.

THE COURT:  Do you have expert costs?

MR. CHAREST:  I -- I -- I don't know them offhand.  I'm sorry.

THE COURT:  Okay.

MR. CHAREST:  I wish I did.

THE COURT:  All right.

MR. CHAREST:  But I -- I can tell you that as a person that knows on the -- on the grand scheme of things, it's expert costs and data hosting costs are the two big costs --

THE COURT:  Okay.

MR. CHAREST:  -- that I (unintelligible)

THE COURT:  Yes.

MR. MILLER:  And Your Honor, just so that the Court is aware, as Your Honor knows the settlement values that we're talking about today involving ArcLight, Freepoint and Pinnacle is right over eighteen million dollars.

THE COURT:  Uh-huh.

MR. MILLER:  The next tranche that Attorney Charest identified for you is much higher.  It's forty-two million dollars.  So that brings us to sixty million dollars.  And I will say, Your Honor, that we haven't even talked about the Limetree entities or B.P. at that point.

We are in active negotiations with the Limetree entities insurers, and that's four hundred million in insurance coverage.  And we are in very active mediations with those insurers.

THE COURT:  Okay.

MR. MILLER:  So there's plenty more to come to

cover the costs.

THE COURT: Okay. All righty. To cover the cost and allow a fair amount for the Plaintiff -- Plaintiff's class.

MR. CHAREST: Yeah. That's, I -- I think Mr. Miller's responding to the Court's question, but absolutely the ambition is to put the money in the --

THE COURT: Right.

MR. CHAREST: -- in the client's pockets.

THE COURT: Right.

MR. CHAREST: A hundred percent.

THE COURT: Okay. Thank you.

MR. CHAREST: Yes, Ma'am.

THE COURT: Okay. Counsel?

MR. BECKSTEDT: May I please the Court? Attorney, Carl Beckstedt on behalf of Limetree Bay Terminals.

THE COURT: Attorney Beckstedt.

MR. BECKSTEDT: I'm going to be arguing on behalf of, I guess, the non-settling Defendants who are still lodging an objection, limited objection to these settlement motion. And I note that Chivonne Thomas for B.P. is here with me today and she may also want to speak.

THE COURT: Okay. That would be fine.

MR. BECKSTEDT: Thank you, Your Honor.

THE COURT: Uh-huh.

MR. BECKSTEDT: The nut or the crux of the objection. Well, let -- actually, let me back up and say that Attorney Charest, in predicting what we would said made three comments.

One, regarding the legal relationship with respect to standing, one regarding the deadlines to bring cross claims. And the third, regarding not a single argument as to why the Rule Twenty-three criteria were not satisfied.

So obviously, I -- we -- it's our position that the Plaintiffs have conceded in their reply brief that we will have a right to contest certification of a litigation class if that's how things evolve with respect to the litigation.

And the Court has set a schedule for motions on certification of the class. So at this point, we respectfully state our position that we reserve our right to object and we're not conceding any of the points that were made by Attorney Charest at this point in time.

I don't think that's really on the table for today, but I just want to stand as a -- have that stand as a point of order, that while we have not raised any objections to these other Class Twenty-three criteria that the Court spent a lot of time going through with today

doesn't mean we do not -- that we waive our right or do not reserve our right to contest Rule Twenty-three criteria on a litigation class at a later date.

THE COURT:  And you would agree that that is the law.

MR. BECKSTEDT:  I would.

THE COURT:  Okay.

MR. BECKSTEDT:  Right.  And they've conceded it. But this throw in that we haven't raised a single argument might suggest that somehow we agree that, you know, to class certification.

THE COURT:  Yeah.

MR. BECKSTEDT:  Which we don't.

THE COURT:  Right.  And -- and that's why I started where I did by saying that.  You know, we're here for the preliminary settlement approval, which does not bind the Court or parties with regard to what happens at the final approval, so.

MR. BECKSTEDT:  Right.  But there's also a final approval for the settlement class.  But then there's also potentially depending on, you know, at least contemplated that there's going to be a move by the Plaintiffs for class certification of a litigation class.

THE COURT:  Uh-huh.

MR. BECKSTEDT:  And at this juncture, as a non-

settling Defendant, we reserve all our rights to contest the points with respect to a class certification of a litigation class.

THE COURT:  I am -- I am not aware of anything that would preclude the Defendants, the non-settling Defendants from raising whatever they choose to raise with regard to the class certification, or anything that transpired here today.

MR. BECKSTEDT:  Thank you, Your Honor.

THE COURT:  Uh-huh.

MR. BECKSTEDT:  So then getting to the crux of the -- of the objection.  As Limetree Bay Terminals, and all of the non-settling Defendants who are in the matter -- sit today, we have a substantive legal right to an apportionment at trial of the contribution of any settling Defendant.

THE COURT:  Uh-huh.

MR. BECKSTEDT:  And all other co-Defendants. There is a legal relationship that is established between the non-settling Defendants such as terminals and the other Defendants, we're co-Defendants.  And under Virgin Island Substantive Law, we have a right to apportionment that with respect to any contribution claims.

We vehemently and stridently disagree with Attorney Charest's statement that the deadline to bring

those claims has passed.  It hasn't even occurred yet. The Court set an order originally in this case to either file an answer, or other responsive pleading.  A motion to dismiss was clearly contemplated.  It was argued.

In fact, ArcLight and Freepoint and other entities argued strenuously about they shouldn't even be in the case, and I'm sure the Court remembers all of that. And they, and all of the Defendants asserted their right under the federal rules of procedure and law to file a motion to dismiss.

And the Court ordered that that motion to dismiss be consolidated for efficiency, which the parties abided by and did.  There has not been a ruling on that motion to dismiss.  And under the rules of procedure, if it is not granted, or if any claims survive after the ruling of the motion to dismiss, then the Defendants would have a right to file their answer and cross claims under the rules.

So that time hasn't come.  The Court, obviously there were large, there were disputes that were presented to the Court where the parties couldn't agree on a scheduling order to the point where the Court had to have a conference.

And then ultimately kind of in a unique situation for this Court had to enter an initial

scheduling order.  It didn't -- was not a product of compromise ultimately, and it was not a product of a Rule Sixteen conference with the magistrate.

But this, Your Honor, entered that order.  And as the Court will recall, there were motions to stay discovery that the Court did not grant, and the Court put the parties to proceeding with discovery in this case.

And in that initial order, the Court stated that the Plaintiffs had a deadline to file an amended pleading and to add parties, and that's embodied in the order.

There's some slight, but I think non-controlling ambiguity in that order because the Court also included a short table, but later put that table into the written word at the end of the order.  And in that table, the word Plaintiffs wasn't there.  But that table was just a shorthand of all of the deadlines in a row so that you could get a snapshot view of --

THE COURT:  Uh-huh.

MR. BECKSTEDT:  -- the discovery progression.

THE COURT:  Uh-huh.

MR. BECKSTEDT:  So clearly the Court's order was that the Plaintiff's deadline to amend their pleading, which would be their complaint because they had filed a pleading and ad parties was set.  And then ultimately there was an extension of that, which was embodied in an

order by the magistrate, which mirrored the Court's original order in the English words and said that the Plaintiff's deadline to amend pleadings and to add parties was set to, I think it was off the top of my head, I believe October 17th --

THE COURT:  Uh-huh.

MR. BECKSTEDT:  -- of 2025.  At any rate, that does not control when the Defendants are to file their responsive pleading in the form of an answer and cross claims, which is governed by the rules.

So we take the position.  And I think it's really a solid position, frankly, Your Honor, that as we stand right now in this case, we would have a right if once the Court rules on the motion to dismiss if we're still in the case to file an answer and to bring our cross claims against the Defendants.

If Defendants are dismissed out prior to that occurring, we will lose that right based upon our legal relationship with the Defendants as co-Defendants because they won't be there.

Now, substantive Virgin Islands law allows us a right to bring a third party complaint at such time.  But as we sit right now, this Court has -- the -- this proceeding allows us apportionment of liability for contribution claims against the co-Defendants.

And that is a right that under interestingly, the settlement with ArcLight paragraph thirty-nine is the key paragraph here.  Contemplates, and clearly the Plaintiffs have stated to you now at this hearing their position that we're not allowed to bring these claims.

And they've included a provision in a sentence in paragraph thirty-nine, that is not included in the Pinnacle settlement, which is the equivalent paragraph twenty-three of the Pinnacle settlement.  Where they're requiring the ArcLight Defendants and settling Defendants under the Arc -- what I'm calling for shorthand the ArcLight settlement agreement to oppose third party claims, cross claims or counterclaims.

So they're asking the Court to sanction basically what we predicted when we objected to this settlement and what we clearly see the writing on the wall to be now, that there is going to be an opposition to these cross claims, which would affect our rights with respect to our legal relationship, to the Defendants, the co-Defendants.

And this notably doesn't say they agree to Defend.  They, it says oppose.  And it's not in the Pinnacle settlement agreement.  So Your Honor, that is the legal substantive right that we have that is being affected by this settlement as it is proposed.

And I would note that the cases that are all cited in the brief talk about the right to challenge a settlement including a bar or prohibiting claims against settling Defendant.  And this is a claim that we are entitled to right now, that we have a right to right now.

And that even without that claim, we would've the right to apportion liability at this moment.  It's a -- it's a legal right that is a substantive right that we're entitled to under Virgin Islands law.  Now --

THE COURT:  And -- and your argument is that you will -- you would lose that right, if the Defendants, the settling Defendants are no longer part of the case?

MR. BECKSTEDT:  If --

THE COURT:  Is that -- is that the argument?

MR. BECKSTEDT:  If they're dismissed out of the case.

THE COURT:  Yes.

MR. BECKSTEDT:  Palermo V World Fresh makes it very clear that we will not be allowed to apportion li -- their liability.  The jury will not be allowed to have a verdict form.  Because they will not be a Defendant.

THE COURT:  They would no longer be a Defendant.

MR. BECKSTEDT:  Right.

THE COURT:  Okay.  But -- but you -- is your concern that the Plaintiffs and the settling Defendants

are now being given the opportunity to challenge your right to file a cross claim?  Or otherwise, bring those Defendants back into the lawsuit?

MR. BECKSTEDT:  Well, they're --

THE COURT:  I mean, you have that right.

MR. BECKSTEDT:  They're not --

THE COURT:  Correct?

MR. BECKSTEDT:  -- out of the law school -- suit as of right now.

THE COURT:  Understood, understood.  But I'm -- I'm sort of trying to make sure I understand what the argument is.  They're not -- they're -- they're not out of the lawsuit now.  They're obviously still in.

If ultimately they are out of the lawsuit because they have settled, if I'm understanding your argument correctly, then you are saying that they are no longer Defendants.

MR. BECKSTEDT:  I would disagree slightly with what you just said.

THE COURT:  Okay.  You -- you can correct me however you need to.

MR. BECKSTEDT:  Right.  The fact that they have settled doesn't extinguish our rights.  What extinguishes our right to apportionment would be if they are dismissed out of the case, then they are no longer Defendant.

In a -- in a perfect world, and I don't mean any disrespect by this. But I -- I -- in a perfect world, the motions to dismiss would be decided long before we got to a trial or a jury or meaning, or even finishing discovery, arguably.

But if that's decided, the rule would allow us, I believe, fourteen days if my right -- my memory is correct, to file our responsive answer and cross claims. That's all triggered by the various rules. I think it's -- I want to say thirteen or fourteen, twelve. Twelve, fourteen.

So we would be able to file our cross claims. They're -- they would be a Defendant. Clearly, I think everybody would agree that this settlement, class settlement could not extinguish, you know, our cross claims against the Defendants.

And we would be able to continue to apportion liability. As it sits right now, we have that right to apportion because they are a Defendant. So if Your Honor ends up dismissing them, so then we would not be able to file the cross claim unless the deadline is triggered before you dismiss them.

So if you ruled on the motion to dismiss, say in January, you know, we would be put to their burden of filing our answer and cross claims, I would argue. So at

that point, they -- then we would have cross claims.

But this whole settlement, interestingly, unlike the Pinnacle settlement contemplates these Defendants being dismissed out and that they are bound to object and to oppose any cross claims because it's foreseeable that at some point the Court's going to rule on the motion to dismiss.

It's foreseeable, I would ask that you dismiss it out. But it's foreseeable that we won't be dismissed out of all claims. We may not even sought, so it's -- it's clearly foreseeable that we're going to be in the case, especially if we didn't seek dismissal of all of the claims in that dispositive motion.

And then we would be able to file a answer and cross claims. And then our cross -- our cross claims would be preserved and our right to apportionment would be preserved. But if they're dismissed, our right to apportionment will be extinguished. And that's affected currently.

And that right exists currently based upon our legal relationship with all of the co-Defendants as co-Defendants. Your Honor, I think we've included in alternative relief, I don't have it in front of me, but I can pull it.

THE COURT: Yeah.

MR. BECKSTEDT:  I mean, there's -- there's a couple of different options.  But one main option would be the Court preserving our right to file cross claims against the settling Defendants, and they stay in the case in order for us to not lose that ability to keep them ultimately on the verdict form for purposes of apportionment.

THE COURT:  But --

MR. BECKSTEDT:  They have contribution protections built into the settlement.

THE COURT:  Before -- before you continue, don't you have a right under local law to bring the Defendants back into the case upon a settlement?

MR. BECKSTEDT:  I don't.  I have a right to seek leave to do that, Your Honor.

THE COURT:  Okay.

MR. BECKSTEDT:  But I don't have a right to do it.  Right now, I have a right to file a cross claim, and they are bound -- they are in the case, they are Defendants.  I service through Rule Five.  I don't have to go serve them with separate process.

THE COURT:  So if you -- Sir, if you -- if you -- if you filed -- but you're saying that you cannot file that now?

MR. BECKSTEDT:  Not saying that.  I'm saying the

time for us to file it isn't triggered yet.  And we have a right to our due process rights under the rules.  And to strategize our case and defend our case in conformity with the law and the rules.

I am not suggesting that we couldn't file a cross claim right now.  I haven't researched that point specifically, but I would accept it if you would like that we could like tomorrow, file a cross claim, but we are not required to file a cross claim tomorrow.

And we are allowed under the rules to see, to have a ruling on our motion to dismiss, and then within fourteen days to file our answer and our cross claim.

THE COURT:  And -- and why would that change that right, that particular right change whether the motion to dismiss is decided tomorrow, or it's decided three months from now?  Why would that change?

MR. BECKSTEDT:  I don't know that the right will change.  But if the -- but if they are dismissed out of the case, the right will be extinguished.  And this contemplates, this settlement contemplates the settling Defendants being dismissed out of the case.

That's clearly contemplated.  Therein lies the -- the prejudice.  I mean, it can probably be remedied.  First with removal of this sentence would be one remedy, but it wouldn't be the sole remedy.  Because that just

takes away the intent apparently, by all of these parties, presumably the Plaintiffs, to mount a full offensive that we are not allowed to bring our cross claim, which we think is not warranted under law but at any rate.

But there's also the -- the idea that if the Court hasn't ruled on the motions to dismiss and triggered our deadline to sort of put up or up --

THE COURT:  Uh-huh.

MR. BECKSTEDT:  -- you know, if I may, Your Honor --

THE COURT:  Uh-huh.

MR. BECKSTEDT:  -- without disrespecting the Court or the judicial system.  But then there'd be at least some type of -- of conditional dismissal that keeps them the settling, all settling Defendants in the case pending, you know, that deadline.

And whether or not cross claims will be brought against one or more of those Defendants.  But the -- but ultimately, well, that -- there may be another form of relief that's not coming to me.  But there -- there is a way, there is a path forward if the Court's inclined to grant this settlement, to preserve our rights under a unique Virgin Islands law.  I think everybody can agree that.

Unlike many jurisdictions, in many of the cases

where clear federal common law says rights for contribution are extinguished with settling Defendants and on and on, we have a very unique situation in the Virgin Islands with respect to contribution and indictment -- well, contribution in particular.

And given our comparative, what I would like to call our modified comparative negligence statute and the Palermo decision.  And I didn't -- I don't know if the Court wants to even hear on Pro Tanto versus Pro Rata and how that affects.

But there's clearly an undetermined, yet to be determined question of Virgin Islands law as to how that will work under Virgin Islands law.  The Supreme Court of the Virgin Islands hasn't spoken to the substantive law of how any contribution claim, or settling Defendant's obligation to a final judgment is to be set off with respect to a Plaintiff's award.

There is clearly an indication by the Supreme Court in a Palermo decision that a Plaintiff is not entitled to double recovery or windfall.  That's right in the decision.  Those words.  How -- whether that results in a Pro Rata type of situation where you allocate a percentage to the settling Defendant, the Plaintiff doesn't get that, and the non-settling Defendant has to pay their percentage of the total judgment.

Or, whether if payment of their total portion of the judgment is going to result in a greater payment than the total judgment as a whole, whether it can be further credited.  All of these issues are -- are -- are issues before the Court at some point.

Not necessarily today, but it does -- but by eliminating our able -- our right to have apportionment, we also lose some of those rights to seek set off or reduction because we will essentially, ultimately it falls back to losing the ability to apportion, the right to apportionment, which we have now.

As opposed to a conditioned right to seek leave, to bring them in as a third party later to get apportionment, which the Court could for whatever reason deny.  So now we have that right, that is being substantially affected.  And that -- that's my argument, Your Honor.

THE COURT:  Let me ask you to point to me the portion of the agreement that you think should be amended.

MR. BECKSTEDT:  Well, I will do my best right now, Your Honor.  I think I can begin to answer that question.  But if the Court would consider, if the Court's not prepared to rule today from the bench being able to provide a written submission with the -- with the assistance of all the non-settling Defendants who might

have an interest, I think that would be ultimately a good thing.

But let me say this.  If you compare paragraphs thirty-nine and twenty -- thirty-nine of the ArcLight settlement with paragraphs twenty-three of the Pinnacle settlement.

I believe you'll see, essentially from a substantive point that the paragraph in paragraph thirty-nine under additional provisions offsetting says, in the event of a third party claim, cross claim, or counterclaim by any non-rereleased party against any settling Defendant related to --

THE COURT:  Hold on for a sec.

MR. BECKSTEDT:  -- the incidents.

THE COURT:  Hold on.  Let me -- let me --

MR. BECKSTEDT:  I'm sorry.

THE COURT:  -- catch up with you here.

MR. BECKSTEDT:  I apologize.

THE COURT:  It starts with, in the event that --

MR. BECKSTEDT:  Correct.  One --

THE COURT:  Where -- where is it?  Middle?

MR. BECKSTEDT:  -- two, three, four, five, six, seven -- eighth line down at the very far right.

THE COURT:  Okay.  I see it now.  Uh-huh.

MR. BECKSTEDT:  In the event --

THE COURT:  Uh-huh.

MR. BECKSTEDT:  -- that sentence.

THE COURT:  Uh-huh.

MR. BECKSTEDT:  I don't -- I don't know if you want me to read it in the record.  But if you read that sentence --

THE COURT:  You -- you can read into the record.

MR. BECKSTEDT:  Okay.  In the event of a third party claim, cross claim or counterclaim by any non-released party against any settling Defendant related to the incidents, such settling Defendants agree to oppose such third party claims, cross claims or counterclaims, and to notify and cooperate with all Plaintiffs and settlement class members through class Counsel in the defense and any settlement of such third party claim, cross claim or counterclaim as reasonable and necessary.

So that sentence there clearly creates an obligation to oppose these types of contribution claims. Not defend, but to actually oppose them.  And in light of both statements that were made in other briefing and statements by -- made by the Plaintiffs today, it's clear that they're going to oppose them just on procedural grounds, not just substantive grounds.

I -- I want to make one note, and I'm sorry to diverge slightly but --

THE COURT:  Don't diverge yet.

MR. BECKSTEDT:  Okay.

THE COURT:  Because I need to make sure I understand precisely what you're arguing.  So your position is that the fact that the settling Defendants would be agreeing to oppose a cross claim, or third party claim.  Which would be the means of getting the settling Defendants back as Defendants, correct?

MR. BECKSTEDT:  If you dismiss them afterwards.

THE COURT:  A -- after if we dismiss?

MR. BECKSTEDT:  If you -- if you accept a settlement and there's a future time when they get dismissed.

THE COURT:  Okay.

MR. BECKSTEDT:  Like, these people are dismissed.

THE COURT:  Okay.

MR. BECKSTEDT:  At that point, we would have to file a motion for leave for third party claim.  Claim to bring them back in as a Defendant to be apportioned liability under V.I. substantive law.  This requires them -- the settling Defendants to oppose that.

If before you dismiss them, we file our answer and cross claim, this would require them to oppose that cross claim, presumably on the grounds as articulated by

the Plaintiffs today, that it's out of time because of the Court's orders.

So in both situations, although slightly different how they would arise, we believe that this paragraph requires every -- basically everyone to gang up and say, you don't get to do this.

THE COURT: Okay.

MR. BECKSTEDT: You don't have this right for a cross claim, which ultimately means they're saying, you don't have the right to apportion liability at trial because they won't be a -- because they're trying to oppose the settling Defendants being, des -- being Defendants for purposes of the verdict in apportionment.

THE COURT: Okay.

MR. BECKSTEDT: The -- okay.

THE COURT: And -- and -- and that is the basis for the argument that they're affecting a right.

MR. BECKSTEDT: Cor --

THE COURT: A right that you now have that you would not then have because they would be opposing it. Then the Court may rule one way or the other, so it's affecting that right.

MR. BECKSTEDT: Absolutely. Which as -- I think everybody can agree that as we sit here today, if no settlement occurred or none -- nothing happened and a jury

was here, as a co-Defendant, regardless of having a cross claim.

You -- you have a right whenever there's a co-Defendant at the trial to have apportionment of liability. That is a right. It's not contingent on a cross claim or a third party claim. But if they get dismissed out of the case, well, you understand my point, I hope.

THE COURT: Uh-huh. How does the fact that you can file a, you know, a cross claim tomorrow affect that?

MR. BECKSTEDT: It doesn't affect that. Because it's a -- it is a right. It doesn't -- it doesn't affect that. It could change how this settlement agreement affects our right if we took that action. But we're not under any obligation to take that action.

THE COURT: That's true.

MR. BECKSTEDT: I mean, and we don't know what claims are going to be there when the Court is finally done ruling on the motion. So I mean to -- I mean, I -- I agree you could -- you could file a cross claim, but we don't -- we aren't required to, Your Honor. I'm -- I'm agreeing for purposes --

THE COURT: I mean --

MR. BECKSTEDT: -- of this argument that we can file a cross claim before the deadline. I -- I -- I'm -- I haven't researched it, but I guess --

THE COURT:  But -- but of course -- but of course, you know, in any lawsuit you file, you don't necessarily know what claims are going to be there when you file cross claims.

MR. BECKSTEDT:  I --

THE COURT:  You don't know what claims will -- may be dismissed, may be there or not when you file a cross claim.  That's -- that's not unusual, is it?

MR. BECKSTEDT:  It's -- well, it's usual in my experience that people file cross claims when they file answers.

THE COURT:  Okay.

MR. BECKSTEDT:  It is not usual, although I have seen it done where people file motions to dismiss and then also file cross claims and answers.  I have seen it done, there's no question I have witnessed that.

But it's usual or typical that Defendants who file motions to dismiss do not file answers or cross claims.  They wait for the motion to dismiss to be decided.  In fact, I think even in this case, maybe some people joined in a partial motion to dismiss and still file an answer.

THE COURT:  All right.

MR. BECKSTEDT:  So but I -- I -- if you talk about usual, I think it's more common than not to have a

motion to dismiss and then the party filing that, not filing an answer until that there's a ruling on that.

But I don't think that ultimately affects the substantive analysis that as we sit here today, we do have this right to apportionment even without a cross claim which if they are dismissed con -- that right would be extinguished and now we wouldn't have that right any longer. I want -- I do -- there was something I wanted to note.

THE COURT: Yes, go ahead.

MR. BECKSTEDT: And it fits into this, but it's a little tangential. As this progressed from April to right before the deadline for, that the Court set for the Plaintiffs to amend their pleadings and -- and add parties. It became clear how this argument was going to play out. I mean, this was not a surprise. It was of a concern back when we filed our opposition, and then it became quite apparent.

We filed a motion to extend that particular deadline. That was out of an abundance of caution and basically based upon arguably some ambiguity given the Court's order with the condensed time -- statement in the table that was in the beginning of the order.

But we have never waived our right to bring a cross claim into file an answer. I -- I want to say that

on the record.  I don't know what Plaintiffs will argue. But that motion is out there out of an abundance of caution and -- and was filed for that reason.

It -- I believe that's stated in the motion, but it maybe -- it could have been stated a little bolder, if I may.

THE COURT:  Uh-huh.

MR. BECKSTEDT:  But at any rate I just want to note that, so we haven't conceded that that -- that our time to file a cross claim has passed.  Now, I will say this.  I think there would have to be other changes either to the settlement agreement or the order to confirm that we are preserved the ability to file a cross claim against the Defendants.

If the Court is inclined to have a settlement that is going to result in the dismissal of certain existing co-Defendants, and that's going to happen before we have to file our cross claims.  I mean, obviously, like I said, this could all change if in the intervening months there's a decision on the motions to dismiss.  And we have a deadline that we have to meet.  But I think I've --

THE COURT:  Is it -- is it -- is it your view that -- that you would, the Defendants, the -- the non-settling Defendants would lose your ability to file an answer at the time that the motions to -- let's say the

motions to dismiss are denied.

