**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

|  |  |
|---|---|
| CLIFFORD BOYNES, et al., <br><br>    *Plaintiffs*, <br><br>    v. <br><br> LIMETREE BAY VENTURES, LLC, et al., <br><br>    *Defendants*. | Civil Action No. 2021-0253 |

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

---

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................1

II. BACKGROUND .......................................................................................................2

III. THE PROPOSED CLASS IS NOT ASCERTAINABLE ......................................3

IV. PLAINTIFFS FAIL TO ESTABLISH COMMONALITY ...................................5

V. PLAINTIFFS FAIL TO ESTABLISH PREDOMINANCE....................................7

    A. INDIVIDUALIZED ISSUES PREDOMINATE FOR PLAINTIFFS' PROPERTY CLAIMS ..............................................................................11

    B. PERSONAL PROOF PREDOMINATES FOR PLAINTIFF'S PERSONAL INJURY CLAIMS .............................................................................16

    C. PLAINTIFFS' MEDICAL-MONITORING THEORY FAILS ON INDIVIDUALIZED EXPOSURE, SUSCEPTIBILITY, AND MEDICAL NECESSITY .......................................17

VI. PLAINTIFFS FAIL TO ESTABLISH TYPICALITY OR ADEQUACY ........................19

    A. PLAINTIFFS' CLAIMS ARE NOT LEGALLY OR FACTUALLY TYPICAL OF THE CLASS .............................................................................20

    B. CERTAIN PLAINTIFFS ARE SUBJECT TO UNIQUE DEFENSES ...................................22

    C. PLAINTIFFS' INTERESTS AND INCENTIVES ARE NOT ALIGNED WITH THE CLASS, WHICH IS DIVIDED BY FUNDAMENTAL CONFLICTS ...................................24

VII. THE PROPOSED CLASS IS NOT SUPERIOR TO OTHER METHODS OF RESOLVING THESE CASES ..............................................................................27

VIII. PLAINTIFFS' CLASS CERTIFICATION THEORY FAILS BECAUSE THE EXPERT OPINIONS ON WHICH IT DEPENDS DO NOT SATISFY RULE 702 ........29

    A. DR. SAJO (AIR DISPERSION)....................................................................30

    B. DR. HUBER (GEOGRAPHIC "IMPACT") ....................................................31

    C. DR. KALTOFEN (CISTERN CONTAMINATION) ..........................................32

    D. DR. HENNET (CISTERN AND PIPING CONTAMINATION)............................34

    E. MR. ALVAREZ (CISTERN REMEDIATION) ...............................................36

F.      DR. BELL (PROPERTY DAMAGE)................................................................37

G.     DR. RUDO (MEDICAL MONITORING)......................................................39

IX.    CONCLUSION.................................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Amchem Products, Inc. v. Windsor,* 521 U.S. 591 (1997)Am ................................................ *passim*

*Arno v. Hess Corp.*, 71 V.I. 463 (Super. Ct. 2019) ........................................................................ 17

*Barnes v. Am. Tobacco Co.,* 161 F.3d 127 (3d Cir. 1998) ............................................................. 18

*Beck v. Maximus, Inc.*, 457 F.3d 291 (3d Cir. 2006) ............................................................. *passim*

*Brathwaite v. Xavier*, 71 V.I. 1089, 1108, 2019 VI 26, ¶ 26 (2019) ........................................... 28

*Brown v. SEPTA,* 1987 WL 9273 (E.D. Pa. Apr. 9, 1987) ............................................................. 8

*Burkhead v. Louisville Gas & Elec. Co.*, 250 F.R.D. 287 (W.D. Ky. 2008) ................................. 26

*Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316 (3d Cir. 2003) ...................................... 39

*Chen v. Amtrak,* 2019 WL 5294419 (E.D. Pa. Oct. 18, 2019) ........................................................ 8

*City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434 (3d Cir. 2017) ................. 4

*Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141 (3d Cir. 2008) .............................. 19, 21, 24

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ....................................................... 34

*E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395 (1977) ............................................. 29

*Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000) .................................................................... 37

*Gates v. Rohm & Haas Co.* 655 F.3d 255 (3d Cir. 2011) ......................................................... *passim*

*Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1996) ................................................ *passim*

*Hargrove v. Sleepy's LLC*, 974 F.3d 467 (3d Cir. 2020) ................................................................. 4

*Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298 (3d Cir. 2016) ................................................ 8

*Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349 (3d Cir. 2013) ....................................................... 4

*Henke v. Arco Midcon, L.L.C.*, 2014 WL 982777 (E.D. Mo. Mar. 12, 2014) ........................ 25, 26

*Henry v. St. Croix Alumina, LLC*, 2008 WL 2329223 (D.V.I. June 3, 2008) ......................... *passim*

*Hirsch v. CSX Transp.*, 2013 WL 12290427 (N.D. Ohio Nov. 14, 2013) .................................... 31

*In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145 (2d Cir. 1987) ........................................... 13

*In re Blood Reagents Antitrust Litig.*, 783 F.3d 183 (3d Cir. 2015) .................................. 29, 30, 32

*In re Community Bank of Northern Virginia Mortgage Lending Practices Litigation*, 795 F.3d 380 (3d Cir. 2015) ............................................................................................................... 27

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008) ........................................ 8

*In re LifeUSA Holding, Inc.,* 242 F.3d 136 (3d Cir. 2001) ................................................................ 8

*In re Niaspan Antitrust Litig.*, 67 F.4th 118 (3d Cir. 2023) ............................................................ 4

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ...................................................... 34

*In re Refinery Hydrocarbon Release Litig.*, 2025 WL 1091615 (Super. Ct. Feb. 19, 2025) ........ 17

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585 (3d Cir. 2009) ............................. *passim*

*In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999) .................................................................. 35, 36, 40

*In re TMI Litig.*, *Cases Consol. II*, 911 F. Supp. 775, 826 (M.D. Pa. 1996), .............................. 40

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) .......................................... 27

*Josephat v. St. Croix Alumina, LLC*, 2000 WL 1679502 (D.V.I. Aug. 7, 2000) .......................... 22

*Kemblesville HHMO Ctr., LLC v. Landhope Realty Co.*, 2011 WL 3240779 (E.D. Pa. July 28, 2011) ..................................................................................................... 5

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) .......................................................... 40

*Lloyd v. Covanta Plymouth Renewable Energy, LLC,* 585 F. Supp. 3d 646 (E.D. Pa. 2022) ................................................................................................................ 5, 13, 27

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012) ........................................... *passim*

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ................................ 30

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001) ................................................................................................................. 21, 22

*Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000) ................................................................. 37

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ......................................................................... 24

*Puerto Rico v. M/V Emily S*, 158 F.R.D. 9 (D.P.R. 1994) ............................................................ 17

*Reilly v. Gould, Inc.,* 965 F. Supp. 588 (M.D. Pa. 1997) ............................................................... 8

*Rymer v. Kmart Corp.*, 68 V.I. 571 (V.I. 2018) ............................................................................. 5

*Sheridan v. NGK Metals Corp.*, 609 F.3d 239 (3d Cir. 2010) ...................................................... 18

*Sines v. Darling Ingredients, Inc.*, 2023 WL 3841714 (D.N.J. June 6, 2023) ............................. 25

*Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988) ................................................ 15

*Taha v. County of Bucks*, 862 F.3d 292 (3d Cir. 2017) ................................................................ 11

*Thornburg v. Ford Motor Co.*, 2022 WL 4348475 (W.D. Mo. Sept. 10, 2022) ........................... 25

*United States v. Titus*, 78 F.4th 595 (3d Cir. 2023) ...................................................................... 34

*Wall v. Sunoco, Inc.*, 211 F.R.D. 272 (M.D. Pa. 2002) ................................................................ 25

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .............................................................. *passim*

*Wasson v. Peabody Coal Co.*, 542 F.3d 1172 (7th Cir. 2008) ....................................................... 34

*Wheeler v. Arkema France S.A.*, 2024 WL 3371039 (S.D. Tex. July 10, 2024) .................... 38, 39

## Rules

Fed. R. Civ. P. 23(a)(3) ................................................................................................................. 19

Fed. R. Civ. P. 23(a)(4) ................................................................................................................. 19

Fed. R. Civ. P. 23(b)(3) ................................................................................................................... 8

Fed. R. Civ. P. 23(b)(3)(B) ........................................................................................................... 29

Fed. R. Civ. P. 23(b)(3)(D) ........................................................................................................... 27

Fed. R. Evid. 408 ........................................................................................................................... 31

## Other Authorities

1 McLaughlin on Class Actions § 5:47 (22nd ed.) ....................................................................... 18

7AA Wright & Miller, Federal Practice & Procedure § 1782 (3d ed. 2005) ................................ 18

## I.    INTRODUCTION

Plaintiffs bear the burden—not Defendants, not the Court—of parsing through the evidence in support of, and affirmatively proving, each requirement of Rule 23. But Plaintiffs here ask this Court to do their work. Instead of meeting their burden, they devote the bulk of their motion to a merits narrative about the Refinery restart. Defendants contest this merits narrative and will do so where it is procedurally appropriate, but that is not here. Plaintiffs give only cursory treatment to the Rule 23 questions that control certification. That approach cannot carry their burden.

Their failure is fundamental and pervasive. Plaintiffs assert tort claims arising from multiple alleged release events over several months, involving different substances, different pathways of exposure, different locations, different properties, and different alleged injuries. Whatever common background evidence may exist about the Refinery's operations, Plaintiffs still must prove the essential elements of causation and injury—and demonstrate in this motion that they can do so class-wide. Plaintiffs cannot satisfy Rule 23 by assuming that every person or property in their proposed geographic area was injured in the same way, by the same event, without admissible evidence demonstrating that to be so.

These questions are precisely why the Supreme Court and Third Circuit courts have regularly held that mass contamination cases such as this one seldom satisfy the requirements of Rule 23. *See, e.g.*, *Amchem Products, Inc. v. Windsor,* 521 U.S. 591 (1997); *Gates v. Rohm & Haas Co.* 655 F.3d 255 (3d Cir. 2011); *Henry v. St. Croix Alumina, LLC*, 2008 WL 2329223 (D.V.I. June 3, 2008). A common allegation of an emission from a facility does not answer the liability questions that matter: who was exposed, to what substance, at what dose, through what pathway, whether a particular person or property was injured, whether the defendant rather than another source caused the alleged harm, and what individualized defenses apply. This case presents *all* of those certification-defeating features: four alleged releases, different chemicals and exposure

pathways, shifting winds and locations, property- and cistern-specific contamination questions, varied personal-injury and medical-monitoring theories, and multiple alternative-causation issues.

Plaintiffs' motion ignores those problems. Their broad class definition includes anyone who was merely "present in" the Affected Geographic Area at any time during a nearly four-month period and thus is not administratively feasible. But more importantly, Plaintiffs do not identify common evidence capable of proving, for each class member "in one stroke," critical questions of exposure, causation and injury. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011). These are essential elements of Plaintiffs' claims—not peripheral damages issues—and would require incident-by-incident, property-by-property, cistern-by-cistern, and person-by-person adjudication. Plaintiffs must demonstrate that this case can be tried fairly and efficiently on a class-wide basis. They have not done so, and the motion for class certification should be denied.