And you're filing an answer, you would have to -- you would still have to file an answer, correct?

MR. BECKSTEDT:  I -- you -- you trailed off and I didn't hear the first.

THE COURT:  You would still have to file an answer.

MR. BECKSTEDT:  I heard that part.

THE COURT:  Okay.

MR. BECKSTEDT:  I didn't hear the first part of your --

THE COURT:  Okay.  Let's -- let's assume that the motions to dismiss are denied.  And at that point you would be filing an answer because there's no answer that you have filed to date, correct?

MR. BECKSTEDT:  We would -- we would have to file an answer within fourteen days, I believe.

THE COURT:  Right.

MR. BECKSTEDT:  And a cross claim if we believe there was a cross claim.

THE COURT:  Okay.  And is it your view that you would be precluded in the context of filing your answer from filing a cross claim at that time?

MR. BECKSTEDT:  If the co-Defendants were dismissed at that time?

THE COURT: Well, they -- okay. In other words, if -- if the co -- co-Defendants were already dismissed, then you would be precluded from filing an answer because it would no longer be Defendants.

MR. BECKSTEDT: A cross claim. Yes.

THE COURT: I'm sorry, a cross claim. You would file an answer, but you couldn't file a cross claim because it would no longer be Defendants.

MR. BECKSTEDT: Correct. And I just want to make --

THE COURT: Go ahead.

MR. BECKSTEDT: -- a footnote that --

THE COURT: Yeah.

MR. BECKSTEDT: -- the right is the right to apportionment. A cross claim --

THE COURT: Yes.

MR. BECKSTEDT: -- would be a vehicle to maintain that right but that right does exist as we sit here today because they are Defendants. Just -- just -- I know I said that already. I just want to make it crystal clear.

As we sit here today, every Defendant is in the case, they are a Defendant and under Virgin Island Substantive law, we have a right to apportionment.

Soon as they get dismissed out of the case, we

lose that right.  Another way that we can preserve that right, is to file a cross claim because then we control whether we're going to -- you control or we control whether that's going to be dismissed.

But they don't control that, the Defendants don't control it, and the Plaintiffs don't control it.

THE COURT:  Okay.  So essentially, a way, not the way but a way to prevent all of what you're indicating could happen, would be to file -- to file the cross claim, to file a cross claim now, right?  Or --

MR. BECKSTEDT:  It -- it --

THE COURT:  But -- and your --

MR. BECKSTEDT:  And if we should be put into that situation.  I think that --

THE COURT:  Yeah.

MR. BECKSTEDT:  -- we have a right to not have to do that until our motion to dismiss is decided so that we can understand the landscape of the land.  But that -- but you're -- you are correct that.  And I -- I -- I -- I am admitting for purposes of this hearing that there's nothing preventing us from filing a cross claim at this time.  I don't believe under the rules for contribution, obviously.

THE COURT:  If you were to file a -- a cross claim now.

MR. BECKSTEDT:  Uh-huh.

THE COURT:  That -- well, let me -- let me back up.  The -- your objection to filing a cross claim now, and obviating all of the potential issues that you've described, is that you can be forced to file a cross claim now?  What is -- what is the objection to that?

MR. BECKSTEDT:  Well --

THE COURT:  You shouldn't be forced to have to do that?

MR. BECKSTEDT:  There's that objection that we shouldn't be forced to have to give up our procedural right as to the timing, as to when we can file -- when we can file our cross claim, which can be affected by what the claims are.

Like, obviously when you go into a case and that you just, say you decide I'm not going to file a motion to dismiss.  You know what the Plaintiff has filed.  You know what the claims are, you know what the statute of limitations are, et cetera, et cetera.

You can make a strategic, a client has the right to make a strategic decision as to filing an answer and cross claims.  All of those due process rights, I think, are embroiled in and strategies are developed based upon the rules of play, right?

We go out to the game, it's a nine inning game.

We know what the rules of baseball are.  Wait, we can't -- are we going to switch them in the middle?  I don't know.  I would hope not.

But I am -- I haven't researched this in all honesty, Your Honor, and I don't know what the law ultimately is.  I'm getting a text that suggests that there is some precedent, maybe not in this Court for striking a standalone cross claim.

But I don't know what the rules are, and I don't want to suggest.  Maybe one of my co-counsel or, I mean other Defendants know the role.  But this -- but you -- I think conceptually you are correct.  That I could -- my client might be able to file a cross claim today or tomorrow and have that claim to keep the settling Defendants as Defendants and then they couldn't be dismissed out of the case.

Unless, Your Honor, I'm -- I'm -- I'm guessing they're going to object to the cross claim is untimely and Your Honor's going to have to make some decision.  But I think the key here is that the right we have by the legal relationship as being Defendants is a right to apportionment.

And we don't want to lose that right.  We believe this settlement is geared to eliminate that right from us, and that there -- that right's going to be tried

to be taken away, which makes perfect sense. Because if they're not a Defendant for purposes of -- if the settling Defendants are not Defendants for purposes of apportionment at trial, there's no contribution protection. That whole award goes to the Plaintiffs.

Whereas if there is apportionment and if they are responsible, they have given them in this agreement contribution protection, which makes perfect sense. But then they have waived their right to get that portion of the award, whether it's Pro Rata or Pro Tanta, right? That is clearly contemplated.

So there is a contemplation in this settlement agreement to extinguish our right to apportionment, and that's what we're concerned about, regardless of procedurally whether we can maintain it by filing a cross claim or filing a contribution action in the Court of New York or Court of Virgin Islands.

There's probably lots of strategies, but right now in this case, we have a substantive Virgin Islands right to apportion it and that's what we're concerned about losing and it's based -- and that's why we object to the settlement agreement the way it is.

And if everybody can agree that we will be able to bring cross claims, have them as Defendants, have them their liability apportioned, and have the contribution

protections play out, and maybe fight a different day on Pro Tanta versus Pro Rata, I suspect.

I mean, I'd have to consult, but I suspect my clients would withdraw their objection. But I mean, this is the crux of what our concern is.

THE COURT: Okay. Thank you.

MR. BECKSTEDT: I -- I -- I just --

THE COURT: Go ahead. You're not -- you're not going to be up yet because I'm going to --

MR. BECKSTEDT: I just want to say that conceptually, Attorney Miller has suggested that my clients might be, are working hard at reaching a settlement. Obviously, those are all things that come into strategies on when to file cross claims, when to poke other bears and create other fights and create more litigation, et cetera. So I mean, there is -- there is a lot that goes into it.

But all of my other comments about the right that's at issue here stand. But I just -- it's just another example of how everything interplays, if you will, Your Honor.

THE COURT: Okay. Thank you. Counsel?

MR. BECKSTEDT: I don't know if Attorney Thomas, I'd defer to her.

THE COURT: Yes.

MS. THOMAS:  I know, right.

THE COURT:  Good afternoon, Counsel.

MS. THOMAS:  Afternoon, Your Honor.  B.P. joins in and stands with the arguments that were made by Limetree today by Attorney Beckstedt.  I briefly started looking into whether an -- a standalone cross claim could be stricken by the Court.

And based on my really quick five minute research, it appears so.  But if there is an ambiguity and the Court would like for us to brief that issue, we would be happy to do the same, Your Honor.

THE COURT:  Okay.  Thank you, Counsel.  Hold on, hold on.  Attorney Beckstedt, is there a reason why you don't have the -- the amendment or edit that you would want, you think should be made here -- s --

MR. BECKSTEDT:  There's no -- there's no reason that I can think of.  I don't know if we were required to do that.  It's just in preparing for this argument and thinking about what were ways to get to a result that preserved our right as well as allowed parties that want to settle.

I realize that the policy is public policy with respect to settlement.  And it's something that came out of me, but I would want to consult with all of my legal team before we presented any alternative language.

I'm also hesitant to start getting into editing an agreement by other parties. If the -- if the -- I think if the parties want to edit an agreement that they think will satisfy us, we'd be happy to review it.

THE COURT: Well, I mean, it seems to me that if -- if the non-settling Defendants have a concern about a particular provision which is the case here that it would be entirely appropriate. And quite frankly, I would've expected that you would've come with something that says, this needs to come out, and this is what we think needs to go in instead. That's what I would've expected since we're having the argument today on your challenge, your objection to something that is in the settlement agreement. I agree it's obviously their settlement agreement, but it's your challenge.

MR. BECKSTEDT: It is my challenge. I -- I -- I think we anticipated that it would be in the relief of any order that the Court would enter as opposed to actually changing language to the settlement agreement.

When we filed it, we just as -- you know, I believe we asked for relief that in your order you allow us the ability to bring these cross claims, and to not have our right extinguished when -- upon the dismissal.

I don't know if that required a change to the settlement agreement. But -- and -- and Your Honor, I --

I just can't.  I can say that I just didn't even envision that that you would want that.  So I apologize for that, not foreseeing that.

And I'm not sure that just changing the settlement agreement's going to actually work.  I think there's going -- there's somehow we're going to have to tackle the mechanism to allow us to do the cross claim before they're actually dismissed out of the case.  So we can at least file that as a right if the case -- if the Court's going that way.  Those are my thoughts.

But I would ultimately ask then, if the Court's so inclined to give us an opportunity to file something in addition if the Court determines that that would be of assistance.

THE COURT:  Okay.  Thank you, Counsel.

MR. CHAREST:  May it please the Court, Daniel Charest, in response to that argument.  To begin with, we are -- the -- the preliminary question is whether the non-settling Defendants have established standing to even raise a substantive objection.

It's not -- it's no surprise that there is no suggested edit here because they never got over the first hump in the first place.  They -- the best the Defendants have articulated is that they lose the procedural mechanism.

But there's a -- there's so many flaws with that approach. I don't really know where to begin. I will start with the federal rules which allow under Rule Thirteen G, a cross claim against a co-party. A pleading may state a cross claim, any claim by one party against a co-party if the claim arises out of the transaction or occurrence, that is a subject matter of the original action or of a counterclaim and it goes on.

And it goes on, but it does not state any deadline by which that must happen or any condition precedent before it could've happen. These claims were filed in June of 2021. They've had four-and-a-half years to bring this claim if they thought it was so important of a right to protect.

What they're trying to do is have the non-settling Defendants hold the -- an actual settlement at -- at bay for tactical purposes and nothing else. Like, they're not actually protecting anything. They -- they have presently the right to do the thing they ask the Court to protect. They have not taken up that right.

If and when the Court approves this settlement and dismisses the settling Defendants according to the terms of the settlement agreement, the Defendants could keep on reading and go to Rule Thirteen H, which refers parties to Rules Nineteen and Twenty to govern the

addition of a party.

The fact that we have contractually agreed to oppose that changes nothing at all.  If Rule Nineteen and Twenty are satisfied, the Court will admit them as parties again.  If Rules Nineteen and Twenty's are not, the Court will not.

They don't have a right to a non-opposition. They have a right to what they have.  And -- and this settlement does not take away any right.  In fact, it expressly protects the rights, expressly.  And I refer the Court to paragraphs thirty-nine and forty specifically where we talk about what happens in the nature of an offset, and we talk about what happens in the nature of contribution.

The -- all of the -- I will point out this.  All of the substantive arguments that were in the brief were abandoned.  The portion that today line free, and I guess all of the non-settling Defendants point to were not the subject of the briefing.

This sentence, this that starts eight lines down on paragraph thirty-nine, is not the subject of their objection because they saw that the subject of their objection when we responded in reply was -- was nothing.

Like, we pointed, like our settlement agreement says to the extent of allowable under law, la, la, la, la.

And then, and in respect of the contribution, it -- it describes exactly what the contribution steps are that the law provides.

Like, and under the controlling precedent, which the Defendants themselves cite in the agreement, regarding school asbestos, when you point out that the settlement will be handled according to applicable law and expressly recognizes the contribution rights, that's -- they don't even have standing to -- to talk about what it ought to be.

All right.  And so they -- they -- they never get over the first threshold, let alone trying to have any kind of right to -- to invade the -- the contractual agreement between these parties.  They just -- they never get there.

And nor have they, you know, even if they had crossed the -- the -- the bridge there, the Court's question is perfect.  Like, what would you have them do?  Well, we don't know, we'll think about it.  Well, today's the day, here we are, this is the hearing.

It's their burden to make a showing of standing and their burden to raise an objection that is valid, that will all -- that will -- that will be heard.  It's not, let me give you a briefing later.  It's, this is their chance and they're -- and they -- and -- and they -- and

they -- and they haven't done it.

Now, this notion that -- again, I go back to like what procedural right did they actually lose?  What rights did they lose?  And that's their question.  They only have standing if they lose rights.  We'll start with the first proposition that I -- I -- I -- I -- I dare anyone to point me to a settlement agreement that amends the rules of civil procedure.  It doesn't.

Should dare anyone to point me to a settlement agreement that binds this Court on how to rule?  The only thing they pointed out was that we've agreed to oppose.  And both parties will agree to oppose.

Well, that's a contractual agreement.  It's not in our interest to have this Defendant back in.  It's not the Defendant's interest to be in the case.  That's fine.  But if we're wrong, we're wrong and the Court will rule that we're wrong.

I don't think we are, but that -- that's the fact.  The -- but the -- in terms of rights, substantive rights.  The Defendants have not identified any that they've lost.  The best they can articulate is tactically we may want to do it later.  That is not a substantive right at all.

And this reference to due process is -- is beyond left field.  There's just no support for it.  They

haven't cited a single case that supports what they want to do. This notion of conditional dismissal show me a case.

This nation of preserving my procedural rights show me a case. They just don't have the authority to do what they want the Court to do because it's -- it's -- it's unsupported by the law. And so in light of the reality that the -- the Courts, the -- the jurisprudence on these issues favors settlement that allowing the Defendants to sort of put a stranglehold on all settlements for their own tactical reasons contradicts that.

And is -- and -- and in fact under the merits that are presented here, that -- that the Defendants haven't actually shown any substantive right that have been affected. And further haven't articulated any -- any basis to avoid the shadow of the specter of the potential harm they have. Their objection should be rejected, and the Court should grant the motion.

THE COURT: Thank you.

MR. CHAREST: If there's no more questions, and again, I -- and I wanted to go over my -- my to-do list. I'm going to take off my mean arguing hat and put on my, like --

THE COURT: Okay. Let me let you sit for a

moment first.

MR. CHAREST:  Yes, Ma'am.

THE COURT:  And Attorney Beckstedt?

MR. CHAREST: Yes, Ma'am.

MR. BECKSTEDT:  I just want to make a -- a -- I -- sorry, Your Honor.  Thank you.  I just want to make a couple responsive points.  First of all, in our opposition at Docket eleven seventy-two, page five of fifteen, we actually do quote provisions thirty-nine.

And then on the next page, provisions forty, those are provisions we took issue with.  It's not the first time today if that -- that that's what I understood Attorney Charest saying.

Also Rule Thirteen that Attorney Charest refers to is regarding a pleading must state a -- a cross claim. Atone or claim, excuse me.  And then talks about cross claims, but we haven't gotten to the point of filing a pleading.

I -- I understand that that's a different nuance from what the Court asked, could we anyways just tote file a pleading even if we don't have to?  But I just want to make it, I guess, want to underscore that we have strategically determined to file a motion to dismiss and we have not gotten to the point of filing our pleading yet.

I mean, if we're ultimately going to be forced by the Court to file a pleading prematurely, that's a different issue.

THE COURT:  So if you decide strategically to take a particular course of action, which if you took another avenue available to you would not create the problem.  Is it your position that you have lost a substantive right?

MR. BECKSTEDT:  Well, we have a substance --

THE COURT:  If -- if -- if strategically.  In other words, if there's an avenue available for you to preserve going with your argument, to preserve the apportionment issue and the ability to get the apportionment.

And you choose strategically not to avail yourself of that avenue.  Can you then come and argue that you have lost a substantive right?

MR. BECKSTEDT:  For example, if -- if you were to choose to not file a particular motion, that would extinguish a right.  Yeah.  I believe you could -- you could waive your right by not doing it.  All right.  We -- we haven't crossed that bridge yet.  We are seeking relief that can still preserve the right without having to file a cross claim right now.

And I think the Court and the parties frankly

have the ability to formulate a path forward that would allow the rights of everybody to be preserved.  So for example --

THE COURT:  But you're asking the Court to change a provision in the proposed settlement agreement.  You're not?

MR. BECKSTEDT:  Not necessarily.

THE COURT:  Yeah.

MR. BECKSTEDT:  Let -- let me put it -- I think -- I think this is correct.  We -- why don't the settling Defendants and the Plaintiffs stipulate that the non-settling Defendants can bring a cross claim against the settling Defendants, and then we could proceed.

THE COURT:  Have a seat, Attorney Charest.

MR. BECKSTEDT:  We -- we could proceed.  I mean, the Court, the -- there could also be a determine --

THE COURT:  But -- but that would be -- that would be changing a provision in the agreement.  Because the -- what I understand you to be saying is that the Court could basically say that you can file a cross claim, which would take out the provisions about the settling Defendants opposing such a cross claim, right?  And Plaintiffs.

MR. BECKSTEDT:  Yeah.  I mean, I guess that would -- that provision should be removed if they agree to

the stipulation. My understanding is that this is an initial hearing on a proposed settlement agreement. It sounds --

THE COURT: Right.

MR. BECKSTEDT: -- to me like there's going to be a number of different changes. Changes to the notice, changes to certain provisions. Sorry, excuse me one moment. Technical skills.

Your Honor, so I think that there could be changes to that. I think the parties could stipulate that we can bring cross claims. And if the cross claims, if the Court hasn't ruled on the motion to dismiss as part of the settlement, it could be agreed that the settling Defendants would stay as nominal Defendants pending our filing of a pleading and cross claims at the proper juncture under the procedural rules.

So those are all things that can be decided either amicably by the parties, or ordered by your Court in order to achieve a fair settlement that acknowledges all of the rights of all of the parties, and the particularly unique situation of Virgin Islands law.

I mean, where there was a discussion about, show me the case. And we have a -- I think everyone will have to agree. We have a very unique substantive law on the Virgin Island. Not so unique back in 1800s, but unique

today.

And there are rights that -- well, I don't want to reiterate my rights, but that -- my argument about rights. If I may just have a moment to look at a note from co-counsel?

THE COURT: Yes. Uh-huh.

MR. BECKSTEDT: Your Honor, I'll just -- I will just state that we are not saying settlement can't go through which I think I've said. We're concerned about apportionment of liability at trial. And if our right to an apportionment of liability can be preserved then we're prepared. You know, then I think that can be achieved in the order of the Court.

How that happens, I'd be -- I'd ask for some time to provide a concrete submission of how we think that could happen. I mean, whether it's concrete changes to the proposed documents, whether it's proposed orders to -- to go with the approval of -- of the settlement.

But I would ask just for additional time, just as the Court's allowing additional time for amendments to notices and whatnot for us to provide that.

But I believe there is a way to preserve both the procedural rights under the rules of federal procedure as to the timing, as well as the substantive right of apportionment. And I believe we can prevent -- present a

submission that would embody an order that could do that.

If the parties can't negotiate one in the next two weeks or whenever the Court wants it. I realize the holidays are up upon us, but we -- we would -- we could act quickly in the next couple of weeks.

MR. CHAREST: Your Honor, as a movement, I'd like to be heard on that. It's -- it's not my practice to stipulate on the fly, but I will stipulate the federal rules of Civil Procedure Fourteen A one exists, and it says this. A Defendant may as a third party Plaintiff service, summons and complaint on any, nor on -- on a non-party who is, or may be liable to it for all or part of the claim against it.

But the third party Plaintiff must by motion obtain the Court's leave if it files the third party complaint more than fourteen days after serving its original answer. So this notion that if they're dismissed, we can never get them back.

By rule, these non-settling Defendants are allowed to serve these -- these third party complaints if that's what they want to do. It's a fallacy. It is this made up nothing that I think you've seen dwindled down to like a crystal, like a dust. There's nothing left to it.

The rule provides exactly what they think they want. The -- the -- the -- the world -- the Court to

order.  Our agreement doesn't change the rules.  It can't change the rules.  That's what I said from the beginning.

It -- the -- we will oppose it.  We're contractually bound, we're -- we're tactically bound, we're -- we're tactically interested in that.  But we have a right to oppose whatever they want to bring, but they have a right under the rules to bring it.

THE COURT:  Well, see, that's why I don't think there's going to be any agreement by the parties because it seems to me that fundamentally, and at bottom here, the Defense, as I understand the -- the argument does not want an opposition.

I think that is the issue.  That's the crux of the issue here, that the Defendants are saying, the non-settling Defendants are saying that they want to have the right to file.

MR. CHAREST:  Well, they have that.

THE COURT:  And -- and --

MR. CHAREST:  I'm sorry.

THE COURT:  They want to have the right to file without any opposition by the other side.

MR. CHAREST:  Understood.  I don't think the rule allows opposition to the service and the filing of a complaint.  Our opposition would be on the merits, on the substance of it like it's a -- it's an invalid complaint.

But the rule --

THE COURT:  My point.

MR. CHAREST:  Yeah.  But the -- but the rule allows exactly the procedural right they think that they're being deprived of.  It -- within fourteen days of an answer, they can by right file these third party complaints.  Period, full stop, Rule Fourteen A one.

THE COURT:  As a matter of right?

MR. CHAREST:  Yes, Ma'am.

THE COURT:  And then why -- what would you be opposing?

MR. CHAREST:  We would -- we probably would oppose the substantive relief required, whatever our contractual obligation would be, but I can't -- I can't step in and stop under Rule Fourteen A one.  If they went fifteen days later, I would say you're too late.  But you know -- then, they only have to seek leave of Court after the four -- after fourteen days after filing.

THE COURT:  They have to seek leave of the Court?

MR. CHAREST:  After -- more than fourteen days after serving the original answer.  So they have a two week window in which they have unfettered rights to do so after filing their answer.  Rule Fourteen A one -- A one, Ma'am.

And I -- I have to -- well, anyway.  I -- I think the Court's looking at the rule, so I'm happy to just wait for a sec.

THE COURT:  Okay.

MR. CHAREST:  And so I -- I guess going back to the actual argument.  The Defendant has to show a -- a right is being impacted in order to even comment on a settlement.  They -- the only right they've identified is the -- the right to bring third party claims.

They have that right now, they could cross claim today, they could have done it for the past four years. They have that right, until the Court dismisses.  And then they have that right by without leave of Court to do so when they file an answer.

And so there is no right that's actually been impacted and therefore they -- these non-settling Defendants have no standing to even object in the first place.

THE COURT:  Okay.

MR. CHAREST:  That's the answer.  You have any - - sorry, unless you have other questions there, Your Honor.

THE COURT:  I'm going to have you sit for a minute because I'm going to hear from Attorney Beckstedt.

MR. BECKSTEDT:  What I heard from Attorney

Charest is, first of all, if at such future time we file an answer and the settling Defendants are already dismissed out of the case, they would still be objecting or opposing the -- the motion for the third party complaint.

Whether it would be on procedural grounds or substantive grounds, not exactly clear. But Attorney Charest hasn't told the Court that if, for whatever reason, before the Court dismisses the settling Defendants and if the motion to dismiss that's pending is not resolved, are they also going to oppose a filing of a standalone cross claim as your client -- as Your Honor has suggested that what -- what's preventing us tomorrow from filing, I guess a pleading a cross claim under the rules.

I'd be interested to know whether they would stipulate that we have the right to file that cross claim and that they would waive. I'm not suggesting where my client would do it, but I'd be curious to know to flush out what the Plaintiff's real intent is here.

Because if they are not going to agree that we can file as a procedural matter, a cross claim against the settling Defendants and we're going to be fighting that fight. That again, is going to impinge upon what we see as our rights to apportionment that we are -- have today as we sit here, but may not have after the settling

Defendants are dismissed.  Thank you, Your Honor.

THE COURT:  Okay.  Thank you.  Okay.  You have the final word.

MR. CHAREST:  Thank you, Your Honor.  The substantive right that these Defendants have is the right to apportionment.  The procedural mechanism are either, as I said before the last go round.  Rule Thirteen G or Rule Thirteen H and Rule Fourteen -- oops, A one.  Those are the procedural mechanisms that in any event can achieve the right.

But that the -- the right is neither increased, nor the right to apportionment is neither increased nor diminished by the fact that parties might oppose it.  Like, this note, like I don't -- at -- at base they're saying, oh, woe is me.  Someone might oppose my effort to make someone else be liable. Well, duh.  That -- I mean, that's what this is -- that this is what litigants do.

And -- and so the -- the notion that that somehow impacts their rights cannot stand.  They have the procedural mechanisms to protect their rights.  They're free to do it.  And -- and you know, this is the adversarial system at the -- and -- and fundamentally that's where we are.  They have not shown a right that has been impacted and therefore, they have no standing to object.

THE COURT:  Okay.

MR. CHAREST:  Thank you.  I wanted to go over my to-do list --

THE COURT:  Yes.

MR. CHAREST: -- with the Court in respect of the -- I don't want also -- I'm sorry, I hate to do this, but I got to go back.  I would very much encourage against invitation of future submissions that will lead to future debate and more argument and more hearing and more delay because that is definitely not in the interest of this class.  Sorry.

THE COURT:  Okay.