## II.    BACKGROUND

This case arises from the attempted 2021 restart of the Limetree Bay Refinery on St. Croix. Plaintiffs allege that, after the Refinery attempted to resume operations in early February 2021, it released oil, hydrogen sulfide, sulfur dioxide, and other substances on four occasions before operations were suspended that May. (Dkt. 1327 ("SAC") ¶¶ 1, 116.) Although the Court preliminarily certified a settlement class involving certain defendants (Dkt. 1687), this motion seeks something different: a *litigated* liability class against remaining defendants.[1]

Plaintiffs allege *four* separate incidents, spread across more than three months and falling into two different categories. Two were heavy-oil "flare rainout" events: on February 4, 2021, Flare #8 allegedly emitted an oily mist that settled on homes, vehicles, and cisterns in Clifton Hill

---

[1] Plaintiffs improperly claim this Court's preliminary approval of a *settlement* class serves as precedent for certification here. This Court already rejected this argument. Dkt. 1687 at 28 n.15 ("The case law on this point is clear as to the preliminary nature of the Court's ruling at this stage.").

and nearby estates (SAC ¶¶ 117–118); and on May 12, 2021, the flare again allegedly rained "pitch oil" on downwind communities (*id.* ¶¶ 154–155). The other two were allegedly gaseous: hydrogen-sulfide exceedances between April 19 and 23, 2021 (*id.* ¶¶129–133), and further hydrogen sulfide and odors on May 5, 2021 (*id.* ¶¶141–145). Each incident occurred on different days, under different winds, over a different footprint, and for different reasons.

The named Plaintiffs allege a variety of injuries: some allege personal injury, some property damage, some both, and many neither. Their alleged personal injuries range from burning eyes and throat, to headaches, nausea, and vomiting, to aggravation of pre-existing asthma and allergies. (*id.* ¶¶ 17–33.) For the class, Plaintiffs allege everything from transient odor annoyance to "loss of consciousness" and "death." (*id.* ¶ 185.) Similarly, Plaintiffs allege property and economic harms including contaminated cisterns and plumbing, oil on roofs and vehicles, crop and business losses, and diminished property values. (*id.* ¶¶ 17–33).

Plaintiffs submitted more than 1,000 pages of interlocking expert reports generally discussing the alleged injuries, but never explain how those reports connect, or identify which portions support which Rule 23 requirements. The Court is left to reverse-engineer Plaintiffs' certification theory from a chain of experts—each relying on others—without any roadmap: Emily Fucile Sanchez (GIS mapping), Stevie Henry (property counts), Dr. Erno Sajo (air dispersion), Dr. William Huber (statistical contamination estimates), Dr. Marco Kaltofen (sampling), Dr. Remy Hennet and Brian Moore (GIS mapping), Mr. Ricardo Alvarez (remediation costs), Dr. Randall Bell (property diminution), and Dr. Kenneth Rudo (medical monitoring).

## ARGUMENT

### III.    THE PROPOSED CLASS IS NOT ASCERTAINABLE

Plaintiffs' proposed class fails at the threshold because it is not "currently and readily ascertainable." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 592–93 (3d Cir. 2012). The Third

3

Circuit requires Plaintiffs to show a reliable, administratively feasible method for determining class membership. *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 129–30 (3d Cir. 2023); *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 469–70 (3d Cir. 2020). Plaintiffs' proposed class includes anyone who was merely "present in" the Affected Geographic Area at any time between February 3 and May 26, 2021, a category that includes tourists, delivery drivers, people visiting friends or family, customers at businesses, beachgoers, and day-trippers, all of whom are impossible to objectively identify.

Where class membership turns on individualized recollection and cannot be verified by reliable records, ascertainability fails. *Marcus*, 687 F.3d at 593–94; *Carrera*, 727 F.3d at 306–08. Ascertainability also fails "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus*, 687 F.3d at 593; *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013). Those are the precise problems here. The catch-all "were present in" language would sweep in anyone who merely stepped foot in the area for any duration over a nearly four-month window, creating the problems the ascertainability requirement seeks to avoid.

Plaintiffs' suggestion that class membership can be established by "attestation" does not solve the problem. The Third Circuit has repeatedly cautioned against ascertainability methods that depend on putative class members' say-so, particularly where defendants have no ability to test the assertion. *Carrera*, 727 F.3d at 309; *Marcus*, 687 F.3d at 594. Affidavits may be considered only when paired with reliable records or other administratively feasible means of verification. *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 441–42 (3d Cir. 2017); *Hargrove*, 974 F.3d at 479. Property records may identify some property owners. Leases may identify some renters. Employment records may identify some workers. But Plaintiffs do not (and

4

cannot) identify any records to determine who was merely "present in" the area. This is not a technical defect. It implicates the core purposes of ascertainability: identifying who is entitled to notice, determining who is bound by judgment, and protecting Defendants' due-process right to challenge class membership. *Carrera*, 727 F.3d at 305–07; *Marcus*, 687 F.3d at 593.[2]

## IV.    PLAINTIFFS FAIL TO ESTABLISH COMMONALITY

Rule 23 is not a pleading standard: it imposes a demanding burden on the party seeking certification. Commonality under Rule 23(a) requires more than common background facts or common allegations of wrongdoing. "What matters to class certification…is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes,* 564 U.S. at 350 (citations omitted).

Plaintiffs frame the common questions at the highest level of abstraction: whether Defendants acted wrongfully in the Refinery restart. But *Dukes* requires more than a generalized allegation of misconduct where claims turn on individualized proof of exposure, causation, and injury. *See id*. at 350–52. Plaintiffs assert claims for negligence, gross negligence, nuisance, trespass, emotional distress, and medical monitoring. Each requires proof of injury and causation as an element or predicate to relief. *See, e.g., Rymer v. Kmart Corp*., 68 V.I. 571, 576 (V.I. 2018) (negligence elements). Plaintiffs do not show these elements can be resolved class-wide.

The proposed class itself is too varied to support commonality. It includes owners, renters, residents, workers, business operators, and persons merely present in the area, alleging a wide

---

[2] Plaintiffs also cannot demonstrate numerosity. In geographically defined classes, courts require that plaintiffs "provide *evidence* that there are *in fact a sufficient number of plaintiffs in the area subject to the defendant's conduct.*" *Lloyd v. Covanta Plymouth Renewable Energy, LLC,* 585 F. Supp. 3d 646, 654 (E.D. Pa. 2022) (emphasis added); *Kemblesville HHMO Ctr., LLC v. Landhope Realty Co.*, 2011 WL 3240779, at *7 (E.D. Pa. July 28, 2011). Instead, Plaintiffs merely invoke "common sense" from the size of the area, number of properties, and population. Mot. 15-16. This is the same "shortcut" *Covanta* rejected. Plaintiffs fail to quantify the putative class members affected by Defendants' conduct and therefore fail to show numerosity.

range of injuries: respiratory symptoms, headaches, nausea, emotional distress, property and cistern contamination, vehicle and crop damage, business losses, diminution in property value, and medical monitoring. Some class members allegedly suffered personal injuries, some property damage, some both, and many perhaps neither. This variety forecloses commonality under Rule 23(a)(2). *See Dukes*, 564 U.S. at 349–50 ("Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." (citations omitted)). The case also involves four separate releases, each involving different chemicals, different conditions, and different areas affected (*see* Ps. App. 0067 (Fucile-Sanchez Rpt. App. B, Figs. B-1–11))—making it impossible to trace each Defendant's conduct to a given injury in "one stroke." *Dukes*, 564 U.S. at 350.

Plaintiffs ignore these issues by focusing on "Defendants' negligent conduct in designing, permitting, constructing, commissioning, controlling, maintaining, and operating the Refinery" as the "central liability question for each Class member." Mot. 16. But identifying and resolving a single element for a single cause of action does not resolve the entirety of the litigation for any class member, let alone the entire class. And because the class definition sweeps in such a wide array of legally and factually disparate individuals asserting a wide range of claims, resolving one plaintiff claim cannot drive resolution of any other putative class member's. Consider four people who qualify as putative class members[3] under Plaintiffs' proposed singular definition:

- *First*, a homeowner in Estate Whim with a cistern, downwind of the Refinery and present for all four releases, must still establish which release reached her property, whether her cistern was in fact contaminated—Plaintiffs' own sampling expert found roughly 40% of tested properties showed no detectable impact, Kaltofen Tr. 268—and whether her exposure warrants monitoring, a "case-by-case" determination turning on individual shower duration, bathing habits, and water usage, according to Plaintiffs' medical monitoring expert, Dr. Rudo. Rudo Tr. 176-177, 225.

---

[3] These differences are not hypothetical. Even the named plaintiffs testified to significant differences among them. *See* Section V (typicality); *see also* Mot. 18 n.111 (cataloguing disparate legal and factual theories from named plaintiff depositions).

- *Second*, a delivery driver who traveled through Frederiksted on some days but was off-island during others and owns no property, could prove a claim only by reconstructing his location across 113 days and identifying which plumes, if any, reached him. He would have no property damage claim, and would have to trace any release to any personal injury he claims.

- *Third*, an owner who lives off-island and rented her property in 2021 may have no knowledge of her cistern's condition or whether the property was even occupied on a given day, would require the individualized inspection Plaintiffs' remediation expert concedes is necessary because "you cannot assume anything." Alvarez Tr. 227. Moreover, that landowner may not have suffered any actual rental loss (the basis of Plaintiffs' experts' property damages theory), nor would she personally have been exposed to any toxin, and accordingly could claim no personal injury or medical monitoring.

- *Fourth*, a homeowner whose cistern was sampled and showed no detectable contamination remains a class member solely because her home falls within the boundary drawn by Plaintiffs' own geographic-scope expert, Dr. Huber—exposing the circularity of a definition that treats location as a proxy for injury when Plaintiffs' own evidence confirms location does not predict injury. Huber Tr. 197-201.

Yet Plaintiffs ask this Court to resolve all four of these claimants, and the tens of thousands like them, through a single set of common proofs. Plaintiffs' own experts concede this cannot be done: their air-dispersion modeler offers no opinion on "the uniformity" of exposure across the class (Sajo Tr. 207); and their statistician cannot say "with 100 percent certainty whether any location is actually impacted" (Huber Tr. 210), acknowledging his model yields only regional probability estimates, not determinations of actual injury at any specific property (*id.* at 157, 195). These concessions go to the threshold question of who was injured at all—not merely to the amount of damages—and they defeat certification.[4]

## V.    PLAINTIFFS FAIL TO ESTABLISH PREDOMINANCE

A class may only be certified where Plaintiffs have demonstrated that any such "questions

---

[4] Plaintiffs' cited commonality authorities are inapposite. *Katz v. AvalonBay Communities, Inc.*, 2018 WL 5278702 (D.N.J. Oct. 24, 2018), involved a single fire on a single day, caused by one defendant's own workers, inflicting one shared harm. *Halley v. Honeywell Int'l, Inc.*, 2016 WL 1682943 (D.N.J. Apr. 26, 2016), was a settlement class against a single, already-liable defendant, pared down to homogeneous property-only claims with "no personal or bodily injury causes of action" and "withdrawn medical monitoring claims." This case is the opposite: multiple defendants, four distinct releases, and the very personal injury, emotional distress, and medical-monitoring claims *Halley* shed.

of law or fact common to class members *predominate* over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3) (emphasis added). "The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation, a standard far more demanding than the commonality requirement of Rule 23(a)." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310–11 (3d Cir. 2008) (cleaned up). Given this demanding requirement, class certification is routinely denied in mass contamination cases given the necessity for individual property-by-property and person-by-person assessment overwhelming any common issues. *See, e.g.*, *Coventa,* 585 F. Supp. 3d at 657 ("[m]ass environmental tort cases [such as this one] seldom satisfy the predominance requirement of Rule 23(b)(3).").[5]

Plaintiffs try to escape this demanding inquiry by dismissing individual variation as related only to "damages." That argument misapprehends what they are required to prove. The "fact of damage" is "an element of liability requiring plaintiffs to prove that they have suffered some harm traceable to the defendant's conduct." *Harnish v. Widener Univ. Sch. of L.*, 833 F.3d 298, 305–06 (3d Cir. 2016). The fact of injury is thus not a question of *how much* a given member may recover; it is the distinct antecedent question of *whether the member was injured at all*—a question that, on this record, can be answered only incident by incident, property by property, and person by person. For these reasons, the Supreme Court, the Third Circuit, and this Court have each held that predominance is lacking in environmental mass-tort cases like this one.