MR. CHAREST:  Now, on the to-do list.  The first question is, does the Court want it a week from today or a week from Friday?  Does it matter to the Court?  Does it either the -- the seven -- the -- the 17th, or the 19th?

Did any -- any particular day help or hurt the Court?  I don't want to take -- I don't want to put too much pressure during the holidays.

THE COURT:  The 17th would be better.

MR. CHAREST:  Yes, Ma'am.  We'll do it by the 17th.  I've got seven to-do items as I -- as I, you know, make sure that we're on the same page here.  Number one, add points for exposure in the -- in the -- in the point allocation --

THE COURT: Uh-huh.

MR. CHAREST: -- via cistern use. Some sort of number that we've -- that we feel is appropriate. Or, and obviously the Court can adjust that, but we'll -- we will add that in. Number two, provide a red line or identify in both notice forms where we expressly tell the -- the absent class members that they can be represented by other counsel.

Number three, either I provide a red line or identify what I'll call conformed long, and for -- short form notices to reflect the administration of both ArcLight, Freepoint, and Pinnacle settlements collectively.

THE COURT: Say that one again?

MR. CHAREST: Yeah. Red -- either identify that we've done it correctly or provide a red line for the notice, the long form and the short form notice that -- that contemplates the set -- the two settlements being administered at once, basically.

THE COURT: Uh-huh.

MR. CHAREST: The seventeen point five and the five-fifty collectively. Because like I said, I saw at least one draft where it was still just seventeen point five.

THE COURT: Uh-huh.

MR. CHAREST:  So it's possible, I think we may have done it correctly in the attachments to the Pinnacle settlement motion.

THE COURT:  Uh-huh.

MR. CHAREST:  But I'll either identify, yes, we've done it correctly, or here's the red line that -- that corrects it.

THE COURT:  All right.

MR. CHAREST:  Number four, report to the Court whether these forms will be available in Spanish.  And sort of just give the Court an update on the language availability.

THE COURT:  Uh-huh.

MR. CHAREST:  And -- and proficiency.  And if we can do it, if we can do a -- a Spanish version, we will try and do that as well.  I don't think we can get that done in seven days, but we can kind of commit to doing that.

Number five, provide feedback on the virtual pre -- prepaid card.  And I think reading the Court's instruction I think advisedly -- if it is not unique to the person, we will drop it as a payment method.

THE COURT:  Okay.

MR. CHAREST:  If it is unique to the person, we'll explain how that is so.

THE COURT:  Okay.

MR. CHAREST:  And then number six, include the map that -- I -- I hand drew out here in the -- in the -- in the sort of independently, but also in the forms.

THE COURT:  Uh-huh.

MR. CHAREST:  And then number seven, this is really me asking the Court.  But we need a final approval date in order to fill that in.  So and again, I think it was hundred and eighty-five days at a minimum from preliminary approval to final.

And those are our to-dos.  I guess, six for you -- six for me, and one for you, Your Honor.

THE COURT:  Okay.  Let me just double check here.

MR. CHAREST:  Yes, Ma'am.

(Side bar discussion)

THE COURT:  Okay.  That's all that we collectively have as well.

MR. CHAREST:  Thank you, Ma'am.  Appreciate it.

THE COURT:  Okay.  So you will have the week to submit the additional information.  It is clear to me that this issue that has been raised, even assuming, that the Court considers that there is standing.

Because there's an issue of the nature raised by the Defense, even assuming that it seems pretty clear to

me that there is not going to be agreement between the parties on this issue. If there is, then that's great. You can let me know. I am not inclined to extend time further, for what I think is simply going to be a back and forth between the parties that would not bear fruit.

It seems to me that the arguments that I have heard today are such that I don't anticipate that there will be any agreement on this issue. It is a Court's view that to the extent that there was some change, provision that was going to be offered for the Court's consideration.

It should have been given today. I don't intend to have another hearing, at least that's not my plan on this. And I think in the final analysis, that's exactly what we would be opening this up for is another hearing on what the Defense has put on and what the prosecution -- what the -- what the Plaintiffs are -- are saying.

So having said that, the Court's going to review all of the material once all of the material is in, and the Court will make a ruling with regard to the preliminary settlement. So that's how the Court intends to proceed.

Is there anything further that the Court needs to address at this time?

MR. CHAREST: On this issue, no, Your Honor.

THE COURT:  Okay.

MR. CHAREST: (Unintelligible) damage trust against the Plaintiff.  Sorry.

THE COURT:  Okay.

MR. CHAREST:  The -- there might be something better done off the record, but we are -- we've heard rumors about, and your -- and you wanted to see if there was any thoughts, did the Court wanted to share about that or did it off the record?  That's -- that's part of the question.

THE COURT:  Uh-huh.  Okay.  Yes, the rumors are true.  I assume that we're talking about the same rumors. I will be retiring from the bench in February of next year.  February of 2026.  For me, this has been some time in coming.  I had actually planned for 2024, and now we're in 2026.  So I think the time is right.  And so I look forward to that -- that next chapter if you will.

I really look forward to that next chapter.  You know, each chapter has been interesting, exciting, new things, new challenges.  And I expect that the next chapter will probably be the same.  Retiring from the bench, but not retiring from life.

So I -- I look forward to that.  I just want to say with regard to -- to this matter, it's -- it's certainly been my pleasure to have all of you appearing

before me.  You know, it's -- it's -- it's good to be able to have good briefing and good arguments and lawyers who are very dedicated to the tasks at hand lawyers who take their responsibility seriously and represent the profession well.

And I think there is no question in -- in my mind that I have seen that among this group.  So thank you for that.  You know, we sit up here as Judges and -- and we can only hope that when folks come before us that we end up with arguments that are zealous.

Zealous in advocacy, but at the same time, hopefully, I -- I'm going to say cordial because I always talk about, and -- and like to think that we in this profession know how to be zealous advocates.  And at the same time, be also cordial in our dealings with each other.  I will also say that, you know, we are the face of this profession.  It's as simple as that.  And I like to think of our profession as a noble profession.

Sometimes we see things that -- that challenge those thoughts.  But I will just say to you, I just hope you continue to -- to carry that banner, you know, and to hold that banner high, and to make us all proud of the profession that we serve in and have served in.

I know for -- for most of you for many, many years.  It's a great profession.  And I just hope that you

will continue to -- to make -- make it worthy of -- of -- of what it really needs to be.  That power is in our hands.

And if we all do our little bit in our little corner of the world, then I think we will have the profession that we can all be very proud of.  So thank you all again.  Thank you for the work that you've done.  And I look forward to -- to seeing it from afar.

You know, and to -- I know that -- I know with the lawyers that are before me, that at the end of the day that, you know, it will work out just fine.  So thank you all very much again.

UNIDENTIFIED MALE SPEAKER:  Thank you, Judge.

UNIDENTIFIED MALE SPEAKER:  Thank you, Your Honor.

COURT CLERK:  All rise.

THE COURT:  Take care, everyone.

COURT CLERK:  Court is adjourned.

(The hearing concluded at 1:26:12 p.m.)

CERTIFICATION

I, Judith Spriggs, court approved transcriber, certify that the foregoing is a correct transcription from the official electronic sound recording of the proceeding in the above-entitled matter.

_____/
Judith Spriggs
Associated Reporters Int'l., Inc.   29th day of December, 2025

800.523.7887                12-10-2025, WORD INDEX, Boynes case        Associated Reporters Int'l., Inc.

Page 1

**A**

**A.C.H** 76:22
**A.I.V** 14:13
**a.m** 7:1 78:18,19
**abandon** 37:9
**abandoned** 126:17
**abenedict@burnscharest.com** 2:6
**abided** 94:13
**abilities** 53:19
**ability** 55:5 56:13 102:5 106:10
  114:13,24 123:22 131:13 132:1
**able** 53:23 100:12,17,20 101:14
  106:7,23 119:13 120:23 147:1
**above-** 149:4
**absent** 32:1 41:20 58:15 64:9
  65:7 142:7
**absolute** 40:1 46:10
**absolutely** 19:14 24:1 56:16
  60:25 67:18 70:3 90:7 110:23
**abundance** 113:20 114:2
**accept** 23:23 61:13 103:7 109:11
**account** 27:9 31:20
**achieve** 29:11 133:19 140:9
**achieved** 66:3,4 134:12
**acknowledges** 133:19
**acochran@labordesiegel.com** 5:18
**act** 135:5
**action** 19:20 111:13,14 120:16
  125:8 131:5
**actions** 15:18 66:17
**active** 67:10 89:20,22
**actual** 37:8 47:25 48:1 51:4
  54:18 80:16 85:11 125:16
  138:6
**ad** 95:24
**Adam** 4:21 5:19 12:10 13:4
**add** 21:11,13 56:16 95:10 96:3
  113:14 141:24 142:5
**adding** 59:9
**addition** 17:24 26:24 53:20 57:1
  124:13 126:1
**additional** 72:10 107:9 134:19
  134:20 144:21
**address** 32:24 36:9,14 37:2,14
  38:2,18 39:9 46:10 51:4 52:4
  52:9 145:24
**addressed** 22:16 48:9
**addresses** 35:24 51:23 63:16
  71:5

**adequacy** 22:21,22,23 24:17 25:9
  25:17 28:25 32:14
**adequate** 15:13 23:2 24:1,2
  25:15 60:21
**adjacent** 45:20
**adjourned** 148:18
**adjudication** 39:23 41:1,5,19
**adjust** 142:4
**adjusted** 52:17
**Adler** 4:10 11:5,7,8
**admin** 87:16,19
**administered** 15:5 142:19
**administration** 18:10,14,18 59:8
  142:11
**administrative** 36:15,18 84:3
**administrator** 15:19 79:3,7
  87:14
**admit** 126:4
**admitting** 117:20
**advance** 23:4
**adversarial** 140:22
**advisedly** 143:21
**advocacy** 147:11
**advocates** 147:14
**afar** 148:8
**affect** 42:13,17,24 65:17 71:25
  97:18 111:9,10,11
**afternoon** 122:2,3
**agree** 23:23 38:24 76:18 92:4,10
  94:21 97:21 100:14 104:23
  108:11 110:24 111:19 120:23
  123:14 128:12 132:25 133:24
  139:20
**agreed** 73:11 82:1 126:2 128:11
  133:13
**agreeing** 67:25 73:16,17 109:6
  111:21
**agreement** 18:11 23:2 62:25
  65:13 97:12,23 106:19 111:12
  114:12 120:7,13,22 123:2,3,14
  123:15,19,25 125:23 126:24
  127:5,14 128:7,10,13 132:5,18
  133:2 136:1,9 145:1,8
**agreement's** 124:5
**agreements** 18:21 53:8 61:3
  65:17 71:22 72:4
**agrees** 53:13
**ahead** 11:3,3 48:24,25 59:21
  68:12 113:10 116:11 121:8
**al** 1:3,6,7,9,14,15,17 2:2 7:11

ARII@courtsteno.com                                              www.courtsteno.com

Case: 1:21-cv-00253-MAK    Document #: 1650    Filed: 12/31/25    Page 151 of 189

800.523.7887                12-10-2025, WORD INDEX, Boynes case        Associated Reporters Int'l., Inc.

Page 2

7:12,12,13,14,15,16,17
**Alex** 5:22 10:17 11:13
**Alexander** 4:17 5:15 10:4
**aligned** 66:9
**alleged** 34:4
**allocate** 105:22
**allocated** 46:10 81:6
**allocation** 37:15 46:13 49:2
 59:24,24 60:14 80:1 85:16
 141:25
**allocations** 62:11
**allow** 32:25 77:15 90:3 100:6
 123:21 124:7 125:3 132:2
**allowable** 126:25
**allowed** 97:5 98:19,20 103:10
 104:3 122:20 135:20
**allowing** 129:9 134:20
**allows** 63:5 65:6 96:21,24
 136:23 137:4
**alter** 41:5
**alternative** 41:5 101:23 122:25
**amarinelli@vilaw.com** 4:25
**ambiguity** 95:12 113:21 122:9
**ambition** 90:7
**AMELIE** 6:7
**amend** 95:22 96:3 113:14
**amended** 24:13 95:9 106:19
**amendment** 122:14
**amendments** 134:20
**amends** 128:7
**America** 9:5
**amicably** 133:18
**amoskowitz@dnfvi.com** 5:25
**amount** 14:9,20 63:20,22,23
 64:22 65:21 73:1,8 79:20
 80:25 81:19 83:2 90:3
**amplify** 35:17
**amply** 54:23
**analysis** 42:17 76:20 113:4
 145:14
**anchor** 18:9
**ANNA** 2:3
**announce** 18:3
**answer** 21:8 27:23 35:13 42:18
 48:7 53:23 58:22 64:2,13
 74:23 75:25 80:21 85:11 88:9
 94:3,17 96:9,15 100:8,25
 101:14 103:12 106:21 109:23
 112:22 113:2,25 114:25 115:2
 115:3,7,14,14,17,22 116:3,7

118:21 135:17 137:6,22,24
 138:14,20 139:2
**answered** 53:12
**answers** 68:1 112:11,15,18
**anticipate** 18:15 74:25 75:16
 145:7
**anticipated** 59:15 123:17
**anticipating** 17:14 59:17
**anyway** 11:4 39:4 138:1
**anyways** 130:20
**apologize** 30:3 42:20 74:25
 107:18 124:2
**apparent** 30:20 31:4 113:18
**apparently** 104:1
**appeal** 61:10,23,24 70:13
**appearance** 10:2,8,15,21 11:6,17
 11:22 12:2,9,16,22 13:2,10
 55:6
**appearances** 2:1 7:21 9:24
**appearing** 9:23 146:25
**appears** 122:9
**applicable** 69:18 127:7
**appoint** 53:13 68:22 69:14
**appointed** 69:7,21 70:2,21
**appointing** 15:14,17
**appointment** 69:2,6
**appointments** 69:24
**apportion** 31:22 98:7,19 100:17
 100:19 106:10 110:10 120:20
**apportioned** 109:20 120:25
**apportionment** 93:15,22 96:24
 99:24 101:16,18 102:7 106:7
 106:11,14 110:13 111:4 113:5
 116:15,24 119:22 120:4,6,13
 131:13,14 134:10,11,25 139:24
 140:6,12
**appreciate** 60:9 77:18 144:19
**approach** 18:11 20:11 21:2,9
 22:3 26:7 29:25 33:9 46:13
 47:7 54:24 70:7 125:2
**appropriate** 23:10 27:25 38:17
 88:12 123:8 142:3
**approval** 14:6,8,17,19 15:20
 16:12,17,20,23,24 18:13,19
 58:23,25 59:1,3,6,14,14 60:3
 60:4,10 69:3,3 71:10,11 85:12
 85:17 92:16,18,20 134:18
 144:7,10
**approve** 16:13 68:21
**approved** 16:21 60:11 149:2

800.523.7887                12-10-2025, WORD INDEX, Boynes case        Associated Reporters Int'l., Inc.

Page 3

**approves** 70:22 125:21
**approving** 15:12,16
**approximate** 20:23
**April** 14:7,18 113:12
**APT** 5:12
**Arc** 97:11
**ArcLight** 3:13 9:8,12 14:10,11
  14:12,12,13,22 15:5 17:24
  58:14 65:13 67:4,9,15,24 68:4
  82:12 89:11 94:5 97:2,10,12
  107:4 142:12
**area** 26:25 36:1 38:6 39:1 45:11
  45:12,13 46:4,19 47:16 51:5
  84:22,25 85:4
**areas** 42:14 43:16 46:2 47:8
**arguably** 100:5 113:21
**argue** 71:15 100:25 114:1 131:16
**argued** 94:4,6
**arguing** 64:10 90:19 109:4
  129:23
**argument** 62:5 64:20 72:14,14
  91:9 92:9 98:10,14 99:12,16
  106:16 110:17 111:23 113:15
  122:18 123:12 124:17 131:12
  134:3 136:11 138:6 141:9
**arguments** 122:4 126:16 145:6
  147:2,10
**arises** 22:18 125:6
**arm** 60:25
**articulate** 72:6 128:21
**articulated** 109:25 124:24
  129:16
**asbestos** 127:6
**ASHFORD** 5:12
**Aside** 52:25
**asked** 23:9 32:10 58:22 60:24
  73:15 74:4,5 123:21 130:20
**asking** 17:4 19:18 30:11,19
  97:14 132:4 144:7
**asks** 62:23
**aspect** 22:16 29:24 49:2
**aspects** 19:19 49:24
**asserted** 94:8
**assertions** 66:6 72:17
**assessment** 31:21 32:8 79:1
**assign** 34:23
**assigned** 26:21 27:1 36:8
**assistance** 106:25 124:14
**associated** 6:12 52:9 53:22
  61:14 80:5 149:10

**ASSOCIATES** 2:8
**assume** 20:11 83:9,22 115:12
  146:12
**assuming** 27:11 29:11 59:13 79:8
  84:7 144:22,25
**ATLANTA** 4:11,19
**Atone** 130:16
**attachments** 143:2
**attendant** 31:15 82:7
**attended** 66:25
**attention** 7:5
**attorney** 7:25 8:7,10,16,24 9:22
  10:1,7,11,12,20,22,24 11:5,7
  11:11,16,20,21 12:1,4,6,8,15
  12:21,24,25 13:1,7,9,11,17,18
  13:25 14:2 15:21 17:7 35:18
  36:12,23,24 42:25 55:6 78:22
  89:15 90:16,18 91:4,20 93:25
  121:11,23 122:5,13 130:3,13
  130:14 132:14 138:24,25 139:7
**attorney's** 62:23 79:6
**attorneys** 4:22 56:10 61:18
  63:20
**authority** 129:5
**authorizations** 73:16
**avail** 131:15
**availability** 143:12
**available** 20:25 53:9,10,22,23
  131:6,11 143:10
**avenue** 2:22 3:14,18,22 5:7,12
  131:6,11,16
**average** 83:8,22 84:7,8,18 85:18
**avoid** 129:17
**award** 72:23 105:17 120:5,10
**aware** 23:10 89:10 93:4
**Azari** 50:20

---

**B**

**b** 6:1 18:24 20:9 24:3 31:22
  39:13,15 41:23 49:23,23 50:1
  50:2,6,16 55:4 60:24 67:14,17
  67:21 68:1
**B.P** 9:4 89:19 90:23 122:3
**back** 11:2 42:5 68:14 72:19
  75:11 78:21 91:3 99:3 102:13
  106:10 109:8,20 113:17 118:2
  128:2,14 133:25 135:18 138:5
  141:7 145:4
**backdrop** 17:3
**backup** 17:9

800.523.7887          12-10-2025, WORD INDEX, Boynes case      Associated Reporters Int'l., Inc.

Page 4

**bad** 66:15
**BAKER** 4:14
**balance** 41:4,12 59:23 66:11
  81:5,9
**balanced** 81:14
**balances** 81:2
**ballpark** 79:18
**banner** 147:21,22
**bar** 98:3 144:16
**BARNES** 6:6
**base** 140:14
**baseball** 119:1
**based** 29:4 45:8 82:6 83:24
  96:18 101:20 113:21 118:23
  120:21 122:8
**bases** 68:15
**basically** 44:4 45:3 49:18 64:25
  83:6 97:15 110:5 113:21
  132:20 142:19
**basis** 48:4 80:4 110:16 129:17
**battle** 32:5
**battles** 70:16
**bay** 1:5,9,13,17 4:1,5,9,17 7:11
  7:13,14,16 8:24 11:8,14 12:5
  12:12,12 13:12,14 14:14,14
  90:16 93:12 125:17
**bear** 145:5
**bears** 60:2 121:15
**Beckstedt** 4:5,6 8:23,24 9:2
  30:2,2 90:15,16,18,19,25 91:2
  92:6,8,13,19,25 93:9,11,18
  95:19,21 96:7 98:13,15,18,23
  99:4,6,8,18,22 102:1,9,14,17
  102:25 103:17 104:9,12 106:20
  107:14,16,18,20,22,25 108:2,4
  108:8 109:2,9,11,15,18 110:8
  110:15,18,23 111:10,16,23
  112:5,9,13,24 113:11 114:8
  115:4,8,10,16,19,24 116:5,9
  116:12,14,17 117:11,13,16
  118:1,7,10 121:7,10,23 122:5
  122:13,16 123:16 130:3,5
  131:9,18 132:7,9,15,24 133:5
  134:7 138:24,25
**BEECHER** 1:15
**beginning** 60:3 113:23 136:2
**behalf** 8:24 9:4,8,15,18,21 10:4
  10:10,17 11:8,14,19 12:4,11
  12:18,24 13:12,14,19 90:16,20
**behavior** 40:6

**believe** 30:13 51:10 70:19 75:22
  77:19 96:5 100:7 107:7 110:4
  114:4 115:17,19 117:22 119:24
  123:21 131:20 134:22,25
**BELTJEN** 5:20
**bench** 106:23 146:13,22
**beneath** 70:9
**Benedict** 2:3 12:21,23,25
**benefit** 32:12 59:1 65:24
**benefits** 54:12
**Bennett** 12:24
**best** 20:13 31:21,25 34:15 35:13
  41:17 43:6,8,11 48:16 50:3,8
  50:8 54:8 106:20 124:23
  128:21
**better** 30:10 31:17 37:14 41:10
  43:3 54:3 65:8 141:20 146:6
**BEYERS** 9:17
**beyond** 34:19 53:5 128:25
**big** 18:4,10 89:4
**Bijou** 47:10
**bind** 92:17
**binding** 16:23 54:17
**binds** 128:10
**BIRTHISEL** 5:7
**bit** 18:19 25:19 32:10 44:24
  49:1 63:21 65:20 84:9 85:13
  148:4
**blank** 54:18
**bleeds** 22:6
**blurb** 76:19
**bmersman@thelambertfirm.com**
  2:20
**bolder** 114:5
**BOLT** 4:22
**bonus** 38:2
**bothers** 86:19
**bottom** 55:18 136:10
**bound** 101:4 102:19 136:4,4
**BOX** 3:10
**boxes** 84:21
**Boynes** 1:3 2:2 7:11
**break** 20:1 78:14,25
**breath** 25:3
**Brian** 2:16 13:19
**bridge** 127:17 131:22
**brief** 21:12,14,14,20 91:12 98:2
  122:10 126:16
**briefing** 108:20 126:19 127:24
  147:2

800.523.7887          12-10-2025, WORD INDEX, Boynes case      Associated Reporters Int'l., Inc.

Page 5

**briefly** 122:5
**bring** 45:1 72:9 91:7 93:25
  96:15,22 97:5 99:2 102:12
  104:3 106:13 109:20 113:24
  120:24 123:22 125:13 132:12
  133:11 136:6,7 138:9
**brings** 89:17
**broad** 41:1
**brought** 104:17
**bucket** 28:24
**building** 5:20 18:9
**built** 29:21 80:22 83:24 102:10
**bulk** 46:1
**bump** 38:17
**bunch** 66:21
**burden** 73:6 100:24 127:21,22
**BURNS** 2:3
**business** 7:2
**busy** 48:12
**Byers** 5:2 9:18

---

### C

**C** 26:17 49:23 50:1,6 61:8 62:6
  62:6,22 63:16,17 65:11
**C.V** 7:10,12,14,15
**CAFA** 77:23 78:1
**calculations** 78:24
**call** 25:11 45:11,12,19 64:3
  65:22 70:9,9 77:24 80:2 83:14
  105:7 142:10
**called** 74:10,11
**calling** 97:11
**CAMPBELL** 5:2
**can't** 42:20
**cancer** 30:17 32:7
**cap** 63:1
**Capital** 3:13 14:12
**capture** 46:6
**captures** 26:8 37:10 45:23 46:1
**capturing** 29:9 35:20
**card** 51:9 75:18 76:9 77:2
  143:20
**care** 23:15 87:6 148:17
**Carl** 4:5 8:24 30:2 90:16
**carl@beckstedtlaw.com** 4:8
**Carolyn** 4:1 12:4
**Carolyn.oconnor@wilsonelser...**
  4:4
**Carr** 4:13 13:9,11,12,14,15
**CARROLL** 4:18

**carry** 147:21
**carryover** 46:8
**Carson** 69:8
**case** 1:3,7,15 16:14 23:1,4,10
  31:10 35:19 61:20 63:5,10,20
  65:23,23 70:18 73:8 74:15
  75:6 85:21,22 86:25 87:5 94:2
  94:7 95:7 96:13,15 98:12,16
  99:25 101:12 102:4,13,19
  103:3,3,19,21 104:15 111:7
  112:20 116:23,25 118:15
  119:16 120:19 123:7 124:8,9
  128:15 129:1,3,5 133:23 139:3
**cases** 7:10 20:10 21:1,4 41:7,8
  72:5 86:14 98:1 104:25
**cash** 28:22
**cat** 64:1
**catch** 107:17
**category** 26:2 33:8
**Catherine** 6:10 11:23
**cause** 28:1
**caution** 113:20 114:3
**celebrated** 66:15
**center** 4:22 18:25
**cents** 86:18
**certain** 18:25 37:4 49:24 114:16
  133:7
**certainly** 146:25
**certainty** 47:15,23
**certification** 65:19 91:13,17
  92:11,23 93:2,7 149:1
**certify** 68:18 149:2
**certifying** 15:11
**cetera** 33:6 118:19,19 121:16
**challenge** 98:2 99:1 123:12,15
  123:16 147:19
**challenges** 146:20
**chance** 127:25
**change** 72:2 103:13,14,16,18
  111:12 114:19 123:24 132:5
  136:1,2 145:9
**changes** 114:11 126:3 133:6,6,7
  133:10 134:16
**changing** 123:19 124:4 132:18
**chapter** 146:17,18,19,21
**Charest** 2:2,3 7:20,23,24 8:1
  15:22,23,25 16:2 17:7,8,12,19
  17:22,24 19:5,7,9,24 20:19,21
  20:24 21:6,13 22:23 24:8,10
  24:16,19,23 25:20,22,25 26:4

800.523.7887                12-10-2025, WORD INDEX, Boynes case        Associated Reporters Int'l., Inc.