The Supreme Court in *Amchem Prods. Inc.,* affirmed decertification of a nationwide

---

[5] *See also, e.g.*, *In re LifeUSA Holding, Inc.,* 242 F.3d 136, 145 (3d Cir. 2001) (class certification is ordinarily "inappropriate in mass tort claims"); *Brown v. SEPTA,* 1987 WL 9273, at *11 (E.D. Pa. Apr. 9, 1987) ("Each plaintiff's property will be damage[d] to a different degree, if at all, based on its proximity to the site, topography, and the off-site migration patterns of [the toxic substances]."); *Reilly v. Gould, Inc.,* 965 F. Supp. 588, 602 (M.D. Pa. 1997) (denying certification where "additional individualized factors…wreak[] havoc on the notion that all plaintiffs' injuries have been caused solely by the defendant's actions"); *Chen v. Amtrak,* 2019 WL 5294419, at *7 (E.D. Pa. Oct. 18, 2019) (Commonality not met where plaintiffs had to show "individual proof of each class member's property and soil contamination").

asbestos settlement class because it lacked the cohesion required for representative adjudication. 521 U.S. at 597, 622–25. The Court refused to treat shared asbestos exposure, a common interest in efficient compensation, or generalized questions about asbestos's health effects as sufficient to overcome the legal and factual questions that make each class member's claim a genuine controversy—exposure, causation, injury, defenses, and the need for relief. *Id.* at 623–24. Those questions were overwhelmingly individualized because class members were exposed to different asbestos products, in different ways, for different durations, and at different times; suffered different diseases or no disease; had different medical histories; and faced different monitoring and treatment issues. *Id.* at 624. The Court therefore held that any "overarching dispute" about asbestos's health consequences could not predominate over the individualized proof required to determine whether each claimant was injured and whether the defendants caused that injury. *Id.*

The Third Circuit in *Gates* affirmed denial of certification for proposed medical-monitoring and property-damage classes alleging vinyl-chloride contamination from a nearby industrial site, holding that plaintiffs' proposed common proof could not overcome individualized questions of exposure, causation, injury, medical necessity, and property contamination. 655 F.3d at 258, 270–74. The predominance analysis is especially instructive: the *Gates* plaintiffs had narrowed their certification theory to a single chemical and a single exposure pathway, yet the court still held class treatment improper because their models estimated exposure for hypothetical or average residents—not any actual class member—and masked differences in where and when residents lived, how much time they spent in the affected area, and the activity- and person-specific factors affecting dose. *Id.* at 266–68. The court likewise rejected reliance on an EPA regulatory threshold and a uniform MRI-based monitoring regime, because increased-risk and medical-necessity questions turned on individualized susceptibility, age, medical history, genetic

9

predisposition, and tolerance for the proposed screening. *Id.* at 268–70. The property-damage class failed for parallel reasons: area-wide evidence could not establish contamination at each property attributable to the defendants, and causation, extent of contamination, and fact and amount of damages required property-specific proof. *Id.* at 271–72.

This Court in *Henry*, reached the same conclusion. 2008 WL 2329223, at *3, *5–7. There, residents of Clifton Hill and other downwind St. Croix neighborhoods alleged that bauxite and red mud stored at the St. Croix alumina refinery were dispersed into their homes during Hurricane Georges, contaminating their cisterns and property and causing personal injury. *Id.* at *1. The Court decertified the personal-injury and property-damage classes because causation, injury, and damages required individualized proof. *Id*. at *5–7. The Court explained that predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication," *id.* at *3 (quoting *Amchem Prods., Inc*., 521 U.S. at 623), and that class treatment of a toxic release is appropriate only where "proximate cause can be determined on a class-wide basis," as in "an airplane crash or a cruise ship food poisoning," *id.* (citation omitted). Causation could not be generalized, because Hurricane Georges "buffeted St. Croix for over twenty-four hours, during which time the wind's speed and direction changed several times," so that it was "not a given that the hurricane affected the people and properties in the six neighborhoods of the proposed class in the same way," and because two substances of "possibly differing degrees of toxicity" were involved. *Id.* at *5. As to personal injury, "each plaintiff must prove causation," the duration and nature of exposure varied, and even among the named plaintiffs "the onset, duration, and severity of the alleged injuries varied enormously," with a real possibility of alternative causes including pre-existing conditions and a contemporaneous conjunctivitis outbreak. *Id.* at *5–6. As to property, the Court found that "[e]ach plaintiffs' property will be damage[d] to a different degree, if at all, based on its proximity

10

to the site, topography, and the off-site migration patterns of [the toxic substances]," and that the amount of damage was "highly individualized." *Id.* at *6 (citation omitted). Measured against these decisions,[6] Plaintiffs fail to establish predominance.

### A.     INDIVIDUALIZED ISSUES PREDOMINATE FOR PLAINTIFFS' PROPERTY CLAIMS

To recover for property damage, each class member must prove three things that can be established only parcel by parcel: first, that a contaminant attributable to Defendants' releases actually reached his particular property (the fact of injury); second, that Defendants caused that contamination—that it is traceable to one of the four Incidents rather than to another source (causation); and only then, third, the nature and degree of any resulting harm (valuation). Plaintiffs' own experts concede that none of the elements can be resolved on a class-wide basis.

*First*, whether a contaminant attributable to Defendants reached any particular property is a threshold liability question, not a damages question. Plaintiffs' experts do not opine that exposure to all properties within the Affected Geographic Area is uniform. *See, e.g.,* Sajo Tr. 206–207. To the contrary, Dr. Huber conceded that his opinion concerns "an entire geographic area and not about individual properties," (Huber Tr. 157), and did not make any "determination…of any actual damage in any property." *Id.* at 195. And Dr. Kaltofen conceded that impact "var[ies]" with cistern type and cannot be known "for a specific home" without testing it. Kaltofen Tr. 258–59, 268–69. Plaintiffs "cannot substitute evidence of exposure of actual class members with evidence of hypothetical, composite persons in order to gain class certification." *Id.* This is precisely the kind

---

[6] Plaintiffs' principal predominance authority, *Taha v. County of Bucks*, 862 F.3d 292 (3d Cir. 2017), is inapposite. *Taha* was a punitive-damages class arising from the County's uniform, ministerial publication of arrestees' booking information, in which liability had already been established and "the only remaining factual issue [was] whether defendants willfully violated" the statute. *Id.* at 309. Causation and the fact of injury were common there only because a single act inflicted the same injury on every passive class member, leaving only intent to be tried. A toxic-tort class arising from four chemically distinct releases over three months is the opposite: the fact of injury and its causation are contested and member-specific. *Taha* may support common proof of *Defendants' conduct and intent*, but not the individualized causation and fact-of-injury questions that *Amchem*, *Gates*, and *Henry* hold to predominate.

of area-wide proof *Gates* holds insufficient: such proof is "not 'common' because it is not shared by all (possibly even most) individuals in the class," and "[a]verages or community-wide estimations would not be probative of any individual's claim because any one class member may have an exposure level well above or below the average." 655 F.3d at 266.

Indeed, the record affirmatively shows that many class members suffered no injury. Dr. Kaltofen and Plaintiffs' team tested water from residential cisterns and tanks across St. Croix and the results split almost evenly—45 came back not impacted and 47 impacted. Kaltofen Tr. 75–76.[7] Additionally, Plaintiffs' Appendix of "Impacted Water Systems" shows several water systems within the proposed class marked as "not confirmed" based on Plaintiffs' sampling. Ps. App. 74. Dr. Kaltofen found no impact in nearly half the water he tested; and he could not say how many separate homes those figures represent, because some cisterns were sampled more than once. Kaltofen Tr. 76–78. The impacted count, moreover, overstates any real-world harm. "Impacted" was a label Dr. Kaltofen devised for this case, applied whenever a sample met any one of five criteria he selected.[8] The criterion that was the focus of Plaintiffs' experts' work—dioxins—rested on a cutoff he acknowledged choosing himself, that no regulation or published study uses, that sits at roughly one three-hundredth of EPA's limit for dioxin in drinking water, and that, in his words, "has no medical significance at all." *Id.* at 173–76. The other criteria almost never appeared: a visible oil sheen showed up in just four samples across both sides' testing combined, and PAHs turned up essentially nothing. *Id.* at 176–78. A cistern could thus be counted "impacted" without

---

[7] Dr. Kaltofen testified that 47 samples were classified as impacted, Kaltofen Tr. 75–76, though his underlying data (Kaltofen Dep. Ex. 8) reflects 46. Either way, that is roughly the same number his team classified as not impacted— 45. Kaltofen Tr. 76.

[8] Dr. Kaltofen defined "impacted" as any of the following: (1) a visible sheen at collection; (2) dioxins and furans above his threshold—a "low-TEQ" greater than 0.1 picograms per liter, or any detection of the tetra-, penta-, or hexa-chlorinated forms; (3) presence of gasoline-, diesel-, oil-, or residual-range organics; (4) a visible oily sheen on the water's surface; or (5) for the defense data only, a significant presence of polycyclic aromatic hydrocarbons (PAHs). Ps. App. 376 (Kaltofen Rpt. 14); Kaltofen Tr. 172–73.

ever being shown to be contaminated, much less unsafe to use. Finally, Dr. Kaltofen was candid about the limits of his data: it was designed to identify the general areas the release reached, "not designed to flag an individual cistern," and "not meant to predict the dioxin contamination in a randomly selected cistern." *Id.* at 204–05. Additionally, more than 60% of respondents to the Bennington College Survey Plaintiffs rely upon reported no impact to their cisterns, gardens, or property, and numerous residents and named Plaintiffs attest they suffered no property damage at all.[9] As in *Covanta*, such "compelling evidence" that some properties "experienced no [] impact at all" independently defeats predominance, because sorting the injured from the uninjured is itself an individual inquiry. 585 F. Supp. 3d at 659.

     *Second*, even a class member whose property or cistern was in fact contaminated must still prove that Defendants caused that harm—that it is traceable to emissions from the Refinery, and to a particular one of the four Incidents, rather than to a different source. As explained in *Henry*, "[t]he relevant question . . . is not whether [the substance] has the capacity to cause harm . . . but whether it did cause harm and to whom," a determination that "is highly individualistic and depends upon the characteristics of individual plaintiffs…and the nature of their exposure." *Henry*, 2008 WL 2329223, at *4 (quoting *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 165 (2d Cir. 1987)); *see also Gates*, 655 F.3d at 266. Plaintiffs cannot make that showing on common proof. Dr. Sajo "did not model deposition," (Sajo Tr. 42); he could not "say with any degree of scientific certainty how much of the aerosol content was deposited over the area identified in [his] model," (*id.* at 87); and he acknowledged there is "no evidentiary data of how much was actually

---

[9] *See* Cantor Rpt. 37–38 & Exs. 17–18 (majority of respondents to Plaintiffs' own "Community Impact Survey," conducted by Professor David Bond of Bennington College, reported no cistern, garden, farm, or property impact); *id.* 44–46 & Exs. 24–25; Bond Tr. 115–16, 123, 126, 132, 202-03 (survey reported purported Refinery "impacts" in eastern St. Croix, *outside* Plaintiffs' proposed Affected Geographic Area); Declarations of Angelita Tuitt, Temara Honore, Susan Perales, and Gordon Corry (no property damage or health impact); *see also, e.g.,* George Tr. 59–61, 80 (off-island during the events).

released," (*id.* at 89). Dr. Kaltofen conceded that the contaminants Plaintiffs attribute to the Refinery have common alternative sources: the combustion of diesel, gasoline, and "backyard burning" are recognized sources of dioxins and furans.[10] Kaltofen Tr. 31, 32–33. Defendants' expert Dr. Cantor independently identified and documented alternative sources of contamination on St. Croix—rum fungus (Baudoinia) from the Diageo and Cruzan distilleries, Hurricane Maria (2017), Sargassum blooms that emit hydrogen sulfide, and "red dust," that should have been examined as confounding factors by Plaintiffs' experts but instead were ignored entirely. Cantor Rpt. 11–17). Indeed, Dr. Saba's source attribution fingerprinting points to those local sources rather than a single Refinery source. (Saba Rpt. 24–29). A model that cannot quantify what left the flare, how much settled where, or what other factors contributed to any contamination, cannot establish for the class that the Refinery caused the contamination found at any particular property—much less apportion it among four separate Incidents. The same problems apply to the alleged cisterns contamination. The evidence is largely undisputed that the February 4 release was confined to the Clifton Hill neighborhood, and even there impact was, as Ms. Wakefield testified, "very much individual"; she estimated that roughly 25% of residents did not use their cisterns at all. June 8, 2023 Tr. (Wakefield) 204–06. Yet Plaintiffs' experts conflate that single-neighborhood event with the May 12 release.