Page 6

26:17,20 27:13,16,19 28:10,16
28:19 29:18 30:9,22,25 31:2,5
31:7,9 33:10,18 34:6,10 35:16
36:12,23 37:13,20 38:7,9,11
38:15,21,24 39:3,7,11,14
42:18,22 43:1,6,8,10,13,20,24
44:1,7,12,15,19 45:6 46:1
47:4,6,18,22 48:7,18,21,23
49:1,4,6,9,12,16,18 50:8,18
51:15,18,25 52:2,7,12,20,24
53:18 54:1,10,21 55:9,11,15
55:18,23,25 56:5,7,12,15,19
56:22,25 57:3,8,12,15,18,20
57:25 58:3,7,10,18 59:18,22
60:1,20 62:22 63:25 64:21,23
65:2,5,22 67:4,6 68:6,11,13
68:17 69:6,14 71:13 72:24
73:2,4 74:18,20,24 75:5,11,19
75:22,24 76:4,12,18,25 77:3,7
77:10,23 78:1,3,5,9,12,15,22
78:23 79:14,17,22,25 80:4,7,9
80:12,14 81:23 82:1,24 83:4,7
83:13,17,20 85:19,24 86:4,6
86:11,21,23,25 87:3,8,15,20
87:23 88:1,5,7,17,22,25 89:2
89:7,16 90:5,9,11,13 91:4,20
124:16,17 129:21 130:2,4,13
130:14 132:14 135:6 136:17,19
136:22 137:3,9,12,21 138:5,20
139:1,8 140:4 141:2,5,13,21
142:2,15,21 143:1,5,9,14,24
144:2,6,15,19 145:25 146:2,5
**Charest's** 93:25
**Charles** 1:11,11 2:22 6:2 7:14
 13:22,25
**CHARLESTOWN** 5:3
**CHARLOTTE** 6:7
**cheap** 88:19,19
**check** 76:23 144:13
**Chemical** 5:22 10:18
**CHICAGO** 4:15
**children** 31:16
**chiming** 30:3
**Chivonne** 5:6 9:4 90:22
**choose** 55:21 56:14 93:6 131:15
 131:19
**Christian** 5:19 13:1,3,5,7
**CHRISTIANSTED** 3:6,10 4:7
**CHURCH** 4:6
**circling** 44:20

**circuit** 63:5
**circumstances** 50:3
**cistern** 29:4,6,13 34:18 35:4,4
 35:12 36:1,16,19 37:10,17,17
 37:23,25 38:5,17 40:20,21
 80:24 81:12,21 82:20 84:21
 142:2
**cisterns** 25:5 36:4,6,11 40:14
 47:8
**cite** 127:5
**cited** 98:2 129:1
**citing** 50:5
**CITY** 5:3
**civil** 128:8 135:9
**claim** 23:25 24:11,14,18 25:10
 26:10,10 29:4 31:14 32:3,4,7
 32:17 37:10 62:2,13,13,17
 80:5,17,18,18 81:3,16 82:17
 82:18 85:1,11 98:4,6 99:2
 100:21 102:18 103:6,8,9,12
 104:3 105:15 107:10,10 108:9
 108:9,15,16 109:6,7,19,19,24
 109:25 110:9 111:2,5,6,9,19
 111:24 112:8 113:5,25 114:10
 114:13 115:19,20,23 116:5,6,7
 116:15 117:2,9,10,21,25 118:3
 118:5,13 119:8,13,14,18
 120:16 122:6 124:7 125:4,5,5
 125:6,13 130:15,16 131:24
 132:12,20,22 135:13 138:10
 139:12,14,16,21
**claimant** 26:18 62:14 80:2 82:11
**claimants** 83:9
**claims** 5:6 28:23 31:9,17,17
 32:9,20,20 33:6 40:5 45:1
 53:22 54:11 66:5 72:10 82:11
 82:14 83:15 85:9 86:4,18,21
 91:8 93:23 94:1,15,17 96:10
 96:16,25 97:5,13,13,18 98:3
 100:8,12,16,25 101:1,5,10,13
 101:15,15 102:3 104:17 108:12
 108:12,18 111:17 112:3,4,6,10
 112:15,19 114:18 118:14,18,22
 120:24 121:14 123:22 125:11
 130:17 133:11,11,15 138:9
**class** 15:12,14,15,18 19:20,20
 19:23,25,25 22:1,3,13,24 23:8
 23:18 30:14 31:22,22 32:1,21
 32:25 33:24,24 34:14 35:25
 36:7 39:22 40:2,16,25 41:5,18

800.523.7887            12-10-2025, WORD INDEX, Boynes case      Associated Reporters Int'l., Inc.

Page 7

41:19,20,24 46:11,12 48:3,3
49:24 50:12,14,22,24 54:11,13
55:5,5,6 56:11 58:15 59:3
64:9 65:7,17,18 68:18 69:2,6
69:14,15,21,22 70:12,20,21,22
73:5,6,24 83:11 90:4 91:14,17
91:24 92:3,11,20,23,23 93:2,3
93:7 100:14 108:14,14 141:11
142:7
**classes** 50:2
**classification** 19:1
**clean** 80:24 82:20
**clear** 16:11 28:21 58:24 60:18
62:19 65:3 69:25 70:10 98:19
105:1 108:21 113:15 116:21
139:7 144:21,25
**clearly** 56:10 82:23 94:4 95:21
97:3,16 100:13 101:11 103:22
105:11,18 108:17 120:11
**CLERK** 7:8 10:1,7,12,14,20 11:2
11:5,11,16,21 12:1,15,21 13:1
13:9,17 78:16,20 148:16,18
**clicks** 53:11
**client** 24:19 45:21 46:16 51:18
66:8 82:2 118:20 119:13
139:12,18
**client's** 52:3 90:9
**clients** 23:22 46:16 48:2 63:4
121:4,12
**CLIFFORD** 1:3 2:2
**close** 43:5 66:3,14
**co-** 101:21 111:3
**co-administration** 57:10
**co-counsel** 119:10 134:5
**co-Defendant** 111:1
**co-Defendants** 93:18,21 96:19,25
97:20 101:21 114:17 115:24
116:2
**co-lead** 15:14 69:8
**co-leads** 70:2
**co-party** 125:4,6
**Cochran** 5:15 10:1,3,4
**cognizant** 19:14
**cohesive** 22:13 39:23 40:3,4
46:13
**cohesively** 22:12 70:5
**COHN** 3:17
**COLIANNI** 3:5
**collectively** 14:25 40:15 50:1
79:22 142:13,22 144:18

**colon** 7:10,12,13,15
**combine** 18:5 19:16
**come** 7:7 23:1 34:12 41:14 48:16
52:8 64:17 72:19 85:14 89:25
94:19 121:13 123:9,10 131:16
147:9
**comes** 64:12
**coming** 11:1 104:20 146:15
**commenced** 7:1
**comment** 138:7
**comments** 91:5 121:18
**commit** 143:17
**commitment** 16:13
**committed** 56:7 70:11 71:3
**Commodities** 3:21 9:15 14:15
**common** 21:19 22:1,5 39:18,19,20
40:14,17,23 41:9 42:5,14
105:1 112:25
**common-** 21:1
**common-sense** 20:11 21:9
**commonality** 21:10,19 22:7,16,20
40:1 42:6,15
**Company** 3:6 16:15
**comparative** 105:6,7
**compare** 107:3
**compared** 82:3
**comparison** 80:20 84:10
**compel** 67:13
**compensate** 64:16
**compensated** 73:23
**complaint** 24:12,13,14,15 29:15
29:17 30:13 95:23 96:22
135:11,16 136:24,25 139:5
**complaints** 135:20 137:7
**complete** 82:5
**complex** 41:6
**component** 36:14
**comprises** 27:8
**compromise** 95:2
**con** 113:6
**concede** 32:5
**conceded** 91:12 92:8 114:9
**conceding** 91:19
**concentration** 46:24 47:2
**concept** 25:8 28:6 29:22 46:6
50:15 81:13
**conceptually** 50:24 119:12
121:11
**concern** 37:14 38:3,18 77:11
98:25 113:17 121:5 123:6

800.523.7887          12-10-2025, WORD INDEX, Boynes case      Associated Reporters Int'l., Inc.

Page 8

concerned 120:14,20 134:9
concerns 71:6
concluded 148:19
concrete 134:15,16
condensed 113:22
condition 125:10
conditional 104:14 129:2
conditionally 15:11 68:18
conditioned 106:12
CONDO 5:12
conduct 22:19
conference 1:20 7:10 68:2,3
  94:23 95:3
confers 68:2
confident 54:4,4
configuration 39:1
confirm 47:7 66:24 114:12
confirmation 48:1
confirmed 47:9,24
confirming 48:2
confirms 23:1 46:22
conform 58:11
conformed 142:10
conforming 58:13
conformity 103:3
connection 39:3 75:1
conscious 36:25
consequences 54:14
consider 106:22
consideration 25:16 145:11
considers 144:23
consolidated 24:13 94:12
Construction 6:1 14:2
consult 121:3 122:24
contain 20:2 50:11
contaminants 36:11
contaminated 37:17
contemplated 92:21 94:4 103:22
  120:11
contemplates 97:3 101:3 103:20
  103:20 142:18
contemplation 120:12
content 50:10 54:5
contest 91:13 92:2 93:1
context 33:4 60:23,23 115:22
contingent 111:5
continue 63:19 100:17 102:11
  147:21 148:1
contours 18:13
contract 71:25 72:2

contracting 30:15
contractual 127:13 128:13
  137:14
contractually 126:2 136:4
contradicts 129:11
contribution 72:6 93:15,23
  96:25 102:9 105:2,4,5,15
  108:18 117:22 120:4,8,16,25
  126:14 127:1,2,8
control 96:8 117:2,3,3,5,6,6
controlling 127:4
CONTROY 5:2
conversation 23:24
convince 63:15
cooperate 108:13
Cor 110:18
cordial 147:12,15
core 31:23 39:15 40:3 54:21
corner 71:15 148:5
correct 30:8 99:7,20 100:8
  107:20 109:8 115:3,15 116:9
  117:19 119:12 132:10 149:3
correctly 59:17 99:16 142:16
  143:2,6
corrects 143:7
correlation 34:24
Correll 6:2 14:1
cost 61:17 63:9 79:2,7 80:24
  81:20 90:3
costs 61:9,13 84:3 87:17,19,21
  87:24 88:6,12,13,15,20,21
  89:4,4,5 90:1
Cotton 1:15 7:16
could've 125:11
counsel 7:22 10:19 11:10,15,25
  12:14,20 13:16,20 14:4 15:15
  22:24 23:2 30:4 56:14 60:21
  69:3,7,9,14,17,21 70:21 90:14
  108:14 121:22 122:2,12 124:15
  142:8
Counsel's 69:17
counterattack 71:18
counterclaim 107:10 108:9,16
  125:8
counterclaims 97:13 108:12
couple 17:5 67:20 102:2 130:7
  135:5
course 16:20 17:22 19:11 21:3
  22:19,24 25:20 39:21 41:19
  61:11 65:9 68:25 82:15 112:1

800.523.7887              12-10-2025, WORD INDEX, Boynes case      Associated Reporters Int'l., Inc.

Page 9

112:2 131:5
**court** 1:1 6:11 7:2,3,5,6,8,18
  7:21,25 8:4,7,10,13,16,19,22
  9:1,6,10,13,16,19,22 10:1,6,7
  10:11,12,13,14,17,19,20,22
  11:2,3,5,10,11,15,16,20,21,25
  12:1,6,8,14,15,20,21,25 13:1
  13:7,9,13,16,17,20,23 14:4,5
  15:9,11,24 16:1,3 17:11,13
  19:2,6,8,17 20:17,20,22 21:1
  21:5,10,15,16 22:22 24:4,6,9
  24:11,17,21 25:18,21,23 26:1
  26:14,16,19 27:8,15,18 28:7
  28:11,17 29:14 30:6,11,23
  31:1,3,6,8,24,25 32:10,11
  33:3,11,21,22 34:7,9 36:20
  37:3,5,12,19 38:4,8,10,14,20
  38:23 39:2,6,10,12 41:19 42:2
  42:3,4,25 43:4,7,9,12,19,23
  43:25 44:6,11,14,18 45:5,7,13
  45:13,25 46:15 47:3,5,13,17
  47:21 48:6,12,17,19,22,25
  49:3,5,8,10,15,17 50:7,17
  51:14,17,23 52:1,6,11,19,23
  53:13,14,17,25 54:9,20 55:2
  55:10,14,17,22,24 56:2,6,10
  56:13,18,20,23 57:2,7,11,13
  57:16,19,23 58:1,6,9,12,17,22
  59:13,17,20,21,25 60:2,12,19
  62:21 63:15,19 64:8,13,14,19
  64:22,24 65:4,20 66:8 67:2,5
  68:5,10,12,16,24 69:5,7,10,11
  69:13 70:5,22 71:3,4,12 72:21
  72:25 73:3 74:16,19,22 75:3
  75:10,16,20,23 76:2,10,13,24
  77:1,5,9,13,19,25 78:2,4,7,11
  78:13,16,16,20,20,22,24 79:15
  79:18,24 80:3,6,8,11,13 81:17
  81:24 82:23,25 83:5,12,16,19
  85:10,18,23 86:3,5,10,20,22
  86:24 87:2,7,13,18,21,25 88:3
  88:6,16,21,24 89:1,6,8,10,14
  89:24 90:2,8,10,12,14,15,18
  90:24 91:1,16,25 92:4,7,12,14
  92:17,24 93:4,10,17 94:2,7,11
  94:19,21,22,25 95:5,6,6,8,12
  95:18,20 96:6,14,23 97:14
  98:10,14,17,22,24 99:5,7,10
  99:20 101:25 102:3,8,11,16,22
  103:13 104:6,8,11,13 105:9,13
  105:19 106:5,14,18,22 107:13
  107:15,17,19,21,24 108:1,3,7
  109:1,3,10,14,17 110:7,14,16
  110:19,21 111:8,15,17,22
  112:1,6,12,23 113:10,13 114:7
  114:15,22 115:6,9,12,18,21
  116:1,6,11,13,16 117:7,12,15
  117:24 118:2,8 119:7 120:16
  120:17 121:6,8,22,25 122:2,7
  122:10,12 123:5,18 124:13,15
  124:16 125:20,21 126:4,5,11
  128:10,16 129:6,19,20,25
  130:3,20 131:2,4,10,25 132:4
  132:4,8,14,16,17,20 133:4,12
  133:18 134:6,13 135:3,25
  136:8,18,20 137:2,8,10,17,19
  137:20 138:4,12,13,19,23
  139:8,9 140:2 141:1,4,5,12,14
  141:15,18,20 142:1,4,14,20,25
  143:4,8,9,11,13,23 144:1,5,7
  144:13,17,20,23 145:20,21,23
  146:1,4,8,11 148:16,17,18,18
  149:2
**Court's** 23:1 26:13 29:3 32:16
  37:14 38:2 39:4,7 48:7 49:7
  58:8 59:1 60:4,7 68:25 71:5,7
  71:8 76:6 90:6 95:21 96:1
  101:6 104:21 106:22 110:2
  113:22 124:10,11 127:17
  134:20 135:15 138:2 143:20
  145:8,10,18
**courts** 20:10 39:17 41:8 129:8
**cover** 44:9 68:15 90:1,2
**coverage** 24:25 25:1 89:22
**covered** 68:23
**covering** 43:15
**covers** 36:18
**create** 121:15,15 131:6
**creates** 108:17
**credited** 106:4
**criteria** 91:9,24 92:3
**Croix** 1:2,18 2:9,13 3:6 4:7 6:3
**cross** 91:8 94:17 96:9,15 97:13
  97:18 99:2 100:8,12,15,21,25
  101:1,5,15,15,15 102:3,18
  103:6,8,9,12 104:3,17 107:10
  108:9,12,16 109:6,24,25 110:9
  111:1,5,9,19,24 112:4,8,10,15
  112:18 113:5,25 114:10,13,18
  115:19,20,23 116:5,6,7,15

Case: 1:21-cv-00253-MAK    Document #: 1650    Filed: 12/31/25    Page 159 of 189

800.523.7887                    12-10-2025, WORD INDEX, Boynes case        Associated Reporters Int'l., Inc.

Page 10

117:2,9,10,21,24 118:3,5,13
118:22 119:8,13,18 120:15,24
121:14 122:6 123:22 124:7
125:4,5 130:15,16 131:24
132:12,20,22 133:11,11,15
138:10 139:12,14,16,21
**crossed** 127:17 131:22
**crux** 91:2 93:11 121:5 136:13
**crystal** 116:20 135:23
**cthomas@hamiltonmillerlaw.com**
 5:9
**curious** 139:18
**current** 51:6
**currently** 27:12 28:7,13 101:19
 101:20
**cut** 74:21
**cutting** 74:25

**D**

**D** 62:7
**D.C** 3:15,18
**D.N.A** 19:10
**D'AMOUR** 6:6
**DALLAS** 2:4
**damage** 38:12 81:21 146:2
**damages** 21:22 36:13
**dangerous** 30:13
**Daniel** 2:2 3:13 7:24 9:11
 124:16
**daniel.donovan@kirkland.com**
 3:16
**dare** 128:6,9
**dash** 26:15 50:21 51:12 55:15
 62:15,16,16,17 65:12,14 76:7
**data** 20:14,25,25 21:8 45:15
 46:21,23 48:13 67:7 88:20
 89:4
**date** 15:19 54:17,18,18 58:23
 59:14 69:3,20 70:25 88:12
 92:3 115:15 144:8
**dates** 42:12
**day** 44:25 61:17 64:20 73:22
 81:18 121:1 127:20 141:17
 148:10 149:10
**days** 59:2,8,12 73:13 100:7
 103:12 115:17 135:16 137:5,16
 137:18,21 143:17 144:9
**dcharest@burnscharest.com** 2:6
**deadline** 15:17 68:22 72:9,13
 93:25 95:9,22 96:3 100:21

104:7,16 111:24 113:13,20
 114:21 125:10
**deadlines** 91:7 95:16
**Deakins** 5:19 13:5
**deal** 16:7 31:20 36:10,21 40:17
 53:19 86:8
**dealing** 41:8 75:8
**dealings** 147:15
**dealt** 44:25
**debate** 141:9
**December** 1:18 7:9 149:10
**decide** 118:16 131:4
**decided** 100:3,6 103:15,15
 112:20 117:17 133:17
**decision** 16:12 23:19 67:1 105:8
 105:19,21 114:20 118:21
 119:19
**decisions** 50:12
**declaration** 38:1 50:20
**declarations** 48:2
**dedicated** 147:3
**defects** 60:12,12
**defend** 97:22 103:3 108:19
**Defendant** 10:4 11:8,14,19 13:5
 21:25 71:23,23,24 72:1,1 78:5
 93:1,16 98:4,21,22 99:25
 100:13,19 105:23,24 107:11
 108:10 109:20 111:4 116:22,23
 120:2 128:14 135:10 138:6
**Defendant's** 40:6 105:15 128:15
**Defendants** 1:10,14,18 3:12
 14:10,11,23,23,24 16:8 22:19
 30:18 66:6,22 70:20 71:15
 82:3,3,7,14 90:20 93:5,6,13
 93:20,21 94:8,16 96:8,16,17
 96:19 97:10,10,19 98:11,12,25
 99:3,17 100:16 101:3,22 102:4
 102:12,20 103:21 104:15,18
 105:2 106:25 108:11 109:5,8,8
 109:22 110:12,13 112:17
 114:14,23,24 116:4,8,19 117:5
 119:11,15,15,21 120:3,3,24
 123:6 124:19,23 125:16,22,23
 126:18 127:5 128:20 129:10,14
 132:11,12,13,22 133:14,14
 135:19 136:14,15 138:17 139:2
 139:9,22 140:1,5
**defense** 64:8 70:13 108:15
 136:11 144:25 145:16
**defer** 34:7 121:24

800.523.7887                12-10-2025, WORD INDEX, Boynes case        Associated Reporters Int'l., Inc.

Page 11

**deficiencies** 16:18 17:1
**definitely** 56:2 74:20 141:10
**degree** 47:14,23
**DEL** 5:12
**delay** 61:9 141:9
**deliberation** 61:17
**Dema** 2:11,12 8:14,14,16 35:18
  36:23,24 37:4,6
**denied** 115:1,13
**denominator** 80:9,20
**dense** 33:20
**deny** 106:15
**depending** 21:4 27:4,7 92:21
**deposed** 66:22 68:7
**deposited** 40:14
**deposition** 67:14,22,24 73:11,14
**depositions** 23:11 67:3 68:9
  70:18
**deprived** 137:5
**derive** 40:5
**dermally** 36:5
**des** 110:12
**describe** 26:5 44:21
**described** 29:14,17 118:5
**describes** 54:11 127:2
**designed** 52:8
**desire** 69:1
**details** 53:3
**determination** 16:17 49:22 64:16
**determine** 49:20 132:16
**determined** 105:12 130:23
**determines** 124:13
**developed** 32:24 118:23
**DIAL** 4:10
**differences** 42:10
**different** 18:12,13,20 22:10,14
  22:15 32:10 42:8,8,23 43:16
  44:16 45:7 48:8 57:9 64:1,10
  67:15 76:5 81:6 102:2 110:4
  121:1 130:19 131:3 133:6
**differentiate** 34:13
**diminished** 140:13
**directly** 30:4 64:13
**disagree** 93:24 99:18
**discern** 34:20
**discomfort** 80:25
**discovery** 23:11 65:21 66:4,14
  66:19,20,23 67:10 70:15,17
  95:6,7,19 100:4
**discretion** 68:25

**discussed** 48:19 62:18
**discussion** 68:20 69:22 133:22
  144:16
**discussions** 33:5
**disease** 30:16,20 35:21,23 36:9
  36:10,17 37:8
**dismiss** 70:14 94:4,10,12,14,16
  96:14 100:3,22,23 101:7,8
  103:11,15 104:6 109:9,10,23
  112:14,18,19,21 113:1 114:20
  115:1,13 117:17 118:17 130:23
  133:12 139:10
**dismissal** 101:12 104:14 114:16
  123:23 129:2
**dismissed** 96:17 98:15 99:24
  101:4,9,17 103:18,21 109:13
  109:16 111:6 112:7 113:6
  115:25 116:2,25 117:4 119:16
  124:8 135:18 139:3 140:1
**dismisses** 125:22 138:12 139:9
**dismissing** 100:20
**dispositive** 101:13
**disputes** 94:20
**disrespect** 100:2
**disrespecting** 104:12
**distribute** 32:18
**distributing** 62:8
**distribution** 46:16,19
**distributions** 65:17
**District** 1:1,1,20 7:3,4 16:14
  78:20
**diverge** 108:25 109:1
**dividing** 84:6
**division** 1:2 41:6
**docket** 26:14 50:20 62:14 65:12
  65:13 69:9 130:8
**documentation** 27:4
**documented** 62:12
**documents** 53:7 57:4 66:21 67:12
  67:25 134:17
**doing** 23:17 39:4 41:18 65:24
  78:24 131:21 143:17
**dollar** 29:1,1
**dollars** 14:9,20 18:2 61:18 64:7
  64:14 74:9 81:7,8,8 82:13
  84:3,4,8 87:16 89:13,17,18
**Donovan** 3:13 9:11,12 67:15
**door** 53:24
**dotted** 25:14
**double** 105:20 144:13

800.523.7887                12-10-2025, WORD INDEX, Boynes case      Associated Reporters Int'l., Inc.