The individualized causation problem here is more acute than in *Gates* or *Henry*. Plaintiffs do not allege one event with shifting winds; they allege four events, on four dates, with different mechanisms, different chemical constituents, different durations, and different wind directions. That is the paradigm *Gates* warned against: a class action is inappropriate "[i]n complex, mass,

---

[10] Dioxins and furans are not intentionally produced but are byproduct compounds generated by combustion from many different sources, including numerous non-refinery sources such as landfill fires, backyard burning, and on-road combustion of gasoline and diesel fuels. They are ubiquitous in the modern environment and are found at low background levels in air, water, and soil. *See* Saba Rebuttal Rpt. at 8; Prueitt Rebuttal Rpt. at 7.

14

toxic tort accidents, where no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member and each defendant, and individual issues outnumber common issues." *Gates*, 655 F.3d at 271 (quoting *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988)).

*Third*, Plaintiffs' method for valuing property damage is the very "mass appraisal" methodology this Court rejected in *Henry* on analogous facts. There, the plaintiffs' appraiser opined that diminution was "likely uniform across neighborhoods" at roughly 30%, and that even uncontaminated homes suffered the same drop from "stigma," yet he conceded that his approach "exclude[d] between 10 and 100 distinct factors" affecting any given home—including the "importance of cisterns" and a Virgin Islands "cultural affinity for certain types of tiling." *Henry*, 2008 WL 2329223, at *7. This Court credited the defense appraiser's view that "individual valuations are necessary" and held that "questions of causation as well as damages with respect to property damage claims do not predominate." *Id.*

Dr. Bell's "uniform formula" suffers from the same defects. He offers no opinion on the actual presence of contaminants—that, he conceded, is "the environmental engineer's domain"—and simply assumes the contamination he was "told" existed; and his method is a "predictive valuation" extrapolated from roughly 215 observed properties to all 6,263 in the class, with no source attribution. Bell Tr. 87, 119–120, 81, 151–52; *see infra* Section VII.F. Such a formula cannot capture whether a given parcel was contaminated at all, its degree, proximity, topography, or the off-site migration that—as *Henry* recognized—makes property damage "highly individualized." *Henry*, 2008 WL 2329223, at *6.

The cost of remediating any contamination is equally individualized. Plaintiffs' cistern-remediation expert, Mr. Alvarez, testified that, "looking at the real conditions of each house or

15

property, you cannot assume anything," and that whether a structure requires decontamination "would be based on individual inspection." Alvarez Tr. 227, 262–63. A remediation model that depends, by its proponent's own admission, on inspecting each property one at a time is the antithesis of common proof.

Thus, whether a Refinery contaminant reached a given parcel, whether Defendants caused it, and the nature and extent of any resulting loss can be answered only property by property, cistern by cistern, and incident by incident, and Plaintiffs' own experts concede as much. *Gates* explains why a case like this is especially unsuited to class treatment: "[n]ot all claims of property damage based on exposure are alike," and claims involving "extensive periods of contamination with multiple sources and various pathways" are far less apt for class treatment than "[s]ingle instances or simple theories of contamination." 65 F.3d at 271–72. As *Gates* held, area-wide "common evidence could not establish contamination at each property that was attributable to the defendants," and because contamination varies parcel by parcel, common questions do not predominate. *Id.* at 262.

### B. PERSONAL PROOF PREDOMINATES FOR PLAINTIFF'S PERSONAL INJURY CLAIMS

Plaintiffs' personal injury claims[11] are the least suited of all to class treatment. Personal injury claims arising from a toxic release are quintessentially individual: "each plaintiff must prove causation," and each must prove the nature and duration of his own exposure to substances of differing toxicity. *Henry*, 2008 WL 2329223, at *5. As this Court recognized, courts regularly deny class certification "[i]n actions for personal injury resulting from a sudden release of toxic chemicals," because "the fact of each class member's personal injury and the causal link between

---

[11] Plaintiffs seek to recover personal injuries under nine of their twelve claims—negligence (SAC ¶ 224), gross negligence (id. ¶¶ 227, 229), abnormally dangerous condition (id. ¶ 266), public nuisance (id. ¶ 276), private nuisance (id. ¶ 280), statutory private nuisance (id. ¶ 285), trespass (id. ¶ 290), negligent infliction of emotional distress (id. ¶ 296), and intentional infliction of emotional distress (id. ¶ 309).

that individual's injury and the [release]" cannot "be answered meaningfully on a class-wide basis." *Id*. at \*3 (quoting *Puerto Rico v. M/V Emily S*, 158 F.R.D. 9, 13 (D.P.R. 1994)).

Plaintiffs' own named representatives illustrate the problem. They allege myriad injuries, ranging from burning eyes and throat (Thompson, Santiago), headaches and nausea (Wells, Shirley, Augustus), vomiting (Alleyne), aggravation of pre-existing asthma (Almestica, Isaac-Joseph), pre-existing nasal allergies (Boynes), cracked and peeling skin (Moorhead), and, for the putative class as a whole, injuries ranging up to loss of consciousness and death. As in *Henry*, many class members' pre-existing conditions produce symptoms indistinguishable from those attributed to Defendants, (*id.* at \*6), and, coupled with exposure to other potential sources, furnish competing causes for the very symptoms and contamination they attribute to the Refinery. Disentangling Refinery-caused harm from these "myriad…potentially contributing factors," (*id.*), is an inherently individual exercise that no common evidence can perform.

C.    **PLAINTIFFS' MEDICAL-MONITORING THEORY FAILS ON INDIVIDUALIZED EXPOSURE, SUSCEPTIBILITY, AND MEDICAL NECESSITY**

Medical monitoring has not been a recognized as a viable claim under Virgin Islands law. *See In re Refinery Hydrocarbon Release Litig.*, 2025 WL 1091615, at \*8 (Super. Ct. Feb. 19, 2025) ("The law in the Virgin Islands is unsettled on medical monitoring claims, including whether it should even be recognized."); *Arno v. Hess Corp.*, 71 V.I. 463, 505–06 (Super. Ct. 2019) (same). Medical monitoring is solely a question of remedy—and the Court cannot bypass the required elements of the underlying claim without wrestling with whether plaintiffs met their initial burden for each of those elements.

When medical monitoring is available, it requires exposure above background levels, a significantly increased risk of latent disease, and the need for a monitoring protocol. For those reasons, the Third Circuit has twice rejected class treatment of medical monitoring claims due to

lack of predominance. *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 146 (3d Cir. 1998) (medical necessity element requires "that each class member demonstrate the need for medical monitoring precludes certification"); *Gates*, 655 F.3d at 270 ("inquiries into whether class members were exposed above background levels, whether class members face a significantly increased risk of developing a serious latent disease, and whether a medical monitoring regime is reasonably medically necessary all require considering individual proof of class members' specific characteristics.").[12]

Defendants' toxicologist, Dr. Prueitt, reaches the same result on the merits: because exposures, doses, and health risks vary across properties and individuals, "any potential health risks from their exposures must be evaluated on an individualized basis." Prueitt Rpt. 5, 44; Prueitt Rebuttal Rpt. 4–5, 7, 9–16.

Plaintiffs' medical monitoring expert, Dr. Kenneth Rudo, likewise conceded that proof of those elements is inherently individualized, calling it "a case-by-case-by-case-by-case approach." Rudo Tr. 189. Determining exposure, he explained, requires asking each person patient-specific questions—how long they shower and bathe, and whether they bathe a child—and he has proposed a plaintiff-specific "questionnaire" returned to a physician for "patient-by-patient evaluation" to decide whether any class member even needs monitoring and, if so, to design an individual protocol. Rudo Tr. 177, 225. As the Third Circuit has held, these individualized questions "predominate over (and are more complex than) common issues such as whether defendants released the offending chemical into the environment." *Gates,* 655 F.3d at 270.

---

[12] *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 251 (3d Cir. 2010) (listing seven elements required to prevail on a medical monitoring claim under Pennsylvania law); 1 McLaughlin on Class Actions § 5:47 (22nd ed.) (medical-monitoring claims "usually do not satisfy the 'predominance' requirement of Rule 23(b)(3)" because entitlement to relief turns on numerous individualized inquiries into each member's health history, exposure, causation, risk, and applicable defenses); 7AA Wright & Miller, Federal Practice & Procedure § 1782 (3d ed. 2005) (same, where "different injuries" occurred "to different class members and over different periods of time").

18

## VI.    PLAINTIFFS FAIL TO ESTABLISH TYPICALITY OR ADEQUACY

Rule 23(a)'s typicality and adequacy requirements are closely related, and the named plaintiffs fail both for overlapping reasons. Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The Third Circuit has distilled the typicality inquiry into "three distinct, though related, concerns: (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).

Adequacy requires that "the representative parties…fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4), and turns here on "the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181, 183 (3d Cir. 2012). The inquiry is "designed to ferret out" conflicts between the named parties and the class and to ensure the representative has the "incentive to represent the claims of the class vigorously." *In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010) ("Community Bank II"). A representative must "possess the same interest and suffer the same injury as the class members." *Amchem*, 521 U.S. at 594–95.

These requirements overlap: the Third Circuit treats typicality and adequacy as inquiries that "both look to the potential for conflicts in the class," *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996), *aff'd*, 521 U.S. 591 (1997); *accord Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 150 (3d Cir. 2008), and hold that a representative "is neither typical nor adequate if [he] is subject to a unique defense that is likely to become a major focus of the

19

litigation," *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006). Here, exposure histories diverge property-by-property and person-by-person, each representative is encumbered by unique defenses, and injury and causation require person- and property-specific proof. This is the "hodgepodge of factually as well as legally different plaintiffs" that admits of no typical representative and each concern independently defeats certification. *Georgine*, 83 F.3d at 632.

### A.    PLAINTIFFS' CLAIMS ARE NOT LEGALLY OR FACTUALLY TYPICAL OF THE CLASS

Typicality first asks whether "the claims of the class representative" are "generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory." *In re Schering*, 589 F.3d at 599. A representative whose "legal or factual position" is "markedly different from that of other members of the class" cannot satisfy that requirement, even where some questions are common to all. *Marcus*, 687 F.3d at 598. The named plaintiffs fail on both axes.

Plaintiffs contend that typicality is satisfied because, "[l]ike all Class members," they allege that Defendants' negligent and reckless conduct "caused hazardous and toxic substances to be released into the surrounding community, resulting in contamination of their properties and exposure to harmful chemicals." Mot. 18 & n.111. But the record they cite demonstrates the divergence among them. Footnote 111 strings together the deposition testimony of sixteen different plaintiffs, which describes sixteen materially different cases.[13] These are not, as Plaintiffs would have it, one claim proved "regardless of factual differences." Mot. 18. They are different legal-injury theories resting on different facts, with claimed harms traced to different events.