Page 12

**downside** 41:18
**downwind** 44:24
**Dr** 36:4
**draft** 60:15 142:23
**drafts** 57:4
**drank** 35:4 36:5 37:16,25
**Draw** 7:4
**drew** 144:3
**Drive** 4:18 6:12
**driven** 29:25
**driver** 88:20
**drop** 143:22
**DUDLEY** 5:23 6:2
**due** 41:6 59:11 103:2 118:22
  128:24
**duh** 140:16
**dunk** 61:20
**dust** 135:23
**duties** 41:17
**duty** 23:19
**dwell** 62:11
**dwindled** 135:22

### E

**E** 1:11 9:7 17:21,23 31:12,23
  49:1,10,12,18 50:1 59:23
  60:17,20,24 61:8 62:6,6,7,22
  63:16,17 65:11
**E.I.G** 4:21 12:11 18:4,8
**E.P.A** 36:15,17 66:2
**eager** 62:5
**early** 66:17
**earned** 63:15
**east** 4:14 46:5
**Eastern** 16:14
**easternmost** 45:4
**easy** 77:16
**echo** 60:2
**edge** 84:12
**edges** 48:2
**edit** 122:14 123:3 124:22
**editing** 123:1
**effect** 38:12 40:13
**effective** 19:15
**effectiveness** 71:9
**effects** 26:11
**efficiency** 19:6 41:4 94:12
**efficiency's** 15:7
**efficient** 19:11,15
**effort** 23:25 41:17 50:5 54:7

  66:7 77:14,17 82:19 140:15
**efforts** 50:9 52:21 66:18
**eight** 16:16 69:10 76:8,8,9
  126:20
**eighteen** 89:12
**eighth** 107:23
**eighty** 50:22 54:2
**eighty-five** 59:12,12 144:9
**eighty-five-day** 71:2
**either** 27:3 38:15 45:10 56:16
  56:25 58:10 71:4,14 94:2
  114:11 133:18 140:6 141:16
  142:9,15 143:5
**electronic** 6:14 149:4
**element** 65:10
**elements** 70:10
**eleven** 65:14 84:3 130:8
**eligible** 29:10
**eliminate** 119:24
**eliminating** 106:7
**Elite** 5:15 10:4 13:5 18:2,5
**Elizabeth** 3:17 9:8
**ELLIS** 3:14
**Elser** 4:2 12:4
**email** 2:6,10,14,19,24 3:4,11,16
  3:20,24 4:4,8,20,25 5:4,9,14
  5:18,25 6:4,8 51:20,23 52:4,5
**embodied** 95:10,25
**embody** 135:1
**embroiled** 118:23
**EMILE** 1:21
**enable** 50:11
**encourage** 141:7
**ended** 46:25 61:17
**endorse** 21:16
**ends** 100:20
**Energy** 4:21 12:11 14:13
**engaged** 67:10
**engaging** 33:4
**English** 75:4 96:2
**enhance** 37:18
**enhanced** 32:25 36:18
**enhancement** 37:23
**enter** 55:6 94:25 123:18
**entered** 95:4
**entire** 22:1 33:7,15,23 35:2
  70:4 82:17
**entirely** 123:8
**entirety** 83:1
**entities** 89:19,21 94:6

800.523.7887                12-10-2025, WORD INDEX, Boynes case        Associated Reporters Int'l., Inc.

Page 13

**entitled** 82:22 98:5,9 105:20
  149:4
**envision** 35:20 124:1
**Epiq** 15:18 53:13 68:22 75:8
**equally** 31:16
**equitable** 62:9
**equitably** 31:23
**equivalent** 97:8
**especially** 101:12
**ESQ** 2:2,3,7,11,16,16,21,21 3:1
  3:5,9,13,17,21 4:1,5,10,13,17
  4:21 5:2,6,11,15,19,22 6:1,2
  6:6,10,10
**essentially** 106:9 107:7 117:7
**establish** 68:21
**established** 25:15 93:19 124:19
**establishing** 15:16
**estates** 45:20
**estimate** 19:23 80:16 87:13,15
**estimated** 50:22 54:1
**estimates** 20:13 80:15
**estimation** 32:3 48:9
**et** 1:3,6,7,9,13,15,17 2:2 7:11
  7:12,12,13,14,15,16,16 33:6
  118:19,19 121:16
**evaluate** 33:5 76:25
**evaluating** 31:12
**event** 41:9 107:10,19,25 108:8
  140:9
**events** 41:13 42:23 43:15
**eventually** 82:16
**everybody** 100:14 104:23 110:24
  120:23 132:2
**everyday** 73:10
**evidence** 28:1 40:17
**evident** 58:21
**evolution** 71:2
**evolve** 91:14
**exactly** 45:6 65:2,6,15 72:6
  76:20 127:2 135:24 137:4
  139:7 145:14
**examined** 23:13
**example** 79:2 81:22 86:1 121:20
  131:18 132:3
**exceed** 32:9
**Excel** 6:1 14:2 18:3,5
**excellence** 23:7
**exchange** 28:23 82:10,12
**exchanged** 44:3
**exciting** 146:19

**excuse** 42:19 130:16 133:7
**exercised** 70:18
**Exhibit** 26:17
**exist** 17:2 116:18
**existing** 114:17
**exists** 101:20 135:9
**expand** 35:15
**expect** 18:18 26:3 56:1 146:20
**expected** 123:9,11
**expecting** 79:20
**expense** 55:20
**expenses** 79:8,9
**experience** 35:21 48:1 69:17
  112:10
**expert** 29:5,20,21 35:19 36:3
  44:2 47:15 88:14,15,21 89:4
**expertise** 81:2
**experts** 70:15 79:8 88:20
**explain** 43:17 51:2 143:25
**expo** 37:16
**exposed** 23:12 35:6 36:5 73:17
  87:11
**exposing** 74:9
**exposure** 25:7,11 29:4,6,13,23
  29:25 30:13,20 32:15 34:2,15
  34:16,17,18,24,25 35:7,10
  36:4,6,14,16,19 37:3,4,6,10
  37:17 81:10 84:21 141:24
**exposures** 42:9
**expressly** 71:22 126:10,10 127:7
  142:6
**extend** 72:12 113:19 145:3
**extended** 47:10
**extension** 95:25
**extent** 33:11 37:4 126:25 145:9
**extinguish** 99:23 100:15 120:13
  131:20
**extinguished** 101:18 103:19
  105:2 113:7 123:23
**extinguishes** 99:23
**eyes** 25:4 81:1

---

### F

**F.R.D** 16:16
**face** 147:16
**faces** 32:5
**facing** 21:25
**fact** 17:15 36:25 66:13 94:5
  99:22 109:5 111:8 112:20
  126:2,9 128:19 129:13 140:13

800.523.7887          12-10-2025, WORD INDEX, Boynes case      Associated Reporters Int'l., Inc.

Page 14

factors 60:16
facts 21:23,24 22:5 40:6 66:5
factual 40:10 48:4
factually 32:6
failure 40:7,7,8
fair 15:13 23:20 31:12 32:17,24
  33:17 46:13 63:23 64:16 74:13
  80:15 90:3 133:19
fairness 41:4 42:1 54:19 79:1
  79:19
fall 28:18
fallacy 135:21
falls 16:19 106:9
false 82:19 84:9
familiar 53:15 77:22
far 16:1 58:13 107:23
FARMS 4:2
fast 60:16
favorable 70:19
favors 129:9
Fax 2:5,10,14,19,24 3:3,8,19,24
  4:4,8,12,16,24 5:9
February 146:13,14
federal 94:9 105:1 125:3 134:23
  135:8
fee 63:16,22,23 64:5
feedback 143:19
feel 30:7 68:23 87:12 142:3
fees 62:23,25 63:20 79:6 84:2
FELIPE 5:16
felt 87:6
FEUERZEIG 5:23 6:2
field 128:25
fifteen 26:23 130:8 137:16
fifteen- 61:16
fifth 15:17 84:14
fifty 14:20 18:1 59:2 83:18
  84:7
fight 121:1 139:23
fighting 139:22
fights 121:15
figure 48:14 88:10
figuring 79:19
file 61:3 83:15 94:3,9,17 95:9
  96:8,15 99:2 100:8,12,21
  101:14 102:3,18,23 103:1,5,8
  103:9,12 109:19,23 111:9,19
  111:24 112:2,4,7,10,10,14,15
  112:18,18,22 113:25 114:10,13
  114:18,24 115:3,6,17 116:7,7

117:2,9,9,10,24 118:5,12,13
  118:16 119:13 121:14 124:9,12
  130:20,23 131:2,19,23 132:20
  136:16,20 137:6 138:14 139:1
  139:16,21
filed 14:7,18 59:11 95:23
  102:23 113:17,19 114:3 115:15
  118:17 123:20 125:12
files 135:15
filing 100:25 113:1,2 115:2,14
  115:22,23 116:3 117:21 118:3
  118:21 120:15,16 130:17,24
  133:15 136:23 137:18,24
  139:11,14
filings 65:15
fill 144:8
filters 52:13
final 15:20 16:13,20,24 58:23
  58:25 59:6,14 60:4 61:12
  71:11 75:2 85:12,16 92:18,19
  105:16 140:3 144:7,10 145:14
finally 16:21 60:11 111:17
financial 4:22 67:10
find 26:25 38:25 51:3 56:8,20
  75:24 76:4 77:11
fine 17:13 35:7 56:19 90:24
  128:15 148:11
finishing 100:4
FIRM 4:18
firms 53:21
first 14:7,16 15:11 16:5 19:22
  28:2 39:20 44:4,12,13,16 46:2
  55:12,19 59:6 60:8 62:4 64:1
  68:17 76:8 103:24 115:5,10
  124:22,23 127:12 128:6 130:1
  130:7,12 138:17 139:1 141:13
FISHMAN 2:22
fits 28:24 113:11
five 7:10,12 14:9,20 17:25 18:1
  27:4,7 45:10,11 46:3,14 51:12
  55:16 56:11 57:5 62:16 69:9
  70:23 73:2,3 74:9 83:24 84:1
  84:11,16 86:9 102:20 107:22
  122:8 130:8 142:21,24 143:19
five-fifty 142:22
flare 42:23 44:4,5
flares 42:9 44:2
flaws 125:1
flight 18:17
flights 18:16

800.523.7887          12-10-2025, WORD INDEX, Boynes case      Associated Reporters Int'l., Inc.

Page 15

FLORIDA 5:8
fluctuates 63:21
flush 139:18
fly 135:8
focus 16:4 39:20 49:13
focuses 69:16
focusing 19:19
FOIL 66:2
folks 45:16,17 46:3 47:24 53:13
  63:12 147:9
followed 63:1
follows 14:12
footnote 116:12
forced 118:5,8,11 131:1
foregoing 149:3
foreseeable 101:5,8,9,11
foreseeing 124:3
form 21:21 30:19 51:5,9,10 53:9
  53:23 54:25,25 55:13,22 56:1
  56:3,4 57:5,17 62:13,15,16,17
  96:9 98:21 102:6 104:19
  142:11,17,17
formal 66:19
forms 15:10 71:4,5 75:2 142:6
  143:10 144:4
formula 26:18 62:14,18
formulas 25:23
formulate 132:1
forth 34:4 145:5
forty 21:3 126:11 130:10
forty- 16:15
forty-two 89:16
forward 17:14 38:18 52:25 64:17
  104:21 132:1 146:17,18,23
  148:8
fought 70:15
four 16:16,16 20:11 21:9 51:19
  62:15 63:18 65:11 70:1 79:11
  79:16 89:21 107:22 137:18
  138:11 143:9
four-and-a-half 125:12
fourteen 36:17 100:7,10,11
  103:12 115:17 135:9,16 137:5
  137:7,15,18,21,24 140:8
Fourth 15:16
FOX 3:1
Francis 1:11 3:21 9:14
francis.healy@hoganlovells.com
  3:24
frankly 45:23 74:3 96:12 123:8

131:25
FREDERIKSBERG 5:23
free 23:12 30:7 126:17 140:21
Freepoint 3:21 9:15 14:10,11,15
  14:22 17:25 65:13 82:12 89:12
  94:5 142:12
Fresh 98:18
friction 77:15
Friday 141:15
front 76:14 101:23
fruit 145:5
FTR 6:11
fulfilled 19:21
full 66:23 67:21 104:2 137:7
fully 85:15
fumes 46:7
Fun 85:25
function 85:19,21
fund 14:13 79:5
fundamental 34:11
fundamentally 19:13 20:1 29:5
  32:6 42:24 43:13 44:9 50:21
  52:25 72:5 136:10 140:22
funds 75:17
Fungus 85:25
further 106:3 129:16 145:4,23
future 27:18,21,22 35:1,23 36:9
  36:10 64:17 109:12 139:1
  141:8,8

---

### G

G 69:10,16 125:4 140:7
GADE 5:23
game 118:25,25
gang 110:5
gap 44:8 59:10
gas 44:21
Gates 16:15
geared 119:24
GEIGER 5:16
general 35:6 79:1
generally 43:15 50:10
gentleman 67:22
geographic 22:11 27:5 36:1 38:6
  42:11 43:16 44:22 45:9 48:11
  60:15 62:11
GEORGIA 4:11,19
getting 23:4 29:12 33:14 47:1
  68:1 81:19 82:4,6,21 84:11
  93:11 109:7 119:6 123:1

800.523.7887          12-10-2025, WORD INDEX, Boynes case       Associated Reporters Int'l., Inc.

Page 16

**gift** 77:2
**GIRALDA** 4:2
**give** 7:5 9:24 18:4 20:14 32:11 35:14 49:8,19 59:7 67:2 71:3 80:19 118:11 124:12 127:24 143:11
**given** 17:15 23:11 49:21 58:19 58:20 76:22 88:11 99:1 105:6 113:21 120:7 145:12
**gives** 84:7
**giving** 82:11,17,17
**Global** 4:21 12:11
**go** 11:3,3 14:21 19:8,19 23:6 24:5 29:11 38:18 42:2 43:25 44:23 46:20 48:15,25 51:3 59:21 61:11,19 66:20 68:12 75:11 82:20 87:9 88:14 102:21 113:10 116:11 118:15,25 121:8 123:11 125:24 128:2 129:22 134:8,18 140:7 141:2,7
**God** 7:5
**goes** 35:22 42:4 52:13 120:5 121:17 125:8,9
**going** 7:21 9:24 11:4 16:3 17:7 17:16 19:17 25:18,18 28:21,22 29:9 33:20 35:15 43:20 49:25 51:21 52:13,17 57:13,15 58:1 63:14 68:13 71:8,15 73:13 74:22,23 75:3 81:20 85:14 87:4 90:19 91:25 92:22 97:17 101:6,11 106:2 108:22 111:17 112:3 113:15 114:16,17 117:3 117:4 118:16 119:2,18,19,25 121:9,9 124:5,6,6,10 129:23 131:1,12 133:5 136:9 138:5,23 138:24 139:11,20,22,23 145:1 145:4,10,18 147:12
**good** 7:8,18,19,20,23,25 8:1,2,4 8:5,7,8,11,14,17,20,23 9:3,7 9:11,17,19,20,22 10:3,6,9,11 10:16,19 11:7,10,13,18,20,23 12:3,6,10,14,17,20,23,25 13:3 13:3,7,11,16,18,20 14:4 16:1 19:2 23:5 38:21 53:15 54:24 58:13 59:9,18,19 61:21 66:1,1 66:1,4,16 73:7,20 76:16 85:1 85:10 107:1 122:2 147:1,2,2
**gotten** 130:17,24
**govern** 125:25
**governed** 96:10

**Gower** 3:9,9 8:20,21
**grand** 89:3
**grant** 45:21 95:6 104:22 129:19
**granted** 94:15
**grants** 59:13
**gravity** 18:25
**great** 145:2 147:25
**greater** 33:1 106:2
**greetings** 8:25 13:4 14:1
**grid** 35:24 37:9
**gritty** 58:21
**gross** 40:11
**grounds** 108:23,23 109:25 139:6 139:7
**group** 5:10 9:21 27:8,9 28:5 29:10 33:8,10,13,15,23,25 35:2 71:24 147:7
**growing** 88:15
**guess** 27:20 41:13 52:2 63:20 90:20 111:25 126:17 130:22 132:24 138:5 139:14 144:11
**guessing** 119:17
**guidance** 60:9
**GUNN** 4:10

---

**H**

**H** 125:24 140:8
**Haas** 16:15
**Hadley** 6:6 12:17
**half** 84:2 87:16
**HAMILTON** 5:7
**hand** 88:1 144:3 147:3
**handled** 127:7
**hands** 61:4 148:3
**happen** 16:24 74:12 114:17 117:9 125:10,11 134:16
**happened** 45:17 62:4 110:25
**happening** 30:7 32:2 33:16,22
**happens** 71:10 92:17 126:12,13 134:14
**happy** 9:1,3,6,8,10 13:8 14:1,4 21:18 24:5 26:13 42:2 49:7 68:24 122:11 123:4 138:2
**hard** 22:2 30:3 74:4 121:12
**harm** 72:18 129:18
**harmed** 22:4 73:11
**hat** 129:23
**hate** 141:6
**HAYGOOD** 2:22
**he's** 10:24

800.523.7887          12-10-2025, WORD INDEX, Boynes case      Associated Reporters Int'l., Inc.

Page 17

**head** 29:19 86:8 96:4
**health** 26:6,22 27:10 84:23
**healthier** 84:23
**healthy** 70:6
**Healy** 3:21 9:14,14
**hear** 10:24 33:15 42:20 43:1
 76:15 105:9 115:5,10 138:24
**heard** 45:14 115:8 127:23 135:7
 138:25 145:7 146:6
**hearing** 7:1 10:24 15:20 30:4
 54:19 69:3 70:25 71:11 97:4
 117:20 127:20 133:2 141:9
 145:13,15 148:19
**hearings** 65:25 67:13
**heart** 87:12
**heavily** 23:18 61:6
**heavy** 54:7
**Heideman** 4:17 11:11,13,13
**held** 41:16
**HELEN** 1:7
**help** 141:17
**helpful** 26:14 57:24 59:16
**helps** 43:17
**Henderson** 1:21 67:12 68:3
**Herpel** 6:1 10:20,23,24 14:2
**hesitant** 123:1
**high** 71:17 86:1 147:22
**higher** 61:12 63:22 64:25 86:12
 89:16
**highlighted** 34:18
**highlighting** 45:15
**hinted** 69:4
**hire** 55:20 58:15 65:7
**histories** 23:13
**hit** 47:15,20
**hjhurst@hurstvilaw.com** 6:8
**hlambert@lambertzainey.com** 2:19
**Hogan** 2:21 3:22 8:2
**hold** 42:25 107:13,15 122:12,13
 125:16 147:22
**Holdings** 4:17 11:14 14:14,15
**holidays** 9:3,8 135:4 141:19
**home** 37:23 38:16 46:17
**homogeny** 32:21
**honest** 20:25 29:19 32:8 56:15
 76:14
**honestly** 86:13 88:2
**honesty** 119:5
**Honor** 7:20,23 8:2,8,11,14,17,20
 8:23 9:2,4,7,11,14,17,20 10:4

 10:9,16 11:7,18 12:3,10,17,23
 13:3,11,18,22 17:19 19:24
 20:14 29:19 30:2 32:3 35:18
 36:22 37:13 42:20 43:3,21
 45:1 48:15 55:9 64:2 67:8
 72:20 75:13 89:9,10,18 90:25
 93:9 95:4 96:12 97:23 100:19
 101:22 102:15 104:10 106:17
 106:21 111:20 119:5,17 121:21
 122:3,11 123:25 130:6 133:9
 134:7 135:6 138:22 139:12
 140:1,4 144:12 145:25 148:15
**Honor's** 119:19
**Honorable** 1:20 7:3,6
**hope** 81:17 86:14 111:7 119:3
 147:9,20,25
**hopefully** 147:12
**horizon** 17:6
**hosting** 89:4
**hot** 73:14
**house** 84:24
**household** 20:12 86:7,8,9
**households** 20:6,18,22,23 22:10
 79:16
**housing** 88:20
**HOUSTON** 5:17
**hpaschal@fishmanhaygood.com**
 2:24
**HRSA** 9:21
**HUDGINS** 4:10
**Hugh** 2:16 10:9
**human** 26:9
**hump** 124:23
**hundred** 14:9,20 18:1 20:15 21:3
 24:25 35:21 50:24 51:1 59:2,8
 59:12 65:15 71:2 84:4,8 89:21
 90:11 144:9
**hundreds** 67:24
**hung** 61:17
**Hurst** 6:6 12:15,17,18
**hurt** 141:17

---

**I**

**I'm** 13:25 35:15 42:19
**idea** 104:5
**identified** 50:5 89:16 128:20
 138:8
**identify** 41:15 56:25 142:5,10
 142:15 143:5
**identifying** 17:1

800.523.7887          12-10-2025, WORD INDEX, Boynes case       Associated Reporters Int'l., Inc.

Page 18

| | |
|---|---|
| **III** 1:21 | **individuals** 28:18 33:8 34:1 |
| **ILLINOIS** 4:15 | 86:7 |
| **illness** 30:16,21 31:1 33:14 | **indulge** 46:15 |
| 34:1,2 | **Industrial** 6:5 12:18 |
| **imagine** 22:2 35:2 80:24,24 | **inform** 77:13 |
| **immediately** 46:5 | **informal** 68:3 |
| **impact** 21:23 26:9 29:7 41:2 | **information** 49:19 50:11 53:7 |
| 42:11 48:9 81:11,12 84:16 | 54:21 66:1,2,5 144:21 |
| 87:10 | **informed** 50:12 67:1,1 |
| **impacted** 35:25 38:5 138:7,16 | **initial** 23:2 60:5 66:20 69:23 |
| 140:24 | 94:25 95:8 133:2 |
| **impacts** 140:19 | **injunction** 45:12 65:25 70:12 |
| **impinge** 139:23 | **injuries** 27:10 28:5,8 32:22 |
| **important** 47:12 87:11 125:13 | 34:17 35:1 38:19 81:24 |
| **importantly** 72:4 | **injury** 22:18 33:1,1 34:12,21,22 |
| **impossible** 34:11 85:7 | **inning** 118:25 |
| **improved** 20:4 51:2 | **instruction** 143:21 |
| **inability** 25:3 | **insurance** 89:22 |
| **incentive** 72:23 | **insurers** 89:21,23 |
| **incentivize** 64:17 | **Int'l** 6:12 149:10 |
| **incidents** 107:14 108:11 | **Integrity** 5:10 9:21 |
| **inclined** 104:21 114:15 124:12 | **intend** 15:4 145:12 |
| 145:3 | **intends** 145:21 |
| **include** 144:2 | **intense** 44:16 45:17 |
| **included** 25:16 28:9,10,12 30:24 | **intensity** 44:15 |
| 55:3 72:23 95:12 97:6,7 | **intent** 104:1 139:19 |
| 101:22 | **interest** 107:1 128:14,15 141:10 |
| **includes** 34:1 48:8 | **interested** 37:15 136:5 139:15 |
| **including** 30:16 50:4,13 98:3 | **interesting** 146:19 |
| **inclusion** 57:9 | **interestingly** 97:1 101:2 |
| **Incorporated** 15:18 | **interests** 32:1 66:9 |
| **incorrect** 34:5 | **intermittent** 46:7 |
| **increased** 30:15 34:24,25 35:10 | **internal** 87:16 |
| 35:12 140:11,12 | **internally** 45:11 |
| **increases** 36:6 | **interplays** 121:20 |
| **incurred** 87:22 | **interpolate** 20:16 |
| **indemnity** 72:7 | **interrogatories** 67:5 |
| **independently** 144:4 | **interrogatory** 68:1 |
| **indicated** 15:4 16:25 64:19 | **intervening** 114:19 |
| 79:10 | **interview** 45:22 |
| **indicating** 117:8 | **interviews** 45:21 |
| **indication** 105:18 | **intrusion** 73:22 |
| **indicia** 34:23 | **invade** 127:13 |
| **indictment** 105:4 | **invalid** 136:25 |
| **individual** 45:8 50:4,9 51:22 | **invasion** 73:21 |
| 52:22 75:17 77:10 80:4 81:18 | **inverse** 80:23 |
| 81:25 84:19,20 | **invitation** 141:8 |
| **individual's** 85:6 | **involved** 23:10 74:1 86:14 |
| **individualized** 40:16,22 | **involving** 89:11 |
| **individually** 79:23,24 | **ish** 51:20 |

800.523.7887          12-10-2025, WORD INDEX, Boynes case      Associated Reporters Int'l., Inc.