---

[13] Some plaintiffs tie their injuries to the February 4 oil rainout (Almestica Tr. 92–101), others to the April–May H2S episodes (Santiago Tr. 74–76; Boynes Tr. 69–72), and others to the May 12 rainout (Ps. App. 764 (Wells Tr. 53–56); (Ps. App. 793 (Moorhead Tr. 78–80)). They allege different pathways—ingestion of cistern water (Ps. App. 793 (Moorhead Tr. 97)); George Tr. 61–62) versus inhalation of gases (Ps. App. 893 (Augustus Tr. 75)); Shirley Tr. 146–147)—and different injuries, from acute personal injury to property loss to aggravation of pre-existing conditions (Almestica, "asthmatic, which was aggravated by the Incidents," SAC ¶ 19).

The Third Circuit's decision in *Georgine* is directly on point. There, the court held that a class comprising "factually as well as legally different plaintiffs" could yield "no set of representatives" that was "typical" of the class, because the atypicality ran in both directions—the representatives' claims were not typical of the absentees, and the absentees' claims were not typical of the representatives. *Georgine*, 83 F.3d at 632. The same is true here. A plaintiff whose claim is that oil fouled his cistern is not typical of a class member whose only claim is a respiratory injury from inhaling $H_2S$, and vice versa. The Supreme Court made this point in affirming *Georgine*: the class failed because its members "were exposed to different…products, in different ways, over different periods, and for different amounts of time." *Amchem*, 521 U.S. at 609.

Anticipating the markedly different legal and factual positions of named plaintiffs, Plaintiffs fall back on the contention that because every claim "rises or falls on the same course of conduct by the same Defendants," typicality follows "regardless of factual differences." Mot. 18 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183–84 (3d Cir. 2001)). The Third Circuit has squarely rejected that syllogism. In *Danvers*, the plaintiffs' claims all arose from Ford's dealer incentive program, yet because those claims were "rooted in a variety of" underlying actions requiring "different, and possibly conflicting, legal theories," the court held that "[t]he wide range of interests among members of the proposed class precludes a finding of typicality." 543 F.3d at 150. A common defendant and a common course of conduct do not manufacture typicality where the resulting claims are fundamentally different. That Defendants allegedly engaged in a single course of conduct in restarting the Refinery does not make different legal-injury theories (e.g., personal injury vs. property) resting on different facts (e.g., the February 4 oil rainout versus the May 5, 2021 H2S odor) the same for typicality purposes.[14]

---

[14] Plaintiffs' typicality authorities do not help them. *Newton* found typicality satisfied because the claims rested on a single theory and a uniform course of conduct, so that the "alleged cause of the[] injuries…remain[ed] typical

21

### B.    CERTAIN PLAINTIFFS ARE SUBJECT TO UNIQUE DEFENSES

A proposed representative subject to a unique defense "is neither typical nor adequate." *Beck*, 457 F.3d at 301. Defendants need not prove that any such defense will prevail; they need show only "some degree of likelihood a unique defense will play a significant role at trial." *Id.* at 300. Here, multiple individualized defenses will do precisely that:

***Signed releases.*** At least two proposed representatives signed releases with Limetree and are therefore burdened by contract defenses—release, waiver, and estoppel—that no absent class member shares. Boynes Tr. 87, 90, 91; Thompson Tr. 80, 81, 84. This is the scenario the Third Circuit held destroys typicality in *Schering*: litigating whether Boynes's and Thompson's releases bar or limit their claims would displace the common questions and undermines their typicality.

***Prior litigation against the Refinery and its predecessors.*** Several representatives have already litigated claims arising from refinery operations, exposing them to preclusion, release, and credibility defenses[15] that "could conceivably become the focus of the entire litigation and divert much of [the representative's] attention from the suit." *Beck*, 457 F.3d at 300 (citation omitted). Plaintiffs' own authority underscores the danger: the *Josephat* court singled out the lead plaintiff's failure to disclose his "previous history of asbestos litigation" as a unique defense and credibility problem bearing on his fitness to represent the class. 2000 WL 1679502, at *6.

***Occupational exposure and alternative causation.*** Four representatives are not neighborhood residents but former refinery workers, raising an alternative-causation defense unique to them.[16] Each will spend the litigation litigating whether their conditions trace to decades

---

throughout the class." 259 F.3d at 185. *Josephat v. St. Croix Alumina, LLC*, 2000 WL 1679502 (D.V.I. Aug. 7, 2000), applied the now-abandoned "doubtful case" presumption to claims arising from a single hurricane-driven dispersal—and arose from the very red-dust litigation this Court later decertified in *Henry*, 2008 WL 2329223.

[15] Edna Santiago sued the Refinery over a gas release and settled. Santiago Tr. 41–43. Sirdrina Isaac-Joseph settled a prior asbestos suit against Hess. Isaac-Joseph Tr. 23–26. John Sonson sued Hess arising from his refinery employment. Sonson Tr. 35–36. Helen Shirley sued HOVENSA regarding refinery contamination. Shirley Tr. 55-58.

[16] Clifford Boynes worked twenty-five years in the plant, received extensive safety training, and acknowledged prior

of occupational exposure rather than the 2021 releases—the very individualized causation inquiry that led this Court to decertify the refinery-emissions class in *Henry*. 2008 WL 2329223, at *6.

**Pre-existing medical conditions.** The Complaint itself pleads "aggravation of preexisting . . . conditions" as a class injury, (SAC ¶ 185), and several representatives have pre-existing conditions that guarantee individualized causation disputes.[17] As to each, Defendants will litigate baseline severity and causation—an inquiry that risks becoming the "major focus" in any trial. *In re Schering*, 589 F.3d at 599.

**Alternative sources of contamination.** Plaintiffs' own sampling expert conceded that the dioxins and furans they attribute to the Refinery have common alternative origins. Kaltofen Tr. 31, 32–33. Several representatives have themselves attributed—and recovered for—materially similar harm from unrelated sources. Helen Shirley recovered in prior litigation against the Refinery's predecessor and in the St. Croix "red dust" litigation. Shirley Tr. 119–23, 129–30. And Ryan Alleyne and Alvina Ilarraza recovered on claims that "rum fungus" emitted by nearby distilleries damaged their cisterns and property. Alleyne Tr., Vol. I, 36–38; Ilarraza Tr. 26–27. For those representatives, disentangling any Refinery-caused harm from these independent sources is a party-specific inquiry. Because proximity to such sources varies parcel by parcel, whether a given representative's alleged contamination is attributable to the Refinery rather than to a nearby roadway, generator, or other industrial or residential source is an individualized inquiry that will

---

on-the-job H2S exposure. Boynes Tr. 18, 24, 127. John Sonson worked for Hess from 1975 to 2006, was diagnosed with an asbestos-related condition, and continues to undergo cancer-center monitoring. Sonson Tr. 8–9, 23, 35-36. Isidore Jules worked forty-three years at the Hess refinery, most of them as a foreman. Jules Tr. 17–18. And Margaret Thompson worked at HOVENSA from 1993 until 2012. Thompson Tr. 18–19.

[17] Cristel Rodriguez suffers from severe allergies and asthma that pre-date the releases and testified that she left her employment for medical reasons connected to those conditions. Rodriguez Tr. 20. Delia Almestica is a self-described asthmatic who used an inhaler about once a week before the events and daily afterward, and whose asthma the Complaint concedes was merely "aggravated by the Incidents." Almestica Tr. 100; SAC ¶ 19. John Sonson's asbestos-related pulmonary condition supplies an obvious alternative cause for his respiratory complaints. Sonson Tr. 36–37. And Clifford Boynes has pre-existing hypertension. Boynes Tr. 38.

23

consume the litigation for some representatives while being irrelevant to others. That is the hallmark of a unique defense under *Beck*. 457 F.3d at 300.

Any one of these defenses would suffice under *Beck*, which requires only that a unique defense be likely to "play a significant role at trial." *Id.* Here, several representatives carry two or three at once—Clifford Boynes alone faces a signed release, an occupational-exposure defense, and a pre-existing-condition defense. Because these defenses are not shared by the class and are certain to become a major focus of any trial, the representatives who bear them are neither typical of nor adequate to represent the class. *In re Schering*, 589 F.3d at 599; *Beck*, 457 F.3d at 301.

### C.   PLAINTIFFS' INTERESTS AND INCENTIVES ARE NOT ALIGNED WITH THE CLASS, WHICH IS DIVIDED BY FUNDAMENTAL CONFLICTS

The third typicality concern requires that "the interests and incentives of the representative . . . be sufficiently aligned with those of the class," *Schering*, 589 F.3d at 599, and it is also the "linchpin of . . . adequacy, *Dewey*, 681 F.3d at 183. On this axis the two requirements fully converge; the Third Circuit treats them as overlapping inquiries that "both look to the potential for conflicts in the class." *Georgine*, 83 F.3d at 632; *accord Danvers*, 543 F.3d at 149–50. An intra-class conflict is "fundamental"—and thus defeats both typicality and adequacy and forecloses class certification—when it "touches the specific issues in controversy." *Dewey*, 681 F.3d at 184–85 (explaining that a conflict concerning the allocation of remedies amongst class members with competing interests is fundamental) (cleaned up); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856–57 (1999); *Amchem*, 521 U.S. at 626–27. Both the unique defenses catalogued above and the structure of the pled class leave the representatives' interests misaligned with those they seek to represent, and the proposed class harbors several fundamental conflicts.

*First*, the representatives' own defenses misalign their incentives. A representative preoccupied with his own release, prior settlement, or alternative-causation defense has every

incentive to steer the litigation toward the individualized issues that will decide his own recovery, and correspondingly less incentive to press the common questions on which the absentees depend. *See Beck*, 457 F.3d at 297. That divergence is most acute for the representatives who signed releases: as *Schering* recognized, a released representative "may not have a monetary stake in the outcome" and faces "different incentives in terms of how much time, energy, and money" to invest in the case. 589 F.3d at 600, 602. Boynes and Thompson, having signed and then second-guessed their releases, illustrate the misalignment precisely.

*Second*, the named representatives do not even uniformly share the class's core claims. Although Plaintiffs describe a class of persons uniformly "expos[ed] to harmful chemicals," (Mot. 18), several named representatives testified that they are not pursuing any claim for personal-injury damages.[18] Personal injury is nonetheless central to a substantial portion of the class: Plaintiffs seek personal-injury damages under nine of their twelve causes of action, (*see* supra Part IV.B), and the pleaded class injuries extend to "loss of consciousness" and "death," (SAC ¶ 185). Because a Rule 23(b)(3) judgment binds absent members, a representative who is not pursuing personal-injury damages has neither the ability nor the incentive to litigate the very claims the judgment will extinguish for those who retain them. Courts hold such a representative both inadequate and atypical on precisely this ground.[19] That defect is independent of the conflicts above: it is not a

---

[18] *See* Almestica Tr. 111–13, 120–22, 128–30, 143–44, 197–98; Boynes Tr. 122–25, 130, 148–49 (disclaiming any individual damages of any kind); Santiago Tr. 212–14; Sonson Tr. 115–16, 132–33; George Tr. 80, 87; *see also* Shirley Tr. 159–60 and Alleyne Tr., Vol. II, 198–201 (disclaiming discrete personal-injury heads).

[19] *See Sines v. Darling Ingredients, Inc.*, 2023 WL 3841714, at *4 (D.N.J. June 6, 2023) (representatives who "admitted that they are not seeking damages for physical injury" could not represent members alleging health effects, because they lacked "the ability and the incentives to represent the claims of the class vigorously"); *Wall v. Sunoco, Inc.*, 211 F.R.D. 272 (M.D. Pa. 2002) (conflict between an injured representative and exposure-only members defeats both typicality and adequacy); *Thornburg v. Ford Motor Co.*, 2022 WL 4348475 (W.D. Mo. Sept. 10, 2022) (representative who voluntarily forgoes personal-injury claims is inadequate); *Henke v. Arco Midcon, L.L.C.*, 2014 WL 982777 (E.D. Mo. Mar. 12, 2014) ("because Plaintiffs assert claims only for property damage, they are not adequate representatives"); *In re MTBE*, 209 F.R.D. 323, 340 (S.D.N.Y. 2002) (same); *Burkhead v. Louisville Gas & Elec. Co.*, 250 F.R.D. 287 (W.D. Ky. 2008) (same).

difference in the amount of any member's damages, but a representative's inability to prosecute an entire category of claim on which the class depends.