Page 19

**island** 44:10 67:20 93:22 116:23 133:25
**Islands** 1:1,1,18 2:9,13 3:7,10 4:23 5:21,24 6:3,7 7:3 78:21 96:21 98:9 104:23 105:4,12,13 105:14 120:17,19 133:21
**issue** 19:23 21:19 25:21 30:19 32:16 81:21 121:19 122:10 130:11 131:3,13 136:13,14 144:22,24 145:2,8,25
**issues** 21:10,24 22:1,5 31:12,15 31:23 39:15,18,19,20 40:2,3 40:10,15,16,22,23 41:10 53:16 75:9 106:4,4 118:4 129:9
**it'll** 53:2,2
**item** 55:2
**items** 141:22

### J

**J** 1:11 2:7,8,21 6:6
**Jack** 8:14
**JACKSON** 2:4
**Jacob** 3:9 8:20
**jacob@gowerlegal.com** 3:11
**JAMES** 2:16
**January** 100:24
**jdema@demalaw.com** 2:14
**Jennifer** 4:10 6:10 11:8,18
**JERSEY** 4:3
**job** 21:14 31:20 53:15 65:8 74:1
**JOHN** 2:11,12
**john@lockettlawfirm.com** 4:20
**join** 18:16
**joined** 23:24 112:21
**joins** 122:3
**joint** 83:25
**jointly** 15:5
**Jones** 6:10 11:16,18,19,20
**Josh** 67:23
**JUAN** 5:13
**Judge** 1:20 7:4 8:5 15:23 33:19 67:12 68:3 148:13
**Judges** 147:8
**judgment** 61:12 105:16,25 106:2 106:3
**judgments** 61:23
**judicial** 104:13
**Judith** 149:2,9
**jump** 25:19 35:16 48:24
**juncture** 92:25 133:16

**June** 125:12
**jurisdictions** 104:25
**jurisprudence** 39:18 129:8
**jury** 61:17 98:20 100:4 110:25
**justified** 64:11
**justifies** 69:21
**justify** 18:6,10

### K

**K** 2:11,12
**KATHERINE** 2:3
**keep** 102:5 119:14 125:24
**keeping** 46:24
**keeps** 104:14
**KELLER** 3:17
**Ken** 36:4
**kept** 73:25
**kernel** 25:9
**Kerry** 2:21 8:5 67:7
**key** 53:7 97:3 119:20
**kicked** 65:24
**kind** 22:6 40:22 46:5 49:13 62:7 63:1 69:4 77:2 94:24 127:13 143:17
**KING** 2:8 6:3
**KIRKLAND** 3:14
**knew** 66:17 86:2,4
**know** 9:23 10:25 17:4,9 20:8 21:14 22:13,25 24:12,24 25:3 25:5 28:15,20 30:7,8 32:11 34:3 37:16 38:1 41:7,13,15 42:4,6 47:8,25 51:20 52:8,14 52:24 53:4,5,5 54:22 56:20 59:23 60:5,6 61:3,10 63:13,15 64:7,19 66:13,22 69:1 70:5,6 70:17 72:17 73:14 74:8,12 75:2,7,14,25,25 76:2,13,14 77:5,6,9,15 79:16 80:13,17 81:1,7 82:9 83:5 84:10,14,24 85:1,2,3,5,8,8,14,15 86:8,12 86:16,17,17,19 87:5,9,10 88:9 88:13,13,17,22 92:10,15,21 100:15,24 103:17 104:9,16 105:8 108:4 111:9,16 112:2,3 112:6 114:1 116:20 118:17,17 118:18 119:1,2,5,9,11 121:23 122:1,17 123:20,24 125:2 127:16,19 134:12 137:17 139:15,18 140:21 141:22 145:3 146:19 147:1,8,14,16,21,24

800.523.7887                    12-10-2025, WORD INDEX, Boynes case        Associated Reporters Int'l., Inc.

Page 20

148:9,9,9,11
**knowingly** 23:22
**knowledge** 69:18
**knowledgeable** 67:19
**knows** 89:3,10
**KUCZYNSKI** 4:6

---

**L**

**L** 5:11
**L.L.C** 3:21 4:1,5,10,17 6:6 7:11
  7:13,15,16 9:15,18 10:18
  11:14,24 12:5,12,12,13,18
  14:12,14,15,16,21
**L.L.P** 2:3 4:6
**L.P** 14:13,14
**la** 126:25,25,25,25
**LABORDE** 5:16
**lack** 46:10
**laid** 50:19
**Lambert** 2:16,17 10:7,9,10,11
**land** 117:18
**landscape** 117:18
**language** 54:7,24 75:7,9 122:25
  123:19 143:11
**LAPEROUSE** 5:16
**large** 94:20
**late** 137:16
**latency** 36:25 37:7 38:18
**latent** 30:15,16,21 31:1 33:14
  34:1,12,21,22,25 35:21,23
  36:17
**latitude** 45:3
**law** 2:12 4:18,22 16:12 40:11
  53:21 63:5,10,20 69:18 72:3,3
  72:3,6 92:5 93:22 94:9 96:21
  98:9 99:8 102:12 103:4 104:4
  104:23 105:1,12,13,14 109:21
  116:24 119:5 126:25 127:3,7
  129:7 133:21,24
**lawsuit** 99:3,13,14 112:2
**lawyer** 46:20 51:20 52:3 55:20
**lawyers** 23:21 58:16 63:2 65:8
  70:1,1,8 147:2,3 148:10
**lead** 25:10 141:8
**leave** 102:15 106:12 109:19
  135:15 137:17,19 138:13
**Lee** 2:7,8 8:8
**lee@rohnlaw.com** 2:10
**leeway** 59:7
**left** 7:22 33:8 128:25 135:23

**leg** 29:21
**legal** 3:9 40:5,5 71:25 91:6
  93:14,19 96:18 97:19,24 98:8
  101:21 119:20 122:24
**legally** 32:5
**legislative** 70:7
**legitimately** 41:16
**LEHOTSKY** 3:17
**length's** 60:25
**Leonard** 3:5,5 8:17,18
**let's** 7:22 83:2 114:25 115:12
  115:12
**letting** 30:6
**level** 29:7,8,12 37:3 43:8 45:19
  71:17
**levels** 40:12
**Lewis** 7:4 8:5
**li** 98:19
**liability** 21:22 96:24 98:7,20
  100:18 109:21 110:10 111:4
  120:25 134:10,11
**liable** 135:12 140:16
**liaison** 69:8 70:2
**lies** 103:22
**life** 73:16,22 146:22
**light** 61:10 74:14 108:19 129:7
**lighter** 46:2
**likelihood** 31:14 34:25 35:12
  66:24
**likes** 24:4
**Limetree** 1:5,9,13,17 4:1,5,9,17
  7:11,13,14,16 8:24 11:8,14
  12:5,12,12 13:12,14 14:13,14
  14:14 89:19,20 90:16 93:12
  122:5
**limit** 63:14
**limitations** 118:19
**limited** 10:5 13:6 30:16 90:21
**line** 45:3 55:19 58:1,11 71:4
  75:2 107:23 126:17 142:5,9,16
  143:6
**lines** 25:14,14 57:21 126:20
**list** 21:20 68:14,19 76:4 129:22
  141:3,13
**listed** 15:20
**listen** 72:18
**lists** 60:17
**literally** 61:15 71:20
**litigants** 140:17
**litigation** 87:23 91:13,15 92:3

800.523.7887          12-10-2025, WORD INDEX, Boynes case      Associated Reporters Int'l., Inc.

Page 21

92:23 93:3 121:16
**little** 18:19 25:19 32:10 44:8
  65:20 76:19 85:13 113:12
  114:5 148:4,4
**live** 31:9
**lived** 37:16 48:1
**LLC** 1:5,9,13 3:9,13 5:2,11,22
**LLLP** 6:2
**LLP** 2:22 3:1,14,17,22 5:23
**local** 53:16,21 102:12
**localized** 44:23
**located** 30:12
**location** 27:7 44:23 45:9 46:17
  51:6,8 52:9
**locations** 22:11
**LOCKETT** 4:18
**lodged** 16:7
**lodging** 90:21
**long** 53:9,23 54:25 55:25 56:3
  58:25 61:6 62:15 80:15 100:3
  142:10,17
**longer** 30:23 33:16,24,25 98:12
  98:22 99:17,25 113:8 116:4,8
**longer-** 26:10
**look** 27:24 31:13,25 41:25 49:21
  55:25 60:13 64:5,6 134:4
  146:16,18,23 148:8
**looked** 55:12
**looking** 19:3 21:17 25:23 26:12
  30:12 55:4,8,11 56:5,8 61:1,2
  62:19 76:7 122:6 138:2
**looks** 16:25 22:23 64:14
**lose** 96:18 98:11 102:5 106:8
  114:24 117:1 119:23 124:24
  128:3,4,5
**losing** 106:10 120:21
**lost** 128:21 131:7,17
**lot** 23:3 48:14 57:4 59:19,22
  64:4 76:13,15 91:25 121:17
**lots** 120:18
**LOUISIANA** 2:18,23
**love** 31:16
**LOVELLS** 3:22
**low** 86:23
**lower** 21:3 63:22
**luxury** 65:23

---

**M**

**M** 5:2
**Ma'am** 10:3 15:25 16:2 17:8 19:5

19:16 20:19,21 24:8,10,16
25:22,25 30:22 31:5 34:10
38:7 39:14 48:18,21 49:9,16
51:25 55:11,23 56:12,22 57:15
57:18 58:18 64:21,23 65:5
72:24 73:4 74:18 75:1 76:12
77:24 78:3,12,15,23 79:17
82:24 87:20 90:13 130:2,4
137:9,25 141:21 144:15,19
**MADISON** 3:22 4:3
**MAGAZINE** 2:17
**magistrate** 95:3 96:1
**magnitude** 64:3
**mail** 51:3,5
**mailed** 51:9,16
**main** 67:9 84:15,22 102:2
**maintain** 116:18 120:15
**maintaining** 82:13
**Maintenance** 6:1 14:3
**making** 23:19 62:18 83:20 85:1
**MALE** 42:19 43:2 148:13,14
**MALL** 4:23
**MANAGEMENT** 5:6
**manifest** 28:15 37:1,7
**manifestation** 26:6 27:3
**manifestations** 26:22 27:11
  34:16 35:5
**manifested** 27:13,15 28:5
**manifesting** 27:12,12 28:8,13,14
**map** 43:17 46:22 48:12 74:16
  75:1 144:3
**MAR** 5:12
**margin** 84:14
**Marina** 3:5 8:17
**Marinelli** 4:21 12:8,10,11
**MARKET** 3:2
**MARY** 3:17
**mary@lkcfirm.com** 3:20
**Mashell** 13:9,12
**Mass** 15:18
**MASSACHUSETTS** 3:18 5:3
**Massena** 6:13
**massive** 52:25
**material** 145:19,19
**materials** 40:13 59:4
**matter** 28:25 93:13 125:7 137:8
  139:21 141:15 146:24 149:4
**matters** 16:25 17:16 28:25
**mbyers@campbell-trial-lawye...**
  5:5

800.523.7887                12-10-2025, WORD INDEX, Boynes case        Associated Reporters Int'l., Inc.

Page 22

MCKENZIE 4:14
mean 19:9 20:5 25:15 28:12
  47:18,20 51:2 79:22 85:6
  86:13 92:1 99:5 100:1 102:1
  103:23 111:16,18,18,22 113:16
  114:18 119:10 121:3,4,16
  123:5 129:23 131:1 132:15,24
  133:22 134:16 140:16
meaning 100:4
means 27:11 47:22 53:1 76:16,20
  109:7 110:9
measure 85:7
mechanism 124:7,25 140:6
mechanisms 140:9,20
mediation 61:7
mediations 89:22
mediator 61:6
medic 29:2
medical 23:13 24:14 25:12 26:3
  26:5,10,22,23 27:8,25 28:11
  28:12,21 29:4,10,15,16 30:17
  35:5,9,19,22 36:3 73:17
medically 34:11
meet 41:17 114:21
meeting 68:2
member 34:13,14 55:5,7
members 10:17 30:14 32:1 41:20
  50:4,12,24 58:15 64:9 65:7
  108:14 142:7
members' 54:13
membership 40:2
memory 56:8 100:7
MERCHANT 4:22
mere 26:24
merits 129:13 136:24
Merman 13:17,18,19
MERSMAN 2:16
met 32:14
method 18:18 59:24 62:8 143:22
methods 41:5
MIAMI 5:8
mic 43:5
Michael 3:1 5:11 8:11 9:21
michael@sheesley-law 5:14
MICHEL 5:11
Michelle 4:13 5:2 9:17 13:15
microphone 30:5
middle 84:17 107:21 119:2
Miller 2:21 3:17 5:7 7:19 8:5,6
  8:7 9:7,8 17:21,23 35:15,17

  36:21,24 37:9 67:7,8 69:7
  78:8,10 89:9,15,25 121:11
Miller's 90:6
million 14:9 17:25 57:6 67:11
  67:25 84:2,4 87:16 89:12,17
  89:17,21
millions 61:18
mind 38:12 46:25 147:7
mine 43:22,23
minimal 74:15
minimum 20:6 144:9
minute 122:8 138:24
minutes 78:17
mirrored 96:1
missed 15:21,24 26:2 33:18 57:1
mix 22:15
model 83:24 87:16
modeling 45:20
models 80:14
modification 38:21
modified 105:7
moment 49:8 98:7 130:1 133:8
  134:4
Mon 47:10
money 19:12 23:3,4 36:12,13
  61:25 62:3,4 66:10 77:16
  82:21,21 84:1 90:7
monitor 40:7 43:21
monitoring 24:14 25:12 26:3,5
  26:10 27:9,25 28:6,11,12,22
  29:4,11,15,16 30:17 35:19,22
  36:3
month 84:22
months 71:9 103:16 114:19
morning 7:8,18,19,20,23 8:1,2,4
  8:5,7,8,11,14,17,20,23 9:3,7
  9:11,14,17,19,20,22 10:3,6,9
  10:11,16,19 11:7,10,13,15,18
  11:20,23,25 12:3,6,7,10,14,17
  12:20,23,25 13:3,4,7,11,16,18
  13:20 14:4,22
Moskowitz 5:22 10:13,14,16,17
motion 14:8,16,18 26:18 67:13
  70:14 90:22 94:3,10,11,14,16
  96:14 100:23 101:6,13 103:11
  103:15 109:19 111:18 112:19
  112:21 113:1,19 114:2,4
  117:17 118:16 129:19 130:23
  131:19 133:12 135:14 139:4,10
  143:3

800.523.7887                12-10-2025, WORD INDEX, Boynes case        Associated Reporters Int'l., Inc.

Page 23

**motions** 14:6 74:11 91:16 95:5
  100:3 104:6 112:14,18 114:20
  114:25 115:1,13
**mount** 104:2
**move** 43:10 65:20 92:22
**moved** 69:23 72:12
**movement** 135:6
**moving** 17:14
**mtwersky@foxrothschild.com** 3:4
**multiple** 61:6
**multiplication** 45:10
**multiplied** 27:6 45:9 46:3
**multiplier** 48:11
**multipliers** 60:15
**muted** 10:22,23,25

**N**

**N.E** 4:11
**N.W** 3:14 4:18
**NAGI** 4:22
**name** 67:23 77:6
**named** 22:9 24:23 25:1
**nation** 129:4
**National** 6:5 12:18
**nature** 21:22,22 54:10 79:9
  126:12,13 144:24
**near** 7:4
**necessarily** 106:6 112:3 132:7
**necessary** 108:16
**need** 19:21 21:19 54:22 76:23
  99:21 109:3 144:7
**needs** 123:10,10 145:23 148:2
**negligence** 40:11,11 105:7
**negotiate** 62:25 135:2
**negotiated** 23:21 61:7 67:17
  70:19
**negotiating** 62:25
**negotiations** 33:5 89:20
**neighborhood** 47:10
**neighborhoods** 86:2
**neither** 140:11,12
**net** 82:10
**never** 113:24 124:22 127:11,14
  135:18
**new** 2:18,23 3:23,23 4:3 6:13
  39:8 74:11 120:16 146:19,20
**NEWMAN** 5:23 6:2
**news** 85:10
**Nice** 7:23
**NICHOLAS** 4:21

**nine** 7:12 26:15 50:21,21 51:12
  51:12 84:8 107:9 118:25
**Nineteen** 125:25 126:3,5
**ninety-** 26:14
**ninety-nine** 55:15 62:15,15,16
  62:17 65:12,14 76:7
**nitty** 58:20,21
**noble** 147:18
**nominal** 133:14
**non-** 92:25 108:9 114:23 124:18
  125:15 132:11 135:11 136:14
**non-controlling** 95:11
**non-opposition** 126:7
**non-rereleased** 107:11
**non-settling** 90:20 93:5,13,20
  105:24 106:25 123:6 126:18
  135:19 138:16
**norm** 50:23,23 86:13
**north** 9:5 46:5
**notability** 85:21
**notably** 97:21
**note** 10:1,7,14,20 11:5,11,16,21
  12:1,8,15,21 13:1,9 52:5 60:2
  90:22 98:1 108:24 113:9 114:9
  134:4 140:14
**notice** 15:6,6,6,16 18:6 26:1
  41:25 49:7,13,20,24 50:3,4,9
  50:11,15,16,19 51:5,9,10,22
  52:14,15,18,22 53:1,10 55:4
  59:19,20 62:13 63:13 65:6
  68:21 71:4,5 74:17 75:2,2
  77:21,23 78:1 85:20 87:3
  133:6 142:6,17,17
**noticed** 57:4
**notices** 75:3 134:21 142:11
**notify** 108:13
**notion** 28:24 61:25 71:23 74:2
  128:2 129:2 135:17 140:18
**Notoriety** 85:21
**noxious** 44:21 46:7
**nuance** 130:19
**nuisance** 26:8,9
**number** 9:23 26:14 28:20 53:12
  56:11 57:8 58:14,14 61:12
  64:14 67:15 71:20,23,23,24
  72:1,1,8,9,13 75:7 79:14,15
  80:10 83:10,13,14,15 84:18,23
  87:4,11 133:6 141:23 142:3,5
  142:9 143:9,19 144:2,6
**numbers** 20:23 62:14 67:2 80:16

800.523.7887                12-10-2025, WORD INDEX, Boynes case        Associated Reporters Int'l., Inc.

Page 24

83:5,21 86:12 88:1
**numerator** 80:7,20
**numerically** 83:7
**numerosity** 19:22 21:2 22:20
**numerous** 70:15
**nut** 91:2
**NW** 3:18

---

### O

**O'Connor** 12:1,3,4,6,7
**O'CONNOR** 4:1
**O'NEIL** 5:2
**object** 16:8 54:14 91:19 101:4
  119:18 120:21 138:17 140:25
**objected** 16:8 41:14 63:7 97:15
**objecting** 50:14 139:3
**objection** 15:17 68:22 90:21,21
  91:3 93:12 118:3,6,10 121:4
  123:13 124:20 126:22,23
  127:22 129:18
**objections** 16:7 91:24
**objective** 34:20
**objectors** 41:14
**obligation** 78:6 105:16 108:18
  111:14 137:14
**obsequious** 60:5
**obtain** 135:15
**obtained** 70:11,17
**obviating** 118:4
**obvious** 16:18 17:1 60:12
**obviously** 17:16 18:17 19:3,19
  25:5 32:2 33:4 36:25 41:13
  42:7 52:20 57:8 71:8 77:17
  81:17 88:13 91:11 94:19 99:13
  114:18 117:23 118:15 121:13
  123:14 142:4
**occurred** 42:9,12 94:1 110:25
**occurrence** 125:7
**occurring** 96:18
**October** 96:5
**offense** 32:14
**offensive** 104:2
**offered** 70:3 145:10
**offers** 76:5
**offhand** 88:23
**OFFICES** 2:12
**official** 149:3
**officials** 77:21
**offset** 126:13
**offsetting** 107:9

**Ogletree** 5:19 13:5
**oh** 13:14 67:4 76:8 82:20 140:15
**oil** 43:15 45:17
**okay** 7:21 8:13,19,22 9:13,16,19
  9:23 10:25 12:20 13:13,16,21
  14:5 16:1 17:7 19:2,17,17
  20:5,17,20 21:10 25:18 30:6
  30:11 31:8 33:21 34:9 35:7,11
  37:12,12 39:10,12 42:22 43:4
  43:7,9,12,19 44:6,11 47:15,17
  48:17,19 49:10,15,15 52:1,6
  55:14,22,24 56:2,2,10,20 57:2
  58:3,6 62:21 68:5,10,16 69:5
  69:13 71:12 74:16,19 75:10
  76:2 77:25 78:2,7,9,11 83:2
  87:18,21 88:24 89:6,24 90:2
  90:12,14,24 92:7 98:24 99:20
  102:16 107:24 108:8 109:2,14
  109:17 110:7,14,15 112:12
  115:9,12,21 116:1 117:7 121:6
  121:22 122:12 124:15 129:25
  138:4,19 140:2,2 141:1,12
  143:23 144:1,13,17,20 146:1,4
  146:11
**once** 96:14 142:19 145:19
**one's** 28:21 41:14
**one-third** 35:3,4
**ones** 36:7 53:21 60:7 73:24
  84:16
**online** 53:2
**oops** 140:8
**open** 23:16
**opening** 145:15
**opportunity** 99:1 124:12
**oppose** 97:12,22 101:5 108:11,18
  108:19,22 109:6,22,24 110:12
  126:3 128:11,12 136:3,6
  137:13 139:11 140:13,15
**opposed** 61:10 70:13 106:12
  123:18
**opposing** 110:20 132:22 137:11
  139:4
**opposition** 97:17 113:17 130:7
  136:12,21,23,24
**opt** 15:17 32:8 54:14,16 65:7
  68:22
**opting** 50:14
**option** 76:21,23 102:2
**options** 75:7 76:5 102:2
**order** 7:7 16:10 36:15,18 46:10

800.523.7887              12-10-2025, WORD INDEX, Boynes case       Associated Reporters Int'l., Inc.

Page 25

59:9 91:23 94:2,22 95:1,4,8
95:10,12,14,21 96:1,2 102:5
113:22,23 114:12 123:18,21
133:19 134:13 135:1 136:1
138:7 144:8
**ordered** 94:11 133:18
**orders** 64:3 110:2 134:17
**organization** 67:19
**original** 96:2 125:7 135:17
137:22
**originally** 94:2
**ORLEANS** 2:18,23
**ought** 25:12 54:6 73:22,23 127:9
**outcome** 70:19
**outer** 48:2 84:12
**overall** 74:14
**overlapping** 40:4
**owned** 35:25,25 38:5
**owner** 37:22 38:13 39:1 51:6
**owners** 22:14
**ownership** 36:9 37:24
**owns** 35:3

---

**P**

**P.C** 2:12 5:2
**p.m** 148:19
**P.O** 3:10
**package** 82:16
**page** 55:19 76:8,9 130:8,10
141:23
**paid** 28:22 36:13 47:1 70:14
**Palermo** 98:18 105:8,19
**PALM** 6:7
**pan** 83:6
**papers** 58:24 59:11
**paragraph** 36:17 55:18 97:2,3,7
97:8 107:8,8 110:5 126:21
**paragraphs** 107:3,5 126:11
**parcels** 20:5
**parents** 11:12
**PARK** 4:23
**part** 30:23 33:16,18,23,24 35:19
35:24 36:7 38:1 45:23 49:10
63:21 74:16 78:25 88:3,4
98:12 115:8,10 133:12 135:12
146:9
**partial** 82:6 112:21
**particular** 25:21 44:25 56:24
70:18 73:24 74:14 80:5 82:7
83:3 103:14 105:5 113:19

123:7 131:5,19 141:17
**particularly** 133:21
**parties** 15:1,3,9,10 16:5 49:19
62:9 63:8 92:17 94:12,21 95:7
95:10,24 96:3 104:1 113:15
122:20 123:2,3 125:25 126:4
127:14 128:12 131:25 133:10
133:18,20 135:2 136:9 140:13
145:2,5
**Partners** 3:13 4:21 12:11 14:12
14:13
**party** 67:9 96:22 97:12 106:13
107:10,11 108:9,10,12,15
109:6,19 111:6 113:1 125:5
126:1 135:10,12,14,15,20
137:6 138:9 139:4
**Paschal** 2:21 8:2,3
**pass** 59:2
**passage** 6:7 66:18
**passed** 72:10,13 94:1 114:10
**path** 66:20 104:21 132:1
**patterns** 40:13
**pay** 105:25
**paying** 30:18 70:14
**payment** 26:18 35:24 62:14 76:17
106:1,2 143:22
**pays** 19:13
**PC** 4:22
**PEACHTREE** 4:11
**peek** 71:14
**pending** 104:16 133:14 139:10
**Pennsylvania** 3:2,14 16:14
**people** 9:23 18:16 20:12 22:4,14
23:15 26:21 28:4 29:10 32:14
35:3,5,8,11,20 36:5 37:16,24
45:22 46:18,20 51:19 52:14
53:24 62:3 64:17,18 73:5,10
73:10 77:16 79:14,15 80:17,18
83:11,14,17,21 84:6,10,11,12
84:15 86:2,9,16 87:5,5 109:15
112:10,14,21
**percent** 24:25 25:1 35:21 50:22
50:24 51:1 54:2 79:6 83:18
84:7 86:16 90:11
**percentage** 63:23 64:6,15 105:23
105:25
**perfect** 43:24 60:8 100:1,2
120:1,8 127:18
**perfectly** 70:6
**performance** 23:1,25

800.523.7887                    12-10-2025, WORD INDEX, Boynes case       Associated Reporters Int'l., Inc.