*Third*, the omnibus class definition yokes together members whose interests are not merely different but potentially adverse: present-injury claimants seeking compensatory damages alongside exposure-only claimants seeking medical monitoring; property owners alongside renters and transient persons merely "present" in the area; cistern-dependent households alongside those on municipal water; and residential occupants alongside commercial operators. Two of these divisions are not differences of degree in the measure of damages—such differences are not fundamental—but conflicts that *Amchem*, *Ortiz*, *Georgine*, and *Dewey* hold defeat certification.

***Present, compensable harm vs. the forward-looking monitoring remedy.*** The Supreme Court identified the divide between present and future harm as the paradigmatic fundamental conflict, and the Third Circuit calls it "[a] recurring fundamental conflict." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 431 (3d Cir. 2016). "[F]or the currently injured, the critical goal is generous immediate payments," which "tugs against the interest of exposure-only plaintiffs in ensuring an ample, (*Georgine*, 83 F.3d at 631), and "would rationally trade them for higher current payouts," (*Amchem*, 521 U.S. at 611). Yet the named representatives who allege present physical injury and property damage, (Mot. 18 & n.111), have a dominant stake in the largest and swiftest compensatory recovery—precisely the representative *Amchem* holds will trade a monitoring remedy's future-protective features "for higher current payouts."

***Property-owning residents vs. renters, businesses, and persons merely "present."*** The named plaintiffs are not a homogenous constituency, and the class they would bind—renters, commercial and institutional operators, and transient persons merely "present"—is more varied still. The named plaintiffs share neither the claims nor the incentives of constituencies they do not

26

belong to, and so have no reason to pursue those claims in any class-wide recovery. As in *Amchem*, "each serve[s] generally as representative for the whole, not for a separate constituency," leaving "no structural assurance of fair and adequate representation for the diverse groups . . . affected." 521 U.S. at 627. That is a textbook "allocative conflict of interest." *Dewey*, 681 F.3d at 188.[20]

## VII.  THE PROPOSED CLASS IS NOT SUPERIOR TO OTHER METHODS OF RESOLVING THESE CASES

Plaintiffs also fail to show that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The superiority inquiry asks the Court to "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533–34 (3d Cir. 2004) (cleaned up). A class action is not superior where a plaintiff "cannot establish causation or injury with class-wide proof," because then "the court would need to hold hearings for each individual plaintiff to demonstrate these elements." *Covanta*, 585 F. Supp. 3d at 660. Every factor confirms what the predominance analysis shows: a class action is not the superior method here—it is the least fair and least manageable one.[21]

Manageability alone is dispositive. Fed. R. Civ. P. 23(b)(3)(D). The individualized proof this case demands would splinter any class trial into thousands of mini-trials. As shown above, liability to each member turns on member-specific questions of exposure, causation, and the fact of injury that can be resolved only property by property, cistern by cistern, and person by person,

---

[20] Plaintiffs' cited authorities do not rescue the class. In *In re Community Bank of Northern Virginia Mortgage Lending Practices Litigation*, the class was adequate because its members pursued "damages under the same statutes and the same theories of liability," could recover "without impacting the recovery of any other class members," and each subgroup had its own representatives. 795 F.3d 380, 394 (3d Cir. 2015). Neither condition holds here. And in *In re NFL*, the class was certified only because counsel used a subclass structure—dividing present- and future-injury claimants into subclasses with "separate class representatives with separate counsel." 821 F.3d at 432–33. Plaintiffs have taken none of those steps.

[21] Plaintiffs' only affirmative argument for superiority—their reliance on this Court's order preliminarily approving settlement classes, Mot. 24 (citing Dkt. 1687)—cannot bear the weight they place on it.

and only after litigating the release, occupational-exposure, and preexisting-condition defenses unique to individual claimants. A proceeding that must adjudicate that many individual disputes manages nothing; it merely relabels a mass of individual cases as one.

Plaintiffs' proposed two-phase trial is no answer. They propose to try "liability, allocation of fault, and . . . entitlement to punitive damages" in Phase One, reserving only "the amount of compensatory and punitive damages" for Phase Two, on the theory that individualized damages do not defeat certification. Mot. 22 & n.117. But the obstacle here is not the arithmetic of damages—it is that the fact of injury and causation are themselves individualized liability questions.[22] Whether a given member was exposed at all, to which Toxin, from which Incident, and whether that exposure caused any compensable injury or contamination are predicate questions for Phase One, not back-end questions for Phase Two, and bifurcation does nothing to make them common. A Phase One jury cannot find class-wide "liability" when liability to each member depends on member-specific exposure, causation, and injury. Plaintiffs' plan thus collapses into one of two things: thousands of individual mini-trials or an aggregate liability finding that strips Defendants of their right to contest causation and injury as to each claimant. That is the impermissible "Trial by Formula" the Supreme Court forbade in *Dukes*. 564 U.S. at 367. Neither route is superior to individual adjudication.

The remaining factors point the same way. The class reaches personal injury claimants alleging injuries as grave as loss of consciousness and death. As *Amchem* cautions, certification "continues to call for caution when individual stakes are high and disparities among class members great." 521 U.S. at 625. Members with such claims have every reason to control their own actions,

---

[22] A plaintiff seeking punitive damages must first establish all elements of an underlying cause of action. *Cf. Brathwaite v. Xavier*, 71 V.I. 1089, 1108, 2019 VI 26, ¶ 26 (2019). Plaintiff's proposal of determining their "entitlement to punitive damages" before establishing that any class member suffered a compensable injury or that defendants' conduct caused that injury ignores that essential foundation.

Rule 23(b)(3)(A); and that interest is no abstraction—several named Plaintiffs have themselves pursued refinery-related claims through individual actions, confirming that individual litigation is a real and available alternative. Fed. R. Civ. P. 23(b)(3)(B).

Denying certification prejudices no one: due process confers no right to a class action, and every putative member would remain free to pursue an individual suit. Certification would do the opposite—binding absent members who hold strong, individualized claims to the outcome of a trial controlled by unrepresentative named Plaintiffs, and forfeiting those claims by *res judicata* should the class fail. *See E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 404–05 (1977). Individual adjudication is the fairer, more manageable, and more protective course, and certification should be denied.

## VIII.  PLAINTIFFS' CLASS CERTIFICATION THEORY FAILS BECAUSE THE EXPERT OPINIONS ON WHICH IT DEPENDS DO NOT SATISFY RULE 702[23]

The Court's "rigorous analysis" in assessing certification motions extends to expert proof necessary to satisfy Rule 23, and opinions inadmissible under Rule 702 cannot carry Plaintiffs' burden under Rule 23. *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187–88 (3d Cir. 2015) (cleaned up). The testimony of Plaintiffs' experts, as quoted above, demonstrates the inability to drive resolution of the litigation "in one stroke." But beyond those failings, the same expert opinions that Plaintiffs rely on do not satisfy Rule 702.[24]  Plaintiffs' motion rests entirely on a chain of interlocking expert opinions. Dr. Sajo models where the released contaminants traveled;

---

[23] Consistent with the meet-and-confer requirements of the Court's Policies and Procedures, Defendants provided Plaintiffs' counsel a summary of the Rule 702 challenges set forth in Section VI on July 9, 2026, and Plaintiffs' counsel responded on July 10, 2026, stating that Plaintiffs oppose each of those challenges.

[24] Pursuant to this Court's direction, Defendants' challenges to the reliability or admissibility of Plaintiffs' expert opinions offered in support of class certification, including challenges arising under Federal Rule of Evidence 702, are being raised within Defendants' Opposition to class certification rather than by separate motion. Defendants have narrowed their expert challenges to only those directly relevant to the question of class certification and therefore reserve the right to separately challenge the qualifications, reliability, or admissibility of any expert's opinions at a later stage of this litigation, including in connection with trial, regardless of whether such expert's opinions were challenged, or not challenged here, in connection with class certification.

Dr. Huber converts that modeling into the boundaries of the proposed class; Dr. Kaltofen and Dr. Hennet supply the sampling and methodology needed to declare cisterns within those boundaries "impacted"; Mr. Alvarez supplies the uniform, per-gallon formula Plaintiffs need to value that contamination on a class-wide basis; Dr. Bell converts that same footprint into a class-wide diminution-in-value formula; and Dr. Rudo relies on it to justify medical monitoring for everyone inside the line. Because of this interplay, a critical fault in any link in the chain will cause Plaintiffs' class certification arguments to fail.

Rule 702's requirements apply with full force at class certification stage. Where a party seeking certification relies on challenged expert testimony that is "critical to class certification," the party bears the burden of demonstrating that the testimony satisfies the reliability standards of *Daubert* and Rule 702 before the court may consider it for Rule 23 purposes. *In re Blood Reagents Antitrust Litig.*, 783 F.3d at 187. The court "must make a conclusive ruling on any challenge to that expert's qualifications or submissions before it may rule on a motion for class certification." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012).

### A.    DR. SAJO (AIR DISPERSION)

Plaintiffs rely on Dr. Sajo's emissions plume generated by his air dispersion model to define the geographic scope of contamination, one of the bases for establishing their class boundaries. Mot. 25; nn.98, 112. But Dr. Sajo's model fails Rule 702(b) because it lacks the foundational inputs his own model requires to reach class-wide conclusions. Rule 702(b) demands that expert testimony rest on data sufficient in quantity and quality to support the opinions offered.

As discussed, Dr. Sajo lacks source term data necessary to reach his class-wide conclusions. Without this data, neither his dispersion opinion nor his conclusion that "deposition must have occurred where plume concentrations were," (Sajo Tr. 206), rests on scientific analysis, rendering both unreliable. Courts have excluded materially identical modeling by Dr. Sajo for this

30

exact reason, finding that his opinions amount to "speculating (based on speculation)" when the same foundational inputs—fire temperature, particle size distribution, and source composition—are missing. *Hirsch v. CSX Transp.*, 2013 WL 12290427 (N.D. Ohio Nov. 14, 2013).

## B.    DR. HUBER (GEOGRAPHIC "IMPACT")

Plaintiffs rely on Dr. Huber, a statistician, to delineate the geographic extent of likely contamination from the Refinery release events. Mot. at nn.112, 128, 129. Dr. Huber's opinions should be excluded because his methodology is built on two fundamentally unreliable foundations.

Dr. Huber relies on unreliable data. Rather than defining "damage" as contamination confirmed through scientific testing, such as that overseen by Dr. Kaltofen, Huber treats any instance where Sedgwick—a claims administrator hired to make settlement offers—recommended monetary compensation to a property owner as impacted.[25] But Sedgwick adjusters were never tasked with determining whether contamination existed; they identified any "specks" on property with no determination that the specks were oil or any Refinery product at all.[26] Settlement offers are not an admissible proxy for environmental contamination liability. *See* Fed. R. Evid. 408. Dr. Huber's reliance on Sedgwick's visual assessments—where adjusters treated "any speck whatsoever" as damage to an entire property—compounds one layer of speculation with another. He admitted he is "making no opinion about whether we're actually looking at oil" and has no knowledge of Sedgwick's protocols or whether the adjusters "knew what they were doing," having "seen no evidence of any kind of verification" of their determinations. Huber Tr. 112, 124. An

---

[25]The Sedgwick data is inadmissible lay opinion evidence under Rule of Evidence 701, in part, because it requires "scientific, technical, or other specialized knowledge" that the Sedgwick adjusters indisputably lack. The data further relates to settlement offers and, as such, is inadmissible under Federal Rule of Evidence 408. Defendants reserve all rights to move to exclude or seek appropriate relief concerning the Sedgwick settlement documents.