Page 26

**period** 59:5 66:23 137:7
**periphery** 84:13
**permission** 39:5,8
**person** 28:8 34:20,21 67:19 68:7
  77:6 84:9 85:16 89:3 143:22
  143:24
**person's** 80:5
**personal** 73:16
**persons** 7:2 20:11
**perspective** 19:4,6 26:8 28:3
  29:20 41:24 46:12 60:13 67:10
  81:5
**pertain** 21:23,24
**pertains** 38:13
**phases** 88:14,15
**PHILADELPHIA** 3:2
**physical** 25:2 26:6,21 27:3,10
  28:5 51:5 76:23 81:10,12
**physically** 51:9
**picture** 18:5
**Pinnacle** 14:21,23 15:4 18:1
  57:9 58:5,14 65:16 67:6 68:7
  82:12 89:12 97:8,9,23 101:3
  107:5 142:12 143:2
**pivot** 24:3
**place** 28:2 60:8 124:23 138:18
**placed** 30:15
**places** 36:4
**plain** 54:7,24
**Plaintiff** 7:24 8:18 24:22 80:2
  90:3 105:19,23 118:17 135:10
  135:14 146:3
**Plaintiff's** 19:12 30:4 61:18
  90:4 95:22 96:3 105:17 139:19
**Plaintiffs** 1:4,7,12,16 2:2 8:3
  8:6,9,12,15,21 10:10 12:24
  13:19 14:25 16:6 19:10 22:9
  22:15 24:23 25:1 30:14 34:4
  71:24 79:20 91:12 92:22 95:9
  95:15 97:4 98:25 104:2 108:13
  108:21 110:1 113:14 114:1
  117:6 120:5 132:11,23 145:17
**Plaintiffs'** 53:22
**plan** 15:6,16 18:14 36:13 50:19
  51:3 52:16 60:14 62:12,13
  63:8 68:21,21 145:13
**planned** 146:15
**planning** 17:18
**Plant** 5:1 9:18
**play** 113:16 118:24 121:1

**PLC** 2:17
**pleading** 94:3 95:9,22,24 96:9
  125:4 130:15,18,21,24 131:2
  133:15 139:14
**pleadings** 53:8 96:3 113:14
**please** 7:6 10:8,15,20 11:5,11
  11:16,21 12:1,8,15,21 13:1,9
  78:21 90:15 124:16
**pleasure** 146:25
**pled** 32:3
**plenty** 89:25
**plume** 44:4,5
**plumes** 44:20 47:6,12,13
**plus** 20:12 63:9 81:24
**pocket** 79:7 88:6
**pockets** 90:9
**point** 16:22 17:25 30:7 32:23
  33:12,19 34:11 35:18 36:24
  38:2 39:8,9 44:13 45:4 46:21
  47:11 48:10,11 49:22 54:12
  57:3,5,20 58:12 60:1,10 62:10
  63:12 66:13 69:19 71:1,4 72:7
  72:9 73:23 77:8 80:22 83:24
  84:1 85:5 89:19 91:17,20,23
  94:22 101:1,6 103:6 106:5,18
  107:8 109:18 111:7 115:13
  126:15,18 127:6 128:7,9
  130:17,24 137:2 141:24 142:21
  142:23
**pointed** 126:24 128:11
**points** 26:6,21 27:1,4 29:8,12
  34:23 35:6 36:2,8,19 37:11,15
  37:22 40:18 45:8,9 46:9 60:14
  80:4,10 81:6,7 91:19 93:2
  130:7 141:24
**poke** 121:14
**policy** 122:22,22
**population** 24:20
**portion** 44:9 82:2,18,21 106:1
  106:19 120:9 126:17
**posed** 39:22
**position** 91:11,18 96:11,12 97:5
  109:5 131:7
**possible** 18:14 19:15 50:9 52:22
  77:17 143:1
**potential** 26:9,10 35:22 36:10
  118:4 129:17
**potentiality** 35:24
**potentially** 92:21
**power** 148:2

800.523.7887                    12-10-2025, WORD INDEX, Boynes case        Associated Reporters Int'l., Inc.

Page 27

practicable 50:3
practice 62:24 63:2 73:5,7
  135:7
pre 143:19
precedent 119:7 125:11 127:4
precisely 109:4
preclude 93:5
precluded 115:22 116:3
predicted 97:15
predicting 91:4
predictive 84:19
predominance 22:6 39:15,17,22
  39:25 40:23 42:7,16,24 48:20
predominate 39:19 40:15 41:10
prefabbed 61:2
Preferred 14:15
prejudice 103:23
preliminarily 15:12
preliminary 14:6,8,16,19 16:12
  16:17,22 45:12 58:25 59:2,13
  60:3,10 65:25 71:10 92:16
  124:18 144:10 145:21
prematurely 131:2
preordained 61:8
prepaid 75:17 76:9 143:20
preparation 21:23 73:13
prepare 40:7
prepared 106:23 134:12
preparing 122:18
presence 26:24 27:21 47:9
present 6:10 13:4 17:20 27:2,9
  34:16 64:24 134:25
presented 15:3 94:20 122:25
  129:14
presently 13:21 14:5 18:2 32:7
  34:12 38:25 41:15 85:12
  125:19
preserve 82:13 104:22 117:1
  131:12,12,23 134:22
preserved 101:16,17 114:13
  122:20 132:2 134:11
preserving 102:3 129:4
presiding 7:4
pressure 141:19
presumably 15:7 104:2 109:25
pretty 54:24 68:6,6 69:19 78:6
  88:15 144:25
prevent 117:8 134:25
preventing 117:21 139:13
previously 33:23

primarily 17:9
principally 16:6
print 53:2
prior 67:13 68:3 96:17
privacy 73:21
private 23:15
Pro 105:9,9,22 120:10,10 121:2
  121:2
probably 25:1 32:8 67:11 71:1
  73:8 74:12 103:23 120:18
  137:12 146:21
problem 58:18 131:7
procedural 108:22 118:11 124:24
  128:3 129:4 133:16 134:23
  137:4 139:6,21 140:6,9,20
procedurally 120:15
procedure 94:9,14 128:8 134:23
  135:9
proceed 15:8 17:2,18 19:21
  132:13,15 145:22
proceeding 95:7 96:24 149:4
proceedings 6:14 17:3
process 18:13,19 102:21 103:2
  118:22 128:24
produced 6:15 67:11,18
product 95:1,2
production 40:9
Products 9:4
profession 147:5,14,17,18,18,23
  147:25 148:6
Professional 61:6
proficiency 143:14
program 18:7 52:7,18 53:15 75:9
  87:4
progressed 113:12
progression 95:19
prohibiting 98:3
projection 63:11
prolonged 29:23
promise 52:3 60:4
proper 32:13 133:15
properly 40:8
properties 50:25 51:2
property 38:12,13 51:15
proposal 21:17 31:20 42:1 49:4
proposed 15:2,12,14,16 17:2,6
  19:25 33:23 51:4 97:25 132:5
  133:2 134:17,17
proposing 48:3
proposition 128:6

800.523.7887          12-10-2025, WORD INDEX, Boynes case      Associated Reporters Int'l., Inc.

Page 28

**prosecution** 145:16
**protect** 41:20 50:13 54:22 64:17
  64:18 125:14,20 140:20
**protected** 71:21
**protecting** 125:18
**protection** 120:5,8
**protections** 102:10 121:1
**protects** 126:10
**proud** 147:22 148:6
**prove** 47:22
**provide** 73:16 106:24 134:15,21
  142:5,9,16 143:19
**provided** 54:23
**provides** 53:7 69:15 127:3
  135:24
**providing** 30:18 75:17
**proving** 21:7
**provision** 77:20 97:6 123:7
  132:5,18,25 145:9
**provisions** 107:9 130:9,10,11
  132:21 133:7
**public** 122:22
**publication** 53:1
**PUERTO** 5:13
**pull** 101:24
**purposes** 16:25 33:13,24 64:24
  79:19 102:6 110:13 111:21
  117:20 120:2,3 125:17
**put** 40:22 48:13 58:4 90:7 95:6
  95:13 100:24 104:7 117:13
  129:10,23 132:9 141:18 145:16
**putting** 24:1 74:10

---

**Q**

**qualifies** 25:13
**quality** 31:13 85:20
**question** 21:8 25:12 27:23 29:3
  31:24 32:13,16 33:19 34:6
  39:21 41:3 42:23 48:7 59:15
  64:2 65:19 76:1,6,10 77:18
  79:23 80:21 85:11 88:9,9 90:6
  105:12 106:22 112:16 124:18
  127:18 128:4 141:14 146:10
  147:6
**questions** 16:5 19:18 24:4 40:12
  40:18 41:25 42:3 53:19,24
  58:22 59:20 60:6,6 68:24
  73:15 129:21 138:21
**quick** 56:15 122:8
**quickly** 21:18 83:22 135:5

**quite** 63:21 86:1 113:18 123:8
**quote** 130:9

---

**R**

**radio** 53:2,4
**rain** 43:15 44:4,5 45:17
**raise** 93:6 124:20 127:22
**raised** 91:23 92:9 144:22,24
**raising** 60:7 93:6
**RANDOLPH** 4:14
**range** 16:19 20:13
**rapidly** 88:15
**Rata** 105:9,22 120:10 121:2
**rate** 83:14,18,23 84:8 85:18,19
  86:1,11,13,15,23 96:7 104:4
  114:8
**rational** 34:20
**rationale** 45:16
**reach** 42:10,11 50:22 54:2,4
**reached** 67:14
**reaching** 121:12
**reactions** 25:2
**read** 49:14 56:16,23 60:5 108:5
  108:5,7
**reading** 50:6 58:24 77:4 125:24
  143:20
**ready** 85:17
**real** 20:14,14 21:18 23:22 54:6
  64:6 73:18 83:22 88:19 139:19
**reality** 84:9 129:8
**realize** 122:22 135:3
**realized** 37:21 72:11
**really** 31:10,11 32:13,15 35:18
  39:16 43:17 49:12 53:15 54:3
  54:4 58:19 65:24 66:4,12
  85:20 91:21 96:12 122:8 125:2
  144:7 146:18 148:2
**reason** 16:19 30:11 32:19 80:1
  85:13 106:14 114:3 122:13,16
  139:9
**reasonable** 15:13 50:5 62:24
  80:25 108:16
**reasonably** 50:9
**reasons** 36:8 87:3 129:11
**rebuttal** 72:19
**recall** 52:7 86:7 95:5
**recalled** 45:8
**recess** 78:16
**recognize** 61:22 72:5
**recognized** 36:15

800.523.7887          12-10-2025, WORD INDEX, Boynes case       Associated Reporters Int'l., Inc.

Page 29

**recognizes** 127:8
**reconstruction** 67:21
**record** 21:16 26:13 44:20 49:7
  50:20 51:11,12 53:3 60:18
  69:9 73:17 76:7 78:18,19
  108:5,7 114:1 146:6,9
**record's** 62:19
**recorded** 6:14
**Recorder** 6:11
**recording** 6:14 149:4
**records** 26:22,23
**recouping** 81:19
**recoveries** 32:25
**recovery** 63:5,9,22 64:4 105:20
**red** 45:15 57:21 58:1,11 71:4
  75:1 142:5,9,15,16 143:6
**reduction** 106:9
**refer** 14:25 24:12,13 57:4
  126:10
**reference** 128:24
**referring** 14:22,24
**refers** 125:24 130:14
**refinery** 45:4 67:21
**Refining** 4:1 7:15 12:5,13
**reflect** 142:11
**reflected** 55:7
**reflective** 62:1 81:20
**refuse** 25:6
**regard** 16:23 24:21 33:16 42:6
  42:13 92:17 93:7 145:20
  146:24
**regarding** 91:6,7,8 127:5 130:15
**regardless** 111:1 120:14
**regrettably** 53:4
**regular** 73:10,22
**reiterate** 134:3
**rejected** 129:18
**related** 87:19 107:12 108:10
**relates** 24:17 76:11
**relationship** 71:25 91:6 93:19
  96:19 97:19 101:21 119:21
**relative** 81:2
**relatively** 81:14 88:19
**release** 46:2,3 86:18
**released** 108:10
**releases** 21:24 25:2 43:14 44:22
  45:24 46:7 48:8,9
**relevant** 65:16
**reliable** 21:21
**relief** 15:10 33:14 46:12 62:8

  68:14 70:12,24 71:14 82:5,6
  101:23 104:20 123:17,21
  131:22 137:13
**remediate** 81:21
**remedied** 103:23
**remedy** 103:24,25
**remember** 43:4 75:19
**remembers** 94:7
**reminder** 16:11
**removal** 103:24
**remove** 76:21 77:12,15
**removed** 132:25
**renter** 38:16 39:1
**renters** 22:14
**repair** 40:8
**reply** 91:12 126:23
**report** 36:3 143:9
**REPORTER** 11:20
**Reporters** 6:12 149:10
**reports** 35:19 44:3
**represent** 14:2 15:15 22:12,12
  147:4
**representation** 39:24 60:21
**representative** 73:7
**representatives** 22:24 23:8
  24:22 60:22 73:24 74:6
**represented** 56:14 58:16 142:7
**representing** 56:11
**represents** 55:19
**requested** 68:14
**requesting** 15:10 71:14
**requests** 66:2 70:23
**require** 30:17 40:1 50:2 109:24
**required** 59:6 103:9 111:20
  122:17 123:24 137:13
**requirements** 19:21
**requires** 109:21 110:5
**requiring** 97:10
**research** 122:9
**researched** 103:6 111:25 119:4
**reserve** 91:18 92:2 93:1
**resident** 38:16 51:6
**residents** 37:23
**resolved** 139:11
**resources** 69:18 70:11
**respect** 24:19 32:20,22 41:6,16
  41:22 50:10 59:18 67:8 70:20
  81:14 91:7,14 93:2,23 97:19
  105:4,17 122:23 127:1 141:5
**respectfully** 91:18

800.523.7887          12-10-2025, WORD INDEX, Boynes case     Associated Reporters Int'l., Inc.

Page 30

**respond** 29:3
**responded** 126:23
**responding** 37:21 90:6
**response** 124:17
**responsibility** 147:4
**responsible** 30:18 120:7
**responsive** 23:9 74:1 94:3 96:9
  100:8 130:7
**rest** 72:20
**result** 29:12 34:2 35:9 75:9
  106:2 114:16 122:19
**resulting** 30:20 35:9
**results** 23:5 34:2 105:21
**retained** 70:14
**retiring** 146:13,21,22
**returns** 9:1,6,10 13:8 14:5
**review** 123:4 145:18
**reviewing** 67:24
**reward** 34:23 73:5 74:2,15
**rewarded** 73:23
**RICO** 5:13
**rid** 36:11
**right** 16:1,3 18:4 19:17 20:20
  21:5 23:20 27:22 31:6,10,16
  31:18 35:3,22 37:24 38:3,4,8
  38:13,20,23 44:1,12,19 45:4
  45:18 46:25 47:4,19,19 48:14
  49:17 50:16 51:7 52:18 54:14
  55:11 58:4,5,15,17 59:18 60:4
  61:21 65:9 66:12 78:10 80:14
  80:17 82:22 83:16 84:5,17
  85:12 87:8 88:4 89:1,12 90:8
  90:10 91:13,18 92:1,2,8,14,19
  93:14,22 94:8,17 96:13,13,18
  96:22,23 97:1,24 98:2,5,5,5,7
  98:8,8,11,23 99:2,5,9,22,24
  100:7,18,18 101:16,17,20
  102:3,12,14,17,18,18 103:2,6
  103:14,14,17,19 105:20 106:7
  106:10,12,15,20 107:23 110:8
  110:10,17,19,22 111:3,5,11,13
  112:23 113:5,6,7,13,24 115:18
  116:14,14,18,18,24 117:1,2,10
  117:16 118:12,20,24 119:20,21
  119:23,24 120:9,10,13,18,20
  121:18 122:1,20 123:23 124:9
  125:14,19,20 126:7,8,9 127:11
  127:13 128:3,23 129:15 131:8
  131:17,20,21,21,23,24 132:22
  133:4 134:10,24 136:6,7,16,20

137:4,6,8 138:7,8,9,10,12,13
  138:15 139:16 140:5,5,10,11
  140:12,23 143:8 146:16
**right's** 119:25
**rights** 50:13 54:13,23 93:1
  97:18 99:23 103:2 104:22
  105:1 106:8 118:22 126:10
  127:8 128:4,5,19,20 129:4
  132:2 133:20 134:2,3,4,23
  137:23 139:24 140:19,20
**righty** 90:2
**rise** 78:16 148:16
**risk** 30:15 31:14 35:22 36:7
  71:21 82:6
**risks** 61:9,13,22 62:2 66:25
**risky** 76:21
**River** 6:12
**road** 4:11 5:20 34:13
**robust** 87:4
**Rohm** 16:15
**Rohn** 2:7,8 8:8,8,10 69:8
**role** 119:11
**Romanette** 61:9 62:6,6,7,22
  63:16,17 65:11
**room** 73:15
**rote** 69:19
**ROTHSCHILD** 3:1
**round** 140:7
**row** 95:16
**Rudo** 36:4
**rule** 19:19,20 22:8 31:23 49:14
  61:2 72:14 91:9 92:2 95:2
  100:6 101:6 102:20 106:23
  110:21 125:3,24 126:3 128:10
  128:16 130:14 135:19,24
  136:23 137:1,3,7,15,24 138:2
  140:7,7,8
**ruled** 100:23 104:6 133:12
**rules** 69:10,12 94:9,14,18 96:10
  96:14 100:9 103:2,4,10 117:22
  118:24 119:1,9 125:3,25 126:5
  128:8 133:16 134:23 135:9
  136:1,2,7 139:14
**ruling** 94:13,16 103:11 111:18
  113:2 145:20
**Rum** 85:25,25
**rumors** 146:7,11,12
**run** 49:25 60:15
**running** 17:12
**rush** 40:8

800.523.7887                 12-10-2025, WORD INDEX, Boynes case       Associated Reporters Int'l., Inc.

Page 31

## S

**s** 122:15
**S.T.X** 53:5
**sadly** 86:13
**sake** 15:7 59:9
**SAN** 5:13,16
**sanction** 97:14
**satisfied** 41:21,23 49:25 65:11
 72:15 77:12 91:10 126:4
**satisfies** 25:17
**satisfy** 123:4
**save** 7:5
**saw** 45:14 55:12 126:22 142:22
**saying** 33:12,15,21 64:25 92:15
 99:16 102:23,25,25 110:9
 130:13 132:19 134:8 136:14,15
 140:15 145:17
**says** 27:10 47:15 49:19,23 55:19
 55:20 57:5 97:22 105:1 107:9
 123:9 126:25 135:10
**schedule** 72:12 91:16
**scheduling** 94:22 95:1
**scheme** 89:3
**school** 99:8 127:6
**scientific** 29:24
**scope** 50:8 54:4
**Scudlarick** 67:23
**seamless** 77:15
**season's** 8:25 13:4 14:1
**seat** 72:23 132:14
**seated** 7:7 78:21
**sec** 107:13 138:3
**second** 14:18 15:14 18:12,16
 20:3 24:12 42:25 44:5,17 46:2
 68:18,19
**secrets** 73:20
**section** 38:12 77:20
**security** 76:11 77:18 87:11
**Sedgwick** 5:6 45:14 46:23,25
**see** 7:24,25 9:25 21:17 26:2,3
 32:15 41:14,18 43:21,21,23
 46:12,15,19 48:13 55:8 56:3
 56:13,16,24 63:13 64:5 76:5,8
 85:6 97:16 103:10 107:7,24
 136:8 139:23 146:7 147:19
**seeing** 148:8
**seek** 63:8 101:12 102:14 106:8
 106:12 137:17,19
**seeking** 131:22

**seen** 26:20 62:4 112:14,15
 135:22 147:7
**selected** 22:11 73:1
**send** 76:17
**sending** 77:21
**Senior** 1:20 7:4
**sense** 19:1,4 20:23 21:2,17 29:1
 30:1 39:6 43:14 67:2 79:2
 120:1,8
**sentence** 97:6 103:24 108:2,6,17
 126:20
**separate** 102:21
**separated** 18:23
**separates** 44:8
**seriously** 147:4
**serve** 102:21 135:20 147:23
**served** 147:23
**service** 6:12,15 74:3 102:20
 135:11 136:23
**Services** 5:2,6,22 6:6 9:18
 10:18 11:24 12:18 13:12 14:21
**serving** 135:16 137:22
**session** 78:21
**sessions** 61:7
**set** 22:4 58:23 65:2,6 66:20
 78:8 91:16 94:2 95:24 96:4
 105:16 106:8 113:13 142:18
**sets** 59:14
**setting** 15:19 70:25
**settle** 23:20 32:17 61:3,3
 122:21
**settled** 18:2 82:3,4,16 99:15,23
**settlement** 1:20 7:9 14:6,8,17
 14:19 15:4,5,6,12,13,15,19
 16:9,13,18 17:25 18:1,10,11
 18:20 19:13 28:20,22 31:13,20
 32:9 33:4,13,17,25 35:23
 41:24 51:21 53:8,20 54:12
 57:10 61:11 62:25 63:3,6
 65:12,16 66:3,14 67:13 68:4
 68:18 69:15,22 70:22 71:22
 72:4 74:14 77:21 79:3,5,7
 80:25 82:5 83:3 85:4,17,25
 87:14 88:11 89:10 90:22 92:16
 92:20 97:2,8,9,12,16,23,25
 98:3 100:14,15 101:2,3 102:10
 102:13 103:20 104:22 107:5,6
 108:14,15 109:12 110:25
 111:12 114:12,15 119:24
 120:12,22 121:13 122:23

800.523.7887          12-10-2025, WORD INDEX, Boynes case      Associated Reporters Int'l., Inc.

Page 32

123:13,14,19,25 124:5 125:16
125:21,23 126:9,24 127:6
128:7,9 129:9 132:5 133:2,13
133:19 134:8,18 138:8 143:3
145:21
**settlements** 15:2 16:20 17:2,5,6
17:15 18:8 87:19 129:11
142:12,18
**settling** 14:23,24,25 15:3,10
16:5 66:21 67:9 93:1,15 97:10
98:4,12,25 102:4 103:20
104:15,15 105:2,15,23 107:11
108:10,11 109:5,7,22 110:12
114:24 119:14 120:2 124:19
125:16,22 132:10,12,13,21
133:13 136:15 139:2,9,22,25
**seven** 60:17 76:9 107:23 141:16
141:22 143:17 144:6
**seventeen** 14:9 17:25 57:5 83:24
84:1 142:21,23
**seventy-one** 59:8
**seventy-six** 86:18
**seventy-two** 130:8
**shadow** 129:17
**shadowbox** 72:17
**shape** 61:22
**share** 84:14,16 146:8
**Sheesley** 5:11,11 9:20,21,22
**sherpel@dnfvi.com** 6:4
**Shirley** 1:7 7:12
**short** 51:5,9,10 54:25 55:13,22
56:3 57:5 62:16 95:13 142:10
142:17
**shorthand** 95:16 97:11
**shortness** 25:3
**shoulders** 62:20
**show** 26:13 34:17 43:17 47:1
76:6 129:2,5 133:22 138:6
**showing** 127:21
**shown** 47:13 129:15 140:23
**shows** 46:23 47:2 53:3
**side** 47:19 136:21 144:16
**sign** 46:21
**signed** 51:18 52:15,17
**similar** 18:14,18 60:23
**similarly** 61:23
**simple** 54:8 147:17
**simply** 145:4
**simultaneously** 15:8
**single** 41:1 72:14 91:8 92:9

129:1
**Sir** 102:22
**sit** 71:18 73:11 93:14 96:23
110:24 113:4 116:18,22 129:25
138:23 139:25 147:8
**sits** 100:18
**sitting** 7:5
**situation** 94:25 105:3,22 117:14
133:21
**situations** 110:3
**six** 7:14,15 15:10 20:4,4,5,17
67:14,17,22 68:1 70:23,25
71:8 79:16 107:22 144:2,11,12
**Sixteen** 95:3
**sixth** 15:19
**sixty** 25:1 89:17
**sixty-one** 20:15
**sixty-six** 84:4
**size** 19:23
**skill** 53:18
**skills** 133:8
**skin** 64:1
**skip** 68:19
**slam** 61:20
**slate** 69:23
**sleep** 25:3
**slight** 95:11
**slightly** 18:12 44:15 99:18
108:25 110:3
**small** 73:14
**smaller** 64:5
**SMITH** 2:17
**snapshot** 95:17
**social** 87:11
**sole** 103:25
**solid** 66:5 96:12
**solution** 48:16
**Solutions** 15:18
**soon** 66:10 116:25
**sooner** 71:9,10
**sorry** 13:15,22,23,25 24:23 33:2
33:20 42:20 43:11 48:23 51:12
64:15 65:5 74:21,25 75:15
88:23 107:16 108:24 116:6
130:6 133:7 136:19 138:21
141:6,11 146:3
**sort** 18:22,24 25:9 28:3 29:25
32:21 34:17 35:6,8 38:18
40:16 42:4 45:21 46:2,7,23
50:1 53:16,21 57:10 60:2 61:2

800.523.7887              12-10-2025, WORD INDEX, Boynes case        Associated Reporters Int'l., Inc.