[26] As Jeff Charles, incident command for the May 12 incident, testified, "you're talking very, very small specks … if we saw a couple of specks on a home, that was an impact. If you saw a speck on a home, that was an impact." June 8, 2023 Hrg. Tr. (Charles) 27. Adjusters further speculated that "any speck whatsoever" indicated that the entire property was impacted, including roofs and cisterns that were never inspected at all. *Id*. at 27-28, 30.

opinion built on data this unreliable is itself inadmissible under *Daubert*. *See In re Blood Reagents Antitrust Litig.*, 783 F.3d at 187. Even Dr. Hennet—Plaintiffs' contamination expert—confirms that to determine "where the released landed . . . you have to go to chemical analysis. You cannot just do it on visual observations." Hennet Tr. 81–82.

Dr. Huber's model further fails because his geographic analysis depends on the untested assumption that Dr. Sajo's modeled air concentrations serve as a reliable "proxy" for ground deposition of refinery contaminants. Huber Tr. 85–86. Dr. Sajo himself could not draw conclusions about actual deposition from his air dispersion model. Dr. Huber can do no better, admitting that he "cannot" test this proxy assumption because he "ha[s] no deposition data."[27] *Id*. at 87.

### C.    DR. KALTOFEN (CISTERN CONTAMINATION)

Plaintiffs rely on Dr. Kaltofen's "investigations and analytical environmental sampling data" to show a common class-wide cistern contamination and that common issues predominate. Mot. 25, nn. 98, 118, 129. The centerpiece of Dr. Kaltofen's opinion is his classification of cisterns as "impacted" or "not impacted." This classification rests not on a recognized methodology that passes Rule 702, but on a threshold Dr. Kaltofen invented for this litigation.[28]  He classified any cistern test result showing a TEQ above 0.1 pg/L as impacted.[29]  Yet he conceded that this "low-TEQ" cutoff was "an arbitrary delineation" with "no medical significance at all," Kaltofen Tr. 174–76, and that "there's no regulatory body and no published literature that uses TEQ for

---

[27] *See* Cantor Tr. 16–18 (Dr. Huber's own analysis, not referenced in his report, shows no statistically significant relationship between Dr. Kaltofen's field sampling results and Dr. Huber's estimates of predicted damage)

[28] Indeed, only one of the cisterns tested by Dr. Kaltofen for dioxins exceeded the EPA's drinking water Maximum Contaminant Level (MCL).

[29] Dr. Kaltofen used Low-TEQ as a criteria to identify a cistern as impacted. Like low-TEQ, none of the other criteria, which included detection of a visible sheen on the water surface or the identification, at any level, of any of several petroleum or chloride-based chemicals, is recognized by any environmental agencies or in the fields of environmental engineering and/or toxicology at large as being a justification for requiring remediation of cisterns or medical monitoring of cistern users.

acceptable contamination level."[30] *Id.* at 175. The alternative dioxin trigger—any detection of certain congeners—has no numerical threshold at all; Dr. Kaltofen confirmed that "any detection" level of those congeners "varies" and "essentially parts per quadrillion," is enough to label a cistern "impacted." Kaltofen Tr. 67–69. Additionally, his "significant presence of PAHs" classification criterion has no defined quantitative meaning. And Dr. Kaltofen's own reply report concedes that the entire definition is not designed to identify a source: "The source of dioxin is not specified in this definition. Any assumption that all dioxins are from the refinery to the exclusion of any background, is incorrect." Kaltofen Reply Rpt. at 2.

Compounding these flaws, Dr. Kaltofen's sample selection was not random, statistical, or otherwise designed to support a class-wide conclusion. He did not consult a statistician, did not design a grid-based or probability-based sampling plan, and instead sampled whoever was "willing to participate in the testing program." Kaltofen Tr. 162–63. When asked directly whether this constituted probability sampling, he answered: "It's not." *Id.* at 205. When asked what statistical confidence he could draw from sampling roughly 22 of 8,000 to 10,000 cisterns estimated to be in the proposed class area, Dr. Kaltofen's answer was unequivocal: "I don't know." *Id.* at 207. He could not quantify the margin of error, could not quantify the sampling error, and acknowledged that his sample was "not meant to predict the dioxin contamination in a randomly selected cistern" within the alleged class area. *Id.* at 203–04, 207–09.

Courts applying Rule 702 have consistently rejected expert opinions drawn from non-random, unrepresentative samples lacking statistical validation. *See United States v. Titus*, 78 F.4th 595, 600-01 (3d Cir. 2023); *Wasson v. Peabody Coal Co.*, 542 F.3d 1172, 1176 (7th Cir. 2008)

---

[30] His report's effort to justify the threshold as "conservative" relative to EPA's drinking-water standard rested on a three-order-of-magnitude error: he reported the EPA standard as 0.3 pg/L when the actual EPA Maximum Contaminant Level is 30 pg/L—three hundred times higher than his cutoff. Kaltofen Rpt. at 15; Kaltofen Tr. 174.

(excluding expert opinion based on improperly limited and insufficient testing). Likewise, a threshold with no known error rate, no regulatory adoption, no peer review, and no existence outside this courtroom cannot serve as the foundation for expert testimony *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 & n.8 (3d Cir. 1994) (lack of "non-judicial uses to which the scientific technique are put" weighs in favor of exclusion under Rule 702) (cleaned up)).

### D.  DR. HENNET (CISTERN AND PIPING CONTAMINATION)

Plaintiffs also rely on Dr. Hennet to establish that cistern and associated piping across the class are contaminated.[31] Mot. at nn. 98, 118. As with Dr. Kaltofen, without Dr. Hennet, Plaintiffs cannot satisfy commonality or predominance because they cannot establish that class members were injured at all. Dr. Hennet's opinions are not "the product of reliable principles and methods," as required by Rule 702(c), because (i) his methodology is not grounded in data and cannot be tested or validated, (ii) his classification boundary line shifts to absorb contrary data, and (iii) his contamination conclusion is unfalsifiable.

*First*, Dr. Hennet's boundary line—the linchpin of his "impacted" versus "background" classification—is not the product of any testable methodology. He divided St. Croix into zones by drawing a line between the refinery's eastern edge and a nearby EPA monitoring station—and asserts that the disparity in contamination levels on either side (roughly 43 samples "impacted" versus seven "background") validate his line.[32] Hennet Tr. 203-04. It does not. When asked what data he relied on to place his line, Dr. Hennet testified he had "no data close by" and instead relied on anecdotal cues like the "detection of refinery smell," because that was the "best [he] could do

---

[31] Dr. Hennet's analysis does not address the Affected Geographic Area, but rather splits St. Croix into an "impacted" area and a "background area based on an arbitrary line that he drew on the map. Ps. App. 0415 (Hennet Rep. at 9).

[32] Plaintiffs reliance on Hennet for actual contamination of cisterns and piping is misplaced. He did not model actual deposition, (Hennet Tr. 64, 67), and did not test or review any testing of associated piping, (*id*. at 222).

at the time." *Id*. at 156. Pressed further, he conceded he simply "just drew a line" between two reference points. *Id*. at 162. His approach to drawing his boundary line cannot be retraced, tested, or verified by another expert. Asked to identify his analytical method, he offered none—he "just looked at the data." *Id*. at 137. His conclusions are nothing more than an inferential leap: because some contaminants were found in some cisterns and the Refinery Events occurred, the Refinery Events must be to blame. And he did nothing to test statistically these conclusions: no margin of error, no significance testing, no assessment of whether the samples he claims validate his line were representative of the properties they purport to describe. *Id*. at 136–39. Without statistical validation, Dr. Hennet's observations are indistinguishable from sampling variability, selection bias, or coincidence, *see id*. A class certification theory that rests on extrapolating from biased, non-representative samples to thousands of untested properties cannot satisfy Rule 702.

*Second*, Dr. Hennet's boundary line is unreliable under Rule 702 because it shifts to absorb contrary data rather than being falsified by it. *In re TMI Litig.*, 193 F.3d 613, 703–04 (3d Cir. 1999) (excluding testimony where expert shifted weight attributed to criteria after initial scoring to reach conclusion). Dr. Hennet originally classified the Peter's Rest neighborhood as falling outside the zone of Refinery impact—part of his designated "background" area. When Defendants' expert, Dr. Saba, pointed in his rebuttal report to test results showing elevated contamination in Peter's Rest that undercut Dr. Hennet's boundary—Dr. Hennet did not treat those test results as a reason to reexamine his methodology. He treated them as a reason to expand his boundary. He did not redraw his boundary line on his map or recalculate his comparative analysis. Hennet Tr. 120. He simply declared the expansion appropriate and moved on—leaving a revised expert opinion with no disclosed quantitative foundation. *See id.*

*Third*, and perhaps most damning, Dr. Hennet's class-wide contamination conclusion is

35

unfalsifiable. He testified that a negative test result "doesn't mean that the cistern wasn't contaminated and doesn't mean that the cistern doesn't need remediation." Hennet Tr. 172–73. When pressed on the logical implication—why test cisterns at all if no result could disprove contamination—he answered with striking candor: "Exactly in some sense." *Id.* An opinion whose proponent concedes that no evidence could refute it is, by definition, not the product of reliable scientific methodology. *In re TMI Litig.*, 193 F.3d at 703 n.144 ("[I]t is impossible to test a hypothesis generated by a subjective methodology because the only person capable of testing or falsifying the hypothesis is the creator of the methodology.").

### E.    MR. ALVAREZ (CISTERN REMEDIATION)

Plaintiffs offer Ricardo Alvarez to support common proof of cistern damage by calculating "the cost to clean exemplar cisterns, and using these examples, to calculate the cost per square foot or gallon of cistern volume to remediate a cistern." Mot. 23. Mr. Alvarez's opinions fail Rule 702. He lacks a sufficient factual foundation for his cost opinions, his pricing is conflicted and untethered to any market, his formulas are circular and irreconcilable, and his methodology is untested and unvalidated.

*First*, Mr. Alvarez's cost opinions lack a sufficient factual foundation.[33] He conceded that he performed no testing on any of three exemplar cisterns to confirm the presence of hydrocarbon contamination, testifying that he "did not inspect or test" and was merely contracted "to perform the work." Alvarez Tr. 243–44. He further admitted he has no evidence that hydrocarbons actually absorbed into the concrete surfaces of the cisterns at issue. Alvarez Tr. 92-93. Without any site-

---

[33] Plaintiffs also rely on Ms. Fucile-Sanchez's cistern capacity opinions, which are equally unreliable. This opinion rests on plaintiffs' compliance with V.I. building code. Yet she concedes she has no opinion on code compliance, did nothing to verify code compliance, and does not know how many properties predate the code or are exempt. Fucile-Sanchez Tr. 109–14. Her methodology has not been peer-reviewed and she has no known error rate. *Id.* at 122–23. Her dataset has been revised three times, contains duplicate entries, non-residential properties, and errors she cannot quantify. *Id.* at 132–51; 163–65. Mr. Alvarez testified that her methodology is unreliable. Alvarez Tr. 226–27.

specific data confirming that the condition he purports to remediate even exists, his cost estimate is speculation dressed as expertise. Moreover, he conducted no post-remediation testing of the cistern water, so he cannot show his protocol achieved any measurable result: an unverified procedure with unverified outcomes. Alvarez Tr. 112.