Page 33

63:20 69:18 70:7 77:1 80:23
81:4 83:1 86:14 99:11 104:7
129:10 142:2 143:11 144:4
**sorts** 23:14 82:8
**SOSO** 2:17
**sought** 101:10
**sound** 6:14 149:4
**sounds** 133:3
**source** 41:1
**SOUTHEAST** 5:7
**southern** 84:25
**spades** 21:7
**spam** 52:10,13
**span** 22:9
**Spanish** 143:10,15
**speak** 67:16 90:23
**SPEAKER** 42:19 43:2 148:13,14
**speaking** 11:4 17:7 30:4 50:10
84:24
**speaks** 30:13 55:5 77:20
**Specialists** 5:15 10:5 13:6
**specific** 18:25 24:4 26:4,5 42:3
77:11
**specifically** 29:3 36:22 48:8
103:7 126:11
**specificity** 20:2,3
**specter** 72:11 129:17
**speedy** 19:15
**spent** 23:3 91:25
**spoken** 105:14
**Spriggs** 149:2,9
**SQUARE** 5:3
**St** 1:2,18 2:9,13,22 3:6 4:7,23
5:21,24 6:3
**staff** 8:25 13:4
**stage** 16:20,24
**stand** 91:22,22 96:13 121:19
140:19
**standalone** 119:8 122:6 139:12
**standing** 91:7 124:19 127:9,21
128:5 138:17 140:24 144:23
**stands** 122:4
**start** 7:22 17:4 19:18 24:24
39:18 44:1 123:1 125:3 128:5
**started** 92:15 122:5
**starters** 16:4
**starts** 107:19 126:20
**state** 16:21 77:21 91:18 125:5,9
130:15 134:8
**stated** 16:14 95:8 97:4 114:4,5

**statement** 93:25 113:22
**statements** 108:20,21
**States** 7:6
**stations** 53:4
**statistical** 47:14,23
**statute** 69:15 105:7 118:18
**stay** 43:4 95:5 102:4 133:14
**STEFAN** 6:1
**step** 41:25 52:25 54:15 137:15
**steps** 50:13 127:2
**stipulate** 132:11 133:10 135:8,8
139:16
**stipulation** 133:1
**stop** 137:7,15
**straight** 45:6
**STRAND** 2:12
**strangers** 73:15
**stranglehold** 129:10
**strategic** 22:11 118:20,21
**strategically** 130:23 131:4,10
131:15
**strategies** 118:23 120:18 121:14
**strategize** 103:3
**STREET** 2:4,8,12,17 3:2,6 4:6,14
6:3
**strength** 32:20 33:5
**strenuously** 94:6
**stress** 21:6
**stricken** 122:7
**strictly** 84:24
**stridently** 93:24
**striking** 119:8
**structure** 29:7 36:1 38:5 39:8
51:4
**struggling** 85:13
**subject** 23:11 29:16 66:23 68:8
125:7 126:19,21,22
**submission** 58:5 59:3,6,10 63:11
75:14 88:10 106:24 134:15
135:1
**submissions** 141:8
**submit** 39:8 57:21 58:11 62:7
70:21 75:1 144:21
**submitted** 63:12 80:10 85:9,11
**substance** 49:14 50:16 131:9
136:25
**substances** 30:14
**substantial** 70:11
**substantially** 40:4 106:16
**substantive** 42:1 72:14 93:14,22

800.523.7887          12-10-2025, WORD INDEX, Boynes case      Associated Reporters Int'l., Inc.

Page 34

96:21 97:24 98:8 105:14 107:8 108:23 109:21 113:4 116:24 120:19 124:20 126:16 128:19 128:22 129:15 131:8,17 133:24 134:24 137:13 139:7 140:5
**success** 31:14 66:25
**suffered** 26:21
**sufficient** 50:11
**sufficiently** 39:23
**suggest** 38:11 57:1,20 59:9 92:10 119:10
**suggested** 121:11 124:22 139:13
**suggesting** 103:5 139:17
**suggestion** 37:13
**suggestions** 58:11
**suggests** 119:6
**suit** 99:8
**suite** 2:4,12,22 3:2,18 4:11,14 4:23 5:3,7,16,20 6:3,7 45:21
**summons** 135:11
**superior** 41:8
**superiority** 39:16 41:3,21 48:20
**supply** 74:20
**support** 21:8 128:25
**supported** 45:14,20 50:19 63:10
**supporting** 27:4
**supports** 129:1
**suppose** 27:22
**supposed** 52:12
**Supreme** 105:13,18
**sure** 10:23 20:8 22:7 40:25 52:16 58:3 62:19 65:22 67:1,6 68:6,6,14 70:4 72:21 75:12 76:23 77:1 78:6 83:4,7 94:7 99:11 109:3 124:4 141:23
**surprise** 113:16 124:21
**survive** 94:15
**suspect** 121:2,3
**sustained** 81:25
**switch** 119:2
**symptoms** 27:12,15 28:13,14
**sync** 17:17
**system** 32:23 48:10,11 54:13 62:11 80:22 104:13 140:22
**systems** 28:15

--- 

**T**

**T** 3:13
**table** 91:21 95:13,13,14,15 113:23

**tackle** 124:7
**tactical** 125:17 129:11
**tactically** 128:21 136:4,5
**tag** 59:7
**tailor** 40:25
**tails** 23:3
**take** 16:9 20:10 21:1 26:7 27:9 50:13 67:24 68:25 71:8 72:22 73:6 75:21 78:13 79:13 83:14 83:18,23 84:2,7,8 85:18,19 86:1,11,13,15,23 96:11 111:14 126:9 129:23 131:5 132:21 141:18 147:3 148:17
**taken** 79:5 120:1 125:20
**takes** 104:1
**talk** 21:4,18 22:7 23:16 49:6 62:7 64:11 83:10 98:2 112:24 126:12,13 127:9 147:13
**talked** 22:19 23:18 39:21 40:18 40:24 47:24 59:19,22 60:14,22 62:10 89:19
**talking** 20:17 21:2,21 42:7,14 44:22 46:22 47:14 58:19,20 62:3 73:9 79:10 83:2 89:11 146:12
**talks** 49:13 54:10,11,13,17 61:9 130:16
**tangential** 113:12
**Tanta** 120:10 121:2
**Tanto** 105:9
**tasks** 147:3
**team** 17:9 70:4 122:25
**Technical** 133:8
**tell** 17:6 19:24 20:1,10 21:1 24:17 26:2 29:20 33:7 34:9 55:10 56:3,23 65:20 66:8,8 69:11 72:25 75:8,23 80:1,22 83:8,8 85:24 89:2 142:6
**tells** 54:12,16
**ten** 26:14,20 27:1 35:3,6 41:8 55:15 62:14,15,16,17 65:12 76:7 78:17 86:16
**ten-minute** 78:13
**tenant** 18:9
**tend** 44:23
**tens** 22:4
**term** 26:11
**Terminal** 8:25
**terminals** 4:9 11:9 13:15 90:17 93:12,20

800.523.7887          12-10-2025, WORD INDEX, Boynes case      Associated Reporters Int'l., Inc.

Page 35

**terms** 17:17 18:4,20,25 23:21
26:7 41:3 42:10 50:18 54:5
59:23 62:10,23 64:4 65:18
68:20 70:10 73:18 79:12 81:2
85:25 125:23 128:19
**tested** 47:7
**TEXAS** 2:4 5:17
**text** 119:6
**thank** 9:2 12:19 13:20 14:3
17:19,23 24:24 30:6 37:12
38:21 39:11,14 43:3 48:17
57:25 60:20 68:5,13 72:20
74:3 77:13 78:12,15 90:12,25
93:9 121:6,22 122:12 124:15
129:20 130:6 140:1,2,4 141:2
144:19 147:7 148:6,7,11,13,14
**that'd** 83:21
**That's** 49:10
**THERESA:Case** 1:11
**they're** 54:22
**thing** 27:21 37:2 54:3 62:8 64:5
64:6 66:15,16 77:2 82:22
107:2 125:19 128:11
**things** 18:24 19:16 23:15,15
24:7 28:4,19 32:24 41:15
42:16 55:3 61:14 66:11 69:19
71:18,21 72:7,11 73:18 79:8
82:8 89:3 91:14 121:13 133:17
146:20 147:19
**think** 15:20 16:11 18:8 19:10
20:3,3 21:15 22:25 23:5,7
24:24 25:16 27:23 29:7,22,24
31:10,12 32:4,12,13,14,18,19
33:15 34:7,10,11,19,24 38:19
38:20,23 39:6 41:21 42:5,24
47:12 48:15,19 49:6 51:19
52:15 53:14 54:2,24 59:15,19
60:1,13,23 61:19 63:25 64:2,8
64:9,10,13 65:8 66:14 67:12
68:8,23 69:16,20 70:6 71:1
73:2,7,8,9,20 74:7,13,13,22
75:5,20 76:20,21 77:3,3,7,7
77:11 78:11 79:9 82:2,9,19,22
83:10,10 84:24 85:2,20,24
87:1,5 88:7,7,8,17 90:5 91:21
95:11 96:4,11 100:9,13 101:22
104:4,23 106:19,21 107:1
110:23 112:20,25 113:3 114:11
114:21 117:14 118:22 119:12
119:20 122:15,17 123:3,4,10

123:17 124:5 127:19 128:18
131:25 132:9,10 133:9,10,23
134:9,12,15 135:22,24 136:8
136:13,22 137:4 138:2 143:1
143:16,20,21 144:8 145:4,14
146:16 147:6,13,18 148:5
**thinking** 28:12 122:19
**thinks** 61:20
**third** 46:4 63:6,7,9,9 64:11
65:4 84:2 91:8 96:22 97:12
106:13 107:10 108:8,12,15
109:6,19 111:6 135:10,14,15
135:20 137:6 138:9 139:4
**Thirdly** 15:15
**thirteen** 100:10 125:4,24 130:14
140:7,8
**thirty** 29:8,12 36:2,8,19 37:11
37:21 67:14,17,21 68:1 84:8
**thirty-** 107:8
**thirty-eight** 16:16
**thirty-four** 16:16
**thirty-nine** 97:2,7 107:4,4
126:11,21 130:9
**thirty-three** 65:1 79:6
**Thomas** 4:23 5:6,21,24 9:3,4
90:22 121:23 122:1,3
**thought** 21:14 60:8 125:13
**thoughts** 124:10 146:8 147:20
**thousand** 14:9,20 18:2 20:4,4,6
20:12,18 35:3 41:8 51:19 73:2
73:3 74:9 79:12,16,18 83:9,17
83:21 84:4,6
**thousands** 22:4 67:25
**thread** 42:5,14
**three** 7:11 19:16 20:1,6,9,16
24:3 25:17 26:15 27:6 39:15
41:23 45:7,10 46:14 49:24
50:2,21 52:13 55:5 60:17 62:6
62:17,23 63:17 70:1,1 72:13
84:17 91:5 103:16 107:22
142:9
**threshold** 21:3 127:12
**throw** 92:9
**ticked** 84:20
**tie** 27:20
**time** 18:23 23:12 30:3 36:6
59:10 61:6 64:12,15 65:23
66:18 71:8 85:16 91:20,25
94:19 96:22 103:1 109:12
110:1 113:22 114:10,25 115:23

Case: 1:21-cv-00253-MAK    Document #: 1650    Filed: 12/31/25    Page 185 of 189

800.523.7887              12-10-2025, WORD INDEX, Boynes case       Associated Reporters Int'l., Inc.

Page 36

115:25 117:22 130:12 134:15
134:19,20 139:1 145:3,24
146:14,16 147:11,15
**timeliness** 62:2
**times** 23:10 46:14,14,14 52:13
64:4
**timing** 44:24 88:11 118:12
134:24
**to-do** 129:22 141:3,13,22
**to-dos** 144:11
**today** 7:8 16:4 17:3 28:14 62:3
88:12 89:11 90:23 91:22,25
93:8,14 106:6,23 108:21 110:1
110:24 113:4 116:19,22 119:13
122:5 123:12 126:17 130:12
134:1 138:11 139:24 141:14
145:7,12
**today's** 127:19
**told** 58:4 74:6 139:8
**toll-free** 53:12 75:7
**tomorrow** 103:8,9,15 111:9
119:14 139:13
**top** 29:7,8,12 79:5 96:4
**topic** 69:2
**topics** 67:15,17 68:1,20
**TORRE** 5:12
**Tort** 15:18
**total** 64:14 80:9,16 105:25
106:1,3
**totally** 56:19 76:18
**tote** 130:20
**touched** 39:16 48:23 49:1
**toxins** 29:23 34:3 42:8
**track** 39:17
**trailed** 115:4
**tranche** 18:12 89:15
**transaction** 60:25 125:6
**transcriber** 149:2
**transcript** 1:20 6:15
**transcription** 6:12,15 149:3
**transpired** 93:8
**travel** 79:9 88:18,19
**treated** 40:10
**treatment** 62:9
**trial** 61:10,16,16 74:11 93:15
100:4 110:10 111:4 120:4
134:10
**tried** 26:7 32:24 54:6 81:5,5
119:25
**tries** 64:15

**trigger** 27:22
**triggered** 100:9,21 103:1 104:6
**true** 40:20 111:15 146:12
**trust** 146:2
**try** 22:11 30:9 34:22 38:25 45:1
46:10 48:14 52:17 54:7 56:8
63:14 66:7,10,13 73:5 77:14
81:1,9,13 82:19 143:16
**trying** 19:11,14,16 21:15 26:25
32:11 45:22 60:5 68:15 75:24
99:11 110:11 125:15 127:12
**TUNICK** 5:20
**turn** 39:12
**Turnaround** 5:15 10:5 13:6
**turning** 65:10
**TUTU** 4:23
**twelve** 83:21 84:6 100:10,10
**twenty** 20:12 27:3 107:4 125:25
126:4
**twenty-** 25:16 27:3 60:16 62:5
69:9 79:10
**twenty-four** 79:12,18 83:9,17
**twenty-one-day** 59:5
**twenty-three** 19:20 22:9,21 24:2
24:3,9 31:11,11,23 39:12,14
41:22,22 49:1,10,12,18,23,23
49:25 50:2,6 55:4 59:23 60:20
60:22,24 61:8 62:22 63:16,17
65:11 69:10,16 72:15 91:9,24
92:2 97:9 107:5
**Twenty's** 126:5
**Twersky** 3:1 8:11,12
**two** 7:10,10,12,12,13,14,15,15
14:6 15:2 16:15 18:15 20:2,6
20:15 28:4,19 32:24 39:15
43:14,15,15 44:8,20 45:19
47:13 48:3 49:2,11,13,23 50:1
50:6 58:15 59:10,23 60:17,20
60:24 61:8 62:6,6,6,7,7,16,22
63:16,17 65:11 66:11 71:17,23
72:1,9 76:7 87:4 89:4 107:22
135:3 137:22 142:5,18
**two-month** 61:16
**tying** 28:4
**type** 23:25 36:16 104:14 105:22
**types** 22:9,14 32:22 43:14 86:21
108:18
**typical** 112:17
**typicality** 21:11 22:8,20 42:15
**typically** 53:21 62:24

800.523.7887              12-10-2025, WORD INDEX, Boynes case      Associated Reporters Int'l., Inc.

Page 37

## U

**U.P.S** 18:3,5
**U.S** 3:7
**U.S.C** 77:20
**Uh-huh** 26:16 36:20 37:5,19
  38:14 39:2 44:14,18 45:5,25
  47:3,5,21 48:6 50:7,17 51:17
  52:11,19,23 53:17,25 54:9,20
  59:25 80:3,6,6,8,11 83:16,19
  85:23 86:3,5,10,20,22,24 87:2
  87:7,13 88:16 89:14 91:1
  92:24 93:10,17 95:18,20 96:6
  104:8,11 107:24 108:1,3 111:8
  114:7 118:1 134:6 142:1,20,25
  143:4,13 144:5 146:11
**ultimately** 28:21 94:24 95:2,24
  99:14 102:6 104:19 106:9
  107:1 110:9 113:3 119:6
  124:11 131:1
**unanimity** 46:11
**uncovered** 73:19
**uncovering** 73:18
**undeniably** 41:10
**underlying** 40:6
**underpinnings** 32:16
**underscore** 130:22
**understand** 23:17,22 33:3,19
  34:6 75:5,6 79:4 99:11 109:4
  111:7 117:18 130:19 132:19
  136:11
**understanding** 76:6 82:25 99:15
  133:1
**understands** 15:9 70:5
**understood** 28:16 31:7 99:10,10
  130:12 136:22
**undertook** 32:23 66:19
**undesirable** 41:12
**undetermined** 105:11
**unfettered** 137:23
**UNIDENTIFIED** 42:19 43:2 148:13
  148:14
**uniformly** 23:5
**unintelligible** 11:24 89:7 146:2
**unique** 94:24 104:23 105:3
  133:21,24,25,25 143:21,24
**unit** 27:6
**United** 7:6
**Universal** 5:1 9:18
**unknown** 72:18

**unsupported** 129:7
**untimely** 119:18
**unusual** 112:8
**update** 143:11
**uphill** 32:5
**upper** 63:13,14
**use** 21:1 53:18 67:12 83:1 142:2
**usual** 112:9,13,17,25
**usually** 63:22 78:5

## V

**v** 1:4,8,12,16 98:18
**V.I** 9:18 14:13 109:21
**vague** 72:17
**valid** 49:20 60:6 127:22
**value** 81:15 82:10
**values** 81:3 89:10
**variance** 64:4
**various** 19:18 25:2 34:3 42:9
  100:9
**vehemently** 93:24
**vehicle** 116:17
**Venmo** 76:22
**Ventures** 1:5,9,13,17 4:5 7:11
  7:13,16 12:12
**verdict** 98:21 102:6 110:13
**Versa** 5:10 18:3,5
**version** 143:15
**versus** 7:11,13,14,16 16:15 39:1
  105:9 121:2
**VI** 5:2 6:1
**viable** 25:10 32:4 33:13
**view** 18:12 21:25 95:17 114:22
  115:21 145:8
**Virgin** 1:1,1,18 2:9,13 3:7,10
  4:23 5:21,24 6:3,7 7:3 78:20
  93:21 96:21 98:9 104:23 105:3
  105:12,13,14 116:23 120:17,19
  133:21,25
**virtual** 75:17 76:9 143:19
**virtually** 9:24
**VOGEL** 6:6
**vomiting** 81:1

## W

**wait** 71:16 112:19 119:1 138:3
**waiting** 72:2
**waive** 92:1 131:21 139:17
**waived** 113:24 120:9
**walk** 53:24 79:21

800.523.7887            12-10-2025, WORD INDEX, Boynes case        Associated Reporters Int'l., Inc.

Page 38

**wall** 97:16
**want** 18:17 20:9 34:8 47:11,11 63:2,3,4 66:9 69:25 70:4 72:11 73:19 87:9 90:23 91:22 100:10 108:5,24 113:8,25 114:8 116:9,20 119:10,23 121:10 122:15,20,24 123:3 124:2 128:22 129:1,6 130:5,6 130:21,22 134:2 135:21,25 136:6,11,15,20 141:6,14,18,18 146:23
**wanted** 37:18 66:20 113:8 129:22 141:2 146:7,8
**wants** 42:2 48:13 55:7 105:9 135:3
**warrant** 39:23
**warranted** 104:4
**washes** 61:4
**WASHINGTON** 3:15,18
**wasn't** 58:24 66:23 95:15
**watchword** 40:1
**water** 25:6 29:24 36:5 37:17,25 52:18 53:15 75:9
**watering** 25:4
**way** 25:7 27:20 29:11,14,15,17 32:18 34:20 35:20,23 36:10,16 41:10 42:17 44:25 47:9 48:14 58:4 60:18 61:11 64:1 75:12 80:22 104:21 110:21 117:1,7,8 117:8 120:22 124:10 134:22
**ways** 64:1 75:16 122:19
**we'll** 9:25 16:7 22:6 41:14 53:23 56:25,25 57:1,12 58:3 64:11,11 68:19 69:4 71:3 72:16 76:19,19,25 77:12 80:2 82:16 127:19 128:5 141:21 142:4 143:25
**we're** 7:9 17:16 19:11,11,13,14 30:3 33:11 38:25 39:4 42:7,14 46:22 47:14 48:3 57:15 58:13 58:19,20 59:19 60:8 61:18 62:2,4 63:14 64:9,10,25 71:8 71:14 73:9 77:12 82:4,6 83:2 88:14,14 89:11 91:19 92:15 93:21 96:14 97:5 98:9 101:11 111:13 117:3 120:14,20 123:12 124:6 128:16,16,17 131:1 134:9,11 136:3,4,4,5,5 139:22 141:23 146:12,15
**we've** 29:6,21 34:15 49:21 58:22

60:14 61:5 62:10,18 63:15,15 69:23 70:5,11,11,13,14,15,17 70:17 101:22 128:11 142:3,16 143:6 146:6
**weaknesses** 33:6
**weather** 21:21
**website** 53:6,11 55:1
**Wednesday** 7:9
**week** 57:21 71:3 75:14 137:23 141:14,15 144:20
**weeks** 59:10 135:3,5
**WEINBERG** 4:10
**welcome** 18:16
**went** 47:24 137:15
**weren't** 46:25
**western** 44:9
**whatnot** 134:21
**whatsoever** 61:8
**WHEELER** 4:10
**willing** 73:6
**Wilma** 7:4
**Wilson** 4:2 12:4
**wind** 40:12 44:25 45:20
**windfall** 105:20
**window** 137:23
**wish** 88:25
**withdraw** 121:4
**witness** 67:18
**witnessed** 112:16
**woe** 140:15
**won** 70:15
**wondered** 78:25
**word** 52:9 75:21 95:14,14 140:3
**words** 16:21 77:4 96:2 105:21 116:1 131:11
**work** 22:25 29:5,21 39:4 45:22 48:14 69:17,20 79:4 87:19 105:13 124:5 148:7,11
**worked** 18:23 35:18 70:5
**working** 23:3 38:25 58:7,8 70:3 70:9 121:12
**works** 75:23 76:2
**world** 98:18 100:1,2 135:25 148:5
**worth** 74:9
**worthy** 22:3 148:1
**would've** 98:6 123:8,9,11
**wouldn't** 70:9 103:25 113:7
**writing** 97:16
**written** 37:20 95:13 106:24

800.523.7887          12-10-2025, WORD INDEX, Boynes case      Associated Reporters Int'l., Inc.

Page 39

**wrong** 33:7 88:18 128:16,16,17

## X

**X** 84:11,16,17

## Y

**yeah** 11:2 19:7,9 20:4 24:6 38:4 38:23 39:7 52:2 56:15,18 58:3 59:22 67:6 68:13 74:24 75:19 76:8,24 77:7 79:18 83:12 88:5 90:5 92:12 101:25 116:13 117:15 131:20 132:8,24 137:3 142:15
**year** 14:7 146:14
**years** 34:13 37:1 61:24 65:23 67:20 125:12 138:11 147:25
**York** 3:23,23 6:13 120:17
**Young** 6:10 11:21,23,23

## Z

**ZAINEY** 2:17
**zealous** 147:10,11,14
**Zelle** 76:22
**zero** 7:14 50:21 51:12
**zone** 41:2 45:19 46:24 48:3 84:16
**zones** 20:1,2,7,9,16 45:7

## 0

**00802** 5:21,24
**00802-1735** 4:23
**00820** 2:9,13 3:7 4:7 6:3
**00823** 3:10
**00907** 5:13
**02129** 5:3

## 1

**1:21-00253-WAL-EAH** 1:3
**1:21-00259-WAL-EAH** 1:7
**1:21-00260-WAL-EAH** 1:11
**1:21-cv-00261-WAL-EAH** 1:15
**1:26:12** 148:19
**10** 1:18 6:12
**1000** 5:23
**10017** 3:23
**103** 2:12
**10th** 7:9
**11:30** 78:18
**11:50** 78:19
**1101** 2:8

**1131** 6:3
**1200** 5:7
**1236** 2:12
**1301** 3:14
**1336** 5:20
**13662** 6:13
**1397** 4:18
**150** 5:7
**1700** 3:2
**1715(b)** 77:20
**17th** 96:5 141:16,20,22
**1800s** 133:25
**18B-1** 6:7
**19103** 3:2
**19th** 141:16

## 2

**20** 5:3
**200** 3:18
**20001** 3:18
**20004** 3:15
**2001** 3:2
**2008** 16:15
**201** 2:22 5:20
**202** 4:23
**202-389-5174** 3:15
**202-389-5933** 3:19
**2021** 125:12
**2024** 146:15
**2025** 1:18 7:9 96:7 149:10
**2026** 146:14,16
**204** 6:3
**212-918-3100** 3:24
**212-918-3119** 3:23
**2120** 3:6
**215-299-2150** 3:3
**215-299-2923** 3:3
**2162** 4:6
**2201** 5:12
**223973** 3:10
**2400** 4:11
**28** 77:20
**29th** 14:18 149:10
**2ND** 5:7

## 3

**300** 4:14 5:3
**30318** 4:19
**30326** 4:11
**305-379-3686** 5:8

800.523.7887                    12-10-2025, WORD INDEX, Boynes case        Associated Reporters Int'l., Inc.

Page 40

**305-379-3690** 5:9
**312-861-2899** 4:16
**312-861-8000** 4:15
**33131** 5:8
**3344** 4:11
**340-200-0025** 3:8
**340-277-2799** 3:11
**340-714-1235** 5:21
**340-719-1766** 3:7
**340-719-8086** 4:7
**340-773-2954** 2:10
**340-773-3200** 6:4
**340-773-3944** 2:14
**340-773-6142** 2:13
**340-774-2944** 4:24
**340-774-4422** 5:24
**340-776-1639** 4:24
**340-778-8855** 2:9
**390** 3:22
**3rd** 14:7

### 4

**404-806-7448** 4:19
**404-875-9433** 4:12
**404-876-2700** 4:12
**40502** 6:7
**412-972-0412** 5:13
**4600** 2:22
**4608** 4:23
**469-444-5002** 2:5
**469-904-4550** 2:5

### 5

**500** 2:4
**5000** 4:14
**504-389-4087** 2:24
**504-529-2931** 2:19
**504-556-5507** 2:23
**504-581-1750** 2:18
**512-727-4755** 3:19
**5143** 6:7
**5151** 5:16
**586-944-7807** 6:8

### 6

**60601** 4:15
**617-241-3000** 5:4

### 7

**7** 4:2

**700** 3:18
**701** 2:17
**70130** 2:18
**70170** 2:23
**750** 5:16
**75202** 2:4
**77056** 5:17

### 8

**800-866-6831** 4:8
**832-255-6000** 5:17

### 9

**9:49:09** 7:1
**900** 2:4
**973-624-0808** 4:4
**973-735-5745** 4:3