*Second*, Mr. Alvarez's methodology is unreliable and inherently biased. Mr. Alvarez conceded that he extrapolated costs from just *three* "exemplar" properties, which he admits are not representative of the thousands of homes in the class, based solely on his own company's pricing. Alvarez Tr. 122–26, 206.[34] While he claims that his proposed remediation protocol of Alconox application followed by steam cleaning is a "consistent and proven methodology" he conceded it is not "followed by anyone else in the field" and that he relied on no peer-reviewed literature to support it. Alvarez Tr. 127–28. He never tested any alternative decontamination approach, so he cannot opine that his protocol is necessary or appropriate rather than a less costly alternative. Alvarez Tr. 128. An expert who has never tested alternatives and validates his own method solely by reference to his own prior use of it (with no confirmation it achieved the desire result) has not employed reliable principles and methods within the meaning of Rule 702. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 157–58 (3d Cir. 2000); *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 748–49 (3d Cir. 2000) (vacating admission of expert testimony where expert methodology was not shown to be "generally accepted" or "bore a logical relationship" to accepted techniques).

### F.    DR. BELL (PROPERTY DAMAGE)

Plaintiffs rely on Dr. Bell's mass appraisal-based calculation of "use effect" on residential properties as their sole support for common class-wide real estate damages. Mot. nn.119, 123–24.

---

[34] This "pricing" is tainted by a direct conflict of interest because Mr. Alvarez owns OSE, the company that performed the work and stands to perform it on thousands more properties. Alvarez Tr. 231. Moreover,  Mr. Alvarez's pricing was set before the work was performed based on his "black box" tool that has never been published, peer-reviewed, or compared to competitive market data. Alvarez Tr. 206–209.

Dr. Bell's opinions fail Rule 702(d) because he does not reliably apply his methodology to the facts of the case. Rather, he applies an unfalsifiable uniform damage model premised on nothing more than his own subjective *ipse dixit* theory to properties Plaintiffs' experts identified as uncontaminated and presents an incomplete work-in-progress rather than a final, testable opinion.

Once Dr. Bell derived his regression-based rental rates, he assumed without any factual support that all 6,263 properties Plaintiffs' expert Stevie Henry identified were contaminated and that the owners were entitled to recover 100% of their rental value for 65.6 months as trespass damages for the "storage of contaminants," including properties that Dr. Kaltofen's own sampling identified as showing no evidence of dioxin or toxic chemical impact.[35]  Bell Tr. 91–92, 137–39, 197–201, 222–24. Without any empirical or factual support, he opines that such 100% rental value loss for his full 65.6-month period is the appropriate measure of damage, regardless of whether the property was occupied or the cisterns were used for potable water. When confronted with evidence that both sales and rentals of properties within the proposed class area occurred after widespread publicity of the Refinery release events, belying his theory of a $0 current rental value, he asserted, again with no supporting evidence, that the buyers and renters must have been uninformed of the release events. Bell Tr. 203–04. Such *ipse dixit* unverifiable theories of damage are wholly inadmissible under Rule 702.

Dr. Bell's prior exclusion in *Wheeler v. Arkema France S.A.* is directly on point. 2024 WL 3371039 (S.D. Tex. July 10, 2024). The court excluded Dr. Bell's class-wide damages opinions at the class certification stage because he proposed regression analyses without having actually built or tested them, leaving the court unable to evaluate reliability. *Id.* at *23. Here, Dr. Bell's reports contain the identical "restricted appraisal report" disclaimer—stating they "can only be understood

---

[35] Bell's model extrapolates from 52 samples to 6,263 properties without any statistical framework he can defend, relying on data whose representativeness he admits he cannot evaluate. *Id*. at 93–96.

in combination with the supporting work file documentation, deposition, and trial testimony"—and he has reserved the right to revise his opinions. Ps. App. 970 (Bell Rpt. at 2, 24, 89). At his deposition, he confirmed that his regressions "are engineered in such a way that they can be modified very easily" and that he can "quickly and relatively easily" adjust his figures to include whatever properties the Court defines as the class. Bell Tr. 73. That is not a completed, reliable methodology; it is an admission that the model remains contingent on rulings yet to be made.

### G.    DR. RUDO (MEDICAL MONITORING)

Dr. Rudo is Plaintiffs' sole expert on class-wide medical monitoring—the only witness offered to justify a thirty-year, eleven-clinical intervention monitoring program administered to over 20,000 individuals at an estimated cost exceeding $519 million. Ps. App. 311 (Rudo Rpt. 30). His opinions fail Rule 702 at the threshold: he lacks the qualifications to render the clinical opinions he offers.

Rule 702(a) requires "specialized expertise" in the domain an expert's opinions address. *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321-22 (3d Cir. 2003) (cleaned up). Dr. Rudo holds no medical degree, has no clinical training, and possesses no authority to prescribe or administer medical tests. Rudo Tr. 116. He nonetheless proposes a monitoring program that includes chest X-rays, EKGs, spirometry, blood panels, and urinalysis, while acknowledging that only "some of the tests are" "geared towards exposure to dioxins and furans," (*id.* at 72; Ps. App. 311 (Rudo Rpt. at 30)), the purportedly at-issue contaminants. When pressed on how these clinical decisions would be made, he deferred entirely: "it's ultimately up to the physicians, what they think." Rudo Tr. 220. He described himself as "just an assistant" to those unnamed physicians, who would bear responsibility for designing the program he asks this Court to certify. *Id.* at 221–22. Dr. Rudo cannot have it both ways: he cannot recommend a specific battery of tests while

39

simultaneously disclaiming responsibility for the clinical judgments that define his own proposal. *See Oddi*, 157–58 (excluding expert cannot identify or defend the specific aspects of his opinion).

Beyond his lack of qualifications, Dr. Rudo's opinion independently fails Rule 702 because he does not follow his own methodology. His report identifies, but does not assess, specific prerequisites for determining whether medical monitoring is warranted.[36] Instead, he proposes the monitoring program to generate the foundational data his own methodology requires. His testimony confirms this inversion: when asked whether he had assessed pharmacokinetic profiles, he speculated that "[t]he results of a medical monitoring questionnaire may give you [that] information" and conceded he "ha[d]n't had to do that yet." Rudo Tr. 205. When asked if he assessed frequency of exposure (*see* Rudo Rpt. at 6) for any class member, he testified that "is something that medical monitoring is crucial, crucial to do in order to have that information." Rudo Tr. 176–77. The ATSDR—which Dr. Rudo repeatedly cites—describes medical monitoring as a mechanism for identifying disease in already-exposed populations, not as a research instrument for establishing exposure or causation. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 154–55 (1999) (excluding expert opinion where the expert's own analytical test was not applied to reach the expert's conclusion); *In re TMI Litig.*, *Cases Consol. II*, 911 F. Supp. 775, 826 (M.D. Pa. 1996), *aff'd sub nom. In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999) (excluding expert whose analysis amounted to "seeking to verify a thesis via circular reasoning").

## IX. CONCLUSION

For the foregoing reasons, undersigned Defendants respectfully request that the Court deny Plaintiffs' motion for class certification and grant all other appropriate relief this Court deems just.

---

[36] *See* Ps. App. 311 (Rudo Rpt. at 6) (listing dose assessment, pharmacokinetic and toxicokinetic profiles, and an assessment of confounding risk factors such as smoking, alcohol consumption, diet, genetics, and occupational exposure).

**Dated:** July 10, 2026                    Respectfully submitted,


*Counsel for Defendant BP*          /s/ Schuyler A. Smith
*Products North America Inc.*       Schuyler A. Smith, Esq. (V.I. Bar No. 1271)
                                    ssmith@hamiltonmillerlaw.com
                                    Jennifer Brooks, Esq. (V.I. Bar No. 1109)
                                    jmiller@hamiltonmillerlaw.com
                                    Chivonne Thomas, Esq. (V.I. Bar No. 1186)
                                    cthomas@hamiltonmillerlaw.com
                                    HAMILTON, MILLER & BIRTHISEL, VI P.C.
                                    150 Southeast Second Avenue, # 1200
                                    Miami, Florida 33131
                                    Telephone: 305-379-3686

                                    /s/ Lori B. Leskin
                                    Lori B. Leskin, Esq. (admitted *pro hac vice*)
                                    lori.leskin@arnoldporter.com
                                    David A. Kerschner, Esq. (admitted *pro hac vice*)
                                    david.kerschner@arnoldporter.com
                                    Robert T. Franciscovich, Esq. (admitted *pro hac vice*)
                                    robert.franciscovich@arnoldporter.com
                                    Rebecca Maller-Stein, Esq. (admitted *pro hac vice*)
                                    rebecca.maller-stein@arnoldporter.com
                                    Matthew F. Medina Esq. (admitted *pro hac vice*)
                                    matthew.medina@arnoldporter.com
                                    ARNOLD & PORTER KAYE SCHOLER LLP
                                    250 W. 55th Street
                                    New York, NY 10019-9710
                                    Telephone: (212) 836-8000

                                    Rhonda R. Trotter, Esq. (admitted *pro hac vice*)
                                    rhonda.trotter@arnoldporter.com
                                    ARNOLD & PORTER KAYE SCHOLER LLP
                                    777 S. Figueroa Street, Suite 4400
                                    Los Angeles, CA 90017
                                    Telephone: (213) 243-4000

*Counsel for Defendant*
*Limetree Bay Terminals, LLC*

/s/   Carl A. Beckstedt III_____
Carl A. Beckstedt III, Esq.
VI Bar No. 684
BECKSTEDT & KUCZYNSKI LLP
2162 Church Street
Christiansted, St. Croix
U.S. Virgin Islands 00820
Tel: (340) 719-8086 / Fax: (800) 886-6831
carl@beckstedtlaw.com

/s/ Nicholas Panayotopoulos_____
Nicholas Panayotopoulos, Esq. (admitted *pro hac vice*)
Ga. Bar No. 560679
Shubhra R. Mashelkar, Esq. (admitted *pro hac vice*)
Ga. Bar No. 475388
WEINBERG WHEELER HUDGINS GUNN
& DIAL, LLC
3344 Peachtree Road, NE
Suite 2400
Atlanta, GA 30326
Tel: (404) 876-2600 / Fax: (404) 875-9433
smashelkar@wwhgd.com

*Counsel for Limetree Bay*
*Refining, LLC, an Intervening*
*Nominal Defendant*

/s/    Carolyn F. O'Connor_____
Carolyn F. O'Connor, Esq.
V.I. Bar Number R2100
WILSON ELSER MOSKOWITZ EDELMAN
& DICKER LLP
7 Giralda Farms,
Madison, NJ 07940
(973) 624-0800
carolyn.oconnor@wilsonelser.com

/s/    Joseph T. Hanlon_____
Joseph T. Hanlon, Esq.
V.I. Bar Number R2099
WILSON ELSER MOSKOWITZ EDELMAN
& DICKER LLP
7 Giralda Farms,
Madison, NJ 07940
(973) 624-0800
joseph.hanlon@wilsonelser.com

42

|  |  |
|---|---|
| *Counsel for Defendants EIG Global Energy Partners, LLC, Limetree Bay Energy, LLC, and Limetree Bay Ventures, LLC* | /s/   Kenneth M. Klemm<br>Kenneth M. Klemm, Esq. (solely with respect to case nos. 21-00253, 00260 & 00261, admitted *pro hac vice*)<br>Adam B. Zuckerman, Esq. (solely with respect to case nos. 21-00253, 00259 & 00260, admitted *pro hac vice*)<br>BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.<br>201 St. Charles Avenue, Suite 3600<br>New Orleans, Louisiana 70170<br>Telephone: (504) 566-5200<br>kklemm@bakerdonelson.com<br>azuckerman@bakerdonelson.com |

/s/   Amy L. Champagne
Amy L. Champagne, Esq. (solely with respect to case nos. 21-00253, 00259 & 00261, admitted *pro hac vice*)
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.
One Eastover Center
100 Vision Drive, Suite 400
Jackson, Mississippi 39211
Telephone: (601) 351-8912
achampagne@bakerdonelson.com

/s/   Adam N. Marinelli
Adam N. Marinelli, Esq.
V.I. Bar No. 1294
BOLTNAGI PC
Merchants Financial Center
4608 Tutu Park Mall, Suite 202
St. Thomas, Virgin Islands 00802-1816
Telephone: (340) 774-2944
amarinelli@vilaw.com