Page 1

Volume I  Pages 1-282

Exhibits 1-18

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS

DIVISION OF ST. CROIX

_____

CLIFFORD BOYNES, et al.,

     Plaintiffs                        C.A. NO.

V.                                     2021-0253

LIMETREE BAY VENTURES, LLC,

et al.

     Defendants

_____

(Full caption on following page)

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

MARCO KALTOFEN, Ph.D., PE

Monday, February 2, 2026, 9:11 a.m.

THE VERVE HOTEL BOSTON NATICK

1360 Worcester Street

Natick, Massachusetts  01760

-----REPORTER:  Sonya Lopes, RPR, CSR-----

Page 2

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

_____
CLIFFORD BOYNES, et al.,
    Plaintiffs                              C.A. NO.
V.                                          2021-0253
LIMETREE BAY VENTURES, LLC,
et al.
    Defendants
_____
HELEN SHIRLEY, et al.
    Plaintiffs                              C.A. NO.
V.                                          2021-0259
LIMETREE BAY VENTURES, LLC,
et al.
    Defendants
_____
MARY L. MOOREHEAD, et al.
    Plaintiffs                              C.A. NO.
V.                                          2021-0260
LIMETREE BAY VENTURES, LLC,
et al.
    Defendants
_____
BEECHER COTTON, et al.
    Plaintiff                               C.A. NO.
V.                                          2021-0261
LIMETREE BAY VENTURES, LLC,
et al.
    Defendants
_____

Page 3

APPEARANCES:

Lambert Zainey Smith & Soso, PLC

    Hugh "Skip" Lambert, Esq.

    Brian J. Mersman, Esq.

    701 Magazine Street

    New Orleans, Louisiana   70130

    504.581.1750

    bmersman@lambertzainey.com

    for Plaintiffs

Weinberg Wheeler Hudgins Gunn & Dial, LLC

    Ronald M. Schirtzer, Esq.

    Nick P. Panayotopoulos, Esq.

    255 South Orange Avenue, Suite 1260

    Orlando, Florida   32801

    407.734.7000

    rschirtzer@wwhgd.com

    npanayotopoulos@wwhgd.com

    for Limetree Bay Terminals, LLC

Page 4

APPEARANCES:


Arnold & Porter Kaye Scholer LLP

        David Kerschner, Esq.

        250 West 55th Street

        New York, New York  10019-9710

        212.836.8214

        david.kerschner@arnoldporter.com

        for BP Products North America


Wilson Elser

        Suna Lee, Esq. (via Zoom)

        7 Giralda Farms

        Madison, New Jersey  07940

        973.735.6026

        suna.lee@wilsonelser.com

        for Limetree Bay Refining, LLC


Fishman Haygood LLP

        Hogan Paschal, Esq. (via Zoom)

        201 St. Charles Avenue, #4600

        New Orleans, Louisiana  70170

        504.586.5252

        for Plaintiffs

Page 5

APPEARANCES:


Baker Donelson

Adam Zuckerman, Esq. (via Zoom)

201 St. Charles Avenue, Suite 3600

New Orleans, Louisiana  70170

504.566.5210

azuckerman@bakerdonelson.com

for EIG Global Energy Partners, LLC;

Limetree Bay Ventures, LLC; and Limetree Bay

Energy, LLC


Michael Sheesley, PC

Michael Sheesley, Esq. (via Zoom)

PO Box 224108

Christiansted, Virgin Islands  00822

340.778.7497

info@usvibar.org

for Versa Integrity Group

Page 6

APPEARANCES:


Laborde Siegel, LLC

        Alexander L. Cochran, Esq. (via Zoom)

        701 Poydras Street, Suite 4800

        New Orleans, Louisiana  70139

        504.561.0400

        acochran@labordesiegel.com

        for Elite Turnaround Specialists, Ltd.


Videographer:  Adam Cerro


Also present:  Brian Moore, Erno Sajo, William

                Huber (via Zoom), Madison Medver (via

                 Zoom), Kerry Miller (via Zoom)

Page 31

Q.   Tell me your opinion regarding the most common sources of dioxins in house dust.

A.   The most common sources of dioxins in house dusts are from combustion byproducts.

Q.   What type of combustion byproducts are we talking about?  Automobiles or something else?

A.   Anything where we have taken carbon-based feedstocks and they've been heated and pyrolized to a certain temperature, usually in the presence of some even trace amount of chlorine.

Q.   Are landfills a common source of dioxins in house dust?

A.   If your landfill is contaminated with dioxins, it may, in fact, be visible in nearby homes.

Q.   Is the burning of diesel fuel a common source of dioxins?

A.   Yes.

Q.   Is the burning of gasoline a common source of dioxins?

A.   Yes.

Q.   Let me show you what I'm going to mark as Exhibit No. 4.

(Publication, Exhibit 4, marked)

Q.   That is a study of dioxins and furans by

Page 32

Walter Shields, Yves Tondeur, Laurie Benton, and Melanie Edwards.  Are you familiar with the publication?

A.  Not this one, no.

Q.  Can I borrow Exhibit 4 back from you for a second?

A.  Sure.

MR. LAMBERT:  Does it have a date?

MR. SCHIRTZER:  I'm sure it does.  2006 is the date.

MR. LAMBERT:  Is there also -- just for the record -- a source where you got that printout?

MR. SCHIRTZER:  It is Chapter 14 from "Introduction to Environmental Forensics Contaminant Specific Guide," pages 293 to 312.

MR. LAMBERT:  Thank you.

Q.  Anyway, if you would turn to Figure 14.2.4. Do you see the list of common sources?

A.  I do.

Q.  And do you agree that that is representative of common sources of dioxins and furans?

A.  I do.

Q.  Is backyard burning a potentially significant cause of elevated dioxin and furans in

D. App. 0008

Page 33

soils and house dust?

A. What do you mean "significant"?

Q. Not inconsequential. Not minor.

A. Yeah. If you have a backyard burner, that house might be subject to dioxins.

Q. Do you agree that it's difficult to predict the source of dioxins and furans found in house dust?

A. In house dust?

Q. Yes.

A. Depends on whether or not you've done the work.

Q. In your experience, do you find that you're able to pinpoint specific levels of dioxins and furans that come from a singular source?

A. A singular source and by specific levels, you mean?

Q. Portions of their detected concentration.

A. So which percentage is ascribable to one particular source?

Q. Correct.

A. Generally, I think that doesn't happen. But I think you could have it in individual cases. I think the finer you look -- meaning if you're not looking nationwide -- if you're looking at

Page 75

found; correct?

A.   Understood.  Yes.

Q.   And what does N mean?

A.   It was not found.

Q.   Okay.  So if I do a search for the Y, I get 47 cells that have Y result.  That sound about right?

A.   It does.

Q.   Okay.  If I do a search for the term N, I get 83 cells.  That sound about right?

A.   I believe you.

Q.   Okay.  So a little less than two times the number of samples tested negative than tested positive.

A.   Yes.  Assuming these numbers are right.  I think they are.

Q.   Okay.

THE WITNESS:  Can we have -- before we do the next question, can we take two minutes?

MR. SCHIRTZER:  Yeah.

THE WITNESS:  Thank you.

VIDEOGRAPHER:  The time is 11:17 a.m. We're off the record.

(A break was taken)

VIDEOGRAPHER:  The time is 11:24 a.m.

Page 116

precipitously.

Q. So is it safe to say that no new dioxin and furan formation was occurring beyond the gates of the Limetree Bay Refinery?

A. The material in the rainout, the dioxin composition was probably fairly static moment to moment.

Q. If you look at the map on page 13 of your report.

A. Yes, sir.

Q. First of all, does this depict the location of PAH detection? Or is this a combination of five factors?

A. This is based on the three factors of whether it was impacted or not.

Q. Okay.

A. Based on the definition that's in the file we've been looking at today.

Q. So it could be DRO or ORO detection. Could be a sheen, or it could be dioxins.

A. Correct.

Q. Will you agree with me that the locations closest to Flare No. 8 are all negative results?

A. Yeah, I would. The closest points all lie to the north of Flare No. 8, so yeah. Seems

Page 117

reasonable that they would be not impacted.

Q.   When you say they lie to the north, they lie to the northwest in the four or five cluster that is immediately above that inlet of water.

A.   Northwest, north, northwest.  It's not the best map for picking that up.  I have a pretty good idea of where Flare 8 is on the refinery grounds.  Yeah.  North, northwest.

Q.   Flare 8 is located by that little peninsula that comes out on the far -- it's, like, three different peninsulas.  It's the thickest one; right?

A.   Yeah.  That's about right.  It's not on the peninsula, but that's about right.

Q.   Does it surprise you that those areas all have no impacts?

MR. LAMBERT:  Object to form.

A.   Looking at the data, no, not particularly. I would have expected more of our impacts to lie in the downwind direction as opposed to the crosswind direction.

Q.   Can you go back to the map on page 12?

A.   Yeah.

Q.   So you've got an overlay here of a variety of things.  But there is a cone section, if you will.  That's Dr. Sajo's initial projection of the

Page 162

for the purposes of developing a background?

A.   I didn't develop a background.  That work had been done mostly by others.  I did collect a number of background samples or upwind samples that are going to be much more reflective of those backgrounds.

I think the background for water supply dioxins is fairly well-known, and it tends to be exceedingly low.  There are going to be exceptions with cisterns because they are so user-specific.

Q.   So an individual cistern user could introduce dioxins and furans that had nothing to do with environmental events; correct?

A.   That's entirely speculative.

Q.   Did you attempt to address any type of probability issues or statistical factors in choosing sites to be tested?

A.   No.

Q.   You didn't consult with a statistician?

A.   No.

Q.   You didn't do any random testing?

A.   That's an interesting turn of phrase.  No. It was not scientific testing in the sense of we didn't produce a grid, then look for what was there at the grid.  We didn't do systematic analyses where

Page 163

we said "All right.  These are the locations where we want to go find samples.  Let's go find someone who's willing to let us do the testing."

It was actually closer to random in the sense that if there were someone who had given us permission to collect a sample, that would be a location where we could.

Q.  Do you know how statisticians define "random sampling"?

A.  I understand how statisticians define "random sampling."  But I also know when I do sampling, I divide it into judgment-based, scientific, grid-based, and random.

And this applies more to -- from my perspective, it's more like random because it's whoever signs up and is willing to participate in the testing program.  So it's certainly not a grid-based system or bias system.

Q.  You'll agree with me that when statisticians refer to random sampling, they don't include samples where people volunteer to be participants.

A.  And you understand that as an engineer, I don't go to sample houses where people have not given me permission.

Page 174

of significant contamination is the US EPA maximum contamination level goal, which is 0, and the US EPA maximum contamination level of 0.3 picograms per liter -- which you say are both lower than 1 component of the definition of analytically significant impact -- low-TEQ greater than 0.1 picogram per liter.  This makes the low-TEQ of greater than 0.1 a conservative measure of contamination.

First -- we've been through this earlier -- the maximum contamination level EPA is 30 picograms --

A.   Yes.

Q.   -- per liter, not 0.3.

A.   Yes.  Miscounted my decimal places on that one.

Q.   So in order to adjust low-TEQ, if your original contemplation was low-TEQ of 0 -- of greater than 0.1 is a conservative measure because it's less than the MCL, wouldn't we need to adjust low-TEQ to a hundred?

A.   No.

Q.   Why?

A.   Because I chose an arbitrary delineation between the highest and the lowest part of my data

Page 175

set.  Then I wanted to see where they were, so the "where" matters.

So whatever number I picked -- knowing it's arbitrary and not based on a standard -- I should still see the same pattern downwind to upwind.  I wanted to know where they are.

Q.  Okay.  So initially, in your report, you thought you were being a conservative measure of contamination because your low-TEQ was essentially three times as high as the MCL.

A.  Yes.

Q.  Okay.  So if you were still going to be conservative with respect to the level of low-TEQ you're going to use for contamination determination -- because, as you've said, there's no regulatory body and no published literature that uses TEQ for acceptable contamination level -- if you're still going to be as conservative, wouldn't we need to adjust it to a hundred?

A.  No, not at all, because I'm not making a medical opinion or toxicity opinion.  I needed it to be reliable based on the detection limits of my data.  And that hasn't changed, even though I got the units wrong for the MCL.

Q.  So you'll agree that at 0 .1 picograms per

Page 176

liter, the ratio of your analytically significant low-TEQ to the US EPA maximum contamination level is approximately one 300ths.

A.  For that low-TEQ arbitrary number, yes.  In fact, it has no medical significance at all.

Q.  I didn't ask about medical significance. I'm just asking about math.

A.  I'm sorry.  I thought you did.  My bad.

Q.  I'm asking just about math.

A.  Okay.

Q.  Your number is one 300ths of the EPA level.

A.  That's correct.

Q.  If we go back to STX master file.  Do you still have that up?

A.  I do.

Q.  How many of your positive results are based on the presence of visible surface sheen when sampled?

A.  I think there were only three when sampled and one that was noted by Exponent.  So that would be the fourth possibility.

Q.  How many were identified as positive based on the presence of dioxins?

A.  We answered this question a little while ago, didn't we?

Page 205

Q. Are you familiar with the concept of probability sampling?

A. Yes.

Q. Is the sampling that's been done here probability sampling?

A. It's not.

Q. Does the sampling that you've done provide us with any confidence level, as that term is used in statistics, that other nontested cisterns within your geographic downwind area were impacted by the release events of 2021?

A. So, to be clear, what we did amount it to is something closer to random sampling, which is certainly scientifically how studies of this kind are done. And they're designed to tell us the areas that have been impacted. They're not designed to flag an individual cistern.

Q. I don't want to belabor the point. But when you say "random," you don't say it the way statisticians say "random"; right?

A. I'm saying there are multiple types of scientific sampling methodologies, and the one employed here is closer to random sampling than any of the others.

Q. Okay. What are the total number of

Page 207

Q.   Okay.   What type of confidence level would a statistician get by taking a sample of 22 out of 8 to 10,000?

A.   I don't know.

Q.   Are you familiar with the term "margin of error"?

A.   I am.

Q.   What type of margin of error would one have if I took a sample 22 out of 8 to 10,000?

A.   I know the error rates of the analytical that I've done.  I don't know the error rates of the modeling or the work that was done by others.  I can only speak to my own work in my own report.

Q.   Are you familiar with the term "selection bias"?

A.   I am.

Q.   What is your understanding of what "selection bias" means?

A.   Meaning that the results are impacted by the nature of the respondents.

Q.   You agree with me that the joint sampling that was done in 2025 which comprises about half of your sampling for water; is that right?

A.   I don't know the exact number, but that sounds close.

Page 208

Q.  Okay.  Those are all plaintiffs in this case; right?

A.  I couldn't tell you.

Q.  You don't know why the locations that were chosen in June and July -- July and August of 2025 were chosen?

A.  I've told you.  I'm a terrible attorney.  I don't know if those individuals were plaintiffs or not.

Q.  All right.  Wouldn't the utilization of people who are the plaintiffs in this -- identified plaintiffs in this complaint be sort of the textbook definition of sampling -- selection bias?

MR. LAMBERT:  Object to form.

A.  I can't speak to the humans that were sampled and their behaviors.  That's just beyond the scope of my work.

Q.  Okay.  How about the concept of sampling error?  Are you familiar with that?

A.  I am.

Q.  What is a sampling error?

A.  So a sampling error is the error introduced by having a sample that was correctly analyzed but may be different from samples that were gathered in a different fashion.

Page 209

Q.   Okay.   Are you able to quantify the magnitude of sampling error in the study that you've done?

A.   Actually, the sampling error or, I should say, the sampling variability is probably fairly high but, in a presence-absence study, less important.

So, in other words, sampling error is unlikely to change someone from petroleum present to petroleum absent and vice versa.

Q.   Is the identification of a low-TEQ of greater than 10 percent a yes-no parameter for the existence of impact from the 2021 release events?

MR. LAMBERT:   Object to form.

A.   I do not understand what you mean by "10 percent."

Q.   Sure.   Okay.   You don't understand what I mean by "less than 0.1"?

A.   No.   You said "less than 10 percent."   And we haven't discussed percentages.

Q.   I'm sorry.   I'll rephrase.

Is the existence of a low-TEQ of less than 0.1 picograms per liter a yes-no parameter for the existence of impact from the 2021 release events?

A.   It was a yes-no for the purpose of dividing

Page 212

everything that was sampled.  And 24 is just the dioxins.

A.  That's correct.

Q.  And with respect to the four blue data points and the one red data point, is there any overlap?  In other words, are the dots on page 24 inclusive of the dots on page -- does 13 include the dots on 24?

A.  13 includes the dots on 24.  24 does not include all the dots on 13.

Q.  Got you.  All right.  Let's talk about your chart on 25.  So of the 30 data point entries on the chart on page 25, is it only four that show TCDD, slash, Fs other than non-detected?

A.  That's correct.

Q.  Okay.  So your mean of 4.23 is based on only four entry points divided by the 30.

A.  It's based on all 30 samples.  Only four are positive.

Q.  Right.  So I take the numbers 2.2, 73.71, 0.56, and 16.5, add them together and divide by 30.

A.  And, technically, you're adding in all those zeros.  But it's the same result.

MR. LAMBERT:  Divide by 4, you mean.

MR. SCHIRTZER:  Divide by 30.

Page 213

THE WITNESS:  It's divide by 30.  That's what we're trying to avoid.

MR. LAMBERT:  I got you.

THE WITNESS:  That the deviser is 30, not 4.

MR. LAMBERT:  I got you.

Q.  So the median would be --

A.  Zero.

Q.  -- not detected.

A.  Correct.

Q.  And then for low-TEQ --

A.  We did this math this morning.

Q.  Yeah.  But we're getting different answers.

A.  Because we did it on the -- when we did it this morning, we did it from this spreadsheet which has new samples.  This is from my report, which is before the new samples came in.

Q.  Okay.

A.  All right.  Got you.

Q.  Do you have a report or something that has new median comparisons?

A.  I haven't done a new report.

Q.  Okay.

A.  I imagine it's quite possible this one might be amended or supplemented.

Page 257

tremendously, isn't it?

MR. SCHIRTZER:  Object to the form.

A.  Yes.

Q.  And I think that's another Dr. Sajo question, isn't it?

A.  I bet it will come up.

Q.  Now, I think that the suggestion has been that when you get some additional information from Exponent, somehow there will be a recalculation of downwind versus upwind.  And I think we've all heard enough about that.

But isn't it fair to say that just basic logic would support the fact that when this refinery accidentally sent material to the flare -- which is not designed to take liquids -- that since the wind is blowing from east to west, that the west end of the island all the way down to Frederiksted -- which is at the far end -- is going to be contaminated?

MR. SCHIRTZER:  Objection.  Form.

A.  Yes.  Because the preponderance of evidence from a lot of different sources backs that up.

Q.  And when you were on the island, do you remember being in Frederiksted?

A.  Yes.

Q.  Do you remember that the cruise ships in

Page 258

Frederiksted were docked at the west end of the island so if they were belching materials from their stacks from bunker, it would blow away from the island?  Correct?

MR. SCHIRTZER:  Object to the form.

A.   That's correct.

Q.   Based on the prevailing winds.

A.   Based on the prevailing winds.

Q.   The trade winds.

A.   Yes.

Q.   Now, some of the dots on this map on page 13 that you've been asked about for hours, isn't it fair to say that the release from the flare during the night -- the middle of the night on February the 4th and then the one that was so visible on May the 12th of 2021, that those don't have defined limits where there's a line; and on one side of the street, there's a contamination, on the other side of the street there's not?  That's kind of silly to make it that simple.  Don't you think?

MR. SCHIRTZER:  Object to the form.

A.   Air doesn't move that way.

Q.   And it's affected by not only the wind but also the topography; correct?

A.   Yes.

Page 259

Q.   Meaning ups and downs in elevations.

A.   Sure.  Stack height.

Q.   Stack height.

A.   Gas temperature.  All these things are important variables.

Q.   Right.  Now these people that are living, we'll call it, downwind from the refinery, there's a bunch of those people -- there's numerous individuals that live in that area; correct?

A.   I understand it's heavily populated.

Q.   Okay.  And, as a matter of fact, the reason you took your background samples to the east side or upwind from the refinery is because you were looking for, quote, "background," meaning something not contaminated by that refinery.  Fair?

        MR. SCHIRTZER:  Object to the form.

A.   Yes.

Q.   And even though there may be some variation in different properties -- property contamination based on cistern use and whether it's porous concrete or a water buffalo, that all of these people have a typical problem of the contamination; correct?

        MR. SCHIRTZER:  Object to the form.

A.   Generally, people have this shared problem,

Page 268

process.

Q.   You talked about not finding each area of contamination in your limited sampling; correct?  Do you remember saying that "I seriously doubt that we've identified every area that's contaminated"?

A.   There are -- what I said was there are likely -- excuse me.  There are likely unsampled homes that have contamination.

Q.   Okay.  Similarly, given the percentage of nonimpacted cisterns, there are likely a significant number of homes that you haven't tested that were nonimpacted; correct?

MR. LAMBERT:  Object to form.

A.   There are likely going to be some homes that were not impacted by our definition, if we were --

Q.   You already know --

A.   Sorry.  I know it's late in the day.  We've been doing really well.  But when you interrupt, it just makes us sit here longer.

So, yes, there are homes that we haven't tested that, when we do test them for various reasons, they may be classified nonimpact.

Q.   And you won't know until you test it.

MR. LAMBERT:  Object to form.

Page 269

A.   Actually, I do know that now.  That's why I answered in the affirmative.  I know that there will be homes that we will test, and they won't meet the impact definition.

Q.   But you don't know which ones.

A.   I know where they're more likely to be found, but I do not know for a specific home.

Q.   I believe I heard you say that most of the dioxins and furans come from the Limetree release.

A.   Did you?

Q.   Did you say that?

A.   I don't recall saying that.

Q.   I thought you said that.

A.   It depends on lots of other parts to that statement, but go ahead.

Q.   Are most of the dioxins and furans that you've identified the result of the Limetree release?

MR. LAMBERT:  Object to form.

A.   Depends on which area you look at.  But we found that the areas that are in the downwind direction were much more likely to be impacted by dioxins and furans.

Q.   But this is a different question.

Are most of the dioxins and furans for the

Page 281

REPORTER'S CERTIFICATE

I, SONYA LOPES, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was properly identified and put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 5th day of February, 2026.

<%11353,Signature%>

Sonya Lopes                          My Commission Expires:

Notary Public                        October 28, 2027

Page 1

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

CLIFFORD BOYNES, ET AL.,

Plaintiffs,

vs.    CIVIL ACTION NO. 2021-0253

LIMETREE BAY VENTURES, LLC,

Defendants.

VIDEOTAPED
DEPOSITION OF:  KENNETH RUDO, PH.D.
DATE:           March 31, 2026
TIME:           9:27 a.m.
LOCATION:       Rudo Residence
                202 Lakeview Drive
                Summerville, SC

TAKEN BY:       Counsel for the Defendant
                Limetree Bay Terminals, LLC
REPORTED BY:    Lauren A. Balogh, RPR
_____

Job No. 7992798

D. App. 0030

Page 72

Q.   So it is or is not a medical monitoring program that you would recommend for exposure to hydrogen sulfide?

A.   You know, I'd have to go back and look, but it was not a focus of what we were looking at.

Q.   That's what I'm trying to get at.

A.   Yeah.

Q.   Isn't this medical monitoring program directed to exposure to dioxins and furans?

A.   It's directed toward our ability to --

(Proceedings were interrupted.)

THE VIDEOGRAPHER:   The time is now 11:19.  We are off the record.

(Off the record.)

THE VIDEOGRAPHER:   The time is now 11:23.  We are back on the record.

BY MR. SCHIRTZER:

Q.   Okay.  Is it accurate, Dr. Rudo, that the medical monitoring examinations identified on page 30 of your report are geared towards exposure to dioxins and furans?

A.   I think some of the tests are.

Q.   Okay.  And is it also accurate that if you were doing the medical monitoring program related to exposure to hydrogen sulfide, that you

Page 116

look because the soup of contaminants for cigarette smoke is so extensive that I don't know if they ever actually went down to the levels that would be necessary to detect the dioxins.

BY MR. SCHIRTZER:

Q.    Have you done any blood testing on any of the potential plaintiffs, actual plaintiffs or potential plaintiffs in this action?

A.    Well, I'm not a medical doctor.  You know, I'd give the old Star Trek answer to that question.  But sometimes even at the toxicology level, we're looking for something that may give us information to give to a physician so that he can protect and do the testing that they need to do. So in that case, it could be something that -- that we ask for or we ask an epidemiologist or a physician, do you think a blood test would be necessary to find this out.  We're relying on other people for information, yes.

Q.    If you're doing a health risk assessment on individuals who may have been exposed to dioxin, isn't determining the existence or nonexistence of dioxins and furans in their blood system part of the baseline analysis?

MS. PETERSEN:  Object to form.

Page 176

systems data --

Q.   Has --

A.   -- going back -- going back -- going back six or seven years to a time before the releases.

Q.   To your knowledge, has anyone done any testing or sampling of public water supplies on St. Croix for dioxins and furans?

A.   I would not necessarily expect it to be on the list, but that list of required chemicals, safe water act asks for -- although I think they got rid of the safe water act or they are trying to.  To me, it depends on have they changed what they require of public water systems from a chemical standpoint.  Are they just chlorine related or have they expanded out to other chemicals.

Q.   Do you know or do you not know if any testing has been done, sir?

A.   I'd have to go and look.

Q.   Is it accurate that you did not do any analysis of frequency of exposure for any members of the proposed class?

MS. PETERSEN:  Object to form.

THE WITNESS:  And that is something

Page 177

that medical monitoring is crucial, crucial to do in order to have that information.  And, once again, because it is so crucial, because the probability of finding out somebody's health either related to the refinery or not, is by doing a medical monitoring analysis where you can ask those questions and find out, well, how long do you take a shower.  Do you take a 15-minute shower.  Do you decide to sing and take a 30-minute shower.  Same thing with bathing.  Are you bathing your child.  If so, how long are you bathing your child.  And then, you know, a lot of that is then comparing it to the dose factors that are, say, put out by EPA in their handbook.

BY MR. SCHIRTZER:

Q.    What other questions would you want to include in a questionnaire if medical monitoring were implemented?

A.    That's a very open question and I would have to go back and look at the first cut that we do with a medical monitoring questionnaire and see what was put in, and determine based on that, and maybe another round of sampling, what the lay of the land is.  In other words, if we have more information -- and this is really the only way I

Page 189

Looking for cause and effect is not necessarily -- if you're looking for exposure and outcome, is not necessarily an end point, you know, that you're looking at -- for -- and for -- especially for research activity.

This is, as I've said many times, a case-by-case-by-case-by-case approach. Medical monitoring, are you going to recommend it for a specific case based on the information from that case? Well, it seems to be that's what ATSDR is saying here. It's case-finding. "Medical monitoring program is case-finding in order to refer individuals for further evaluation and, as appropriate, treatment. Within this framework, medical monitoring includes testing for early biological effect and an assessment of exposure using biological specimens when appropriate. It's provided as a service to individuals in communities where there is believed to be an increased risk of disease from exposure to hazardous substances released into the environment."

That is what I've been talking about all day long. That is what I've been talking about and what I've written. That is what I've looked for in other reports that have been written by

Page 205

BY MR. SCHIRTZER:

Q. Pharmacokinetic and toxicokinetic profiles, have those been done in this analysis?

MS. PETERSEN: Object to form.

THE WITNESS: The results of a medical monitoring questionnaire may give you information on how it's going to behave from a kinetic standpoint of the body. That's very useful for determining if somebody will be at risk down the road. So that one to me is more of a -- an outcome from a medical monitoring program in addition to potentially being a reason for doing it. You might want to go to the literature and see -- see what the kinetics are for that particular chemical, see how it moves, see how it's distributed.

BY MR. SCHIRTZER:

Q. Have you done that?

A. I haven't -- I haven't had to do that yet, no.

Q. Persistence of chemicals in both body and the environment, you've got discussions of that, correct, for dioxins and furans?

A. Correct, yes.

Q. Target organs and documented health effects, what are the targeted organs in this case?

Page 220

be used for the reason you just asked a question about.

Q.    Are you aware that there are health risks associated with routine X-rays?

A.    Routine X-rays?

Q.    Uh-huh.

A.    Yeah, if they drop the lead ball on your foot, lots of things like that.  I've experienced that personally.  But, yeah, I mean, my cousin, she was a radiologist.  She died of -- of cancer from that, you know, so I'm very well aware of that.

Q.    Okay.  You're recommending that people undergo chest X-rays every three years for a 30-year period, correct?

A.    Well, it's ultimately up to the physicians, what they think.  By and large, I found that physicians are very quick on the draw when it comes to, let's get an X-ray.  So they probably feel the cancer risk from that is much less than it probably is.

Q.    Have you made that assessment for this case?

A.    No, I haven't been asked to, no.

Q.    Why are you doing urine heavy metal

Page 221

screenings?

A.    Why am I doing what?

Q.    Urine heavy metal screenings.  How is that related to dioxins and furans?

A.    Well, it's -- it's related to excretion of these chemicals.  It's related to the metabolism of these chemicals.  It would be related to how long has it -- is it taking to get it out of the body.  So there's a lot of information that you can get.  Are there abnormalities from this that maybe could be traced to the kidneys.  These are all things that are possible -- potentially issues.

Q.    In terms of your math, with respect to your proposed medical monitoring program, did you calculate that each -- I'm trying to figure out -- let me do the numbers before I ask this question. For the 22,000 people that you anticipate undergoing these treatments for the next 30 years, did you do any calculation of average age of these people, life expectancy, participation rates, any of that?

A.    That would be determined by the treating physicians.  They may look at somebody for a three-year period and say, well, I don't need to do this anymore or I do need to continue to do

Page 222

this.  I may want to change the focus of the test that I'm doing for this particular end point.  It's -- it's up to them at that point.

Q.  Okay.

A.  I'm just an assistant.

Q.  Are you doing all of these tests regardless of the age of the individuals involved?

A.  Once again, that's up to the treating physician.

Q.  Okay.  So if a newborn baby is involved, they'll undergo the same battery of tests, or you don't know?

MS. PETERSEN:  Object to form.  Asked and answered.

THE WITNESS:  It's up to the physician.

BY MR. SCHIRTZER:

Q.  So this is not a final program to be adopted for medical monitoring, correct?

MS. PETERSEN:  Object to form.

THE WITNESS:  I would say when we develop the -- the first or second draft of this, we would show it to physicians that are going to be treating these folks and see how -- how they would look at it, what changes they might make, what suggestions they may have.

Page 225

Q. Is it -- is your analysis for medical monitoring based on any exposure to cistern water for bathing or watering plants or anything?

A. Exposure to me is the issue that I want to deal with. I want to know how often people bathe or shower, how long they do -- bathe or shower. Do they have a vent open, for example, in the bathroom. But to a great degree, whether or not it continues is a physician's decision. In other words, after I give whatever help I can give to the actual drafting of the questionnaire and the -- just getting it out to people and looking at response rate, then I would turn to, you know, it's returned to the physician for their patient-by-patient evaluation.

Q. So the propriety of continued participation in medical monitoring is going to be based in part on individual survey responses, which is analyzed on a case-by-case basis from one person to the next, correct?

MS. PETERSEN: Object to form.

THE WITNESS: To a certain degree. I mean, we're going to -- we're going to want these folks to understand what they're doing. There might be different points of the process where I

Page 230

CERTIFICATE OF REPORTER

I, Lauren A. Balogh, Registered Professional Reporter and Notary Public for the State of South Carolina at Large, do hereby certify that the foregoing transcript is a true, accurate, and complete record.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal this 20th day of April, 2026 at Myrtle Beach, Horry County, South Carolina.

*Lauren A. Balogh*

Lauren A. Balogh
My Commission expires
March 19, 2030

Page 1

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

CLIFFORD BOYNES, et al,        )
        Plaintiffs,            )
    vs.                        )        CIVIL ACTION FILE NO.
                               )        2021-0253
LIMETREE BAY VENTURES, LLC,)
et al,                         )
        Defendants.            )
HELEN SHIRLEY, et al,          )
        Plaintiffs,            )
    vs.                        )        CIVIL ACTION FILE NO.
                               )        2021-0259
LIMETREE BAY VENTURES, LLC,)
et al,                         )
        Defendants.            )
MARY L. MOOREHEAD, et al,   )
        Plaintiffs,            )
    vs.                        )        CIVIL ACTION FILE NO.
                               )        2021-0260
LIMETREE BAY VENTURES, LLC,)
et al,                         )
        Defendants.            )
BEECHER COTTON, et al,         )
        Plaintiffs,            )
    vs.                        )        CIVIL ACTION FILE NO.
                               )        2021-0261
LIMETREE BAY VENTURES, LLC,)
et al,                         )
        Defendants.            )
                VIDEOTAPED DEPOSITION OF:
                   RICARDO N. ALVAREZ, PE
                      February 3, 2026
                Lee J. Rohn & Associates, LLC
                56 King Street, Third Floor
              Christiansted, St. Croix  00820
                Commencing at 9:02 a.m. AST
              Before Debbie C. Hennings, CCR, RPR

Job No. 7875343

Page 92

Q.    And that citation is to the expert report of Remy Hennet, right?

A.    Yes.

Q.    And that report was issued in this case?

A.    Can you say that again.

Q.    The report you cite, yeah, that was a report in this case, right?

A.    Yes.

Q.    So in that sentence when you use the word "these findings," you're referring to the published articles we just discussed, right?

A.    Yes.

Q.    Okay.  And we agree that those articles describe what can happen under certain conditions, not necessarily what happened here, right?

A.    Under certain conditions.  But also I mention in AWWA and EPA 2022 (sic) that you didn't mention.

Q.    Yeah, yeah, sorry.  I mean, you cited that, I just didn't have any questions about that one.

A.    But these findings also are related to this EPA --

Q.    I see what you're saying, yes.  The -- these findings demonstrate that clause is related to the three articles you cite above?

A.    Right.

Page 93

Q.    And that AWWA and EPA citation, that also deals with what can happen under certain conditions, right?

A.    Under certain conditions with the same similar circumstances, same similar atmosphere environments, whatever, concrete.

Q.    And we have talked about this at length, but you don't have any evidence that concrete on roofs or cisterns in this case absorbed hydrocarbons, do you?

MR. DEMA:  Objection to form.

THE WITNESS:  No.

BY MR. GARTEN:

Q.    Okay.  So what's your basis for stating that surface cleaning is insufficient in this instance?

A.    Based on the fact that from the EPA studies and the consultants from Mr. Dema's research and documentations and the concrete is absorbing material, I can conclude that.

Q.    Okay.  But with no testing to determine whether it happened here?

A.    No testing necessary.

Q.    So it's your position that because something generally can happen, it's okay to assume that it happened here?

MR. DEMA: Objection.  Form.

THE WITNESS:  It's my opinion that if

Page 112

Q.   Okay.   And when you -- after you use the Alconox and you seal the cistern, do you do any testing on the water?

A.   If we do any testing on the water that -- the wash water, the water we use for decontamination or --

Q.   No.   After you -- after you use the Alconox, you steam clean, you seal, you put water back in the cistern --

A.   Okay.

Q.   -- do you test that water?

A.   No.

Q.   So you have no way to know whether Alconox leaches back out?

MR. DEMA:  Objection.  Form.

THE WITNESS:  We know that in combination with the steam cleaning, it mixes with the water that -- it gets diluted in the water, the power wash water that we steam clean it with.

And then that water flows through all the conduits and gets back to the cistern and then we pump it out.  And it's only 1 to 2 percent.  And with one -- with more water that we add to it, it's totally diluted.

BY MR. GARTEN:

Q.   But you have never tested the concrete after

D. App. 0045

Page 122

BY MR. GARTEN:

Q.   So as we sit here today, you don't know or you don't have an opinion on whether metal roofs need to be sealed?

A.   May.

Q.   Okay.  And you included that in your cost estimate for remediating homes without knowing how many roofs are metal?

MR. DEMA:  Objection to form.

THE WITNESS:  I included my cost based on the same conditions of the exemplars properties we did.

BY MR. GARTEN:

Q.   So it's based on the same conditions.  So if a property is in a different condition than one of the exemplars, your cost estimate wouldn't apply?

A.   Probably.

Q.   So would you agree that LANCO Siliconizer, the roof sealant you used on the exemplar properties, is not designed to be applied to metal roofs?

A.   Not necessarily.

Q.   Okay.

A.   I will have to do an inspection of the cover surface, or the roof in this case, prior to giving you an opinion.

Q.   Okay.  Could you use LANCO Siliconizer on

Page 123

galvanized metal?

A.    You can.  I mean, if you want to you can.  But we have to verify that it doesn't have any cracks, because metal can have cracks.  But I prefer take a look specifically of that, you know, surface prior to certify that it's necessary.

Q.    All right.  Let's go down to the next paragraph on 14.  You discuss two sealants that you use.  Sorry, I'll wait for you to get there, I'm sorry.

A.    Yeah, in the -- yeah.

Q.    Okay.  Let's -- walk me through these two sealants.  Let's start with MasterSeal 581; what is that?

A.    Yeah, MasterSeal 581 provides a dense, waterproof barrier, while MasterEmaco 660 enhances the bond strength and flexibility of the coating, ensuring the long-term adhesion even under variable temperature and moisture conditions.

         So one of them is designed to create a barrier and the other one is designed to bond -- the strength, the bond of that barrier to be bonded to the surface.

Q.    Okay.  So I just want to make sure.  So MasterSeal 581 is like the sealant and then the MasterEmaco A660 strengthens up the bond between the sealant and the concrete?

A.    Make sure that the sealant -- that the sealant

D. App. 0047

Page 124

is well bonded, otherwise it will fault.

Q. Okay. And have you used these two materials in other projects in the past?

A. Oh, yes.

Q. Commonly?

A. Same -- the only we did for the Coast Guard I mentioned to you, we use the same combination of both.

Q. Okay. And was there any issue with the application of these sealants?

A. No issues.

Q. Okay. And I should ask, have you inspected the exemplar properties since you decontaminated them?

A. No.

Q. All right. We can go to page 17, Opinion 3. Okay. Just give me one second; I need to look at something. All right.

So your report relies on three exemplar properties. That's 15-E Two Williams, 122-E Whim, and 216 Campo Rico Road, right?

A. Yes.

Q. And those properties are intended to be representative of thousands of homes in the putative class area, right?

MR. DEMA: Objection to form.

THE WITNESS: I don't know. I just was

D. App. 0048

Page 125

contracted to do the decontamination of those three.

BY MR. GARTEN:

Q. Okay. Well, let's flip to page 22.

A. Okay.

Q. Okay. Do you see the middle paragraph, starting with "Accordingly?"

A. Yes.

Q. Accordingly, based on the data provided by the exemplar properties, the average cost to remove contamination from an individual home and cistern in the affected area can be calculated as...?

A. Yeah.

Q. So you're using the three exemplar properties to be representative of cleaning the homes in which you call the affected area?

A. I'm using the three examples units as a base cost in case there are other properties affected by hydrocarbons in the affected areas.

Q. Okay. That are similar to the exemplar properties?

A. Yes.

Q. Who selected the three properties?

A. Mr. Dema's team.

Q. Okay. Why were they chosen?

A. I will have to ask them. I don't know.

Page 126

Q.   So you didn't have a hand in picking them?

A.   No.

Q.   So yeah -- and I think you have covered this. I just want to make sure I'm fully understanding. You're not saying that these three properties are representative of all of the homes in the putative class; that's not what you're saying?

A.   No, I'm not.

Q.   Okay. So this is not like a sample of a larger representation?

A.   It may. If we find similar houses or roof or cistern with the similar conditions, yes.

Q.   Okay. Got it. All right. If we could go to the second paragraph under Opinion 3, the second sentence that starts with "While each." Are you there?

A.   Yes.

Q.   "While each site presented its own structural and logistical conditions, the overall process followed a consistent and proven methodology to ensure effective decontamination, sealing, and restoration of the roof and cistern systems that were impacted by the contamination." Did I read that correctly?

A.   Yes.

Q.   What do you mean by each site presented its own structural and logistical conditions?

Page 127

A.    The structural -- the structural.  Whether the measurements, whether it's the shape -- measurements, shape.  It's the structural.  Dimensions, that's part of the structure.

Q.    Okay.  I was just trying to get an idea of what differences you were referring to in that clause.

A.    Yeah, the other logistical -- yeah, logistical conditions may vary because the location of the structure of the house, you know, the location of the cistern, inside or outside.  That's logistical.

Q.    Okay.  So kind of dimensions, shapes, locations of different attributes, that sort of thing?

A.    Yes.

Q.    Okay.  Did that affect the time that it took or the materials that needed to be used?

A.    Yes.  The time, pretty much time.

Q.    Okay.  Labor cost?

A.    The materials also depends on the size.  Because the bigger the area the more material we need.

Q.    Sure, exactly.  And the bigger the area the more time it takes to clean, right?

A.    Right.

Q.    Okay.  Okay.  And then you use the phrase "consistent and proven methodology," right?  And I assume you mean proven by you in your experience?

Page 128

A.   Yes.

Q.   Okay.  And are you aware of it being followed by anyone else in the field?

A.   No.

Q.   Okay.  And there was no post or mediation testing at the exemplar properties?  I think I asked that before.

A.   No.

Q.   Okay.

A.   Can I add something about proven technology?

Q.   Sure.

A.   Proven means that we have done it before, approved by EPA standards, in other projects.  Similar conditions, concrete impacted with hydrocarbons under EPA.  So, to me, that's proven.

Q.   Yeah, proven in your experience.  I just wanted to make sure you weren't relying on any literature or anything outside that.

A.   Right, right.

Q.   And you have never tested any other alternative decontamination approaches on a cistern, have you?

A.   Alternative such as what?

Q.   Well, your process is to use Alconox and steam clean?

A.   Right.

Page 206

Q.   Yeah.  Sorry, I didn't mean to be confusing.  I guess my question was not about the pricing of the bidder.  It's generally the bidding process?

A.   You mentioned lowest bidder.

Q.   I said the winning bid, yeah.  So what I mean is that in the construction industry, generally jobs are bid to multiple contractors and the client picks which one they want to go with, right?

A.   Right.

Q.   Okay.  But that wasn't done here, right?

A.   I'm not aware of that.

Q.   Okay.  You're not aware of any contractors being contacted about this?

A.   No, I am not.

Q.   In page 19 of your report, the bottom paragraph.

A.   Yes.

Q.   It says, "The total cost represents the actual amount invoiced and paid for environmental remediation services performed by OSE on the three exemplar properties.  It was derived using OSE's standard pricing methods."  Did I read that correctly?

A.   Yes.

Q.   What is OSE's standard pricing methods; what does that mean?

A.    Well, we have a pricing methods of each activity that we have conducted previously.  For instance, we have in my own data of my own, that's how I -- that's how I do my cost estimates based on pricing data that I have that for every future cost proposal I do; I look at it.

So those are the pricing -- pricing methods. That's my data sheet, if you want to call it that way, that I have in internally.  It's like a tool that I use for pricing.

Q.    Kind of like an internal guideline?

A.    Like a tool that I have for pricing and specific traits, specific task, specific locations, so yes.

Q.    Okay.  And those aren't published anywhere, are they?

A.    No.

Q.    Are they -- is it written down?

A.    That's inside my -- no, inside my black box.

Q.    Okay.

A.    That's my secret.

Q.    That's the secret sauce?

A.    Of my company.

Q.    Gotcha.

A.    Because only me does that estimate, cost

Page 208

estimating my company.

Q.   So fair to say they're not peer reviewed?

A.   No.

Q.   And when you were creating your cost proposal here, you didn't compare your cost proposal to the costs charged by anybody else on St. Croix, right?

A.   No.

Q.   Okay.  And you didn't obtain bids or quotes from any other contractors?

A.   Not contractors, but vendors and providers, yes.

Q.   My question was confusing.  Let me rephrase. You didn't ask other contractors to quote the work that OSE was doing?

A.   No.

Q.   Okay.

A.   Let me add something.  Although I did call, for instance, Marco because I don't know how much Marco cost -- price for a tanker.  So I had to call Marco, that particular --

Q.   Uh-huh.

A.   -- I have to be prior to it.  Okay, so I have that cost to put in my cost estimate.

Q.   Yeah, vendors that would work for you?

A.   Vendors for that specific -- right, which I

Page 209

don't do every day.

Q.   Yeah.  But you didn't call, you know, Cistern Pro 123 and say, how much would you charge to do these 15 services?

A.   No, I did not.

Q.   Okay.  On page 20 of your report in the first full paragraph.

A.   Uh-huh.

Q.   First sentence says, "Importantly, as is standard in all commercial and professional service industries, the total project cost also incorporates a reasonable profit margin."  Did I read that correctly?

A.   Yes.

Q.   Okay.  And what was the profit margin here?

A.   The profit margin varies between -- depends on risk.  It can be from 15 percent to 30 percent, between that range.

Q.   What was it here?

A.   Between that range.

Q.   Okay.  But you don't know where it was in that range?

A.   Between 15 percent and 30 percent.

Q.   Okay.  But you don't know what percent you used?

A.   I use it on a different -- on each one a

Page 226

A.   Right, could be.  If the roof is not conducted -- if the roof cleanup or decontamination is out of the scope, maybe I can recompute a cost estimate based on those factors and provide a new cost estimate.

Q.   Looking at the chart on 21, I'm just going to ask some questions about these numbers.  At 15-E Two William, the roof area is 680 square feet, yet the cistern is 28,000 gallons, right?

A.   Yes.

Q.   And then at 122-E Whim, the roof area is much larger, it's 2,248 square feet, right?

A.   Uh-huh, yes.

Q.   But the cistern volume is smaller.  It's 22,852 gallons, right?

A.   Yes.

Q.   Okay.  And then at Campo Rico, the roof area is 1,800 square feet, yet the cistern volume is only 11,310 gallons, right?  And so based on these numbers, the roof area doesn't necessarily correspond to cistern gallon size, right?

A.   Absolutely not, you are correct.

Q.   And so you couldn't reliably estimate the volume of a cistern based on the roof area?

A.   No.

Q.   Okay.  Yeah, you would have to go see what the

Page 227

gallon size of the cistern is, right?

A.   Yes.

Q.   Okay.   And any sort of analysis that tried to estimate what a cistern volume was based on the roof area would be not reliable?

A.   No.   But we can conduct an estimate cost.   And when we do the clean up, we reconfirm the measurements, like we did with one of the properties as different site conditions.

Q.   Of course.   Of course.   I'm just asking about estimating cistern volume size based on roof area.   And we agree you can't do that?

A.   No.   It's very difficult to project a cost here because looking at the real conditions of each house or property, you cannot assume anything.

Q.   Yeah, yeah.   Very different --

A.   Yeah.

Q.   -- very different characteristics of every property?

A.   That was one of our many, many discussions on that because --

Q.   -- of how different all the properties are?

A.   Yeah, exactly.

Q.   Yeah.   Okay.   Opinion 6 on page 22, are you there?

Page 231

Q.   Okay.  And is it fair to say that your report and the opinions you have reached assume that OSE would perform the work you recommend?

A.   Yes.

Q.   Okay.  And you would agree that the greater amount of remediation performed, the greater the revenue to OSE, correct?

A.   Yes.

Q.   And the higher cost of that work, the more money OSE makes, right?

A.   Well, the more revenues of the work performed is -- is fair to say that the more money we make, yes.  More revenue based on the houses remediated.

Q.   Uh-huh.  And so there is an incentive for the cost to be higher?

A.   Incentive on the cost?

Q.   Uh-huh.

A.   To be hired?

Q.   To be higher.

A.   Oh, to be higher.  I don't follow.

Q.   Well, if you have -- if OSE has a financial interest, the greater revenue, if there is more homes that need to be remediated or that remediation is more expensive, then there is an incentive for the remediation estimate to be higher, right?

Page 243

with Limetree Bay Refinery, correct?

A.   Correct.

Q.   And you don't know whether BP personnel were at the refinery during the relevant period in 2021, correct?

A.   Correct.

Q.   And you don't know who from BP was present during any alleged release, correct?

A.   Correct.

Q.   So your role here is truly limited to proposed remediation methods, not causation, correct?

A.   Remediation, yes, correct.

Q.   And you cannot determine whether any particular cistern is contaminated without inspecting it or testing it, correct?

MR. DEMA:  Objection.  Form.

THE WITNESS:  Can you repeat that question again.

BY MS. THOMAS:

Q.   Sure.  You cannot determine whether any particular cistern is contaminated without inspecting it or testing it, correct?

MR. DEMA:  Objection to form.

THE WITNESS:  I cannot answer that question.

BY MS. THOMAS:

Q.   Why?

Page 244

A.   Because I don't -- I don't know the basic of your question.  I was contracted to do decontamination on the cistern, on a roof, that according to the -- some documents, EPA and some consultants from Dema's office contained contamination in their surfaces.  That's all I can say.

Q.   So in determining the contamination to the surfaces, wouldn't you have to inspect or test?

A.   I did not inspect or test.  I was to perform the work.

Q.   Would you agree with me that what happens in one cistern does not dictate what happens in another cistern, correct?

MR. DEMA:  Objection.  Form.

THE WITNESS:  I don't agree with you.

BY MS. THOMAS:

Q.   How would you correct that statement?

A.   Based on the EPA studies and other consultant studies.

Q.   So in the reverse, you would say what happens in one cistern happens in another cistern?

MR. DEMA:  Objection.  Form.

THE WITNESS:  Based on the EPA studies and the consulting studies, I perform my work.

BY MS. THOMAS:

Page 262

Q.   However, for each of those categories, if hydrocarbon contamination were deposited on those roofs, do they all have to be decontaminated?

A.   Yes.

MR. DEMA:  No further questions.

FURTHER EXAMINATION

BY MR. GARTEN:

Q.   This is -- I'll just ask a couple of questions on that last line of questioning.  You said that metal roofs would need to be decontaminated.  What is that based on?

A.   Based on inspection, individual inspections.

Q.   Okay.  Sorry.  I mean the basis for your statement that they need to be decontaminated, what is that based on?

A.   Would be based on individual inspection.  I cannot -- I cannot give you a broader opinion on each metal -- I have to inspect each individual metal roof.

Q.   So you don't know whether metal roofs in the so-called affected area need to be decontaminated; you need to see the roof first?

A.   Right, yes.

Q.   And you don't have any scientific literature that hydrocarbons sorb to galvanized metal, do you?

A.   No, I don't.

Page 263

Q. Okay. And you don't have any testing showing that steam cleaning is required to remediate a galvanized metal roof, do you?

A. No, I don't.

Q. Okay. And you don't know whether -- well, you don't know whether metal roofs would need to be sealed or not sealed, right? We covered that earlier. You need to inspect each one?

A. Yes.

Q. So fair to say you don't know whether metal roofs in the affected area would need to be decontaminated?

A. I don't know.

Q. Are you an OSHA expert?

A. No, I'm not.

MR. GARTEN: That's all the questions I have right now.

COURT REPORTER: Anybody else?

MR. DEMA: Done.

MR. GARTEN: Good.

THE VIDEOGRAPHER: The time is 5:51 p.m. This concludes the deposition of Ricardo Alvarez.

(Proceedings concluded at 5:51 p.m.)

                          * * *

Page 265

CERTIFICATE

I, Debbie C. Hennings, CCR, RPR, residing in the state of U.S. Virgin Islands, do hereby certify:

That I did appear as court reporter for the above-entitled matter, which was held on February 3, 2026.

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 265 represent a true, complete, and accurate transcript of the proceedings.

The witness did reserve the right to read and sign the transcript.

Signed this 9th day of February.

_____
Debbie C. Hennings, CCR, RPR
NCRA 833411
Licensed in GA, AL, ID, CO
GOLKOW, a Veritext Division
www.golkow.com
(877)370-3377

WILLIAM HUBER, Ph.D.

Page 1

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

- - -

                     :  Civil Action
                     :  Nos.
                     :
CLIFFORD BOYNES and    :  2021-0253
                     :
HELEN SHIRLEY and     :  2021-0259
                     :
MARY L. MOOREHEAD and   :  2021-0260
                     :
BEECHER COTTON, et    :  2021-0261
al.,                   :
                     :
       Plaintiffs,     :
                     :
         v.               :
                     :
LIMETREE BAY VENTURES, :
LLC, et al.,         :
                     :
       Defendants.     :

- - -

March 13, 2026

- - -

Videotape expert deposition of WILLIAM HUBER, Ph.D., taken pursuant to notice, was held at the law offices of BERGER MONTAGUE, P.C., 1818 Market Street, Suite 3600, Philadelphia, Pennsylvania, beginning at 9:11 a.m., on the above date, before Kimberly A. Cahill, a Federally Approved Registered Merit Reporter and Notary Public.

- - -

GOLKOW, A VERITEXT COMPANY
877.370.3377 ph| 917.591.5672
deps@golkow.com

WILLIAM HUBER, Ph.D.

Page 85

recall him explaining, that is why he reported his results as these tiny, tiny fractions of the total mass of contamination.

If you take a look at some of the keys on later figures, I think you're looking at numbers as small as 10 to the minus 15 and that's -- the reason for that is that he doesn't know --

Q.    Correct.

A.    -- the total mass or ultimately the actual amount of deposition on the surface.

Q.    Right.  He was unable to determine the amount of deposition.

A.    Right.

Q.    And he didn't quantify deposition philosophy, droplet rates, or even which chemicals were released; correct?

A.    As far as I know, that's right.

Q.    So you took his air modeling and assumed that that was a proxy for

WILLIAM HUBER, Ph.D.

Page 86

deposition.

A.    That's what I wrote, that's correct.

Q.    Despite the fact that he did not make any determination of that.

A.    That's correct, but as I said, I discussed that with him concerning the reasonableness of that assumption.

Q.    But he was unable to prepare any reliable deposition analysis.

A.    I have not seen one.

Q.    So he plotted -- Dr. Sajo provided you this data which you plotted onto your map; correct?

A.    Correct.

Let me modify that.  What you're seeing on this map is a summary of the data that Dr. Sajo provided.  You might recall from some of my later figures and from some of his figures that what he provided were these hourly averages and quarterly averages, so I had to combine them into the plume maps that

WILLIAM HUBER, Ph.D.

Page 87

you're seeing here in figure 1.

Q. Correct. And you cannot and did not test his assumption -- or your assumption that this is a proxy for deposition, his air modeling; correct?

A. Correct, because I have no deposition data.

Q. Right. And are you aware of any peer-reviewed studies that show that modeled air concentrations can reliably predict ground deposition of refinery byproducts?

A. That's so narrow that the answer definitely is, no, I've not read any such paper.

Q. And you don't cite any in your report --

A. No.

Q. -- correct?

A. Correct.

Q. Did you do any testing to determine how any errors in Dr. Sajo's model would affect your results?

A. As I described earlier, the

WILLIAM HUBER, Ph.D.

Page 112

testimony from the preliminary injunction proceedings about the retention of Sedgwick or its protocols that were followed?

A.    No.

Q.    So you don't have any knowledge of what Sedgwick was actually retained to do.

A.    Not explicitly, only what I've gleaned from what they did do.

Q.    And you don't have any knowledge of what training the Sedgwick adjusters had?

A.    That's correct.

Q.    Or whether their determinations were scientifically valid or verified?

A.    I can answer that one fairly positively by saying I've seen no evidence of any kind of verification. What I see is individual claims adjusters reporting what they saw in the field and what they did in the field.

Q.    And you have no knowledge of

WILLIAM HUBER, Ph.D.

Page 124

form.

BY ATTORNEY ADLER:

Q.    -- as defined in your report.

ATTORNEY LAMBERT:  Object to form.

THE WITNESS:  I made no such assumption.  Again, my definition of damage is that -- I would classify this property, as identified by the file number in the left-hand corner, as damaged in the sense that this report has resulted in Sedgwick recommending a positive dollar amount be paid to the property owner.  That's all.

I'm making no opinion about whether we're actually looking at oil.  I'm making no opinion about whether the claims adjuster knew what they were doing or not.  I am accepting this for what it is.

BY ATTORNEY ADLER:

WILLIAM HUBER, Ph.D.

Page 157

Q.    But your predictions of more likely than not doesn't demonstrate any contamination or damage at any specific property; correct?

ATTORNEY LAMBERT:  Object to form; asked and answered 200 times.

THE WITNESS:  In the same sense as I explained about how risk assessments usually present their information, I'm giving an opinion about an entire geographic area and not about individual properties.

BY ATTORNEY ADLER:

Q.    And to determine anything, you'd have to look at each individual property; correct?

ATTORNEY LAMBERT:  Object to form.

THE WITNESS:  I've already determined something about those properties, namely, my opinion is that if a property lies within the

WILLIAM HUBER, Ph.D.

Page 195

determining that compromise.

Q.    So there are blue dots within your plume; correct?

A.    Right, but just a few.  The vast majority are outside it.

Q.    But the air extent cannot reliably predict where damages may or may not be present.

A.    And you're seeing the extent to that -- the extent of that potential unreliability.  So I'm not saying when I say it's a prediction that there is necessarily -- that necessarily if Sedgwick went in that they would have seen anything and recommended damages. I'm just saying it's more likely than not that they would have.

Q.    So there's no determination by you of any actual damage in any property.

ATTORNEY LAMBERT:  Object to form.

THE WITNESS:  That is correct.

WILLIAM HUBER, Ph.D.

Page 197

knowledge I have.

BY ATTORNEY ADLER:

Q.    Yeah, but you didn't review any testimony or any evidence of what their protocols were or what their directive was in --

A.    That's correct.

Q.    Okay.  And at a minimum, these maps show you have to look at individual properties to determine an actual impact, not just a likelihood of impact.

ATTORNEY LAMBERT:  Object to form.

THE WITNESS:  Since we're distinguishing likelihood of impact from actual impact, I think that's fair.

BY ATTORNEY ADLER:

Q.    And the red dots reference the assessments based on Ms. Wakefield's testimony from the February 4th event; correct?

A.    Correct.

WILLIAM HUBER, Ph.D.

Page 198

Q.    Which was limited to the Clifton Hills neighborhood?

A.    Yes.

Q.    Let's go back to your report and look at page 6.  So you say -- you say that for each incident, you analyze the relationships between the concentrations and the outcome of the investigations.

So the investigations, you mean the May and February investigations as you've defined them in here?

A.    I believe so, and this is in -- for the rest of you, this is the beginning of paragraph 20.

Q.    Correct, yes, page 6, paragraph 20.

And so you did models to show the relationship between Dr. Sajo's air dispersion concentrations and the damage indicators from February and May, the investigations; is that right?

A.    Yes.

Q.    And in doing your analysis,

WILLIAM HUBER, Ph.D.

Page 199

you assumed only air concentrations affected the probability of damages?

ATTORNEY LAMBERT:  Object to form.

THE WITNESS:  Are you reading something here?

ATTORNEY ADLER:  No.

THE WITNESS:  No.  I'm not saying that.

BY ATTORNEY ADLER:

Q.    Okay.

A.    Quite a few physical conditions and parameters likely would have affected the deposition of the contaminants that were released during these incidents.

I am using Dr. Sajo's modeled results as an explanatory variable, understanding that it's not the only thing that can predict or contribute to predicting whether a dot is red or green, and not maintaining in any sense that there was some kind of direct effect between the concentration -- the modeled

D. App. 0075

WILLIAM HUBER, Ph.D.

Page 200

concentration in the air and what was observed on the ground.

I am reporting the results of an analysis of an association between these two that makes it possible to predict whether a dot on the map is red or blue based on Dr. Sajo's results.

Q. Okay. But you did not consider such variations as the structure of a property, the presence of a garage, the presence of a cistern or where it may be, in other words, other sources of visual damage, in doing your analysis.

A. That's basically right, understanding my understanding of what you mean by sources of visual damage would be just additional explanatory variables.

And among those, I contemplated using things like topographic elevation, tree cover, and other elements like that that I know physically might be related to deposition or observable contamination.

WILLIAM HUBER, Ph.D.

Page 201

The problem is that that kind of information just is not available at that level of detail. And a second problem is is that if we threw a lot of such variables, speculative variables, in the sense we're not really sure whether and how well they might help predict something, if we throw lots of those into the model, it actually makes the model less certain and less reliable rather than more certain and more reliable. This is a situation where simpler is better.

Q. But you ignored evidence in this case of other factors that matter in terms of whether a property was actually damaged.

A. What evidence are you referring to?

ATTORNEY LAMBERT: Object to form.

Go ahead.

BY ATTORNEY ADLER:

Q. The things that I was

WILLIAM HUBER, Ph.D.

Page 210

alternative universe Sedgwick had gone to such and such a location and investigated it, they would have recommended compensation. That's what I mean by actually impacted.

I cannot tell you with 100 percent certainty whether any location is actually impacted apart from those that have already been determined by Sedgwick to be impacted.

For all the others, I have to admit that there's uncertainty because I'm making a prediction based on data that can only make less-than-perfect predictions.

So I'm settling for a standard of more likely than not rather than 100 percent certain.

Q. But would you agree with me that in your model, you get a probability of damages even where the modeled concentration was zero?

A. No. That's what I was trying to explain.

WILLIAM HUBER, Ph.D.

Page 249

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, WILLIAM HUBER, Ph.D., have the opportunity to read and sign the deposition transcript.

_____
KIMBERLY A. CAHILL, a
Federally Approved Registered
Merit Reporter and Notary Public
Dated:  March 16, 2026

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Page 1

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

CLIFFORD BOYNES, ET AL.,            CIVIL ACTION
                                    NO. 2021-0253
          Plaintiffs,

vs.
LIMETREE BAY VENTURES, LLC,
ET AL.,
          Defendants.
_____
HELEN SHIRLEY, ET AL.,              CIVIL ACTION
                                    NO. 2021-0259
          Plaintiffs,

vs.
LIMETREE BAY VENTURES, LLC,
ET AL.,

          Defendants.
_____
MARY L. MOOREHEAD, ET AL.,          CIVIL ACTION
                                    2021-0260
          Plaintiffs,

vs.
LIMETREE BAY VENTURES LLC,
ET AL.,
          Defendants.
_____
BEECHER COTTON, ET AL.,             CIVIL ACTION
                                    2021-0261
          Plaintiffs,

vs.
LIMETREE BAY VENTURES, LLC,
ET AL.,

          Defendants.
_____
               VIDEOTAPED DEPOSITION OF
                 ERNO SAJO, Ph.D.
DATE:          February 4, 2026
TIME:          8:42 a.m.
HELD AT:       The Verve Hotel Boston Natick
               1360 Worcester Street
               Natick, Massachusetts  01760
    By:        Sarah J. Miner, RPR, LSR #238

Page 42

and will -- which will alter the general atmospheric meteorology of the island, including updrafts and precipitation and related things.

Q   So would you agree that terrain impacts deposition related to aerosol transport?

A   Terrain is one of the many things that will impact it, yes.

Q   Did you find in this case that the terrain impacted potential deposition in your air modeling study?

A   I did not model deposition, so I cannot say that I found it this way or that way.

Q   Did plume height modeling ever exceed the highest elevation of the mountain range in the northwest section of St. Croix?

MR. LAMBERT:  Object to form.

THE WITNESS:  I did not model the plume height.  There was no supporting data for that.  I geometrically re-created the plume height.

BY MR. SCHIRTZER:

Q   Re-created from what?

A   The height of the plume looking at photographic evidence.

Q   What was the furthest distance from the

Page 87

about the source.

BY MR. SCHIRTZER:

Q   So you can't say with any degree of scientific certainty how much of the aerosol content was deposited over the area identified in your model max, correct?

A   Not the absolute value, but if data becomes available it will become possible to do that.

Q   And what data are you looking for that would allow you to say this much of this type of material fell within 100 yards of the flare versus a mile of the flare versus five miles of the flare?

A   For example, mass flow rate that went through the flare, which could be measured around measurement points in the piping in the flare but we didn't receive information on that.  The speciation, what percentage of this is, for example, heavy oil or light oil or naphtha, for example.

The combustion temperature which may depend on the speciation and the total mass release.  So the mother of all information is the total mass flow rate and the speciation.  The liquid fraction of the substance that was released

Page 89

that would allow me to perform such computations.

Q   Would you agree with me that the maximum amount of initial material before any chemical modification occurred at the tip and beyond the tip of the flare is limited by the content of the coker drum on the date of the events?

A   As far as if the coker drum doesn't have further feed, if there is no further feed.  And if there is not -- no other feed that comes through the knockout drum, then you are characterization would be correct.

Q   And you will agree with me that it is extremely unlikely that 100 percent of the contents of the coker drum made its way past the flare tip?

A   I am a scientist.  Would you please define what "extremely" means?

Q   Less than one chance in a million.

A   Meaning that it is .0000001 percent.  No, I cannot say that because there is no evidentiary data of how much was actually released.  So I cannot opine on the probability.

Q   So even trace amounts potentially -- in your opinion, you can't even say that trace amounts of whatever the materials were remained in the --

A   Well, it is likely --

Page 206

Q   You are not offering any opinions regarding the commonality of impact on soils and plants amongst class members?

A   Only to the extent that atmospheric dispersion would affect it.

Q   But you don't contest that different class members have different properties that some of which have vegetation that is used for consumption, some of which don't, some people have cisterns, some people don't?

A   Only to the extent that such variations do not negate the existence of common exposures to these substances.

Q   And you are not offering any opinion regarding disposition [sic] rates.  Correct?

A   Disposition rates?

Q   Deposition rates?

A   Deposition rates in terms of atmospheric deposition rates, no, I did not calculate the deposition rate, only to the extent that we know the deposition must have occurred where plume concentrations were.

Q   And you are not you have offering any opinion that each of the potential 20-some-odd-thousand or more members of a putative

Page 207

class experienced equal deposition rates of any carcinogens or other harmful chemicals that may have emanated from this event?

MR. LAMBERT:  Object to form.  Go ahead and answer.

THE WITNESS:  Can you repeat this. This was a long question.

BY MR. SCHIRTZER:

Q   You are not offering any opinion as to uniformity of exposure to chemicals emanating from the release events amongst the 20 or more thousand members of the putative class?

MR. LAMBERT:  Object to form.

THE WITNESS:  I offer opinion on the fact that some community members shown by my plume footprints were exposed to chemicals, but not on the uniformity of that.

BY MR. SCHIRTZER:

Q   You are not offering an opinion, for example, that each member of the class suffered exposures equal to or above minimum drinking water levels for dioxins?

A   That is for a toxicologist, not for me.

Q   So in addition to your rebuttal report you

Page 247

C E R T I F I C A T E

I hereby certify that I am a Notary Public, in and for the State of Connecticut, duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and reduced to typewriting under my direction, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor related to either of the parties to said suit, nor of either counsel in said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public the 9th day of February, 2026.

_____
Notary Public
My Commission Expires:
November 30, 2027

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX**

<table>
<tr>
<td>

CLIFFORD BOYNES, MARGARET THOMPSON, DELIA ALMESTICA, EDNA SANTIAGO, GUIDRYCIA WELLS, MARY L. MOORHEAD, SIRDRINA ISAAC-JOSEPH, ESTHER CLIFFORD, ALVINA JEAN-MARIE ILARRAZA, RYAN ALLEYNE, AGNES AUGUSTUS, HELEN SHIRLEY, CRISTEL RODRIGUEZ, JOHN SONSON, ISIDORE JULES, VIRGINIE GEORGE, and MINOR CHILD "O.N.", individually and on behalf of all others similarly situated,

Plaintiffs,

v.

LIMETREE BAY VENTURES, LLC; LIMETREE BAY ENERGY, LLC; LIMETREE BAY HOLDINGS, LLC; LIMETREE BAY PREFERRED HOLDINGS, LLC; LIMETREE BAY REFINING, LLC; LIMETREE BAY TERMINALS, LLC (D.B.A. OCEAN POINT TERMINALS); ARCLIGHT CAPITAL PARTNERS, LLC; ARCLIGHT ENERGY PARTNER FUND VI, L.P.; ARCLIGHT LIMETREE AIV, L.P.; EIG GLOBAL ENERGY PARTNERS, LLC; FREEPOINT COMMODITIES, LLC; BP PRODUCTS NORTH AMERICA, INC.; UNIVERSAL PLANT SERVICES, (VI), LLC; EXCEL CONSTRUCTION AND MAINTENANCE VI, INC.; ELITE TURNAROUND SPECIALISTS, LTD.; PINNACLE SERVICES LLC; VERSA INTEGRITY GROUP, INC.; and NATIONAL INDUSTRIES SERVICES, LLC,

Defendants.

</td>
<td>

**Case Nos.** 1:21-cv-00253; 2021-cv-00259; 2021-cv-00260; 2021-cv-00261

</td>
</tr>
</table>

**EXPERT REPORT OF ROBIN CANTOR, PH.D.**

_____

Robin Cantor

November 7, 2025



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

### 1.    Rum Fungus Litigation

24. Rum fungus grows when ethanol, which is released during the rum aging process, meets moisture. This can occur "sometimes up to a mile away from the actual aging barrel."[30] Rum fungus can stain houses and cars, signs, fruit, and trees, and it collects in cisterns.[31]

25. On April 29, 2013, eight plaintiffs began a class action seeking damages due to the release of ethanol vapors from rum storage facilities in St. Croix operated by Diageo USVI, LLC and Cruzan Viril, Ltd.[32] The plaintiffs alleged that the distillation process caused 'Baudoinia compniacensis', referred to as "rum fungus," to grow on their homes, as well as on vegetation surrounding their homes.[33] The locations of the distilleries at issue are shown in the map above.

26. In mid-2015, the U.S.V.I. Department of Planning and Natural Resources (USVI DPNR) Commissioner-designee Dawn Henry determined that rum fungus was present in Estates Cane Carlton, Williams Delight, Enfield Green and Mt. Pleasant after interviewing residents and inspecting the sites. Several individuals testified in a public forum about their experiences with rum fungus found on "roofs, street signs, vegetation, walls and cisterns."[34]

27. In September of 2019, the court ordered new scientific tests to be conducted on 121 properties as part of the litigation. All prior test results and receipts for mitigation work for fungus removal expenses were ordered to be submitted to the court.[35] A settlement was reached on December 29, 2022.[36]

---

[30] Burns Charest LLP. "Firm Reaches Settlement For Caribbean Residents Suffering with Airborne Infections," Jan. 10, 2023, *available at* https://www.burnscharest.com/headlines/2023/01/10/firm-reaches-settlement-for-caribbean-residents-suffering-with-airborne-infections.

[31] The Virgin Islands Daily News. "Judge orders 'rum fungus' tests of St. Croix properties," Sep. 25, 2019, *available at* https://www.virginislandsdailynews.com/news/judge-orders-rum-fungus-tests-of-st-croix-properties/article_74136dd9-8807-529d-9dd4-6d7729c6c3cb.html.

[32] *Alleyne, et al. v. Diageo USVI, Inc. and Cruzan Viril, Ltd.*, No. SX-13-CV-143, "Memorandum Opinion," Sep. 10, 2018, pp. 3-4.

[33] *Alleyne, et al. v. Diageo USVI, Inc. and Cruzan Viril, Ltd.*, No. SX-13-CV-143, "Memorandum Opinion," Sep. 10, 2018, p. 4.

[34] The St. Thomas Source. "DPNR to Take Action Against Rum Distilleries over Black Fungus," Jul. 9, 2015, *available at* https://stthomassource.com/content/2015/07/09/dpnr-to-take-action-against-rum-distilleries-over-black-fungus/.

[35] The Virgin Islands Daily News. "Judge orders 'rum fungus' tests of St. Croix properties," Sep. 25, 2019, *available at* https://www.virginislandsdailynews.com/news/judge-orders-rum-fungus-tests-of-st-croix-properties/article_74136dd9-8807-529d-9dd4-6d7729c6c3cb.html.

[36] The St. Thomas Source. "Rum Fungus Settlement Reached," Jan. 04, 2023, *available at* https://stthomassource.com/content/2023/01/04/rum-fungus-settlement-reached/.

11



D. App. 0088

Berkeley Research Group

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Individuals who "owned, or rented property in Williams Delight, Estate Cane, Enfield Green, or Estate Diamond as far back as April 29, 2007, could be eligible."[37]

28. Some of the Named Plaintiffs in the instant matter were also involved in the rum fungus settlement. For example, Ryan Alleyne testified that he received a settlement from the Rum Fungus Litigation.[38] Given the injuries alleged in the Rum Fungus Litigation, other properties of the Named Plaintiffs in the instant matter might have been impacted as well. Exhibit 2 below shows Named Plaintiff property locations in the instant matter relative to the eligible estates in the Rum Fungus Litigation.

29. Named Plaintiff Ryan Alleyne was the Class Representative in the Rum Fungus Litigation.[39] He claimed damages for black fungus contamination of his plants, roof, the wooden structure over his fishpond, and his cistern.[40] Mr. Alleyne testified that the black fungus negatively impacted his water quality because the "black stuff that collects on your roof. When rain fall, it end up going down into your cistern."[41] Mr. Alleyne further testified that since the Rum Fungus incidents, he has not successfully had his roof cleaned to get rid of the black fungus. His remediation efforts include painting over the black fungus, attempting to pressure-wash the fungus off, and rainfall.[42] In 2017, Mr. Alleyne painted over the fungus. He testified that he believes the rainfall has since mitigated the fungus, but without testing, this cannot be confirmed.[43]

30. Named Plaintiffs Esther Clifford and Alvina Ilarraza also received settlements from the Rum Fungus Litigation.[44] Ms. Ilarraza lived at a different home during the rum fungus litigation, having moved to 305 Enfield Green in 2018.[45] Plaintiff Ilarraza testified to roof and cistern fungus contamination of her former home, which she explained has not been fully cleaned up and "it's still visible."[46]

---

[37] The St. Thomas Source. "Rum Fungus Settlement Reached," Jan. 04, 2023, *available at* https://stthomassource.com/content/2023/01/04/rum-fungus-settlement-reached/.

[38] Deposition of Ryan Alleyne, Vol. I, March 12, 2025, pp. 46-48.

[39] Deposition of Ryan Alleyne, Vol. I, March 12, 2025, pp. 47. *See also*, *Alleyne, et al. v. Diageo USVI, Inc. and Cruzan Viril, Ltd.*, No. SX-13-CV-143, "Memorandum Opinion," Sep. 10, 2018, p. 1.

[40] Deposition of Ryan Alleyne, Vol. I, March 12, 2025, pp. 36-38.

[41] Deposition of Ryan Alleyne, Vol. I, March 12, 2025, p. 38.

[42] Deposition of Ryan Alleyne, Vol. I, March 12, 2025, pp. 39-40.

[43] Deposition of Ryan Alleyne, Vol I, March 12, 2025, pp. 40-41.

[44] Deposition of Esther Clifford, March 11, 2025, p. 200; and Deposition of Alvina Ilarraza, April 11, 2025, pp. 23-25.

[45] Deposition of Alvina Ilarraza, April 11, 2025, pp. 43-45.

[46] Deposition of Alvina Ilarraza, April 11, 2025, pp. 26-30.


D. App. 0089
Berkeley Research Group

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

31. Exhibit 2 shows that the properties of multiple Named Plaintiffs are in the areas covered by the Rum Fungus Litigation settlement. An individual inquiry would be required to understand if these and other Putative properties were or continue to be affected by the rum fungus contamination.

### Exhibit 2: Named Plaintiff Property Locations in St. Croix
### Compared to Potential Eligible Estates in the Rum Fungus Litigation Settlement



*Notes*:

[1] The red dotted vertical line represents the boundary of the alleged Affected Geographic Area, at -64.74 longitude.

[2] Each blue circle represents a Named Plaintiff's property during the Environmental Events or acquired afterwards. There are 25 total properties indicated on the map. Multiple properties located in the same area are indicated by the darker shaded blue circles. These properties include properties leased/acquired after 2021: Edna Santiago's residence at 107 Estate Cane and Helen Shirley's property at 1Da Estate Blessing.

[3] The orange highlighted Estates are Estate Williams Delight, Estate Cane, Estate Cane South, Estate Cane Valley, Estate Enfield Green, Estate Diamond West, and Estate Diamond East.

[4] The specific estate names were indciated by proximity to the rum factories from the Rum Fungus Litigation.

*Sources*:

[1] Named Plaintiffs' property addresses are sourced from the Named Plaintiff Depositions and Title Reports, prepared by Anita Baron, dated September 19, 2025.

[2] Named Plaintiff property locations are sourced from The Office of Tax Assessor for the U.S. Virgin Islands, Assessor parcel records for St. Croix (Alvarez_Marshall_Phillips_0000026), MapGeo for the U.S. Virgin Islands, and Google Maps. Virginie George's property at 43-Ab Estate Cane is assumed to be the second property located at 43-A Estate Cane in MapGeo for the U.S. Virgin Islands. *See* Deposition of Virginie George, pp. 44-45.

[3] Geographic regions of St. Croix are sourced from GIS Shapefiles of the U.S. Virgin Islands Estates through ESRI and published by the National Geospatial Data Asset of the U.S. Census Bureau (Alvarez_Marshall_Phillips_0000029; Alvarez_Marshall_Phillips_0000030; Alvarez_Marshall_Phillips_0000031; Alvarez_Marshall_Phillips_0000032, Alvarez_Marshall_Phillips_0000033; Alvarez_Marshall_Phillips_0000034).

[4] Estates are selected based on potential eligibility of settlement. *See,* The St. Thomas Source. "Rum Fungus Settlement Reached," Jan. 04, 2023, *available at* https://stthomassource.com/content/2023/01/04/rum-fungus-settlement-reached/.

### 2. Hurricane Maria

32. On September 19, 2017, St. Croix experienced severe damage, including widespread power outages, and destroyed infrastructure because of Hurricane Maria. The center of Hurricane Maria hit just south of St. Croix as a Category 5 storm. The storm caused high storm surge, flooding, extensive damage to



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

buildings and infrastructure, and widespread power outages.[47] The Department of Energy stated that, as of September 21, 2017, the majority of the 25,000 utility customers on St. Croix were without power from Hurricane Maria.[48] As of November 27, 2017, 72.4% of customers on St. Croix remained without power.[49]

33. By March 2, 2018, 99% of customers had their power restored. FEMA reported that power was restored to 90% of customers within one hundred days. However, many homes were still using blue tarps on their roofs.[50] Additionally, FEMA oversaw a program called "Operation Blue Roof" to provide homeowners affected by Hurricane Maria with fiber-reinforced blue plastic sheeting to cover their damaged roofs until permanent repairs could be made.[51] It is unclear how many homeowners took part in this program, and how many have since made permanent repairs. I understand that roof damage and mold contamination are important factors for the water quality delivered by operating cisterns.[52]

34. In 2018, the St. Croix Foundation for Community Development reported that blue tarped roofs were prevalent on the western end of the island of St. Croix a full year after the storms.[53]

---

[47] FEMA. "2017 Hurricane Season FEMA After-Action Report," July 12, 2018, *available at* https://www.fema.gov/sites/default/files/2020-08/fema_hurricane-season-after-action-report_2017.pdf, pp. v and 2; and Pasch, R.J. et al. "National Hurricane Center Tropical Cyclone Report Hurricane Maria," Jan. 4, 2023, p. 7.

[48] U.S. Department of Energy. "Hurricanes Maria, Irma, and Harvey September 24 Event Summary (Report #45)," Sep. 24, 2017, *available at* https://www.energy.gov/sites/default/files/2017/09/f36/Hurricanes%20Maria%20Irma%20and%20Harvey%20Event%20Summary%20September%2024%2C%202017.pdf.

[49] U.S. Department of Energy. "Hurricanes Maria & Irma November 27 Event Summary (Report #79)," Nov. 24, 2017, *available at* https://www.energy.gov/sites/prod/files/2017/11/f46/Hurricanes%20Maria%20and%20Irma%20Event%20Summary%20November%2027%2C%202017.pdf.

[50] FEMA. "Six Months after Two Category 5 Hurricanes Struck, the U.S. Virgin Islands Is Recovering," March 2, 2018, *available at* https://www.fema.gov/press-release/20250602/six-months-after-two-category-5-hurricanes-struck-us-virgin-islands.

[51] FEMA. "Operation Blue Roof Application Deadline Extended in U.S. Virgin Islands," Nov. 4, 2017, *available at* https://www.fema.gov/press-release/20250602/operation-blue-roof-application-deadline-extended-us-virgin-islands.

[52] *See e.g.*, CDC. "Cleaning and Disinfecting Water Cisterns After Floods and Heavy Rains," *available at* https://www.cdc.gov/water-emergency/media/pdfs/cistern-factsheet-eng-H.pdf; University of the Virgin Islands Cooperative Extension Service. "Cistern Health Tips," *available at* https://www.stoppests.org/stoppests/assets/File/cisterntips2.pdf; and Hageskal, G. et al. "Occurrence of moulds in drinking water," *Journal of Applied Microbiology*, Vol. 102(3), Mar. 2007, pp. 774-780, at p. 778.

[53] St. Croix Foundation. "After the Storms: St. Croix Foundation for Community Development: Rebuilding Communities and Nurturing Resiliency," Nov. 2018, *available at* https://www.stxfoundation.org/wp-content/uploads/2018/11/CARE-Fund-Nonprofit-Consortium-Hurricane-Rebuilding_STXFND-Sept-2017-Sept-2018.pdf, at "POST-HURRICANE QUICK FACTS."



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

35. In 2019, an NPR article noted that the mental health of St. Croix residents was also impacted by the earlier hurricanes. After the hurricanes in 2017, many residents started seeking help for mental health, citing the high cost of repair after the storms as a source of stress.[54]

36. In 2017, St. Croix Foundation for Community Development developed and implemented the survey, "Survey on Status of Households Impacted by Hurricanes Irma and Maria on St. Croix." The Foundation collected data from October 14 to December 31 of 2017.[55] The following findings were reported:

- "65% of survey respondents reported that they had mold in their homes."

- "93% of survey respondents said their homes were damaged. 76% had roof damage."

- 65.3% of the responses reported flooding when it rains.

- 72.7% of the responses reported damage to their yard/fence.

- 72% of surveyed residents did not have homeowner's insurance. Of those with insurance, only 25% reported they were able to afford the deductible.[56]

37. The severe impacts of hurricanes on St. Croix are potentially important factors for the condition of individual properties on the west side of St. Croix at the time of the Environmental Events. The lasting impacts of the hurricanes likely will confound the measurement of incremental impacts in the instant matter.

### 3.    Sargassum Bloom

38. Research shows that in recent years Sargassum events have become a prominent phenomenon in the Caribbean region, including the Virgin Islands.[57] A White Paper published in 2021 by the United Nations Caribbean Environment Programme noted the socioeconomic impacts of Sargassum:

---

[54] NPR. "After 2 Hurricanes, A 'Floodgate' Of Mental Health Issues In U.S. Virgin Islands," Apr. 23, 2019, *available at* https://www.npr.org/2019/04/23/716089187/after-two-hurricanes-a-floodgate-of-mental-health-issues-in-the-virgin-islands.

[55] St. Croix Foundation for Community Development. "Survey on Status of Households Impacted by Hurricanes Irma and Maria on St. Croix Summary Report," Jun. 2018, *available at* https://www.stxfoundation.org/wp-content/uploads/2021/12/Individual-Household-Needs-Assessment_2018-St.-Croix-Foundation.pdf, pp. 3 and 34.

[56] St. Croix Foundation for Community Development. "Survey on Status of Households Impacted by Hurricanes Irma and Maria," Jun. 2018, *available at* https://www.stxfoundation.org/wp-content/uploads/2021/12/Individual-Household-Needs-Assessment_2018-St.-Croix-Foundation.pdf, pp. 6, 15, and 17.

[57] *See* e.g., Hamel et al. "Perceived Sargassum event incidence, impacts, and management response in the Caribbean Basin," Marine Policy, Vol. 165, July 2024; and United Nations Environment Programme- Caribbean Environment



D. App. 0092

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

> Sargassum influxes negatively impact human well-being, activities, and livelihoods as well as major sectors of Caribbean Economies. Key sectors impacted include: coastal living and livelihoods, marine transport/ navigation, public health, fisheries and tourism. These impacts are inter-related, with many stemming from one of the key drivers of biophysical impacts – the decay of the sargassum biomass. The production of hydrogen sulphide negatively impacts air quality, results in very unpleasant odours, and prolonged exposure is unhealthy, especially for persons with underlying respiratory conditions. This is detrimental for coastal residents and beach users, whether local or visitors. Beach users who live elsewhere have the option to avoid impacted locations, while residents may be unable to avoid prolonged exposure.[58]

The same study noted public health impacts of Sargassum:

> There have been reports of respiratory problems, nausea, headaches and irritation of the eyes believed to be caused by exposure to high concentrations of hydrogen sulphide in the air. Furthermore, direct contact with Sargassum may cause skin rashes and/or irritation[.][59]

39. Similarly, a study published the results of a survey conducted in the Caribbean in the summer and fall of 2021:

> Of those who attested that they knew people (potentially including themselves) whose health had been affected, many named respiratory and sinus issues, nausea, or headaches associated with decomposing *Sargassum* as the foremost issues. Dermatological complaints associated with physical contact on the beach or in the water were also common, and several people reported ear infections after swimming in *Sargassum*-laden waters. In addition to physical complaints, some respondents discussed mental health issues like anxiety, stress, depression, and uncertainty about *Sargassum*'s potential health implications. A British Virgin Islander summed up the composite nature of potential health threats: "*People having breathing issues, getting headaches, fearing long term effects on themselves and their children. If it* [Sargassum] *turns silver and copper black, what does it do to our lungs*?"[60]

The same article noted:

> Public health concerns and symptoms figured prominently in this study. When accumulations of *Sargassum* begin to decay, bacterial decomposition results in emission of sometimes high levels of hydrogen sulfide and ammonia, toxic gases

---

Programme. "Sargassum White Paper - Turning the crisis into an opportunity," 2021, *available at* https://wedocs.unep.org/bitstream/handle/20.500.11822/36244/SGWP21.pdf?sequence%E2%80%A6.

[58] United Nations Environment Programme- Caribbean Environment Programme. "Sargassum White Paper - Turning the crisis into an opportunity," 2021, *available at* https://wedocs.unep.org/bitstream/handle/20.500.11822/36244/SGWP21.pdf?sequence%E2%80%A6, p. 13.

[59] United Nations Environment Programme- Caribbean Environment Programme. "Sargassum White Paper - Turning the crisis into an opportunity," 2021, *available at* https://wedocs.unep.org/bitstream/handle/20.500.11822/36244/SGWP21.pdf?sequence%E2%80%A6, p. 13.

[60] Hamel et al. "Perceived *Sargassum* event incidence, impacts, and management response in the Caribbean Basin," Marine Policy, Vol. 165, July 2024, 106214, p. 4 (emphasis in original).



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

that can cause a variety of negative health outcomes, including death, in humans and other animals. In the only clinical study specific to physical health effects of *Sargassum* known to the authors at this time, Resiere et al. found that 154 patients exposed to *Sargassum* for at least a week ed various symptoms consistent with monitored hydrogen sulfide levels, including respiratory, dermatological, and neurological complaints. Respondents in our study reported physical and mental health problems consistent with hydrogen sulfide emissions from Sargassum decomposition, though other factors may play a role in some of these complaints. Mental health symptoms like anxiety, depression, and fear have been reported in people whose homes or possessions have been tarnished by the corrosive properties of hydrogen sulfide [.][61]

40. These studies indicate that Sargassum impacts existed in the alleged Affected Geographic Area at the time of the Bennington survey in 2021 and might have confounded the reporting of environmental and public health impacts from the Environmental Events. Similarly, I also understand there was earlier litigation involving releases of "Red Dust" that could be another source of preexisting contamination to properties related to the putative Class.[62]

41. In addition to the illustrative baseline conditions that I noted above, I understand from Dr. Saba's and Dr. Vetrano's reports that there are other notable sources of hydrocarbon and hydrogen sulfide emissions in St. Croix. These sources include the Anguilla Landfill fire, the Anguilla Wastewater Treatment Plant, the Henry Rohslen airport, and the 2010 release from the HOVENSA refinery.[63] These unrelated emission sources further confound any measurement of incremental impact from the Environmental Events.

## IV.    No Single Methodology Can Fit the Broad Scopes of Putative Class Members and Alleged Injuries

42. The putative Class includes diverse groups of Plaintiffs. For resident Plaintiffs it includes homeowners, renters, businessowners, workers, students, and commercial property owners. For non-resident Plaintiffs it includes these same categories and also visitors and tourists.

43. Exhibit 3 shows that alleged or reported damage categories from the Complaint, Named Plaintiffs' depositions, and the Bennington College Survey are diverse. Such diverse injury categories will require the consideration of many different metrics to indicate damages. For example, health damages might

---

[61] Hamel et al. "Perceived *Sargassum* event incidence, impacts, and management response in the Caribbean Basin," Marine Policy, Vol. 165, July 2024, 106214, p. 8.

[62] *Abednego, et al. v. St. Croix Alumina LLC, et al*, No. SX-2009-CV-00571, First Amended Complaint, Dec. 9, 2009, at ¶2911, 2915-2922.

[63] Initial Expert Report of Tarek Saba, Ph.D., Nov. 7, 2025, pp. 11-14; Expert Report of Karen M. Vetrano, Ph.D., Nov. 7, 2025, pp. 10-11.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 16: Timing of Remediation Cleaning Affects Economic Damages**



70. There is also information indicating that many cisterns in the alleged Affected Geographic Area were not affected by the Environmental Events. Exhibit 17 below shows more than 60% of respondents in the Bennington College Survey reported no impact to their cisterns. Of those who reported an impact, the frequency and therefore the potential damage calculation varies substantially and would require an individual inquiry to determine the amounts reliably.

**Exhibit 17: Bennington College Survey Cistern Impacts**

| Survey Question | More than Five Times | Five Times | Four Times | Three Times | Twice | Once | No Reported Impact |
|---|---|---|---|---|---|---|---|
| Cistern Impacted? | | | | | | | |
| Frederiksted | 8.2% | 0.3% | 0.3% | 5.0% | 6.0% | 13.9% | 66.2% |
| Kingshill | 6.5% | 0.0% | 1.1% | 1.1% | 14.0% | 16.1% | 61.3% |

*Notes*:
[1] There are 317 respondents in Frederiksted. There are 93 respondents in Kingshill.
[2] "No Reported Impact" includes N/A values and "Never" responses.
*Source*: Bennington College Public Survey Responses. *See,* BENNINGTON_01886.

### B.    Personal Property and Real Property Diminution

71. There is information indicating that certain types of personal property in the alleged Affected Geographic Area were not affected by the Environmental Events. Several putative Class members

37



D. App. 0095

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

reported no impact to their properties.[87] In addition, Exhibit 18 below shows more than 60% of respondents in the Bennington College Survey reported no impact to their gardens or farms. Of those who reported an impact, the type and frequency and therefore the potential damage calculations vary substantially and would require an individual inquiry to determine the amounts reliably.

**Exhibit 18: Bennington College Survey Reported Personal Property Impacts**

| Survey Question | More than Five Times | Five Times | Four Times | Three Times | Twice | Once | No Reported Impact |
|---|---|---|---|---|---|---|---|
| Garden/Farm Impacted? | | | | | | | |
| Frederiksted | 15.1% | 0.6% | 1.9% | 4.1% | 6.9% | 10.1% | 61.2% |
| Kingshill | 7.5% | 0.0% | 2.2% | 7.5% | 8.6% | 14.0% | 60.2% |

*Notes*:
[1] There are 317 respondents in Frederiksted. There are 93 respondents in Kingshill.
[2] "No Reported Impact" includes N/A values and "Never" responses.
*Source*: Bennington College Public Survey Responses. *See,* BENNINGTON_01886.

72. Using the MLS data for real property sales, I investigated prices before and after the Environmental Events. Exhibit 19 through Exhibit 22 show high variation in the prices per square foot across and within property types. In addition, there is no apparent consistent pattern supporting a PVD impact based on the mean or median values.[88]

---

[87] *See, e.g.,* Declaration of Angelita Tuitt, Sep. 11, 2025, at ¶4, 8, 10, 11; Declaration of Temara Honore, Sep. 29, 2025, at ¶5, 8-11; Declaration of Susan Perales, Oct. 15, 2025, at ¶9, 11, 13; and Declaration of Gordon Corry, Sep. 11, 2025, at ¶4, 9, 10, 12, 14.

[88] I also understand from Mr. Phillips' report that he found no evidence of the at issue residential PVD for the putative Class caused by the Environmental Events. *See,* Expert Report of Trevor Phillips, Nov. 7, 2025, pp. 47-49.



D. App. 0096

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

2016 to 64 in 2023.[92] Hotel occupancy rates rose from 46.6% in 2016 to 54.2% in 2021, before adjusting to 47.2% and 46.2% in 2022 and 2023, respectively.[93] Meanwhile, the total hotel room nights occupied in St. Croix decreased from 192,700 in 2016 to 183,100 in 2023.[94] This information fails to support that stigma led to a general market wide decline in the tourism sector following the Environmental Events.

### C.    Enhanced Health Risks

75. Some putative Class members reported no health impacts from the Environmental Events.[95] In addition, responses to the Bennington College Survey shown in Exhibit 24 indicate that the vast majority of respondents reported no general health impacts and did not need medical assistance in the alleged Affected Geographic Area following the Environmental Events. This further undermines a classwide approach to measuring the health impacts and conducting future monitoring.

---

[92] USVI Bureau of Economic Research. "Cruise Ship Calls – U.S. Virgin Islands, January 2016 to December 2017," *available at* https://usviber.org/wp-content/uploads/2022/07/CS17-updte.pdf; and USVI Bureau of Economic Research. "Cruise Ship Calls – U.S. Virgin Islands, January 2022 to December 2023," *available at* https://usviber.org/wp-content/uploads/2024/07/CS23-DEC.pdf.

[93] USVI Bureau of Economic Research. "Hotel Occupancy Rates, U.S. Virgin Islands, January 2016 to December 2017," *available at* https://usviber.org/wp-content/uploads/2022/07/H17-REVISED.pdf; USVI Bureau of Economic Research. "Hotel Occupancy Rates, U.S. Virgin Islands, January 2021 to December 2022," *available at* https://usviber.org/wp-content/uploads/2024/07/H22-DEC-24.pdf; and USVI Bureau of Economic Research. "Hotel Occupancy Rates, U.S. Virgin Islands, January 2022 to December 2023," *available at* https://usviber.org/wp-content/uploads/2025/06/h23-decR.pdf.

[94] USVI Bureau of Economic Research. "Hotel Room Nights Occupied, U.S. Virgin Islands, In Thousands of Units, January 2016 to December 2017," *available at* https://usviber.org/wp-content/uploads/2022/07/RN17-REVISED.pdf; and USVI Bureau of Economic Research. "Hotel Room Nights Occupied, U.S. Virgin Islands, January 2022 to December 2023," *available at* https://usviber.org/wp-content/uploads/2024/07/RN23-DEC.pdf.

[95] *See, e.g.,* Declaration of Angelita Tuitt, Sep. 11, 2025, at ¶6, 9, 10, 11; Declaration of Temara Honore, Sep. 29, 2025, at ¶8, 9, 11, 12; Declaration of Susan Perales, Oct. 15, 2025, at ¶9, 11, 14; and Declaration of Gordon Corry, Sep. 11, 2025, at ¶7, 9, 10, 15. *See also, e.g.*, Deposition of Virginie George, Apr. 10, 2025, pp. 45, 87.



BRG
Berkeley Research Group

D. App. 0097

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Exhibit 24: Bennington College Survey Reported Health Impacts**

| Survey Question | Yes | No Reported Impact |
|---|---|---|
| Health impacts after May 12th? | | |
|     Frederiksted | 32.2% | 67.8% |
|     Kingshill | 25.8% | 74.2% |
| Health impacts in June? | | |
|     Frederiksted | 17.7% | 82.3% |
|     Kingshill | 19.4% | 80.6% |
| Household medical assistance due to health impacts from Refinery? | | |
|     Frederiksted | 16.4% | 83.6% |
|     Kingshill | 16.1% | 83.9% |

*Notes*:
[1] There are 317 respondents in Frederiksted. There are 93 respondents in Kingshill.
[2] "No Reported Impact" includes N/A values and "No" responses.
*Source*: Bennington College Public Survey Responses. *See,* BENNINGTON_01886.

76. Even for the specific types of health impacts alleged by Plaintiffs, large proportions of respondents reported no impact as shown in Exhibit 25.

**Exhibit 25: Bennington College Survey Additional Reported Health Impacts**

| Survey Question | More than Five Times | Five Times | Four Times | Three Times | Twice | Once | No Reported Impact |
|---|---|---|---|---|---|---|---|
| Eye irritation due to emissions? | | | | | | | |
|     Frederiksted | 30.6% | 2.8% | 4.4% | 12.3% | 10.7% | 5.0% | 34.1% |
|     Kingshill | 26.9% | 2.2% | 6.5% | 9.7% | 10.8% | 3.2% | 40.9% |
| Trouble breathing due to emissions? | | | | | | | |
|     Frederiksted | 28.4% | 2.5% | 8.8% | 11.7% | 10.7% | 6.9% | 30.9% |
|     Kingshill | 22.6% | 2.2% | 8.6% | 9.7% | 15.1% | 7.5% | 34.4% |
| Headaches due to emissions? | | | | | | | |
|     Frederiksted | 29.7% | 3.8% | 6.6% | 10.1% | 10.7% | 7.9% | 31.2% |
|     Kingshill | 30.1% | 0.0% | 6.5% | 10.8% | 7.5% | 6.5% | 38.7% |
| Nausea due to emissions? | | | | | | | |
|     Frederiksted | 23.3% | 2.2% | 5.0% | 7.3% | 10.7% | 9.1% | 42.3% |
|     Kingshill | 20.4% | 0.0% | 6.5% | 10.8% | 8.6% | 3.2% | 50.5% |
| Skin rashes due to emissions? | | | | | | | |
|     Frederiksted | 7.9% | 0.3% | 0.9% | 3.5% | 6.9% | 6.9% | 73.5% |
|     Kingshill | 3.2% | 2.2% | 2.2% | 6.5% | 6.5% | 11.8% | 67.7% |
| Vomitting due to emissions? | | | | | | | |
|     Frederiksted | 5.0% | 0.3% | 1.3% | 2.8% | 6.3% | 6.3% | 77.9% |
|     Kingshill | 2.2% | 1.1% | 2.2% | 5.4% | 5.4% | 6.5% | 77.4% |

*Notes*:
[1] There are 317 respondents in Frederiksted. There are 93 respondents in Kingshill.
[2] "No Reported Impact" includes N/A values and "Never" responses.
*Source*: Bennington College Public Survey Responses. *See,* BENNINGTON_01886.

45



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

77. Regarding the potential for classwide enhanced health risks, there is information that fails to support significant residual contamination from the Environmental Events in the alleged Affected Geographic Area. The Terra Ay Ay Project was a research project supported by the EPA.[96] On the project website, the project is described as an "initiative dedicated to collecting community-sourced data on St. Croix's air, water and soil quality."[97] The project was conducted between 2024 and 2025.[98] The Project prioritized "low-income, high-risk zones" for data collection.[99] Exhibit 26 below shows a source for the target collection area partly overlaps with the areas affected by the Environmental Events as set forth in the Complaint.[100]

---

[96] Terra Ay Ay. "Home," *available at* https://terra-ayay-project.org/.

[97] Terra Ay Ay. "Home," *available at* https://terra-ayay-project.org/.

[98] Terra Ay Ay Environmental Action Group. "Terra Ay Ay Citizen Science Project Data and Analysis Report," Jun. 2025, p. 3. (*hereafter* "Terra Ay Ay Report").

[99] Terra Ay Ay Report, p. 7 (emphasis removed).

[100] Terra Ay Ay Report, p. 7.



D. App. 0099

# E$^x$ponent®

*x*

## Initial Expert Report of Tarek Saba, Ph.D.

*In the matter of*

*CLIFFORD BOYNES, et al., Plaintiffs,*
*v. LIMETREE BAY VENTURES, LLC, et al.,*
*Defendants. (Civil Action No. 2021-0253)*
*HELEN SHIRLEY, et al., Plaintiffs,*
*v. LIMETREE BAY VENTURES, LLC, et al.,*
*Defendants. (Civil Action No. 2021-0259)*
*FRANCIS E. CHARLES, et al., Plaintiffs,*
*v. LIMETREE BAY VENTURES, LLC, et al.,*
*Defendants. (Civil Action No. 2021-0260)*
*BEECHER COTTON, et al., Plaintiffs,*
*v. LIMETREE BAY VENTURES, LLC, et al.,*
*Defendants. (Civil Action No. 2021-0261)*

*In the District Court of the Virgin Islands,*
*Division of St. Croix*

D. App. 0100

E$^x$ponent®

# Initial Expert Report of Tarek Saba, Ph.D.

*In the matters of*

*CLIFFORD BOYNES, et al., Plaintiffs, v. LIMETREE BAY VENTURES, LLC, et al., Defendants. (Civil Action No. 2021-0253)*
*HELEN SHIRLEY, et al., Plaintiffs, v. LIMETREE BAY VENTURES, LLC, et al., Defendants. (Civil Action No. 2021-0259)*
*FRANCIS E. CHARLES, et al., Plaintiffs, v. LIMETREE BAY VENTURES, LLC, et al., Defendants. (Civil Action No. 2021-0260)*
*BEECHER COTTON, et al., Plaintiffs, v. LIMETREE BAY VENTURES, LLC, et al., Defendants. (Civil Action No. 2021-0261)*

*Prepared by:*

Tarek Saba, Ph.D.
Principal Scientist & Office Director
77 South Bedford Street, Suite 350
Burlington, MA 01803

November 7, 2025



Figure 11.    PAH concentration distribution in the cistern and water buffalo samples collected during the 2025 sampling effort by Exponent.  The vertical bars represent the total $PAH_{16}$ concentration found in each sample.

The finding that local sources resulted in elevated PAH concentrations relative to the remainder of the water samples is supported by the following:

- There is high variability in the total $PAH_{16}$ concentrations for the water samples collected from different cisterns or water buffaloes, or both, located on the same property (as demonstrated in Figure 11), inconsistent with a single source impacting the entire property.
- The elevated PAH concentrations presented in Figure 11 (labeled 1 through 4) have variable PAH fingerprints and could not have all originated from a single source or from regional ambient sources because each PAH fingerprint was unique to the property from which the water sample was collected (see Figure 12). In Figure 12, PAH fingerprints for the four water source samples are presented, with the PAH compound listed on the horizontal axis, and the concentration of the compound presented as a vertical bar. One can see that the PAH fingerprints varied among the four water source samples collected from different properties, which means that those PAHs could not have originated from a single source and likely originated from within the properties themselves.

In subsequent sections of this report, I present analysis details of the four properties presented in Figure 11 where the five water samples were collected.



Figure 12.    PAH fingerprints were unique to each property indicating sources from within the properties.

Figure 11 also shows low PAH concentrations that were found throughout many of the water samples collected from cisterns and water buffaloes (total $PAH_{16}$ concentrations up to 0.016 µg/L) and were also found in the laboratory blank samples (total $PAH_{16}$ up to 0.00854 µg/L). The PAH fingerprints in both sets of samples are dominated by naphthalene and its alkylated compounds and phenanthrene (see Figure 13).



Figure 13.    Average PAH fingerprint in the laboratory blank samples and water samples with low total $PAH_{16}$ detections demonstrate that both have similar compounds.

The low total PAH$_{16}$ concentrations are consistent with expected false positives from the lowered detection limits:

- For compounds detected in water samples to be reliable, the concentrations of those compounds need to be three times the concentration found in the blank samples. Indeed, the Ohio Environmental Protection Agency stated:[41]

  *Blank contamination can result in qualification of other results that were in the same field batch as that blank. In some cases, these other results may still be useable and other times the sample results should not be considered valid, largely depending on the concentration in the sample vs. the concentration in the blank. Laboratories often use a factor of three to differentiate a detected compound from background 'noise' present in the system (analytical instrument, etc.). When a result exceeds three times the background noise, it is considered to be positively identified in the sample. We can consider blank contamination as extra 'noise' in the system, since we don't know the source of the contamination, and use this factor of three to help us assess our data. To do so, the sample concentration must be at least three times the blank concentration for us to be confident that analyte is truly present in the sample.*

  The low PAH concentrations detected in the water sources (as presented in Figure 13) are not more than three times that found in the blank samples, and as such, the detections are likely false positives.

- The EPA 2003 Contaminant Candidate List Regulatory Determination Support Document for Naphthalene states, the following:

  *For naphthalene, there are two analytical methods available. EPA Method 524.2 is a well-established, and sensitive, purge and trap gas chromatographic/mass spectrometry (GC/MS) method with a detection limit of **0.04 µg/L**. EPA Method 502.2, a purge and trap method using*

---

[41] https://dam.assets.ohio.gov/image/upload/epa.ohio.gov/Portals/35/guidance/2023-DSW-FieldSamplingManual-AppendixIV.pdf.

> *conventional gas chromatography detectors (PID and ELCD in series),*
> *has a method detection limit of **0.02 μg/L*** (bold emphasis added).

Compared to the lowest detection limit of 0.02 μg/L, the highest naphthalene concentration found in the samples presented in Figure 13 is **0.00825 μg/L**, an order of magnitude lower than the lowest detection limit cited by EPA.

- As part of EPA's 2010 HOVENSA incident oil fingerprint assessment, EPA states, "the detection limit for individual PAH compounds is 1.00 μg/L each."[42] In Figure 13, the highest PAH compound concentration is two orders of magnitude lower than the detection limit used by EPA to determine whether there is a PAH impact.

- Impacts from the former refinery are unlikely to have contributed to the low PAH concentrations because the compounds' makeup of the low PAH detections (LMW PAHs) was reported in many cisterns and water buffaloes that were cleaned after May 2021.  For example, at the 256 Grove Place property, the five water buffaloes that were sampled and reported to have low PAH detections were cleaned every 6 months (see Figure 11).

## 6.1.2    Background Cistern Water PAH Data

Figure 11 demonstrates that the total $PAH_{16}$ concentrations found in the plaintiffs' cistern water samples are within the range of that found in background cistern water samples collected from the eastern side of St. Croix and from St. Thomas.

In St. Croix, the highest background total $PAH_{16}$ concentration in a cistern water sample contained a mix of petrogenic and pyrogenic PAHs (see Figure 14).  The second highest total $PAH_{16}$ concentration in a background cistern water sample was consistent with a pyrogenic PAH profile and was dominated by the presence of naphthalene.  The third highest total $PAH_{16}$ concentration in a cistern water sample was 0.076 μg/L with a mixed petrogenic and

---

[42]  Case Narrative.  2011.  Preliminary Results of GC/MS analysis of water samples for PAH's, TPH and Oil Fingerprint Assessment.  A memo from the analytical section leader (SERAS) to EPA's Work Assignment manager, for twenty-six water samples, dated January 6, 2011.

$E^x$ ™

D. App. 0107

1

                    VIRGIN ISLANDS DISTRICT COURT
                    DISTRICT OF THE VIRGIN ISLANDS
                       DIVISION OF ST. CROIX


CLIFFORD BOYNES, et al          :Case No.:  1:21-00253-WAL-EAH
           Plaintiffs,          :
v                               :
                                :
LIMETREE BAY VENTURES, LLC.,    :
et al,                          :
. . . . . . . . . . . . . . . .
HELEN SHIRLEY, et al,           :Case No.:  1:21-00259-WAL-EAH
           Plaintiffs,          :
v                               :
                                :
LIMETREE BAY VENTURES, LLC, et:
al,                             :
           Defendants.          :
. . . . . . . . . . . . . . . .
FRANCIS E. CHARLES and THERESA:Case No.:  1:21-00260-WAL-EAH
J. CHARLES,                     :
           Plaintiffs,          :
v                               :
                                :
LIMETREE BAY VENTURES, LLC, et:
al,                             :
           Defendants.          :
. . . . . . . . . . . . . . . .
BEECHER COTTON, et al,          :Case No. 1:21-cv-00261-WAL-EAH
           Plaintiffs,          :
v                               :
                                :
LIMETREE BAY VENTURES, et al  :
           Defendants.          :St. Croix, Virgin Islands
. . . . . . . . . . . . . . . . .June 8, 2023


          TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
           BEFORE THE HONORABLE JUDGE WILMA A. LEWIS

D. App. 0108

Q.    And when you say some impacts, what do you mean by that?

A.    Any speck whatsoever.  So the impacts that we saw, it was an oily water mix that would have been released.  So you're talking very, very small specks of -- of material -- of oily water mix.  So if we saw a couple of specks on a home, that was impact.  If we saw a speck on a home, that was an impact.

Q.    Prior to the Sedgwick adjusters arriving, was there a protocol in place for the community outreach teams from terminals and the refinery?

A.    Yes.  So prior to the adjusters arriving, really what -- what we were trying to do was understand the areas of impact.  So the outreach team would go out, they would assess a home, document if they saw any impacts whatsoever so that we can continue to spread our potential area of impact out.

So we were just trying to determine the extent of the -- of the release.  But at no point in time were they providing any numbers or compensation that -- that we would rely on the professionals for.  But just establishing boundaries was all they would do prior to Sedgwick.

Q.    As a part of the protocol for the inspection teams, was there a threshold that was set for them to determine that a property was impacted?

A.    It was not.  So our approach, again, in this situation was a bit different.  We acted out of an abundance of

caution completely.  So if there were any impacts, if I saw two specks on the front of a home, I would assume that we would power wash the whole house.

If there was cisterns, then we would compensate for -- not power wash, compensate for response.  So compensate for power washing, compensate for cleaning of the cisterns.  So any specks, we just made the assumption that we would just take care of the whole house in full.

And when I say take care, that means compensate.  So we were not -- we were not taking samples of every single home.  We just -- out of an abundance of caution, if I saw two specks, then we would compensate for the home to include cisterns.

Q.   So was there testing done in response to the May release?

A.   For the May release, there was a very small set of samples that were taken.  This would have been in the Clifton Hill area very early on, just to get an idea of what we might be dealing with.  Those sample results, again, these are just oil and grease, not necessarily specific to the constituents of whatever was released.

This is just an oil and grease.  There's a lot of things taken care of with oil and grease, but we were just trying to get an idea.  All those results were non-detect to low-detect, and that would have been -- should have been the hardest impacted area.

organization would not go out and attempt to do the function of an adjuster to create a level of compensation.

So once Sedgwick was on site, they started to complete their professional assessments of the homes with the direction that, you know, we're not going to -- they're not going to climb inside every single cistern.  Basically, any impacts on the homes, we're going to compensate for all.

So they were responsible for developing  square footage, one, two cisterns, no cisterns, and then providing a level of compensation for -- for that.  So we transitioned into a professional adjustment firm to provide levels of compensation.

Q.   Other than the response efforts to Enfield Green, what other estates did -- did the response efforts expand to other estates?

A.   I did -- I'm not sure if I can list them all off the top of my head, but essentially the weather that day was heading towards the west-southwest.  So basically, the residents and the estates that were directly west of the facility, those estates were -- were impacted.

Q.   How was it determined whether to go out into a -- a different estate?

A.   Well, the -- what we did was, we actually had people on the ground.  And so the best -- the best input that you can ever get is the input that you can actually see.  So we had people go on the ground, look at the homes directly, see impact

Q. And did this family have access to city water?

A. Yes.

Q. I want to turn to the next page of the family's document and you testified earlier that individuals this -- the individuals would sign-off when the work was complete.

A. Yes. That would be towards the bottom.

Q. Is that what we're seeing here?

A. Yes.

Q. Okay. I want to take you to -- to two other houses. The next place I'd like to take you to is Ms. McKenzie's house in seven A.

A. Yes.

Q. According to the questionnaire does Ms. McKenzie -- did Ms. McKenzie use a cistern?

A. She has a cistern, but she did not use it much.

Q. And did Ms. McKenzie have access to WAPA Water?

A. Yes.

Q. And according to this questionnaire, what was Ms. McKenzie's use of WAPA Water?

A. As her primary source.

Q. And the last place I want to take you to is the house of Concepcion Martinez. According to this survey, does Ms. Martinez use her cistern?

A. No.

Q. And I'm going to the third page of this house

document, even though she did not use her cistern, was it tested?

A. Yes.

Q. And even though her cistern was tested, did she approve having her cistern cleaned?

A. No.

Q. These are just a few examples. But do you recall other instances of families where they did not use their cistern water?

A. Yes, many.

Q. And about how many?

A. I would have to look at the data but if I had to take a guess, do you want -- if you want me to take my best estimate. I would say twenty-five percent of people don't, out of close to two hundred people.

Q. And close to two hundred -- two hundred people, you mean two hundred people total --

A. That we visited, yes.

Q. That you visited. And we saw instances from this examples of people who use city water or WAPA Water as a primary source. Did you see other instances in the field of people who used city water as their primary source of water?

A. A lot of people would use both and a lot would just use the city water because they didn't trust their cistern water. And then, other individuals, it was very much

individual whether they use their city water or cistern water, different preferences.

Q.   And were other homes where individuals decline having their cistern cleaned?

A.   Yes

Q.   Do you know about how many?

A.   I do not.

Q.   Okay.  I'm going to take that document down for a second.  So you also mentioned for documentation a tracking spreadsheet.  Is that right?

A.   Yes.

Q.   Okay.  I'm going to show you what's been marked as Exhibit L.B.T. Two-Eighteen.  Let me know when you have it up on your screen.

A.   Yes, that's a two page.  Right.  There is a tracker, and the other one is a summary.

Q.   You're saying the -- this first page is the summary, and the second page is where the tracking begins?

A.   Right.  So the first page pulled from the second.

MS. CARTER:  Your Honor, at this time, I'd like to move into evidence Exhibit L.B.T. Two-Eighteen.

THE COURT:  Any objection, Counsel?

MR. MILLER:  No, Your Honor.

THE COURT:  Okay.  L.B.T. Two-Eighteen

you, ma'am.

THE COURT DEPUTY:  All rise.

(The hearing adjourned at 6:59 p.m.)

CERTIFICATION

I, Judith Spriggs, court approved transcriber, certify that the foregoing is a correct transcription from the official electronic sound recording of the proceeding in the above-entitled matter.

_____/
Judith Spriggs
Associated Reporters Int'l., Inc.   15th day of August, 2023

Page 1

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

CLIFFORD BOYNES, et al.,          )
                                  )
                    Plaintiffs,   )
                                  )
          vs.                     ) Civil Action 2021-0253
                                  )
LIMETREE BAY VENTURES LLC, et al, )
                                  )
                    Defendants.   )
_____)
HELEN SHIRLEY, et al.,            )
                                  )
                    Plaintiffs,   )
                                  )
          vs.                     ) Civil Action 2021-0259
                                  )
LIMETREE BAY VENTURES LLC, et al, )
                                  )
                    Defendants.   )
_____)
MARY L. MOOREHEAD, et al.,        )
                    Plaintiffs,   )
                                  )
          vs.                     ) Civil Action 2021-0260
                                  )
LIMETREE BAY VENTURES LLC, et al, )
                                  )
                    Defendants.   )
_____)
BEECHER COTTON, et al.,           )
                    Plaintiffs,   )
                                  )
          vs.                     ) Civil Action 2021-0261
                                  )
LIMETREE BAY VENTURES LLC, et al, )
                                  )
                    Defendants.   )
_____)

VIDEOTAPED DEPOSITION OF GLEN RANDALL BELL, Ph.D.
TUESDAY, FEBRUARY 17, 2026

Page 73

anything else that I would like to do as far as demonstrative exhibits.

Q    Nobody has told you about changing the number of properties that they want included in your analysis again?

A    I don't recall any updates other than what's already been discussed within the reports.

Q    Nobody has talked about modifying the proposed class area?

A    Well, they've talked about -- there's always a chance of modification and it has -- the issue generally has been discussed.  And the answer is that I'm -- the reports are -- or the methodologies, the regressions and so forth, are engineered in such a way that they can be modified very easily.

If the Court instructs something to exclude or include, I can quickly and relatively easily make those adjustments.  That's been discussed.

Q    Is there anything else that we haven't discussed that you anticipate addressing at trial?

A    Not that I can think of.

Q    All right.  When were you retained and by whom?

A    I was retained by Mr. Dan Charest, and that was -- I want to say somewhere around the middle of last year, of 2005 [sic].  But I would have to look at the

Page 81

inferential statistics.  And we get the -- all the data from the online sources.  We can download it all from MLS or any number of sources.

And then we look -- we can confirm the data or verify the data and then put clean data in.  And from all the data we can go in various directions with the regressions.  But we're not sampling.

BY MR. SCHIRTZER:

Q    Okay.  But you're using the properties that you've examined or observed --

A    Um-hum.

Q    -- to make -- or to draw conclusions regarding properties that you haven't sampled -- or you haven't observed or inspected?

MS. BENEDICT:  Form.

THE WITNESS:  Right.  That's a better way to put it.  You're not sampling, but you are doing a predictive valuation of the properties that haven't rented.  They haven't rented, so you have to predict what they would rent for.  And you use the properties that have rented to make that accurate prediction.

BY MR. SCHIRTZER:

Q    Whereas, in traditional appraisal, you would go to each property and make an evaluation based on comparison?

Page 87

Q    And are residential properties all single family or are they single family and multifamily?

A    There's condos and apartments, but it's mostly single family.

Q    Did your analysis of the 6,263 properties include analysis of multifamily?

A    It included some multifamily, if I remember right.

Q    You're not observing any opinions as to the actual presence of hydrocarbons and hydrogen sulfide or dioxins on the residential properties, correct?

A    Correct.  That's the environmental engineer's domain.

Q    All right.  All right.  Going to the real estate damage analysis considering a cost, use, risk effect.

When you use those terms, are you referring to the factors for valuing impaired properties identified in USPAP Advisory Opinion Number 9?

A    Yes, USPAP AO 9 is the advisory opinion dealing specifically with environmental situations, which is exactly what we have here.

Q    All right.  Let's talk about any field investigations that you or your staff conducted.

A    Okay.

Q    Did you visit St. Croix in conjunction with this

Page 91

going out?

(A discussion is held off the record.)

THE VIDEOGRAPHER:  We are going off the record at 11:48 A.M.

(A discussion is held off the record.)

MR. SCHIRTZER:  We are going back on.

THE VIDEOGRAPHER:  We are back on the record at 11:49 a.m.

Please continue.

BY MR. SCHIRTZER:

Q    You list a series of extraordinary assumptions.

A    On what page, sir?

Q    On page 26.  The first is that the proposed class properties identified by Stevie Henry and Emily Fucile Sanchez are accurate and correct.

So you're offering no opinion on the accuracy, correct?

A    If we see an inaccuracy from what -- we let them know, but we're relying on them.

Q    Did you do any other analysis or research to vet the accuracy of information being provided by Mr. Henry or Ms. Sanchez?

A    Well, we would get the information from them. We would look at the property cards and rate grid and MLS.  We would rely on what they told us, but if we saw

Page 92

something, we would let them know:  Hey, we are seeing

the other information here; we need this reconciled.

But ultimately we would rely on them.

Q    The next extraordinary assumption is that the environmental data set regarding presence of hydrocarbons, hydrogen sulfide, and/or dioxins set forth by fate and transport expert Dr. Erno Sajo and environmental engineer Dr. Marco Kaltofen are accurate and correct.

So you undertook no effort to check the accuracy of that work, correct?

MS. BENEDICT:  Form.

THE WITNESS:  That's essentially correct.  We are not environmental engineers.  They are, or they are air dispersion experts and environmental experts.  We're not.  We're not going to wander into territory where we don't have expertise.

BY MR. SCHIRTZER:

Q    Did you review their methodology in any way?

A    I'm sorry?

Q    Did you review their methodology?

A    No.

Q    Um, do you think --

A    I'm sorry to interrupt.  We read their reports. And to the extent a layperson can understand it, you

Page 93

know, I would understand it.  But, you know, I'm not in a position to fully understand it or to correct them.  They are the experts in that field and I'm not.

Q    Well, let me ask you a question about specifically Dr. Kaltofen or a series of questions about Dr. Kaltofen.

Dr. Kaltofen took 52 properties total to sample for a variety of hydrocarbons.  Is the use of 52 properties, more than half of which are plaintiffs' in this case, an acceptable statistical method if you're attempting to predict the likelihood of similar characteristics in nonsample properties?

MS. BENEDICT:  Form.

THE WITNESS:  The short answer is I'm not an expertise -- or I'm not an expert, nor do I possess the expertise in environmental engineering to answer that question.

My laymen -- or quasi-laymen response is the law of large numbers is 30 randomly-taken samples.  Anything -- it's the law of large numbers is -- is necessary, at least in the work that we do.

I'm not trying to imply that it applies to him.  But 52 is greater than 30, so I don't see red flags going off.

But again I have to reiterate that I'm not an

Page 94

expert in this field.  So the short answer is I don't know.

BY MR. SCHIRTZER:

Q    When you say the law of large numbers is 30 for random sampling, sampling has to be random for that to occur, correct?

A    Correct.  And also that's inferential statistics.  I think I made a comment earlier about inferential versus descriptive.  I'm more well -- better versed in descriptive statistics, not inferential statistics.

So again I would reiterate I'm not a sampling expert in regards to environmental sampling for sure.

Q    So is it accurate that at this point the only thing you know with respect to the existence of hydrocarbons, hydrogen sulfide, and dioxins, on any of the 6,263 properties in your analysis is that if one of those properties, or more, were sampled by Dr. Kaltofen or the other environmentalists, and those samples identified the existence of hydrocarbons, hydrogen sulfide, or dioxins, that for those properties there is a contamination factor?

MS. BENEDICT:  Form.

THE WITNESS:  The short answer, I don't know. I'm not an environmental engineer.

Page 95

BY MR. SCHIRTZER:

Q    So did you, for the purpose of your analysis, assume that all 6,263 properties had dioxins, hydrocarbons, or hydrogen sulfide deposited in their cisterns?

A    I wouldn't characterize my testimony being as you just suggested.  I would say that I defer to the environmental experts as an underlying assumption of their being correct and in doing my work.

Q    Okay.  But your assignment was to identify real estate damages resulting from the presence of hydrocarbons, hydrogen sulfide, or dioxins on residential properties, correct?

A    Right.  With the underlying assumption that the environmental engineers that we're relying on are correct.

Q    So to be included in the damage calculations that you've done, you're performing, the underlying assumption is each of those properties has the presence of hydrocarbons, hydrogen sulfide, or dioxins in their cisterns?

MS. BENEDICT:  Form.

THE WITNESS:  I would characterize it better in saying that we're relying on the environmental experts being correct.  I'm not the one to designate which

Page 96

properties have what constituents in the properties.  I would defer all of that to the environmental engineers.

BY MR. SCHIRTZER:

Q    And then you say it's an extraordinary assumption -- back on page 26 -- that the estimated cost effects, including Ricardo Alvarez who set forth an estimate on the cost to remediate cisterns, is accurate and correct.

My first question is, is there anybody other than Ricardo Alvarez who identified the cost of cleaning and remediating cisterns?

A    Um, you'd have to ask him.  I don't know.  I know that we're relying upon Mr. Alvarez or Dr. Alvarez. I'm not sure what his credentials are.

But we relied on -- I'll say Mr. Alvarez -- being correct.  That's again an underlying assumption.

Q    And you didn't do any independent investigation to determine if Mr. Alvarez's methodology were reliable?

A    Again, not only did I not, it would be inappropriate because I'm not the person -- I'm not an appropriate expert to do that kind of work.  I know what lane I'm in, and I'm not going to put my credibility on the line by wandering into somebody else's area of expertise.

Q    When you're identifying the real estate damage

Page 119

Q   Dr. Prueitt.

A   I don't remember that.

Q   The toxicologist retained by the defendants in this case.

A   I don't recall reading that report.  Maybe it's there and I missed it, but from memory I don't recall it.

Q   If the EPA has established a guideline of 30 picograms per liter of drinking water, would you agree with me there is a regulatory standard?

MS. BENEDICT:  Form.

THE WITNESS:  Oh, there could be a regulatory standard.  My point is that it's a dated standard because they don't manufacture dioxins anymore.

And, again, I could be totally mistaken.  I'm not an environmental engineer.  My point is that some standards are going -- getting stricter, some are loosening, and some are dated.  I'm just saying that there's a flux.  Ultimately, it comes down to the toxicologists and the environmental engineers to render decisions upon which I rely on.

BY MR. SCHIRTZER:

Q   Did you assume, in performing your analysis, the only source of hydrocarbons, hydrogen sulfide, or dioxins located in cisterns in properties identified by Mr. Henry and Ms. Sanchez was the Limetree Bay emission release

Page 120

events?

A    I didn't make any such assumption.  Liability is not my area of expertise, and fingerprinting constituents and identifying the original source is not my area of expertise.

I'm just saying -- I'm being told there are contaminants in these cisterns that need to be cleaned, and I can measure the real estate damage economics from a loss-of-use over that period of time until they're cleaned.  Where they originate, who the source property is, are all questions for the environmental folks.

Q    Are you aware that both Dr. Sajo and Dr. Kaltofen have acknowledged there are other sources of hydrocarbons, hydrogen sulfide, and dioxins on the island of St. Croix besides the Limetree Bay Refinery emission release events, and have identified no means to distinguish -- well, let me -- so I don't get a compound question.

Are you aware of that?

A    I'm aware that there are other sources -- potential sources of constituents on the island, yes.

Q    The landfill is a potential source for some of these?

A    It could.  That doesn't come to mind, but it could be.  I don't know.

Page 137

methodology -- was the testing that you perform for your hypothesis?

A   Amongst -- amongst other things.  The use effect is one of the most tested and utilized on a daily basis in the real estate market that's been consistent since over the duration of my career, and I expect will extend well beyond my career.  It's just a -- a very much an observed tested premise.

Q   Did you consider alternative approaches, such as impact of less than a hundred percent of market rent for the period of contamination?

A   Yes, I did consider it, yeah.

Q   How did you consider it and where does that show up in your report?

A   Well, I considered it because the -- the deposition of the contaminants encompass -- it went onto the property.  They weren't off the property.  They were on the property.

They covered the -- or had the potential of covering the entirety of the properties, and they affected the fundamental -- the three pillars of inhabitability of residential properties, is that you have water, electricity and sewer.  And it affected the water.  If you knock any one of those three out, you don't have normal use and enjoyment.

Page 138

So there are cases where you have partial loss of use because it doesn't have those elements.  These cases do.

Q    You did not calculate damages for any properties that don't have cisterns, correct?

A    To my knowledge.  I was given properties with cisterns as far as it's been represented to me.

Q    Okay.  And there are properties without cisterns that are within the zone identified by Dr. Sajo for potential deposition of chemicals, correct?

A    There could be.  I would have to ask him or relook at his report.

Q    And you just said that, to your knowledge, your understanding, that the contaminants were deposited all over the properties, not just in a single location?

MS. BENEDICT:  Form.

THE WITNESS:  I said potentially all over the properties, yes.

BY MR. SCHIRTZER:

Q    If deposition of contaminants amounts to unauthorized rental, if you will, or unauthorized occupancy of the property, why limit it to properties with cisterns?

A    Um, that was an instruction that the -- that there was a cleanup cost associated with getting the

Page 139

water back into a clean state. And that was represented to me to be the most direct way of measuring the -- the damage. While the loss of use was going on, while they had contaminants in the cistern, they had the most practical kind of -- fundamental detrimental impact on the properties.

Q   So if a property doesn't use cisterns for the provision of water, which is an essential element of a residential rental, is your understanding that it wasn't impacted?

MS. BENEDICT:  Form.

THE WITNESS:  Not at all.  It could be impacted. I just wasn't asked to calculate it.

BY MR. SCHIRTZER:

Q   Do you understand the logic of limiting it to properties with cisterns versus properties without cisterns?

MS. BENEDICT:  Form.

THE WITNESS:  I didn't formally look at the logic, but it makes sense on its -- from -- its explanation makes sense.

BY MR. SCHIRTZER:

Q   One of the reasons why there is a cost effect is that it's essential to have a source of water for habitability of a residential property, correct?

Page 151

contaminated situations -- residential properties to contaminated residential properties.  That's not apples to rocks.  That's apples to apples.  They might be red apples to green apples, but they are both apples.  They are both a reasonable discussion.

BY MR. SCHIRTZER:

Q   Don't hide behind black boxes of multiple regressions.

A   Sorry.  Go ahead.

Q   At the end of the day, your regression analysis identified rental rates for the island, which you can make adjustments for the number of rooms and amenities, the 12 -- we'll go through the 12 different independent variables and things.

And then you, at the end of the day, take the median of all of that, multiply it -- or the mean of all of that, multiply it by 6,263, and that's your damage number, right?

MS. BENEDICT:  Form.

THE WITNESS:  I don't know that that's exactly what I did.  I have to go back.  But I'm not sure what your question is.

BY MR. SCHIRTZER:

Q   You used a multiple regression analysis to establish essentially an average rental rate that you

Page 152

applied to the other properties that you -- and it allows

for some adjustments based on the amenities of the

property, right?

MS. BENEDICT:  Form.

THE WITNESS:  I use market data to derive

predictive values of rental rates for the properties that

had rented and looked at the duration of time, and then

did the math to compute the total damages, if that's what

you're trying to say.

BY MR. SCHIRTZER:

Q    How different would my result have been if I

simply added up the 215 properties, or the monthly rate

for each of the 215 properties, divide it by 215, and

multiplied it by 6,263?

MS. BENEDICT:  Form.

THE WITNESS:  I don't know without doing the

math.

BY MR. SCHIRTZER:

Q    Last, you had "Don't omit the obvious."

A    I'm sorry.  What?

Q    I'm going through your junk science steps.

A    What page are you on?

Q    I'm on page 2 now.  "Don't omit the obvious."

And you talk about recognizing independent

sources of potential impact in the Hurricane Katrina

Q    Um-hum.

A    Sure.

Q    Does storage of contaminants result in an obligation to pay full rental value?

A    I'm sorry?  What?

Q    You gave the example that it's like the storage of contaminants on the property when you determined that the value for the cost effect was the full rental -- full market value.

A    Um-hum.

Q    Does storage of contaminants result in an obligation to pay full rental value in all situations?

A    I don't know about in all situations, but in this situation it certainly does because, one, you've knocked out of one of the essential utilities, that being specifically clean water.

And, secondly, the contaminants are potentially spread over the entirety of the property, not just -- well, they potentially -- deposition typically comes over the entire property when it comes over.

Q    So if I used a portion of the property -- for example, a backyard shed to store contaminants -- I would pay for the portion of the property that I used, right?

MS. BENEDICT:  Form.

THE WITNESS:  Not necessarily.  I mean, you

Page 198

could -- particularly in inverse situations or trespass situations where you're using a portion of it, you're throwing a wrench in the overall bundle of rights. So I wouldn't say just because you're using a portion, you only owe a portion.

I'll go back to the Bikini Atoll. There were portions of the islands that were below the 15 millirem standard. The calculation was made on the entire island, given the practicalities -- and, you know, situations just like this one where the Nuclear Claims Tribunal agreed with me that it was the entirety of the islands and atolls over the period of time.

BY MR. SCHIRTZER:

Q    Let's talk about your regression analysis. 215 properties?

A    Let me look it up. What page are you on?

Q    I think the chart is on -- is it 51?

A    I think that's right.

Q    Actually, no. I'm looking at -- sorry -- I'm on 47.

A    All right. Okay.

Q    215 properties?

A    Yes.

Q    Relevant time frame -- all the properties were within the proposed class area?

Page 199

A    That's my understanding.

Q    Relevant time frame is 2017 to 2025?

A    I don't know if the dates are on this chart. That's in another part of the report.  I can go look.

Q    Do you agree with me that 90 percent of your properties that go into your regression analysis are post-release rentals?

MS. BENEDICT:  Form.

THE WITNESS:  That -- I never calculated it, but that wouldn't surprise me.

BY MR. SCHIRTZER:

Q    If the market did, in fact, reflect a reduction in use effect in lower rental rates, wouldn't the use of post-release transactions result in a skewing of the reliability of your market rent analysis?

A    That's conceptually possible.  I -- and if it did, that would be a situation where I'm understating damages.

Q    You had the ability to look not only at rental but also at sales and utilize conversion methods to try and figure out reasonable rental rates from the sale value of property; isn't that correct?

A    Oh, from the gross rent multipliers?  Is that what you mean?

Q    (Nods head.)

A     Yes, uh-huh.

Q     Okay.  Now, you talk in the gross rent multiplier about the problem with utilizing the assessor's rates as being undervalued.  Therefore, it's not a reliable measurement.

Am I correct that the method by which you determined that was to compare the assessor's values to sales of the property?

MS. BENEDICT:  Form.

THE WITNESS:  Um, it's been a while since I looked hat the gross rent multiplier information.

The -- to the first part of your question, yes, I definitely remember.  The assessed value when I looked it up on the internet for the Virgin Islands, that St. Croix said that their assessed values were at market.

So I thought:  Well, that's a great proxy for the market values.  We can just use that.

And then we looked at the assessed values versus the sales prices, and they were considerably lower, generally speaking.  I'm not making an absolute statement.

So that didn't square with what they were saying on the website.  And that made -- that's where the gross rent multiplier was -- using the assessed value was -- was -- it was a point of data, but it was a low point of

Page 201

data, is I guess what I'm saying.

BY MR. SCHIRTZER:

Q    So when you talk about the gross rent multiplier in your report, you say that --

A    What page are you on?

Q    20 and going to 21.  You say that --

A    I'm not there yet, if you want me to read along.

Q    Sure.

A    Okay.  I'm on page 20.

Q    Okay.  Take a look at 21.

"However an analysis was conducted comparing" -- I'm on the first full paragraph, second sentence -- "sales price on St. Croix in 2024 and 2025 to the 2025 assessor's fair market values, which indicated that assessor's values were on average 230 to median 130 percent lower than the sales price."

My question is if you had the sales data, why not calculate the gross rent multiplier from sales data instead of from the assessor values?

A    Oh, well, I think the answer to that one, from my best memory -- and as I mentioned, it's been a while since I thought about it -- the -- there were only -- not every property sold but every property is assessed.

So I thought on a mass appraisal basis we could get all the assessments on the representation that they

Page 222

BY MR. SCHIRTZER:

Q    You talk on page 5 about the most common measure of damage accepted by courts is the rental value in the easement area for a period of occupancy of the condemning.

A    Right.

Q    If there's a 10-foot utility easement across my 100-by-60 foot property, does the utility company pay me a hundred percent of the rental value every month?

A    A utility issue is a permanent issue.  It's not a temporary issue.  So it's a payment for the acquisition of that easement in perpetuity usually.

Q    So what type of easement area were you talking about in your report?

A    Well, I think we were talking here more about temporary construction easements, if I remember.  I will take a minute and read this, but I think we were talking about more temporary construction easements.

I would have to reread it.  If you want me to do that, I will be happy to do it.

Q    No, I will shift my hypothetical.  So it's a temporary construction easement.

A    Okay.

Q    I need 10 feet across the front of your 100-by-60-foot property.  You get to stay in the house

Page 223

and you get to access the house.  All the other rights.
You've just given up that 10 feet for a period of time.

Do you get a hundred percent of your rental value for the entire 600 square foot -- or 6,000 square foot property during the period of my temporary easement?

A    Well, typically -- and I say typically because -- because there could be other circumstances not in your hypothetical.

Typically, the -- and I think we already covered it, but I'm happy to cover it again -- the rental rate is based upon the 100 percent of the area actually taken for the TCE -- the temporary construction easement -- for the period of time where they have the rights to use it.

So it's a hundred percent of the TCE, not the entire lot.

Q    So if it's a 10-foot swath on a hundred-foot lot that's 60 feet wide, they pay me 10 percent of the full rental value of the lot?

A    I'm not following your math.

Q    A hundred feet depth, 60-foot width.  I took a 10-foot swath on the front, that's going to be 10 feet deep and 60-feet wide.

A    Okay.

Q    That's 10 percent of the total property, right?

A    I would like to do math and check it.  But if my

Page 224

mind is working and I'm doing the math in my head, that sounds right.

Q    But I don't pay a hundred percent.  I pay 10 percent in that situation?

MS. BENEDICT:  Form.

BY MR. SCHIRTZER:

Q    Or some percentage?

A    Well, that misstates things.  That's not how it's computed.  What the larger parcel is, is not how -- what you just said is not how it's conveyed in, you know, in appraisal reports for condemnation.

Q    If two tenants share the same space, do they both pay a hundred percent of the rental value of the space?

A    If there are two tenants sharing the space?

Q    Um-hum.

A    Well, there's no rule.  So -- but, um, typically, if there's two tenants sharing space, typically I would think they would each pay 50 percent.

Q    So in that instance, the occupancy and the loss of the owner's bundle of rights -- or the reduction of the bundle of rights from the rental is compensated by the fair market value of the property, not the -- and, you know, the individual use isn't significant, correct?

MS. BENEDICT:  Form.

Page 280

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter of the State of California does hereby certify:

That the foregoing proceeding was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof;

That the dismantling of the original transcript will void the reporter's certificate.

In witness thereof, I have subscribed my name this date:  February 24, 2020

_____

CAROLYN GREGOR, CSR 2351

Certified Realtime Reporter

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

# Expert Report of Robyn Prueitt, Ph.D., DABT, ATS In the Matter of Boynes *et al.*, Individually and on Behalf of All Others Similarly Situated *vs.* Limetree Bay Ventures, LLC *et al.*

## Case Nos. 1:21-cv-00253; 2021-cv-00259; 2021-cv-00260; 2021-cv-00261

Prepared by

Robyn L. Prueitt, Ph.D., DABT, ATS

November 6, 2025



www.gradientcorp.com
801 5th Ave., Suite 2200
Seattle, WA 98104
206-267-2920

residential properties of the Class Representatives to the health-based guidance values for these chemicals. The concentrations of TPH and PAHs in the soil samples from the Class Representative properties were low, and none exceeded the screening guidance values for soil.

- Importantly, the health-based guidance values for drinking water and soil do not predict whether specific exposures will cause adverse health effects and instead are designed to overestimate risk, such that exceedance of these guidance values does not indicate that an adverse health effect has occurred or will occur in the future.

- I evaluated the potential impacts to human health from potential exposures to the chemicals at properties with exceedances of the most conservative guidance values. I conducted an exposure assessment for TPH and 1-methylnaphthalene by calculating hypothetical doses to these chemicals for a generic adult and a generic child who may be highly exposed to the concentrations of these chemicals at each property, as a worst-case exposure scenario. I then conducted a margin of exposure (MOE) analysis by comparing these hypothetical doses to the doses at which the health effects that form the basis for the underlying toxicity guideline values for that chemical are observed, to evaluate variability in the potential human health impacts of the exposures. My MOE analysis indicates that estimated exposure intakes at the properties with exceedances are not of toxicological concern under any of the evaluated exposure scenarios.

- Exposure, dose, and risk for plaintiffs within the proposed Class area depend on the levels of chemicals in the drinking water supply and soil at each residence. Site-specific data for cistern water and soil at Class Representative properties demonstrate high variability among property-specific concentrations of TPH and PAHs in water and soil. The dose of a chemical and any associated risk can also vary among individuals and even within a single individual over time based on differences in factors that include, but are not limited to, water or soil ingestion intake, inhalation rate, age, gender, body mass, genetics, other underlying health effects, lifestyle factors (*e.g.*, diet, exercise, use of tobacco or alcohol), residence factors, behavioral factors, and occupation. These factors vary among the Class Representatives and would be expected to vary among the proposed Class members.

- The Class Representatives vary in their use of cistern water at their properties, the cleaning of their cisterns, the time they spend outdoors, the time they were at their properties during the emission events, and their response to the emission events. To the extent that these factors differ among Plaintiffs in the proposed Class area, the exposures, doses, and risks associated with the Plaintiffs' use of their properties will differ.

- Given the amount of variability in property-specific cistern and soil concentrations of TPH and PAHs, as well as in the use of properties by the Class Representatives, it is not possible for any individual or small group of individuals to represent all potential Class members adequately. The Class Representatives are not typical of other proposed Class members because the potential exposures, doses, and health risks at their properties allegedly associated with any of the emission incidents will differ from those at every other proposed Class member's property associated with any releases from the same alleged source. Because of this, any potential health risks from exposures in the proposed Class area must be evaluated on an individualized basis.

- The MOE ranges for non-cancer and cancer health effects of petroleum hydrocarbon fractions show variability across the nine properties with exceedances of the most conservative guideline values among US states. Because the MOEs are proportional to the chemical concentrations at each property, and the chemical concentrations are variable across the Class Representative properties, even the MOEs for properties without an exceedance would also show variability. Given the variability in exposures and risks among the Class Representatives, my MOE analysis does not support the proposed Class area for understanding exposure, dose, and risk of TPH exposures in

---

cistern or water buffalo water among the Class Representatives and the other proposed Class members.

- Overall, there is considerable variability in property-specific cistern and soil concentrations of TPH and PAHs among the Class Representatives, leading to variability in the potential exposures, doses, and health risks across properties, so it is not possible for any individual to represent all potential Class members adequately, and the Class Representatives are not typical of other proposed Class members. Instead, the Class Representatives and all other proposed Class members are unique, and any potential health risks from their exposures must be evaluated on an individualized basis.

GRADIENT

r110625z

# 6    Conclusions

There is considerable variability in property-specific cistern and soil concentrations of TPH and PAHs among the Class Representatives, leading to variability in the potential exposures, doses, and health risks across properties, so it is not possible for any individual to represent all potential Class members adequately. A conservative exposure assessment and MOE analysis to assess potential health risks for Class Representative properties with the highest concentrations of TPH and 1-methylnaphthalene in cistern water indicates that estimated exposure intakes at these properties are not of toxicological concern under any of the evaluated exposure scenarios. Because the potential exposures, doses, and health risks at their properties associated with any alleged contamination by the Defendants will differ from those at every other Class member's property associated with any releases from the same alleged source, the Class Representatives are not typical of other proposed Class members. Instead, the Class Representatives and all other proposed Class members are unique, and any potential health risks from their exposures should be evaluated on an individualized basis.

r110625z

D. App. 0145

# Rebuttal Report of Robyn Prueitt, Ph.D., DABT, ATS In the Matter of Boynes *et al.*, Individually and on Behalf of All Others Similarly Situated
*vs.*
# Limetree Bay Ventures, LLC *et al.*

# Case Nos. 1:21-cv-00253; 2021-cv-00259; 2021-cv-00260; 2021-cv-00261

Prepared by

Robyn L. Prueitt, Ph.D., DABT, ATS

December 22, 2025



www.gradientcorp.com
801 5th Ave., Suite 2200
Seattle, WA 98104
206-267-2920

D. App. 0146

# 1   Overview

## 1.1   Background

On November 6, 2025, I submitted an expert report (Prueitt, 2025) in the class action matter of Boynes *et al*. *vs*. Limetree Bay Ventures, LLC *et al*. (Case Nos. 1:21-cv-00253; 2021-cv-00259; 2021-cv-00260; 2021-cv-00261).   I provided opinions on the potential chemical exposures from alleged releases from the Limetree Bay Refinery (the "refinery") in St. Croix, United States Virgin Islands (USVI), during February through May of 2021, the associated risks of health effects for Class Representatives, and whether Plaintiffs could be properly assessed on a class wide basis.  I concluded that the Class Representatives were not typical of other proposed Class members and that any potential health risks from their exposures must be evaluated on an individualized basis.  I also conducted a conservative exposure and health risk assessment based on the highest concentrations of total petroleum hydrocarbons (TPH) and 1-methylnaphthalene in cistern water at Class Representative properties and found that estimated exposure intakes at these properties are not of toxicological concern.

After submitting my expert report on November 6, 2025 (hereafter, my "previous report"), I reviewed the reports of Plaintiffs' experts Dr. Marco Kaltofen (Kaltofen, 2025) and Dr. Kenneth Rudo (Rudo, 2025). This rebuttal report addresses the opinions of Dr. Marco Kaltofen and Dr. Kenneth Rudo in their respective reports dated November 7, 2025.

My previous report presented my qualifications related to this matter, so these are not repeated herein. Gradient is being compensated for my work on this matter at a rate of $495 per hour.  Gradient's compensation in this matter is not contingent upon the outcome of the litigation, and the opinions expressed herein are based solely on my professional judgment and analysis of the facts and data presented.

## 1.2   Summary of Opinions

My opinions on this matter for this rebuttal report are summarized below.

- Dr. Kaltofen's report does not discuss the variability in concentrations of dioxins and furans in cistern water across the properties sampled by Plaintiffs' experts and Exponent. The considerable variability in property-specific cistern concentrations of dioxins and furans leads to variability in the potential exposures, doses, and health risks across properties, and it is not possible for any individual at any specific property to represent all potential Class members adequately.   The proposed Class members are unique in their potential exposure to dioxins and furans from cistern water, and any potential health risks from their exposures should be evaluated on an individualized basis.

- Dr. Kaltofen's use of the cut-off of 10 pg/L for a dioxin toxicity equivalence (TEQ) concentration in cistern water, which he defines as indicating a "significant impact" from the refinery, is not justified, as it is higher than United States Environmental Protection Agency's (US EPA's) maximum contaminant level (MCL) for dioxin in drinking water (30 pg/L) and the majority of properties located upwind of the refinery or on the island of St. Thomas had cistern water concentrations that exceed this cut-off.  These locations that could not have been impacted by the refinery releases have similar or even higher dioxin concentrations than those downwind of the

refinery. In addition, four upwind properties that Dr. Kaltofen deemed as unimpacted from the refinery are the properties of Class Representatives, so simply looking at dioxin concentrations in cistern water is not a reliable indicator of impacts from any particular source, such as the refinery.

- Dr. Rudo's proposed medical monitoring program based on alleged exposure to dioxins and furans in cistern water in St. Croix is not consistent with established criteria from the Agency for Toxic Substances and Disease Registry (ATSDR) for determining the appropriateness of a medical monitoring program and does not consider individual exposure differences among proposed Class members.

- Dr. Rudo did not establish whether there was exposure across the proposed Class to determine which individuals should be part of his proposed medical monitoring program and instead assumed that the detection of dioxins and furans in cistern water at a subset of properties in St. Croix indicated that the individuals at those properties, as well as 22,000 others in the alleged impacted area of the island, were exposed to these chemicals.

- Dr. Rudo's report fails to acknowledge that potential health risks from chemical exposure depend on an individual's level of exposure to a chemical, and that the exposure levels of individual Plaintiffs and proposed Class members can vary widely based on multiple exposure-related factors, such as ingestion rates and use of cistern water, as well as variable concentrations of chemicals in allegedly contaminated cisterns and/or soils. Dr. Rudo also failed to provide exposure analyses for any of the Class Representatives or putative Plaintiffs that would support a medical monitoring program for similarly situated Plaintiffs, let alone the entire proposed Class of 22,000 people.

- Dr. Rudo's report contains several statements that are based on speculation rather than evidence for exposures of St. Croix residents to dioxins and furans at sufficient levels to induce adverse health effects and justify the need for medical monitoring. He did not provide any evidence of the sources and time period of deposition of dioxins and furans in cistern water in St. Croix and the similarity of their concentrations to background levels; the variability in use and exposure of residents to their cistern water; the ingestion of meat, fish, or plants grown in an area with known dioxin and furan contamination; the testing of meat, fish, or plants for impacts of dioxins and furans in the food web; and the testing of blood levels of dioxins and furans in St. Croix residents to suggest high body burdens and exposure from their food and water.

- Dr. Rudo's report includes several statements that are not supported by the literature he cited, and he did not provide a comprehensive review of the evidence for human health effects of dioxin and furan exposure but instead included only studies with positive results in his discussion and not the many studies that have not shown dioxins and furans to be associated with an increased risk of cancer or other health effects in humans. He did not evaluate whether there was consistency across studies for the associations and did not discuss the conclusions of ATSDR that except for the skin condition of chloracne, there is inconsistent evidence for all of the health effects that he listed as having a significantly increased risk from exposure to dioxins and furans in his summary of opinions.

- Dr. Rudo did not evaluate the exposure concentrations of dioxins and furans associated with adverse health effects in the epidemiology studies he cited and did not show that the potential exposures to dioxins and furans of residents in St. Croix were at levels as high as those for which adverse health effects have been reported in the literature.

- Dr. Rudo failed to mention that laboratory animals are more sensitive to the effects of dioxins compared to humans, such that the effects of any particular exposure level of dioxins in animal models cannot be extrapolated to humans. His reliance on evidence from laboratory animal studies is not consistent with the ATSDR medical monitoring criteria, which do not consider studies in animal models to be sufficient to determine whether an exposure results in an adverse human health

r122225z

# 2  Opinions

## 2.1  Critique of Dr. Kaltofen's Expert Report

Dr. Kaltofen's report provides opinions related to alleged impacts of releases from the refinery during February through May of 2021 on drinking water in St. Croix, including opinions on the constituents of the releases and the affected areas of St. Croix (Kaltofen, 2025).

In his report, Dr. Kaltofen provided dioxin and furan concentrations, in the form of dioxin TEQ values, for two sets of cistern and water buffalo water samples collected from various properties on St. Croix by Plaintiffs' experts (page 25 of his report) and by Exponent for the defense (page 36 [Appendix 1] of his report). The dioxin TEQ concentrations are highly variable in both sets of data, with detected values from Plaintiffs' sampling of properties to the west, southwest, and northwest of the refinery (the area that Dr. Kaltofen describes as being downwind of the refinery and impacted by its releases) ranging from 0.001-40.3 pg/L (for the "low-TEQ," which is TEQ calculated with non-detects as 0 pg/L), and with detected values from Exponent's sampling of Class Representative properties ranging from 0.0017-42.76 pg/L. Dr. Kaltofen's report does not discuss this variability in dioxin TEQ concentrations across the properties.

As discussed in my previous report (Prueitt, 2025), a consideration of variability in exposure among individuals is part of the process of class certification. The considerable variability in property-specific cistern concentrations of dioxin TEQ leads to variability in the potential exposures, doses, and health risks across properties, and it is not possible for any individual at any specific property to represent all potential Class members adequately. Instead, the Class Representatives and all other proposed Class members are unique in their potential exposure to dioxins and furans from cistern water, and any potential health risks from their exposures should be evaluated on an individualized basis.

One of the components of Dr. Kaltofen's definition of an "analytically significant impact" from the refinery is any property with a cistern water low-TEQ dioxin concentration > 0.10 pg/L, and page 15 of his report states that this is a "conservative" measure of contamination because 10 pg/L is higher than US EPA's MCL for dioxin in drinking water. This is not the case, however, as the MCL for dioxin is 30 pg/L (US EPA, 2024), which is two orders of magnitude higher than Dr. Kaltofen's cut-off of 10 pg/L for an "analytically significant impact." Dr. Kaltofen incorrectly stated on pages 15 and 26 of his report that the MCL for dioxin is 0.03 pg/L, which is three orders of magnitude lower than the actual value of 30 pg/L.

The use of the cut-off of 10 pg/L for a dioxin TEQ concentration in cistern water with significant impact is not justified. Only one property tested by Plaintiffs' experts had a dioxin TEQ concentration in water that exceeded the MCL of 30 pg/L (sample ID 2025-17, Estate Cane, at 40.3 pg/L) (Kaltofen, 2025). This is also the only property tested by Plaintiffs' experts with a water concentration that exceeded US EPA's drinking water health advisory level of 20 pg/L for dioxin, based on a 1 in 10,000 cancer risk, as noted by Dr. Kaltofen on page 26 of his report (US EPA, 2018). Similarly, only one water buffalo at one property tested by Exponent had a dioxin TEQ water concentration that exceeded the MCL and the 20 pg/L drinking water health advisory level (77A Estate Whim, 42.764 pg/L), as discussed further below in Section 2.2.4.

Dioxins and furans are ubiquitous in the environment and found at low background levels in air, water, and soil (ATSDR, 2024). Exponent collected and analyzed cistern water samples from properties located

properties (the same seven upwind properties noted above, plus the property at 256 Strawberry, which is also a Class Representative property), six did not have detectable TPH in cistern water. This further indicates variability in chemical concentrations among Class Representative properties, with several such properties showing no impact from dioxins or TPH in their cistern water.

My previous report focused on the variability in TPH concentrations in cistern water across Class Representative properties and compared these concentrations to the most conservative (*i.e.*, lowest), human health-based guidance value for TPH in drinking water among US states (0.2 mg/L) (MADEP, 2020). On page 16 of his report, Dr. Kaltofen described (but did not compare any cistern water concentrations to) a "(MA GW3) ground water quality standard" for TPH of 0.02 mg/L (Kaltofen, 2025). He cited a website for this standard, but the website does not appear to exist anymore. The standard may be an outdated GW3 groundwater standard for Massachusetts, which is not based on potential human health effects but instead is based on potential ecological effects from contaminated groundwater discharging to surface water (MADEP, 2017). Thus, this standard, if it exists, is not relevant to the protection of human health.

## 2.2    Critique of Dr. Rudo's Expert Report

### 2.2.1    Criteria for Medical Monitoring

Dr. Rudo's report provides opinions regarding whether a medical monitoring program is needed for St. Croix residents based on alleged exposure to dioxins and furans in their cistern water and the potential increased risks of adverse health effects from this exposure (Rudo, 2025). Dr. Rudo proposed a medical monitoring plan with follow-up examinations for 30 years in a population of 22,000 people in St. Croix (Rudo, 2025), which is the population within the "Plume Affected Area" alleged to be the area impacted by the 2021 releases from the refinery, as estimated by Plaintiffs' expert Mr. Stevie Henry (Henry, 2025).

ATSDR has established criteria for determining the appropriateness of a medical monitoring program in a population exposed to a hazardous substance (ATSDR, 1995). ATSDR (1995) stated that all of these criteria must be met for a medical monitoring program to be established at a hazardous waste site. These criteria include the following:

- There should be evidence that a hazardous substance is present in the environment at a level that suggests a high likelihood of exposure and subsequent adverse health outcomes; the exposure level is sufficient if there is documentation of an increased opportunity for exposure to a level of the substance that meets or exceeds a health-based comparison value or a level reported in the peer-reviewed literature as resulting in an adverse health effect.

- There should be a well-defined target population of concern for which there is documented exposure to a hazardous substance at a sufficient level to place individuals in the population at a significantly increased risk of developing an adverse health effect.

- There should be documented research from studies in human populations that demonstrates a scientific basis for a reasonable association between exposure to the hazardous substance and a specific adverse health effect, based on consideration of the strength, consistency, and specificity of the association, as well as whether the association has dose-response relationships and is consistent with the existing body of knowledge.

- Medical monitoring should be directed at the detection of specific adverse health effects that are consistent with the existing body of knowledge, in that they have been described in the literature as being caused by that substance. If there is no known association between exposure to the

substance and specific adverse health effects, medical monitoring is not an appropriate public health activity.

- For the program to have a public health benefit, the population being screened should be at a high risk for the undiagnosed health effect (*i.e.*, the health effect should have a sufficiently high prevalence in the population).

- The natural history of the disease process should be understood sufficiently, and it should be known that early detection through screening has an impact on this natural history.

- There should be an accepted screening test for the specific adverse health effect that meets requirements for validity, reliability, sensitivity, and specificity. Poor sensitivity (*i.e.*, the proportion of people with the disease who test positive) results in false negative results, which can cause delays in diagnosis or treatment. Poor specificity (*i.e.*, the proportion of people without the disease who test negative) can result in false positive results, which can result in additional testing that is uncomfortable or potentially harmful. The evaluation and selection of a screening test should include a determination of the likelihood of producing false positive results (*i.e.*, the positive predictive value), which can change with the prevalence of the health effect in the screened population.

In addition, decisions regarding the need for medical monitoring should consider the potential risks and benefits of the program, and it should be clear that the benefits (*i.e.*, earlier detection of the adverse effect and reduction in the likelihood or severity of the effect) are greater than any risks that may result from the medical monitoring program (Vearrier and Greenberg, 2017).

Dr. Rudo's report is not consistent with the criteria above for determining the appropriateness of a medical monitoring program and does not consider individual exposure differences among proposed Class members, as described further below.

### 2.2.2  Exposure to Dioxins and Furans

On page 6 of his report, Dr. Rudo stated that medical monitoring decisions should use a weight-of-evidence approach, and he noted key factors for determining whether medical monitoring is warranted (Rudo, 2025). Dr. Rudo did not provide any citations for his approach or his list of key factors, however, and his approach is not consistent with the ATSDR (1995) criteria for the appropriateness of a medical monitoring program. The first key factor Dr. Rudo listed is the level, frequency, and duration of exposure, but he did not evaluate these exposure parameters for any Class Representatives or proposed Class members and did not provide any discussion to indicate that he would establish whether there was exposure across the proposed Class to determine which individuals should be part of his proposed medical monitoring program. Instead, he assumed that the detection of dioxins and furans in cistern water at a subset of properties in St. Croix indicated that the individuals at those properties, as well as 22,000 others in the alleged impacted area of the island, were exposed to these chemicals. This is contrary to the ATSDR (1995) criterion that there should be documented exposure of a target population to a hazardous substance.

It is my understanding that there must be commonality among proposed Class members for a medical monitoring Class to be established. Dr. Rudo's report does not recognize or evaluate individual exposure differences among the proposed Class members. For example, he did not recognize the variability in dioxin TEQ concentrations among the sampled properties discussed in Dr. Kaltofen's report (Kaltofen, 2025), as described above in Section 2.1, or the variability in exposure-related factors among the proposed Class, such as ingestion rates, whether they drank their cistern water or not, whether they used the cistern water for bathing, or whether their cistern had been cleaned since the emission incidents from the refinery, as

r122225z

discussed in my previous report (Prueitt, 2025). Dr. Rudo did not recognize that this variability demonstrates the need for individualized exposure assessments for medical monitoring claims rather than a proposed medical monitoring program for 22,000 people with highly variable potential exposures.

As noted above, medical monitoring should not be conducted unless there is documented exposure that is sufficient to be associated with a significantly increased risk of a specific adverse health effect (ATSDR, 1995). Dr. Rudo's report does not provide any evidence that St. Croix residents, including proposed Class members, were exposed to dioxins and furans at sufficiently high levels to be causally linked to any disease. In the general discussion regarding dioxin exposure, Dr. Rudo's report contains several statements that are based on speculation rather than evidence for exposures of St. Croix residents to dioxins and furans at sufficient levels to induce adverse health effects and justify the need for medical monitoring.

For example, on page 9 of his report, Dr. Rudo stated that the detection of dioxins and furans in cistern water samples collected in 2025 reflects the releases from the refinery that occurred in 2021, and he noted the long environmental half-lives of dioxins and furans (Rudo, 2025). This is speculation, however, as the presence of dioxins and furans in cistern water does not indicate their source and does not indicate the period of time that they were deposited in the water. Dr. Rudo did not consider that the concentrations of dioxins and furans in the cistern water samples from properties alleged to be impacted by releases from the refinery were similar to, or in some cases lower than, the levels of dioxins and furans in cistern water at locations that could not have been impacted by the refinery (*i.e.*, background levels), as discussed above in Section 2.1. His report also states on page 9 that "residents who were exposed in 2021 continue to carry body burdens of these compounds while simultaneously facing continued low-level exposure from environmental reservoirs" (Rudo, 2025). This is also speculation, as he did not show that the detected dioxins and furans came from the refinery releases in 2021, he did not discuss whether any residents were actually exposed to dioxins in cistern water, and he did not show that any residents had higher body burdens than background, such as through blood testing of levels of dioxins and furans.

On page 12 of his report, Dr. Rudo stated that residents of St. Croix were exposed to dioxins and furans by dermal contact with contaminated surfaces and water and by ingestion of contaminated cistern water, and he noted that dioxins and furans in meat or fish are readily absorbed after consumption and that these chemicals can be taken up by plants (Rudo, 2025). This is another example of speculation, as he did not mention that not all residents would have been exposed, even if there was a release of dioxins and furans from the refinery in 2021, as not all residents consumed or used their cistern water (see Prueitt, 2025). He also did not provide evidence that any residents ate fish or meat grown in the allegedly contaminated area, or that they ate vegetables grown in a yard with known contamination of dioxins and furans. In addition, Dr. Rudo did not provide evidence of any testing of meat, fish, or plants grown in the area to determine whether they had been impacted by dioxins and furans and that these chemicals had entered the food web.

On page 14 of his report, Dr. Rudo stated that quantifiable levels of dioxins and furans "will persist in soil and food webs long after the source of the release is removed, providing a continuing source of exposure to biota. Their ability to bioaccumulate and biomagnify in aquatic and terrestrial food webs results in the highest concentrations in top predator species, including humans" (Rudo, 2025). Similarly, on page 17 of his report, Dr. Rudo stated "Other upper trophic level animals that humans may utilize as a food source (cattle, hogs, goats) will also bioaccumulate and biomagnify these contaminants and provide a significant human exposure source" (Rudo, 2025). Application of these statements to proposed Class members is speculation, as Dr. Rudo did not provide any evidence to show that any residents of St. Croix were eating fish or meat grown in the specific area with alleged contamination of dioxins and furans or that any resident had blood levels of dioxins and furans higher than background levels and suggestive of impacts from exposure to these chemicals in the meat that they ate.

r122225z

Overall, Dr. Rudo did not provide any evidence to support his opinions on potential exposures of St. Croix residents to dioxins and furans, such as evidence of the sources and time period of deposition of dioxins and furans in cistern water in St. Croix and the similarity of their concentrations to background levels; the variability in use (and, therefore, exposure) of residents to their cistern water; the ingestion of meat, fish, or plants grown in an area with known dioxin and furan contamination; the testing of meat, fish, or plants for impacts of dioxins and furans in the food web; and the testing of blood levels of dioxins and furans in St. Croix residents to suggest high body burdens and exposure from their food and water. As such, his opinions regarding potential exposures of St. Croix residents are speculative and are not consistent with the ATSDR (1995) criterion that there should be documented exposure of a target population to a hazardous substance at a sufficient level to increase the risk of developing an adverse health effect.

### 2.2.3   Toxicology of Dioxins and Furans

Dr. Rudo's discussion of the toxicology of dioxins and furans is also not consistent with the ATSDR (1995) criteria for determining the appropriateness of a medical monitoring program As noted above, the ATSDR (1995) criteria indicate that there should be studies in human populations that demonstrate a reasonable association between exposure to a hazardous substance and a specific adverse health effect, based on consideration of the strength, consistency, specificity, dose-response relationships, and coherence (*i.e.*, consistency with the existing body of knowledge) of the association, and that the adverse health effect has been described in the literature as being caused by the substance. Dr. Rudo's discussion of the epidemiology literature on dioxins is not consistent with these criteria. He did not provide a comprehensive review of the evidence for human health effects of dioxin and furan exposure but instead included only studies with positive results in his discussion and not the many studies that have not shown dioxins and furans to be associated with an increased risk of cancer or other health effects in humans (ATSDR, 2024; Boffetta *et al*., 2011; Tuomisto, 2019; Paustenbach *et al*., 2025). For many of the health effects that he stated are associated with dioxins and furans, he only cited one study (or provided no citations at all) and did not evaluate whether there was consistency across studies for the associations. Dr. Rudo relied heavily on the studies cited in ATSDR's draft *Toxicological Profile for Chlorinated Dibenzo-p-Dioxins* (ATSDR, 2024) but did not discuss the conclusions of ATSDR (2024) that except for the skin condition of chloracne, there is inconsistent evidence for all of the health effects that he listed as having a significantly increased risk from exposure to dioxins and furans in the Summary of Opinions on page 5 of his report (liver cancer, lung cancer, non-Hodgkin's lymphoma, total cancers, metabolic disorders, liver dysfunction, cardiovascular disease, immune system impairment, endocrine system perturbations, developmental abnormalities, reproductive abnormalities, and neurodevelopmental effects) (Rudo, 2025).

Dr. Rudo also did not evaluate the exposure concentrations of dioxins and furans associated with adverse health effects in the literature he cited so that these could be compared to the potential exposures of residents of St. Croix based on detections of dioxins and furans in their cistern water. The scientific literature indicates that there is no strong evidence for dioxins as a cause of human health effects at low, environmental exposure levels such as those measured in cistern water in St. Croix (Boffetta *et al*., 2011; Tuomisto, 2019; ATSDR, 2024). Dr. Rudo did not show that the proposed Class would be exposed to dioxin levels as high as those for which adverse health effects have been reported in the literature, and this is not consistent with the ATSDR (1995) criterion that there should be documented exposure to a substance at a sufficient level to significantly increase the risk of developing an adverse health effect. It is notable that of the Class Representatives who claimed health effects from their alleged exposure to emissions from the refinery in 2021, none claimed to have experienced any of the health effects that Dr. Rudo listed as having a significant risk from exposure to dioxins and furans in his Summary of Opinions; rather, they claimed mainly reversible effects such as breathing issues, headache, chest pain, muscle spasms, nausea, congestion, cough, dizziness, and irritation of the eyes, nose, and throat (see Prueitt, 2025).

r122225z

Dr. Rudo's report includes several statements that are not supported by the literature he cited. His report discusses that some epidemiology studies have associated dioxin exposure with an increased risk of all cancer types combined rather than with any specific type of cancer, and that the toxic effects of dioxins and furans act through a common mechanism of activating a molecule known as the aryl hydrocarbon receptor (AhR) that is found widely throughout the body. On page 17 of his report, he stated: "It is the activation of AhR and its prevalence in tissues and influence in a number of complex cellular pathways of significant metabolic relevance that justifies the consideration of 'all cancers' in additional to individual cancer sites when evaluating the association between PCDD [polychlorinated dibenzo-para-dioxin] and PCDF [polychlorinated dibenzofuran] exposures and carcinogenesis (Boffetta *et al.* 2011)" (Rudo, 2025). While the publication by Boffetta *et al*. (2011) does indicate that the role of AhR activation by dioxin as a non-specific mechanism of carcinogenesis has been used by some to justify an emphasis on associations with all cancer types combined in human studies, Boffetta *et al*. (2011) stated that this interpretation of the human study results has been criticized, and the authors indicated that they have not found convincing evidence of a central role for AhR in dioxin-related cancers. Thus, Boffetta *et al*. (2011) do not consider AhR activation in multiple tissues to justify considering all cancers combined in human studies.

Boffetta *et al*. (2011) also stated that assessing risks of all cancers combined is unusual in cancer epidemiology, that other carcinogens that act through pathways present throughout the body target only one or a few specific organs, and that there has been no consistent pattern of any specific cancer type in studies of populations exposed to dioxins. This is in contrast to Dr. Rudo's statement on page 6 of his report that "few chemicals are clearly associated with specific cancers" (Rudo, 2025). It is known in the cancer literature that each specific cancer type is a separate disease, and no other chemical has been identified that induces tumors at multiple sites in the body without one or a few particular sites predominating (Cole *et al*., 2003; Popp *et al*., 2006; Boffetta *et al*., 2011).

Dr. Rudo's report includes a discussion of the effects of dioxins and furans in laboratory animal studies and notes that while animal models can provide insights into human toxicity, there can be differences between species in the responses and sensitivities to chemical exposures. This is correct, but Dr. Rudo failed to mention that there are known species differences in the interaction of dioxins with the AhR, such that the binding affinity of dioxin to the human AhR is generally 10-fold lower than that of the AhR in laboratory rodents, and rodents are much more sensitive to the effects of dioxin exposure compared to humans (ATSDR, 2024). Thus, the effects of any particular exposure level of dioxins in animal models cannot be extrapolated to humans. Dr. Rudo's reliance on evidence from laboratory animal studies is not consistent with the ATSDR (1995) medical monitoring criteria, which do not consider studies in animal models to be sufficient to determine whether an exposure results in an adverse human health effect for medical monitoring purposes.

Another example of a statement in Dr. Rudo's report that is not supported by the literature he cited is on page 22, where Dr. Rudo stated "Animal studies indicate that either maternal or paternal exposure can lead to multigenerational effects in offspring. Animal studies also suggest multigenerational effects related to the accumulation and persistence of PCDDs and PCDFs. This has implications for human chronic low-level exposure scenarios, since it can result in biomagnification in the food web and long-term body burdens at concentrations greater than those in environmental compartments to which humans are exposed (Tuomisto 2019)" (Rudo, 2025). This does not make sense, however, as the fact that laboratory animal studies suggest multigenerational effects (which occur from changes in DNA structure or gene expression) has nothing to do with biomagnification of dioxins and furans in the food web (which occurs from animals ingesting dioxins and furans from eating other animals) and body burdens of dioxins and furans in humans. The cited paper by Tuomisto (2019) does not provide any statement linking multigenerational effects in animal studies to biomagnification in the food web and human exposures.

---

Also, on page 22 of his report, Dr. Rudo stated: "Human sensitivity to the effects of PCDDs and PCDFs is indicated by the observation of developmental effects in animal models at exposure levels near human background exposure levels…" (Rudo, 2025). This statement does not make any sense, as developmental effects in animal models at low dioxin exposure levels do not provide any information about whether those effects would be observed in humans and at what concentrations, particularly given the differences in sensitivity to dioxins between laboratory animals and humans. If effects are observed in laboratory animals at low exposure levels of dioxins but not in humans at the same exposure levels, this is to be expected given that laboratory animals are more sensitive to the effects of dioxin exposure than humans.

Even with the increased sensitivity of laboratory animals to dioxin exposure compared to humans, the dioxin concentrations that induce adverse effects in laboratory animals are much higher than concentrations typically encountered by humans. This is consistent with the fact that if an individual was to drink 2.5 liters of water (a high-end daily ingestion rate) from the water buffalo at 77A Estate Whim with a dioxin TEQ concentration of 42.8 pg/L (discussed above in Section 2.1), the resulting dose of $1.53 \times 10^{-6}$ µg/kg-day would be at least two orders of magnitude lower than all of the oral exposure concentrations associated with cancer and non-cancer health effects in chronic laboratory animal studies reported by Dr. Rudo in Table 7 of his report (Rudo, 2025). The resulting dose would also result in an intake of dioxin TEQ of 107 pg/day, which is similar to estimates of total daily background intake of dioxin TEQ from foods and other background sources, which range from 40.6 to 120 pg/day (ATSDR, 2024).

Dr. Rudo's discussion of cumulative and interactive effects on pages 28-29 of his report notes that cumulative exposures to different chemicals that induce toxic effects through the same pathways or organs increase the level of concern for low-level exposures (Rudo, 2025). While this can be true, he also stated that simultaneous exposure to multiple classes of toxic chemicals (such as polycyclic aromatic hydrocarbons [PAHs] and other hydrocarbons along with dioxins and furans) presents compounded health risks beyond those attributable to any single contaminant, but this is speculation as he did not present any evidence that PAHs and other hydrocarbons induce their toxic effects through the same pathways or organs as dioxins and furans.

One of the ATSDR (1995) criteria is that medical monitoring should be directed at the detection of *specific* adverse health effects, but Dr. Rudo's report does not indicate the specific effects or diseases for which his proposed medical monitoring program will screen for. Because of this, his program cannot meet the ATSDR (1995) criterion that it should be known that early detection through screening impacts the natural history of the specific health effect or disease. He also did not discuss which of the non-cancer effects that he associated with dioxins and furans were expected to be acute (*i.e.*, short-term) effects *vs*. chronic effects with a latency period between exposure and presentation of the effect, so it is not only unclear what specific health effects he proposed screening for, but also when the screening for those specific health effects should begin and how long it should continue. Dr. Rudo included urine testing for heavy metals in his medical monitoring program because he stated that heavy metals were detected in cistern water samples in St. Croix (though he did not provide any evidence that the metals came from the refinery or that they were present at concentrations associated with adverse health effects), but he did not indicate what this testing would achieve or the specific health effects they would necessitate screening for.

According to the ATSDR (1995) criteria for medical monitoring, the proposed screening test or procedure must be sufficiently sensitive and specific for the adverse health effect being monitored to yield useful positive and negative predictive values in the population for which monitoring is being considered. Dr. Rudo's report does not address this, as he did not define the sensitivity and specificity of his recommended screening tests in the population to be monitored, so the effectiveness of his proposed screening in identifying individuals at risk for any specific health effect is unclear.

As noted above, decisions regarding the need for medical monitoring should consider the potential risks and benefits of the program, and it should be clear that the benefits are greater than any risks that may result.  Dr. Rudo's report does not articulate the extent to which his proposed screening would benefit the health of the individuals in his medical monitoring program.  Dr. Rudo also did not weigh any of the potential benefits against potential harms, such as adverse effects from screening (*e.g*., psychological harm or adverse effects of the screening test itself).  The use of screening tests without a scientifically sound rationale can increase the likelihood of abnormal results by chance alone, and further investigation of the abnormal results (such as invasive confirmatory testing) can increase the risk of adverse effects from the testing and can be costly (Vearrier and Greenberg, 2017).  For example, there are issues with lung cancer screening using chest X-ray, which is one of the procedures Dr. Rudo recommends in his proposed program.  Inappropriate use, or overuse, of radiographic studies such as X-rays may increase the risk of cancer (Vearrier and Greenberg, 2017), but Dr. Rudo did not address this potential harm, nor weigh these risks with the benefits of his medical monitoring program, in his report.

### 2.2.4   Risk Estimates at Two Class Representative Properties

The ATSDR (1995) criteria for medical monitoring indicate that there should be evidence that a hazardous substance is present in the environment at a level that suggests a high likelihood of exposure and subsequent adverse health outcomes.  Although Dr. Rudo did not evaluate exposure for any proposed Class member, he did calculate risk estimates for a hypothetical person exposed to dioxins and furans at the levels detected in two water samples from St. Croix.  There are several issues with his risk estimates, however, as it is unclear where one of the chemical concentrations he used came from; the estimates cannot be evaluated for their reliability; they are hypothetical overestimates of risk that indicate a negligible increase above background risks and, thus, do not indicate a significant health risk; and he did not consider whether there was any actual exposure to the cistern water containing dioxins and furans at the concentrations used for his risk estimates.

Page 25 of Dr. Rudo's report states:  "Human health risk estimates were calculated for St. Croix cistern water samples collected in June and July 2025 (Kaltofen, 2025) and analyzed for a subset of PCDD and PCDF congeners…" (Rudo, 2025).  However, Dr. Rudo did not use the data for cistern water collected by Plaintiffs' experts and instead used the dioxin TEQ values for cistern water samples collected at Class Representative properties by Exponent for his risk evaluation.  He chose the two samples from this data set with the highest dioxin TEQ values.

The highest dioxin TEQ concentrations from the Exponent data set were detected in a water buffalo at 77A Estate Whim and another at 259 Grove Place.  Dr. Kaltofen's report lists the dioxin low-TEQ concentration for the water buffalo at 77A Estate Whim as 42.764 pg/L ($4.28 \times 10^{-5}$ µg/L) and at 259 Grove Place as 16.353 pg/L ($1.64 \times 10^{-5}$ µg/L).  Dr. Rudo's report lists the same value as Dr. Kaltofen's report for 77A Estate Whim but incorrectly lists a much higher value of $7.56 \times 10^{-5}$ µg/L as the dioxin TEQ concentration for 259 Grove Place.  It is unclear where the erroneous concentration came from and what TEQ value was used to generate Dr. Rudo's risk estimates for this sample.

Dr. Rudo did not document the exposure estimates and assumptions that he used to calculate his risk estimates but stated that he used the "NC DEQ risk calculator" that incorporates standard US EPA default exposure parameters and risk values (Rudo, 2025).  However, without listing the specific exposure concentrations and assumptions that were used, his risk estimate calculations cannot be replicated or evaluated for their reliability.

Dr. Rudo stated on page 26 of his report that the two cancer risk estimates he calculated exceed the 1 in 10,000 threshold for an unacceptable level of increased cancer risk (Rudo, 2025), but this interpretation

ignores the fact that in regulatory risk practice, calculation of cancer risk estimates assumes that there is no threshold for cancer and results in an overestimate of cancer risk, particularly for chemicals such as dioxins which have a threshold for their effects (ATSDR, 2024). In addition, calculations of cancer risks using regulatory toxicity values are only hypothetical overestimates of risk and not estimates of actual risk. As discussed in my previous report (Prueitt, 2025), regulatory toxicology is concerned with avoiding adverse health effects in populations rather than with precisely estimating the likelihood that health effects will actually occur in a specific population or individual. As such, risk estimates using regulatory toxicity values may be appropriate for public health decisions but cannot be used to predict the likelihood that cancer will occur in any specific individual. The assessment of the likelihood of adverse effects in an individual requires an estimate of actual risk, based on an individual exposure assessment, dose or exposure characterization, evaluation of the evidence that the chemical can cause adverse health effects in humans (and the doses associated with those effects), and comparison of the individual dose characterization to doses associated with health effects in the literature (Federal Judicial Center and NRC, 2011; Olsen *et al*., 2014; Faustman, 2019). Regardless, it is notable that only the highest dioxin TEQ concentration (at 77A Estate Whim) in the Exponent data set exceeds US EPA's drinking water health advisory level of 20 pg/L for dioxin, which is based on a 1 in 10,000 cancer risk, and this is inconsistent with Dr. Rudo's cancer risk estimate that is greater than 1 in 10,000 for an unknown dioxin TEQ concentration in the water buffalo at 259 Grove Place.

The significance of the levels of Dr. Rudo's cancer risk estimates is very low for any specific individual. According to the American Cancer Society, the lifetime probability that a man will develop some form of cancer (*i.e*., background cancer risk) is approximately 40% (ACS, 2025). Dr. Rudo's cancer risk estimates of $6.4 \times 10^{-4}$ and $1.3 \times 10^{-3}$ for individuals exposed to the two water samples with the highest dioxin TEQ would increase the hypothetical risk of developing cancer from a background risk of 40% to a risk of 40.064-40.13%, and these are negligible increases above background risks.

Dr. Rudo compared the two highest dioxin TEQ concentrations (including the erroneous value of $7.56 \times 10^{-8}$ mg/L for the sample from 259 Grove Place) to the MCL for dioxin, and incorrectly listed the dioxin MCL as $5 \times 10^{-4}$ mg/L in Table 12 on page 28 of his report (Rudo, 2025) instead of the correct value of $3 \times 10^{-8}$ mg/L (US EPA, 2024). On page 28 of his report, he also stated that the two water samples with the highest dioxin TEQ exceed the MCL by four orders of magnitude. This is not true, as the dioxin TEQ concentrations for the two samples are the same order of magnitude as the MCL, and if the correct dioxin TEQ concentration is used for the sample from 259 Grove Place ($1.64 \times 10^{-8}$ mg/L), this sample does not exceed the MCL and it is only the sample from 77A Estate Whim that exceeds the MCL, and only by 1.4-fold. As discussed in my previous report (Prueitt, 2025), exceedance of regulatory guidance values, such as MCLs, does not indicate that an adverse health effect has occurred or will occur in the future (US EPA, 1996).

Dr. Rudo stated on page 28 of his report that comparison to the MCL values demonstrates that the dioxin and furan levels in the cistern water represents a "significant human health hazard requiring immediate action" (Rudo, 2025), but only one sample among those collected from Class Representative properties exceeded the MCL value by a very small margin (1.4-fold), and this was from a water buffalo at the property of Clifford Boynes at 77A Estate Whim. Dr. Rudo did not consider whether there was any actual exposure to the water from this water buffalo in claiming that it represented a significant human health hazard. According to his deposition, Mr. Boynes stated that the water buffalo on his property was only used for watering plants and not for drinking, bathing, or washing dishes (Boynes, 2025), which severely limits any potential exposure to the water within it.

In Dr. Rudo's summary of opinions on page 5 of his report, he stated that it "is medically necessary and urgent to stop ongoing exposure to dioxins and furans *via* contaminated cisterns and cistern water" (Rudo, 2025). This opinion is unwarranted as only one sample from one of the tested Class Representative

Page 1

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

CLIFFORD BOYNES, ET AL,    )
                           )
        Plaintiffs,        )
                           )
     vs.                   )      CIVIL ACTION FILE NO.
                           )      1:21-CV-00253
LIMETREE BAY               )
VENTURES, LLC, ET AL,      )
                           )
        Defendants.        )

VIDEOTAPED DEPOSITION OF:
CLIFFORD BOYNES
VOLUME I

Being taken pursuant to stipulations herein:

January 29, 2025

Lee J. Rohn & Associates, LLC
56 King Street, Third Floor
Hamilton House
Christiansted, St. Croix, VI   00820
Commencing at 10:00 a.m. Atlantic Standard Time

Before Debbie C. Hennings, CCR, RPR

Job No. 7126678-1

Page 18

no.

Q. All right. Do you have any education in oil refinery operations or petroleum products?

A. Education?

Q. Uh-huh.

A. I guess. I worked 25 years in the plant.

Q. Okay. Sounds like some experience to me. Tell me what you did. I assume we're talking about the refinery here on the island?

A. Uh-huh, St. Croix.

Q. Okay. When did you begin to work there?

A. '91.

Q. And who did you work for at the time?

A. I think it was calling itself either Hess -- started office Hess and then transition to Hovensa.

Q. Okay. When you first went to work at the refinery, what did you do?

A. Sat on the docks. Where the ships come in, you tie the ship up. From there you would -- how you say -- put the different cargo holds for either receiving or discharging their product and monitor the ship that -- like boiler or whatever goes in, so on, so forth.

Q. Okay. How long did you work on the dock?

A. About three years.

Q. After the three years on the dock, what was the

Page 24

special guests or whatever would come down, educate on different items.

BY MS. CHAMPAGNE:

Q.   Did you have any health or safety training while you worked at the refinery?

A.   Say that again.

Q.   Did you have any training on safety while --

A.   Yeah, lots of safety, yeah, uh-huh.

Q.   Was that a focus of your job?

A.   That was definitely the focus of the job.

Q.   Okay.  Did you have any training about -- let me come back to that.

A.   Okay.

Q.   Gather my thoughts on that one.  While you were at the refinery, did you have any training related to proper cleaning of oil or hydrocarbons?

A.    As far as training, I think the term you're probably looking for is first responder.  First responder job, if I'm in the area and something happen, is to contain it and that's as far -- what you call it -- observancy booms or the pads, you try to contain it, whether that be at the C or whatever the case is.

But you report that to the next guys and the guys that are higher will take it from here.

Q.   Okay.  So is it fair to say that you don't have

Page 37

we're going to talk about today, the emissions events, which is the reason we're here, did you have any illnesses or diseased that needed medical treatment?

A.   Diseases, no.

Q.   Okay.  I noticed in some of the information that was provided to us through your attorneys that you suffer from nasal allergies; is that correct?

A.   No, I don't have a nasal problem.

Q.   Okay.  Prior to the emissions events, who were your medical providers?

A.   It would be the Frederiksted Health Clinic.

Q.   Was there a particular doctor at the clinic that you saw?

A.   It's random, yeah.

Q.   I have the same problem.  It's frustrating, isn't it?

A.   Uh-huh.

Q.   Why would you seek medical treatment at the Frederiksted Health Clinic?  What would you go there for?

A.   That's something that I do just to maintain annual checkup, you know, just to see everything is good.

Q.   So you go for an annual checkup every year?

A.   Yeah, basically, yeah.

Q.   Did you undergo any surgeries before the emissions events?

Page 38

A.   No.

Q.   Prior to the emissions events, did you take any medications?

A.   Medication will be -- don't have the name but it's a blood pressure medicine.

Q.   It's a what?

A.   Blood pressure medicine.

Q.   And you don't recall the name?

A.   Not offhand.

Q.   How long have you taken the blood pressure medicine?

A.   Couple years.

Q.   Was that something that your doctor recommended during one of your annual checkups or did you go in for a specific -- because you were having specific symptoms?

A.   Yeah, it was just high and just got diagnosed with hypertension, you know.

Q.   Okay.  During an annual checkup or --

A.   No, this is years back.

Q.   Okay.

A.   Yeah, so it was, you know, tested, at -- you need to take those pills to keep it down.

Q.   Okay.  And that was at the Frederiksted Health Clinic?

A.   I don't remember; it's so many years back.

Page 69

the February 4th emissions event, correct?

A.   I would have to say no.  No.

Q.   Okay.  Now let's move on to the next one.  All right.  So the next emissions event is alleged to have occurred between April 19th and the 22nd of April on 2021, okay?

A.   Okay.

Q.   Were you aware of that event?

A.   No.  Well, aware from radio station, again, but never come to anything on the property and such.

Q.   Okay.  You never smelled anything in April of 2021?

A.   No.

Q.   And you never suffered any symptoms from the release in April of 2021?

A.   No.

Q.   Well, let's talk about the May 5th emissions event.  Were you aware of that emissions event?

A.   Yes, I was.

Q.   Okay.  When did you first become aware of the emissions event on May 5th?

A.   That's -- how to say -- during the night.

Q.   Okay.

A.   Right.  So, okay, so during the night we were preparing to go to sleep, the family.  And 8-ish or 9,

Page 70

whatever, started to getting a strong odor of H2S,
right --

Q. Let me stop you right there, just because H2S is hydrogen sulfide?

A. Uh-huh.

Q. Okay, go ahead.

A. Ay, ay, ay, ay, ay, so got a strong odor of H2S. I start choking, you know, difficulty breathing. Have about 36 windows that I -- how to say -- close off immediately?

Q. 26 or --

A. 36. That I had to close off from whatever coming out towards the building. So from there, 15 minutes-ish, like I said, I have problem breathing per se. And, how to say, wake up the next morning and find out this took place.

Q. Okay. How did you find out what took place?

A. Well, me and Mr. Christian start talking with each other and this is how we found out they had a release, you know, coming from the plant.

Q. Mr. Christian told you it was a release from the plant?

A. We both -- what you call it -- the talk was we had -- what you call it -- Limetree Bay, this could be Cruzan Rum. You had all kind of different things found

D. App. 0164

Page 71

out there.  But then we found out that it came from Limetree Bay.

Q.   Okay.  Let me go back to you said you woke up and -- with a strong odor and you started choking.  A strong odor --

A.   Not woke up.

Q.   Okay.  You were going to sleep and then you noticed a strong odor of H2S and you started choking.  After you closed your windows, did your symptoms go away?

A.   After 15 minutes, yeah.

Q.   Did anyone else in your household suffer symptoms on February 4, 2021?

A.   Well, how to say -- the kids, them was basically sleeping.  The wife -- how to say -- of course choking on the same substance.

Q.   She was still awake?

A.   Yeah, we didn't go to sleep yet.

MR. MERSMAN:  Amy, you said February 4th.

MS. CHAMPAGNE:  I'm sorry.  Let me go back and clarify that.  Thank you.

BY MS. CHAMPAGNE:

Q.   It's my mistake so I just need to re-ask the question to get it correct.  Did anyone else in your household suffer symptoms on May 5th, 2021?

A.   Yeah, my wife, you know, same difficulty

Page 72

breathing and so forth.

Q.   And once the windows were closed, did her symptoms go away as well?

A.   Well, to tell you the truth, I was focusing on me, but yes.

Q.   Save yourself first, right?

A.   Yeah, that's right.

Q.   Okay.  Other than the choking, did you suffer any other symptoms from the release on May 5th?

A.   Not that I could tell you because I didn't went to the doctors and all of that so I be lying if I tell you.

Q.   That was my next question.  Did anyone in your household seek medical treatment following the May 5th event?

A.   No, no.

Q.   Did you inspect your property following the May 5th event?

A.   Well, how -- what you call it?  After all the talk and -- what you call it?  I basically reached out to Limetree Bay and they came to the property, did their assessment, and they concur that there was some kind of -- what you call it -- oil or carbons on the property.

Q.   Do you recall when you reached out to Limetree?

A.   That was May, May 5th, anywhere in between

Page 87

A.   I have never had any -- how to say -- concentration like the others closest to the refinery, so no.

Q.   Okay.  When the gentleman was out inspecting your property, did you take any pictures?

A.   No, I didn't take no pictures, no.

Q.   Did you ever take any pictures of your -- of what you suspected to be oil on your property?

A.   No, I didn't take no pictures.

Q.   All right.  You mentioned earlier -- and I told you we would come back to it -- that you were asked to sign a release; do you recall that?

A.   Yeah.

Q.   Was the gentleman that we have been talking about who inspected your property the person who asked you to sign the release?

A.   I can't even remember who gave me the release, to tell you the truth.  I didn't know it was a release. And when I sign it -- how to say -- how to say -- questioned my attorney on it.  He said it's not a good idea to take the check, so I never took the check.  That was to clean the cistern.

Q.   Okay.  Do you recall whether you were given the release before or after the cistern testing by your lawyers?

Page 90

A.   Yeah.

(Boynes Exhibit No. 3 marked.)

BY MS. CHAMPAGNE:

Q.   I was giving you time to read it.  So, Mr. Boynes, you have been handed what has been labeled Exhibit Boynes 3, with Bates number Boynes 000034.  Do you recognize this document?

A.   Sure, yes.

Q.   And what is it?

A.   The release form, or claim, yeah.

Q.   And is this the release form that you testified you were offered by Limetree?

A.   Correct.

Q.   And what's the date on this release?

A.   The 25th of 2021.

Q.   Okay.  Does that help refresh your recollection at all as to when your cistern was tested?

A.   I can't even give you, seriously, a date.

Q.   Okay.

A.   Too much time pass.

Q.   And you signed this release, correct?

A.   Correct.

Q.   And let's see.  Who was the witness; do you know?

A.   Nope.

Page 91

Q.   And this release you were offered $3,575, right?

A.   Yeah, something to that effect, yes.

Q.   Okay.  At the time, why did you make the decision to sign the release?

A.   Well, I was thinking of cleaning the cistern, you know, logically, like any homeowner.  And then I was like, this thing could be bigger than just a simple, you know.  So I called my attorney, Jennifer Jones, and she says not a good thing to do so, I never took the check.

Q.   Was that the first time you had contacted Jennifer Jones?

A.   Yeah.

Q.   Why did you -- how did you choose Jennifer Jones to contact?

A.   That's a good question.  As I said before, when this incident happen, me and Chris Christian, you know, we spoke and then we both have like the same attorney, Attorney Boykins.  And she know Jennifer and she put us on to Jennifer and then that's how we got in touch with Jennifer.

Q.   Okay.  Let me make sure I understand.  So you were already represented by an attorney, Boykins?

A.   Yeah, you can say yes.  Yes, through to the business.

Q.   You had retained Attorney Boykins before?

Page 122

like to prevent a situation like that from happening.

So if it's not Limetree or whoever, that's all I'm saying.

BY MS. CHAMPAGNE:

Q.   Are you seeking recovery for the same damages in the bankruptcy court and in this litigation?

MR. LAMBERT:  Object to form.

Go ahead.

THE WITNESS:  No, I'm not.  I am -- how to say -- as a collective body -- what you call it -- under the class action suit trying to -- how to say -- again, prevent something like this in the future from happening.

BY MS. CHAMPAGNE:

Q.   But you understand that in bringing a civil class action, the remedy that you have requested is to be financially compensated, correct?

A.   If I understand, I guess to some degree, yeah.

Q.   What else do you believe you have asked for in this lawsuit?

A.   Well, I mean -- how to say -- we, like -- what you call it -- based on the exposure, we don't know -- we like some kind of medical monitoring on the individuals who went through the ordeal, you know.

Some type of monetary -- what you call it --

Page 123

monetary -- what you call it -- punitive damages in a collective bargain. That's not just me. And am I missing anything else?

You know, this might be a big if, but if they can actually put some kind of sensors to avoid that in the future, you know, at least people could be aware because nobody had no clue what was happening in that event.

Q. Okay. We have talked before about plaintiffs' consolidated amended class action complaint. Have you seen this?

A. Yes.

Q. And you understand that this is the document in which the plaintiffs make all of their allegations and where they lay out their requests for relief, right?

A. Sure.

Q. Are you aware that there is no request for any -- what did you call it; alert?

A. Monitoring system.

Q. Monitoring system. That there is no request for a monitoring system in this amended complaint?

A. I'm more talking about collectively as, you know --

Q. But are you aware that this lawsuit does not request that any sort of monitoring program be put in place around the refinery?

Page 124

MR. LAMBERT:  Object to form.

THE WITNESS:  No, I would have to say no.

BY MS. CHAMPAGNE:

Q.   You just mentioned medical monitoring.

A.   Uh-huh.

Q.   Do you believe that you personally need to be medically monitored?

A.   Not just for me.

Q.   No, I'm asking you just you personally, do you believe that you need to be medically monitored?

MR. LAMBERT:  Object to form.

THE WITNESS:  When I use the term -- oh, oh, medical, oh, yeah, sure.  Because I don't know the -- what you call it -- the long-term effects of the exposure that sharp turn that it happened, so yeah.

BY MS. CHAMPAGNE:

Q.   But you never sought any medical attention to this day related to the release events, right?

A.   Correct.

Q.   Are you making a claim for personal injuries?

A.   I'm not making a personal claim, no.

Q.   Are you making a claim for property damage?

A.   No, I'm not.

Q.   Are you making a claim for lost income?

A.   No, I'm not.

Page 125

Q.   Are you making a claim for lost business?

A.   No, I'm not.

Q.   Isn't it true that you were exposed to hydrocarbons during your 24-year history working at the refinery?

A.   When you say exposed, could you give me a definition.

Q.   Let me do this.  Do you believe that you were exposed to hydrocarbons as a result of the emissions events we have discussed today?

A.   If you referring to the May 5th?

Q.   I'm referring to all four -- any of the four events:  February 4th, April 19 through 22nd, May 5th, or May 12, 2021.

A.   I can't tell hydrocarbon, but I know I was exposed to H2S or sulphur.

Q.   And you told me you recognize that smell from the refinery, right?

A.   Finished?

Q.   Yes.

A.   It's a very common smell.

Q.   So isn't it true that you were exposed to hydrogen sulfide during the 24 years that you worked at the refinery?

MR. LAMBERT:   Object to form.

Page 127

the sulphur pellets. And it has a -- what you call it -- moderate smell. But you don't sit there and smell it, you know. But the concentration at home was greater than when I was working.

Q. Did you -- were you exposed to H2S on more than one occasion while you worked at the refinery?

A. You mean a high dosage or --

Q. Did you -- were you exposed to it at all in any dosage more than once while you worked at the refinery?

A. Small -- small dosage you smell it, the wind, yeah, small dosage.

Q. And you're not a doctor, correct?

A. Not that I know of.

Q. You don't have any medical training?

A. No.

Q. Okay. So you can't say whether -- withdraw that. Who is Lambert Woods?

A. That's a friend of mine.

Q. Did you discuss any of the release events with Mr. Woods?

A. We would discuss about that, yes.

Q. What did you talk about?

A. Basically, the event that happened when people couldn't breathe the night, choking on air --

Q. How many times have you talked -- I'm sorry.

Page 130

interrogatories that we looked at earlier as someone that you communicated with about the incidents.  Are you telling me now that you didn't speak with Ms. Gomez at all about the incidents?

A.   I wouldn't say -- okay, initially we spoke.  I advise them I was -- how to say -- class -- what you call it -- class rep about what's taking place, you know.  We had them to sign up with Jennifer Jones.  But I wasn't talking to her constantly.  I was more talking to the son.

Q.   So you referred Mr. Woods and Ms. Gomez to Jennifer Jones?

A.   That's correct.

Q.   Do you know whether they also signed retainers with Ms. Jones?

A.   They did.

MR. MERSMAN:  I also would like to put on the record that it does not say he communicated with the witness Gomez in his discovery responses.  It just lists her as someone who may have relevant information to the class action claim.

MS. CHAMPAGNE:  Thank you.  I stand corrected.

BY MS. CHAMPAGNE:

Q.   Mr. Boynes, do you suffer from any fear or anxiety related to the releases?

A.   Not that I know of, no.

Page 148

(Break.)

THE VIDEOGRAPHER: On record 2:46 p.m.

BY MS. CHAMPAGNE:

Q. Mr. Boynes, I only have two or three more questions for you today.

Here we are almost four years after the May 5th, 2021, incident. Have you suffered any health effects in that time frame that you believe are related to your exposure to hydrogen sulfide?

A. Not that I know.

Q. Have you undergone any testing in that time frame?

A. No, I have not.

Q. You stated earlier that you were seeking medical monitoring. What are you seeking to be monitored for?

A. Well, it's not me as an individual. I'm -- how to say -- collectively as the -- what you call it -- the group -- how to say -- to make sure that, let's say, you know -- let's say you take your blood work or whatever the case may be, whatever they looking for -- I don't know. I'm not a doctor per se.

Just like you do annual checkup every two or three years, I don't know, I'm just saying. At least it's being monitored.

Q. What -- what are you asking -- what testing are

Page 149

you asking to be done?

A.   That's what I said, I'm not a doctor, but at least -- how to say -- exposure to what that sulphur came down on May 5th.  You know, I'm not a doctor to say it does this and it does that, but in great concentration, I don't know.  So only a doctor could be able to tell you that.

Q.   Okay.  So you're asking for medical monitoring to include testing for any long-term effects to hydrogen sulfide?

A.   Basically, yes.

MS. CHAMPAGNE:  All right.  I pass the witness.

MS. ADLER:  I don't have any questions at this time.

COURT REPORTER:  Anybody on Zoom?  No questions on Zoom?

MS. ZHANG:  Hello?  Hi, can you hear me?

COURT REPORTER:  Yes.

EXAMINATION

BY MS. ZHANG:

Q.   Hi, Mr. Boynes.  My name is Kim Zhang.  I represent Pinnacle Services, LLC in this case, and I just have a few questions for you.

A.   Sure.

Q.   Do you know Pinnacle Services, LLC?

Page 182

CERTIFICATE

I, Debbie C. Hennings, CCR, RPR, residing in the state of U.S. Virgin Islands, do hereby certify:

That I did appear as court reporter for the above-entitled matter, which was held on January 29, 2025.

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 182 represent a true, complete, and accurate transcript of the proceedings.

The witness did not reserve the right to read and sign the transcript.

Signed this 14th day of February 2025.

Debbie C. Hennings, CCR, RPR
NCRA 833411
Licensed in GA, AL, ID, CO
GOLKOW, a Veritext Division
www.golkow.com
(877)370-3377

D. App. 0178

Page 1

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

CLIFFORD BOYNES, ET AL,    )
                           )
         Plaintiffs,       )
                           )
     vs.                   )     CIVIL ACTION FILE NO.
                           )     1:21-CV-00253
LIMETREE BAY               )
VENTURES, LLC, ET AL,      )
                           )
         Defendants.       )

VIDEOTAPED DEPOSITION OF:
MARGARET THOMPSON
VOLUME I

Being taken pursuant to stipulations herein:

January 29, 2025

Lee J. Rohn & Associates, LLC
56 King Street, Third Floor
Hamilton House
Christiansted, St. Croix, VI   00820
Commencing at 4:21 p.m. Atlantic Standard Time

Before Debbie C. Hennings, CCR, RPR

Job No. 7126678-2

Page 18

A.   Yes, correct.

Q.   Where did you work prior to your retirement?

A.   From Hovensa.

Q.   You worked at Hovensa?

A.   Yes.

Q.   When did you start work for Hovensa?

A.   I start working there 1993.

Q.   And just briefly, where did you work before working for Hovensa?

A.   I used to work in Frederiksted at a snack bar. Clifford's Snack Bar.

Q.   And when you went to work for Hovensa in 1993, what was your position there?

A.   Well, first, they put me at the man camp.  They had a man camp.

Q.   Okay.

A.   Yeah, and I used to do housekeeping.

Q.   Okay.  And how long were you in that position?

A.   That was about, about six years.

Q.   Six years?

A.   Uh-huh.

Q.   So roughly up until 1999?

A.   Uh-huh.

Q.   And then --

A.   They transfer me from there to Hovensa.

Page 19

Q.   Okay.  They transferred you from there to Hovensa in 1999?

A.   Yeah.

Q.   And what were you doing when you transferred?

A.   Well, I work at the kitchen.

Q.   Okay.  What were you doing in the kitchen; were you like a cook or a chef?

A.   Not really, but I prepped.

Q.   Okay.  Prepped food for the people --

A.   Yeah.

Q.   -- who lived on the site?

A.   Uh-huh.

Q.   And how long did you hold that position?

A.   Well, until when they close refinery 2012.

Q.   In 2012?

A.   Uh-huh.

Q.   Is that what you said?

A.   Yeah.

Q.   Okay.  So that's when you retired?

A.   Yes.

Q.   And since that time, you have not been employed?

A.   No.

Q.   Okay.  Did you ever have any involvement when you worked at Hovensa with the refinery operations or anything relating to that, or Terminal operations?

Page 80

A.    Correct.

Q.    Tell me what it is.

A.    It's the release, the release form that I signed.

Q.    Okay.  And It says at the very up top, "Release of Certain Claims."

A.    Yes.

Q.    Let's just do -- tell me how it came to be that you signed this agreement.

A.    Because I don't understand this signature, but the guy who came is Pablo.  This is his signature?  Because I don't recognize that.

Q.    That does not look like Pablo to me.  So Pablo came out, inspected your property; is that right?

A.    Correct.

Q.    Did he present you with this or any other document at that time?

A.    No, this the only one.

Q.    Okay.  But during that visit that they came and inspected your property, that's not when signed this agreement, is it?

A.    I think so.

Q.    They didn't come back a second time and bring this document?

A.    No.

Page 81

Q.   They had it with them?

A.   Correct.

Q.   So Pablo gave you this document or the other gentleman that he was with?

A.   I think it is the other gentleman.  That is not his signature.

Q.   Based on the signature?

A.   Yes.

Q.   And what did they say when he gave you this document?

A.   They said they will give me this amount of money to clean the cistern.

Q.   They would give you $4,500 to clean the cistern?

A.   Correct.

Q.   Did they represent to you that you were required to sign this document?

A.   Not really.

Q.   Did you read it over before you signed it?

A.   Yes, I read it and he explain to me.  So after I sign it I was thinking, this is not enough money to clean those two big cistern.  So I tell them I don't think I gonna bother with the check.  So I won't take it.

Q.   Did you show this document or review it with anyone before you signed it?

A.   If I showed anyone?

Page 84

recollection?

A.   I think so.

Q.   Okay.

A.   But how this one get here?

Q.   Okay.  Do you have that copy still in your possession?

A.   I don't think so.  That was a long time.  I think it is lost or something, but.

Q.   And I believe you said you never received this money; is that accurate?

A.   No, no, never.

Q.   And this is dated a June 23rd, 2021, right above your signature?

A.   Uh-huh.

Q.   Do you see that?

A.   Uh-huh, I haven't received anything.

Q.   But is that consistent with your recollection they came out on June 23rd, 2021, and that's when you signed this document?

A.   Correct.

Q.   Did they ever try to send you a check and you refused it?

A.   No, they never tried to.

Q.   Okay.  So you just never heard from them again?

A.   No, I didn't.

Page 104

CERTIFICATE

I, Debbie C. Hennings, CCR, RPR, residing in the state of U.S. Virgin Islands, do hereby certify:

That I did appear as court reporter for the above-entitled matter, which was held on January 29, 2025.

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 104 represent a true, complete, and accurate transcript of the proceedings.

The witness did not reserve the right to read and sign the transcript.

Signed this 14th day of February 2025.


Debbie C. Hennings, CCR, RPR
NCRA 833411
Licensed in GA, AL, ID, CO
GOLKOW, a Veritext Division
www.golkow.com
(877)370-3377

Page 1

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

CLIFFORD BOYNES, et al,                )
        Plaintiffs,                    )
                                       )
    vs.                                ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0253
        Defendants.                    )
_____
HELEN SHIRLEY, et al,                  )
        Plaintiffs,                    )
                                       )
    vs.                                ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0259
        Defendants.                    )
_____
MARY L. MOORHEAD, et al                )
        Plaintiff,                     )
                                       )
    vs.                                ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0260
        Defendants.                    )
_____
BEECHER COTTON, et al,                 )
        Plaintiffs,                    )
                                       )
    vs.                                ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0261
        Defendants.                    )
_____

VIDEOTAPED DEPOSITION OF:
HELEN SHIRLEY
March 14, 2025
Colianni & Leonard
2121 Company St.
Christiansted, VI  00820
Commencing at 10:04 a.m. AST

Before Debbie C. Hennings, CCR, RPR

Job No. 7212713

Page 119

have you been a party to any other lawsuits?

A. Yes.

Q. How many other lawsuits?

A. Limetree -- oh, sorry. Limetree, Hess. I mean --

MR. CHAREST: Red dust?

THE WITNESS: Yeah, yeah, that's the first one I wanted to say. Harvey Aluminum and Hess twice and this one.

BY MS. CHAMPAGNE:

Q. You sued Hess twice?

A. There is one that was settled. Well -- yeah, it was settled. And now we have another portion of it, yeah.

Q. All right. So I want to better understand that.

A. I don't understand it myself.

Q. What was the basis of your lawsuit against Hess --

A. The first one?

Q. -- that was settled?

A. It wasn't completely -- it was the same thing but it wasn't completely settled I think. It was -- I have to look at the records so I can explain it better.

Q. But was the first lawsuit related to the same

Page 120

release from Hess as the complaint that we have already looked at today?  Was it the same incident?

A.  Yes, I think so, yeah.

MR. CHAREST:  I can provide a little light I think, if you'd like.

MS. CHAMPAGNE:  Okay.

MR. CHAREST:  My understanding is that there was a series of settlements related to the 2010 release.  I think Ms. Shirley did not participate in that.  And I think her claim is still live from the larger group that did settle.  That's my understanding.  I don't think there is two.  I think hers is still left.

BY MS. CHAMPAGNE:

Q.  Did you receive any settlement money from Hess?

A.  Hess?

Q.  Ever, yes.

A.  Clarify.

Q.  Have you gotten any money from Hess as a result of the release in 2010?

A.  From Hess or from the attorney, through the attorney?

Q.  Have you gotten any money at all from your attorney related to your claims against Hess?

A.  Yes.

Page 121

Q.   Okay.  When did you get paid?

A.   Before they move over to the new building.  I can't remember the year.  Several years ago now, so I'm not sure the date.

Q.   How much money did you receive?

A.   $3,000.  Oh, wait a minute.  Oh, yeah, I received $3,000 for -- yeah, right.

Q.   And do you know what you received the $3,000 for?

A.   That's why I refuse to sign and ask for an explanation.  And I was given an explanation, but it just gone from my head.  And this is before I retire so it's a while.  It's a long time.

Q.   So you received the $3,000 before you retired?

A.   I think so, yeah.

Q.   So you received $3,000 more than 17 years ago?

A.   I'm not sure.  I'm not sure.  I don't want to answer for sure and I'm not...

Q.   All right.  What role did you play in the red dust case?

A.   Clarify, please.

Q.   Sure.  When we were referring to the red dust case, are we talking about the Shirley vs. St. Croix Alumina case?

A.   Yes.

Page 122

Q.   And so because of the way that case is styled, am I right that you were a named plaintiff in that lawsuit?

A.   Yes.

MR. CHAREST:  Form.

THE WITNESS:  I was one of the plaintiffs, yeah.  I don't know what form plaintiffs means.

BY MS. CHAMPAGNE:

Q.   Okay, that's fair.  So the Shirley in Shirley vs. St. Croix Alumina would be referring to you, right?

A.   I believe so.

Q.   Do you -- is that case still ongoing or did it settle?

A.   It settled.

Q.   Did you receive money from the red dust case?

A.   Yes.

Q.   How much did you receive from that suit?

A.   $50,000.

Q.   When did you receive the 50,000?

A.   Maybe two to three weeks ago.

Q.   Have we talked about all of the lawsuits that you have been involved in?

A.   Uh-huh.

Q.   Who is your attorney in this case?

A.   Which case?

Page 123

Q.   The one that we're here for today, Shirley vs. Limetree, or Clifford Boynes v. Limetree.

A.   Daniel and Mariana Leonard attorneys.  I can't pronounce his last name --

Q.   Daniel Charest?

A.   Daniel Charest and Mariana Leonard attorneys.

Q.   How did you come to retain Ms. Leonard and Mr. Charest?

A.   That's a good one.  Instead of or --

Q.   No.

MR. CHAREST:  You can tell me that one later. But she's asking the history of how you found us, I think.

THE WITNESS:  My niece, Joy Christian, had worked with Daniel Charest and Mariana, Ms. Leonard, Attorney Leonard, and that's why I chose them.

BY MS. CHAMPAGNE:

Q.   Had Mr. Charest and Ms. Leonard represented your niece before?

A.   Yes.

Q.   Did you talk to any other attorneys before deciding to hire Mr. Charest and Ms. Leonard for this case?

A.   No, I did not.

Q.   Do you have a signed retention agreement with

Page 129

Q.   Would you agree with me that not everyone had the same symptoms that you experienced?

A.   I don't know.

Q.   Well, did Joy or Denise have to go to the ER for breathing problems?

A.   I don't know for sure.  I don't know.

Q.   Okay.  Did any of the folks that you have talked to tell you that they went to the ER for breathing problems?

A.   I can't remember.

Q.   Was Mr. Jeffries upset that he wasn't paid the money?

A.   I'm not sure.  I don't think so, no.

Q.   Is your ongoing lawsuit against Hess a class action?

MR. CHAREST:  Form.

Answer if you know.

THE WITNESS:  Yes.

BY MS. CHAMPAGNE:

Q.   The red dust case was also a class action, correct?

MR. CHAREST:  Form.

Answer if you know.

THE WITNESS:  I believe so, yes.

BY MS. CHAMPAGNE:

Page 130

Q.   And do you understand that the lawsuit -- that the complaint in this case is also seeking to permit you to represent a class of individuals?

MR. CHAREST:  The question is what do you understand.

THE WITNESS:  I don't understand me representing who, you know.  Are there other people represented besides myself or just me alone?  That's why I need clarification.

BY MS. CHAMPAGNE:

Q.   Okay.  So you're correct that there are other individuals whose names appear in the complaint, right?

A.   Uh-huh.

Q.   What is your understanding of your role as a plaintiff whose name appears on the complaint?

MR. CHAREST:  Form.

You can answer if you know.

THE WITNESS:  To my knowledge, I believe that I'm here to give testimony to what I experienced as, well as what I saw and my experience along with whatever, you know, that anybody else may have experienced.

I can only speak for myself, but it's a large amount of people.  It's a big island with all these things.  And everybody got exposure different

Page 146

A.   Dyspnea, unspecified; left bundle-branch block, unspecified; headache, unspecified; nausea, unspecified.

Q.   Is the visit to Plessen Healthcare on April 26th the only time you sought medical attention with regard to release from the Limetree Bay Refining?

A.   Yes, I think so, yes.

Q.   All right.  Let's set that aside.  I want to talk to you about --

A.   Can I clarify?  Other than my medical doctor, Dr. Nielsen, she was off island.  So she's been following up with me and that's basically it.

Q.   Okay.  So based on your medical record there, when do you believe the emission event that you experienced occurred?

A.   About 10, 11:00 in the morning.

Q.   On April 26th?

A.   Yes, that's the date.

Q.   All right.  Describe to me -- I want you to just tell me the story, okay, of exactly what you experienced that day.

A.   I was outside in the garage in the front of the house and then this blast of noxious, toxic, bitter tasting in the back of my throat.  I have a tendency, like if you cut aloe, it taste in the back of my throat.  Anything bitter or got a chemical residue, it stayed in

Page 147

my throat.

And I felt this bitter taste that want to make you vomit. And then I couldn't breathe, you know. Took my breath away. It was horrible. And all I could think about was getting to the doctor.

I call her and she wouldn't answer. They said go straight to Plessen. I should have gone to the emergency room, but they were the closest. And then I realize that I was scared, frightened. I can't explain to you frightened.

And then when you panic and you frightened, other things, pressure goes up, this happens, that happens. It's a chain reaction.

The thing is, I wanted relief for my breathing. That was my paramount and my most important concern was to get that breath back that was taken from me at that moment. I can't explain it other than that.

Q. Why do you say you should have gone to the ER instead of --

A. Because -- because --

Q. -- instead of Plessen?

A. I panic because I wanted to get to the nearest person that could help me. Had I gone to the emergency room, I think they may have given me oxygen and been comprehensive and then I would have a better idea, would

Page 198

CERTIFICATE

I, Debbie C. Hennings, CCR, RPR, residing in the state of U.S. Virgin Islands, do hereby certify:

That I did appear as court reporter for the above-entitled matter, which was held on March 14, 2025.

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 197 represent a true, complete, and accurate transcript of the proceedings.

The witness did reserve the right to read and sign the transcript.

Signed this 31st day of March 2025.

Debbie C. Hennings, CCR, RPR
NCRA 833411
Licensed in GA, AL, ID, CO
GOLKOW, a Veritext Division

Page 1

              IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
                          DIVISION OF ST. CROIX
CLIFFORD BOYNES, et al,                )
          Plaintiffs,                  )
                                       )
       vs.                             ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0253
          Defendants.                  )
_____
HELEN SHIRLEY, et al,                  )
          Plaintiffs,                  )
                                       )
       vs.                             ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0259
          Defendants.                  )
_____
MARY L. MOORHEAD,                      )
          Plaintiff,                   )
                                       )
       vs.                             ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0260
          Defendants.                  )
_____
BEECHER COTTON, et al,                 )
          Plaintiffs,                  )
                                       )
       vs.                             ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0261
          Defendants.                  )
_____

                    VIDEOTAPED DEPOSITION OF:
                         RYAN H. ALLEYNE
                            Volume I
                         March 12, 2025
                        Colianni & Leonard
                        2121 Company St.
                     Christiansted, VI  00820
                    Commencing at 10:00 a.m. AST

             Before Debbie C. Hennings, CCR, RPR

Job No. 7212689

Page 36

someone retained by your attorneys?

A. By the attorneys.

Q. What were the results of that testing?

A. I cannot recall what the actual.

Q. Did you have any damages to any of your property other than your plants involving rum fungus?

A. It was black stuff on the roof of the property.

Q. Was that ever tested?

A. Yes.

Q. Do you recall approximately when?

A. No.

Q. Was it after the lawsuit was filed?

A. After the lawsuit was filed.

Q. Do you recall ever seeing the results of that testing?

A. No.

Q. So your plants and your roof. Anything else?

A. Plants, roof. Had some material, some wooden structure over the fish pond, like --

Q. At your property?

A. At my property.

Q. Okay. Anything else?

A. I think that's it.

Q. Do you recall suffering any physical symptoms that you believe were tied to this black fungus that was

Page 37

on your property?

A.   No.

Q.   So you were not claiming personal injuries in connection with that case?

A.   No.

Q.   Did you ever recall seeing the black fungus inside of your home or just on the outside?

A.   Just on the outside.

Q.   And I believe you testified, just to clarify, you noticed it about a year before you reached out to the government and ultimately to your attorneys; is that accurate?

A.   Yes, that's accurate.

Q.   Let's talk about your participation in that lawsuit.  What damages were you seeking?  Is it just the property that you outlined for me a few minutes ago?

A.   Yes.

Q.   Did you have damage to your cistern?

A.   Yes.

Q.   And I'm going to get into the cistern in a little bit.  But I assume you have a cistern at your property?

A.   Yes.

Q.   Tell me what damages you claim this black fungus caused --

Page 38

MS. BENEDICT:  Objection.  Form.

BY MS. ADLER:

Q.   -- to your cistern?

MS. BENEDICT:  Objection.  Form.

THE WITNESS:  Water quality.

BY MS. ADLER:

Q.   Water quality?

A.   Yes.

Q.   Can you explain what you mean by that, please?

A.   Water quality is because this black stuff that collects on your roof.  When rain fall, it end up going down into your cistern.

Q.   So you -- the black stuff that you believe was on your roof was coming down through the downspouts and getting into the cistern?

A.   The cistern, that's correct.

Q.   Did you ever -- if you had the ability to, did you ever disconnect the downspout so black stuff wouldn't drain into your cistern?

A.   Could you rephrase that question.

Q.   Sure.  You testified that the fungus from your roof was draining through the downspouts into your cistern; is that accurate?

A.   Yes.

Q.   Did you ever try to disconnect those downspouts

Page 120

CERTIFICATE

I, Debbie C. Hennings, CCR, RPR, residing in the state of U.S. Virgin Islands, do hereby certify:

That I did appear as court reporter for the above-entitled matter, which was held on March 12, 2025.

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 120 represent a true, complete, and accurate transcript of the proceedings.

The witness did reserve the right to read and sign the transcript.

Signed this 28th day of March 2025.

Debbie C. Hennings, CCR, RPR

NCRA 833411

Licensed in GA, AL, ID, CO

GOLKOW, a Veritext Division

Page 1

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

CLIFFORD BOYNES, et al,                )
            Plaintiffs,                )
                                       )
        vs.                            ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0253
            Defendants.                )
_____
HELEN SHIRLEY, et al,                  )
            Plaintiffs,                )
                                       )
        vs.                            ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0259
            Defendants.                )
_____
MARY L. MOORHEAD, et al                )
            Plaintiff,                 )
                                       )
        vs.                            ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0260
            Defendants.                )
_____
BEECHER COTTON, et al,                 )
            Plaintiffs,                )
                                       )
        vs.                            ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0261
            Defendants.                )
_____

VIDEOTAPED DEPOSITION OF:
ALVINA ILARRAZA
April 11, 2025

7 Church Street
Christiansted, Virgin Islands 00820
Commencing at 9:32 a.m. AST

Before Debbie C. Hennings, CCR, RPR

Job No. 7282774

Page 26

that.

BY MS. ADLER:

Q.    So you filed a claim as part of the settlement and received $1,600?

A.    Correct.

Q.    When was that?

A.    Sometime last year.

Q.    2024?

A.    Yeah.

Q.    Did your family members file separate claims?

A.    No, it was one household.

Q.    It was by household?

A.    Yeah.

Q.    Who received $180?

A.    My mom, Bernadette Augustin; my daughter Malaysia Ilarraza, and my husband Jose Ilarraza.

Q.    So just those of you who lived in house?

A.    Right, right.

Q.    Tell me what damages you believe you suffered due to the rum fungus.

A.    You said damages.  Well, there is -- the way the cistern is and we have a concrete roof --

Q.    Okay.

A.    -- there was always some black stuff -- you know, it's still there because every time you try to

Page 27

clean it, it comes back, you know.  You know, it's really harassing with the black stuff, yeah.

Q.   So there is black stuff on your roof that you believe were caused from --

A.   On the cistern.

Q.   On the cistern?

A.   Yeah, some black stuff on the cistern that was -- yeah.

Q.   Inside of the cistern?

A.   No, on the surface.

Q.   Okay.  Not the roof of your home?

A.   No, at the roof of the home is just not as much as the cistern.  The cistern have more of the black stuff.

Q.   Uh-huh.

A.   Yeah, because we live so close.

Q.   To the rum --

A.   Yeah, yeah, we live so close.

Q.   -- factory?  How close do you live?

A.   Enfield Green.

Q.   And how far away is that?

A.   It's not too far.  Not too far.

Q.   When did you first notice this black stuff on your cistern?

A.   I can't recall right now, but it's something

Page 102

CERTIFICATE

I, Debbie C. Hennings, CCR, RPR, residing in the state of U.S. Virgin Islands, do hereby certify:

That I did appear as court reporter for the above-entitled matter, which was held on April 11, 2025.

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 102 represent a true, complete, and accurate transcript of the proceedings.

The witness did reserve the right to read and sign the transcript.

Signed this 24th day of April 2025.

Debbie C. Hennings, CCR, RPR
NCRA 833411
Licensed in GA, AL, ID, CO
GOLKOW, a Veritext Division

Page 1

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

- - - - - - - - - - - - - - -x

CLIFFORD BOYNES and        : Civil Action No. 2021-0253

HELEN SHIRLEY and          : Civil Action No. 2021-0259

MARY L. MOOREHEAD and      : Civil Action No. 2021-0260

BEECHER COTTON, et al.,    : Civil Action No. 2021-0261

             Plaintiffs, :

        V.                :

LIMETREE BAY VENTURES,     :

LLC, et al.,               :

        Defendants.  : Pages 1-248

- - - - - - - - - - - - - - -x

                       Rockville, MD

                 Friday, February 20, 2026

Videotaped deposition of:

DR. REMY JEAN-CLAUDE HENNET

called for oral examination by counsel for the
Defendants, pursuant to notice, before Sherry L.
Brooks, Certified LiveNote Reporter, of Golkow
Litigation Services, a Notary Public in and for the
State of Maryland, beginning at 9:18 a.m., when were
present on behalf of respective parties:

Page 64

4th, 2021 and May 12th, 2021; isn't that correct, sir?

A.    Yes.  This is a series of -- a series of events, four of them being major events, as I characterized them, during that period of time.

Q.    Is it accurate that you've done no deposition modeling for hydrocarbons or dioxins related to the February 4th and the May 12th release events?

A.    What I have done, I have reviewed the information and the testimony by witnesses, the evaluation done by the refinery people themselves, EPA, all of this which basically describes the fact that things were falling from the sky, and that I did not do -- specifically, the intensity of the fallout, I did not do that.

And you may ask the air modeler if they did that, but personally, I did not do that.

Q.    Did you review Dr. Sajo's report?

A.    I browsed through it but -- after my report.

Q.    Did you review Dr. Sajo's testimony from

Page 67

Q.   Do you see the paragraph that starts: "Similarly, due to lack of supporting data, deposition was not modeled"?

A.   Yes.  This is part of -- I'll give context to that.  And basically this relates to his observation that -- that's the way I understand this.  You have to ask him -- that --

Q.   I did ask him.

A.   Because the total amount of released material would not be determined with sufficient accuracy.  So the dispersion analysis assumed that a unit mass of substance was released from the flare.

Q.   Do you agree with Dr. Sajo that insufficient information exists to perform a deposition analysis?

MR. DEMA:  Objection to form.

A.   That's his opinion.  That's his conclusion.  I have not found any information on the mass release.

BY MR. SCHIRTZER:

Q.   So you don't know the volume of materials that were released, correct?

Page 81

reported the following:  'The troubled Limetree Bay refinery in St. Croix will temporarily suspend production activities until further notice after a flaring incident dropped oil on a nearby neighborhood,' the company said on Wednesday.

"The company urged residents in the nearby Enfield Green community not to consume the water following the incident.  'Water distribution will be established for affected communities,' the company said in a statement, adding that processing units will be brought to a 'safe, stable condition.'"

Is it accurate that the only communities referenced in the EPA report are the Enfield community and the Clifton Hills community?

MR. DEMA:  Objection.  Form.

A.    Well, no.  In the sense that what EPA is reporting is secondhand information that was collected by the refinery -- the Limetree Refinery personnel themselves.  So they recognize that you had oil in some areas.  That's all what they were looking for.

This is not -- this is not basically the

Page 82

extent of the -- where the release landed, in my opinion. And in order to do that, you have to go to chemical analysis. You cannot just do it on visual observations.

BY MR. SCHIRTZER:

Q. Let me ask my question again because maybe we have a misunderstanding.

Is it accurate that the only communities referenced in the EPA report as having been affected by the February 4th and the May 12th, 2021 incidents are the Clifton Hills community and the Enfield community?

A. What is accurate is that the Limetree personnel or consultant reported that to EPA. And EPA is verbatim using that in this description of the available information. That has nothing to do with what EPA believes or concluded really.

Q. You cite to pages 9 through 24 of the EPA order in your report for the proposition that "The presence of hazardous chemicals identified in water cisterns in the area potentially impacted is consistent with the 2021 refinery releases as a

Page 120

A.    My -- reviewing the Saba so-called background locations around here I plot on what I have looked at -- I plot particularly between the refinery and those points you discuss there.

Q.    You could have redone your map with your reply report, right?

A.    Given the time, I could do a lot of things.

Q.    Okay.  You didn't replot your map?

A.    I did not.  It's not in my report.

Q.    How many samples for each category addressed in your report are left in your background area once we move that line to incorporate everything west of the Saba samples 5, 10, and 11?

A.    Again, looking at the entirety of the data, I think you have about seven locations that basically I considered.  You have to look at my Exhibit 2 where you have information, the data.

Q.    You had seven locations initially and you just moved the line.

A.    What do you mean?  I didn't move the line past those locations.  I just moved the line because

Page 136

results for 51 locations, does that sound about right?

A.   Yeah, if you some -- your count, it's close, right.

Q.   Do you know if your analysis with respect to the number of samples is statistically significant?

A.   The data is the data, right, and you just happen to have seven locations in one pot and (inaudible) in the other pot.

Q.   Do you know what I mean by "statistically significant"?

A.   Yes, it is basically a statistical calculation for that.

Q.   Were any of your samples chosen randomly?

A.   The data is the data.  The locations are the locations.  I have nothing else.  So --

Q.   You have no idea one way or the other whether they were chosen randomly?

A.   I suppose they were chosen where access could be granted.

Q.   Do you know one way or another whether it

Page 137

was chosen randomly?

A.   My understanding is that they went where access was granted for the purpose of what they were trying to sample for.

Q.   So they were not chosen randomly?

MR. DEMA:  Objection.  Foundation.

A.   Well, as I do represent the areas, I mean, the density of samples is basically, you know, higher in the potentially impacted area because that's where people were likely doing most of the investigation. But, you know, you have seven locations that are in the other area and that's the data.

BY MR. SCHIRTZER:

Q.   Do you know if, in fact, these sample results are considered statistically representative?

A.   I did not do a statistical representation of that.  I just looked at the data.  That's the data we have.  This is what the data informs, and that combines with the rest.  That's what I based my opinions on.

Q.   So you're unaware if there's any standard deviation analysis associated with these sample

Page 138

results?

A.   Well, I have not done standard deviation analysis.

Q.   And you're not aware of any opinions being provided with respect to the competency (sic) intervals?

A.   I didn't do that and I have not -- I have not looked for that and I have not seen that.

Q.   Have you ever done competency (sic) intervals with any of the analysis that you've previously performed?

A.   In some cases we did that, yes.

Q.   But you didn't do it here?

A.   I did not do it here.

Q.   Did you calculate a margin of error?

A.   No, but I did compare data that was done by different labs for the same -- reportedly the same location or duplicate samples and those kind of things.  I looked at that.

Q.   Are you familiar with the term "margin of error" in the statistical context?

A.   Yes.

Page 139

Q.    Okay.  And comparing two separate samples from the same location does not have anything to do with a statistical margin of error.

Is that accurate, sir?

A.    That depends what you look at, but it is -- it is -- it is true that in this situation you can take two samples from what is reported as the same location and they will have different values.

Q.    Is it safe to say that you're not providing any statistical opinions regarding the representative nature of any of the sampling?

A.    I was not asked to do any statistical evaluation.

MR. SCHIRTZER:  Let's go ahead and mark as Exhibit No. 10 something you'll find towards the bottom -- three from the bottom -- saying Strategies for Rebutting Junk Science.

A.    Yes.  I think I found this.

(Exhibit Number 10 was marked for identification and was attached to the deposition.)

BY MR. SCHIRTZER:

Q.    Okay.  Are you familiar with Dr. Bell?

Page 156

boundary?

A.   I think those were independent, and the way I did the boundary is conservatively.  I just took the eastern boundary of the refinery -- I had no data close by before Saba came with some data -- and then I had -- you have an EPA air monitoring station that was installed at some point after those releases.

And there is detection of refinery smell, if you wish, you know, refinery releases in the air.  And I just say, okay, at least I know the refinery can have an impact.

Along the refinery -- obviously, you're in the refineries or the refineries have any contaminated stuff and I drew a line which is a conservative line, and that's the best I could do at the time.

Q.   So initially you picked the geographical boundary without consideration of the testing results and then you applied the testing results to the two areas separated by the geographical boundary?

A.   I worked in parallel in the sense that,

Page 162

or no.

A.    I will repeat just slowly.  The location of the refinery and the location of that air station where you have data that positively and objectively say you have some things that can be smelled from the refinery by EPA, and I just drew a line along there.

And I feel that this line is conservative and then I compared the data from one side to the data from the other side and I reached my conclusion.

BY MR. SCHIRTZER:

Q.    After you drew the line you compared?

A.    Of course.  I could not put those in different buckets before I had that line.

Q.    And now you're revising your line based on data results?

A.    Based on new data that I considered, additional background data that shows that you have an aura around the refineries that can be impacted by the refinery, which makes plenty of sense.

Q.    Let's talk about concrete and concrete cracking.  Were the cisterns examined for concrete cracks?

Page 172

experience, that I explain how do that and then, you know, that's my opinion.

BY MR. SCHIRTZER:

Q.   You'll agree with me that at least 40 percent of the cisterns that were sampled demonstrate no detectable level of contaminants?

MR. DEMA:  Objection.  Form.  Foundation.

A.   The data is the data, right?  Now, you have to understand what the data means.  You have cisterns where you can take a sample in one location or a sample in another location and one will have contamination and the other one not.

So that's the entire problem here.  The thing is you cannot interpret one non-detect in one location of a cistern and just say, oh, that cistern is clean.  The problem is it has been impacted commonly and you can analyze to gazoo.  It's not going to repair or fix the problem.

BY MR. SCHIRTZER:

Q.   Why bother sampling at all -- if you're telling me that a negative result of no detectable contaminant doesn't mean that the cistern wasn't

Page 173

contaminated and doesn't mean that the cistern doesn't need remediation, why bother sampling at all?

A.    Exactly in some sense.  I determine where -- the potential area of impact, right, and I think within that area you have basically -- you are likely to be contaminated to some extent.

Now, when you take a sample and have it analyzed, you don't have -- that doesn't mean because you don't detect.  That depends on the detection limit, right?

And you can have a sample in that cistern analyzed by one laboratory and another one analyzed by another one and it will not give you the same results, and then you can have two samples taken from the same cistern a different time or different location of the cistern and they will not give you the same result.

So you have to conclude that those areas have been infected or impacted and need to be cleaned because something was put in it that shouldn't be in it.

Q.    Regardless of the percentages that come

Page 203

And, again, those compounds, in my opinion -- and it is supported by the literature -- were part of what was released at the refinery during those three- to four-months period of time.

Now, then, again, considering the entirety of the data, I feel very strongly that the data supports that the area that is potentially impacted by those releases is substantially higher concentration than the area of the island that are not likely to have been contaminated by those releases.

This is basically the support for the conclusion that the most likely cause for what the data indicates is relatively recent releases in 2021, and that's my conclusion and I haven't changed my opinion. I have looked at all of the data. I have not changed my opinion.

I have looked at the more recent data that was submitted after -- after the reports -- the expert's reports were published and -- or, you know, provided to both sides, and all of a sudden some new data come up and I looked at that data, and I opined

Page 204

on that that in -- my conclusion is that those high elevated levels that Saba reported for what he called background samples -- by the way, he called them background samples before he knew what the data was.

So -- and there were -- those sample locations were close to the refinery.  You have indications that -- of odors in that area, and all of this taken together supports my conclusion that those particularly elevated samples should be included in the impacted area, and I haven't changed my opinion.

Q.    You created the background geographic parameters before you went through the data and assigned them to impacted versus background, correct?

MR. DEMA:  Objection.  Form.  Foundation. Misstates the testimony.

A.    I answered that question before many times.

BY MR. SCHIRTZER:

Q.    You just brought it up.  You said he put it in background before he looked at the data.  Isn't -- isn't that, in essence --

A.    You know that -- hold on.

Page 222

that could occur in a cistern once it's been cleaned out as a result of any leaching or weathering of concrete?

A.   It will be low.  It will be more than zero, but I have not made a calculation for maximum.

MR. SCHIRTZER:  Let's take a break, and I'm going to look through my notes and hopefully we'll be done.

THE VIDEOGRAPHER:  Off the record at 15:38.

(A break was taken.)

THE VIDEOGRAPHER:  We are on the record at 15:50.

BY MR. SCHIRTZER:

Q.   Dr. Hennet, you talk a couple of places in your report about piping issues.  Is it accurate that nobody's done any testing of piping?

A.   Not to my knowledge.

Q.   Okay.  And you're not recommending any remediation related to piping?

A.   I say in my report that I am not addressing that in this report.

Case: 1:21-cv-00253-MAK-GAT   Document #: 1794   Filed: 07/10/26   Page 223 of 439

Page 247

United States of America       :

                               :  SS

State of Maryland              :


                    CERTIFICATE

                I, SHERRY L. BROOKS, a Certified
LiveNote Reporter and Notary Public do hereby certify
that, pursuant to notice, the deposition of DR. REMY
JEAN-CLAUDE HENNET, was duly taken at 9:18 a.m.
before me.  The said DR. REMY JEAN-CLAUDE HENNET, was
first duly sworn by me, according to law, to tell the
truth, the whole truth, and nothing but the truth,
and thereupon did testify as set forth in the above
transcript of testimony.  The testimony was taken
down stenographically by me.

                I do further certify that the above
deposition is full, complete and a true record of all
the te                                        ess.

_____

SHERRY L. BROOKS
Certified LiveNote Reporter
Notary Public
July 9, 2027



                (The foregoing certification of
this transcript does not apply to any reproduction of
the same by any means, unless under the direct
control and/or supervision of the certifying
reporter.)
My Commission Expires:  July 9, 2027

Golkow Technologies,
877-370-3377              A Veritext Division              www.veritext.com

D. App. 0223

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**

**DIVISION OF ST. CROIX**

| | |
|---|---|
| **CLIFFORD BOYNES, et al., Plaintiffs,**<br><br>v.<br><br>**LIMETREE BAY VENTURES, LLC, et al.,**<br><br>Defendants. | **Civil Action No. 2021-0253** |
| **HELEN SHIRLEY, et al., Plaintiffs,**<br><br>v.<br><br>**LIMETREE BAY VENTURES, LLC, et al.,**<br><br>Defendants. | **Civil Action No. 2021-0259** |
| **MARY L. MOORHEAD, et al., Plaintiffs,**<br><br>v.<br><br>**LIMETREE BAY VENTURES, LLC, et al.,**<br><br>Defendants. | **Civil Action No. 2021-0260** |
| **BEECHER COTTON, et al., Plaintiffs,**<br><br>v.<br><br>**LIMETREE BAY VENTURES, LLC, et al.,**<br><br>Defendants. | **Civil Action No. 2021-0261** |

**Marco Kaltofen, PhD., PE (Civil, Massachusetts)**
**Reply to the Rebuttal Reports of Dr. Saba & Dr. Prueitt**

**Dated: January 28, 2026**

1

D. App. 0224

In these responses it is important to note that on the island of St. Croix in the Virgin Islands, many homes consistently rely upon rainfall for drinking water. In the cisterns that collect this water, there are some variations in the individual concentrations of petroleum hydrocarbons depending on the quantity of contaminants collected as well as cistern-related factors (*e.g.*, water usage rates, house orientation, cistern fill state, location, cleaning frequency). Indeed, it is understood in the peer-reviewed scientific literature that petroleum hydrocarbons, dioxins, and furans exist in the environmental background.[1]

But the existence of petroleum hydrocarbons, dioxins, and furans does not mean that a series of releases from a refinery will not have a common contaminating impact on cisterns, even if cisterns do not have the same background. Based on cistern test data, Plaintiffs' experts used the following scientifically accepted methods to define petroleum-impacted vs. nonimpacted cistern samples: (1) visible sheen in cisterns; (2) detectable TPH or PAH; or (3) DX/FX detections for tetra to hexa congeners or lower bound TEQ > 0.1 pg/L. They also compared the number of impacted cisterns found in the downwind and upwind directions.

**Response to Rebuttal Report of Dr. Tarek Saba**

Dr. Saba does not present any data regarding dioxin or furan emissions from the flaring of coke residuals, despite having had the opportunity to do so. Plaintiffs, moreover, were granted access to the Refinery only years after the release events and were prohibited from collecting samples during the inspection of Flare #8 and its surrounding area. As a result, Dr. Saba is not in a position to offer a scientifically grounded rebuttal to my conclusion of a common impact from the refinery releases, which is based on the data analyzed in my report.

Dr. Saba misstates my expert opinions on D/Fs in St. Croix, stating, "Dr. Kaltofen directly contradicts the scientific literature which demonstrates the presence of tetra-, penta-, and hexa-chlorinated D/F compounds in many sources that can be found in the St. Croix environment and unrelated to the refinery." Saba Rebuttal, at 12. But in my report, I acknowledge exactly that, comparing tetra-, penta-, and hexa-chlorinated D/F compounds in both background upwind and refinery-release downwind samples.

In my expert report, I define impacted cisterns as having reliable detections of petroleum and/or dioxins and furans. The source of dioxin is not specified in this definition. Any assumption that *all* dioxins are from the refinery to the exclusion of any background, is incorrect.

In other words, Dr. Saba emphasizes that my criteria regarding "the detections of tetra, penta, or hexa-chlorinated dioxins and furans" to indicate impacted cisterns "ignores the presence of those compounds in St. Croix sources unrelated to the refinery." But this argument is a strawman. It ignores the fact that my report *compares* the concentrations of tetra-, penta-, and hexa-chlorinated D/Fs in downwind versus background samples. My report does not assert that these congeners are

---

[1] It should also be noted that normal human movement means residents routinely use water from multiple cisterns in workplaces, childcare facilities, and other visited locations. As a result, individuals experience a cumulative exposure to petroleum hydrocarbons that reflects the average contaminant levels across the various cisterns they encounter.

2

Signed,

Marco Kaltofen

---

Marco Kaltofen, PhD., PE (civil, Mass.)                    1/28/2026

| Sample ID | Latitude | Longitude | Sampler | Date Sampled | Client | ID | vector | Matrix | Solvent NA, E1, E2, Hx | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| unique identifier | based on GPS or location of front door of home | based on GPS or location of front door of home | Individual collecting sample | | Name of property occupant | Secondary location identifier | | material sampled | | SI units |
| STX-001S | 17.70344 | -64.86736 | Kaltofen/Moore | 7/13/2021 | public ROW | Elementary School | | soil | | mg/kg |
| STX-002S | 17.700644 | -64.862367 | Kaltofen/Moore | 7/13/2021 | public ROW | Museum Grounds | | soil | | mg/kg |
| STX-003W | 17.69454 | -64.83749 | Kaltofen/Moore | 7/13/2021 | | Williams Delight | | water | | mg/L |
| STX-004S | 17.69454 | -64.83749 | Kaltofen/Moore | 7/13/2021 | | Williams Delight | | soil | | mg/kg |
| STX-005S | 17.69454 | -64.83749 | Kaltofen/Moore | 7/13/2021 | | Williams Delight | | soil | | mg/kg |
| STX-006D | 17.69454 | -64.83749 | Kaltofen/Moore | 7/13/2021 | | Williams Delight | | dust | | mg/kg |
| STX-007S | 17.70788 | -64.76595 | Kaltofen/Moore | 7/13/2021 | public ROW | Refinery SW | | soil | | mg/kg |
| STX-008S | 17.70569 | -64.76231 | Kaltofen/Moore | 7/13/2021 | public ROW | Refinery outfall area | | soil | | mg/kg |
| STX-009S | 17.70625 | -64.76047 | Kaltofen/Moore | 7/13/2021 | public ROW | Refinery West | | soil | | mg/kg |
| STX-010W | 17.70761 | -64.81995 | Kaltofen/Moore | 7/13/2021 | | Mount Pleasant | | water | | mg/L |
| STX-011S | 17.70761 | -64.81995 | Kaltofen/Moore | 7/13/2021 | | Mount Pleasant | | soil | | mg/kg |
| STX-012S | 17.755934 | -64.567605 | Kaltofen/Moore | 7/14/2021 | public ROW | Point Udall | | soil | | mg/kg |
| STX-013S | 17.759689 | -64.575232 | Kaltofen/Moore | 7/14/2021 | public ROW | Boiler Bay | | sands | | mg/kg |
| STX-014S | 17.701083 | -64.835486 | Moore/Henry | 7/14/2021 | | Good Shepherd Ave. | | soil | | mg/kg |
| STX-015W | 17.700912 | -64.835399 | Moore/Henry | 7/14/2021 | | Good Shepherd Ave. | | water | | mg/L |
| STX 2021 01 W1 | 17.708 | -64.880 | Douglas/Henry | 8/31/2021 | Rochelle Gomez | No. 1 BA Two Brothers | | water | | mg/L |
| STX 2021 01 S1/S2 | 17.708 | -64.880 | Douglas/Henry | 8/31/2021 | Rochelle Gomez | No. 1 BA Two Brothers | | soil | | mg/kg |
| STX 2021 02 W1 | 17.6978 | -64.8791 | Douglas/Henry | 8/31/2021 | Margret Thompson | 94 B Smithfield | | water | | mg/L |
| STX 2021 02 S1/S2 | 17.6978 | -64.8791 | Douglas/Henry | 8/31/2021 | Margret Thompson | 94 B Smithfield | | soil | | mg/kg |
| STX 2021 03 W1 | 17.6951 | -64.880 | Douglas/Henry | 8/31/2021 | Anna Rexach | 25 B Stony Ground | | water | | mg/L |
| STX 2021 03 S1/S2 | 17.6951 | -64.880 | Douglas/Henry | 8/31/2021 | Anna Rexach | 25 B Stony Ground | | soil | | mg/kg |
| STX 2021 04 W1 | 17.6938 | -64.8856 | Douglas/Henry | 8/31/2021 | Marin Rexach | 17 Whites Bay | | water | | mg/L |
| STX 2021 04 W3 | 17.6938 | -64.8856 | Douglas/Henry | 8/31/2021 | Marin Rexach | 17 Whites Bay | | water | | mg/L |
| STX 2021 04 S1/S2 | 17.6938 | -64.8856 | Douglas/Henry | 8/31/2021 | Marin Rexach | 17 Whites Bay | | soil | | mg/kg |
| STX 2021 04 S2/S4 | 17.6938 | -64.8856 | Douglas/Henry | 8/31/2021 | Marin Rexach | 17 Whites Bay | | soil | | mg/kg |
| STX 2021 05 W1 | 17.70646 | -64.8676 | Douglas/Henry | 8/31/2021 | Clifford Boynes | No. 77 A Esate Whim | | water | | mg/L |
| STX 2021 05 S1/S2 | 17.70646 | -64.8676 | Douglas/Henry | 8/31/2021 | Clifford Boynes | No. 77 A Esate Whim | | soil | | mg/kg |
| STX 2021 06 W1 | 17.6983 | -64.8689 | Douglas/Henry | 8/31/2021 | Maria Parilla | 121 Concordia | | water | | mg/L |

D. App. 0227

Petroleum

| Sample ID | method | Impacted water system | Basis for water system impact | TPH-GRO C6-10 | TPH-DRO C10-28 | TPH-RRO C25-36 | TPH-ORO C28-40 |
|---|---|---|---|---|---|---|---|
| unique identifier | EPA method number | Definition: (1) Visible sheen in cistern, detectable (2) TPH, PAH, or (3) DX/FX (see note) in cistern water | | TPH as gasoline range hydrocarbons | TPH as diesel range hydrocarbons | TPH as residual range hydrocarbons | TPH as oil range hydrocarbons |
| STX-001S | 8270D, 160.3(1) | NA | | | < 11 | | 50 |
| STX-002S | 8270D | NA | | | 20 | | 120 |
| STX-003W | SW8015D, 8270D | Y | ORO | | < 0.10 | | 0.19 |
| STX-004S | SW8015D, 8270D | NA | | | 46 | | 140 |
| STX-005S | 8270D | NA | | | | | |
| STX-006D | EPA 600/R-02/070 | NA | | | | | |
| STX-007S | SW8015D, 8270D | NA | | | 16 | | 100 |
| STX-008S | SW8015D, 8270D | NA | | | 34 | | 200 |
| STX-009S | SW6020B, SW7196A, SW7471B | NA | | | | | |
| STX-010W | SW8015D | Y | ORO | | < 0.10 | | 0.14 |
| STX-011S | SW8015D, 8270D | | | | < 10 | | 52 |
| STX-012S | SW8015D, 8270D | | | | < 48 | | 200 |
| STX-013S | | | | | | | |
| STX-014S | SW8015D | | | | < 12 | | 50 |
| STX-015W | SW8015D | N | | | < 0.10 | | < 0.10 |
| STX 2021 01 W1 | SW3511, SW8015D | N | | | < 0.10 | | < 0.10 |
| STX 2021 01 S1/S2 | SW8015D | NA | | | 22 | | 88 |
| STX 2021 02 W1 | SW3511, SW8015D | Y | DRO | | 0.66 | | < 0.10 |
| STX 2021 02 S1/S2 | SW8015D | | | | 15 | | 59 |
| STX 2021 03 W1 | SW3511, SW8015D | N | | | < 0.10 | | < 0.10 |
| STX 2021 03 S1/S2 | SW8015D | | | | 14 | | 91 |
| STX 2021 04 W1 | SW3511, SW8015D | N | | | < 0.10 | | < 0.10 |
| STX 2021 04 W3 | SW3511, SW8015D | | | | < 0.10 | | < 0.10 |
| STX 2021 04 S1/S2 | SW8015D | | | | 15 | | 57 |
| STX 2021 04 S2/S4 | SW8015D | | | | 53 | | 260 |
| STX 2021 05 W1 | SW3511, SW8015D | N | | | < 0.10 | | < 0.10 |
| STX 2021 05 S1/S2 | SW8015D, 8270D | | | | 16 | | 93 |
| STX 2021 06 W1 | SW3511, SW8015D | N | | | < 0.10 | | < 0.10 |

D. App. 0228

Petroleum

| Sample ID | DX/FX  TEQ : total in pg/L | work order | TPAH in ppm (LLD = per analyte) | Talkyl_PAH in ppm (LLD = per analyte) | DX/FX-Alk-PAH-1 | DF/FX - Alk-PAH-2 |
|---|---|---|---|---|---|---|
| unique identifier | dioxins & furans, midTEQ in pg/L and total 2,3,7,8-substituted in pg/L | Laboratory EDD work order number matching row# and report file | total polynuclear aromatic hydrocarbons | total alkylated (substituted) polynuclear aromatic hydrocarbons | compound 1        (from highest to lowest PAH concentration detected) | compound 2 |
| STX-001S | | 21072473 | | | | |
| STX-002S | | 21072473, K2109349 | 0.3266 | | C30 hopane 0.120 | benzo(k)fluor anthene 0.017 |
| STX-003W | | 21072473 | | | | |
| STX-004S | | 21072473, K2109349 | 0.0826 | | C30 hopane 0.028 | retene 0.0089 |
| STX-005S | | K2109349 | 0.0519 | | C4-chrysenes 0.028 | C30 hopane 0.016 |
| STX-006D | | | | | | |
| STX-007S | | 21072473, K2109349 | 0.8627 | | C30 hopane 0.090 | C4-chrysenes 0.086 |
| STX-008S | | 21072473, K2109349 | 6.496 | | C30 hopane 0.690 | C2-chrysenes 0.500 |
| STX-009S | | 21072473 | | | | |
| STX-010W | | 21072473 | | | | |
| STX-011S | | 21072473, K2109349 | < 0.0063 | NA | NA | |
| STX-012S | | 21072473, K2109349 | < 0.0063 | NA | NA | |
| STX-013S | | | | | | |
| STX-014S | | 21072473 | | | | |
| STX-015W | | 21072473 | | | | |
| STX 2021 01 W1 | | 21090388 | | | | |
| STX 2021 01 S1/S2 | | 21091012 | | | | |
| STX 2021 02 W1 | | 21090388 | | | | |
| STX 2021 02 S1/S2 | | 21091012 | | | | |
| STX 2021 03 W1 | | 21090388 | | | | |
| STX 2021 03 S1/S2 | | 21091012 | | | | |
| STX 2021 04 W1 | | 21090388 | | | | |
| STX 2021 04 W3 | | 21090388 | | | | |
| STX 2021 04 S1/S2 | | 21091012 | | | | |
| STX 2021 04 S2/S4 | | 21091012 | | | | |
| STX 2021 05 W1 | | 21090388 | | | | |
| STX 2021 05 S1/S2 | | 21091012, K2110717 | <0.0056 | 0.046 | C30 hopane 0.046 | |
| STX 2021 06 W1 | | 21090388 | | | | |

D. App. 0229

| Sample ID | DF/FX - Alk-PAH-3 | DF/FX - Alk-PAH-4 | Notes |
|---|---|---|---|
| unique identifier | compound 3 | compound 4 | metals or inorganic detections of note as a range |
| STX-001S | | | Zn: 42 min. to 1000 ppm, max. |
| STX-002S | benzo(g,h,i)perylene 0.017 | C4-chrysenes 0.017 | |
| STX-003W | | | |
| STX-004S | C2-Naphthobenzo thiophenes 0.0086 | C2-chrysenes 0.0074 | As: 1.2 min. to  42 ppm by SW6020B, Study max. value |
| STX-005S | benzo(e)pyrene 0.0079 | | |
| STX-006D | | | |
| STX-007S | C3-Naphthobenzo thiophenes 0.054 | C3-chrysenes 0.050 | Be: ND to 0.6 ppm by SW6020B, Study max. value |
| STX-008S | C3-Naphthobenzo thiophenes 0.430 | C3-chrysenes 0.430 | Cd: ND -  0.33, Hg: ND -  0.2 ppm by SW6020B, Study max. values |
| STX-009S | | | |
| STX-010W | | | |
| STX-011S | NA | NA | |
| STX-012S | NA | NA | |
| STX-013S | | | |
| STX-014S | | | |
| STX-015W | | | |
| STX 2021 01 W1 | | | |
| STX 2021 01 S1/S2 | | | |
| STX 2021 02 W1 | | | |
| STX 2021 02 S1/S2 | | | |
| STX 2021 03 W1 | | | |
| STX 2021 03 S1/S2 | | | |
| STX 2021 04 W1 | | | |
| STX 2021 04 W3 | | | |
| STX 2021 04 S1/S2 | | | |
| STX 2021 04 S2/S4 | | | |
| STX 2021 05 W1 | | | |
| STX 2021 05 S1/S2 | | | |
| STX 2021 06 W1 | | | |

D. App. 0230

Petroleum

| Sample ID | Latitude | Longitude | Sampler | Date Sampled | Client | ID | vector | Matrix | Solvent NA, E1, E2, Hx | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| unique identifier | based on GPS or location of front door of home | based on GPS or location of front door of home | Individual collecting sample | | Name of property occupant | Secondary location identifier | | material sampled | | SI units |
| STX 2021 06 S1/S2 | 17.6983 | -64.8689 | Douglas/Henry | 8/31/2021 | Maria Parilla | 121 Concordia | | soil | | mg/kg |
| STX 2021 07 W1 | 17.7285 | -64.8097 | Douglas/Henry | 8/31/2021 | Joan Matherin | 44 Upper Love | | water | | mg/L |
| STX 2021 07 S1/S2 | 17.7285 | -64.8097 | Douglas/Henry | 8/31/2021 | Joan Matherin | 44 Upper Love | | soil | | mg/kg |
| STX 2021 08 W1 | 17.711 | -64.86 | Douglas/Henry | 9/1/2021 | Alyssa Fredericks | 74 Fredrik's Haab | | water | | mg/L |
| STX 2021 08 S1 | 17.711 | -64.86 | Douglas/Henry | 9/1/2021 | Alyssa Fredericks | 74 Fredrik's Haab | | soil | | mg/kg |
| STX 2021 09 W1 | 17.702 | -64.86545 | Douglas/Henry | 9/1/2021 | Carol Hugging | 205 Concordia West | | water | | mg/L |
| STX 2021 09 S1 | 17.702 | -64.86545 | Douglas/Henry | 9/1/2021 | Carol Hugging | 205 Concordia West | | soil | | mg/kg |
| STX 2021 10 W1 | 17.69 | -64.8658 | Douglas/Henry | 9/1/2021 | Maria AH Garcia-Belan | 105-H Whim | | water | | mg/L |
| STX 2021 10 W3 | 17.69 | -64.8658 | Douglas/Henry | 9/1/2021 | Maria AH Garcia-Belan | 105-H Whim | | water | | mg/L |
| STX 2021 10 S1 | 17.69 | -64.8658 | Douglas/Henry | 9/1/2021 | Maria AH Garcia-Belan | 105-H Whim | | soil | | mg/kg |
| STX 2021 10 S3 | 17.69 | -64.8658 | Douglas/Henry | 9/1/2021 | Maria AH Garcia-Belan | 105-H Whim | | soil | | mg/kg |
| STX 2021 11 W1 | 17.693 | -64.8559 | Douglas/Henry | 9/1/2021 | Isaac President | 117-H Estate Whim | | water | | mg/L |
| STX 2021 11 S1 | 17.693 | -64.8559 | Douglas/Henry | 9/1/2021 | Isaac President | 117-H Estate Whim | | soil | | mg/kg |
| STX 2021 12 W1 | 17.699974 | -64.853 | Douglas/Henry | 9/1/2021 | Carlos Christian | 38C Whim Frederiksted | | water | | mg/L |
| STX 2021 12 S1 | 17.699974 | -64.853 | Douglas/Henry | 9/1/2021 | Carlos Christian | 38C Whim Frederiksted | | soil | | mg/kg |
| STX 2021 13 W1 | 17.71 | -64.8238 | Douglas/Henry | 9/1/2021 | Benedict Chelcher | 504 Mount Pleasant | | water | | mg/L |
| STX 2021 13 S1 | 17.71 | -64.8238 | Douglas/Henry | 9/1/2021 | Benedict Chelcher | 504 Mount Pleasant | | soil | | mg/kg |
| STX 2021 14 W1 | 17.7253 | -64.8239 | Douglas/Henry | 9/1/2021 | Aaron Maynard | 72 B Grove Place | | water | | mg/L |
| STX 2021 14 S1 | 17.7253 | -64.8239 | Douglas/Henry | 9/1/2021 | Aaron Maynard | 72 B Grove Place | | soil | | mg/kg |
| STX 2021 15 W1 | 17.7259 | -64.8239 | Douglas/Henry | 9/1/2021 | Eldimiro Acosta | 620 Sunny Acres | | water | | mg/L |
| STX 2021 15 S1 | 17.7259 | -64.8239 | Douglas/Henry | 9/1/2021 | Eldimiro Acosta | 620 Sunny Acres | | soil | | mg/kg |
| STX 2021 16 W1 | 17.71478 | -64.7253 | Douglas/Henry | 9/1/2021 | Vafudare Boodoosingh | No. 65 Estate Humbug | | water | | mg/L |
| STX 2021 16 S1 | 17.71478 | -64.7253 | Douglas/Henry | 9/1/2021 | Vafudare Boodoosingh | No. 65 Estate Humbug | | soil | | mg/kg |
| STX-2021-17SW | 17.744324 | -64.71103 | Douglas/Henry | 10/19/2021 | Michael Boyce | 143 Richmond | | Swab | | mg |
| STX-2021-17S | 17.744324 | -64.71103 | Douglas/Henry | 10/19/2021 | Michael Boyce | 143 Richmond | | soil | | mg/kg |
| STX-2021-18SW | 17.694554 | -64.837482 | Douglas/Henry | 10/19/2021 | Delia Armistios | 175 Williams Delight | | Swab | | mg |
| STX-2021-18S | 17.694554 | -64.837482 | Douglas/Henry | 10/19/2021 | Delia Armistios | 175 Williams Delight | | soil | | mg/kg |
| STX-2021-19SW | 17.692187 | -64.858377 | Douglas/Henry | 10/19/2021 | Kenya John | 113J Whim | | Swab | | mg |
| STX-2021-19S | 17.692187 | -64.858377 | Douglas/Henry | 10/19/2021 | Kenya John | 113J Whim | | soil | | mg/kg |
| STX-2021-20SW | 17.689259 | -64.82066 | Douglas/Henry | 10/19/2021 | Shiobhan Henderson | 387 Whim | | Swab | | mg |
| STX-2021-20S | 17.689259 | -64.82066 | Douglas/Henry | 10/19/2021 | Shiobhan Henderson | 387 Whim | | soil | | mg/kg |

D. App. 0231

Petroleum

| Sample ID | method | Impacted water system | Basis for water system impact | TPH-GRO C6-10 | TPH-DRO C10-28 | TPH-RRO C25-36 | TPH-ORO C28-40 |
|---|---|---|---|---|---|---|---|
| unique identifier | EPA method number | Definition: (1) Visible sheen in cistern, detectable (2) TPH, PAH, or (3) DX/FX (see note) in cistern water |  | TPH as gasoline range hydrocarbons | TPH as diesel range hydrocarbons | TPH as residual range hydrocarbons | TPH as oil range hydrocarbons |
| STX 2021 06 S1/S2 | SW8015D |  |  |  | < 11 |  | 75 |
| STX 2021 07 W1 | SW3511, SW8015D | N |  |  | < 0.10 |  | < 0.10 |
| STX 2021 07 S1/S2 | SW8015D |  |  |  | < 11 |  | 59 |
| STX 2021 08 W1 | SW3511, SW8015D | N |  |  | < 0.10 |  | < 0.10 |
| STX 2021 08 S1 | SW8015D |  |  |  | < 11 |  | 76 |
| STX 2021 09 W1 | SW3511, SW8015D | N |  |  | < 0.10 |  | < 0.10 |
| STX 2021 09 S1 | SW8015D |  |  |  | 12 |  | 110 |
| STX 2021 10 W1 | SW3511, SW8015D | N |  |  | < 0.10 |  | < 0.10 |
| STX 2021 10 W3 | SW8015D |  |  |  | < 0.10 |  | < 0.10 |
| STX 2021 10 S1 | SW3511, SW8015D |  |  |  | 28 |  | 180 |
| STX 2021 10 S3 | SW8015D |  |  |  | 27 |  | 140 |
| STX 2021 11 W1 | SW3511, SW8015D | N |  |  | < 0.10 |  | < 0.10 |
| STX 2021 11 S1 | SW8015D |  |  |  | 31 |  | 200 |
| STX 2021 12 W1 | SW3511, SW8015D | N |  |  | < 0.10 |  | < 0.10 |
| STX 2021 12 S1 | SW8015D |  |  |  | < 11 |  | 42 |
| STX 2021 13 W1 | SW3511, SW8015D | N |  |  | < 0.10 |  | < 0.10 |
| STX 2021 13 S1 | SW8015D |  |  |  | < 13 |  | 46 |
| STX 2021 14 W1 | SW3511, SW8015D | N |  |  | < 0.10 |  | < 0.10 |
| STX 2021 14 S1 | SW8015D |  |  |  | 45 |  | 150 |
| STX 2021 15 W1 | SW3511, SW8015D | N |  |  | < 0.10 |  | < 0.10 |
| STX 2021 15 S1 | SW8015D |  |  |  | 19 |  | 83 |
| STX 2021 16 W1 | SW3511, SW8015D | N |  |  | < 0.10 |  | < 0.10 |
| STX 2021 16 S1 | SW8015D |  |  |  | < 11 |  | 38 |
| STX-2021-17SW | EPA/600/R-07-004, SW8015D | NA |  |  | 2.4 |  | 2 |
| STX-2021-17S | SW8015D | NA |  |  | < 11 |  | 50 |
| STX-2021-18SW | EPA/600/R-07-004, SW8015D |  |  |  | <1.0 |  | <1.0 |
| STX-2021-18S | SW8015D | NA |  |  | < 13 |  | 32 |
| STX-2021-19SW | EPA/600/R-07-004, SW8015D |  |  |  | <1.0 |  | <1.0 |
| STX-2021-19S | SW8015D | NA |  |  | < 12 |  | 38 |
| STX-2021-20SW | EPA/600/R-07-004, SW8015D |  |  |  | <1.0 |  | <1.0 |
| STX-2021-20S | SW8015D | NA |  |  | 26 |  | 180 |

D. App. 0232

| Sample ID | DX/FX   TEQ : total in pg/L | work order | TPAH in ppm (LLD = per analyte) | Talkyl_PAH in ppm (LLD = per analyte) | DX/FX-Alk-PAH-1 | DF/FX - Alk-PAH-2 |
|---|---|---|---|---|---|---|
| unique identifier | dioxins & furans, midTEQ in pg/L and total 2,3,7,8-substituted in pg/L | Laboratory EDD work order number matching row# and report file | total polynuclear aromatic hydrocarbons | total alkylated (substituted) polynuclear aromatic hydrocarbons | compound 1          (from highest to lowest PAH concentration detected) | compound 2 |
| STX 2021 06 S1/S2 | | 21091012 | | | | |
| STX 2021 07 W1 | | 21090388 | | | | |
| STX 2021 07 S1/S2 | | 21091012 | | | | |
| STX 2021 08 W1 | | 21091043 | | | | |
| STX 2021 08 S1 | | 21091012 | | | | |
| STX 2021 09 W1 | | 21091043 | | | | |
| STX 2021 09 S1 | | 21091012, K2110717 | <0.0054 | <0.0054 | | |
| STX 2021 10 W1 | | 21091043 | | | | |
| STX 2021 10 W3 | | 21091043 | | | | |
| STX 2021 10 S1 | | 21091012 | | | | |
| STX 2021 10 S3 | | 21091012 | | | | |
| STX 2021 11 W1 | | 21091043 | | | | |
| STX 2021 11 S1 | | 21091012 | | | | |
| STX 2021 12 W1 | | 21091043 | | | | |
| STX 2021 12 S1 | | 21091012 | | | | |
| STX 2021 13 W1 | | 21091043 | | | | |
| STX 2021 13 S1 | | 21091012, K2110717 | <0.0062 | <0.0062 | | |
| STX 2021 14 W1 | | 21091043 | | | | |
| STX 2021 14 S1 | | 21091012 | | | | |
| STX 2021 15 W1 | | 21091043 | | | | |
| STX 2021 15 S1 | | 21091012 | | | | |
| STX 2021 16 W1 | | 21091043 | | | | |
| STX 2021 16 S1 | | 21091012, K2110717 | <0.0052 | 0.0054 | 1-Methyl-7-(1-methylethyl) phenanthrene 0.0054 | |
| STX-2021-17SW | | 21111403 | | | | |
| STX-2021-17S | | K2113304, 21111432 | <0.0059 | | | |
| STX-2021-18SW | | 21111403 | | | | |
| STX-2021-18S | | K2113304, 21111432 | <0.0064 | | | |
| STX-2021-19SW | | 21111403 | | | | |
| STX-2021-19S | | K2113304, 21111432 | <0.0059 | | | |
| STX-2021-20SW | | 21111403 | | | | |
| STX-2021-20S | | K2113304, 21111432 | 0.0527 | | | |

D. App. 0233

| Sample ID | DF/FX - Alk-PAH-3 | DF/FX - Alk-PAH-4 | Notes |
|---|---|---|---|
| unique identifier | compound 3 | compound 4 | metals or inorganic detections of note as a range |
| STX 2021 06 S1/S2 | | | |
| STX 2021 07 W1 | | | |
| STX 2021 07 S1/S2 | | | |
| STX 2021 08 W1 | | | |
| STX 2021 08 S1 | | | |
| STX 2021 09 W1 | | | |
| STX 2021 09 S1 | | | |
| STX 2021 10 W1 | | | |
| STX 2021 10 W3 | | | |
| STX 2021 10 S1 | | | |
| STX 2021 10 S3 | | | |
| STX 2021 11 W1 | | | |
| STX 2021 11 S1 | | | |
| STX 2021 12 W1 | | | |
| STX 2021 12 S1 | | | |
| STX 2021 13 W1 | | | |
| STX 2021 13 S1 | | | |
| STX 2021 14 W1 | | | |
| STX 2021 14 S1 | | | |
| STX 2021 15 W1 | | | |
| STX 2021 15 S1 | | | |
| STX 2021 16 W1 | | | |
| STX 2021 16 S1 | | | |
| STX-2021-17SW | | | |
| STX-2021-17S | | | |
| STX-2021-18SW | | | |
| STX-2021-18S | | | |
| STX-2021-19SW | | | |
| STX-2021-19S | | | |
| STX-2021-20SW | | | |
| STX-2021-20S | | | |

D. App. 0234

Petroleum

| Sample ID | Latitude | Longitude | Sampler | Date Sampled | Client | ID | vector | Matrix | Solvent NA, E1, E2, Hx | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| unique identifier | based on GPS or location of front door of home | based on GPS or location of front door of home | Individual collecting sample | | Name of property occupant | Secondary location identifier | | material sampled | | SI units |
| STX-2021-21SW | 17.707887 | -64.86041 | Douglas/Henry | 10/19/2021 | David Lang | 15-I Two Williams (Whim) | | Swab | | mg |
| STX-2021-21S | 17.707887 | -64.86041 | Douglas/Henry | 10/19/2021 | David Lang | 15-I Two Williams (Whim) | | soil | | mg/kg |
| STX-2021-22SW | 17.708262 | -64.860456 | Douglas/Henry | 10/19/2021 | Reuben Lang | 15G Two Williams | | Swab | | mg |
| STX-2021-22S | 17.708262 | -64.860456 | Douglas/Henry | 10/19/2021 | Reuben Lang | 15G Two Williams | | soil | | mg/kg |
| STX-2021-23SW | 17.701 | -64.886 | Douglas/Henry | 10/19/2021 | Luz Navarro | 1-11B Smithfield | | Swab | | mg |
| STX-2021-23S | 17.701 | -64.886 | Douglas/Henry | 10/19/2021 | Luz Navarro | 1-11B Smithfield | | soil | | mg/kg |
| STX-2021-24SW | 17.6978 | -64.8791 | Douglas/Henry | 10/19/2021 | Margaret Thompson | 94B Smithfield | | Swab | | mg |
| STX-2021-25SW | 17.713988 | -64.814266 | Douglas/Henry | 10/19/2021 | Lucia Marcelle | 499 Mt. Pleasant | | Swab | | mg |
| STX-2021-25S | 17.713988 | -64.814266 | Douglas/Henry | 10/19/2021 | Lucia Marcelle | 499 Mt. Pleasant | | soil | | mg/kg |
| STX-2021-26SW | 17.7413 | -64.6944 | Douglas/Henry | 10/21/2021 | Nicholas Drayton | 1 Mt. Welcome | | Swab | | mg/wipe |
| STX-2021-26S | 17.7413 | -64.6944 | Douglas/Henry | 10/21/2021 | Nicholas Drayton | 1 Mt. Welcome | | soil | | mg/kg |
| STX-2021-27SW | 17.710078 | -64.861097 | Douglas/Henry | 10/21/2021 | Rubio Lang | * 15-E Two Williams | | Swab | | mg/wipe |
| STX-2021-27S | 17.710078 | -64.861097 | Douglas/Henry | 10/21/2021 | Rubio Lang | * 15-E Two Williams | | soil | | mg/kg |
| STX-2021-28SW | 17.710078 | -64.861097 | Douglas/Henry | 10/21/2021 | Hortense Vasquez | 107H Whim | | Swab | | mg/wipe |
| STX-2021-28S | 17.710078 | -64.861097 | Douglas/Henry | 10/21/2021 | Hortense Vasquez | 107H Whim | | soil | | mg/kg |
| STX-2021-29SW | 17.696959 | -64.833371 | Douglas/Henry | 10/21/2021 | Michael Floyd | 58 Williams Delight | | Swab | | mg/wipe |
| STX-2021-29S | 17.696959 | -64.833371 | Douglas/Henry | 10/21/2021 | Michael Floyd | 58 Williams Delight | | soil | | mg/kg |
| STX-2021-30SW1 | 17.694847 | -64.852364 | Douglas/Henry | 10/21/2021 | Raphael Munches | * 122 E Whim | | Swab | | mg/wipe |
| STX-2021-30S1 | 17.694847 | -64.852364 | Douglas/Henry | 10/21/2021 | Raphael Munches | * 122 E Whim | | soil | | mg/kg |
| STX-2021-30SW2 | 17.694847 | -64.852364 | Douglas/Henry | 10/21/2021 | Raphael Munches | 122 E Whim | | Swab | | mg/wipe |
| STX-2021-30S2 | 17.694847 | -64.852364 | Douglas/Henry | 10/21/2021 | Raphael Munches | 122 E Whim | | soil | | mg/kg |
| STX-2021-31SW | 17.698869 | -64.864561 | Douglas/Henry | 10/21/2021 | Helena Mulgrar | 86B Whim | | Swab | | mg/wipe |
| STX-2021-31S | 17.698869 | -64.864561 | Douglas/Henry | 10/21/2021 | Helena Mulgrar | 86B Whim | | soil | | mg/kg |
| STX-2021-32W1 | 17.710078 | -64.861097 | Douglas/Henry | 11/3/2021 | Rubio lang | 15E Two Brothers | | water | | mg/L |
| STX-2021-32W2 | 17.710078 | -64.861097 | Douglas/Henry | 11/3/2021 | Rubio lang | 15E Two Brothers | | water | | mg/L |
| STX-2021-32W3 | 17.710078 | -64.861097 | Douglas/Henry | 11/3/2021 | Rubio lang | 15E Two Brothers | | water | | mg/L |
| STX-2021-32S | 17.710078 | -64.861097 | Douglas/Henry | 11/3/2021 | Rubio lang | 15E Two Brothers | | soil | | mg/kg |
| STX-2022-01-RF1 | 17.710078 | -64.861097 | Douglas/Henry | 3/22/2022 | Rubio Lang | 15 E Two Williams | | roof swabs | | mg/wipe |
| STX-2022-01-RF2 | 17.710078 | -64.861097 | Douglas/Henry | 3/22/2022 | Rubio Lang | 15 E Two Williams | | roof swabs | | mg/wipe |

D. App. 0235

| Sample ID | method | Impacted water system | Basis for water system impact | TPH-GRO C6-10 | TPH-DRO C10-28 | TPH-RRO C25-36 | TPH-ORO C28-40 |
|---|---|---|---|---|---|---|---|
| unique identifier | EPA method number | Definition: (1) Visible sheen in cistern, detectable (2) TPH, PAH, or (3) DX/FX (see note) in cistern water⬚ ⬚ ⬚ | | TPH as gasoline range hydrocarbons | TPH as diesel range hydrocarbons | TPH as residual range hydrocarbons | TPH as oil range hydrocarbons |
| STX-2021-21SW | EPA/600/R-07-004, SW8015D | | | | <1.0 | | <1.0 |
| STX-2021-21S | SW8015D | NA | | | < 14 | | < 14 |
| STX-2021-22SW | EPA/600/R-07-004, SW8015D | NA | | | 1.6 | | <1.0 |
| STX-2021-22S | SW8015D | NA | | | < 15 | | 24 |
| STX-2021-23SW | EPA/600/R-07-004, SW8015D | | | | <1.0 | | <1.0 |
| STX-2021-23S | SW8015D | NA | | | < 14 | | 32 |
| STX-2021-24SW | EPA/600/R-07-004, SW8015D | | | | <1.0 | | <1.0 |
| STX-2021-25SW | EPA/600/R-07-004, SW8015D | NA | | | <1.0 | | 1.6 |
| STX-2021-25S | SW8015D | NA | | | < 14 | | 16 |
| STX-2021-26SW | EPA/600/R-07-004, SW8015D | | | | <1.0 | | <1.0 |
| STX-2021-26S | SW8015D | NA | | | < 13 | | 21 |
| STX-2021-27SW | EPA/600/R-07-004, SW8015D | Y | sheen | | <1.0 | | <1.0 |
| STX-2021-27S | SW8015D | | | | 15 | | 140 |
| STX-2021-28SW | EPA/600/R-07-004, SW8015D | NA | | | <1.0 | | 1.1 |
| STX-2021-28S | SW8015D | | | | < 14 | | 24 |
| STX-2021-29SW | EPA/600/R-07-004, SW8015D | NA | | | <1.0 | | <1.0 |
| STX-2021-29S | SW8015D | | | | < 13 | | 26 |
| STX-2021-30SW1 | EPA/600/R-07-004, SW8015D | Y | sheen | | 1.1 | | <1.0 |
| STX-2021-30S1 | SW8015D | | | | 20 | | 160 |
| STX-2021-30SW2 | EPA/600/R-07-004, SW8015D | | | | <1.0 | | <1.0 |
| STX-2021-30S2 | SW8015D | | | | < 13 | | 67 |
| STX-2021-31SW | EPA/600/R-07-004, SW8015D | N | | | <1.0 | | <1.0 |
| STX-2021-31S | SW8015D | | | | 18 | | 100 |
| STX-2021-32W1 | SW8015D | N | | | < 0.10 | | < 0.10 |
| STX-2021-32W2 | 8270D/EPA 3510C prep | | | | | | |
| STX-2021-32W3 | 8270D/EPA 3510C prep | | | | | | |
| STX-2021-32S | | | | | | | |
| STX-2022-01-RF1 | SW8015D, 8270D | NA | | | 100 (Z) | 240 (Z) | |
| STX-2022-01-RF2 | SW8015D, 8270D | | | | 200 (Z) | 380 (Z) | |

D. App. 0236

| Sample ID | DX/FX   TEQ : total in pg/L | work order | TPAH in ppm (LLD = per analyte) | Talkyl_PAH in ppm (LLD = per analyte) | DX/FX-Alk-PAH-1 | DF/FX - Alk-PAH-2 |
|---|---|---|---|---|---|---|
| unique identifier | dioxins & furans, midTEQ in pg/L and total 2,3,7,8-substituted in pg/L | Laboratory EDD work order number matching row# and report file | total polynuclear aromatic hydrocarbons | total alkylated (substituted) polynuclear aromatic hydrocarbons | compound 1      (from highest to lowest PAH concentration detected) | compound 2 |
| STX-2021-21SW | | 21111403 | | | | |
| STX-2021-21S | | K2113304, 21111432 | <0.0068 | | | |
| STX-2021-22SW | | 21111403 | | | | |
| STX-2021-22S | | K2113304, 21111432 | 0.1401 | | | |
| STX-2021-23SW | | 21111403 | | | | |
| STX-2021-23S | | K2113304, 21111432 | 0.0110 | | | |
| STX-2021-24SW | | 21111403 | | | | |
| STX-2021-25SW | | 21111403 | | | | |
| STX-2021-25S | | K2113304, 21111432 | <0.0069 | | | |
| STX-2021-26SW | | 21111403 | | | | |
| STX-2021-26S | | K2113304, 21111432 | <0.0064 | | | |
| STX-2021-27SW | | 21111403 | | | | |
| STX-2021-27S | | K2113304, 21111432 | <0.0065 | | | |
| STX-2021-28SW | | 21111403 | | | | |
| STX-2021-28S | | K2113304, 21111432 | <0.0068 | | | |
| STX-2021-29SW | | 21111403 | | | | |
| STX-2021-29S | | K2113304, 21111432 | <0.0064 | | | |
| STX-2021-30SW1 | | 21111403 | | | | |
| STX-2021-30S1 | | K2113304, 21111432 | <0.0063 | | | |
| STX-2021-30SW2 | | 21111403 | | | | |
| STX-2021-30S2 | | K2113304, 21111432 | <0.0063 | | | |
| STX-2021-31SW | | 21111403 | | | | |
| STX-2021-31S | | K2113304, 21111432 | <0.0063 | | | |
| STX-2021-32W1 | | 21111379 | | | | |
| STX-2021-32W2 | | K2113171 | <0.000036 ug/L | | | |
| STX-2021-32W3 | | K2113171 | <0.000037 ug/L | | <0.00008 for each biomarker | |
| STX-2021-32S | | | | | | |
| STX-2022-01-RF1 | | K2203933.01 | | | | |
| STX-2022-01-RF2 | | K2203933.01 | | | | |

D. App. 0237

| Sample ID | DF/FX - Alk-PAH-3 | DF/FX - Alk-PAH-4 | Notes |
|---|---|---|---|
| unique identifier | compound 3 | compound 4 | metals or inorganic detections of note as a range |
| STX-2021-21SW | | | |
| STX-2021-21S | | | |
| STX-2021-22SW | | | |
| STX-2021-22S | | | |
| STX-2021-23SW | | | |
| STX-2021-23S | | | |
| STX-2021-24SW | | | |
| STX-2021-25SW | | | |
| STX-2021-25S | | | |
| STX-2021-26SW | | | |
| STX-2021-26S | | | |
| STX-2021-27SW | | | |
| STX-2021-27S | | | |
| STX-2021-28SW | | | |
| STX-2021-28S | | | |
| STX-2021-29SW | | | |
| STX-2021-29S | | | |
| STX-2021-30SW1 | | | |
| STX-2021-30S1 | | | |
| STX-2021-30SW2 | | | |
| STX-2021-30S2 | | | |
| STX-2021-31SW | | | |
| STX-2021-31S | | | |
| STX-2021-32W1 | | | |
| STX-2021-32W2 | | | |
| STX-2021-32W3 | | | |
| STX-2021-32S | | | |
| STX-2022-01-RF1 | | | |
| STX-2022-01-RF2 | | | |

D. App. 0238

Petroleum

| Sample ID | Latitude | Longitude | Sampler | Date Sampled | Client | ID | vector | Matrix | Solvent NA, E1, E2, Hx | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| unique identifier | based on GPS or location of front door of home | based on GPS or location of front door of home | Individual collecting sample | | Name of property occupant | Secondary location identifier | | material sampled | | SI units |
| STX-2022-02-RF1 | 17.710078 | -64.861097 | Douglas/Henry | 3/24/2022 | Rubio Lang | 15 E Two Williams | | roof swabs | | mg/wipe |
| STX-2022-02-RF2 | 17.710078 | -64.861097 | Douglas/Henry | 3/24/2022 | Rubio Lang | 15 E Two Williams | | roof swabs | | mg/wipe |
| STX-2022-03-CN1 | 17.710078 | -64.861097 | Douglas/Henry | 3/24/2022 | Rubio Lang | 15 E Two Williams | | cistern swabs | | mg/wipe |
| STX-2022-03-CN2 | 17.710078 | -64.861097 | Douglas/Henry | 3/24/2022 | Rubio Lang | 15 E Two Williams | | cistern swabs | | mg/wipe |
| STX-2022-04-RF1 | 17.694847 | -64.852364 | Douglas/Henry | 3/28/2022 | Raphael Munches | 122 E & F Whim | | ash | | mg/kg |
| STX-2022-04-RF2 | 17.694847 | -64.852364 | Douglas/Henry | 3/28/2022 | Raphael Munches | 122 E & F Whim | | ash | | mg/kg |
| STX-2022-04-RF3 | 17.694847 | -64.852364 | Douglas/Henry | 3/28/2022 | Raphael Munches | 122 E & F Whim | | roof deposits | | |
| STX-2022-04-RF4 | 17.694847 | -64.852364 | Douglas/Henry | 3/28/2022 | Raphael Munches | 122 E & F Whim | | roof deposits | | |
| STX-2022-05-W1 | 17.710078 | -64.861097 | Douglas/Henry | 3/29/2022 | Rubio Lang | 15 E Two Williams | W of LTB | water | | mg/L |
| STX-2022-06-RF1 (2 & 3) *** | 17.694847 | -64.852364 | Douglas/Henry | 3/30/2022 | Raphael Munches | 122 E & F Whim | | roof swabs | | mg/kg |
| STX-2022-06-RF2 (2 & 3) *** | 17.694847 | -64.852364 | Douglas/Henry | 3/30/2022 | Raphael Munches | 122 E & F Whim | | roof swabs | | mg/kg |
| STX-2022-07-CN1 (2 & 3) *** | 17.694847 | -64.852364 | Douglas/Henry | 4/1/2022 | Raphael Munches | 122 E & F Whim | | cistern swabs | | mg |
| STX-2022-07-CN2 (2 & 3) *** | 17.694847 | -64.852364 | Douglas/Henry | 4/1/2022 | Raphael Munches | 122 E & F Whim | | cistern swabs | | mg/kg |
| STX-2024-01 C1 | 17.693912 | -64.867684 | Henry | 8/8/2024 | | * 216 Campo Rico | W of LTB | water | | mg/L |
| STX-2024-01 C2 duplicate | 17.693912 | -64.867684 | Henry | 8/8/2024 | | * 216 Campo Rico | | water | | mg/L |
| STX-2024-01 R1 | 17.693912 | -64.867684 | Henry | 8/8/2024 | | 216 Campo Rico | | roof sample | | mg/kg |
| STX-2024-01 R2 | 17.693912 | -64.867684 | Henry | 8/8/2024 | | 216 Campo Rico | | roof sample | | mg/kg |
| STX-2024-01 S1 | 17.693912 | -64.867684 | Henry | 8/8/2024 | | 216 Campo Rico | | wipe | | mg/wipe |
| STX-2024-01 S2 | 17.693912 | -64.867684 | Henry | 8/8/2024 | | 216 Campo Rico | | wipe | | mg/wipe |
| STX-2024-02 S1 | 17.714576 | -64.784245 | Henry | 8/12/2024 | | 137 Estate Profit | W of LTB | soil | | mg/kg |
| STX-2024-02 S2 | 17.714576 | -64.784245 | Henry | 8/12/2024 | | 137 Estate Profit | | soil | | mg/kg |
| STX-2024-02 W1 | 17.714576 | -64.784245 | Henry | 8/12/2024 | | 137 Estate Profit | | water | | mg/L |

D. App. 0239

Petroleum

| Sample ID | method | Impacted water system | Basis for water system impact | TPH-GRO C6-10 | TPH-DRO C10-28 | TPH-RRO C25-36 | TPH-ORO C28-40 |
|---|---|---|---|---|---|---|---|
| unique identifier | EPA method number | Definition: (1) Visible sheen in cistern, detectable (2) TPH, PAH, or (3) DX/FX (see note) in cistern water▢ ▢ ▢ | | TPH as gasoline range hydrocarbons | TPH as diesel range hydrocarbons | TPH as residual range hydrocarbons | TPH as oil range hydrocarbons |
| STX-2022-02-RF1 | SW8015D, 8270D | | | | < 230 | 1200 (Z) | |
| STX-2022-02-RF2 | SW8015D, 8270D | | | | < 200 | 760 (Z) | |
| STX-2022-03-CN1 | SW8015D, 8270D | | | | < 160 | 720 (Z) | |
| STX-2022-03-CN2 | SW8015D, 8270D | | | | < 230 | 1000 (Z) | |
| STX-2022-04-RF1 | SW8015D, 8270D | NA | | < 11 | < 790 | | < 790 |
| STX-2022-04-RF2 | SW8015D, 8270D | | | < 11 | < 780 | | < 780 |
| STX-2022-04-RF3 | | | | | | | |
| STX-2022-04-RF4 | | | | | | | |
| STX-2022-05-W1 | SW8015D, 8270D | Y | DRO/ORO | < 2.0 | 0.11 | | 0.42 |
| STX-2022-06-RF1 (2 & 3) *** | SW8015C, 8270 | NA | | < 42 | < 280 | 1100 (Z) | |
| STX-2022-06-RF2 (2 & 3) *** | SW8015C, 8270 | | | < 34 | < 210 | 700 (Z) | |
| STX-2022-07-CN1 (2 & 3) *** | SW8015C, 8270 | NA | | < 28 | < 180 | < 450 | |
| STX-2022-07-CN2 (2 & 3) *** | SW8015C, 8270 | | | < 49 | < 290 | 980 (Z) | |
| STX-2024-01 C1 | SW8015C, 8270E | Y | sheen/DRO/ORO | | 130 H | | 170 H |
| STX-2024-01 C2 duplicate | SW8015C, 8270E | | | | 110 H | | 150 H |
| STX-2024-01 R1 | SW8015C, 8270E | | | | 160 H | | 390 H |
| STX-2024-01 R2 | SW8015C, 8270E | | | | <7.9 | | 50 H |
| STX-2024-01 S1 | SW8015C, 8270E | | | | <330 | | <500 |
| STX-2024-01 S2 | SW8015C, 8270E | | | | <330 | | <500 |
| STX-2024-02 S1 | SW8015C, 8270E | Y | ORO | | 13 J | | 84 |
| STX-2024-02 S2 | SW8015C, 8270E | | | | 5.8 J | | 70 |
| STX-2024-02 W1 | SW8015C, 8270E | | | | <0.18 | | 0.29 H |

D. App. 0240

| Sample ID | DX/FX  TEQ : total in pg/L | work order | TPAH in ppm (LLD = per analyte) | Talkyl_PAH in ppm (LLD = per analyte) | DX/FX-Alk-PAH-1 | DF/FX - Alk-PAH-2 |
|---|---|---|---|---|---|---|
| unique identifier | dioxins & furans, midTEQ in pg/L and total 2,3,7,8-substituted in pg/L | Laboratory EDD work order number matching row# and report file | total polynuclear aromatic hydrocarbons | total alkylated (substituted) polynuclear aromatic hydrocarbons | compound 1        (from highest to lowest PAH concentration detected) | compound 2 |
| STX-2022-02-RF1 | | K2203933.01 | | | | |
| STX-2022-02-RF2 | | K2203933.01 | | | | |
| STX-2022-03-CN1 | | K2203933.01 | | | | |
| STX-2022-03-CN2 | | K2203933.01 | | | | |
| STX-2022-04-RF1 | | 22041115, K2203930 | < 0.0051 | | | |
| STX-2022-04-RF2 | | 22041115, K2203930 | < 0.0051 | | | |
| STX-2022-04-RF3 | | | | | | |
| STX-2022-04-RF4 | | | | | | |
| STX-2022-05-W1 | | 22041115 | | | | |
| STX-2022-06-RF1 (2 & 3) *** | | K2203930 | 0.1042 | 0.0139 | | |
| STX-2022-06-RF2 (2 & 3) *** | | K2203930 | 0.0293 | 0.0096 | | |
| STX-2022-07-CN1 (2 & 3) *** | | K2203930 | < 0.0050 | 0.0159 | | |
| STX-2022-07-CN2 (2 & 3) *** | | K2203930 | 0.0448 | 0.0985 | | |
| STX-2024-01 C1 | | 24080913 | | | | |
| STX-2024-01 C2 duplicate | | 24080913 | | | | |
| STX-2024-01 R1 | | 24080913 | | | | |
| STX-2024-01 R2 | | 24080913 | | | | |
| STX-2024-01 S1 | | 24080913 | | 21 ug/wipe | | |
| STX-2024-01 S2 | | 24080913 | | 39 ug/wipe | | |
| STX-2024-02 S1 | | 24080913 | <0.006 | | | |
| STX-2024-02 S2 | | 24080913 | <0.005 | | | |
| STX-2024-02 W1 | | 24080913 | | | | |

D. App. 0241

| Sample ID | DF/FX - Alk-PAH-3 | DF/FX - Alk-PAH-4 | Notes |
|---|---|---|---|
| unique identifier | compound 3 | compound 4 | metals or inorganic detections of note as a range |
| STX-2022-02-RF1 | | | |
| STX-2022-02-RF2 | | | |
| STX-2022-03-CN1 | | | |
| STX-2022-03-CN2 | | | |
| STX-2022-04-RF1 | | | |
| STX-2022-04-RF2 | | | |
| STX-2022-04-RF3 | | | |
| STX-2022-04-RF4 | | | |
| STX-2022-05-W1 | | | |
| STX-2022-06-RF1 (2 & 3) *** | | | |
| STX-2022-06-RF2 (2 & 3) *** | | | |
| STX-2022-07-CN1 (2 & 3) *** | | | |
| STX-2022-07-CN2 (2 & 3) *** | | | |
| STX-2024-01 C1 | | | |
| STX-2024-01 C2 duplicate | | | not on coc |
| STX-2024-01 R1 | | | |
| STX-2024-01 R2 | | | |
| STX-2024-01 S1 | | | |
| STX-2024-01 S2 | | | |
| STX-2024-02 S1 | | | |
| STX-2024-02 S2 | | | |
| STX-2024-02 W1 | | | |

D. App. 0242

Petroleum

| Sample ID | Latitude | Longitude | Sampler | Date Sampled | Client | ID | vector | Matrix | Solvent NA, E1, E2, Hx | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| unique identifier | based on GPS or location of front door of home | based on GPS or location of front door of home | Individual collecting sample | | Name of property occupant | Secondary location identifier | | material sampled | | SI units |
| STX-2024-02 SW1 | 17.714576 | -64.784245 | Henry | 8/12/2024 | | 137 Estate Profit | | wipe | | mg/wipe |
| STX-2024-02 SW2 | 17.714576 | -64.784245 | Henry | 8/12/2024 | | 137 Estate Profit | | wipe | | mg/wipe |
| STX-2024-02 SW3 | 17.714576 | -64.784245 | Henry | 8/8/2024 | | 137 Estate Profit | | wipe | | mg/wipe |
| STX-2024-02 SW4 | 17.714576 | -64.784245 | Henry | 8/8/2024 | | 137 Estate Profit | | wipe | | mg/wipe |
| STX-2024-02 SW5 | 17.714576 | -64.784245 | Henry | 8/8/2024 | | 137 Estate Profit | | wipe | | mg/wipe |
| STX-2024-02 SW6 | 17.714576 | -64.784245 | Henry | 8/8/2024 | | 137 Estate Profit | | wipe | | mg/wipe |
| STX-2024-02 SW7 | 17.714576 | -64.784245 | Henry | 8/8/2024 | | 137 Estate Profit | | wipe | | mg/wipe |
| STX-2024-03 W1 | 17.695223 | -64.875916 | Henry | 9/9/2024 | | 16 Stoney ground | W of LTB | water | | mg/L |
| STX-2024-03 S1 | 17.695223 | -64.875916 | Henry | 9/9/2024 | | 16 Stoney ground | | soil | | mg/kg |
| STX-2024-03 S2 | 17.695223 | -64.875916 | Henry | 9/9/2024 | | 16 Stoney ground | | soil | | mg/kg |
| STX-2024-03 SW1 | 17.695223 | -64.875916 | Henry | 9/9/2024 | | 16 Stoney ground | | wipe | | mg/wipe |
| STX-2024-03 SW2 | 17.695223 | -64.875916 | Henry | 9/9/2024 | | 16 Stoney ground | | wipe | | mg/wipe |
| STX-2024-03 SW3 | 17.695223 | -64.875916 | Henry | 9/9/2024 | | 16 Stoney ground | | wipe | | mg/wipe |
| STX-2024-03 SW4 | 17.695223 | -64.875916 | Henry | 9/9/2024 | | 16 Stoney ground | | wipe | | mg/wipe |
| STX-2024-04 W1 | 17.702175 | -64.871089 | Henry | 9/9/2024 | | 203 Concordia, Fredricsted | W of LTB | water | | mg/L |
| STX-2024-04 S1 | 17.702175 | -64.871089 | Henry | 9/9/2024 | | 203 Concordia, Fredricsted | | soil | | mg/kg |
| STX-2024-04 S2 | 17.702175 | -64.871089 | Henry | 9/9/2024 | | 203 Concordia, Fredricsted | | soil | | mg/kg |
| STX-2024-04 SW1 cistern | 17.702175 | -64.871089 | Henry | 9/9/2024 | | 203 Concordia, Fredricsted | | wipe | | mg/wipe |
| STX-2024-04 SW1 porch | 17.702175 | -64.871089 | Henry | 9/9/2024 | | 203 Concordia, Fredricsted | | wipe | | mg/wipe |
| STX-2024-04 SW2 | 17.702175 | -64.871089 | Henry | 9/9/2024 | | 203 Concordia, Fredricsted | | wipe | | mg/wipe |
| STX-2024-04 SW3 | 17.702175 | -64.871089 | Henry | 9/9/2024 | | 203 Concordia, Fredricsted | | wipe | | mg/wipe |
| STX-2024-04 SW4 | 17.702175 | -64.871089 | Henry | 9/9/2024 | | 203 Concordia, Fredricsted | | wipe | | mg/wipe |
| STX-2024-05 W1 | 17.703530 | -64.859228 | Henry | 9/9/2024 | | 1AA Whim | W of LTB | water | | mg/L |
| STX-2024-05 S1 | 17.703530 | -64.859228 | Henry | 9/9/2024 | | 1AA Whim | | soil | | mg/kg |
| STX-2024-05 S2 | 17.703530 | -64.859228 | Henry | 9/9/2024 | | 1AA Whim | | soil | | mg/kg |

D. App. 0243

| Sample ID | method | Impacted water system | Basis for water system impact | TPH-GRO C6-10 | TPH-DRO C10-28 | TPH-RRO C25-36 | TPH-ORO C28-40 |
|---|---|---|---|---|---|---|---|
| unique identifier | EPA method number | Definition: (1) Visible sheen in cistern, detectable (2) TPH, PAH, or (3) DX/FX (see note) in cistern water⬚ ⬚ ⬚ | | TPH as gasoline range hydrocarbons | TPH as diesel range hydrocarbons | TPH as residual range hydrocarbons | TPH as oil range hydrocarbons |
| STX-2024-02 SW1 | SW8015C, 8270E | N | | | <1.0 | | <1.0 |
| STX-2024-02 SW2 | SW8015C, 8270E | | | | <1.0 | | <1.0 |
| STX-2024-02 SW3 | SW8015C, 8270E | | | | <1.0 | | <1.0 |
| STX-2024-02 SW4 | SW8015C, 8270E | | | | <1.0 | | 1.8 H |
| STX-2024-02 SW5 | SW8015C, 8270E | | | | <330 | | 0.57 H |
| STX-2024-02 SW6 | SW8015C, 8270E | | | | <1.0 | | <1.0 |
| STX-2024-02 SW7 | SW8015C, 8270E | | | | <1.0 | | <1.0 |
| STX-2024-03 W1 | SW8015C, 8270E | Y | DRO/ORO | | 0.57 | | 0.66 |
| STX-2024-03 S1 | SW8015C, 8270E | | | | <3.18 | | 22.2 |
| STX-2024-03 S2 | SW8015C, 8270E | | | | <19.6 | | <50.5 |
| STX-2024-03 SW1 | SW8015C, 8270E | | | | <1.0 | | 1.4 |
| STX-2024-03 SW2 | SW8015C, 8270E | | | | <1.0 | | <1.0 |
| STX-2024-03 SW3 | SW8015C, 8270E | | | | <1.0 | | 1.4 |
| STX-2024-03 SW4 | SW8015C, 8270E | | | | <1.0 | | 1.7 |
| STX-2024-04 W1 | SW8015C, 8270E | Y | DRO | | 0.49 | | <0.31 |
| STX-2024-04 S1 | SW8015C, 8270E | | | | <22.5 | | <57.8 |
| STX-2024-04 S2 | SW8015C, 8270E | | | | <21.3 | | <54.8 |
| STX-2024-04 SW1 cistern | SW8015C, 8270E | | | | <1.0 | | 1.2 |
| STX-2024-04 SW1 porch | SW8015C, 8270E | | | | <1.0 | | 2 |
| STX-2024-04 SW2 | SW8015C, 8270E | | | | <1.0 | | <1.0 |
| STX-2024-04 SW3 | SW8015C, 8270E | | | | <1.0 | | <1.0 |
| STX-2024-04 SW4 | SW8015C, 8270E | | | | <1.0 | | 1.8 |
| STX-2024-05 W1 | SW8015C, 8270E | Y | DRO/ORO | | 0.99 | | 2.9 |
| STX-2024-05 S1 | SW8015C, 8270E | | | | <15.8 | | 47.3J |
| STX-2024-05 S2 | SW8015C, 8270E | | | | <18.8 | | 93.4 |

D. App. 0244

| Sample ID | DX/FX  TEQ : total in pg/L | work order | TPAH in ppm (LLD = per analyte) | Talkyl_PAH in ppm (LLD = per analyte) | DX/FX-Alk-PAH-1 | DF/FX - Alk-PAH-2 |
|---|---|---|---|---|---|---|
| unique identifier | dioxins & furans, midTEQ in pg/L and total 2,3,7,8-substituted in pg/L | Laboratory EDD work order number matching row# and report file | total polynuclear aromatic hydrocarbons | total alkylated (substituted) polynuclear aromatic hydrocarbons | compound 1        (from highest to lowest PAH concentration detected) | compound 2 |
| STX-2024-02 SW1 | | 24080913 | | | | |
| STX-2024-02 SW2 | | 24100088 | | | | |
| STX-2024-02 SW3 | | 24100088 | | | | |
| STX-2024-02 SW4 | | 24100088 | | | | |
| STX-2024-02 SW5 | | 24100088 | | | | |
| STX-2024-02 SW6 | | 24080913 | | | | |
| STX-2024-02 SW7 | | 24080913 | | | | |
| STX-2024-03 W1 | | 24100088 | | | | |
| STX-2024-03 S1 | | HN2407517 | <0.004 | | | |
| STX-2024-03 S2 | | HN2407517 | <0.0227 | | | |
| STX-2024-03 SW1 | | 24100088 | | | | |
| STX-2024-03 SW2 | | 24100088 | | | | |
| STX-2024-03 SW3 | | 24100088 | | | | |
| STX-2024-03 SW4 | | 24100088 | | | | |
| STX-2024-04 W1 | | 24100088 | | | | |
| STX-2024-04 S1 | | HN2407517 | <0.0258 | | | |
| STX-2024-04 S2 | | HN2407517 | <0.0244 | | | |
| STX-2024-04 SW1 cistern | | 24100088 | | | | |
| STX-2024-04 SW1 porch | | 24100088 | | | | |
| STX-2024-04 SW2 | | 24100088 | | | | |
| STX-2024-04 SW3 | | 24100088 | | | | |
| STX-2024-04 SW4 | | 24100088 | | | | |
| STX-2024-05 W1 | | 24100088 | | | | |
| STX-2024-05 S1 | | HN2407517 | <0.0181 | | | |
| STX-2024-05 S2 | | HN2407517 | <0.0216 | | | |

D. App. 0245

| Sample ID | DF/FX - Alk-PAH-3 | DF/FX - Alk-PAH-4 | Notes |
|---|---|---|---|
| unique identifier | compound 3 | compound 4 | metals or inorganic detections of note as a range |
| STX-2024-02 SW1 | | | |
| STX-2024-02 SW2 | | | |
| STX-2024-02 SW3 | | | |
| STX-2024-02 SW4 | | | |
| STX-2024-02 SW5 | | | |
| STX-2024-02 SW6 | | | |
| STX-2024-02 SW7 | | | |
| STX-2024-03 W1 | | | |
| STX-2024-03 S1 | | | |
| STX-2024-03 S2 | | | |
| STX-2024-03 SW1 | | | |
| STX-2024-03 SW2 | | | |
| STX-2024-03 SW3 | | | |
| STX-2024-03 SW4 | | | |
| STX-2024-04 W1 | | | |
| STX-2024-04 S1 | | | |
| STX-2024-04 S2 | | | |
| STX-2024-04 SW1 cistern | | | |
| STX-2024-04 SW1 porch | | | |
| STX-2024-04 SW2 | | | |
| STX-2024-04 SW3 | | | |
| STX-2024-04 SW4 | | | |
| STX-2024-05 W1 | | | |
| STX-2024-05 S1 | | | |
| STX-2024-05 S2 | | | |

D. App. 0246

Petroleum

| Sample ID | Latitude | Longitude | Sampler | Date Sampled | Client | ID | vector | Matrix | Solvent NA, E1, E2, Hx | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| unique identifier | based on GPS or location of front door of home | based on GPS or location of front door of home | Individual collecting sample | | Name of property occupant | Secondary location identifier | | material sampled | | SI units |
| STX-2024-05 SW1 | 17.703530 | -64.859228 | Henry | 9/9/2024 | | 1AA Whim | | wipe | | mg/wipe |
| STX-2024-05 SW2 | 17.703530 | -64.859228 | Henry | 9/9/2024 | | 1AA Whim | | wipe | | mg/wipe |
| DBLKWI1-247774-247774 | | | lab | 10/8/2024 | | Method blank (5/12/25 restated) | | lab | | mg/L |
| DBLKWI1-247727-247727 | | | lab | 10/8/2024 | | Method blank (5/12/25 restated) | | lab | | mg/wipe |
| STX-2024-06 S1 | 17.692345 | -64.868365 | Henry | 12/3/2024 | | 288 Whim | W of LTB | soil | | mg/kg |
| STX-2024-06 W1 | 17.692345 | -64.868365 | Henry | 12/3/2024 | | 288 Whim | | water | | mg/L |
| STX-2024-07 S1 | 17.723893 | -64.792260 | Henry | 12/4/2024 | | 462 Castle Burke | NW of LTB | soil | | mg/kg |
| STX-2024-07 S2 | 17.723893 | -64.792260 | Henry | 12/4/2024 | | 462 Castle Burke | | soil | | mg/kg |
| STX-2024-07 W1 | 17.723893 | -64.792260 | Henry | 12/4/2024 | | 462 Castle Burke | | water | | mg/L |
| STX-2024-07 W2 | 17.723893 | -64.792260 | Henry | 12/4/2024 | | 462 Castle Burke | | water | | mg/L |
| STX-2024-07 SW1 | 17.723893 | -64.792260 | Henry | 12/4/2024 | | 462 Castle Burke | | wipe | | mg/wipe |
| STX-2024-07 SW2 | 17.723893 | -64.792260 | Henry | 12/4/2024 | | 462 Castle Burke | | wipe | | mg/wipe |
| STX-2024-07 SW3 | 17.723893 | -64.792260 | Henry | 12/4/2024 | | 462 Castle Burke | | wipe | | mg/wipe |
| STX-2024-07 SW4 | 17.723893 | -64.792260 | Henry | 12/4/2024 | | 462 Castle Burke | | wipe | | mg/wipe |
| STX-2024-07 SW5 | 17.723893 | -64.792260 | Henry | 12/4/2024 | | 462 Castle Burke | | wipe | | mg/wipe |
| STX-2024-08 S1 | 17.730648 | -64.813511 | Henry | 12/5/2024 | | 89D Upper Love | W of LTB | soil | | mg/kg |
| STX-2024-08 S2 | 17.730648 | -64.813511 | Henry | 12/5/2024 | | 89D Upper Love | | soil | | mg/kg |
| STX-2024-08 W1 | 17.730648 | -64.813511 | Henry | 12/5/2024 | | 89D Upper Love | | water | | pg/L |
| STX-2024-08 W2 | 17.730648 | -64.813511 | Henry | 12/5/2024 | | 89D Upper Love | | water | | mg/L |
| STX-2024-08 SW1 | 17.730648 | -64.813511 | Henry | 12/5/2024 | | 89D Upper Love | | wipe | | mg/wipe |
| STX-2024-08 SW2 | 17.730648 | -64.813511 | Henry | 12/5/2024 | | 89D Upper Love | | wipe | | mg/wipe |
| STX-2024-08 SW3 | 17.730648 | -64.813511 | Henry | 12/5/2024 | | 89D Upper Love | | wipe | | mg/wipe |
| STX-2024-08 SW4 | 17.730648 | -64.813511 | Henry | 12/5/2024 | | 89D Upper Love | | wipe | | mg/wipe |
| STX-2024-08 SW5 | 17.730648 | -64.813511 | Henry | 12/5/2024 | | 89D Upper Love | | wipe | | mg/wipe |
| STX-2024-08 SW6 | 17.730648 | -64.813511 | Henry | 12/5/2024 | | 89D Upper Love | | wipe | | mg/wipe |
| STX-2024-09 W1 | 17.692345 | -64.868365 | Henry | 12/9/2024 | | 288 Whim | W of LTB | water | | mg/L |
| STX-2024-09 W2 | 17.692345 | -64.868365 | Henry | 12/9/2024 | | 288 Whim | | water | | pg/L |
| STX-2024-09 SW1 | 17.692345 | -64.868365 | Henry | 12/9/2024 | | 288 Whim | | wipe | | mg/wipe |
| STX-2024-09 SW2 | 17.692345 | -64.868365 | Henry | 12/9/2024 | | 288 Whim | | wipe | | mg/wipe |
| STX-2024-10 S1 | 17.728874 | -64.809812 | Henry | 12/12/2024 | | 46 Upper love | W of LTB | soil | | mg/kg |

D. App. 0247

Petroleum

| Sample ID | method | Impacted water system | Basis for water system impact | TPH-GRO C6-10 | TPH-DRO C10-28 | TPH-RRO C25-36 | TPH-ORO C28-40 |
|---|---|---|---|---|---|---|---|
| unique identifier | EPA method number | Definition: (1) Visible sheen in cistern, detectable (2) TPH, PAH, or (3) DX/FX (see note) in cistern water? ▯ ▯ | | TPH as gasoline range hydrocarbons | TPH as diesel range hydrocarbons | TPH as residual range hydrocarbons | TPH as oil range hydrocarbons |
| STX-2024-05 SW1 | SW8015C, 8270E | | | | <1.0 | | 4.6 |
| STX-2024-05 SW2 | SW8015C, 8270E | | | | <1.0 | | 2.0 |
| DBLKWI1-247774-247774 | SW8105C | | | | <0.1 | | <0.1 |
| DBLKWI1-247727-247727 | SW8105C | | | | <1.0 | | <1.0 |
| STX-2024-06 S1 | SW8015C, 8270E | N | | | 6.7 J | | 115 |
| STX-2024-06 W1 | SW8015C, 8270E | | | | <0.229 | | <0.145 |
| STX-2024-07 S1 | SW8015C, 8270E | N | | | <3.56 | | 41.9 |
| STX-2024-07 S2 | SW8015C, 8270E | | | | 15 | | 94.3 |
| STX-2024-07 W1 | SW8015C, 8270E | | | | <0.082 | | <0.052 |
| STX-2024-07 W2 | SW8015C, 8270E | | | | <0.229 | | <0.145 |
| STX-2024-07 SW1 | SW8015C, 8270E | | | | 27 H | | <1.0 H |
| STX-2024-07 SW2 | SW8015C, 8270E | | | | 21 H | | <1.0 H |
| STX-2024-07 SW3 | SW8015C, 8270E | | | | 19 H | | <1.0 H |
| STX-2024-07 SW4 | SW8015C, 8270E | | | | 22 H | | <1.0 H |
| STX-2024-07 SW5 | SW8015C, 8270E | | | | 19 H | | <1.0 H |
| STX-2024-08 S1 | SW8015C, 8270E | Y | ORO/DX | | 3.9 J | | 85.3 |
| STX-2024-08 S2 | SW8015C, 8270E | | | | 14.4 | | 143 |
| STX-2024-08 W1 | DX 1613B | | | | | | |
| STX-2024-08 W2 | SW8015C, 8270E | | | | <0.244 | | 0.227 J |
| STX-2024-08 SW1 | SW8015C, 8270E | | | | 15 H | | <1.0 H |
| STX-2024-08 SW2 | SW8015C, 8270E | | | | 15 H | | 1.6 H |
| STX-2024-08 SW3 | SW8015C, 8270E | | | | 10 H | | <1.0 H |
| STX-2024-08 SW4 | SW8015C, 8270E | | | | 14 H | | 1.4 H |
| STX-2024-08 SW5 | SW8015C, 8270E | | | | 17 H | | 1.2 H |
| STX-2024-08 SW6 | SW8015C, 8270E | | | | 16 H | | <1.0 H |
| STX-2024-09 W1 | SW8015C, 8270E | Y | DX | | <0.233 | | <0.147 |
| STX-2024-09 W2 | DX 1613B | | | | | | |
| STX-2024-09 SW1 | SW8015C, 8270E | | | | 14 H | | <1.0 H |
| STX-2024-09 SW2 | SW8015C, 8270E | | | | 16 H | | <1.0 H |
| STX-2024-10 S1 | SW8015C, 8270E | Y | ORO | | ND | | 53.5 |

D. App. 0248

| Sample ID | DX/FX TEQ : total in pg/L | work order | TPAH in ppm (LLD = per analyte) | Talkyl_PAH in ppm (LLD = per analyte) | DX/FX-Alk-PAH-1 | DF/FX - Alk-PAH-2 |
|---|---|---|---|---|---|---|
| unique identifier | dioxins & furans, midTEQ in pg/L and total 2,3,7,8-substituted in pg/L | Laboratory EDD work order number matching row# and report file | total polynuclear aromatic hydrocarbons | total alkylated (substituted) polynuclear aromatic hydrocarbons | compound 1     (from highest to lowest PAH concentration detected) | compound 2 |
| STX-2024-05 SW1 | | 24100088 | | | | |
| STX-2024-05 SW2 | | 24100088 | | | | |
| DBLKWI1-247774-247774 | | 24100088 | | | | |
| DBLKWI1-247727-247727 | | 24100088 | | | | |
| STX-2024-06 S1 | | HN2500001 | | | | |
| STX-2024-06 W1 | | HN2411193 | | | | |
| STX-2024-07 S1 | | HN2500001 | | | | |
| STX-2024-07 S2 | | HN2500001 | | | | |
| STX-2024-07 W1 | | HN2411193 | | | | |
| STX-2024-07 W2 | | HN2411193 | | | | |
| STX-2024-07 SW1 | | 24120656.R2 | | | | |
| STX-2024-07 SW2 | | 24120656.R2 | | | | |
| STX-2024-07 SW3 | | 24120656.R2 | | | | |
| STX-2024-07 SW4 | | 24120656.R2 | | | | |
| STX-2024-07 SW5 | | 24120656.R2 | | | | |
| STX-2024-08 S1 | | HN2500001 | | | | |
| STX-2024-08 S2 | | HN2500001 | | | | |
| STX-2024-08 W1 | 2.39 : 399 | L2758492 | | | 1,2,3,4,7,8-HxCDF 1.09 pg/L | 1,2,3,6,7,8-HxCDF 0.97 pg/L |
| STX-2024-08 W2 | | HN2411193 | | | | |
| STX-2024-08 SW1 | | 24120656.R2 | | | | |
| STX-2024-08 SW2 | | 24120656.R2 | | | | |
| STX-2024-08 SW3 | | 24120656.R2 | | | | |
| STX-2024-08 SW4 | | 24120656.R2 | | | | |
| STX-2024-08 SW5 | | 24120656.R2 | | | | |
| STX-2024-08 SW6 | | 24120656.R2 | | | | |
| STX-2024-09 W1 | | HN2411193 | | | | |
| STX-2024-09 W2 | 9.8 : 1392 | L2758492 | | | 2,3,7,8-TCDF 2.2 pg/L | |
| STX-2024-09 SW1 | | 24120656.R2 | | | | |
| STX-2024-09 SW2 | | 24120656.R2 | | | | |
| STX-2024-10 S1 | | HN2500001 | | | | |

D. App. 0249

| Sample ID | DF/FX - Alk-PAH-3 | DF/FX - Alk-PAH-4 | Notes |
|---|---|---|---|
| unique identifier | compound 3 | compound 4 | metals or inorganic detections of note as a range |
| STX-2024-05 SW1 | | | |
| STX-2024-05 SW2 | | | |
| DBLKWI1-247774-247774 | | | |
| DBLKWI1-247727-247727 | | | |
| STX-2024-06 S1 | | | |
| STX-2024-06 W1 | | | |
| STX-2024-07 S1 | | | |
| STX-2024-07 S2 | | | |
| STX-2024-07 W1 | | | |
| STX-2024-07 W2 | | | |
| STX-2024-07 SW1 | | | |
| STX-2024-07 SW2 | | | |
| STX-2024-07 SW3 | | | |
| STX-2024-07 SW4 | | | |
| STX-2024-07 SW5 | | | |
| STX-2024-08 S1 | | | |
| STX-2024-08 S2 | | | |
| STX-2024-08 W1 | 1,2,3,7,8,9-HxCDD 1.38 pg/L | 1,2,3,4,7,8-HxCDD 0.972 pg/L | |
| STX-2024-08 W2 | | | |
| STX-2024-08 SW1 | | | |
| STX-2024-08 SW2 | | | |
| STX-2024-08 SW3 | | | |
| STX-2024-08 SW4 | | | |
| STX-2024-08 SW5 | | | |
| STX-2024-08 SW6 | | | |
| STX-2024-09 W1 | | | |
| STX-2024-09 W2 | | | |
| STX-2024-09 SW1 | | | |
| STX-2024-09 SW2 | | | |
| STX-2024-10 S1 | | | |

D. App. 0250

Petroleum

| Sample ID | Latitude | Longitude | Sampler | Date Sampled | Client | ID | vector | Matrix | Solvent NA, E1, E2, Hx | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| unique identifier | based on GPS or location of front door of home | based on GPS or location of front door of home | Individual collecting sample | | Name of property occupant | Secondary location identifier | | material sampled | | SI units |
| STX-2024-10 W1 | 17.728874 | -64.809812 | Henry | 12/12/2024 | | 46 Upper love | | water | | mg/L |
| STX-2024-10 W2 | 17.728874 | -64.809812 | Henry | 12/12/2024 | | 46 Upper love | | water | | mg/L |
| STX-2024-10 W3 | 17.728874 | -64.809812 | Henry | 12/12/2024 | | 46 Upper love | | water | | mg/L |
| STX-2024-10 W4 | 17.728874 | -64.809812 | Henry | 12/12/2024 | | 46 Upper love | | water | | mg/L |
| STX-2024-10 SW1 | 17.728874 | -64.809812 | Henry | 12/12/2024 | | 46 Upper love | | wipe | | mg/wipe |
| STX-2024-10 SW2 | 17.728874 | -64.809812 | Henry | 12/12/2024 | | 46 Upper love | | wipe | | mg/wipe |
| STX-2024-10 SW3 | 17.728874 | -64.809812 | Henry | 12/12/2024 | | 46 Upper love | | wipe | | mg/wipe |
| STX-2024-10 SW4 | 17.728874 | -64.809812 | Henry | 12/12/2024 | | 46 Upper love | | wipe | | mg/wipe |
| STX-2024-10 SW5 | 17.728874 | -64.809812 | Henry | 12/12/2024 | | 46 Upper love | | wipe | | mg/wipe |
| STX-2024-10 SW6 | 17.728874 | -64.809812 | Henry | 12/12/2024 | | 46 Upper love | | wipe | | mg/wipe |
| STX-2025-01 W1 | 17.693179 | -64.884593 | Henry | 2/24/2025 | | 55 Whites Bay | W of LTB | water | | pg/L |
| STX-2025-01 SW1 | 17.693179 | -64.884593 | Henry | 2/24/2025 | | 55 Whites Bay | | wipe | | mg/wipe |
| STX-2025-01 SW2 | 17.693179 | -64.884593 | Henry | 2/24/2025 | | 55 Whites Bay | | wipe | | mg/wipe |
| STX-2025-01 SW3 | 17.693179 | -64.884593 | Henry | 2/24/2025 | | 55 Whites Bay | | wipe | | mg/wipe |
| STX-2025-01 SW4 roof | 17.693179 | -64.884593 | Henry | 2/24/2025 | | 55 Whites Bay | | wipe | | mg/wipe |
| STX-2025-01 SW5 roof | 17.693179 | -64.884593 | Henry | 2/24/2025 | | 55 Whites Bay | | wipe | | mg/wipe |
| STX-2025-02 W1 | 17.692381 | -64.887195 | Henry | 2/24/2025 | | 67 Whites Bay | NA | water | | mg/L |
| STX-2025-02 W2 | 17.692381 | -64.887195 | Henry | 2/24/2025 | | 67 Whites Bay - smp broken in shipment | | water | | mg/L |
| STX-2025-02 SW1 | 17.692381 | -64.887195 | Henry | 2/24/2025 | | 67 Whites Bay | | wipe | | mg/wipe |
| STX-2025-02 SW2 | 17.692381 | -64.887195 | Henry | 2/24/2025 | | 67 Whites Bay | | wipe | | mg/wipe |
| STX-2025-03 W1 | 17.708865 | -64.852500 | Henry | 2/26/2025 | | 1 S Carlton | W of LTB | water | | mg/L |
| STX-2025-03 W2 | 17.708865 | -64.852500 | Henry | 2/26/2025 | | 1 S Carlton | | water | | mg/L |
| STX-2025-03 SW1 | 17.708865 | -64.852500 | Henry | 2/26/2025 | | 1 S Carlton | | wipe | | mg/wipe |
| STX-2025-03 SW2 | 17.708865 | -64.852500 | Henry | 2/26/2025 | | 1 S Carlton | | wipe | | mg/wipe |
| STX-2025-03 SW3 | 17.708865 | -64.852500 | Henry | 2/26/2025 | | 1 S Carlton | | wipe | | mg/wipe |
| STX-2025-03 SW4 | 17.708865 | -64.852500 | Henry | 2/26/2025 | | 1 S Carlton | | wipe | | mg/wipe |
| STX-2025-04 W1 | 17.70704 | -64.848367 | Henry | 2/26/2025 | | 10 Carlton - cleaned cistern | W of LTB | water | | mg/L |
| STX-2025-04 W2 | 17.70704 | -64.848367 | Henry | 2/26/2025 | | 10 Carlton - cleaned cistern | | water | | pg/L |
| MBLK-253363-253363 | - - | - - | LAB | - - | | associated blank | | wipe | | mg/wipe |

D. App. 0251

Petroleum

| Sample ID | method | Impacted water system | Basis for water system impact | TPH-GRO C6-10 | TPH-DRO C10-28 | TPH-RRO C25-36 | TPH-ORO C28-40 |
|---|---|---|---|---|---|---|---|
| unique identifier | EPA method number | Definition: (1) Visible sheen in cistern, detectable (2) TPH, PAH, or (3) DX/FX (see note) in cistern water | | TPH as gasoline range hydrocarbons | TPH as diesel range hydrocarbons | TPH as residual range hydrocarbons | TPH as oil range hydrocarbons |
| STX-2024-10 W1 | SW8015C, 8270E | | | | <0.229 | | 0.151 J |
| STX-2024-10 W2 | SW8015C, 8270E | | | | <0.244 | | <0.154 |
| STX-2024-10 W3 | SW8015C, 8270E | | | | <0.081 | | <0.051 |
| STX-2024-10 W4 | SW8015C, 8270E | | | | <0.081 | | <0.051 |
| STX-2024-10 SW1 | SW8015C, 8270E | | | | 19 | | <1.0 |
| STX-2024-10 SW2 | SW8015C, 8270E | | | | 18 | | <1.0 |
| STX-2024-10 SW3 | SW8015C, 8270E | | | | 18 | | <1.0 |
| STX-2024-10 SW4 | SW8015C, 8270E | | | | 14 | | <1.0 |
| STX-2024-10 SW5 | SW8015C, 8270E | | | | 11 | | <1.0 |
| STX-2024-10 SW6 | SW8015C, 8270E | | | | 10 | | <1.0 |
| STX-2025-01 W1 | DX 1613B, SW8015C | Y | DX | | <0.30 | | <0.30 |
| STX-2025-01 SW1 | SW8015C, 8270E | | | | 15.0 H | | 1.2 H |
| STX-2025-01 SW2 | SW8015C, 8270E | | | | 16.0 H | | 1.8 BH |
| STX-2025-01 SW3 | SW8015C, 8270E | | | | 17.0 H | | 3.1 BH |
| STX-2025-01 SW4 roof | SW8015C, 8270E | | | | 16 H | | 1.3 BH |
| STX-2025-01 SW5 roof | SW8015C, 8270E | | | | 9.5 H | | <1.0 H |
| STX-2025-02 W1 | SW8015C | N | | | <0.29 | | <0.29 |
| STX-2025-02 W2 | SW8015C | | | | <0.30 | | <0.30 |
| STX-2025-02 SW1 | SW8015C | | | | 19 HS | | 3.9 BHS |
| STX-2025-02 SW2 | SW8015C | | | | 14 H | | 1.9 BH |
| STX-2025-03 W1 | SW8015C | N | | | <0.30 | | <0.30 |
| STX-2025-03 W2 | SW8015C | | | | <0.29 | | <0.29 |
| STX-2025-03 SW1 | SW8015C | | | | 9.7 H | | 1.5 BH |
| STX-2025-03 SW2 | SW8015C | | | | 16 H | | 3.2 BH |
| STX-2025-03 SW3 | SW8015C | | | | 14 H | | 2.4 BH |
| STX-2025-03 SW4 | SW8015C | | | | 22 H | | 1.6 BH |
| STX-2025-04 W1 | SW8015C | Y | DX | | <0.31 | | <0.31 |
| STX-2025-04 W2 | DX 1613B | | | | | | |
| MBLK-253363-253363 | SW8015C | | | | <1.0 | | 1.0 |

D. App. 0252

| Sample ID | DX/FX   TEQ : total in pg/L | work order | TPAH in ppm (LLD = per analyte) | Talkyl_PAH in ppm (LLD = per analyte) | DX/FX-Alk-PAH-1 | DF/FX - Alk-PAH-2 |
|---|---|---|---|---|---|---|
| unique identifier | dioxins & furans, midTEQ in pg/L and total 2,3,7,8-substituted in pg/L | Laboratory EDD work order number matching row# and report file | total polynuclear aromatic hydrocarbons | total alkylated (substituted) polynuclear aromatic hydrocarbons | compound 1          (from highest to lowest PAH concentration detected) | compound 2 |
| STX-2024-10 W1 | | HN2411193 | | | | |
| STX-2024-10 W2 | | HN2411193 | | | | |
| STX-2024-10 W3 | | HN2411193 | | | | |
| STX-2024-10 W4 | | HN2411193 | | | | |
| STX-2024-10 SW1 | | 24120656.R2 | | | | |
| STX-2024-10 SW2 | | 24120656.R2 | | | | |
| STX-2024-10 SW3 | | 24120656.R2 | | | | |
| STX-2024-10 SW4 | | 24120656.R2 | | | | |
| STX-2024-10 SW5 | | 24120656.R2 | | | | |
| STX-2024-10 SW6 | | 24120656.R2 | | | | |
| STX-2025-01 W1 | 0.706 : 139 | L2759166 | | | Low TEQ = 0.222 | HxCDF present |
| STX-2025-01 SW1 | | 25030110 | <0.025 | | | |
| STX-2025-01 SW2 | | 25030110 | <0.025 | | | |
| STX-2025-01 SW3 | | 25030110 | <0.025 | | | |
| STX-2025-01 SW4 roof | | 25030110 | <0.025 | | | |
| STX-2025-01 SW5 roof | | 25030110 | <0.025 | | | |
| STX-2025-02 W1 | | 25030111 | | | | |
| STX-2025-02 W2 | | 25030111 | | | | |
| STX-2025-02 SW1 | | 25030110 | | | | |
| STX-2025-02 SW2 | | 25030110 | | | | |
| STX-2025-03 W1 | | 25030111 | | | | |
| STX-2025-03 W2 | | 25030111 | | | | |
| STX-2025-03 SW1 | | 25030110 | | | | |
| STX-2025-03 SW2 | | 25030110 | | | | |
| STX-2025-03 SW3 | | 25030110 | | | | |
| STX-2025-03 SW4 | | 25030110 | | | | |
| STX-2025-04 W1 | | 25030111 | | | | |
| STX-2025-04 W2 | 1.76 : 275 | L2759166 | | | Low TEQ = 0.804 | HxCDD, PeCDF, HxCDF present |
| MBLK-253363-253363 | | 25030110 | | | | |

D. App. 0253

| Sample ID | DF/FX - Alk-PAH-3 | DF/FX - Alk-PAH-4 | Notes |
|---|---|---|---|
| unique identifier | compound 3 | compound 4 | metals or inorganic detections of note as a range |
| STX-2024-10 W1 | | | |
| STX-2024-10 W2 | | | |
| STX-2024-10 W3 | | | |
| STX-2024-10 W4 | | | |
| STX-2024-10 SW1 | | | |
| STX-2024-10 SW2 | | | |
| STX-2024-10 SW3 | | | |
| STX-2024-10 SW4 | | | |
| STX-2024-10 SW5 | | | |
| STX-2024-10 SW6 | | | |
| STX-2025-01 W1 | | | |
| STX-2025-01 SW1 | | | |
| STX-2025-01 SW2 | | | |
| STX-2025-01 SW3 | | | |
| STX-2025-01 SW4 roof | | | |
| STX-2025-01 SW5 roof | | | |
| STX-2025-02 W1 | | | |
| STX-2025-02 W2 | | | |
| STX-2025-02 SW1 | | | |
| STX-2025-02 SW2 | | | |
| STX-2025-03 W1 | | | |
| STX-2025-03 W2 | | | |
| STX-2025-03 SW1 | | | |
| STX-2025-03 SW2 | | | |
| STX-2025-03 SW3 | | | |
| STX-2025-03 SW4 | | | |
| STX-2025-04 W1 | | | |
| STX-2025-04 W2 | | | |
| MBLK-253363-253363 | | | |

D. App. 0254

Petroleum

| Sample ID | Latitude | Longitude | Sampler | Date Sampled | Client | ID | vector | Matrix | Solvent NA, E1, E2, Hx | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| unique identifier | based on GPS or location of front door of home | based on GPS or location of front door of home | Individual collecting sample | | Name of property occupant | Secondary location identifier | | material sampled | | SI units |
| STX-2025-04 SW1 | 17.70704 | -64.848367 | Henry | 2/26/2025 | | 10 Carlton - cleaned cistern | | wipe | | mg/wipe |
| STX-2025-04 SW2 | 17.70704 | -64.848367 | Henry | 2/26/2025 | | 10 Carlton - cleaned cistern | | wipe | | mg/wipe |
| STX-2025-04 SW3 | 17.70704 | -64.848367 | Henry | 2/26/2025 | | 10 Carlton - cleaned cistern | | wipe | | mg/wipe |
| STX-2025-04 SW4 | 17.70704 | -64.848367 | Henry | 2/26/2025 | | 10 Carlton - cleaned cistern | | wipe | | mg/wipe |
| STX-2025-04 SW5 | 17.70704 | -64.848367 | Henry | 2/26/2025 | | 10 Carlton - cleaned cistern | | wipe | | mg/wipe |
| STX-2025-05 W1 | 17.707382 | -64.84975 | Henry | 2/27/2025 | | 13 Carlton | W of LTB | water | | mg/L |
| STX-2025-05 SW1 | 17.707382 | -64.84975 | Henry | 2/27/2025 | | 13 Carlton | | wipe | | mg/wipe |
| STX-2025-05 SW2 | 17.707382 | -64.84975 | Henry | 2/27/2025 | | 13 Carlton | | wipe | | mg/wipe |
| STX-2025-05 SW3 | 17.707382 | -64.84975 | Henry | 2/27/2025 | | 13 Carlton | | wipe | | mg/wipe |
| STX-2025-05 SW4 | 17.707382 | -64.84975 | Henry | 2/27/2025 | | 13 Carlton | | wipe | | mg/wipe |
| STX-2025-06 W1 | 17.692381 | -64.887195 | Henry | 3/4/2025 | | (Robe Hill) cleaned cistern (TEMP:bkgd) | W of LTB | water | | pg/L |
| STX-2025-06 W2 | 17.692381 | -64.887195 | Henry | 3/4/2025 | | (Robe Hill) cleaned cistern (TEMP:bkgd) | | water | | mg/L |
| STX-2025-06 W3 | 17.692381 | -64.887195 | Henry | 3/4/2025 | | (Robe Hill) cleaned cistern (TEMP:bkgd) | | water | | mg/L |
| STX-2025-06 SW1 | 17.692381 | -64.887195 | Henry | 3/4/2025 | | (Robe Hill) cleaned cistern (TEMP:bkgd) | | wipe | | mg/wipe |
| STX-2025-06 SW2 | 17.692381 | -64.887195 | Henry | 3/4/2025 | | (Robe Hill) cleaned cistern (TEMP:bkgd) | | wipe | | mg/wipe |
| STX-2025-06 SW3 | 17.692381 | -64.887195 | Henry | 3/4/2025 | | (Robe Hill) cleaned cistern (TEMP:bkgd) | | wipe | | mg/wipe |
| MBLK-253381-253381 | - - | - - | LAB | - - | | associated blank | | wipe | | mg/wipe |
| STX-2025-07-SW1 - BKGD | 17.756753 | -64.672944 | Henry | 3/25/2025 | Craig Winn | 158 East Valley Road, Estate Shoys (E of LTB) | E of LTB | wipe | | mg/wipe |
| STX-2025-07-SW2 - BKGD | 17.756753 | -64.672944 | Henry | 3/25/2025 | Craig Winn | 158 East Valley Road, Estate Shoys (E of LTB) | | wipe | | mg/wipe |

Petroleum

| Sample ID | method | Impacted water system | Basis for water system impact | TPH-GRO C6-10 | TPH-DRO C10-28 | TPH-RRO C25-36 | TPH-ORO C28-40 |
|---|---|---|---|---|---|---|---|
| unique identifier | EPA method number | Definition: (1) Visible sheen in cistern, detectable (2) TPH, PAH, or (3) DX/FX (see note) in cistern water<br><br> | | TPH as gasoline range hydrocarbons | TPH as diesel range hydrocarbons | TPH as residual range hydrocarbons | TPH as oil range hydrocarbons |
| STX-2025-04 SW1 | SW8015C, 8270E | | | | 6.5 H | | <1.0 H |
| STX-2025-04 SW2 | SW8015C, 8270E | | | | 7.1 H | | <1.0 H |
| STX-2025-04 SW3 | SW8015C, 8270E | | | | 7.0 H | | <1.0 H |
| STX-2025-04 SW4 | SW8015C, 8270E | | | | <1.0 H | | <1.0 H |
| STX-2025-04 SW5 | SW8015C, 8270E | | | | 1.5 H | | <1.0 H |
| STX-2025-05 W1 | NT | NA | | | | | |
| STX-2025-05 SW1 | SW8015C | | | | 11 H | | 1.7 BH |
| STX-2025-05 SW2 | SW8015C | | | | 5.5 H | | 1.2 BH |
| STX-2025-05 SW3 | SW8015C | | | | 10 H | | 1.4 BH |
| STX-2025-05 SW4 | SW8015C | | | | 7.0 H | | 2.3 BH |
| STX-2025-06 W1 | DX 1613B | Y | ORO | | | | |
| STX-2025-06 W2 | SW8015C | | | | <0.31 | | <0.31 |
| STX-2025-06 W3 | SW8015C | | | | <0.31 | | 0.32 H |
| STX-2025-06 SW1 | SW8015C, 8270E | | | | 11 | | 1.9 BH |
| STX-2025-06 SW2 | SW8015C, 8270E | | | | 8.3 | | 1.6 BH |
| STX-2025-06 SW3 | SW8015C, 8270E | | | | 11 | | 2.4 BH |
| MBLK-253381-253381 | SW8015C | | | | <1.0 | | 1.2 |
| STX-2025-07-SW1 - BKGD | SW8015C | N | | | 17 | | 1.3 B |
| STX-2025-07-SW2 - BKGD | SW8015C | | | | 18 | | 2.2 B |

D. App. 0256

| Sample ID | DX/FX   TEQ : total in pg/L | work order | TPAH in ppm (LLD = per analyte) | Talkyl_PAH in ppm (LLD = per analyte) | DX/FX-Alk-PAH-1 | DF/FX - Alk-PAH-2 |
|---|---|---|---|---|---|---|
| unique identifier | dioxins & furans, midTEQ in pg/L and total 2,3,7,8-substituted in pg/L | Laboratory EDD work order number matching row# and report file | total polynuclear aromatic hydrocarbons | total alkylated (substituted) polynuclear aromatic hydrocarbons | compound 1         (from highest to lowest PAH concentration detected) | compound 2 |
| STX-2025-04 SW1 | | 25030110 | <0.025 | | | |
| STX-2025-04 SW2 | | 25030110 | <0.025 | | | |
| STX-2025-04 SW3 | | 25030110 | <0.025 | | | |
| STX-2025-04 SW4 | | 25030110 | <0.025 | | | |
| STX-2025-04 SW5 | | 25030110 | <0.025 | | | |
| STX-2025-05 W1 | | | | | | |
| STX-2025-05 SW1 | | 25030110 | | | | |
| STX-2025-05 SW2 | | 25030110 | | | | |
| STX-2025-05 SW3 | | 25030110 | | | | |
| STX-2025-05 SW4 | | 25030110 | | | | |
| STX-2025-06 W1 | 0.391 : 2.9 | L2759166 | | | Low TEQ = 0.004 | |
| STX-2025-06 W2 | | 25030111 | | | | |
| STX-2025-06 W3 | | 25030111 | | | | |
| STX-2025-06 SW1 | | 25030111 | | | | |
| STX-2025-06 SW2 | | 25030111 | | | | |
| STX-2025-06 SW3 | | 25030111 | | | | |
| MBLK-253381-253381 | | 25030111 | | | | |
| STX-2025-07-SW1 - BKGD | | 25030230 | | | | |
| STX-2025-07-SW2 - BKGD | | 25030230 | | | | |

D. App. 0257

| Sample ID | DF/FX - Alk-PAH-3 | DF/FX - Alk-PAH-4 | Notes |
|---|---|---|---|
| unique identifier | compound 3 | compound 4 | metals or inorganic detections of note as a range |
| | | | |
| STX-2025-04 SW1 | | | |
| STX-2025-04 SW2 | | | |
| STX-2025-04 SW3 | | | |
| STX-2025-04 SW4 | | | |
| STX-2025-04 SW5 | | | |
| STX-2025-05 W1 | | | |
| STX-2025-05 SW1 | | | |
| STX-2025-05 SW2 | | | |
| STX-2025-05 SW3 | | | |
| STX-2025-05 SW4 | | | |
| STX-2025-06 W1 | | | |
| STX-2025-06 W2 | | | |
| STX-2025-06 W3 | | | |
| STX-2025-06 SW1 | | | |
| STX-2025-06 SW2 | | | |
| STX-2025-06 SW3 | | | |
| MBLK-253381-253381 | | | |
| STX-2025-07-SW1 - BKGD | | | |
| STX-2025-07-SW2 - BKGD | | | |

D. App. 0258

Petroleum

| Sample ID | Latitude | Longitude | Sampler | Date Sampled | Client | ID | vector | Matrix | Solvent NA, E1, E2, Hx | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| unique identifier | based on GPS or location of front door of home | based on GPS or location of front door of home | Individual collecting sample | | Name of property occupant | Secondary location identifier | | material sampled | | SI units |
| STX-2025-07-SW3 - BKGD | 17.756753 | -64.672944 | Henry | 3/25/2025 | Craig Winn | 158 East Valley Road, Estate Shoys (E of LTB) | | wipe | | mg/wipe |
| STX-2025-07-SW4 - BKGD | 17.756753 | -64.672944 | Henry | 3/25/2025 | Craig Winn | 158 East Valley Road, Estate Shoys (E of LTB) | | wipe | | mg/wipe |
| STX-2025-07-SW5 - BKGD | 17.756753 | -64.672944 | Henry | 3/25/2025 | Craig Winn | Field Blank | | wipe | | mg/wipe |
| STX-2025-07-SW6 - BKGD | 17.756753 | -64.672944 | Henry | 3/25/2025 | Craig Winn | Field Blank | | wipe | | mg/wipe |
| STX-2025-07 W2 - BKGD | 17.756753 | -64.672944 | Henry | 3/25/2025 | Craig Winn | 158 East Valley Road, Estate Shoys (E of LTB) | | water | | pg/L |
| QC-1967157- 001 | - - | - - | LAB | - - | | associated blank | | water | | pg/L |
| STX-2025-08 SW1 - BKGD | 17.749122 | -64.630528 | Henry | 4/17/2025 | | 163 Cotton Valley | (E of LTB) | water | | mg/L |
| STX-2025-08 SW1 - BKGD | 17.749122 | -64.630528 | Henry | 4/17/2025 | | 163 Cotton Valley | | wipe | bio-ETOH | mg/wipe |
| STX-2025-08 SW2 - BKGD | 17.749122 | -64.630528 | Henry | 4/17/2025 | | 163 Cotton Valley | | wipe | bio-ETOH | mg/wipe |
| STX-2025-08 SW3 - BKGD | 17.749122 | -64.630528 | Henry | 4/17/2025 | | 163 Cotton Valley | | wipe | bio-ETOH | mg/wipe |
| STX-2025-08 SW4 - BKGD | 17.749122 | -64.630528 | Henry | 4/17/2025 | | 163 Cotton Valley | | wipe | bio-ETOH | mg/wipe |
| STX-2025-08 W2 - BKGD | 17.749122 | -64.630528 | Henry | 4/17/2025 | | 163 Cotton Valley | | water | | pg/L |
| mean of 4 (-08) wipes | 17.749122 | -64.630528 | Henry | 4/17/2025 | | 163 Cotton Valley | | wipe | bio-ETOH | mg/wipe |
| MBLK-254298-254298 | - - | - - | LAB | - - | | associated blank | | wipe | | mg/wipe |
| STX-2025-09-C1 | 17.724172 | -64.715579 | | 6/23/2025 | | 170 Work Rest | E of LTB | water | | pg/L |
| STX-2025-09-C2 | 17.724172 | -64.715579 | | 6/23/2025 | | 170 Work Rest | | water | | mg/L |
| STX2025-09-SW1 | 17.724172 | -64.715579 | | 6/23/2025 | | 170 Work Rest | | wipe | | mg/wipe |
| STX2025-09-SW2 | 17.724172 | -64.715579 | | 6/23/2025 | | 170 Work Rest | | wipe | | mg/wipe |
| STX-2025-10-W1 | 17.720598 | -64.777123 | | 6/25/2025 | | 165 Clifton Hill | NW of LTB | | | |
| STX-2025-10-W2 | 17.720598 | -64.777123 | | 6/25/2025 | | 165 Clifton Hill | | water | | pg/L |
| STX-2025-10-SW1 | 17.720598 | -64.777123 | | 6/25/2025 | | 165 Clifton Hill | | wipe | | mg/wipe |
| STX-2025-11-C1 | 17.714304 | -64.813830 | | 6/25/2025 | | 484 Mt. Pleasant | W of LTB | water | | pg/L |
| STX-2025-11-C2 | 17.714304 | -64.813830 | | 6/25/2025 | | 484 Mt. Pleasant | | water | | mg/L |
| STX-2025-11-C3 | 17.714304 | -64.813830 | | 6/25/2025 | | 484 Mt. Pleasant | | | | |
| STX-2025-11-C4 | 17.714304 | -64.813830 | | 6/25/2025 | | 484 Mt. Pleasant | | water | | mg/L |
| STX-2025-12-W1 | 17.704178 | -64.823040 | | 6/25/2025 | | 128 Diamond | W of LTB | water | | pg/L |
| STX-2025-12-W2 | 17.704178 | -64.823040 | | 6/25/2025 | | 128 Diamond | | water | | mg/L |
| QC-MRG2- 2083300-001 | | | | 7/2/2025 | | associated blank | | water | | pg/L |
| STX-2025-13-W1 | 17.691064 | -64.834196 | | 6/26/2025 | | 43 AB Estate Cane | W of LTB | water | | pg/L |
| STX-2025-13-W2 | 17.691064 | -64.834196 | | 6/26/2025 | | 43 AB Estate Cane | | water | | mg/L |

D. App. 0259

Petroleum

| Sample ID | method | Impacted water system | Basis for water system impact | TPH-GRO C6-10 | TPH-DRO C10-28 | TPH-RRO C25-36 | TPH-ORO C28-40 |
|---|---|---|---|---|---|---|---|
| unique identifier | EPA method number | Definition: (1) Visible sheen in cistern, detectable (2) TPH, PAH, or (3) DX/FX (see note) in cistern water⬚ ⬚ ⬚ | | TPH as gasoline range hydrocarbons | TPH as diesel range hydrocarbons | TPH as residual range hydrocarbons | TPH as oil range hydrocarbons |
| STX-2025-07-SW3 - BKGD | SW8015C | | | | 11 | | 1.7 B |
| STX-2025-07-SW4 - BKGD | SW8015C | | | | 13 | | 1.8 B |
| STX-2025-07-SW5 - BKGD | SW8015C | | | | 24 | | |
| STX-2025-07-SW6 - BKGD | SW8015C | | | | 28 | | |
| STX-2025-07 W2 - BKGD | DX 1613B | | | | <0.29 ** | | 0.34 ** |
| QC-1967157- 001 | DX 1613B | | | | | | |
| STX-2025-08 SW1 - BKGD | SW8015C | Y | DX | | <0.29 | | <0.29 |
| STX-2025-08 SW1 - BKGD | SW8015C | | | | 16 | | 2.6 B |
| STX-2025-08 SW2 - BKGD | SW8015C | | | | 13 | | 2.5 B |
| STX-2025-08 SW3 - BKGD | SW8015C | | | | 13 | | 2.0 B |
| STX-2025-08 SW4 - BKGD | SW8015C | | | | 17 | | 1.7 B |
| STX-2025-08 W2 - BKGD | DX 1613B | | | | | | |
| mean of 4 (-08) wipes | SW8015C | | | | 14.8 | | |
| MBLK-254298-254298 | SW8015C | N | | | <1.2 | | 1.3 |
| STX-2025-09-C1 | DX | Y | DRO | | | | |
| STX-2025-09-C2 | TPH DRO/ORO | | | | 0.49 | | <0.30 |
| STX2025-09-SW1 | TPH DRO/ORO | | | | 23 | | <1.0 |
| STX2025-09-SW2 | TPH DRO/ORO | | | | 18 | | 1.2  B |
| STX-2025-10-W1 | TPH DRO/ORO | N | | | | | |
| STX-2025-10-W2 | DX | | | | | | |
| STX-2025-10-SW1 | TPH DRO/ORO | | | | <1.0 | | <1.0 |
| STX-2025-11-C1 | DX - TPH DRO/ORO | N | | | | | |
| STX-2025-11-C2 | TPH DRO/ORO | | | | <0.36 | | <0.36 |
| STX-2025-11-C3 | DX - TPH DRO/ORO | | | | | | |
| STX-2025-11-C4 | TPH DRO/ORO | | | | <0.30 | | <0.30 |
| STX-2025-12-W1 | DX | Y | DX | | | | |
| STX-2025-12-W2 | TPH DRO/ORO | | | | <0.30 | | <0.30 |
| QC-MRG2- 2083300-001 | DX | N | | | | | |
| STX-2025-13-W1 | DX | Y | DRO | | | | |
| STX-2025-13-W2 | TPH DRO/ORO | | | | 0.38 | | <0.30 |

D. App. 0260

| Sample ID | DX/FX   TEQ : total in pg/L | work order | TPAH in ppm (LLD = per analyte) | Talkyl_PAH in ppm (LLD = per analyte) | DX/FX-Alk-PAH-1 | DF/FX - Alk-PAH-2 |
|---|---|---|---|---|---|---|
| unique identifier | dioxins & furans, midTEQ in pg/L and total 2,3,7,8-substituted in pg/L | Laboratory EDD work order number matching row# and report file | total polynuclear aromatic hydrocarbons | total alkylated (substituted) polynuclear aromatic hydrocarbons | compound 1          (from highest to lowest PAH concentration detected) | compound 2 |
| STX-2025-07-SW3 - BKGD | | 25030230 | | | | |
| STX-2025-07-SW4 - BKGD | | 25030230 | | | | |
| STX-2025-07-SW5 - BKGD | | 25030230 | | | | |
| STX-2025-07-SW6 - BKGD | | 25030230 | | | | |
| STX-2025-07 W2 - BKGD | 0.650 : 13.0 | BU2500730 | | | Octa. Hp DX/FX only | Low TEQ <0.1 |
| QC-1967157- 001 | 0.378 : 5.0 | BU2501015 | | | Low TEQ <0.1 | |
| STX-2025-08 SW1 - BKGD | | 25040230 | | | | |
| STX-2025-08 SW1 - BKGD | | 25040230 | | | | |
| STX-2025-08 SW2 - BKGD | | 25040230 | | | | |
| STX-2025-08 SW3 - BKGD | | 25040230 | | | | |
| STX-2025-08 SW4 - BKGD | | 25040230 | | | | |
| STX-2025-08 W2 - BKGD mean of 4 (-08) wipes | 1.35 : 174.1 | BU2501015 | | | 1,2,3,7,8-PeCDF 0.402 pg/L | Low TEQ = 0.61 |
| MBLK-254298-254298 | | 25040230 | | | | |
| STX-2025-09-C1 | 1.14 : 43.0 | BU2501766 | | | Low TEQ <0.1 | |
| STX-2025-09-C2 | | 25070036 | | | | |
| STX2025-09-SW1 | | 25070035 | | | | |
| STX2025-09-SW2 | | 25070035 | | | | |
| STX-2025-10-W1 | | | | | | |
| STX-2025-10-W2 | 0.874 : 3.7 | BU2501766 | | | Low TEQ <0.1 | |
| STX-2025-10-SW1 | | 25070036 | | | | |
| STX-2025-11-C1 | 0.790 : ND | BU2501766 | | | Low TEQ <0.1 | |
| STX-2025-11-C2 | | 25070036 | | | | |
| STX-2025-11-C3 | | | | | | |
| STX-2025-11-C4 | | 25070036 | | | | |
| STX-2025-12-W1 | 2.39 : 350.6 | BU2501766 | | | Low TEQ < 1.0 | 1,2,3,7,8-PeCDF 1.43 pg/L |
| STX-2025-12-W2 | | 25070036 | | | | |
| QC-MRG2- 2083300-001 | 0.719 : 0.5 | BU2501763 | | | Low TEQ <0.1 | |
| STX-2025-13-W1 | <0.55 : 0.91 | BU2501763 | | | Octa. DX/FX only | Low TEQ <0.1 |
| STX-2025-13-W2 | | 25070035 | | | | |

D. App. 0261

Petroleum

| Sample ID | DF/FX - Alk-PAH-3 | DF/FX - Alk-PAH-4 | Notes |
|---|---|---|---|
| unique identifier | compound 3 | compound 4 | metals or inorganic detections of note as a range |
| STX-2025-07-SW3 - BKGD | | | |
| STX-2025-07-SW4 - BKGD | | | |
| STX-2025-07-SW5 - BKGD | | | |
| STX-2025-07-SW6 - BKGD | | | |
| STX-2025-07 W2 - BKGD | ** bottom sample not surface | | |
| QC-1967157- 001 | | | |
| STX-2025-08 SW1 - BKGD | | | |
| STX-2025-08 SW1 - BKGD | | | |
| STX-2025-08 SW2 - BKGD | | | |
| STX-2025-08 SW3 - BKGD | | | |
| STX-2025-08 SW4 - BKGD | | | |
| STX-2025-08 W2 - BKGD | | | |
| mean of 4 (-08) wipes | | | |
| MBLK-254298-254298 | | | |
| STX-2025-09-C1 | | | |
| STX-2025-09-C2 | | | |
| STX2025-09-SW1 | | | |
| STX2025-09-SW2 | | | |
| STX-2025-10-W1 | | | |
| STX-2025-10-W2 | | | |
| STX-2025-10-SW1 | | | |
| STX-2025-11-C1 | | | |
| STX-2025-11-C2 | | | |
| STX-2025-11-C3 | | | |
| STX-2025-11-C4 | | | |
| STX-2025-12-W1 | | | |
| STX-2025-12-W2 | | | |
| QC-MRG2- 2083300-001 | | | |
| STX-2025-13-W1 | | | |
| STX-2025-13-W2 | | | |

D. App. 0262

Petroleum

| Sample ID | Latitude | Longitude | Sampler | Date Sampled | Client | ID | vector | Matrix | Solvent NA, E1, E2, Hx | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| unique identifier | based on GPS or location of front door of home | based on GPS or location of front door of home | Individual collecting sample | | Name of property occupant | Secondary location identifier | | material sampled | | SI units |
| STX-2025-13-W3 | 17.691064 | -64.834196 | | 6/26/2025 | | 43 AB Estate Cane | | water | | pg/L |
| STX-2025-13-W4 | 17.691064 | -64.834196 | | 6/26/2025 | | 43 AB Estate Cane | | water | | mg/L |
| STX-2025-13-SW1 | 17.691064 | -64.834196 | | 6/26/2025 | | 43 AB Estate Cane | | wipe | | mg/wipe |
| STX-2025-13-SW2 | 17.691064 | -64.834196 | | 6/26/2025 | | 43 AB Estate Cane | | wipe | | mg/wipe |
| STX-2025-14-W1 | 17.691170 | -64.834375 | | 6/26/2025 | | 43A Estate Cane | W of LTB | water | | mg/L |
| STX-2025-14-W2 | 17.691170 | -64.834375 | | 6/26/2025 | | 43A Estate Cane | | water | | pg/L |
| STX-2025-14-W3 | 17.691170 | -64.834375 | | 6/26/2025 | | 43A Estate Cane | | water | | mg/L |
| STX-2025-14-W4 | 17.691170 | -64.834375 | | 6/26/2025 | | 43A Estate Cane | | water | | pg/L |
| STX-2025-14-SW1 | 17.691170 | -64.834375 | | 6/26/2025 | | 43A Estate Cane | | wipe | | mg/wipe |
| STX-2025-14-SW2 | 17.691170 | -64.834375 | | 6/26/2025 | | 43A Estate Cane | | wipe | | mg/wipe |
| STX-2025-15-W1 | 17.691744 | -64.832654 | | 7/1/2025 | | 305 Enfield green | W of LTB | water | | mg/L |
| STX-2025-15-W2 | 17.691744 | -64.832654 | | 7/1/2025 | | 305 Enfield green | | water | | pg/L |
| STX-2025-15-SW1 | 17.691744 | -64.832654 | | 7/1/2025 | | 305 Enfield green | | wipe | | mg/wipe |
| STX-2025-15-SW2 | 17.691744 | -64.832654 | | 7/1/2025 | | 305 Enfield green | | wipe | | mg/wipe |
| STX-2025-16-W1 | 17.691127 | -64.834594 | | 6/30/2025 | | 43 Estate Cane | W of LTB | water | | mg/L |
| STX-2025-16-W2 | 17.691127 | -64.834594 | | 6/30/2025 | | 43 Estate Cane | | water | | mg/L |
| STX-2025-16-W3 | 17.691127 | -64.834594 | | 6/30/2025 | | 43 Estate Cane | | | | |
| STX-2025-16-W4 | 17.691127 | -64.834594 | | 6/30/2025 | | 43 Estate Cane | | water | | mg/L |
| STX-2025-16-W5 | 17.691127 | -64.834594 | | 6/30/2025 | | 43 Estate Cane | | water | | pg/L |
| STX-2025-16-W6 | 17.691127 | -64.834594 | | 6/30/2025 | | 43 Estate Cane | | water | | mg/L |
| STX-2025-16-W7 | 17.691127 | -64.834594 | | 6/30/2025 | | 43 Estate Cane | | | | |
| STX-2025-16-W8 | 17.691127 | -64.834594 | | 6/30/2025 | | 43 Estate Cane | | water | | mg/L |
| STX-2025-16-W9 | 17.691127 | -64.834594 | | 6/30/2025 | | 43 Estate Cane | | water | | mg/L |
| STX-2025-16-W10 | 17.691127 | -64.834594 | | 6/30/2025 | | 43 Estate Cane | | | | |
| STX-2025-16-SW2 | 17.691127 | -64.834594 | | 6/30/2025 | | 43 Estate Cane | | wipe (hexane) | | mg/wipe |
| STX-2025-16-SW3 | 17.691127 | -64.834594 | | 6/30/2025 | | 43 Estate Cane | | wipe (hexane) | | mg/wipe |
| STX-2025-16-SW4 | 17.691127 | -64.834594 | | 6/30/2025 | | 43 Estate Cane | | wipe (hexane) | | mg/wipe |
| STX-2025-16-SW5 | 17.691127 | -64.834594 | | 6/30/2025 | | 43 Estate Cane | | wipe (hexane) | | mg/wipe |

D. App. 0263

Petroleum

| Sample ID | method | Impacted water system | Basis for water system impact | TPH-GRO C6-10 | TPH-DRO C10-28 | TPH-RRO C25-36 | TPH-ORO C28-40 |
|---|---|---|---|---|---|---|---|
| unique identifier | EPA method number | Definition: (1) Visible sheen in cistern, detectable (2) TPH, PAH, or (3) DX/FX (see note) in cistern water▯ ▯ ▯ | | TPH as gasoline range hydrocarbons | TPH as diesel range hydrocarbons | TPH as residual range hydrocarbons | TPH as oil range hydrocarbons |
| STX-2025-13-W3 | DX | | | | | | |
| STX-2025-13-W4 | TPH DRO/ORO | | | | 0.41 | | <0.33 |
| STX-2025-13-SW1 | TPH DRO/ORO | | | | <1.0 | | <1.0 |
| STX-2025-13-SW2 | TPH DRO/ORO | | | | <1.0 | | <1.0 |
| STX-2025-14-W1 | TPH DRO/ORO | N | | | <0.29 | | <0.29 |
| STX-2025-14-W2 | DX | | | | | | |
| STX-2025-14-W3 | TPH DRO/ORO | | | | <0.29 | | <0.29 |
| STX-2025-14-W4 | DX | | | | | | |
| STX-2025-14-SW1 | TPH DRO/ORO | | | | <1.0 | | <1.0 |
| STX-2025-14-SW2 | TPH DRO/ORO | | | | <1.0 | | 1.1  B |
| STX-2025-15-W1 | TPH DRO/ORO | Y | DRO | | 1.64  H | | 0.481  HS |
| STX-2025-15-W2 | DX | | | | | | |
| STX-2025-15-SW1 | TPH DRO/ORO | | | | <1.0 | | <1.0 |
| STX-2025-15-SW2 | TPH DRO/ORO | | | | <1.0 | | <1.0 |
| STX-2025-16-W1 | TPH DRO/ORO | Y | DRO/DX | | <0.248 H | | <0.156 HS |
| STX-2025-16-W2 | TPH DRO/ORO | | | | 0.355  H | | 0.240  HJS |
| STX-2025-16-W3 | DX - TPH DRO/ORO | | | | | | |
| STX-2025-16-W4 | TPH DRO/ORO | | | | <0.238 H | | <0.150 H |
| STX-2025-16-W5 | DX - TPH DRO/ORO | | | | | | |
| STX-2025-16-W6 | TPH DRO/ORO | | | | <0.248 H | | <0.156 H |
| STX-2025-16-W7 | DX - TPH DRO/ORO | | | | | | |
| STX-2025-16-W8 | TPH DRO/ORO | | | | <0.248 H | | <0.153 H |
| STX-2025-16-W9 | TPH DRO/ORO | | | | <0.238 H | | <0.150 HS |
| STX-2025-16-W10 | DX - TPH DRO/ORO | | | | | | |
| STX-2025-16-SW2 | TPH DRO/ORO | | | | <1.0 | | <1.0 |
| STX-2025-16-SW3 | TPH DRO/ORO | | | | <1.0 | | <1.0 |
| STX-2025-16-SW4 | TPH DRO/ORO | | | | <1.0 | | <1.0 |
| STX-2025-16-SW5 | TPH DRO/ORO | | | | <1.0 | | <1.0 |

D. App. 0264

| Sample ID | DX/FX   TEQ : total in pg/L | work order | TPAH in ppm (LLD = per analyte) | Talkyl_PAH in ppm (LLD = per analyte) | DX/FX-Alk-PAH-1 | DF/FX - Alk-PAH-2 |
|---|---|---|---|---|---|---|
| unique identifier | dioxins & furans, midTEQ in pg/L and total 2,3,7,8-substituted in pg/L | Laboratory EDD work order number matching row# and report file | total polynuclear aromatic hydrocarbons | total alkylated (substituted) polynuclear aromatic hydrocarbons | compound 1        (from highest to lowest PAH concentration detected) | compound 2 |
| STX-2025-13-W3 | <0.56 : 1.05 | BU2501763 | | | Octa. Hp DX/FX only | Low TEQ <0.1 |
| STX-2025-13-W4 | | 25070035 | | | | |
| STX-2025-13-SW1 | | 25070035 | | | | |
| STX-2025-13-SW2 | | 25070035 | | | | |
| STX-2025-14-W1 | | 25070035 | | | | |
| STX-2025-14-W2 | <0.53 : 0.96 | BU2501763 | | | Octa. DX/FX only | Low TEQ <0.1 |
| STX-2025-14-W3 | | 25070035 | | | | |
| STX-2025-14-W4 | <0.45 : 1.11 | BU2501763 | | | Octa. Hp DX/FX only | Low TEQ < 1.0 |
| STX-2025-14-SW1 | | 25070035 | | | | |
| STX-2025-14-SW2 | | 25070035 | | | | |
| STX-2025-15-W1 | | HN2509898 | | | | |
| STX-2025-15-W2 | 0.497 : 25.2 | BU2501903 | | | Octa. Hp DX/FX only | Low TEQ <0.1 |
| STX-2025-15-SW1 | | 25070280 | | | | |
| STX-2025-15-SW2 | | 25070280 | | | | |
| STX-2025-16-W1 | | HN2509898 | | | | |
| STX-2025-16-W2 | | HN2509898 | | | | |
| STX-2025-16-W3 | | | | | | |
| STX-2025-16-W4 | | HN2509898 | | | | |
| STX-2025-16-W5 | 1.01 : 140.7 | BU2501903 | | | 1,2,3,7,8-PeCDF 0.648 pg/L | Low TEQ < 1.0 |
| STX-2025-16-W6 | | HN2509898 | | | | |
| STX-2025-16-W7 | | | | | | |
| STX-2025-16-W8 | | HN2509898 | | | | |
| STX-2025-16-W9 | | HN2509898 | | | | |
| STX-2025-16-W10 | | | | | | |
| STX-2025-16-SW2 | | 25070280 | | | | |
| STX-2025-16-SW3 | | 25070280 | | | | |
| STX-2025-16-SW4 | | 25070280 | | | | |
| STX-2025-16-SW5 | | 25070280 | | | | |

D. App. 0265

| Sample ID | DF/FX - Alk-PAH-3 | DF/FX - Alk-PAH-4 | Notes |
|---|---|---|---|
| unique identifier | compound 3 | compound 4 | metals or inorganic detections of note as a range |
| STX-2025-13-W3 | | | |
| STX-2025-13-W4 | | | |
| STX-2025-13-SW1 | | | |
| STX-2025-13-SW2 | | | |
| STX-2025-14-W1 | | | |
| STX-2025-14-W2 | | | |
| STX-2025-14-W3 | | | |
| STX-2025-14-W4 | | | |
| STX-2025-14-SW1 | | | |
| STX-2025-14-SW2 | | | |
| STX-2025-15-W1 | | | |
| STX-2025-15-W2 | | | |
| STX-2025-15-SW1 | | | |
| STX-2025-15-SW2 | | | |
| STX-2025-16-W1 | | | |
| STX-2025-16-W2 | | | |
| STX-2025-16-W3 | | | |
| STX-2025-16-W4 | | | |
| STX-2025-16-W5 | | | |
| STX-2025-16-W6 | | | |
| STX-2025-16-W7 | | | |
| STX-2025-16-W8 | | | |
| STX-2025-16-W9 | | | |
| STX-2025-16-W10 | | | |
| STX-2025-16-SW2 | | | |
| STX-2025-16-SW3 | | | |
| STX-2025-16-SW4 | | | |
| STX-2025-16-SW5 | | | |

D. App. 0266

| Sample ID | Latitude | Longitude | Sampler | Date Sampled | Client | ID | vector | Matrix | Solvent NA, E1, E2, Hx | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| unique identifier | based on GPS or location of front door of home | based on GPS or location of front door of home | Individual collecting sample | | Name of property occupant | Secondary location identifier | | material sampled | | SI units |
| STX-2025-16-SW6 | 17.691127 | -64.834594 | | 6/30/2025 | | 43 Estate Cane | | wipe (hexane) | | mg/wipe |
| STX-2025-16-SW7 | 17.691127 | -64.834594 | | 6/30/2025 | | 43 Estate Cane | | wipe (hexane) | | mg/wipe |
| STX-2025-16-SW8 | 17.691127 | -64.834594 | | 6/30/2025 | | 43 Estate Cane | | wipe (hexane) | | mg/wipe |
| STX-2025-17-W1 | 17.699970 | -64.841728 | | 7/1/2025 | | 107 Cane Apt. A | W of LTB | | | |
| STX-2025-17-W2 | 17.699970 | -64.841728 | | 7/1/2025 | | 107 Cane Apt. A | | water | | pg/L |
| STX-2025-17-SW1 | 17.699970 | -64.841728 | | 7/1/2025 | | 107 Cane Apt. A | | wipe (hexane) | | |
| STX-2025-17-SW2 | 17.699970 | -64.841728 | | 7/1/2025 | | 107 Cane Apt. A | | wipe (hexane) | | |
| STX-2025-17-SW3 | 17.699970 | -64.841728 | | 7/1/2025 | | 107 Cane Apt. A | | wipe (hexane) | | |
| MBLK-255890-255890 | | | | | | associated blank | | | | |
| QC-MRG2-2106707-001 | | | | | | associated blank | | water | | pg/L |
| STX-2025-18-W1 | 17.694208 | -64.825839 | | 7/1/2025 | | 6 Enfield Green | W of LTB | | | |
| STX-2025-18-W2 | 17.694208 | -64.825839 | | 7/1/2025 | | 6 Enfield Green | | water | | pg/L |
| STX-2025-18-W3 | 17.694208 | -64.825839 | | 7/1/2025 | | 6 Enfield Green | | | | |
| STX-2025-18-W4 | 17.694208 | -64.825839 | | 7/1/2025 | | 6 Enfield Green | | | | |
| STX-2025-18-W5 | 17.694208 | -64.825839 | | 7/1/2025 | | 6 Enfield Green | | | | |
| STX-2025-18-SW1 | 17.694208 | -64.825839 | | 7/1/2025 | | 6 Enfield Green | | wipe (hexane) | | |
| STX-2025-18-SW2 | 17.694208 | -64.825839 | | 7/1/2025 | | 6 Enfield Green | | wipe (hexane) | | |
| STX-2025-18-SW3 | 17.694208 | -64.825839 | | 7/1/2025 | | 6 Enfield Green | | wipe (hexane) | | |
| STX-2025-18-SW4 | 17.694208 | -64.825839 | | 7/1/2025 | | 6 Enfield Green | | wipe (hexane) | | |
| STX-2025-19-W1 | 17.694100 | -64.865877 | | 7/2/2025 | | 99F Estate Whim | W of LTB | | | |
| STX-2025-19-W2 DO | 17.694100 | -64.865877 | | 7/2/2025 | | 99F Estate Whim | | water | | pg/L |
| STX-2025-19-W3 | 17.694100 | -64.865877 | | 7/2/2025 | | 99F Estate Whim | | | | |
| STX-2025-19-W4 DUP | 17.694100 | -64.865877 | | 7/2/2025 | | 99F Estate Whim | | water | | pg/L |

D. App. 0267

| Sample ID | method | Impacted water system | Basis for water system impact | TPH-GRO C6-10 | TPH-DRO C10-28 | TPH-RRO C25-36 | TPH-ORO C28-40 |
|---|---|---|---|---|---|---|---|
| unique identifier | EPA method number | Definition: (1) Visible sheen in cistern, detectable (2) TPH, PAH, or (3) DX/FX (see note) in cistern water⬚ ⬚ ⬚ | | TPH as gasoline range hydrocarbons | TPH as diesel range hydrocarbons | TPH as residual range hydrocarbons | TPH as oil range hydrocarbons |
| STX-2025-16-SW6 | TPH DRO/ORO | | | | <1.0 | | <1.0 |
| STX-2025-16-SW7 | TPH DRO/ORO | | | | <1.0 | | <1.0 |
| STX-2025-16-SW8 | TPH DRO/ORO | | | | <1.0 | | <1.0 |
| STX-2025-17-W1 | TPH DRO/ORO | Y | DRO/DX | | 0.411 H | | <0.146 H |
| STX-2025-17-W2 | DX | | | | | | |
| STX-2025-17-SW1 | NT | | | | | | |
| STX-2025-17-SW2 | NT | | | | | | |
| STX-2025-17-SW3 | TPH DRO/ORO | | | | <1.0 | | <1.0 |
| MBLK-255890-255890 | | | | | <1.0 | | 1.2 |
| QC-MRG2-2106707-001 | DX | | | | | | |
| STX-2025-18-W1 | DX-DO | Y | DRO/ORO/DX | | 0.392 H | | <0.147 H |
| STX-2025-18-W2 | DX-DUP | | | | | | |
| STX-2025-18-W3 | TPH DRO/ORO | | | | <0.30 H | | <0.30 H |
| STX-2025-18-W4 | NT | | | | | | |
| STX-2025-18-W5 | TPH DRO/ORO | | | | <0.33 H | | 1.1 |
| STX-2025-18-SW1 | NT | | | | | | |
| STX-2025-18-SW2 | NT | | | | | | |
| STX-2025-18-SW3 | NT | | | | | | |
| STX-2025-18-SW4 | TPH DRO/ORO | | | | <1.0 | | <1.0 |
| STX-2025-19-W1 | TPH DRO/ORO-DO | Y | DRO/DX | | 0.361 H | | <0.149 |
| STX-2025-19-W2 DO | DX-DO | | | | | | |
| STX-2025-19-W3 | TPH DRO/ORO-DUP | | | | 0.335 H | | <0.146 |
| STX-2025-19-W4 DUP | DX-DO-DUP | | | | | | |

D. App. 0268

Petroleum

| Sample ID | DX/FX   TEQ : total in pg/L | work order | TPAH in ppm (LLD = per analyte) | Talkyl_PAH in ppm (LLD = per analyte) | DX/FX-Alk-PAH-1 | DF/FX - Alk-PAH-2 |
|---|---|---|---|---|---|---|
| unique identifier | dioxins & furans, midTEQ in pg/L and total 2,3,7,8-substituted in pg/L | Laboratory EDD work order number matching row# and report file | total polynuclear aromatic hydrocarbons | total alkylated (substituted) polynuclear aromatic hydrocarbons | compound 1          (from highest to lowest PAH concentration detected) | compound 2 |
| STX-2025-16-SW6 | | 25070280 | | | | |
| STX-2025-16-SW7 | | 25070280 | | | | |
| STX-2025-16-SW8 | | 25070280 | | | | |
| STX-2025-17-W1 STX-2025-17-W2 STX-2025-17-SW1 | 55.0 : 2692.8 | HN2509898 BU2501903 | | | 2,3,7,8-TCDD 1.31 pg/L | 2,3,7,8-TCDF 72.4 pg/L |
| STX-2025-17-SW2 | | | | | | |
| STX-2025-17-SW3 | | 25070280 | | | | |
| MBLK-255890-255890 QC-MRG2-2106707-001 | 0.620 : 0.7 | 25070280 BU2501903 | | | Low TEQ <0.1 | |
| STX-2025-18-W1 STX-2025-18-W2 STX-2025-18-W3 STX-2025-18-W4 STX-2025-18-W5 STX-2025-18-SW1 | 0.616 : 11.2 | HN2509898 BU2501903 | | | 1,2,3,7,8-PeCDF 0.347 pg/L | Low TEQ <0.1 |
| STX-2025-18-SW2 | | | | | | |
| STX-2025-18-SW3 | | | | | | |
| STX-2025-18-SW4 | | 25070280 | | | | |
| STX-2025-19-W1 STX-2025-19-W2 DO STX-2025-19-W3 STX-2025-19-W4 DUP | 10.5 : 2750.8  9.37 : 2597.5 | HN2509898 BU2501903 HN2509898 BU2501903 | | | 1,2,3,7,8-PeCDF 1.41 pg/L  1,2,3,7,8-PeCDF 1.55 pg/L | 2,3,7,8-TCDD <0.60 pg/L  2,3,7,8-TCDD 0.566 pg/L |

D. App. 0269

| Sample ID | DF/FX - Alk-PAH-3 | DF/FX - Alk-PAH-4 | Notes |
|---|---|---|---|
| unique identifier | compound 3 | compound 4 | metals or inorganic detections of note as a range |
| | | | |
| STX-2025-16-SW6 | | | |
| STX-2025-16-SW7 | | | |
| STX-2025-16-SW8 | | | |
| STX-2025-17-W1 | | | |
| STX-2025-17-W2 | | | |
| STX-2025-17-SW1 | | | |
| STX-2025-17-SW2 | | | |
| STX-2025-17-SW3 | | | |
| MBLK-255890-255890 | | | |
| QC-MRG2-2106707-001 | | | |
| STX-2025-18-W1 | | | |
| STX-2025-18-W2 | | | |
| STX-2025-18-W3 | | | |
| STX-2025-18-W4 | | | |
| STX-2025-18-W5 | | | |
| STX-2025-18-SW1 | | | |
| STX-2025-18-SW2 | | | |
| STX-2025-18-SW3 | | | |
| STX-2025-18-SW4 | | | |
| STX-2025-19-W1 | | | |
| STX-2025-19-W2 DO | 1,2,3,7,8-PePeCDD 3.15 pg/L | | |
| STX-2025-19-W3 | | | |
| STX-2025-19-W4 DUP | | | |

D. App. 0270

Petroleum

| Sample ID | Latitude | Longitude | Sampler | Date Sampled | Client | ID | vector | Matrix | Solvent NA, E1, E2, Hx | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| unique identifier | based on GPS or location of front door of home | based on GPS or location of front door of home | Individual collecting sample | | Name of property occupant | Secondary location identifier | | material sampled | | SI units |
| STX-2025-19-W5 | 17.694100 | -64.865877 | | 7/2/2025 | | 99F Estate Whim | | | | |
| STX-2025-19-W6 | 17.694100 | -64.865877 | | 7/2/2025 | | 99F Estate Whim | | | | |
| STX-2025-19-W7 | 17.694100 | -64.865877 | | 7/2/2025 | | 99F Estate Whim | | | | |
| STX-2025-19-W8 | 17.694100 | -64.865877 | | 7/2/2025 | | 99F Estate Whim | | | | |
| STX-2025-19-SW1 | 17.694100 | -64.865877 | | 7/2/2025 | | 99F Estate Whim | | wipe (hexane) | | |
| STX-2025-19-SW2 | 17.694100 | -64.865877 | | 7/2/2025 | | 99F Estate Whim | | wipe (hexane) | | |
| STX-2025-19-SW3 | 17.694100 | -64.865877 | | 7/2/2025 | | 99F Estate Whim | | wipe (hexane) | | |
| STX-2025-19-SW4 | 17.694100 | -64.865877 | | 7/2/2025 | | 99F Estate Whim | | wipe (hexane) | | |
| STX-2025-20-W1 | 17.694497 | -64.837597 | | 7/2/2025 | | 175 Williams Delight | W of LTB | | | |
| STX-2025-20-W2 | 17.694497 | -64.837597 | | 7/2/2025 | | 175 Williams Delight | | | | |
| STX-2025-20-W3 | 17.694497 | -64.837597 | | 7/2/2025 | | 175 Williams Delight | | | | |
| STX-2025-20-W4 DO | 17.694497 | -64.837597 | | 7/2/2025 | | 175 Williams Delight | | water | | pg/L |
| STX-2025-20-W5 | 17.694497 | -64.837597 | | 7/2/2025 | | 175 Williams Delight | | | | |
| STX-2025-20-W6 DUP | 17.694497 | -64.837597 | | 7/2/2025 | | 175 Williams Delight | | water | | pg/L |
| STX-2025-20-SW1 | 17.694497 | -64.837597 | | 7/2/2025 | | 175 Williams Delight | | wipe (hexane) | | |
| STX-2025-21-W1 | 17.698284 | -64.868606 | | 7/7/2025 | | 77A Estate Whim | W of LTB | | | |
| STX-2025-21-W2 | 17.698284 | -64.868606 | | 7/7/2025 | | 77A Estate Whim | | | | |
| STX-2025-21-W3 | 17.698284 | -64.868606 | | 7/7/2025 | | 77A Estate Whim | | | | |
| STX-2025-21-W4 | 17.698284 | -64.868606 | | 7/7/2025 | | 77A Estate Whim | | | | |
| STX-2025-21-W5 | 17.698284 | -64.868606 | | 7/7/2025 | | 77A Estate Whim | | water | | mg/L |
| STX-2025-21-W6 | 17.698284 | -64.868606 | | 7/7/2025 | | 77A Estate Whim | | water | | pg/L |
| STX-2025-21-W7 | 17.698284 | -64.868606 | | 7/7/2025 | | 77A Estate Whim | | | | |
| STX-2025-21-W8 | 17.698284 | -64.868606 | | 7/7/2025 | | 77A Estate Whim | | | | |
| STX-2025-21-W9 | 17.698284 | -64.868606 | | 7/7/2025 | | 77A Estate Whim | | | | |
| STX-2025-21-W10 | 17.698284 | -64.868606 | | 7/7/2025 | | 77A Estate Whim | | | | |
| STX-2025-21-SW1 | 17.698284 | -64.868606 | | 7/7/2025 | | 77A Estate Whim | | wipe | | mg/wipe |
| QC-2119631-001 | | | | 7/24/2025 | | associated blank | | water | | pg/L |
| STX-2025-22-W1 | 17.699682 | -64.865647 | | 7/7/2025 | | 72 Estate Whim | W of LTB | water | | mg/L |

Petroleum

| Sample ID | method | Impacted water system | Basis for water system impact | TPH-GRO C6-10 | TPH-DRO C10-28 | TPH-RRO C25-36 | TPH-ORO C28-40 |
|---|---|---|---|---|---|---|---|
| unique identifier | EPA method number | Definition: (1) Visible sheen in cistern, detectable (2) TPH, PAH, or (3) DX/FX (see note) in cistern water⬚ ⬚ ⬚ | | TPH as gasoline range hydrocarbons | TPH as diesel range hydrocarbons | TPH as residual range hydrocarbons | TPH as oil range hydrocarbons |
| STX-2025-19-W5 | NT | | | | | | |
| STX-2025-19-W6 | NT | | | | | | |
| STX-2025-19-W7 | NT | | | | | | |
| STX-2025-19-W8 | NT | | | | | | |
| STX-2025-19-SW1 | TPH DRO/ORO | | | | 20. H | | <1.0 |
| STX-2025-19-SW2 | NT | | | | | | |
| STX-2025-19-SW3 | NT | | | | | | |
| STX-2025-19-SW4 | TPH DRO/ORO | | | | 15. H | | 1.2 BH |
| STX-2025-20-W1 | NT | Y | DRO/DX | | | | |
| STX-2025-20-W2 | NT | | | | | | |
| STX-2025-20-W3 | TPH DRO/ORO-DO | | | | 0.675 H | | <0.147 H |
| STX-2025-20-W4 DO | DX-DO | | | | | | |
| STX-2025-20-W5 | TPH DRO/ORO-DUP | | | | <0.232 H | | <0.146 H |
| STX-2025-20-W6 DUP | DX-DUP | | | | | | |
| STX-2025-20-SW1 | TPH DRO/ORO | | | | <1.0 | | <1.0 |
| STX-2025-21-W1 | NS/NT | Y | DX | | | | |
| STX-2025-21-W2 | NS/NT | | | | | | |
| STX-2025-21-W3 | NS/NT | | | | | | |
| STX-2025-21-W4 | NS/NT | | | | | | |
| STX-2025-21-W5 | DX-DO | | | | <0.31 | | <0.31 |
| STX-2025-21-W6 | DX-DUP | | | | | | |
| STX-2025-21-W7 | TPH DRO/ORO-DO | | | | | | |
| STX-2025-21-W8 | TPH DRO/ORO-DUP | | | | | | |
| STX-2025-21-W9 | NS/NT | | | | | | |
| STX-2025-21-W10 | NS/NT | | | | | | |
| STX-2025-21-SW1 | SW8015C | | | | 11 | | <1.0 |
| QC-2119631-001 | DX | N | | | | | |
| STX-2025-22-W1 | TPH DRO/ORO | N | | | <0.31 | | <0.31 |

D. App. 0272

| Sample ID | DX/FX   TEQ : total in pg/L | work order | TPAH in ppm (LLD = per analyte) | Talkyl_PAH in ppm (LLD = per analyte) | DX/FX-Alk-PAH-1 | DF/FX - Alk-PAH-2 |
|---|---|---|---|---|---|---|
| unique identifier | dioxins & furans, midTEQ in pg/L and total 2,3,7,8-substituted in pg/L | Laboratory EDD work order number matching row# and report file | total polynuclear aromatic hydrocarbons | total alkylated (substituted) polynuclear aromatic hydrocarbons | compound 1        (from highest to lowest PAH concentration detected) | compound 2 |
| STX-2025-19-W5 STX-2025-19-W6 STX-2025-19-W7 STX-2025-19-W8 STX-2025-19-SW1 | | 25070280 | | | | |
| STX-2025-19-SW2 | | | | | | |
| STX-2025-19-SW3 | | | | | | |
| STX-2025-19-SW4 | | 25070280 | | | | |
| STX-2025-20-W1 STX-2025-20-W2 STX-2025-20-W3 | | HN2509898 | | | | |
| STX-2025-20-W4 DO | 2.83 : 906.8 | BU2501903 | | | 2,3,4,7,8-PeCDF 0.417 pg/L | |
| STX-2025-20-W5 | | HN2509898 | | | | |
| STX-2025-20-W6 DUP | 1.16 : 291.2 | BU2501903 | | | 1,2,3,7,8-PeCDD 0.294 pg/L | |
| STX-2025-20-SW1 | | 25070280 | | | | |
| STX-2025-21-W1 STX-2025-21-W2 STX-2025-21-W3 STX-2025-21-W4 | | | | | | |
| STX-2025-21-W5 | | BU2501977 | | | | |
| STX-2025-21-W6 | 2.42 : 420.6 | BU2501977 | | | HxDD 4.52 pg/L | |
| STX-2025-21-W7 STX-2025-21-W8 STX-2025-21-W9 STX-2025-21-W10 | | | | | | |
| STX-2025-21-SW1 | | BU2501977 | | | | |
| QC-2119631-001 | 1.25 : ND | BU2501977 | | | ND | Low TEQ <0.1 |
| STX-2025-22-W1 | | BU2501977 | | | | |

D. App. 0273

| Sample ID | DF/FX - Alk-PAH-3 | DF/FX - Alk-PAH-4 | Notes |
|---|---|---|---|
| unique identifier | compound 3 | compound 4 | metals or inorganic detections of note as a range |
| STX-2025-19-W5 | | | |
| STX-2025-19-W6 | | | |
| STX-2025-19-W7 | | | |
| STX-2025-19-W8 | | | |
| STX-2025-19-SW1 | | | |
| STX-2025-19-SW2 | | | |
| STX-2025-19-SW3 | | | |
| STX-2025-19-SW4 | | | |
| STX-2025-20-W1 | | | |
| STX-2025-20-W2 | | | |
| STX-2025-20-W3 | | | |
| STX-2025-20-W4 DO | | | |
| STX-2025-20-W5 | | | |
| STX-2025-20-W6 DUP | | | |
| STX-2025-20-SW1 | | | |
| STX-2025-21-W1 | | | |
| STX-2025-21-W2 | | | |
| STX-2025-21-W3 | | | |
| STX-2025-21-W4 | | | |
| STX-2025-21-W5 | | | |
| STX-2025-21-W6 | | | |
| STX-2025-21-W7 | | | |
| STX-2025-21-W8 | | | |
| STX-2025-21-W9 | | | |
| STX-2025-21-W10 | | | |
| STX-2025-21-SW1 | | | |
| QC-2119631-001 | | | |
| STX-2025-22-W1 | | | |

D. App. 0274

Petroleum

| Sample ID | Latitude | Longitude | Sampler | Date Sampled | Client | ID | vector | Matrix | Solvent NA, E1, E2, Hx | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| unique identifier | based on GPS or location of front door of home | based on GPS or location of front door of home | Individual collecting sample | | Name of property occupant | Secondary location identifier | | material sampled | | SI units |
| STX-2025-22-W2 | 17.699682 | -64.865647 | | 7/7/2025 | | 72 Estate Whim | | water | | pg/L |
| STX-2025-22-SW1 | 17.699682 | -64.865647 | | 7/7/2025 | | 72 Estate Whim | | wipe | | mg/wipe |
| STX-2025-23-W5 | 17.715330 | -64.872300 | | 7/8/2025 | | 5E Estate LaGrange | W of LTB | water | | mg/L |
| STX-2025-23-W6 | 17.715330 | -64.872300 | | 7/8/2025 | | 5E Estate LaGrange | | water | | pg/L |
| STX-2025-23-SW3 | 17.715330 | -64.872300 | | 7/8/2025 | | 5E Estate LaGrange | | wipe | | mg/wipe |
| STX-2025-24-W3 | 17.697865 | -64.879375 | | 7/8/2025 | | 04-02 Smithfield | W of LTB | water | | mg/L |
| STX-2025-24-W4 | 17.697865 | -64.879375 | | 7/8/2025 | | 04-02 Smithfield | | water | | pg/L |
| STX-2025-24-SW1 | 17.697865 | -64.879375 | | 7/8/2025 | | 04-02 Smithfield | | wipe | | mg/wipe |
| STX-2025-25-W1 | 17.739304 | -64.764072 | | 7/9/2025 | | 668 Barren Spot | N of LTB | water | | mg/L |
| STX-2025-25-W2 | 17.739304 | -64.764072 | | 7/9/2025 | | 668 Barren Spot | | water | | pg/L |
| STX-2025-25-SW2 | 17.739304 | -64.764072 | | 7/9/2025 | | 668 Barren Spot | | wipe | | mg/wipe |
| STX-2025-27-W1 | 17.731327 | -64.761584 | | 7/9/2025 | | 256 Strawberry, Christiansted | N of LTB | water | | mg/L |
| STX-2025-27-SW1 | 17.731327 | -64.761584 | | 7/9/2025 | | 256 Strawberry, Christiansted | | wipe | | mg/wipe |
| STX-2025-28-W1 | 17.725855 | -64.763581 | | 7/14/2025 | | 341 Barren Spot | N of LTB | water | | mg/L |
| STX-2025-28-W2 | 17.725855 | -64.763581 | | 7/14/2025 | | 341 Barren Spot | | water | | pg/L |
| STX-2025-28-SW1 | 17.725855 | -64.763581 | | 7/14/2025 | | 341 Barren Spot | | wipe | | mg/wipe |
| STX-2025-29-W1 | 17.733173 | -64.823627 | | 7/10/2025 | | 259 Grove Place, Fred. | W of LTB | water | | mg/L |
| STX-2025-29-W2 | 17.733173 | -64.823627 | | 7/10/2025 | | 259 Grove Place, Fred. | | water | | pg/L |
| STX-2025-29-SW1 | 17.733173 | -64.823627 | | 7/10/2025 | | 259 Grove Place, Fred. | | wipe | | mg/wipe |
| STX-2025-30-W1 | 17.749755 | -64.783348 | | 7/15/2025 | | 313 Mon Bijou | NW of LTB | water | | mg/L |
| STX-2025-30-W2 | 17.749755 | -64.783348 | | 7/15/2025 | | 313 Mon Bijou | | water | NA | pg/L |
| STX-2025-31-W1 | 17.726036 | -64.763544 | | 7/15/2025 | | 340 Barren Spot | N of LTB | water | | mg/L |
| STX-2025-31-W2 | 17.726036 | -64.763544 | | 7/15/2025 | | 340 Barren Spot | | water | NA | pg/L |
| STX-2025-33-W1 | 17.721979 | -64.765524 | | 7/15/2025 | | 1 DA Blessing, Christiansted | N of LTB | water | | mg/L |
| STX-2025-33-W2 | 17.721979 | -64.765524 | | 7/15/2025 | | 1 DA Blessing, Christiansted | | water | NA | pg/L |
| STX-2025-33-SW1 | 17.721979 | -64.765524 | | 7/15/2025 | | 1 DA Blessing, Christiansted | | wipe | | mg/wipe |
| QC-2119631- 001 | | | | 7/24/2025 | | associated blank | | water | NA | pg/L |
| MBLK-255973-255973 | | | | 7/23/2025 | | associated blank | | wipe | | mg/wipe |

D. App. 0275

Petroleum

| Sample ID | method | Impacted water system | Basis for water system impact | TPH-GRO C6-10 | TPH-DRO C10-28 | TPH-RRO C25-36 | TPH-ORO C28-40 |
|---|---|---|---|---|---|---|---|
| unique identifier | EPA method number | Definition: (1) Visible sheen in cistern, detectable (2) TPH, PAH, or (3) DX/FX (see note) in cistern water⬚ ⬚ ⬚ | | TPH as gasoline range hydrocarbons | TPH as diesel range hydrocarbons | TPH as residual range hydrocarbons | TPH as oil range hydrocarbons |
| STX-2025-22-W2 | DX | | | | | | |
| STX-2025-22-SW1 | TPH DRO/ORO | | | | <1.0 | | <1.0 |
| STX-2025-23-W5 | TPH DRO/ORO | N | | | <0.31 | | <0.31 |
| STX-2025-23-W6 | DX | | | | | | |
| STX-2025-23-SW3 | TPH DRO/ORO | | | | 17H | | <1.0 |
| STX-2025-24-W3 | TPH DRO/ORO | N | | | <0.30 | | <0.30 |
| STX-2025-24-W4 | DX | N | | | | | |
| STX-2025-24-SW1 | TPH DRO/ORO | N | | | <1.0 | | <1.0 |
| STX-2025-25-W1 | TPH DRO/ORO | N | | | <0.31 | | <0.31 |
| STX-2025-25-W2 | DX | | | | | | |
| STX-2025-25-SW2 | TPH DRO/ORO | | | | <1.0 | | 1.4 |
| STX-2025-27-W1 | TPH DRO/ORO | N | | | <0.30 | | <0.30 |
| STX-2025-27-SW1 | TPH DRO/ORO | | | | <1.0 | | 2.7 |
| STX-2025-28-W1 | TPH DRO/ORO | N | | | <0.30 | | <0.30 |
| STX-2025-28-W2 | DX | | | | | | |
| STX-2025-28-SW1 | TPH DRO/ORO | | | | <1.0 | | 1.5 |
| STX-2025-29-W1 | TPH DRO/ORO | Y | DX | | <0.29 | | <0.29 |
| STX-2025-29-W2 | DX | | | | | | |
| STX-2025-29-SW1 | TPH DRO/ORO | | | | <1.0 | | 2.2 |
| STX-2025-30-W1 | TPH DRO/ORO | Y | DX | | <0.31 H | | <0.31 H |
| STX-2025-30-W2 | DX | | | | | | |
| STX-2025-31-W1 | TPH DRO/ORO | N | | | <0.31 | | <0.31 |
| STX-2025-31-W2 | DX | | | | | | |
| STX-2025-33-W1 | TPH DRO/ORO | N | | | <0.30 H | | <0.30 H |
| STX-2025-33-W2 | DX | | | | | | |
| STX-2025-33-SW1 | TPH DRO/ORO | | | | <1.0 | | <1.0 |
| QC-2119631- 001 | DX | N | | | | | |
| MBLK-255973-255973 | TPH DRO/ORO | N | | | <1.0 | | <1.0 |

D. App. 0276

| Sample ID | DX/FX   TEQ : total in pg/L | work order | TPAH in ppm (LLD = per analyte) | Talkyl_PAH in ppm (LLD = per analyte) | DX/FX-Alk-PAH-1 | DF/FX - Alk-PAH-2 |
|---|---|---|---|---|---|---|
| unique identifier | dioxins & furans, midTEQ in pg/L and total 2,3,7,8-substituted in pg/L | Laboratory EDD work order number matching row# and report file | total polynuclear aromatic hydrocarbons | total alkylated (substituted) polynuclear aromatic hydrocarbons | compound 1        (from highest to lowest PAH concentration detected) | compound 2 |
| STX-2025-22-W2 | 1.18 : 8.0 | BU2501977 | | | Octa. DX/FX only | Low TEQ <0.1 |
| STX-2025-22-SW1 | | BU2501977 | | | | |
| STX-2025-23-W5 | | BU2501977 | | | | |
| STX-2025-23-W6 | 1.25 : 39.8 | BU2501977 | | | Octa. DX/FX only | Low TEQ <0.1 |
| STX-2025-23-SW3 | | BU2501977 | | | | |
| STX-2025-24-W3 | | BU2501977 | | | | |
| STX-2025-24-W4 | 1.35 : 140.5 | BU2501977 | | | Octa. DX/FX only | Low TEQ <1.0 |
| STX-2025-24-SW1 | | BU2501977 | | | | |
| STX-2025-25-W1 | | BU2501977 | | | | |
| STX-2025-25-W2 | 1.59 : 6.6 | BU2501977 | | | Octa. DX/FX only | Low TEQ <0.1 |
| STX-2025-25-SW2 | | BU2501977 | | | | |
| STX-2025-27-W1 | | BU2501977 | | | | |
| STX-2025-27-SW1 | | BU2501977 | | | | |
| STX-2025-28-W1 | | BU2501976 | | | | |
| STX-2025-28-W2 | 2.04 : 60.2 | BU2501976 | | | Octa. Hp DX/FX only | Low TEQ <0.1 |
| STX-2025-28-SW1 | | BU2501976 | | | | |
| STX-2025-29-W1 | | BU2501977 | | | | |
| STX-2025-29-W2 | 22.7 : 4697.0 | BU2501977 | | | 2,3,7,8-TCDF  16.5 pg/L | |
| STX-2025-29-SW1 | | BU2501977 | | | | |
| STX-2025-30-W1 | | BU2501976 | | | | |
| STX-2025-30-W2 | 6.00 : 1768.0 | BU2501976 | | | 1,2,3,7,8,9-HxCDD 2.48 pg/L | |
| STX-2025-31-W1 | | BU2501976 | | | | |
| STX-2025-31-W2 | 1.23 : ND | BU2501976 | | | ND | Low TEQ <0.1 |
| STX-2025-33-W1 | | BU2501976 | | | | |
| STX-2025-33-W2 | 0.99 : 83.0 | BU2501976 | | | Octa. Hp DX/FX only | Low TEQ <0.1 |
| STX-2025-33-SW1 | | BU2501976 | | | | |
| QC-2119631- 001 | 1.25 : ND | BU2501976 | | | ND | Low TEQ <0.1 |
| MBLK-255973-255973 | | BU2501976 | | | | |

D. App. 0277

| Sample ID | DF/FX - Alk-PAH-3 | DF/FX - Alk-PAH-4 | Notes |
|---|---|---|---|
| unique identifier | compound 3 | compound 4 | metals or inorganic detections of note as a range |
| STX-2025-22-W2 | | | |
| STX-2025-22-SW1 | | | |
| STX-2025-23-W5 | | | |
| STX-2025-23-W6 | | | |
| STX-2025-23-SW3 | | | |
| STX-2025-24-W3 | | | |
| STX-2025-24-W4 | | | |
| STX-2025-24-SW1 | | | |
| STX-2025-25-W1 | | | |
| STX-2025-25-W2 | | | |
| STX-2025-25-SW2 | | | |
| STX-2025-27-W1 | | | |
| STX-2025-27-SW1 | | | |
| STX-2025-28-W1 | | | |
| STX-2025-28-W2 | | | |
| STX-2025-28-SW1 | | | |
| STX-2025-29-W1 | | | |
| STX-2025-29-W2 | | | |
| STX-2025-29-SW1 | | | |
| STX-2025-30-W1 | | | |
| STX-2025-30-W2 | | | |
| STX-2025-31-W1 | | | |
| STX-2025-31-W2 | | | |
| STX-2025-33-W1 | | | |
| STX-2025-33-W2 | | | |
| STX-2025-33-SW1 | | | |
| QC-2119631- 001 | | | |
| MBLK-255973-255973 | | | |

D. App. 0278

Petroleum

| Sample ID | Latitude | Longitude | Sampler | Date Sampled | Client | ID | vector | Matrix | Solvent NA, E1, E2, Hx | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| unique identifier | based on GPS or location of front door of home | based on GPS or location of front door of home | Individual collecting sample | | Name of property occupant | Secondary location identifier | | material sampled | | SI units |
| Defense sample 460-313-420-1 | | | | 10/8/2024 | | 216 Whim  Karin Minkara | W of LTB | water | | mg/L |
| STX-2025-32-W1 | 17.758579 | -64.625063 | | 8/20/2025 | | 5V Cotton Valley | E of LTB | water | | mg/L |
| STX-2025-32-W2 | 17.758579 | -64.625063 | | 8/20/2025 | | 5V Cotton Valley | | water | | pg/L |
| STX-2025-32-SW1 | 17.758579 | -64.625063 | | 8/20/2025 | | 5V Cotton Valley | | wipe | | mg/wipe |
| STX-2025-33-W1 | 17.721979 | -64.765524 | | 7/15/2025 | | 1DA Blessing | N of LTB | water | | mg/L |
| STX-2025-33-W2 | 17.721979 | -64.765524 | | 7/15/2025 | | 1DA Blessing | | water | | pg/L |
| STX-2025-33-SW1 | 17.721979 | -64.765524 | | 7/15/2025 | | 1DA Blessing | | wipe | | mg/wipe |
| STX-2025-34-W1 | 17.49122 | -64.630528 | | 9/23/2025 | | 163 Cotton Valley | E of LTB | water | | pg/L |
| STX-2025-34-W2 | 17.49122 | -64.630528 | | 9/23/2025 | | 163 Cotton Valley | | water | | mg/L |
| STX-2025-34-SW1 | 17.49122 | -64.630528 | | 9/23/2025 | | 163 Cotton Valley | | wipe | | mg/wipe |
| STX-2025-35 W1 | 17.49122 | -64.630528 | | 10/13/2025 | | 163 Cotton Valley | E of LTB | water | | pg/L |
| STX-2025-35 W2 | 17.49122 | -64.630528 | | 10/13/2025 | | 163 Cotton Valley | | water | | mg/L |
| STX-2025-036 cistern-bottom | 17.728477 | -64.809469 | | 10/27/2025 | | 44 Upper Love | W of LTB | water | | pg/L |
| STX-2025-037 cistern-bottom | 17.707942 | -64.860298 | | 10/27/2025 | | 15-I Two Williams | W of LTB | water | | pg/L |
| STX-2025-038 cistern-bottom | 17.708304 | -64.860331 | | 10/27/2025 | | 15-G Two Williams | W of LTB | water | | pg/L |
| STX-2025-039 cistern-bottom | 17.694062 | -64.855791 | | 10/27/2025 | | 117-H Whim | W of LTB | water | | pg/L |
| STX-2025-040  cistern-bottom | 17.706717 | -64.867474 | | 10/27/2025 | | 205 Concordia | W of LTB | water | | pg/L |
| STX-2025-041  cistern-bottom | 17.692383 | -64.887193 | | 11/3/2025 | | 67 White Bay | W of LTB | water | | pg/L |
| STX-2025-042 Overflow Valve | 17.714200 | -64.7255407 | | 11/11/2025 | | 65 Humbug | E of LTB | water | | pg/L |
| STX-2025-043 (roof cleaned) | 17.7114 | -64.817 | | 11/11/2025 | | 504 Mt. Pleasant | W of LTB | water | | pg/L |
| STX-2025-044 W1 | 17.699978 | -64.853053 | | 11/11/2025 | | 38C Whim | W of LTB | water | | pg/L |
| STX-2025-044 W2 | 17.699978 | -64.853053 | | 11/11/2025 | | 38C Whim | W of LTB | water | | pg/L |
| STX-2025-045 W1 | 17.711177 | -64.860677 | | 11/12/2025 | | 74 Frederiks Haab | W of LTB | water | | pg/L |
| STX-2025-045 W2 | 17.711177 | -64.860677 | | 11/12/2025 | | 74 Frederiks Haab | W of LTB | water | | pg/L |

D. App. 0279

Petroleum

| Sample ID | method | Impacted water system | Basis for water system impact | TPH-GRO C6-10 | TPH-DRO C10-28 | TPH-RRO C25-36 | TPH-ORO C28-40 |
|---|---|---|---|---|---|---|---|
| unique identifier | EPA method number | Definition: (1) Visible sheen in cistern, detectable (2) TPH, PAH, or (3) DX/FX (see note) in cistern water⬚ ⬚ ⬚ | | TPH as gasoline range hydrocarbons | TPH as diesel range hydrocarbons | TPH as residual range hydrocarbons | TPH as oil range hydrocarbons |
| Defense sample 460-313-420-1 | TPH DRO | Y | DRO | | 15 | | |
| STX-2025-32-W1 | TPH DRO/ORO | N | | | <0.1 | | <0.1 |
| STX-2025-32-W2 | DX | | | | | | |
| STX-2025-32-SW1 | TPH DRO/ORO | | | | 22 | | 2.0 |
| STX-2025-33-W1 | TPH DRO/ORO | | | | | | |
| STX-2025-33-W2 | DX | | | | | | |
| STX-2025-33-SW1 | TPH DRO/ORO | | | | | | |
| STX-2025-34-W1 | NA | NA | | | | | |
| STX-2025-34-W2 | NA | | | | | | |
| STX-2025-34-SW1 | NA | | | | | | |
| STX-2025-35 W1 | DX | | | | | | |
| STX-2025-35 W2 | TPH DRO/ORO | | | | <0.1 | | 0.196 |
| STX-2025-036 cistern-bottom | DX | N | | | | | |
| STX-2025-037 cistern-bottom | DX | Y | | | | | |
| STX-2025-038 cistern-bottom | DX | Y | | | | | |
| STX-2025-039 cistern-bottom | DX | Y | | | | | |
| STX-2025-040  cistern-bottom | DX | Y | | | | | |
| STX-2025-041  cistern-bottom | DX | N | | | | | |
| STX-2025-042 Overflow Valve | DX | Y | | | | | |
| STX-2025-043 (roof cleaned) | DX | Y | | | | | |
| STX-2025-044 W1 | DX | Y | | | | | |
| STX-2025-044 W2 | DX | Y | | | | | |
| STX-2025-045 W1 | DX | Y | | | | | |
| STX-2025-045 W2 | DX | Y | | | | | |

D. App. 0280

Petroleum

| Sample ID | DX/FX   TEQ : total in pg/L | work order | TPAH in ppm (LLD = per analyte) | Talkyl_PAH in ppm (LLD = per analyte) | DX/FX-Alk-PAH-1 | DF/FX - Alk-PAH-2 |
|---|---|---|---|---|---|---|
| unique identifier | dioxins & furans, midTEQ in pg/L and total 2,3,7,8-substituted in pg/L | Laboratory EDD work order number matching row# and report file | total polynuclear aromatic hydrocarbons | total alkylated (substituted) polynuclear aromatic hydrocarbons | compound 1        (from highest to lowest PAH concentration detected) | compound 2 |
| Defense sample 460-313-420-1 | | Eurofins 460-313420-1 | | | | |
| STX-2025-32-W1 STX-2025-32-W2 STX-2025-32-SW1 | 0.523 : 6.9 BJM | 25090068 BU2502351 25090068 | | | | |
| STX-2025-33-W1 STX-2025-33-W2 STX-2025-33-SW1 | 0.99 : 83.0 | | | | | |
| STX-2025-34-W1 STX-2025-34-W2 STX-2025-34-SW1 | | | | | | |
| STX-2025-35 W1 STX-2025-35 W2 | 1.85 : 55.8 | BU2502846 HN2515703 | | | Octa. Hp DX/FX only | Low TEQ <0.1 |
| STX-2025-036 cistern-bottom | 0.65 : 64.8 | BU2502980 | | | Octa. Hp DX/FX only | Low TEQ <0.1 |
| STX-2025-037 cistern-bottom | 0.75 : 83.4 | BU2502980 | | | | |
| STX-2025-038 cistern-bottom | 1.05 : 155.0 | BU2502980 | | | | |
| STX-2025-039 cistern-bottom | 3.96 : 564.4 | BU2502980 | | | | |
| STX-2025-040  cistern-bottom | 22.5 : 4919.6 | BU2502980 | | | | |
| STX-2025-041  cistern-bottom | 0.65 : 20.0 | BU2503048 | | | Octa. Hp DX/FX only | Low TEQ <0.1 |
| STX-2025-042 Overflow Valve | 15.9 : 6760.2 | BU2503183 | | | | |
| STX-2025-043 (roof cleaned) | 1.03 : 110.5 | BU2503183 | | | | |
| STX-2025-044 W1 | 12.1 : 1831.1 | BU2503183 | | | | |
| STX-2025-044 W2 | 22.2 : 2488.5 | BU2503183 | | | | |
| STX-2025-045 W1 | 2.03 : 607.5 | BU2503183 | | | | |
| STX-2025-045 W2 | 3.75 : 1242.8 | BU2503183 | | | | |

D. App. 0281

| Sample ID | DF/FX - Alk-PAH-3 | DF/FX - Alk-PAH-4 | Notes |
|---|---|---|---|
| unique identifier | compound 3 | compound 4 | metals or inorganic detections of note as a range |
| Defense sample 460-313-420-1 | | | |
| STX-2025-32-W1 | | | |
| STX-2025-32-W2 | | | |
| STX-2025-32-SW1 | | | |
| STX-2025-33-W1 | | | |
| STX-2025-33-W2 | | | |
| STX-2025-33-SW1 | | | |
| STX-2025-34-W1 | | | |
| STX-2025-34-W2 | | | |
| STX-2025-34-SW1 | | | |
| STX-2025-35 W1 | | | |
| STX-2025-35 W2 | | | |
| STX-2025-036 cistern-bottom | | | |
| STX-2025-037 cistern-bottom | | | |
| STX-2025-038 cistern-bottom | | | |
| STX-2025-039 cistern-bottom | | | |
| STX-2025-040  cistern-bottom | | | |
| STX-2025-041  cistern-bottom | | | |
| STX-2025-042 Overflow Valve | | | |
| STX-2025-043 (roof cleaned) | | | |
| STX-2025-044 W1 | | | |
| STX-2025-044 W2 | | | |
| STX-2025-045 W1 | | | |
| STX-2025-045 W2 | | | |

D. App. 0282

Petroleum

| Sample ID | Latitude | Longitude | Sampler | Date Sampled | Client | ID | vector | Matrix | Solvent NA, E1, E2, Hx | Units |
|---|---|---|---|---|---|---|---|---|---|---|
| unique identifier | based on GPS or location of front door of home | based on GPS or location of front door of home | Individual collecting sample | | Name of property occupant | Secondary location identifier | | material sampled | | SI units |
| STX-2025-046 W1 | 17.707861 | -64.880952 | | 11/24/2025 | | 1 B A Two Brothers | W of LTB | water | | pg/L |
| STX-2025-046 W2 | 17.707861 | -64.880952 | | 11/24/2025 | | 1 B A Two Brothers | W of LTB | water | | pg/L |
| STX-2025-047 | 17.693649 | -64.885649 | | 11/24/2025 | | 17 White Bay | W of LTB | water | | pg/L |
| STX-2025-048 | 17.725293 | -64.823874 | | 11/24/2025 | | 72 D Grove Place | W of LTB | water | | pg/L |
| STX-2025-049 | 17.725949 | -64.755803 | | 11/24/2025 | | 620 Sunny Acres | W of LTB | water | | pg/L |
| Release site | 17.707863 | -64.746668 | | | | Onsite: Flare #8 | | | | |

**Impacted water sample definition, (revision 2, 02/13/2025)  (1) Visible sheen in cistern, (2) detectable TPH, PAH, or (3) DX/FX detects for Tetra to Hexa congeners or lower bound TEQ >0.1 pg/L.**

* visible sheen

*** 3 aliquots per sample ID

Note (1)    All soils reported as percent dry wgt., using Method 160.3 mod. Or 3500 series

Note (Z)    Chromatogram does not resemble a petroleum product

Note (H)    Hold time exceeded, potential low bias result

D. App. 0283

Petroleum

| Sample ID | method | Impacted water system | Basis for water system impact | TPH-GRO C6-10 | TPH-DRO C10-28 | TPH-RRO C25-36 | TPH-ORO C28-40 |
|---|---|---|---|---|---|---|---|
| unique identifier | EPA method number | Definition: (1) Visible sheen in cistern, detectable (2) TPH, PAH, or (3) DX/FX (see note) in cistern water⬚ ⬚ ⬚ | | TPH as gasoline range hydrocarbons | TPH as diesel range hydrocarbons | TPH as residual range hydrocarbons | TPH as oil range hydrocarbons |
| STX-2025-046 W1 | DX-DO | Y | | | | | |
| STX-2025-046 W2 | DX-DUP | Y | | | | | |
| STX-2025-047 | DX | Y | | | | | |
| STX-2025-048 | DX | Y | | | | | |
| STX-2025-049 | DX | Y | | | | | |

Release site

**Impacted water sample de**
**to Hexa congeners or lowe**

\* visible sheen

\*\*\* 3 aliquots per sample ID

Note (1)

Note (Z)

Note (H)

D. App. 0284

| Sample ID | DX/FX   TEQ : total in pg/L | work order | TPAH in ppm (LLD = per analyte) | Talkyl_PAH in ppm (LLD = per analyte) | DX/FX-Alk-PAH-1 | DF/FX - Alk-PAH-2 |
|---|---|---|---|---|---|---|
| unique identifier | dioxins & furans, midTEQ in pg/L and total 2,3,7,8-substituted in pg/L | Laboratory EDD work order number matching row# and report file | total polynuclear aromatic hydrocarbons | total alkylated (substituted) polynuclear aromatic hydrocarbons | compound 1        (from highest to lowest PAH concentration detected) | compound 2 |
| STX-2025-046 W1 | 4.07 : 769.9 | BU2503294 | | | | |
| STX-2025-046 W2 | 2.01 : 360.1 | BU2503294 | | | | |
| STX-2025-047 | 4.02 : 1077.3 | BU2503294 | | | | |
| STX-2025-048 | 2.22 : 586.2 | BU2503294 | | | | |
| STX-2025-049 | 1.83 : 546.2 | BU2503294 | | | | |

Release site

**Impacted water sample de**
**to Hexa congeners or lowe**

* visible sheen

*** 3 aliquots per sample ID

Note (1)

Note (Z)

Note (H)

D. App. 0285

| Sample ID | DF/FX - Alk-PAH-3 | DF/FX - Alk-PAH-4 | Notes |
|---|---|---|---|
| unique identifier | compound 3 | compound 4 | metals or inorganic detections of note as a range |

STX-2025-046 W1
STX-2025-046 W2
STX-2025-047
STX-2025-048
STX-2025-049

Release site

**Impacted water sample de**
**to Hexa congeners or lowe**

* visible sheen

*** 3 aliquots per sample
ID

Note (1)

Note (Z)

Note (H)

D. App. 0286

Petroleum

| Sample ID | Latitude | Longitude | Sampler | Date Sampled | Client | ID | vector | Matrix | Solvent NA, E1, E2, Hx | Units |
|-----------|----------|-----------|---------|--------------|--------|-----|--------|--------|------------------------|-------|
| unique identifier | based on GPS or location of front door of home | based on GPS or location of front door of home | Individual collecting sample | | Name of property occupant | Secondary location identifier | | material sampled | | SI units |

| | | | | | | | | | | |
|-----------|----------|-----------|---------|--------------|--------|-----|--------|--------|------------------------|-------|
| Method 160.3 Modified | | | Soils - percent solids | | | | | | | |
| Method EPA 3510C | | | Sample preparation, water | | | | | | | |
| Method EPA 3549 | | | Sample preparation, soils | | | | | | | |
| Methjod SW 3550C | | | Sample preparation, soils | | | | | | | |
| Method SW 8015D | | | DRO/ORO by GC-FID | | | | | | | |
| Method 8270D | | | Polynuclear Aromatic Hydrocarbons and Alkylated Homologues by GC/MS SIM | | | | | | | |
| Method EPA/600/R-07-004 | | | Wipe sample preparation, wipes are ethanolic | | | | | | | |

D. App. 0287

Petroleum

| Sample ID | method | Impacted water system | Basis for water system impact | TPH-GRO C6-10 | TPH-DRO C10-28 | TPH-RRO C25-36 | TPH-ORO C28-40 |
|---|---|---|---|---|---|---|---|
| unique identifier | EPA method number | Definition: (1) Visible sheen in cistern, detectable (2) TPH, PAH, or (3) DX/FX (see note) in cistern water⬜ ⬜ ⬜ | | TPH as gasoline range hydrocarbons | TPH as diesel range hydrocarbons | TPH as residual range hydrocarbons | TPH as oil range hydrocarbons |

Method 160.3 Modified

Method EPA 3510C

Method EPA 3549

Methjod SW 3550C

Method SW 8015D

Method 8270D

Method EPA/600/R-07-004

D. App. 0288

Petroleum

| Sample ID | DX/FX   TEQ : total in pg/L | work order | TPAH in ppm (LLD = per analyte) | Talkyl_PAH in ppm (LLD = per analyte) | DX/FX-Alk-PAH-1 | DF/FX - Alk-PAH-2 |
|---|---|---|---|---|---|---|
| unique identifier | dioxins & furans, midTEQ in pg/L and total 2,3,7,8-substituted in pg/L | Laboratory EDD work order number matching row# and report file | total polynuclear aromatic hydrocarbons | total alkylated (substituted) polynuclear aromatic hydrocarbons | compound 1        (from highest to lowest PAH concentration detected) | compound 2 |

Method 160.3 Modified

Method EPA 3510C

Method EPA 3549

Methjod SW 3550C

Method SW 8015D

Method 8270D

Method EPA/600/R-07-004

D. App. 0289

| Sample ID | DF/FX - Alk-PAH-3 | DF/FX - Alk-PAH-4 | Notes |
|---|---|---|---|
| unique identifier | compound 3 | compound 4 | metals or inorganic detections of note as a range |

Method 160.3 Modified

Method EPA 3510C

Method EPA 3549

Methjod SW 3550C

Method SW 8015D

Method 8270D

Method EPA/600/R-07-004

D. App. 0290

BCD-Defense DX FX

| ID | | 2,3,7,8-TCDD/F | Mid TEQ | Low TEQ | Total 2,3,7,8-Chlorinated | Te, Pe, Hx 2,3,7,8-Cl |
|---|---|---|---|---|---|---|
| 2024-08 | Upper Love - W | ND | 2.39 | 0.95 | 399 | 4.41 |
| 2024-09 | Whim – W | 2.22 | 9.8 | 8.28 | 1392 | 53.79 |
| 2025-01 | Whites Bay - W | ND | 0.71 | 0.222 | 139 | 1.44 |
| 2025-04 | *Carlton -W | ND | 1.76 | 0.804 | 275 | 8.37 |
| 2025-06 | *Robe Hill- W | ND | 0.39 | 0.004 | 2.9 | 0.22 |
| 2025-07 | Shoys - E | ND | 0.65 | 0.009 | 13.0 | ND |
| 2025-08 | Cotton Val. - E | ND | 1.35 | 0.61 | 174.1 | 3.48 |
| 2025-09 | Work Rest - E | ND | 1.14 | 0.076 | 43.0 | ND |
| 2025-10 | Clifton Hill - NW | ND | 0.87 | 0.001 | 3.7 | ND |
| 2025-11 | Mt. Pleasant – W | ND | 0.79 | ND | ND | ND |
| 2025-12 | Diamond – W | ND | 2.39 | 0.682 | 350.6 | 1.43 |
| 2025-13 | Estate Cane – W | ND | 0.55 | 0.024 | 1.0 | ND |
| 2025-14 | Estate Cane – W | ND | 0.49 | 0.084 | 1.0 | ND |
| 2025-15 | Enfield Green – W | ND | 0.5 | 0.039 | 25.2 | ND |
| 2025-16 | Estate Cane – W | ND | 1.01 | 0.309 | 140.7 | 1.27 |
| 2025-17 | Estate Cane – W | 73.71 | 55 | 40.3 | 2692.8 | 265.7 |
| 2025-18 | Enfield Green – W | ND | 0.62 | 0.024 | 11.2 | 0.35 |
| 2025-19 | Estate Whim – W | 0.566 | 9.94 | 7.14 | 2674 | 21.76 |
| 2025-20 | Williams Delight – W | ND | 2.0 | 1.29 | 599 | 3.66 |
| 2025-21 | Whim – W | ND | 2.42 | 1.02 | 420.6 | 4.52 |
| 2025-22 | Whim – W | ND | 1.18 | 0.002 | 8.0 | ND |
| 2025-23 | LaGrange – W | ND | 1.25 | 0.012 | 39.8 | ND |
| 2025-24 | Smithfield – W | ND | 1.35 | 0.132 | 140.5 | 0.52 |
| 2025-25 | Barren Spot - N | ND | 1.59 | 0.002 | 6.6 | ND |
| 2025-28 | Barren Spot - N | ND | 2.04 | 0.085 | 60.2 | ND |
| 2025-29 | Grove Place - W | 16.5 | 22.7 | 18.9 | 4697 | 62.03 |
| 2025-30 | Mon Bijou – NW | ND | 6.0 | 2.58 | 1768 | 2.48 |
| 2025-31 | Barren Spot – N | ND | 1.23 | ND | ND | ND |
| 2025-32 | Cotton Valley - E | ND | 0.52 | 0.002 | 6.8 | ND |
| 2025-33 | Blessing, Chr. – N | ND | 0.99 | 0.043 | 83.0 | ND |
| STX-2025-035 | 163 Cotton Valley (E of LTB) | ND | 1.85 | 0.014 | 55.8 | |
| STX-2025-036 | 44 Upper Love | ND | 0.65 | 0.081 | 64.8 | |
| STX-2025-037 | 15-I Two Williams | ND | 0.75 | 0.221 | 83.4 | |
| STX-2025-038 | 15-G Two Williams | ND | 1.05 | 0.361 | 155.0 | |
| STX-2025-039 | 117-H Whim | ND | 3.96 | 3.62 | 564.4 | |
| STX-2025-040 | 205 Concordia | 0.851 | 22.5 | 22.2 | 4919.6 | |
| STX-2025-041 | 67 White Bay | ND | 0.65 | 0.006 | 20.0 | |
| STX-2025-042 | 65 Humbug (E of LTB) Overflow Valve | ND | 15.9 | 14.3 | 6760.2 | |
| STX-2025-043 | 504 Mt. Pleasant | ND | 1.03 | 0.306 | 110.5 | |
| STX-2025-044 W1 | 38C Whim | ND | 12.1 | 10.0 | 1831.1 | |
| STX-2025-044 W2 | 38C Whim | ND | 22.2 | 19.4 | 2488.5 | |
| STX-2025-045 W1 | 74 Frederiks Haab | ND | 2.03 | 1.12 | 607.5 | |
| STX-2025-045 W2 | 74 Frederiks Haab | ND | 3.75 | 2.50 | 1242.8 | |
| STX-2025-046 W1 | 1 B A Two Brothers | | 4.07 | | 769.9 | |
| STX-2025-046 W2 | 1 B A Two Brothers | | 2.01 | | 360.1 | |
| STX-2025-047 | 17 White Bay | | 4.02 | | 1077.3 | |
| STX-2025-048 | 72 D Grove Place | | 2.22 | | 586.2 | |
| STX-2025-049 | 620 Sunny Acres | | 1.83 | | 546.2 | |
| Release site | Onsite: Flare #8 | | | | | |

**Data Below needs recalculating!**

| | | 2,3,7,8-TCDD/F | Mid TEQ | Low TEQ | Total 2,3,7,8-Chlorinated | Te, Pe, Hx 2,3,7,8-Cl |
|---|---|---|---|---|---|---|
| Mean | SW, NW & W of LBT (22) | 4.23 | 5.64 | 3.76 | 717.3 | 19.63 |
| Mean | N & E of LBT (8) | ND | 1.18 | 0.104 | 56.3 | 0.44 |

| Sample ID | Low-TEQ (pg/l) | Mid-TEQ (pg/l) |
|---|---|---|
| 107CANEAPTA-CW1-01-DF-HC | 0.00246 | 0.3929543 |
| 128DIAMOND-WB1-01-DF-HC | 0.0223 | 0.2109135 |
| 165CLIFTON-CW1-01-DF-HC | 0.07323 | 0.46998 |
| 175WILLIAMS-CW1-01-DF-HC | 0.1309 | 0.5548 |
| 175WILLIAMS-CW2-01-DF-HC | 0.00312 | 0.40957 |
| 256STRAWBERRY-CW1-01-DF-HC | 0.5022 | 0.99585 |
| 256STRAWBERRY-CW1-01-DF-HC-3ft | 2.5948 | 3.2611 |
| 259GROVEPLACE-WB1-01-DF-HC | 0.0361 | 0.8687935 |
| 259GROVEPLACE-WB1-01-DF-HC-3ft | 16.353 | 16.71285 |
| 259GROVEPLACE-WB2-01-DF-HC | 0.0241 | 0.7501055 |
| 259GROVEPLACE-WB3-01-DF-HC | 0.00201 | 0.8588245 |
| 259GROVEPLACE-WB3-01-DF-HC-3ft | 0.00255 | 0.74576 |
| 259GROVEPLACE-WB4-01-DF-HC | 0.02837 | 0.83582 |
| 259GROVEPLACE-WB4-01-DF-HC-3ft | 0.0375 | 0.7544995 |
| 259GROVEPLACE-WB5-01-DF-HC | 6.2588 | 7.0105 |
| 259GROVEPLACE-WB5-01-DF-HC-3ft | 0.1797 | 1.19485 |
| 305ENFIELDGREEN-CW1-01-DF-HC | 0.0054 | 0.606878 |
| 43ABESTATECANE-CW1-01-DF-HC | 0.0033 | 0.3647705 |
| 43ABESTATECANE-CW2-01-DF-HC | 0.0138 | 0.338177 |
| 43AESTATECANE-CW1-01-DF-HC | 0.0036 | 0.3199135 |
| 43AESTATECANE-CW1-02-DF-HC | 0.0123 | 0.2534265 |
| 43AESTATECANE-CW2-01-DF-HC | 0.0084 | 0.3390745 |
| 43ESTATECANE-CW1-01-DF-HC | 0.0033 | 0.68907 |
| 43ESTATECANE-CW2-01-DF-HC | 0.01761 | 0.51259365 |
| 43ESTATECANE-CW3-01-DF-HC | 0.0638 | 1.05165 |
| 43ESTATECANE-CW4-01-DF-HC | 0.00168 | 0.674083 |
| 484MTPLEASANT-CW1-01-DF-HC | 0.18537 | 0.45169 |
| 484MTPLEASANT-CW2-01-DF-HC | 0.0942 | 0.3481345 |
| 5EESTATELAGRAN-CW1-01-DF-HC | 0 | 0.8935825 |
| 5EESTATELAGRAN-CW1-01-DF-HC-3FT | 4.11726 | 5.37076 |
| 5EESTATELAGRAN-CW2-01-DF-HC | 0.9601 | 1.80005 |
| 5EESTATELAGRAN-CW2-01-DF-HC-3FT | 4.6608 | 5.3889 |
| 5EESTATELAGRAN-CW3-01-DF-HC | 0.00264 | 0.8018135 |
| 5EESTATELAGRAN-CW3-01-DF-HC-3FT | 0.35238 | 1.17813 |
| 668BARRENSPOT-CW1-01-DF-HC | 0.0036 | 0.3810775 |
| 668BARRENSPOT-CW1-01-DF-HC-3ft | 0.09083 | 0.46353 |
| 6ENFIELDGREEN-CW1-01-DF-HC | 0.002028 | 0.380128 |
| 6ENFIELDGREEN-CW2-01-DF-HC | 0.04096 | 0.53096 |
| 72ESTATEWHIM-CW1-01-DF-HC | 0.11533 | 0.90458 |
| 72ESTATEWHIM-CW1-01-DF-HC-3FT | 0.3384 | 0.99525 |
| 72ESTATEWHIM-CW2-01-DF-HC | 0.00201 | 0.614826 |
| 77AESTATEWHIM-CW1-01-DF-HC | 0.003 | 1.030213 |
| 77AESTATEWHIM-CW2-01-DF-HC | 0.1389 | 0.82395 |
| 77AESTATEWHIM-WB1-01-DF-HC | 0.00255 | 0.538789 |
| 77AESTATEWHIM-WB1-01-DF-HC-3FT | 42.764 | 43.079 |
| 94BSMITHFIELD-CW1-01-DF-HC | 0.03822 | 0.8286935 |
| 94BSMITHFIELD-CW1-01-DF-HC-3ft | 0 | 2.0339045 |
| 94BSMITHFIELD-CW2-01-DF-HC | 0.33907 | 1.04452 |
| 94BSMITHFIELD-CW2-01-DF-HC-3ft | 0.0033 | 0.6805965 |
| 99FESTATEWHIM-CW1-01-DF-HC | 0.0446 | 0.551103 |
| 99FESTATEWHIM-CW2-01-DF-HC | 0.04792 | 0.41672 |
| 99FESTATEWHIM-CW2-01-DF-HC-2 | 0.00417 | 0.44342 |
| FIELDBLANK-01-DF-HC | 0.00225 | 0.4096579 |
| 313 MONBIJOU-CW1-01-DF-HC-3ft | 2.3269 | 3.0341 |
| 313MONBIJOU-CW1-01-DF-HC | 1.4345 | 2.03235 |
| 1DABLESSING-CW1-01-DF-HC-3ft | 0.00225 | 0.5570265 |
| 1DABLESSING-CW1-01-DF-HC | 0.0045 | 0.59887 |
| 340BARRENSPOT-CW1-01-DF-HC-3ft | 0.04143 | 1.221867 |
| 340BARRENSPOT-CW1-01-DF-HC | 0.2736 | 1.35975 |
| 341BARRENSPOT-CW1-01-DF-HC-3ft | 0.64923 | 1.44853 |
| 341BARRENSPOT-CW1-01-DF-HC | 0.00285 | 0.71055 |

D. App. 0291

Defense Petroleum

| Sample ID | Latitude | Longitude | Sampler | Date Sampled |
|---|---|---|---|---|
| unique identifier | based on GPS or location of front door of home | based on GPS or location of front door of home | Individul collecting sample | |
| 460-313-420-1 | | | Karim Minkara | 10/8/2024 |
| 460-313-420-2 | | | Karim Minkara | 10/8/2024 |

## Detection Summary

Client: WSP USA Inc
Project/Site: 216 Estate Whim

Job ID: 460-313420-1

### Client Sample ID: 216 Estate Whim — Lab Sample ID: 460-313420-1

| Analyte | Result | Qualifier | RL | MDL | Unit | Dil Fac | D | Method | Prep Type |
|---|---|---|---|---|---|---|---|---|---|
| Acetone | 5.3 | | 5.0 | 4.4 | ug/L | 1 | | 8260D | Total/NA |
| Bis(2-ethylhexyl) phthalate | 2.2 | | 2.0 | 0.80 | ug/L | 1 | | 8270E | Total/NA |
| n-Heptadecane | 60 | | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| n-Octadecane | 20 | J | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| Phytane | 50 | | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| n-Nonadecane | 38 | J | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| n-Eicosane | 110 | | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| n-Heneicosane | 110 | | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| n-Docosane | 130 | | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| n-Tricosane | 150 | | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| n-Tetracosane | 130 | | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| n-Hexacosane | 100 | | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| n-Octacosane | 240 | | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| n-Nonacosane | 250 | | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| n-Triacontane | 130 | | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| n-Hentriacontane | 190 | | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| n-Dotriacontane | 160 | | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| n-Pentatriacontane | 100 | | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| n-Heptatriacontane | 48 | | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| n-Octatriacontane | 73 | | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| N-Nonatriacontane | 31 | J | 48 | 18 | ug/L | 10 | | 8015C | Total/NA |
| DRO (C10-C28) | 15000 | | 1200 | 600 | ug/L | 10 | | 8015C | Total/NA |
| TPH (Total hydrocarbon range) C9-C40 | 23000 | | 1200 | 600 | ug/L | 10 | | 8015C | Total/NA |
| Diesel Range Organics [C10-C28] | 0.39 | | 0.10 | 0.028 | mg/L | 1 | | 8015D | Total/NA |
| Pyrene | 25 | *1 | 16 | 16 | ug/L | 1 | | MA-EPH | Total/NA |
| Benzo[g,h,i]perylene | 17 | *1 | 2.7 | 2.7 | ug/L | 1 | | MA-EPH | Total/NA |
| Indeno[1,2,3-cd]pyrene | 16 | *1 | 2.7 | 2.7 | ug/L | 1 | | MA-EPH | Total/NA |
| Benzo[b]fluoranthene | 10 | *1 | 2.7 | 2.7 | ug/L | 1 | | MA-EPH | Total/NA |
| Fluoranthene | 14 | *1 | 2.7 | 2.7 | ug/L | 1 | | MA-EPH | Total/NA |
| Benzo[a]pyrene | 6.2 | *1 | 2.7 | 2.7 | ug/L | 1 | | MA-EPH | Total/NA |
| Dibenz(a,h)anthracene | 26 | *1 | 2.7 | 2.7 | ug/L | 1 | | MA-EPH | Total/NA |
| Phenanthrene | 2.9 | *1 | 2.7 | 2.7 | ug/L | 1 | | MA-EPH | Total/NA |
| C11-C22 Aromatics (unadjusted) | 1100 | *1 | 54 | 54 | ug/L | 1 | | MA-EPH | Total/NA |
| C11-C22 Aromatics (Adjusted) | 1000 | | 54 | 54 | ug/L | 1 | | MA-EPH | Total/NA |
| C9-C18 Aliphatics | 340 | | 41 | 41 | ug/L | 1 | | MA-EPH | Total/NA |
| C19-C36 Aliphatics - DL | 13000 | D | 340 | 340 | ug/L | 5 | | MA-EPH | Total/NA |
| Sulfur | 57800 | | 4000 | 1060 | ug/L | 20 | | 6010D | Total Recoverable |

### Client Sample ID: EB-100824 — Lab Sample ID: 460-313420-2

| Analyte | Result | Qualifier | RL | MDL | Unit | Dil Fac | D | Method | Prep Type |
|---|---|---|---|---|---|---|---|---|---|
| Methylene Chloride | 1.1 | | 1.0 | 0.32 | ug/L | 1 | | 8260D | Total/NA |
| Isoprenoid RRT 1380 | NC | | 4.6 | 1.7 | ug/L | 1 | | 8015C | Total/NA |
| Norpristane (1650) | NC | | 4.6 | 1.7 | ug/L | 1 | | 8015C | Total/NA |

### Client Sample ID: Trip blank — Lab Sample ID: 460-313420-3

| Analyte | Result | Qualifier | RL | MDL | Unit | Dil Fac | D | Method | Prep Type |
|---|---|---|---|---|---|---|---|---|---|
| Chloromethane | 0.55 | J | 1.0 | 0.40 | ug/L | 1 | | 8260D | Total/NA |

This Detection Summary does not include radiochemical test results.

Eurofins Edison

10/31/2024
10:19:25 PM

D. App. 0292

Defense Petroleum

| Sample ID | Units | OCDD in pg/L | OCDF in pg/L |
|---|---|---|---|
| 484MTPLEASANT-CW1-01-DF | water pg/L | 47 J B | 1.9 J q |
| 484MTPLEASANT-CW2-01-DF | water pg/L | 14 J B | |
| 484MTPLEASANT-SO-01-DF | solid pg/g | 1300 | 34 |
| 484MTPLEASANT-CW1-01-HC | | | |
| 484MTPLEASANT-CW2-01-HC | | | |
| | | | |
| 165 CLIFTON   - CW1-01-DF | | 57 J B | 7.1 J |
| 165 CLIFTON-SO-01-DF | solid pg/g | 200 | 3.7 J |
| 165CLIFTON-CW1-01-HC | | | |
| 165CLIFTON-CW1-01-HC | | | |
| | | | |
| 128 DIAMOND   - WB1-01-DF | water pg/L | 21 J B | 3.7 J  q |
| 128DIAMOND-SO-01-DF | solid pg/g | 15 | .69 J  q |
| 128DIAMOND-SO-ECO-01-DF | solid pg/g | 25 | 0.96 J q |
| 128DIAMOND-WB1-01-HC | | | |
| | | | |
| 256STRAWBERRY-CW1-01-DF | | 31 J B | 13 J B |
| 256STRAWBERRY-CW1-01-DF-3ft | | 1200 B | 16 J B |
| | | | |
| 668 BARRENSPOT-CW1-01-DF | | 12 J B | ND |
| 668 BARRENSPOT-CW1-01-DF-3ft | | 42 J B | 4.1 J B |
| | | | |
| 5E ESTATELAGRAN-CW1-01-DF-3FT | | 40 J B | 4.2 J B q |
| 5E ESTATELAGRAN-CW2-01-DF-3FT | | 1300 B | 36 J B |
| 5E ESTATELAGRAN-CW3-01-DF-3FT | | 230 B | 4.6 J B |
| | | | |
| 94BSMITHFIELD-CW1-01-DF | | 7.4 J B | ND |
| 94BSMITHFIELD-CW2-01-DF | | 11 J B | 5.9 J B |
| | | | |
| 94BSMITHFIELD-CW1-01-DF-3ft | | ND | ND |
| 94BSMITHFIELD-CW2-01-DF-3ft | | 11 J B | ND |
| | | | |
| 5EESTATELAGRAN-CW1-01-DF | | ND | ND |
| 5EESTATELAGRAN-CW2-01-DF | | 570 B | 17 J B |
| 5EESTATELAGRAN-CW3-01-DF | | 8.8 J B q | ND |
| | | | |
| 77AESTATEWHIM-CW1-01-DF | | 10 J B | ND |
| 77AESTATEWHIM-CW2-01-DF | | 69 J B | 4.0 J B |
| 77AESTATEWHIM-WB1-01-DF | | 8.5 J B | ND |
| 77AESTATEWHIM-WB1-01-DF-3FT | | 8000 B | 320 B |
| | | | |
| 72ESTATEWHIM-CW1-01-DF | | 47 J B | 4.1 J B |
| 72ESTATEWHIM-CW2-01-DF | | 6.7 J B q | ND |
| 72ESTATEWHIM-CW1-01-DF-3FT | | 200 B | 4.3 J q B |
| | | | |
| 259GROVEPLACE-WB1-01-DF | W - Frederiksted | 27 J B | ND |
| 259GROVEPLACE-WB1-01-DF-3ft | | 3500 B | 140 B |
| 259GROVEPLACE-WB2-01-DF | | 17 J b | ND |
| 259GROVEPLACE-WB3-01-DF | | 6.7 J B q | ND |
| 259GROVEPLACE-WB3-01-DF-3ft | | 8.5 J B | ND |
| 259GROVEPLACE-WB4-01-DF | | 15 J B | 2.9 J B |
| 259GROVEPLACE-WB4-01-DF-3ft | | 35 J B | ND |
| 259GROVEPLACE-WB5-01-DF | | 2900 B | 96 J B |
| 259GROVEPLACE-WB5-01-DF-3ft | | 26 J B | 3.0 J B q |

1 DA BLESSING

D. App. 0293

Defense Petroleum

| Client | ID | Matrix | Units | method | Impacted water system | TPH-GRO C6-10 | TPH-DRO C10-28 | TPH-RRO C25-36 | | TPH C9-40 | DX/FX  TEQ : total in pg/L |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Name of property occupant | Secondary location identifier | material sampled | SI units | EPA method number | Definition: (1) Visible sheen in cistern, (2) detectable TPH, PAH, or Dioxins/furan (see detail - main page) in cistern | TPH as gasoline range hydrocarbons | TPH as diesel range hydrocarbons | TPH as residual range hydrocarbons | Dissolved Oxygen in mg/L | TPH total hydrocarbons | dioxins & furans, midTEQ in pg/L and total 2,3,7,8-substituted in pg/L |
| | 216 Estate Whim | cistern water | mg/L | 8015D GRO, 8015C SVOC | Y | | | 15.0 | 1.30 | 23.0 | |
| | 216 Estate Whim | field blank | | 8015D GRO, 8015C SVOC | N | | | | | | |

## Client Sample Results

Client: WSP USA Inc
Project/Site: 216 Estate Whim

Job ID: 460-313420-1

**Client Sample ID: 216 Estate Whim**
**Date Collected: 10/08/24 11:30**
**Date Received: 10/11/24 10:40**

Lab Sample ID: 460-313420-1
Matrix: Water

### Method: MA DEP MAVPH - Massachusetts - Volatile Petroleum Hydrocarbons (GC)

| Analyte | Result | Qualifier | RL | MDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | 1.0 | U | 5.0 | 1.0 | ug/L | | | 10/16/24 17:10 | 1 |
| C5-C8 Aliphatics (unadjusted) | 25 | U | 100 | 25 | ug/L | | | 10/16/24 17:10 | 1 |
| C9-C10 Aromatics | 10 | U | 100 | 10 | ug/L | | | 10/16/24 17:10 | 1 |
| C9-C12 Aliphatics (unadjusted) | 25 | U | 100 | 25 | ug/L | | | 10/16/24 17:10 | 1 |
| Ethylbenzene | 1.0 | U | 5.0 | 1.0 | ug/L | | | 10/16/24 17:10 | 1 |
| Methyl tert-butyl ether | 1.0 | U | 5.0 | 1.0 | ug/L | | | 10/16/24 17:10 | 1 |
| Naphthalene | 2.0 | U | 6.0 | 2.0 | ug/L | | | 10/16/24 17:10 | 1 |
| Toluene | 1.0 | U | 5.0 | 1.0 | ug/L | | | 10/16/24 17:10 | 1 |
| C9-C12 Aliphatics (adjusted) | 25 | U | 100 | 25 | ug/L | | | 10/16/24 17:10 | 1 |
| m-Xylene & p-Xylene | 2.5 | U | 10 | 2.5 | ug/L | | | 10/16/24 17:10 | 1 |
| o-Xylene | 1.0 | U | 5.0 | 1.0 | ug/L | | | 10/16/24 17:10 | 1 |
| C5-C8 Aliphatics (adjusted) | 25 | U | 100 | 25 | ug/L | | | 10/16/24 17:10 | 1 |

| Surrogate | %Recovery | Qualifier | Limits | | | | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| a,a,a-Trifluorotoluene (fid) | 82 | | 70 - 130 | | | | | 10/16/24 17:10 | 1 |
| a,a,a-Trifluorotoluene (pid) | 82 | | 70 - 130 | | | | | 10/16/24 17:10 | 1 |

### Method: SW846 8015C - Saturated Hydrocarbons by GC (FID)

| Analyte | Result | Qualifier | RL | MDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| n-Nonane | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Decane | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Undecane | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Dodecane | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Tridecane | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| Isoprenoid RRT 1380 | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| Isoprenoid RRT 1470 | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Tetradecane | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Pentadecane | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Hexadecane | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| Norpristane (1650) | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Heptadecane | 60 | | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| Pristane | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Octadecane | 20 | J | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| Phytane | 50 | | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Nonadecane | 38 | J | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Eicosane | 110 | | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Heneicosane | 110 | | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Docosane | 130 | | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Tricosane | 150 | | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Tetracosane | 130 | | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Pentacosane | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Hexacosane | 100 | | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Heptacosane | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Octacosane | 240 | | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Nonacosane | 250 | | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Triacontane | 130 | | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Hentriacontane | 190 | | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Dotriacontane | 160 | | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Tritriacontane | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Tetratriacontane | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |

Eurofins Edison
10/31/2024
10:19:25 PM

WSP000022

## Client Sample Results

Client: WSP USA Inc
Project/Site: 216 Estate Whim

Job ID: 460-313420-1

**Client Sample ID: 216 Estate Whim**
**Date Collected: 10/08/24 11:30**
**Date Received: 10/11/24 10:40**

Lab Sample ID: 460-313420-1
Matrix: Water

### Method: SW846 8015C - Saturated Hydrocarbons by GC (FID)  (Continued)

| Analyte | Result | Qualifier | RL | MDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| n-Pentatriacontane | 100 | | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Hexatriacontane | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Heptatriacontane | 48 | | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Octatriacontane | 73 | | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| N-Nonatriacontane | 31 | J | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| n-Tetracontane | 18 | U | 48 | 18 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| DRO (C10-C28) | 15000 | | 1200 | 600 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| TPH (Total hydrocarbon range) C9-C40 | 23000 | | 1200 | 600 | ug/L | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |

| Surrogate | %Recovery | Qualifier | Limits | | | | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Chlorobenzene (Surr) | 110 | | 50 - 150 | | | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |
| o- terphenyl (Surr) | 67 | | 50 - 150 | | | | 10/15/24 20:35 | 10/16/24 23:45 | 10 |

### Method: SW846 8015D - Diesel Range Organics (DRO) (GC)

| Analyte | Result | Qualifier | RL | MDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Diesel Range Organics [C10-C28] | 0.39 | | 0.10 | 0.028 | mg/L | | 10/14/24 09:15 | 10/15/24 11:03 | 1 |

| Surrogate | %Recovery | Qualifier | Limits | | | | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| o-Terphenyl | 67 | | 15 - 150 | | | | 10/14/24 09:15 | 10/15/24 11:03 | 1 |

### Method: MA DEP MA-EPH - Massachusetts - Extractable Petroleum Hydrocarbons (GC)

| Analyte | Result | Qualifier | RL | MDL | Unit | D | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| Anthracene | 2.7 | U *1 | 2.7 | 2.7 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| Pyrene | 25 | *1 | 16 | 16 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| Benzo[g,h,i]perylene | 17 | *1 | 2.7 | 2.7 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| Indeno[1,2,3-cd]pyrene | 16 | *1 | 2.7 | 2.7 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| Benzo[b]fluoranthene | 10 | *1 | 2.7 | 2.7 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| Fluoranthene | 14 | *1 | 2.7 | 2.7 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| Benzo[k]fluoranthene | 5.4 | *1 | 5.4 | 5.4 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| Acenaphthylene | 2.7 | U *1 | 2.7 | 2.7 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| Chrysene | 2.7 | U *1 | 2.7 | 2.7 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| Benzo[a]pyrene | 6.2 | *1 | 2.7 | 2.7 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| Dibenz(a,h)anthracene | 26 | *1 | 2.7 | 2.7 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| Benzo[a]anthracene | 2.7 | U | 2.7 | 2.7 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| Acenaphthene | 2.7 | U *1 | 2.7 | 2.7 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| Phenanthrene | 2.9 | *1 | 2.7 | 2.7 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| Fluorene | 2.7 | U *1 | 2.7 | 2.7 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| Naphthalene | 2.7 | U *1 | 2.7 | 2.7 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| 2-Methylnaphthalene | 2.7 | U *1 | 2.7 | 2.7 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| C11-C22 Aromatics (unadjusted) | 1100 | *1 | 54 | 54 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| C11-C22 Aromatics (Adjusted) | 1000 | | 54 | 54 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| C9-C18 Aliphatics | 340 | | 41 | 41 | ug/L | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |

| Surrogate | %Recovery | Qualifier | Limits | | | | Prepared | Analyzed | Dil Fac |
|---|---|---|---|---|---|---|---|---|---|
| 1-Chlorooctadecane (Surr) | 87 | | 40 - 140 | | | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| 2-Fluorobiphenyl (Surr) | 120 | | 40 - 140 | | | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |
| o- terphenyl (Surr) | 41 | | 40 - 140 | | | | 10/17/24 22:00 | 10/21/24 22:04 | 1 |

Eurofins Edison
10/31/2024
10:19:25 PM

WSP000023

D. App. 0294

Defense Petroleum

| NOTE - DX/FX lower Cl | TPH GRO mg/L | TPH DRO mg/L | TPH ORO mg/L | PAHs w/Alkyl ng/L | Impacted water system | Basis for water system impact |
|---|---|---|---|---|---|---|
| | | | | 51.37 | | |
| | 0.02 J | 0.074 | 0.021 | | | |
| | 0.02 J | 0.149 | 0.061 | | | |
| | | | | 51.72 | | |
| | 0.02 J | 0.043 | 0.007 J | | | |
| | 0.02 J | 0.067 | 0.004 J | 33.06 | | |

2,3,7,8-TCDF   4.5 J

2,3,7,8-TCDF   4.1 J

2,3,7,8-TCDF   10 J

D. App. 0295

Defense Petroleum

| work order | TPAH in ppm (LLD = per analyte) | Talkyl_PAH in ppm (LLD = per analyte) | Alk-PAH-1 | Alk-PAH-2 | Alk-PAH-3 | Alk-PAH-4 | Notes |
|---|---|---|---|---|---|---|---|
| Laboratory EDD work order number matching row# and report file | total polynuclear aromatic hydrocarbons | total alkylated (substituted) polynuclear aromatic hydrocarbons | compound 1 (from highest to lowest concentration detected) | compound 2 | compound 3 | compound 4 | metals or inorganic detections of note as a range |

Eurofins 460-313420-1

## Chain of Custody Record

**eurofins**

| Client Information   (Sub Contract Lab) | Sampler: N/A | Lab PM: Tempe, Kristyn L | Carrier Tracking No(s): N/A | COC No: 410-3199323.1 |
|---|---|---|---|---|
| Client Contact: Shipping/Receiving | Phone: N/A | E-Mail: Kristyn.Tempe@et.eurofinsus.com | State of Origin: Virgin Islands, U.S. | Page: Page 1 of 1 |
| Company: Eurofins Environment Testing Northeast L | Due Date Requested: 10/23/2024 | Accreditations Required (See note): NELAP  New Jersey | | Job #: 460-313420-1 |
| Address: 777 New Durham Road | | **Analysis Requested** | | Preservation Codes: N  None |
| City: Edison | TAT Requested (days): N/A | | | |
| State, Zip: NJ  08817 | | | | |
| Phone: 732-549-3900(Tel)  732-549-3679(Fax) | PO #: N/A | | | |
| Email: N/A | WO #: N/A | | | |
| Project Name: 216 Estate Whim | Project #: 46044740 | | | |
| Site: N/A | SSOW#: N/A | | | |

Analysis columns: Field Filtered Sample (Yes or No); Perform MS/MSD (Yes or No); 8260D/8030C TCL VOA +10; 8270E/8510C_LVI TCL BNA +20; 1664A_NFI HEM (Oil & Grease); 8015D_DRO/3510C_LVI C10-C28 Diesel Range Organics; 8015D_GRO/5030C Gasoline Range Organics; 6010D/3005A Sulfur; Total Number of containers

| Sample Identification   Client ID (Lab ID) | Sample Date | Sample Time | Sample Type (C=comp, G=grab) | Matrix (W=water, S=solid, O=waste/oil, BT=Tissue, A=Air) | Preservation Code: | N | N | N | N | N | N | | | | Total Number of containers | Special Instructions/Note: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 216 Estate Whim (460-313420-1) | 10/8/24 | 11:30 Atlantic | G | Water | | X | X | X | X | X | X | | | | 2 | |
| EB-100824 (460-313420-2) | 10/8/24 | 12:15 Atlantic | G | Water | | X | X | X | X | X | X | | | | 2 | |

Note: Since laboratory accreditations are subject to change, Eurofins Lancaster Laboratories Environment Testing, LLC places the ownership of method, analyte & accreditation compliance upon our subcontract laboratories.  This sample shipment is forwarded under chain-of-custody.  If the laboratory does not currently maintain accreditation in the State of Origin listed above for analysis/tests/matrix being analyzed, the samples must be shipped back to the Eurofins Lancaster Laboratories Environment Testing, LLC laboratory or other instructions will be provided.  Any changes to accreditation status should be brought to Eurofins Lancaster Laboratories Environment Testing, LLC attention immediately.  If all requested accreditations are current to date, return the signed Chain of Custody attesting to said compliance to Eurofins Lancaster Laboratories Environment Testing, LLC.

| Possible Hazard Identification | | Sample Disposal ( A fee may be assessed if samples are retained longer than 1 month) | | |
|---|---|---|---|---|
| Unconfirmed | | ☐ Return To Client   ☐ Disposal By Lab   ☐ Archive For _____ Months | | |
| Deliverable Requested: I II III, IV Other (specify) | Primary Deliverable Rank: 1 | Special Instructions/QC Requirements: | | |

| Empty Kit Relinquished by: | | Date: | Time: | Method of Shipment: | |
|---|---|---|---|---|---|
| Relinquished by: | Date/Time: 10/24/24  1444 | Company: EUET | Received by: | Date/Time: 10/25/24  10:25 | Company: ELLE |
| Relinquished by: | Date/Time: 10/25/24  1520 | Company: ELLE | Received by: | Date/Time: 10/25/24  1525 | Company: |
| Relinquished by: | Date/Time: | Company: | Received by: | Date/Time: | Company: |
| Custody Seals Intact: ☐ Yes ☐ No | Custody Seal No.: | | Cooler Temperature(s) °C and Other Remarks: | | |

IR 914-1-6

Ver 10/10/2024

WSP000001

D. App. 0296

Defense Petroleum

D. App. 0297

288 Whim showing example of sheen



Example cistern showing visible sheen, 5.6 miles west of refinery, 15E Two Williams



D. App. 0298

St. Croix photos

288 Whim showing example of nonsettling solids

Defense photo showing nonsettling solids, Arcadis®, 216 Campo Rico





Flare 8 release



New ethanol was used on odd number sites
Old ethanol used on even number sites
Hexane was used on the samples below

STX-2025-16

STX-2025-18

STX-2025-17

STX-2025-19

STX-2025-20.

D. App. 0299

| Sample ID | Sampler | Date Sampled | Client | ID | Matrix | Units | Sb | As | Ba | Be | Cd | Cr | Cu | Hg | Pb | Ni | Se | Ag | Tl | Th | U | V | Zn | Cr(VI) | work order | method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STX-001S | Kaltofen/Moore | 7/13/2021 | public ROW | Elementary School | soil | mg/kg | ND | 3.1 | | 0.26 | ND | 15 | 93 | 0.038 | 16 | 12 | ND | ND | ND | 0.26 | ND | | 1000 | | 21072473 | SW6020B |
| STX-002S | Kaltofen/Moore | 7/13/2021 | public ROW | Museum Grounds | soil | mg/kg | ND | 2.9 | | 0.36 | ND | 19 | 61 | 0.040 | 26 | 21 | 0.49 | ND | ND | 0.33 | ND | | 100 | | 21072473 | SW6020B |
| STX-003W | Kaltofen/Moore | 7/13/2021 | | Williams Delight | water | mg/L | | | | | | | | | | | | | | | | | | | | |
| STX-004S | Kaltofen/Moore | 7/13/2021 | | Williams Delight | soil | mg/kg | 0.85 | 42.0 | | 0.20 | 0.17 | 99 | 95 | ND | 33 | 19 | 0.48 | ND | ND | 0.31 | 0.38 | | 620 | | 21072473 | SW6020B |
| STX-005S | Kaltofen/Moore | 7/13/2021 | | Williams Delight | soil | mg/kg | | | | | | | | | | | | | | | | | | | | |
| STX-006D | Kaltofen/Moore | 7/13/2021 | | Williams Delight | dust | mg/kg | | | | | | | | | | | | | | | | | | | | |
| STX-007S | Kaltofen/Moore | 7/13/2021 | public ROW | Refinery SW | soil | mg/kg | ND | 1.7 | | 0.60 | ND | 16 | 45 | ND | 22 | 21 | ND | ND | ND | ND | ND | | 770 | | 21072473 | SW6020B |
| STX-008S | Kaltofen/Moore | 7/13/2021 | public ROW | Refinery outfall area | soil | mg/kg | 0.78 | 3.4 | | 0.15 | 0.33 | 28 | 45 | 0.200 | 55 | 22 | ND | ND | ND | ND | ND | | 680 | | 21072473 | SW6020B |
| STX-009S | Kaltofen/Moore | 7/13/2021 | public ROW | Refinery West | soil | mg/kg | ND | 1.2 | | ND | 0.17 | 18 | 5 | 0.140 | 1 | 4 | ND | ND | ND | ND | ND | | 30 | ND | 21072473 | SW6020B |
| STX-010W | Kaltofen/Moore | 7/13/2021 | | Mount Pleasant | water | mg/L | | | | | | | | | | | | | | | | | | | | |
| STX-011S | Kaltofen/Moore | 7/13/2021 | | Mount Pleasant | soil | mg/kg | ND | 1.5 | | 0.16 | ND | 9 | 12 | ND | 6 | 7 | ND | ND | ND | ND | 0.21 | | 63 | | 21072473 | SW6020B |
| STX-012S | Kaltofen/Moore | 7/14/2021 | public ROW | Point Udall | soil | mg/kg | ND | 2.4 | | 0.29 | ND | 40 | 42 | 0.053 | 5 | 65 | 1.80 | ND | ND | ND | ND | | 80 | | 21072473 | SW6020B |
| STX-013S | Kaltofen/Moore | 7/14/2021 | public ROW | Boiler Bay | sands | mg/kg | | | | | | | | | | | | | | | | | | | | |
| STX-014S | Moore/Henry | 7/14/2021 | | Good Shepherd Ave. | soil | mg/kg | ND | 3.5 | | 0.51 | ND | 14 | 49 | 0.021 | 11 | 11 | 0.52 | ND | ND | 0.45 | ND | | 76 | | 21072473 | SW6020B |
| STX-015W | Moore/Henry | 7/14/2021 | | Good Shepherd Ave. | water | mg/L | | | | | | | | | | | | | | | | | | | | |
| STX-2021-05 S1 & S2 | Douglas/Henry | 8/31/2021 | Clifford Boynes | No. 77 A Esate Whim | soil | mg/kg | ND | 2.7 | 180 | 0.33 | ND | 12 | 30 | 0.061 | 10 | 8 | 1.20 | ND | ND | 0.29 | ND | 18 | 48 | | 21091012 | SW6020B |
| STX-2021-09 S1 | Douglas/Henry | 9/1/2021 | Carol Hugging | 205 Concordia West | soil | mg/kg | ND | 4.1 | 80 | 0.42 | ND | 22 | 49 | 0.022 | 6 | 18 | ND | ND | ND | 1.0 | 0.53 | 66 | 60 | | 21091012 | SW6020B |
| STX-2021-13 S1 | Douglas/Henry | 9/1/2021 | Benedict Chelcher | 504 Mount Pleasant | soil | mg/kg | ND | 2.4 | 100 | 0.44 | ND | 14 | 20 | 0.053 | 8 | 13 | 0.52 | ND | ND | | | | 42 | | 21091012 | SW6020B |
| STX-2021-16 S1 | Douglas/Henry | 9/1/2021 | Vafudare Boodoosingh | No. 65 Estate Humbug | soil | mg/kg | 0.48 | 10.0 | 110 | 0.35 | 0.21 | 23 | 41 | 0.087 | 30 | 14 | ND | ND | ND | | | | 99 | | 21091012 | SW6020B |

D. App. 0300

Page 1

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

--------------------------------
CLIFFORD BOYNES, et al.,
          Plaintiffs,
V.                              Civil Action No. 2021-0253
LIMETREE BAY VENTURES, LLC, et al.,
          Defendants.
--------------------------------
HELEN SHIRLEY, et al.,
          Plaintiffs,
V.                              Civil Action No. 2021-0259
LIMETREE BAY VENTURES, LLC, et al.,
          Defendants.
--------------------------------
MARY L. MOORHEAD, et al.,
          Plaintiffs,
V.                              Civil Action No. 2021-0260
LIMETREE BAY VENTURES, LLC, et al.,
          Defendants.
--------------------------------
BEECHER COTTON, et al.,
          Plaintiffs,
V.                              Civil Action No. 2021-0261
LIMETREE BAY VENTURES, LLC, et al.,
          Defendants.
--------------------------------


        VIDEO-RECORDED DEPOSITION OF PROF. DAVID BOND
              CONDUCTED AT BENNINGTON COLLEGE
          1 COLLEGE DRIVE, COMMONS BUILDING, RM. 304
                    BENNINGTON, VERMONT
        THURSDAY, SEPTEMBER 11TH, 2025 AT 10:08 A.M. EST

Job No. 7563683
REPORTED BY: KELLEY BOHAN

Page 115

Croix survey?

A.   A sampling plan?

Q.   Uh-hmm.

A.   There was a plan to get out into every state and try to get feedback as broadly as we could across all of St. Croix.

Q.   Okay.  But no formal sampling plan prepared?  A lot of times with these big, bigger surveys, they do a sampling plan which includes like target population sample, it has all this data that they're seeking and kind of designs how they're going to go over the data, that sort.

A.   The plan was we wanted feedback from as many estates as we could possibly get, and we wanted a range, you know, a geographic range.  We wanted survey results from every estate in St. Croix.

Q.   And did you go or -- Did you go door to door in every estate in St. Croix?

A.   As many of them as we could.  I don't have the exact number of estates we did, but we went to a lot.

Q.   When you say as many as you could, what was the constraint on going to all of them?

A.   It takes a lot of time.  You go door to door on a weekday most people are not going to be home, so generally you're confined to weekends.  And if you've ever done door-to-door survey research, it just, it takes a lot of time to get down a single street.  But we tried to make sure that we got

Page 116

as many neighborhoods as we possibly could all across St. Croix.

Q.   And so that would include on the east side?

A.   Yes.

Q.   Okay.  And do you know, and it's okay if you don't offhand, what towns or neighborhoods on the east side you did?

A.   I don't recall.  But there were definitely neighborhoods that we went to that were east of the refinery, north of the refinery, and around Christiansted.

Q.   Okay.  So there was no specific sort of sampling frame created, the idea was just however many Crucians we can get to we're going to talk to?

A.   The goal was to get input from as many neighborhoods as we could.

Q.   Was there any consideration or anything that went into the thought and the design about reflecting the sample population of St. Croix as a whole?

A.   Explain what you mean.

Q.   Sure.  So the island of St. Croix has a number of different averages - age, gender, race, location, socioeconomic - right?

A.   Yeah.

Q.   And so when you form a survey, right, that's your total population, and then your sample population in order to be reflective of the total population should align with the demographic criteria of the total population.  Was there any

Page 123

and we looked at a map of the neighborhood and tried to figure out a plan to go through all of the streets in that neighborhood. And we would go through and reach -- knock on every house.

Q. Okay. So then you went to every house in every neighborhood?

A. We had a goal. Because the survey was only open for a short amount of time we were not able to get to every house, but we made an effort to try to go in a systematic way through as many neighborhoods as we could.

Q. And how is that system designed; in other words, where did you start and go out from?

A. We started in neighborhoods immediately around the refinery and slowly moved outward from there.

Q. "Immediately around," would that be east, west, and north?

A. East, west, and north. And we also had folks at the grocery stores in Christiansted, Frederiksted. And we also had different events on the east side of the island and events on the west end and in Kingshill, and tried to have boots in every kind of section of the island and went door to door in as many estates as we could get to.

Q. And you said there's a lot of folks during the week wouldn't answer their door, what would happen if someone didn't answer?

Page 126

group?

A.   No.

Q.   Why not?

A.   It wasn't clear to us at the get-go what a control group would consist of in this case.  What we wanted to understand was where the impacts were occurring.  We knew that a number of folks from the community had fairly consistent complaints, and we wanted to understand the scale of those complaints and the sort of spatial pattern of them.

Q.   Was the survey intended to note impact from the events of the restart of the refinery?

A.   Yes.

Q.   Okay.  Did you do any sort of like baseline comparison, establish a baseline or a threshold?

A.   There's not a lot of longitudinal data on some of these issues, and we felt it was better to do a kind of preliminary study to begin to lay a better foundation for future studies.

Q.   Okay.  Who drafted the survey instrument itself?

A.   I did in conversation with the other sort of lead folks and with input from a much wider range folks on St. Croix.

Q.   And that includes the preamble and the questions, right?

A.   Yes.

Q.   Okay.  And so you're the one who put the words on the

D. App. 0305

Page 132

related to every meeting that we've discussed today produced in the documents that Bennington College produced in response to the subpoena?

A. I believe so.

Q. Professor Bond, would you agree with me that the goal of a survey question is to be clear, precise, and unbiased?

A. Yeah.

Q. In designing these questions, did you consider whether the questions could be leading or biased?

A. We had conversations about every question and to make sure that it was written in a way that was clear that would accurately reflect the concerns that the community had voiced to us and that would capture that in some systematic way.

Q. And what was your conclusion on bias with these questions?

A. That it was clear from the things we were hearing from the community that impacts had happened, and we wanted to measure the severity of those impacts and the spatial patterns of them.

Q. Okay. So seeking information on the severity of impact, not whether there was an impact?

A. No. I mean, we, as I said, every time we introduced the survey, every time I talked about it on radio programs, every time we were introducing it, we encouraged people that had no impacts to fill out the survey. And you'll notice every

D. App. 0306

Page 202

Q.   Okay.  Assuming it is 148 responses from Christiansted, did the fact that Christiansted is not a downwind community and nearly a quarter of responses came from Christiansted impact your analysis of the data?

A.   It enriched our understanding of impacts.

Q.   How so?

A.   We had a number of responses from Christiansted, and it enhanced our understanding of the spatial pattern of impacts. We want a lot of responses that didn't experience impact so we can sort of clarify where exactly the impacts happened.  And if I recall, a lot of the responses from Christiansted did not record as many impacts or the frequency of impacts as those neighborhoods on the other side of the island recorded.  So actually having a lot of responses from Christiansted was a really good thing for us to understand the spatial pattern of the impacts that people experienced.

Q.   Does it dilute the reliability of the surveys administered in the downwind communities, that nearly a quarter came from non-downwind communities?

A.   I don't know what you mean by diluted.  We wanted -- we wanted the input, the insight of people from all across St. Croix.  So we wanted everybody on St. Croix to report what their experience was so we could understand it.  The more you get from the more places, the better your understanding is.

Q.   Are there towns on the far east side of the island?

Page 203

A.    Far-far east is sparsely populated, but there are a few places on the southeast, east of the refinery, south side.

Q.    Towns or neighborhoods?

A.    Neighborhoods.  I mean, the towns, the main towns are Christiansted, Frederiksted, and Kingshill.

Q.    And did you send canvassers in those eastern neighborhoods?

A.    I believe we went out there.  I recall at least one experience where I was out there at houses east of the refinery on the south side.  I don't recall how frequently we went out there, but we definitely went out there.

Q.    Okay.  Professor Bond, let's go to Tab 2.

MR. GARTEN:  And this is Bennington 1 through Bennington 11.  I'll go ahead and mark it as LBT Exhibit 12.

(EXHIBIT 12 MARKED FOR IDENTIFICATION)

BY MR. GARTEN:

Q.    Do you recognize this document?

A.    Yeah, this is the website.

Q.    Okay.  Whose decision was it to put up this website?

A.    Mine in consultation with folks at Bennington College and in consultation with the groups that participated in the survey.

Q.    And what was the purpose of putting up the website?

A.    We wanted to make the results of our survey publicly available, and we wanted to make sure that people could see and

Page 267

COMMONWEALTH OF MASSACHUSETTS

HAMPSHIRE, ss.

I, KELLEY K. BOHAN, a Court Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 11th day of September, 2025 at 10:08 a.m., the person hereinbefore named, identification as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts, was by me duly sworn to testify to the truth and nothing but the truth of his knowledge concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that this is a true record of the testimony given by the witness to the best of my ability.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

My Commission Expires:  December 25, 2026

Kelley K. Bohan
Court Reporter/Notary Public

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| CLIFFORD BOYNES, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 2021-0253 |
| LIMETREE BAY VENTURES, LLC, et al., | |
| Defendants. | |
| HELEN SHIRLEY, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 2021-0259 |
| LIMETREE BAY VENTURES, LLC, et al., | |
| Defendants. | |
| MARY L. MOOREHEAD, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 2021-0260 |
| LIMETREE BAY VENTURES, LLC, et al., | |
| Defendants. | |
| BEECHER COTTON, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 2021-0261 |
| LIMETREE BAY VENTURES, LLC, et al., | |
| Defendants. | |

## DECLARATION OF ANGELITA TUITT

1. My name is Angelita Tuitt. I am an adult resident of St. Croix, U.S. Virgin Islands. The matters set forth herein are based on my personal knowledge.

2. I reside at 201 Adventure Hill on St. Croix. I have lived there with my family since before 2021.

3. I recall learning of an incident on or around February 4, 2021, involving a release of oil from the Limetree Bay Refinery. I learned about this event through the media.

4. Following this release event, I inspected my property for the presence of oil or any other damage, including on my roof, in my cistern, on my vehicles and in my yard. I did not find any oil on my property or any other damage or impact to my property.

5. Even though I did not find any oil, I cleaned my property after the event in February 2021. I did not contact anyone at the Refinery and no one from the Refinery came to my house to inspect my property.

6. During and after the February event, neither myself nor any of my family members that live with me suffered any physical symptoms or needed any medical attention.

7. I also recall an event involving a release of gases from the Refinery around April 19-23, 2021. I recall I was at home during this event and the John H. Woodson school was closed.

8. I also inspected my property after this event, and did not find any damage or other impact from this event. I did not contact anyone from the Refinery, and no one from the Refinery came to my house to inspect my property after this event.

9. Neither myself nor my family members that live with me suffered any physical symptoms during or following this event.

2

D. App. 0311

10.    I recall another event around May 5, 2021, also involving the release of gases from the Refinery. At the time of this event, I was driving on the highway. As with the other events, I inspected my property after this event but did not find any damage or other impact. Neither myself nor my family members suffered any physical symptoms following this event.

11.    I do not recall an event involving a release of oil from the Refinery on or around May 12, 2021, and did not have any impact or damage to my property from any such event. Also, neither myself nor my family members suffered any physical symptoms or needed any medical attention during or following this event.

12.    While I cannot recall specific dates, I have on occasion smelled foul odors that I believe were coming from the Anguilla landfill or from the wastewater treatment plant.

13.    I have been informed of the general nature of the allegations in this case, including the claims of trespass and nuisance due to the four releases discussed in this Declaration.

14.    I am not represented by any counsel representing the plaintiffs or members of the class in this case and I am giving this declaration voluntarily.

15.    I declare under penalty of perjury under the laws of the United States of America and the Territory of the United States Virgin Islands that the foregoing is true and correct.

Date: 9/11/25 .

_____
Angelita Tuitt

3

# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| CLIFFORD BOYNES, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 2021-0253 |
| LIMETREE BAY VENTURES, LLC, et al., | |
| Defendants. | |
| HELEN SHIRLEY, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 2021-0259 |
| LIMETREE BAY VENTURES, LLC, et al., | |
| Defendants. | |
| MARY L. MOOREHEAD, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 2021-0260 |
| LIMETREE BAY VENTURES, LLC, et al., | |
| Defendants. | |
| BEECHER COTTON, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 2021-0261 |
| LIMETREE BAY VENTURES, LLC, et al., | |
| Defendants. | |

D. App. 0313

## DECLARATION OF TEMARA HONORE

1. My name is Temara Honore. I am an adult resident of St. Croix, U.S. Virgin Islands. The matters set forth herein are based on my personal knowledge.

2. I reside at 275 Estate St. Georges on St. Croix. United States Virgin Islands. I have lived there with my son and daughter since before 2021.

3. I have been informed of the general nature of the allegations in this case and the claims being made due to the four releases discussed in this Declaration.

4. I am not represented by any counsel in connection with this case, including counsel for the plaintiffs or members of the class, and I am giving this declaration voluntarily.

5. On or about September 4, 2025, Attorney Dan Charest, who I understand is counsel for some of the plaintiffs in this case, called me to offer representation. This was the first time I was made aware of this lawsuit. I informed him that I did not want to have an attorney and I had nothing to make a claim for in this case, because I had no impact from any of the events. The next day, on September 5, 2024, Attorney Charest emailed me to offer representation. I informed him, once again, that per our conversation from September 4, 2025, I was not seeking representation and did not wish to become a client for this case.

6. I own my house at 275 Estate St. Georges and it has one cistern. To the best of my knowledge, the cistern is around 5,000 gallons. We do not regularly clean the cistern, but we occasionally will put Clorox into it.

7. We use the cistern for bathing, washing dishes and laundry. We do not use it for drinking or cooking, and have never used it for these purposes, either before or after 2021.

8. I have been told about an incident on or around February 4, 2021, involving a release of oil from the Limetree Bay Refinery, but I have no recollection of this incident. None

2

of my property, including my house, yard, or vehicles were impacted in any way or had any oil or other damage. Neither myself nor my family members had any physical symptoms as a result of this incident.

9.     I also have no recollection events involving a release of gases from the Refinery around April 19-23, 2021 or on May 5, 2021. I may have heard something about a release of gas from the newspaper but I can't recall for sure. My property had no impact or damages from these events, and neither myself nor any of my family members that live with me suffered any physical symptoms.

10.     I do recall an event involving a release of oil from the Refinery on or around May 12, 2021. To the best of my recollection, a neighbor told me that there was a flare of oil from the Refinery and oil was getting on people's homes. I did not find any oil or any other damage or impact to any of my property after this event.

11.     Following the May event, I recall people coming to my property to inspect it. I remember being outside with them as they did the inspection. They told me that they did not find any oil or other damage on any of my property. This was the only time anyone came out to inspect my property. Also, neither myself nor my family members suffered any physical symptoms during or following this event.

12.     I have no issues with Limetree or the Refinery and do not wish to make a claim in this case because I had no damage or other injuries to my property or to myself or any of my family members.

3

D. App. 0315

13.    I declare under penalty of perjury under the laws of the United States of America and the Territory of the United Stets Virgin Islands that the foregoing is true and correct.

Date: _9/29/25_

_____
Temara Honoré

4

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX**

| | |
|---|---|
| **CLIFFORD BOYNES, et al.,**<br><br>  Plaintiffs,<br><br>  v.<br><br>**LIMETREE BAY VENTURES, LLC, et al.,**<br><br>  Defendants. | **Civil Action No. 2021-0253** |
| **HELEN SHIRLEY, et al.,**<br><br>  Plaintiffs,<br><br>  v.<br><br>**LIMETREE BAY VENTURES, LLC, et al.,**<br><br>  Defendants. | **Civil Action No. 2021-0259** |
| **MARY L. MOOREHEAD, et al.,**<br><br>  Plaintiffs,<br><br>  v.<br><br>**LIMETREE BAY VENTURES, LLC, et al.,**<br><br>  Defendants. | **Civil Action No. 2021-0260** |
| **BEECHER COTTON, et al.,**<br><br>  Plaintiffs,<br><br>  v.<br><br>**LIMETREE BAY VENTURES, LLC, et al.,**<br><br>  Defendants. | **Civil Action No. 2021-0261** |

## DECLARATION OF SUSAN PERALES

1.      My name is Susan Perales. I am an adult resident of St. Croix, U.S. Virgin Islands. The matters set forth herein are based on my personal knowledge.

2.      I reside in the Estate of Williams Delight on St. Croix. United States Virgin Islands. I have lived there with my son and two grandchildren since before 2021.

3.      I have been informed of the general nature of the allegations in this case and the claims being made due to the four releases discussed in this Declaration.

4.      I am not represented by any counsel in connection with this case, including counsel for the plaintiffs or members of the class, and I am giving this declaration voluntarily.

5.      I currently work in the Command Center in the Security Department at Limetree Bay Terminals. I have worked there for approximately eight (8) years.

6.      My property has two bedrooms and one bathroom, and has one cistern. We use the cistern for bathing, cleaning and cooking. We do not use it for drinking because it does not have a filter. We have not changed how we use our cistern since before or after 2021.

7.      I recall an incident on or around February 4, 2021, involving a release of oil from the Limetree Bay Refinery. As part of the Command Center, I participated in taking calls from residents with complaints of oil or odors. I would gather information from the resident and email it to a group member who would inspect the property to determine what action should be taken. I recall that this incident seemed to be limited to the Clifton Hill estate.

8.      At the time, my vehicle was in the employee parking lot and got some drops of oil on it. My car was washed for free and the oil spots washed off of the vehicle.

2

9.    After this incident, I inspected my property but did not go up on the roof. I did not see any damage or impact to any of my property, including my house or yard. Neither myself nor my family members had any physical symptoms as a result of this incident.

10.    Because of my job at the Command Center, I also recall events involving a release of gases from the Refinery around April 19-23, 2021 and around May 5, 2021. Again, I took calls from some residents who were complaining about bad odors. Some claimed that they could smell the odor in their homes, and others complained about headaches or asthma-related symptoms.

11.    My property had no impact or damages from the gas events in April and early May of 2021. The smell was not strong in my area and did not make myself or any of my family members ill.

12.    I also recall an event involving a release of oil from the Refinery on or around May 12, 2021. I cannot recall whether I was at home during this incident, but I remember taking phone calls at the Command Center at work. Residents were calling to ask for inspections of their properties.

13.    I did not find any impact or damage to my home, vehicle or other property from this event. I was also not concerned about any impact to my cistern. did not inspect my cistern or the water inside it. I did get some bottled water for a very short period of time because it was available but we did not change how we use the cistern after this event.

14.    I have no issues with Limetree or the Refinery and do not wish to make a claim in this case because I had no damage or other injuries to my property or to myself or any of my family members.

3

15.    I declare under penalty of perjury under the laws of the United States of America

and the Territory of the United Stets Virgin Islands that the foregoing is true and correct.

Date: 10/15/25

Susan Perales

4

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| CLIFFORD BOYNES, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 2021-0253 |
| LIMETREE BAY VENTURES, LLC, et al., | |
| Defendants. | |
| HELEN SHIRLEY, et al., | |
| Plaintiffs, | Civil Action No. 2021-0259 |
| v. | |
| LIMETREE BAY VENTURES, LLC, et al., | |
| Defendants. | |
| MARY L. MOOREHEAD, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 2021-0260 |
| LIMETREE BAY VENTURES, LLC, et al., | |
| Defendants. | |
| BEECHER COTTON, et al., | |
| Plaintiffs, | Civil Action No. 2021-0261 |
| v. | |
| LIMETREE BAY VENTURES, LLC, et al., | |
| Defendants. | |

## <u>DECLARATION OF GORDON CORRY</u>

1.      My name is Gordon Corry. I am an adult resident of St. Croix, U.S. Virgin Islands. The matters set forth herein are based on my personal knowledge.

2.      I reside at 124 Hannah's Rest on St. Croix. I have lived there with my family since before 2021.

3.      I worked at Limetree Bay Terminals on and around February 4, 2021 and was at work at the time of an incident involving a release of oil from the Limetree Bay Refinery. I was part of the Incident Command Team and was summoned to a meeting when the event occurred.

4.      Following this event, I inspected my property for the presence of oil or any other damage, including on my roof, in my cistern, and in my yard. I did not find any oil on my property or any other damage or impact to my property.

5.      An individual (I believe a representative from the Refinery) came to my home and inspected the walls but did not find anything. The representative did not inspect my roof.

6.      Although I did not find any oil on my property, I paid an individual to pressure wash my roof and cistern.

7.      During and after the February event, neither myself nor any of my family members that live with me suffered any physical symptoms.

8.      I also recall an event involving a release of gases from the Refinery around April 19-23, 2021. I was also at work during this incident and recall a bad rotten egg smell.

9.      I also inspected my property after this event, and did not find any damage or other impact to my property. Neither myself nor my family members that live with me suffered any physical symptoms during or following this event.

2

D. App. 0322

10. I do not recall any event around May 5, 2021 involving the release of gases from the Refinery. Because I do not recall this event, there was no impact to my property and neither myself nor any of my family members suffered any physical symptoms.

11. I do recall an event involving a release of oil from the Refinery on or around May 12, 2021. Once again, I was at work when this incident happened.

12. Following the May event, I inspected my property, including my yard, roof, cistern and vehicles, and did not see any oil on the property or any other impact.

13. Individuals (I believe from the Refinery) came to my house and inspected after this incident. To the best of my knowledge they did not find any oil or impact to my property.

14. Even though I did not find any oil on my property after the May 12, 2021 event, I also paid an individual to clean my cistern and roof after this event.

15. Neither myself nor my family members suffered any physical symptoms during or following this event.

16. I have been informed of the general nature of the allegations in this case, including the claims of trespass and nuisance due to the four releases discussed in this Declaration.

17. I am not represented by any counsel representing the plaintiffs or members of the class in this case and I am giving this declaration voluntarily.

18. I declare under penalty of perjury under the laws of the United States of America and the Territory of the United Stets Virgin Islands that the foregoing is true and correct.

Date: _9 · 11 · 25_____.

_____
Gordon Corry

3

Page 1

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

CLIFFORD BOYNES, ET AL.,      )
        Plaintiffs,           )
                              )
VERSUS                        ) Civil Action No.
                              ) 2021-0253
LIMETREE BAY VENTURES,        )
LLC, ET AL.,                  )
        Defendants.           )

HELEN SHIRLEY, ET AL.,        )
        Plaintiffs,           )
                              )
VERSUS                        ) CIVIL ACTION NO.
                              ) 2021-0259
LIMETREE BAY VENTURES,        )
LLC, ET AL.,                  )
        Defendants.           )
BEECHER COTTON, ET AL.,       )
        Plaintiffs,           )
                              )
VERSUS                        ) CIVIL ACTION NO.
                              ) 2021-0261
LIMETREE BAY VENTURES,        )
LLC, ET AL.,                  )
        Defendants.           )
_____

VIDEOTAPED DEPOSITION OF VIRGINIE GEORGE
TAKEN AT BURNS CHAREST, LLP
201 ST. CHARLES AVENUE, SUITE 2900
NEW ORLEANS, LOUISIANA 70170
ON THURSDAY, APRIL 10, 2025, AT 9:32 A.M.

Job No. 7282736

Page 59

Q.   Okay.

A.   But I don't know if I have the -- I think I have the document for her, as well as the year it concerned.

Q.   But it's your understanding that she was there between February and May of 2021?

A.   Yes.

Q.   Okay.  So how did you first learn about the emissions events?

A.   Probably from St. Croix.  Having properties in St. Croix, people keep in touch with me most of the time.  Sometimes maybe long period of time, I don't hear from them, and then all of a sudden I'll hear from them.  So somebody called and told me what took place.

Q.   Do you recall when they called you, what date, or an approximate date?

A.   Not off the top of my head.  One thing I do know, it was like the following day after the event occurred, I got several calls.

Q.   Okay.  So you don't know if it was in February, March, April, May?

A.   The last big event.

Q.   Okay.  Do you --

A.   When I say "several calls," from some of

Page 60

the tenants.

Q.   Okay.  Do you recall who specifically called you?

A.   No.

Q.   Okay.  Do you recall what they told you?

A.   I do.

Q.   What --

A.   Some of what they told me.

Q.   Yes, sir.  What do you remember them telling you?

A.   It's all around the property and the whole St. Croix, so I need to come home.

Q.   And backing up to the properties.  Are the properties located close to one another, the 43, 43-A, and 43-AB?

A.   Per government, not too close, the required space.

Q.   Okay.  So about what's the distance between each property?

A.   43 is adjacent to 43-A.  The buildings are approximately a few hundred feet from each other.  And I may be wrong.

Q.   I won't hold you to it.

What about 43-AB?

A.   About 50/50.

Page 61

Q.   50?

A.   50 this one, and 50, and then you have the in center (INDICATING).

Q.   How far are these properties from the refinery?

A.   I don't know.

Q.   Okay.

A.   Not too far, though, but I don't know.

Q.   Like if you were to drive from the properties to the refinery, about how long do you think it would take you?

A.   Depend on how I drive.  Sometimes 5 minutes, 10 minutes.

Q.   Okay.  So once you got the phonecall, how soon did you go to St. Croix?

A.   I made a reservation between a week, week and a half.

Q.   So you were in St. Croix between a week, a week and a half after you got those phonecalls?

A.   Yes.

Q.   Okay.  And what did you observe once you got to St. Croix and to the properties?

A.   There were a couple -- quite a few oil mists around the buildings, the perimeter fence, the roof, the plants.  And then later when I

Page 62

opened the cistern, I saw -- in one building, then I saw the oil, oil drops in the water.

Q. Okay. I actually want to -- that's a perfect segue to my next set of questions. So does each property have a cistern?

A. There are some without; and there are some with more than one.

Q. Okay. Can you walk me through which property has what in terms of cisterns?

A. 43 has four. 43-A has two. 43-AB has two.

Q. Two?

A. Yes, ma'am.

Q. All right. Are the cisterns all the same size?

A. Basically, yes.

Q. Okay. Do you know about how many gallons each cistern can hold?

A. Not off the top of my head. But to the best of my recollection, as to the sizes, that can be factored.

Q. Okay. And what -- at the time -- in February through May of 2021, how were the cisterns used? Do you know how the residents used the cisterns; was it to bathe, cook, clean, drink?

Page 80

A.    The concrete roof on 43.

Q.    Have the roofs for any of the properties, were they at any point damaged before the emission events?

A.    No, ma'am.

Q.    So before the emission events, do you know if your property has ever suffered from any issues regarding an environmental impact of any sort?

A.    Not that I know of.  We're talking about before the event?

Q.    Yes, sir.

A.    Okay, ma'am.

Q.    Do you have homeowner's insurance on the properties?

A.    Currently?

Q.    Yes, sir.

A.    No.

Q.    Okay.  Did you have it at the time between February and May of 2021?

A.    No.

Q.    Have you ever had insurance, homeowner's insurance?

A.    Yes.  Yes.

Q.    Okay.  When did you have insurance on

Page 87

question.  Let me rephrase.

After the emission events, did anybody come to your properties to take samples?

A.   Limetree did not.

Q.   Okay.  Did you take any photographs or videos after the emission events?

A.   No.  Some people did.

Q.   I'm sorry?

A.   The Limetree people did.

Q.   Okay.

A.   I probably did a few, but I did not keep them.

Q.   So you don't believe you have any pictures or videos in your possession of the --

A.   Probably not.  I am aware Limetree does.

Q.   Are you claiming any personal injuries as a result of the emission events?

A.   No, ma'am.

Q.   What about lost wages?

A.   No, ma'am -- let me back up.  I don't know if my counsel does, because that's what they are being paid for.

Q.   Okay.  I'm just going to stop you, because I don't want to know any discussions with counsel.

Page 152

REPORTER'S PAGE

I, ANNA COATES, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(B) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the record;

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for the court reporter's transcription of a proceeding, and that dashes (--) do not indicate that words or phrases have been left out of this transcript; also, that any words and/or names which could not be verified through reference material have been denoted with the phrase "(spelled phonetically)."

ANNA COATES, CCR, RPR

LOUISIANA CCR NO. 97018

# E$^x$ponent®

$x$

## Rebuttal Report of Tarek Saba, Ph.D.

*In the matter of*

*CLIFFORD BOYNES, et al., Plaintiffs,*
*v. LIMETREE BAY VENTURES, LLC, et al.,*
*Defendants. (Civil Action No. 2021-0253)*
*HELEN SHIRLEY, et al., Plaintiffs,*
*v. LIMETREE BAY VENTURES, LLC, et al.,*
*Defendants. (Civil Action No. 2021-0259)*
*FRANCIS E. CHARLES, et al., Plaintiffs,*
*v. LIMETREE BAY VENTURES, LLC, et al.,*
*Defendants. (Civil Action No. 2021-0260)*
*BEECHER COTTON, et al., Plaintiffs,*
*v. LIMETREE BAY VENTURES, LLC, et al.,*
*Defendants. (Civil Action No. 2021-0261)*

*In the District Court of the Virgin Islands,*
*Division of St. Croix*

# E$^x$ponent®

# Rebuttal Report of Tarek Saba, Ph.D.

*In the matters of*

*CLIFFORD BOYNES, et al., Plaintiffs, v. LIMETREE BAY VENTURES, LLC, et al., Defendants. (Civil Action No. 2021-0253)*
*HELEN SHIRLEY, et al., Plaintiffs, v. LIMETREE BAY VENTURES, LLC, et al., Defendants. (Civil Action No. 2021-0259)*
*FRANCIS E. CHARLES, et al., Plaintiffs, v. LIMETREE BAY VENTURES, LLC, et al., Defendants. (Civil Action No. 2021-0260)*
*BEECHER COTTON, et al., Plaintiffs, v. LIMETREE BAY VENTURES, LLC, et al., Defendants. (Civil Action No. 2021-0261)*

*Prepared by:*

**Tarek Saba, Ph.D.**
**Principal Scientist & Office Director**
**77 South Bedford Street, Suite 350**
**Burlington, MA 01803**

**December 30, 2025**

# 2    Analysis of Dioxins and Furans Data in Cistern and Soil Samples

## 2.1    Background on dioxins and furans

The plaintiffs' experts use several D/F terminologies without providing context of what those terms mean.  This section provides background discussion on D/F.

D/F are a group of byproduct compounds[1] produced from different sources.[2]  Figure 1 presents the annual air emissions of D/F by source category, many of which are applicable to St. Croix such as landfill fires, backyard burning, and on-road combustion of gasoline and diesel fuels, in addition to oil combustion.  As such, the detection of D/F compounds in a cistern water sample will require additional analysis to determine their source.[3,4]  The additional analysis may include D/F chemical forensic analysis, chemical forensic analysis of other compounds that may have been detected in the cistern waters (such as polycyclic aromatic hydrocarbons [PAH]), consideration of hyper-local sources on the sampled properties, and proper definition of ambient background.

---

[1]    Shields, E.J., Tondeur, Y., Benton, L., and M.R. Edwards. 2006. Chapter 14 in Murphy, B.L., Morrison, R.D. (Eds.), Introduction to Environmental Forensics – Contaminant Specific Guide, pp. 293–312.

[2]    Shields, W.J., Saba, T., Boehm, P.D., Pietari, J. 2015. Congeners: A Forensics Analysis. Chapter 10 in: Murphy, B.L., Morrison, R.D. (Eds.), Introduction to Environmental Forensics, pp. 347–393.

[3]    Figure 1 taken from Shields, E.J., Tondeur, Y., Benton, L., and M.R. Edwards.  2006.  Chapter 14 in Murphy, B.L., Morrison, R.D. (Eds.), Introduction to Environmental Forensics – Contaminant Specific Guide, pp. 293–312.

[4]    Figure 1 is based on EPA. 2006. An Inventory of Sources and Environmental Releases of Dioxin-Like Compounds in the United States for the Years 1987, 1995, and 2000. EPA/600/P-03/002F.  November.

$E^{\mathcal{x}}$ ™

D. App. 0334

Page 1

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

CLIFFORD BOYNES, ET AL,    )
                           )
        Plaintiffs,        )
                           )
    vs.                    )      CIVIL ACTION FILE NO.
                           )      1:21-CV-00253
LIMETREE BAY               )
VENTURES, LLC, ET AL,      )
                           )
        Defendants.        )


VIDEOTAPED DEPOSITION OF:

DELIA ALMESTICA

Being taken pursuant to stipulations herein:

January 28, 2025

Lee J. Rohn & Associates, LLC

56 King Street, Third Floor

Hamilton House

Christiansted, St. Croix, VI   00820


Commencing at 9:56 a.m. Atlantic Standard Time


Before Debbie C. Hennings, CCR, RPR


Job No. 7126665

Page 92

A.   One puppy and she had eight and nine puppies. And we end up selling all the puppies and we end up having three puppies, three dogs.  Then the one died.  I mean, we keep having puppies and then the dogs, selling them off. So right now, we have three dogs and six puppies.

Q.   Back in 2021, did you have that many dogs on the property?

A.   Yeah, one dog, one dog, Apple, and then she had her eight puppies.

Q.   And the dogs are inside and outside dogs?

A.   Outside.  Outside.

Q.   All outside?

A.   Yeah.

Q.   Okay.  Let's talk about the events at issue in this case.  The first event I will represent to you, according to your pleadings, occurred on February 4, 2021. Do you recall that event?

A.   Ask me again.  I didn't understand what you just asked.

Q.   Do you recall an event occurring at the refinery on February 4, 2021?

A.   Yes.

Q.   Tell me what you recall about it.

A.   In the news they were saying that it was a big smoke and then you could see like the smoke in the sky.

Page 93

But at that time it wasn't as -- I could have smelled it coming down and could have seen it.

But the main one was more bigger and more -- it was more devastating. But yeah, I -- I have known about the -- to answer your question, yes, I knew about the February blowout.

Q. Okay. And where were you when that event occurred on February 4th?

A. I was at work.

Q. You were not at the residence?

A. No, I was at work when it happened.

Q. At the hotel?

A. Yes.

Q. The Fred Hotel?

A. Yeah, because I work nights. I work afternoons to nights. And at that time I was doing -- I do medical assistant home care at the time, too. So I was working two jobs.

So in the morning, I wake up early in the morning, head off to go take care of elderly. And then from there, I get dressed to go to the hotel and be gone all day during that time.

Q. So when you learned about this February event, that's where you were?

A. Yes. Then when I came home, that's when I

Page 94

noticed like the whole house was smelling like smoke and my curtains were black.  Because I have white curtains and gold curtains but they were very black.

Q.    I'm sorry, can you repeat that.  I missed it.

A.    For the first time when I came home, the curtains were black.

Q.    Okay.

A.    I have white curtains and they were like brown-black.

Q.    This was in February?

A.    Yeah, that's in February.

Q.    Were the curtains on the inside or outside?

A.    Inside.

Q.    Were the windows open?

A.    Yeah, just like in the picture here.  Keep the windows open.

Q.    Did you clean the curtains?

A.    Yeah, yeah, I had to take it down and wash them.

Q.    Did they come clean?

A.    Yeah, they end up coming clean.  But after a while they end up being dry-rotted.  But I end up buying new curtains anyway.

After washing them like a few times, it just became dry rot, like it just start tearing up.  I end up buying new curtains after and then it happened again.

Page 95

Q.   Oh, you're talking the later incident?

A.   Yeah.

Q.   We'll talk about that, but I want to focus on the February incident for now.

A.   Okay.

Q.   Did you notice any other impact to the house or the property when you came home that day on February 4th?

A.   No, I didn't notice any -- any other impact, no, just the smokiness of the place.

Q.   Did you actually see any flare or anything coming from the refinery on that day?

A.   Yeah.  Not flare or fire but the smoke.  You could have seen the black smoke in the air.  And then the clouds were somewhat black, black clouds.

Never seen that before.  But there was black clouds.  Besides if it was like rain clouds, that would be great, but this time it was like black clouds.  It was kind of weird.

Q.   Did you contact anyone at the refinery that day when you noticed the smokiness and the black clouds?

A.   No.  I just call my mom, I call my family.  And they was like, Did you guys see that?  What's going on there?  Try to inquire with family and friends to see what was going on because we didn't know what was really happening.

Page 96

There was no alarm, there was no indication, nothing to warn us that something like that happened, you know.  Usually like you have like alarm that says, hey, you know.

Q.   Did you inspect the house and the surrounding lot on that day after you noticed that event?

A.   Yeah.  But only the windows, the galvanized windows, those windows there, these are louvers, they were all black.  So we had to clean those from the outside and the inside, had to wash them.

Q.   That's from the smoke?

A.   Yes.

Q.   Did you notice any oil on the property during this February event?

A.   Not -- not quite in the February, no.  I didn't see much of the spots, but the smoke was more, was -- yeah.

Q.   Did you contact any Virgin Islands governmental agency or anyone to report or complain about this event?

A.   Well, I thought it was WAPA, you know, something happened to do with WAPA.  So I call them and let them know it must have been a fire or something going on.

But it wasn't me generally that did the calling but the neighbor.  Call the neighbor, told the neighbor what was going on, and he was on the phone with whoever it

Page 97

was at WAPA to find out what was going on at the time. But they said it wasn't them.

Q. Why did you think it was WAPA?

A. Well, everything was blame WAPA. We always think is WAPA. You know, power goes out. WAPA. Water. So.

Q. What did you think happened at WAPA at that time?

A. I don't know. They blew up. At the time I was wondering if something happened with them but -- but that's it.

Q. Did you inspect the roof during that February emissions event at the house?

A. No, I didn't. I didn't do any inspection of the roof.

Q. And you didn't see any oil at all from this event?

A. No.

Q. And that includes you didn't see any oil on or in your cistern; is that correct?

A. At that time I wasn't even thinking about any oils or whatever because the smoke, I figured was only the smoke. And I didn't see any spots on the curtains until the second blowout in May. That's when I start seeing those spots all over. It was a lot.

Page 98

Q.   Does the house have air conditioning?

A.   Yes.

Q.   When the air is on I assume the windows are closed; is that accurate?

A.   Yeah, the windows are closed.  Only at nighttime I put on the AC.

Q.   Did you do any testing on any part of the property after this February event?

A.   That I know of, I don't know if Michael did, but I didn't do any testing.  Only on my health; that's the only testing I did.

Q.   You didn't take samples or have somebody take samples of the soil or the water?

A.   No, not in February but in May.

Q.   After this February event, did you continue to use your cistern?

A.   Yeah.

Q.   Didn't make any changes on that -- at least after that one?

A.   Yeah, I didn't think anything was -- had anything to do with the cistern having any oils.  I figured the water was okay, but.

Q.   Did you take any pictures of the smoke that you saw after this February event on the curtains or anywhere else?

Page 99

A.    I did.  I did take a picture of it, but I --
that phone was broken and I'm not sure if it stayed in
the Google storage.  I tried looking for it but I
couldn't find it so I lost it.

Q.    So you have produced a number of photos.  I
just want to...

(Almestica Exhibit No. 7 marked.)

BY MS. ADLER:

Q.    Okay.  I'm handing you what's been marked
Exhibit 7.  And this is a series of photographs and
they are stamped Boynes 000141 through -143.  These
were produced to us by your attorneys.  Do you
recognize these photographs?

A.    Yes.

Q.    Can you tell from these photographs when they
were taken?  Do you recall?

A.    The day, the same day.

Q.    So are these photographs taken after this
February incident that we're talking about?

A.    No, this was taken in -- in May.

Q.    Okay.  That's what I wanted to -- and we're
going to come back to these.  I just wanted to make
sure these were not from the first incident.

So you believe you took pictures from this
event but don't believe you were able to recover them

Page 100

and produce them in connection with this?

A.   Yes, yes.

Q.   Did you suffer any personal injuries as a result of this first --

A.   Yeah.

Q.   -- incident?

A.   I'm an asthmatic so the smoke was really tough on my lungs.  I usually will take like a -- my inhaler. And I just had to use the inhaler a little bit more often than I usually would.

I would use like my inhaler, like maybe once a week, but after the event I had to use the inhaler like every day from the February.

Q.   After this February event in particular?

A.   Yeah, because of the smoke.

Q.   How long would you say the smoke lasted?

A.   About a day.

Q.   And after that, you say you had to use your inhaler daily?

A.   Yes.

Q.   For how long?

A.   For about a month.

Q.   Did you seek any medical treatment after this February event?

A.   I didn't go directly then because I figured I

Page 101

got my inhaler, I'm getting better, I'm fine.  But after the May, I end up going to the doctor because it was extremely bad.

Q.    After the May?

A.    Yeah, yeah, the May incident was extremely bad. It's like you get one blow for the first one, kind of like, okay, I'll tough it out.  But this my mistake because then it just end up being worse for the second one.  It was extremely worse.

Q.    Well, I want to stay focused on February.  We'll get there, I promise.  Do you recall speaking to anyone at any Limetree entity at the refinery or Limetree entity after this February event?

A.    No, I haven't spoken to anyone.  No one came.

Q.    No one came?

A.    No.  After February, no one came, no one came to look.  Taught me to now have a gas --

MR. LAMBERT:  She didn't ask you anything.

THE WITNESS:  I'm sorry?

MR. LAMBERT:  Wait until she asks a question. Just answer the question.

THE WITNESS:  Okay.

BY MS. ADLER:

Q.    Is it fair to say you didn't give any statements to anyone after this February event?

Page 111

Q.   Ended up renewing your prescription?

A.   Yeah, prescription, yes.

Q.   Do you have records from that visit or any other visits with Dr. Campbell?

A.   Yeah, I got records of visits.

Q.   Are you claiming damages from personal injury in connection with this case?

A.   I would like to continuously have medical evaluation further for my future, just to make sure that I didn't develop any extra anything from the events.

Q.   I understand that.  But my question was, are you claiming damages from any physical or personal injuries that you sustained or you claimed you sustained as a result of these events?

A.   Yeah, my -- yes, I'm basically claiming that as a form of medical issues that been -- yes.

MS. ADLER:  Okay.  I don't believe -- or matter of fact I --

MR. LAMBERT:  No, she's not -- again, she's not making an individual claim for her medical damages.  She wants --

MS. ADLER:  She just testified --

MS. CHAMPAGNE:  Objection.  She's --

MR. LAMBERT:  I know --

MS. ADLER:  You can't change her testimony as

Page 112

her attorney --

MR. LAMBERT:  She can.

MS. ADLER:  She just testified under oath that she's making a claim for personal injuries as a result of these events.  We have zero medical records.  This Dr. Campbell --

THE WITNESS:  When you said personal, meaning like I am saying that -- when you mention personal, how I explain to be is that I'm personally letting you know that I did suffer these injuries but not claiming anything based on like I -- like a form of like, okay, I need the money just because of this personally for myself.

But I'm doing it in overall for everyone that's in this suit, that we all suffered from it.  This is -- that's why I try to explain to my lawyer here that I don't want it to be a situation where I am personally making it be for myself only.  I want it to be overall for everyone, you know.  I suffer, they suffer.

BY MS. ADLER:

Q.   Okay.  So just to be clear, is it your testimony today that you are not claiming damages, monetary damages, due to any physical -- or personal to your person, physical injuries that you claim you suffered as a result

Page 113

of any of these events or anything any of the defendants did?

A.   Correct.

MR. LAMBERT:  Now can we take a break?

MS. ADLER:  Almost.

BY MS. ADLER:

Q.   Can you identify this photo for me, please?

A.   Yeah, that's me.

Q.   Was this when you were in the hospital in connection with this visit?

A.   This one here, yes, connection to this visit the three days after when I went to Campbell I went to this -- this was this was the picture I took.

Q.   So this picture was not taken when you were in the emergency room, correct?

A.   Correct.

Q.   This was taken three days later when you went to see Dr. Campbell?

A.   Correct.

Q.   And would you agree with me that any injuries you physically suffered as a result of any of these events or that you claim to have suffered would be different from any injuries anyone else claims to have suffered?

MR. LAMBERT:  Object to form.

BY MS. ADLER:

Page 120

Q.   Understood.  There are four incidents described so I would like to go through all four --

A.   Okay.

Q.   -- and you testify as to what you recall.

A.   Okay.

Q.   Did you at some point -- again focusing on this April 19th through 23rd incident two as described in your complaint -- at some point learn what that smell was, what was causing it?  Do you recall learning that?

A.   I learn it after I heard it in the news, that that smell was because of that incident that happened.  But at the time when I was smelling it, it was something that I thought that maybe a garbage truck probably pass by or something like died or -- but at the time when I heard it in the news I said, oh, that's where the smell came from; oh, my god.

Q.   Did you contact anyone either from the refinery or any governmental agency --

A.   No.

Q.   -- In the Virgin Islands about this particular incident?

A.   No.

Q.   Did you conduct any inspections of your property to see any impact on your property from this?

A.   No.

Page 121

Q.   Do you contend that any of your personal or real -- the house or any of land was impacted or damaged by this particular event where it smelled bad?

A.   No.

Q.   Do you contend that you suffered any personal injuries as a result of this second event due to the rotten smelling gas?

A.   I could say yes in some sort of way because of my chest pains and stuff that I was having prior to the February, within that period of time.  The smell did give me a significant, like, headache, you know, because of the smell of the rotten smell.

Q.   So the smell gave you a headache?

A.   Yeah, headache.

Q.   Did you seek any medical attention for that?

A.   No, because at the time I didn't realize that that's where the gas was coming from, that smell was coming from the gas.  I thought it was something that was in the air that just was disgusting at the time.

But then when I heard in the news, I was like, oh, that's where that came from; that's why I got the headache.  But I never really went to the doctor concerning that matter.

Q.   Had you ever experienced headaches in the past?

A.   Yes.

Page 122

Q.    And have you experienced headaches since that bad smelling event?

A.    Yeah, I experience headaches after.

Q.    How long do you believe you suffered from headaches due to the bad smell?

A.    Well, that specific smell, yeah, it was like a sharp headache, like, you know, that goes into your nostril.  It starts between your eyes and straight to your head.  It was that type of smell.

But other headaches is usually start from the back where, you know, probably stressed out or something like that.  That's where mostly my headaches would start.  But this one really start from the nostril, the top.

Q.    Had you ever experienced headaches from a smell of any sort up until then?

A.    Not really, no, not in that -- not as strong as that smell.

Q.    Did you have any other symptoms that you claim were caused by this bad smelling gas that you claim to smell during that time?

A.    No, that's it, no.

Q.    Are you claiming any damages from personal injuries as a result of that?

A.    No.

Q.    Did you do anything with -- I know -- let me

Page 128

Q.    So as of at least May 5, 2021, you were aware that there was going to be a class action and you had determined you wanted to be a part of it as a class representative?

A.    Correct.

Q.    Did you inspect anything on your property after this May 5th event to see if there was any impact due to the gas, bad smelling gas?

A.    No.

Q.    I'm sorry?

A.    No.

Q.    Do you contend that your personal or real property was impacted or damaged in any way as a result of this event, the May 5th event?

A.    No.

Q.    You testified that you had watery eyes from the gas?

A.    Yes.

Q.    For -- I'm sorry, tell me again.  How long did you experience that for?

A.    For --

Q.    Couple hours, did you say?  I apologize.

A.    Like a half a day.

Q.    Did you seek any medical treatment for that?

A.    No.

Page 129

Q.   And after half a day, your watery eyes resolved themselves?

A.   Yeah, I just used some eye drops and then I -- in June, after, I end up going to the doctor's office for eye checkup.

Q.   In June of 2021, you went to the doctor's office for a routine eye checkup?

A.   Yes.

Q.   And did they find anything abnormal or wrong with your eyes during that visit?

A.   No.  I just got some new glasses because my eye couldn't see with my old glasses.

Q.   Do you claim to have suffered any other symptoms as a result of the May 5, 2021 -- physical symptoms -- incident?

A.   No.

Q.   And are you seeking any damages for personal or physical injury as a result of that incident?

A.   No.

Q.   Did you experience any vomiting or nausea as a result of that incident?

A.   No.

Q.   Any stomach ache?

A.   No.

Q.   Any itching or sore throat?

Page 130

A.   I did have some sore throat, a little itching, but nothing major, just my -- you know, just because of the headache and the itching of my eyes, but nothing -- just a minor sore throat.

Q.   Around the same time?  Tell me when you experienced the sore throat.

A.   The same time, in May.  When I start smelling the smell, my eyes were watering and my throat given a little itch.

Q.   Did you seek medical treatment for that?

A.   No, I didn't.  I just did my herbal drinking the tea and detoxing.

Q.   Did you experience any rash as a result of the May 5th incident?

A.   No.

Q.   Okay.  Let's move on to the 4th and final event, which was May 12, 2021.  Do you recall an incident happening that day with respect to emissions from the refinery?

A.   Yes.

Q.   Tell me what you recall on that day.

A.   There were black smoke.  The oil -- the oil was everywhere.  I had to run from -- I was in the bedroom.  I was sleeping when that happened.  I woke up coughing, wanted to know what exactly happened.

Page 143

during your entire life?

A.    No.    When I was younger, back then they didn't have inhalers.    They had like oxygen tank that you had to go to the hospital and tank it up.    That's how I was during the time.    Then I had my own little personal tank at home.

And then after that I went away to go to college and whatnot and I -- I wasn't getting the asthma as much as I would then.    I end up having my first child.    And after my first child for some reason my asthma subsided a lot.    And I have kids and it subsided a lot.    It wasn't as much.

I would have more allergies, allergies.    Like I would get stuffy nose, a little bit of wheezing, but then it would stop within morning dew.    And then within the afternoon everything should be okay.

But after I came from St. Thomas and I came here, I -- after these incidents, my asthma like seemed to flare up and now I feel like I'm back like how I was when I was a younger person, like a kid.

Q.    Are you claiming any damages for physical or personal injuries resulting from the May 12th, 2021, incident?

A.    I -- no.    I am doing this for basically for -- for everyone, like a class action that I'm doing this.    I

Page 144

am making this on an open statement to -- for everyone, everyone, even asthma, any elderly that suffered, kids that suffered, everything.

I am just -- all this is just for the representation for me being -- going through this is for everyone to have this understanding that we can't have this anymore on our community, just can't. We just can't.

Q. Okay. Let's talk about any impact you claim your property suffered as a result of the May 12th incident. Are you claiming either real or personal property suffered any damages as a result of this May 12th, 2021, incident?

A. Personally, no. But as a class action representative, I am mentioning it to you and to everyone that we have to do something about this. This cannot happen again.

Q. Did you inspect your cistern after this event?

A. Inspect the cistern?

Q. Did you look at it and see if there was any impact to it from what happened on May 12th?

A. No, just when even those guys came in to take a look and view everything and whatnot, I only kind of just saw what they were doing. But I haven't personally went in there to take a look at it, no.

Q. When you say "those guys," who were those guys,

Page 197

No one came down in Frederiksted area said, hey, there was a blowout, take precaution.  When I come home, here I am in this situation.

If I was -- say, tsunami.  When tsunami, when they wanted to do the little tsunami testing, our phones go off, beep, beep, beep, beep to let us know, hey, a storm is happening, precaution for tsunami.

But there was no precaution to say, hey, there was a blowout.  There was smoke that would like hurt you.  And we didn't get that.  We didn't get it on our phones, didn't get it on our TV, we didn't get it on the radio.

It's after the fact.  And then on top of that, they claim bankruptcy and nobody come out to say, hey, let me clean your cisterns or, hey, let me help you out.  Here is a mask or here is something to help you through this.

And that's what the community is saying.  We're tired.  That you guys are -- I'm not saying you, but these companies coming in bringing the oil and they don't have no alertness for us to understand what's going on.

And that's why I'm here today to claim this.  And I don't want it to be personally for me.  That's why I end up telling Jones, Attorney Jones, I told

Page 198

these guys here that -- don't make it be on me.

I'm not the one that just going to be like, okay, I'm going to claim for myself.  No, I want to do it everybody here in the Virgin Islands.

(Cell phone interruption.)

BY MS. CHAMPAGNE:

Q.   Would you like to take a break?

A.   That's okay.  I just turn off my phone.  That's my job calling but I told them already I was taking this day off.  Sorry.  So yes.

Q.   You brought up, for instance, tsunami warnings, that you get an alert on your phone.  Who is that alert issued by?

MR. LAMBERT:  Object to form.

THE WITNESS:  I have no idea.  I think it -- it's -- I don't know.  I think it has to do with government.  I guess they the one that issue out tsunami warnings on your phone.  Or whenever we have hurricanes, we would hear that we have a flood watch in our phone that gives us a little incident saying, we got, you know -- sometimes they will also say like if they have like heat waves, we get that on our phones, that beeping sound to let us know to avoid, you know, any of these things that other people may not have seen in the news or whatnot.

Page 314

CERTIFICATE

I, Debbie C. Hennings, CCR, RPR, residing in the state of U.S. Virgin Islands, do hereby certify:

That I did appear as court reporter for the above-entitled matter, which was held on January 28, 2025.

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 314 represent a true, complete, and accurate transcript of the proceedings.

The witness did reserve the right to read and sign the transcript.

Signed this 13th day of February 2025.

Debbie C. Hennings, CCR, RPR
NCRA 833411
Licensed in GA, AL, ID, CO
GOLKOW, a Veritext Division
www.golkow.com
(877)370-3377

Page 41

A.   No.

Q.   Have you ever been involved -- were you deposed in connection with the sewage, the Housing Authority case; did you have your deposition taken on that one too?

A.   Yes.

Q.   Did you participate in a mediation in either of those cases; do you recall?

A.   I can't recall.

Q.   Do you have any documents relating to your payments?  I think you answered that, but --

A.   I can't -- I can't recall.

Q.   Okay.

(Deposition Exhibit Number 3 marked for identification.)

BY MS. ADLER:

Q.   Before we get to this exhibit I just handed you, Miss Santiago, let me just make sure:  Have you ever been involved in any other lawsuits other than what we've discussed today?

A.   Yes.

Q.   Yes?  Not -- this is -- this question's not related to that document at all.

Just wondering:  Have you ever been involved in any other lawsuits other than the two that we discussed, and obviously the current lawsuit that we are in?

Page 42

A.   Yes.

Q.   Okay.  What other lawsuits have you been involved in?

A.   I've been in one with the -- with a gas from the refinery.

Q.   When was that?

A.   I can't even remember the date.

Q.   So you have sued the refinery in the past?

A.   Well, I guess it was a settlement.  I had -- my attorney was Colianni and Colianni.

Q.   And you can't recall when that was?

A.   No, I can't remember when that was.

Q.   Were you a plaintiff in that lawsuit?

A.   Yes.

Q.   You were a named party?

A.   I just can't remember.  I don't know.

Q.   What was it for?

A.   Actually, they had a mass of gas that was traveling west down to the island, you know, to the -- the west side of the island.

Q.   And did you have -- were you damaged from that?

A.   Yes.

Q.   What were your claimed damages?

A.   The gas, inhaling the gas.

Q.   So you were claiming that you were injured from

Page 43

that gas?

A.    Yes, yes.

Q.    And was it prior to the events that happened in this -- in connection with this lawsuit?

A.    No.

Q.    We are talking about the events in connection with this current lawsuit?

A.    No.  No.

Q.    Previous one?

A.    Previous one.

Q.    Okay.  And you received a settlement from that case?

A.    Yes.

Q.    How much was that settlement?

A.    I can't even remember right about now.

Q.    When did you receive the settlement?

A.    I can't remember right now.  It was --

Q.    Was it in the past five years?

A.    I'm not too sure.

Q.    And do you recall who you sued?

A.    No, I can't remember that.

Q.    It was the refinery, though?

A.    The attorney that I had then did know.  But I can't even remember everything.

Q.    Colianni was your attorney?

Page 74

odor.

Q. Okay. Would it be safe you don't -- you're not aware of any impact to the cistern due to the bad odor?

MR. LAMBERT: Object to form.

THE WITNESS: That I know of? It -- you know?

BY MS. ADLER:

Q. Just the bad odor, correct?

A. Yeah, just -- just the bad odor.

Q. Are you seeking any damages to either your property or personal injury due to this bad odor on February 4th of 2021?

MR. LAMBERT: Object to form.

THE WITNESS: No.

MS. ADLER: That makes my job easier.

BY MS. ADLER:

Q. Okay. Let's move on to the next event, which was in April of 2021.

A. All right.

Q. April roughly 19th through the 23rd. Do you recall an event happening around those dates?

A. Yes.

Q. Tell me what you recall about that one.

A. It was another bad odor.

Q. Okay. Where were you when you smelled that bad odor?

Page 75

A.   In the house.  I was in the house.

Q.   Tell me what you did when you smelled it.

A.   Just closed the windows.

Q.   Did you call and tell anyone about it?

A.   No.

Q.   Did you discuss either of these bad odors --

MR. LAMBERT:  Hold on one second.

Miss Santiago, wait till she finishes --

THE WITNESS:  Oh, okay.

MR. LAMBERT:  -- before you answer.  And she's going to wait until you answer --

THE WITNESS:  Okay.

MR. LAMBERT:  -- before she.  So the court reporter can keep track.  Okay?

THE WITNESS:  Okay.  I'm sorry.

MR. LAMBERT:  No, that's okay.

BY MS. ADLER:

Q.   Did you call anyone -- or I mean, did you discuss either of these bad odors in February or in April with any of your neighbors?

A.   The kids, my children, I said, do you smell that odor?  And they said, yes, we smell it.  You know?  I would say, you know, it smelled bad.  But I didn't call nobody.  I didn't call Limetree.  I didn't call the radio.  I didn't do nothing.

Page 76

Q.   Did you discuss it with your landlords?

A.   No.

Q.   Do you recall in April how long that bad odor lasted?

A.   No.

Q.   Did you have any physical symptoms from that bad odor in April?

A.   I had, like, headaches, and, you know, feeling nauseated, but it wasn't -- to me, it wasn't that big of an issue because it was just an odor.

Q.   How long did those headaches and feeling nauseated last?

A.   I can't recall.

Q.   Did you seek any medical treatment due to those?

A.   No.

Q.   And same with the February event; do you recall any impact to any of your property due to the bad odor?

MR. LAMBERT:  Object to form.

THE WITNESS:  No.  No.

BY MS. ADLER:

Q.   Or is it safe to say you don't recall any impact to your cistern due to that bad odor in April?

A.   No.

Q.   Are you claiming damages, either personal injury or property damages, from that bad odor back in April of

Page 212

BY MR. LAMBERT:

Q.   And when I say your house, I'm using the words that you would use to describe the apartment that you lived in; fair?

A.   That's correct, yes.

Q.   And that's the same terms that you used in the response to the documents or the -- scratch that.

That's the same term that you used in your responses to the questions.  You talked about your house and your cistern, meaning the one that you occupied, meaning your apartment, correct?

A.   That's correct.

Q.   And the cistern that you used, correct?

A.   That's correct.

Q.   All right.  Now, when you talk about personal injuries, you're -- you're not suggesting that -- scratch that. let me start again.

You're not bringing an individual claim for personal injuries, are you?

A.   No.

Q.   Okay.

A.   I'm not.

Q.   One of the reasons for that is that you want to bring a claim on behalf of yourself and the other people in the community; fair?

Page 213

A.    That's correct.

MR. HERPEL:  Objection.  Question is leading.

MS. BENTZ:  Form.

MR. HERPEL:  Leading question.

MS. BENTZ:  Leading.

BY MR. LAMBERT:

Q.    Now, so that the record's clear, the juices that you made after this rainout event --

A.    Mm-hmm.

Q.    -- were made from fruits and vegetables that you purchased that were not in the impacted zone; fair?

A.    Yes, that -- it was not impacted.

Q.    Okay.  And all the questions that you were asked about doctors, you're not seeking to recover for individual medical expenses that you had as a result of this; fair?

A.    No.

Q.    Correct?

A.    That's correct.

Q.    And so, as far as your medical records go, you're happy to give up your medical records, but it's not something you're looking for as specific damages; fair?

A.    That's correct.

Q.    The agricultural fair that you attend every year, I imagine that that's something that you enjoy doing because of your hobby/business of -- let me scratch that.  Let me

Page 214

start again.

The agricultural fair that you participate in each year, is that something that you do because you enjoy working with plants and making juices?

A.   Yes, that's correct.

Q.   Okay.

MS. BENTZ:   Objection to the form.

BY MR. LAMBERT:

Q.   Though you don't know specifically what BP Products of North America does, is it fair to say that if they are one of the investors or one of the contractors or one of the people that runs Limetree, that you'd leave it up to your lawyers to know the details of what they would do; fair?

A.   That's correct.

MR. HERPEL:   Objection.   Leading.

BY MR. LAMBERT:

Q.   And is it fair to say that the same thing's true for Universal Plant Services or UPS?

A.   That's correct.

Q.   Okay.   And is it also fair to say that even though you might not know the specifics of what any contractor did that tried to get this plant that was -- well, first -- let me start again.

This plant was shut down for a long period of time

Page 222

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA      )

COUNTY OF PALM BEACH)

I, TAMARA MASCI TANNEN, Registered Professional Reporter, certify that I was authorized to and did stenographically report the video deposition of EDNA SANTIAGO; that a review of the transcript was requested; and that the foregoing transcript, pages 1-220, is a true and complete record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 2nd day of April 2025.


TAMARA MASCI TANNEN, RPR, FPR-C

Page 1

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

CLIFFORD BOYNES, et al,                )
        Plaintiffs,                    )
                                       )
    vs.                                ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0253
        Defendants.                    )
_____
HELEN SHIRLEY, et al,                  )
        Plaintiffs,                    )
                                       )
    vs.                                ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0259
        Defendants.                    )
_____
MARY L. MOORHEAD, et al                )
        Plaintiff,                     )
                                       )
    vs.                                ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0260
        Defendants.                    )
_____
BEECHER COTTON, et al,                 )
        Plaintiffs,                    )
                                       )
    vs.                                ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0261
        Defendants.                    )
_____

VIDEOTAPED DEPOSITION OF:
SIRDRINA ISAAC JOSEPH
APRIL 7, 2025

Offices of Lee J. Rohn & Associates
56 King Street, Third Floor
Hamilton House
Christiansted, VI 00820
Commencing at 9:31 a.m. AST

Before Debbie C. Hennings, CCR, RPR

Job No. 7282600

Page 23

A.   Against Hess?

Q.   Yes.

A.   No.

Q.   So I just want to make sure I understand.  You never sued Hess?

A.   No.

Q.   Okay.  Did you ever receive any money from an asbestos lawsuit?

A.   Yes.

Q.   In your discovery responses you listed Sirdrina Isaac Joseph vs. Hess as a lawsuit that you previously filed; do you recall that?

A.   Yes, but I didn't sue them.

Q.   Do you understand that you were a plaintiff in that case?

A.   Yes.

Q.   Okay.  Who was your attorney?

A.   I don't remember.  I don't remember.

Q.   Did you answer discovery requests in that case?  Did you provide information, for example in response to interrogatories, the way you did here?

A.   No.

Q.   And you weren't deposed, right?

A.   No.

Q.   Do you recall what damages you claimed in that

Page 24

lawsuit?

A.   What damages I claimed?

Q.   Yes.

A.   Can you explain the question.

Q.   Sure.  As a plaintiff in the lawsuit against Hess, what -- what did you allege -- how did -- how did -- let me think about this.  Sorry.  Tough time today.  How did you believe you were damaged by Hess?

MS. ROHN:  Objection.  Calls for a legal conclusion.

BY MS. CHAMPAGNE:

Q.   You can answer.

THE WITNESS:  Can I answer?

MS. ROHN:  (Counsel nods head affirmatively.)

THE WITNESS:  Okay.  The question -- repeat the question again.

BY MS. CHAMPAGNE:

Q.   Sure.  In the lawsuit against Hess, what -- how -- what damages were you claiming?

MS. ROHN:  Object to the form of the question as to she.

THE WITNESS:  I don't understand what you asking me.

BY MS. CHAMPAGNE:

Q.   Sure.  In the lawsuit against Hess, were you

Page 25

claiming that you had suffered personal injuries or property damage?  What were your allegations against Hess?

A.   Well, it wasn't my allegations.  My dad worked there.  You want me to explain to you what it was because --

Q.   Yes, please.

A.   I'm not the -- your first question is if I had a lawsuit against Hess.  I didn't.  I was a plaintiff but I didn't have a lawsuit on them.

So my dad worked there and the case was because I used to wash and take care of his clothes and whatnot so I was exposed.  So that was the case was about.  It wasn't to say that I was -- and went and was suing Hess. That wasn't the case.

Q.   Do you claim that you suffered respiratory injuries due to your exposure to asbestos from your father's work at Hess?

A.   Well, I wouldn't say that -- I can't answer that because I never saw medical reports or anything like that.  I was told to go and do testing, which I did.  I never get any results or anything from it so I can't answer the question.

Q.   How much money did you get from the lawsuit against Hess?

Page 26

A.    It was --

MS. ROHN:  Wait.  She cannot tell you that. That's a confidential settlement.

MS. CHAMPAGNE:  Did you represent her?

MS. ROHN:  I know that Hess -- all Hess settlements are confidential.  I sue them a lot.  I sue them a lot, so no, she's not going to answer that and violate confidentiality.

BY MS. CHAMPAGNE:

Q.    Do you know who the defendants are that you have named in this lawsuit?

A.    Limetree.

Q.    Is that the only one you know?

A.    Yup.

Q.    Have you ever worked for any of the defendants in the case?

A.    No.

Q.    So earlier we all made our -- we all announced who we represented.  And one of the parties that I represent is Limetree Bay Ventures, LLC.  Do you know what Limetree Bay Ventures, LLC does?

A.    No.

Q.    Can you tell me what you believe Limetree Bay Ventures, LLC did wrong?

MS. ROHN:  Objection.  Calls for a legal

Page 95

CERTIFICATE

I, Debbie C. Hennings, CCR, RPR, residing in the state of U.S. Virgin Islands, do hereby certify:

That I did appear as court reporter for the above-entitled matter, which was held on April 7, 2025.

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 95 represent a true, complete, and accurate transcript of the proceedings.

The witness did reserve the right to read and sign the transcript.

Signed this 18th day of April 2025.


Debbie C. Hennings, CCR, RPR

NCRA 833411

Licensed in GA, AL, ID, CO

GOLKOW, a Veritext Division

D. App. 0376

Page 1

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

CLIFFORD BOYNES, et al,                )
        Plaintiffs,                    )
                                       )
    vs.                                ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,)      2021-0253
        Defendants.                    )
_____
HELEN SHIRLEY, et al,                  )
        Plaintiffs,                    )
                                       )
    vs.                                ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,)      2021-0259
        Defendants.                    )
_____
MARY L. MOORHEAD,                      )
        Plaintiff,                     )
                                       )
    vs.                                ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,)      2021-0260
        Defendants.                    )
_____
BEECHER COTTON, et al,                 )
        Plaintiffs,                    )
                                       )
    vs.                                ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,)      2021-0261
        Defendants.                    )

VIDEOTAPED DEPOSITION OF:
JOHN SONSON

March 11, 2025

Colianni & Leonard
2121 Company St.
Christiansted, VI  00820
Commencing at 9:04 a.m. AST
Before Debbie C. Hennings, CCR, RPR
Job No. 7212652

Page 8

Terminals, in this case.  Have you ever had your deposition taken before?

A.    If I had deposition taken before?

Q.    Correct.  Have you ever gone through this process?

A.    Yes.

Q.    And when was the last time you had your deposition taken?

A.    Yesterday.  That was the 10th of this month.

MR. CHAREST:  I think she's asking when you took a deposition, not when we prepared for a deposition.

BY MS. ADAMS:

Q.    Correct.

MR. CHAREST:  When you gave a deposition, I should say.  Sorry.

THE WITNESS:  When they give me the deposition?

MR. CHAREST:  Do you mind?

MS. ADAMS:  No.

MR. CHAREST:  The last time you were in a deposition with a court reporter for a different case, not this one.

THE WITNESS:  Oh, that was 2019, I guess.

BY MS. ADAMS:

Q.    And what was that case?  What was the

Page 9

deposition for?

A.    Asbestos.

Q.    Do you remember the name of the case?

A.    If I remember the name of the case?

Q.    Correct.

A.    It was the asbestos case.

Q.    Okay.  And that's fine.  We'll talk more about that later.  Is that the only other time you have ever given a deposition?

A.    Yes, sir -- yes, ma'am.

Q.    No problem.  I understand.  So let me -- I'll go through the ground rules with you really quick, since it's been several years for you.

So our court reporter today is taking down everything that we say.  So to make her job easier, I ask that you wait for me to finish my questions before you provide your answers.  And, in turn, I'll do the same thing so we're not talking over each other.

Sometimes -- I know it's being videoed, but it's also being taken down.  So sometimes people answer by nodding their heads or saying "uh-huh" or "huh-uh." But those, since this all gets typed up, isn't going to make a lot of sense.

So if you forget going through, I might just remind you and ask is that a yes or no.

Page 23

Q.   Do you know what that would equate to in the U.S.?

A.   Excuse me?

Q.   Do you know what that would equate to in the U.S.?

A.   No.

Q.   And other than standard three, have you obtained any other types of licenses, specialized training, certificates?

A.   Yes, I have training through Hess.

Q.   What type of training did you receive from Hess?

A.   Run crane, drive truck, run forklift, run lull.

Q.   And when were you employed by Hess?

A.   Excuse me?

Q.   When were you employed by Hess?

A.   That was June 6, 1975.

Q.   And how long did you work for them?

A.   I work for them until 2006.

Q.   When you were first hired back on June 6, 1975, what were you hired to do?

A.   Laborer.

Q.   And what do you mean by labor; what kinds of things?

A.   Use a shovel, you use a pickax, you dig hole,

Page 35

can't remember.

Q. Okay, fair enough.

A. I have all the document at home.

Q. After these events in February through May of 2021, was your farm impacted at all?

A. Yes.

Q. So tell me a little bit about what changed on your farm after the May 12th, 2021, event moving forward.

A. Well, when I get outside I watch my plant and my seed, it oil up. So I asking myself, but wait, somebody look like they throw oil on my plant. Then I heard the radio speaking about they had the event in Limetree.

So I say, oh. Then I hear they say to disconnect your spouting, don't use your cistern water. But I don't have a cistern. I have them buffalo, them drum. So I empty it out, clean it up, and put it back stand up. And I think two days after that we had a heavy shower of rain.

Q. Okay. So I want to go through each event individually. So we'll circle back to this just to make sure I understand the timing and that we're on the same page with that, okay?

So your -- tell me about your asbestos case with Hess. And, again, nothing related to anything you

Page 36

discussed with your attorneys, just your own personal knowledge. What was the case about?

A. The case about I could hardly breathe. I had lungs problem. When they check -- went to the doctor, they checked. I was diagnosed with asbestos.

Q. And is that case still going on or has it been resolved?

A. I don't know.

Q. Okay. So you don't know -- and again, I don't want to know anything confidential, if there was a confidential settlement amount. But you don't know if it was settled, it's ongoing, or what the outcome of that case was?

A. I don't know. When my case done with the asbestos, I don't thinking about it. I don't -- whoever in it, I don't know.

Q. What kind of physical symptoms -- I know you mentioned the breathing -- were you experiencing at time that led you to file the Hess case?

A. Well, the doctor give you a tube and it have numbers and tell you to blow, blow as hard as you can. I blow and I didn't make the number. Then they find out -- they realize I been diagnosed with that.

Q. Did you receive any type of treatment, any procedures, medications after that?

Page 37

A.    No.

Q.    Do you know what they diagnosed you with?

A.    Excuse me?

Q.    Do you know what they diagnosed you with?

A.    If I know the guy?

Q.    No, what they diagnosed you, the medical condition.

A.    I -- I know the doctor I went to, which is in Dr. Gassen office, the heart doctor.  That's the office they use, but I don't know exactly the name.  I think they had from the States.  They have them doctor here.

Q.    Do you know what the diagnosis was that that doctor gave you, you know, whether it was asthma, influenza, just --

A.    No, he said I been diagnosed with asbestos. That's all I know.

Q.    Are you still receiving any type of medical treatment for your breathing issues related to that?

A.    No.  I seeing the lab for cancer center.  Every three months I think I have to go and give them blood.

Q.    Do you know the name of that facility?

A.    Oh, man.  I think the only way I could know is in my truck.  All the info send for me, I just leave it in the truck.  But it's the cancer center.

Q.    Were you treating at the cancer center before

Page 115

about Warren Burns but I don't know for sure.

BY MS. ADAMS:

Q.   And do you know how long it was after May 12, 2021, that you reached out to your attorney, or you first contacted them?

MR. CHAREST:  How much time passed between the pollution and talking to the lawyers?

THE WITNESS:  Well, my -- reframe that question.  What did you say?

BY MS. ADAMS:

Q.   Do you remember when you contacted your attorneys for this case the first time?  Was it a couple days?  Couple weeks?  Couple months?

A.   Couple weeks.  Because I didn't know what to do, where to go, just that my place messed up.

Q.   Do you know if any of your other family members contacted any attorneys after May 12, 2021?

A.   Not that I know of.

Q.   So what type of damages, Mr. Sonson, are you looking to recover in this case?

A.   Excuse me?

Q.   What types of damages are you looking to recover in this case?

MR. CHAREST:  Form.

Answer what you can, how you can.

Page 116

THE WITNESS:  My property is damaged and I don't think they will clean that because the earth will suck it down.

BY MS. ADAMS:

Q.   Anything other than property?

A.   No, that's what I have, only the property and myself.

Q.   Do you feel you have suffered any type of mental anguish or anxiety since May 12, 2021?

A.   No.

Q.   Are you aware that a mediation occurred in this case back in November of 2024 in New Orleans?

A.   No.

Q.   And you didn't attend that mediation?

A.   In where?

Q.   In New Orleans.

A.   By the time I land in St. Croix, I haven't moved a foot yet.  New Orleans is up in the States.  I ain't moving nowhere.  Not even St. Thomas I don't go.  Right here in St. Croix.

Q.   Are you aware of any of the named plaintiffs that attended the mediation?

A.   No.

Q.   Are you aware of any of the named plaintiffs who were even aware that the mediation occurred?

D. App. 0385

Page 132

A.    Yes.

Q.    But then you said you went to see a Dr. Watty?

A.    Yes, I did.

Q.    Why did you go see Dr. Watty?

A.    Because of the smell.  My throat was feeling like something tight, so I went to him and I explain what happened.  He send me to get blood test to the lab.  I went to the lab, they take the test, and send the report to him.

Q.    What kind of doctor is Dr. Watty?

A.    I think he's a physical doctor.

Q.    Just a general practitioner?

A.    Yeah.

Q.    Is he your normal treating physician?

A.    Yeah.

Q.    You go to him for all things, basically?

A.    I don't choose him for my doctor because I already have three other, so I didn't choose him.  But he was the closest to go to.

Q.    Okay.  And after you got your blood test, they found no problems?

A.    They said no problem, everything is good.

Q.    Other than the things that we have already heard that you were being treated for; the kidneys, the low blood iron, those things?

Page 133

A.   I think come again.

Q.   Sure.  Other than the things that you were already being treated for, he said you were good; is that accurate?

A.   Yes.

Q.   Okay.  Okay.  You testified that -- let's talk about Sonson Exhibit No. 4, which are your interrogatory responses.  You said the first time you saw these was yesterday?

A.   Those papers?

Q.   Yeah.

A.   Yes.

Q.   Okay.  Did your attorneys not ask you to sign these?

A.   No, he did not.

Q.   Have you signed these?

A.   No.

Q.   And with respect to the proof of claim -- actually, strike that.  Let's stick with the interrogatories.

Interrogatory No. 5 you responded that you had a cistern that was affected for the house that you were building; do you recall that response?

A.   A cistern I was --

MR. CHAREST:  Objection.  Form.

Page 156

CERTIFICATE

I, Debbie C. Hennings, CCR, RPR, residing in the state of U.S. Virgin Islands, do hereby certify:

That I did appear as court reporter for the above-entitled matter, which was held on March 11, 2025.

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 156 represent a true, complete, and accurate transcript of the proceedings.

The witness did reserve the right to read and sign the transcript.

Signed this 26th day of March 2025.

Debbie C. Hennings, CCR, RPR

NCRA 833411

Licensed in GA, AL, ID, CO

GOLKOW, a Veritext Division

Page 1

```
        IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
                  DIVISION OF ST. CROIX
CLIFFORD BOYNES, et al,              )
        Plaintiffs,                  )
                                     )
    vs.                              ) CIVIL ACTION
                                     ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0253
        Defendants.                  )
_____
HELEN SHIRLEY, et al,                )
        Plaintiffs,                  )
                                     )
    vs.                              ) CIVIL ACTION
                                     ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0259
        Defendants.                  )
_____
MARY L. MOORHEAD, et al              )
        Plaintiff,                   )
                                     )
    vs.                              ) CIVIL ACTION
                                     ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0260
        Defendants.                  )
_____
BEECHER COTTON, et al,               )
        Plaintiffs,                  )
                                     )
    vs.                              ) CIVIL ACTION
                                     ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0261
        Defendants.                  )
_____

                VIDEOTAPED DEPOSITION OF:
                     ISIDORE JULES
                     APRIL 8, 2025

                Lee J. Rohn & Associates
           56 King Street, Christiansted,
                      St. Croix
              Commencing at 9:02 a.m. AST
          Before Debbie C. Hennings, CCR, RPR

Job No. 7284129
```

Page 17

about what you -- what your work history is, it may be easier.  Let's just do that.  Are you currently employed?

A.   No.

Q.   Retired?

A.   Yes, ma'am.

Q.   Congratulations.  When did you retire?

A.   April 24, 2012.

Q.   Before you retired, what was the last job that you had?

A.   I was working at Wyatt in Hess, in Hess refinery, oil refinery.

Q.   You worked in the Hess oil refinery?

A.   43 years.

Q.   Three years?

A.   Four-three.

Q.   43 years, okay.  When did you first start working at the refinery?

A.   1971.

Q.   And when you first started there, what was your job?

A.   I was working as a laborer.

Q.   Did you work as a laborer in the refinery or the terminals?  What part?

A.   In the refinery.

Q.   And what types of things did you do as a

Page 18

laborer?

A. Well, picking up -- picking up garbage, digging, digging dirt.

Q. How long were you a laborer?

A. Work labor about four months.

Q. And what was your next job?

A. They make me -- they promote me to be a foreman.

Q. All right. And as a foreman, what was your -- what did you do?

A. Well, they give me six or eight people and they assign me to check this out there, so I tell these six people what to do.

Q. Were the six people that you supervised laborers?

A. Yeah.

Q. How long were you a foreman?

A. Until I -- until I retire.

Q. All right. So you did that job for most of the 43 years?

A. Yeah.

Q. Okay. During the time that you worked at the refinery, did you have any training or education about the hazards of working in a refinery?

A. Yes, they did tell you -- they used to have

Page 93

CERTIFICATE

I, Debbie C. Hennings, CCR, RPR, residing in the state of U.S. Virgin Islands, do hereby certify:

That I did appear as court reporter for the above-entitled matter, which was held on April 8, 2025.

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 93 represent a true, complete, and accurate transcript of the proceedings.

The witness did reserve the right to read and sign the transcript.

Signed this 21st day of April 2025.

Debbie C. Hennings, CCR, RPR

NCRA 833411

Licensed in GA, AL, ID, CO

GOLKOW, a Veritext Division

```
                                                      Page 1
         THE IN DISTRICT COURT OF THE VIRGIN ISLANDS
                    DIVISION OF ST. CROIX
    CLIFFORD BOYNES, et al,              )
            Plaintiffs,                  )
                                         )
        vs.                              ) CIVIL ACTION
                                         ) FILE NO.
    LIMETREE BAY VENTURES, LLC, et al,) 2021-0253
            Defendants.                  )
    _____
    HELEN SHIRLEY, et al,                )
            Plaintiffs,                  )
                                         )
        vs.                              ) CIVIL ACTION
                                         ) FILE NO.
    LIMETREE BAY VENTURES, LLC, et al,) 2021-0259
            Defendants.                  )
    _____
    MARY L. MOORHEAD, et al              )
            Plaintiff,                   )
                                         )
        vs.                              ) CIVIL ACTION
                                         ) FILE NO.
    LIMETREE BAY VENTURES, LLC, et al,) 2021-0260
            Defendants.                  )
    _____
    BEECHER COTTON, et al,               )
            Plaintiffs,                  )
                                         )
        vs.                              ) CIVIL ACTION
                                         ) FILE NO.
    LIMETREE BAY VENTURES, LLC, et al,) 2021-0261
            Defendants.                  )
    _____

                    VIDEOTAPED DEPOSITION OF:
                        CRISTEL RODRIGUEZ
                         APRIL 10, 2025

                      Beckstedt & Kuczynski
                        2162 Church Street
                     Christiansted, VI  00820
                 Commencing at 9:32 a.m. AST
              Before Debbie C. Hennings, CCR, RPR

    Job No. 7282765
```

Page 20

Q.   What about the use, design, or maintenance of flares?

A.   I can't recall.

Q.   Are you currently employed?

A.   No.

Q.   What was the last place where you worked?

A.   Department of Education.

Q.   When did you become unemployed from education?

A.   Two thousand -- two years ago.  I think it was 2023 I resigned.  2023.

Q.   What happened?

A.   Due to medical reasons.

Q.   Okay.  What medical issues were you experiencing?

A.   Situations with the building, with the mold and so forth.  I have severe allergies and asthma.  Dealing with different situations occurring near the school and the school having to be shut down because of similar situations or the situation also.  So that was like the main reasons, and also my back.

Q.   Okay.  What was your former position at the Department of Education?

A.   Registrar.

Q.   Okay.  And when did you begin working for the Department of Education?

Page 139

CERTIFICATE

I, Debbie C. Hennings, CCR, RPR, residing in the state of U.S. Virgin Islands, do hereby certify:

That I did appear as court reporter for the above-entitled matter, which was held on April 10, 2025.

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 1 through 139 represent a true, complete, and accurate transcript of the proceedings.

The witness did reserve the right to read and sign the transcript.

Signed this 23rd day of April 2025.

Debbie C. Hennings, CCR, RPR
NCRA 833411
Licensed in GA, AL, ID, CO
GOLKOW, a Veritext Division

Page 121

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

CLIFFORD BOYNES, et al,                )
          Plaintiffs,                  )
                                       )
     vs.                               ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0253
          Defendants.                  )
_____

HELEN SHIRLEY, et al,                  )
          Plaintiffs,                  )
                                       )
     vs.                               ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0259
          Defendants.                  )
_____

MARY L. MOOREHEAD, et al               )
          Plaintiff,                   )
                                       )
     vs.                               ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0260
          Defendants.                  )
_____

BEECHER COTTON, et al,                 )
          Plaintiffs,                  )
                                       )
     vs.                               ) CIVIL ACTION
                                       ) FILE NO.
LIMETREE BAY VENTURES, LLC, et al,) 2021-0261
          Defendants.                  )
_____

VIDEOTAPED DEPOSITION OF:
RYAN ALLEYNE
Volume II
March 13, 2025
Colianni & Leonard
2121 Company St.
Christiansted, VI  00820
Commencing at 10:12 a.m. AST

Before Debbie C. Hennings, CCR, RPR

Job No. 7212704

Page 198

from Hurricane Maria?

A. That's correct.

Q. Anything other than that, that you can recall?

A. No.

Q. Do you have homeowners insurance?

A. Yes.

Q. Have you ever made a claim on your homeowners?

A. Yes.

Q. Tell me when that was.

A. After Hurricane Maria.

Q. Did the insurance company pay for those damages to be fixed?

A. Percentage.

Q. A percentage, as insurance companies do. Have you made any claims on your homeowners insurance since that time?

A. No.

Q. Have you made any claims on your homeowners insurance related to any alleged damages in connection with this case?

A. No.

Q. Are you seeking damages in this case for any anxiety or mental anguish that you believe you suffer?

MS. BENEDICT: Objection to form.

THE WITNESS: No.

Page 199

BY MS. ADLER:

Q.   Do you have any fear or anxiety due to the releases that we were talking about today?

A.   Could you re -- could you say that over.

Q.   Do you have any fear or anxiety that there might be another release that could cause your property damage?

A.   Yes.

Q.   You're aware that the refinery was purchased by a completely separate company, correct?

A.   That's correct.

Q.   So you're not seeking to recover from any of the defendants in this case damages for that alleged fear or anxiety, correct?

MS. BENEDICT:  Objection to form.

THE WITNESS:  The legal aspect of that, I will leave that up to my attorneys.

BY MS. ADLER:

Q.   And I understand.  I'm just trying to get from you what damages you're trying to recover in connection with this lawsuit.  And I believe you said you were not trying to recover damages for anxiety or mental anguish. I just want to confirm that.

A.   Well, mental and anxiety, it could be a long-term case.  You don't know what tomorrow is going to

Page 200

be.

Q.    And I believe that's true.  I understand that.  But just to confirm, you're not seeking to recover damages due to anything you experienced with respect to the emission events in this case?

MS. BENEDICT:  Objection to form.

THE WITNESS:  I leave that up to my attorney.

BY MS. ADLER:

Q.    You previously testified you were not.  Is that true still?

MS. BENEDICT:  Objection to form.  Misstates.

THE WITNESS:  Based on the -- based on -- things change on a daily basis based on your body chemistry.  It may not happen today, but tomorrow, yes, as a result of yesterday.

BY MS. ADLER:

Q.    Understood.  Sitting here today, you're not claiming damages, mental anguish, due to the emission events at issue in this case; is that right?

MS. BENEDICT:  Objection to form.

THE WITNESS:  I still leave that up to the attorneys.

BY MS. ADLER:

Q.    Well, it's yes or no.  You either are seeking --

Page 201

MS. BENEDICT:  I'm going to object as asked and answered.  This is getting --

MS. ADLER:  I'm trying to get an answer.

MR. CHAREST:  -- four or five.

MS. BENEDICT:  His answer is clear.

BY MS. ADLER:

Q.   Okay.  Did you specifically seek out any medical treatment as a result of the May 12, 2021, emissions event?

A.   I did my physical.

Q.   Other than your physical that was previously scheduled?

A.   No.

Q.   You disclosed in some of your discovery responses that you go see Dr. Victor Villegas?

A.   Yes.

Q.   To check on your eyes?

A.   Yes.

Q.   That's just a regular checkup?

A.   It's started out a monthly checkup because I have pressure in my eyes.

Q.   Okay.

A.   So I treat for pressure in my eyes.  If I don't do it, chances are I go blind.

Q.   Understood.

Page 257

CERTIFICATE

I, Debbie C. Hennings, CCR, RPR, residing in the state of U.S. Virgin Islands, do hereby certify:

That I did appear as court reporter for the above-entitled matter, which was held on March 13, 2025.

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages 121 through 257 represent a true, complete, and accurate transcript of the proceedings.

The witness did reserve the right to read and sign the transcript.

Signed this 28th day of March 2025.

Debbie C. Hennings, CCR, RPR
NCRA 833411
Licensed in GA, AL, ID, CO
GOLKOW, a Veritext Division

Page 1

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

----------------------------
CLIFFORD BOYNES, et al.,
                Plaintiffs,
V.                          Civil Action No. 2021-0253
LIMETREE BAY VENTURES, LLC, et al.,
                Defendants.
----------------------------
HELEN SHIRLEY, et al.,
                Plaintiffs,
V.                          Civil Action No. 2021-0259
LIMETREE BAY VENTURES, LLC, et al.,
                Defendants.
----------------------------
MARY L. MOORHEAD, et al.,
                Plaintiffs,
V.                          Civil Action No. 2021-0260
LIMETREE BAY VENTURES, LLC, et al.,
                Defendants.
----------------------------
BEECHER COTTON, et al.,
                Plaintiffs,
V.                          Civil Action No. 2021-0261
LIMETREE BAY VENTURES, LLC, et al.,
                Defendants.
----------------------------

VIDEO-RECORDED EXPERT DEPOSITION OF

ROBIN CANTOR, PH.D.

Monday, April 13, 2026
10:03 AM EST

JOB NO.: 7990719
Reported by:  Denise Dobner Vickery, CRR, RMR

Page 16

Q.       And that's Jen Adler and Matt Medina?

A.       Yes.

Q.       Okay.  And were Ms. Adler, Mr. Medina folks with whom you prepared for this deposition?

A.       Yes.

Q.       Okay.  In respect to the three reports that you issued, Exhibits 1, 2, and 3, those reports contain all of your opinions in this case, correct?

A.       I would say that they contain most of my opinions in this case.  I did continue to review some information, and I have some observations from that review.

Q.       What opinions do you have in respect to this case that are not set forth in your three reports?

A.       Well, I continued to review the materials that were provided by Dr. Huber, and in that review I did see an analysis that I think is relevant to the matter that Dr. Huber didn't discuss in his reports.

Q.       Okay.  What analysis are we talking

Page 17

about?

A.    He did an analysis where he tested to see whether or not the on-the-ground contamination measurements by Dr. Kaltofen were related to -- statistically related to a designation of whether a property was damaged or not.

Q.    And what opinions do you have about that analysis?

A.    Well, he found that the on-the-ground measures of contamination were not statistically related to the measure of damage as per Dr. Huber's model.

You know, he had this model between the air concentration and then it would produce a probability of being damaged, and when he makes those assignments with his theory and his model and then further tests to see if that's related to the on-the-ground measurements that Dr. Kaltofen did of contamination at the sites, he finds that result is not significant.

Q.    And what opinions do you have about that, ma'am?

A.    Well, it suggests that there is, at

Page 18

least by the work of Dr. Huber, not a statistical connection between the air concentrations and the measures of damage and the on-the-ground measurements by Dr. Kaltofen and Dr. Huber's assignment of damage.

Q.    So this is your interpretation of Mr. Huber's work.

Is that what I'm understanding?

A.    I don't think it's an interpretation.

It's one of the sensitivity analyses that he produced, but then he did not discuss that in his reports.

Q.    When was this production that you're pointing -- that your discussing made?

A.    This production I believe was made before -- I think we had the materials before the rebuttal report, but we could not do the analysis. I couldn't do the analysis because we did not have the roadmap to all of the many files that Dr. Huber produced.

And so when I was working on the rebuttal report, I did ask counsel to make sure that we got a roadmap, which we did receive after

Page 421

CERTIFICATE OF REPORTER

DISTRICT OF COLUMBIA        )

I, Denise Dobner Vickery, a Registered Court Reporter and Notary Public of the District of Columbia, do hereby certify that the witness was first duly sworn by me.

I do further certify that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date herein set forth, to the best of my ability.

I do further certify that I am neither a relative nor employee nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such counsel, and that I am not financially interested in the outcome of this action.

DENISE DOBNER VICKERY, CRR,RMR
Notary Public in and for the
District of Columbia

My Commission expires:  March 14, 2028

Page 1

IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

CLIFFORD BOYNES, et al.,
    Plaintiffs,
V.                                Civil Action No. 2021-0253
LIMETREE BAY VENTURES, LLC, et al.,
 Defendants.
--------------------------------------
HELEN SHIRLEY, et al.,
 Plaintiffs,
 V.                               Civil Action No. 2021-0259
LIMETREE BAY VENTURES, LLC, et al.,
 Defendants.
--------------------------------------
MARY L. MOORHEAD, et al.
 Plaintiffs,

 V.                               Civil Action No. 2021-0260

LIMETREE BAY VENTURES, LLC, et al.,
 Defendants.
--------------------------------------
BEECHER COTTON, et al.,
 Plaintiffs,

 V.                               Civil Action No. 2021-0261

LIMETREE BAY VENTURES, LLC, et al.,
 Defendants.

VIDEO DEPOSITION
OF
EMILY FUCILE SANCHEZ
Taken at the offices of
Susman Godfrey
1000 Louisiana Street, Suite 5100
Houston, Texas

February 13, 2026                          9:01 a.m.

you found to estimate cistern capacity, right?

A.    Yes.

Q.    And that number, that final product number, assumes that all of those residential dwellings that you identified follow the building code, right?

A.    Yes.

Q.    Okay.  And so what's your basis for the assumption that all residential dwellings follow the building code?

A.    My assumption is that the buildings should be in compliance with the building code.

Q.    But I thought a couple moments ago, you testified you don't have any opinions at all about building codes.

A.    No, I don't have any opinions on building codes.

Q.    And you didn't do any verification to determine whether structures follow building codes?

A.    That was outside the scope of what I -- of my analysis.

Q.    Despite applying that building code to every residential property that you identified?

A.    Is that a question?

Q.    Yes.

A.    Can you rephrase it?

Q.    Yes.  You don't have any opinions on building

Page 110

codes, and you didn't do anything to verify whether structures follow building codes, yet you applied the building code to every residential property you identified to reach your opinion, correct?

THE WITNESS:  Can you repeat it back to me?

(Reporter reads back previous question.)

A.   Yes, we applied the building code to every residential property.

Can we take a break?

Q.   Sure.

VIDEOGRAPHER:  We're off the record at 12:11 p.m.  That's the end of media 4.

(Lunch recess was taken.)

VIDEOGRAPHER:  We're back on the record at 12:55 p.m.  It's the beginning of media 5.

BY MR. GARTEN:

Q.   Before we took a break, we were looking at Defendant's Exhibit No. 10, which is Tab 12.  That's the VI Code Title 29, Section 308, (2019); do you have that up?

A.   Yes.

Q.   Okay, and first sentence says, bullet A, General, "After May 1, 1964, no building except commercial developments, dwellings, and single-unit apartments with connected access to the potable water

Page 111

system shall be constructed, enlarged, or moved unless the owner thereof shall make provision for a self-sustaining water supply system."  Did I read that correctly?

A.    Yes.

Q.    Okay.  And so we agree that this code applies to homes constructed after 1964, right?

A.    Constructed, enlarged or moved.

Q.    Yes.  Constructed, enlarged or moved; we agree to that?

A.    Yes.

Q.    Do you know how many homes in the putative class area or the proposed class area were built before 1964?

A.    That is not data that we were able to get from the parcel information.  We had a very limited number of properties that we had the construction date for, and, of those, I would say that 90, 95 percent of them were constructed after 1964, and I have no way of knowing whether they had been enlarged -- the other five percent, whether they were enlarged or moved.

Q.    And how many homes did you have that data for?

A.    I had that data for the homes in the area in the data provided from the assessor's office by Stevie Henry.

Q.    Do you know how many homes you had that data

Page 112

for?

A.   No.

Q.   Okay.  And so it wasn't all the homes?

A.   No.  It was just a portion of the homes.

Q.   And that was that -- what was it?  The BF file?

A.   The dbf.  The .dbf.

Q.   It was in that same file?

A.   Yeah, I believe so.

Q.   And did you do anything to verify that data that Stevie Henry provided you?

A.   No.

Q.   Subsection B(1), the last sentence reads, "If a dwelling shall have access to the potable water system and is verified by appropriate WAPA officials and service is installed, no cistern will be required."  Did I read that correctly?

A.   Yes.

Q.   So we agree that, under the code, homes connected appropriately to public water systems are exempted from the requirement?

A.   Yes.

Q.   Do you know how many homes in the proposed class area have public water system connections?

A.   I do not, no.

Q.   What did you do to determine that the

Page 113

residential structures in your count don't have public water connections?

A.    That was based on Stevie Henry's verification or the assessor data saying that the cistern was their primary water source.

Q.    Does it say that it's their only water source?

A.    No.  I don't have information on ancillary water sources.

Q.    And it's possible that a property has a cistern and a WAPA connection, right?

A.    Yes.

Q.    And if that was an approved WAPA connection, that property would be exempted from these cistern requirements, right?

A.    Yes.

Q.    Subsection E says, "Wells:  A well supplying a safe, palatable, continuously adequate water supply may be used in lieu of a cistern."  Did I read that correctly?

A.    Yes.

Q.    So we agree that homes connected to an approved well are exempted from these requirements?

A.    Yes.

Q.    How many homes in the proposed class area have access or connections to approved wells?

Page 114

A.   I don't have that information.

Q.   Okay.  What did you do to determine that the structures in your residential dwelling count don't have approved well connections?

A.   Stevie verified that they used cisterns as their primary water source.

Q.   Did he do anything to verify that they don't have wells?

A.   I don't know.

Q.   To your knowledge, did he do anything to verify that they don't have wells?

A.   I don't know.

Q.   Did you verify, yourself, that they don't have access to wells?

A.   No.

Q.   How many times have you visited St. Croix?

A.   I've never visited St. Croix.

Q.   Do you know who Ricardo Alvarez is?

A.   No.

Q.   Have you heard that name before?

A.   No.

Q.   Have you reviewed his report in this case?

A.   No.

Q.   Let's go to Tab 13.  I'll mark Tab 13 as Defendant's Exhibit No. 11.

Q.    Do you have any peer-reviewed literature supporting that calculating cistern volume by roof area is an acceptable practice?

A.    My literature review was not exhaustive, but I don't know of any cases that do this specifically in the Virgin Islands.

Q.    Okay.  Do you know of cases where they do it specifically elsewhere?

A.    No.

Q.    So, as far as you know, you're the first person to apply this methodology?

A.    I'm the first person to apply the VI Code to very standard methodology of calculating building height and area using the two datasets I used.

Q.    And so, to be clear, to your knowledge, you're the first person to estimate cistern volume based on roof area, right?

A.    To my knowledge, I'm the first person to estimate cistern -- yes, but that's -- there could be more people out there that -- that -- the literature -- my literature review was not exhaustive.

Q.    And have you done anything to calculate your error rate?

A.    No.  There was no -- not necessarily a need to calculate the error rate, because the input data had an

D. App. 0414

Page 123

error rate itself.

Q.   And your opinions, they've changed, right?  From your initial report to your supplemental report, to your reply report, your final conclusions have changed about resident structures and cistern capacity, correct?

A.   The counts, yes.

Q.   Okay.  And those changes were based on errors, right?

MR. CHAREST:  Form.

A.   Those changes were based on data refinement.

Q.   Well, there was duplicate data, right?

A.   There were a set of properties that were duplicate, yes, and those data were refined so that we could have a more robust answer, and these refinements were done electively.

Q.   What does that mean, they were done electively?

A.   I noticed the issue, and I fixed it without being told I needed to.

Q.   So there was an issue in your initial report, right?

A.   There was a data -- yes, there was a data issue in the report.

Q.   Okay --

A.   On a small subset of properties.

Q.   So you noticed that error and you corrected that

Page 132

your supplement, right?

A.    Yes.

Q.    And why did those properties get excluded?

A.    Stevie confirmed -- or, yeah, verified that those do not use a cistern as their primary water source.

Q.    Okay.  And these numbers, your conclusions change again, right?  They're different in your reply report?

A.    In the supplement, yes.

Q.    Okay.  Let's look at your reply report, which is Tab 6, Defendant's Exhibit 6.  And your reply report made two categories of corrections to your earlier work, right?

MR. CHAREST:  Form.

A.    Yes.

Q.    First, you conducted a manual zoning verification and removed 225 non-residential properties?

A.    Yes.

Q.    And that correction was prompted by issues identified in the defense rebuttal reports, right?

A.    Correct.

Q.    And, in making that correction, you virtually inspected 362 properties, right?

A.    Correct.

Page 133

Q.   And 225 of those were deemed non-residential and removed, right?

A.   Yes.

Q.   Okay.  The second category is that you resolved 313 duplicate parcel IDs with conflicting data, correct?

A.   Yes.

Q.   How did that error come to your attention?

MR. CHAREST:  Form.

A.   I believe when I was inspecting some of the properties, I saw that there were duplicate values in the table.  Basically, when you click around, I would click on the next, and it would go to the exact same place.

Q.   And that's what cued you that there was duplicates?

A.   Yes.

Q.   And do you know for sure how these duplicates ended up in your data?

A.   I don't know for sure, but -- no, I don't know for sure.

Q.   Before Mr. Phillips's rebuttal, you had not identified that your dataset included non-residential properties like schools and resorts, had you?

A.   Can you ask it again?

Q. Sure. Prior to Mr. Phillips' rebuttal where he identified the non-residential properties, you didn't identify that there was non-residential properties in your dataset, right?

A. I don't believe so, no.

Q. Is it possible that there are still errors in your reply report?

MR. CHAREST: Form.

A. It's possible that more data refinement could be conducted.

Q. And that data refinement could change your opinions again, right?

A. I don't think that they would change the -- the actual number, the number would change, but, no, my opinions about my methodology being correct would not change.

Q. Sure. Your conclusion about the gallon capacity and/or the number of residential properties could change if there were errors in the data, though, right?

A. Yes.

Q. Let's go to Table C-1 in your reply report on page 22. And this table, C-1, is the full property-by-property listing of your cistern volume estimates, correct?

A. Yes.

Q.   And it's the same columns as the other Table C-1s, correct?

A.   Yes, it has the same column headers.

Q.   Uh-huh.  And that's latitude, longitude, roof area, and square feet are, you know -- really, building footprint is a proxy for roof area, right?

A.   That's correct.

Q.   Then a designation, single-story/multi-story?

A.   Yes.

Q.   And then the estimated cistern volume, and then a designation about whether the property is within the preliminary injunction area, right?

A.   Yes.

Q.   It doesn't include the actual nDSM height value for each property, right?

A.   No.

Q.   So, by looking at this table, we can't tell whether a building was 16.1 feet or 25 feet, right?

A.   From this table, no.

Q.   We just know whether it's classified as a single or a multi-story?

A.   Yes.

Q.   And there's no indication of whether these -- whether or which of these properties was verified by Mr. Henry, correct?

Page 136

MR. CHAREST:  In this table.

A.    In this table, no.

Q.    And in this table, there's no indication of whether a property was built before the building code was enacted?

A.    In this table, no.

Q.    And this table also doesn't include any indication of whether any property has a WAPA connection, right?

A.    Any property that was found to have a WAPA connection should be removed from this table.

Q.    And how would that have been done?

A.    That would have been done through Stevie Henry's verification.

Q.    So I thought Stevie Henry's verification indicated whether or not it had a cistern, not whether there was no alternative source of water.

A.    Oh, the cistern was its primary water source. If WAPA was its primary water source, as defined by Stevie Henry or in the appraiser data, that should not have -- that would not be in this table.

Q.    And how would Stevie Henry have deduced whether a property's primary source of water was a WAPA connection or a cistern?

A.    Based on his local expertise.

Page 137

Q.   So based on his local expertise, he could tell what residents of a home were using as their primary water source?

A.   Yes.

Q.   Okay, do you have any idea how he did that?

A.   He did it in the ways I've explained earlier in the record.

Q.   But we agree that a property could have a cistern and a WAPA connection, right?

A.   Yes.

Q.   Okay, and he didn't remove all properties with a WAPA connection from the numbers, correct?

A.   No.

Q.   So let's look at page 81.  About ten rows down, there is a property listed with 12,341 square feet of roof area; do you see that?

A.   Yes.

Q.   And that has an estimated cistern volume of 185,115 gallons, correct?

A.   Correct.

Q.   Is that consistent with a residential structure, in your experience?

A.   In my experience, people can have very big homes.  I don't know.

Q.   And the coordinates you have, the latitude is

D. App. 0421

17.710401; is that correct?

A.   Yes.

Q.   And the longitude is -64.822572?

A.   -64.8829 -- wait.  2919.

Q.   Did I miss a number?

A.   It's -64.882919.

Q.   Okay.  Thank you.  You got a pen?  Will you write down the coordinates of that property?

A.   (Witness complies.)

Q.   Okay, will you flip to Tab 33 for me.  I'll mark Tab 33 as Defendant's Exhibit No. 12.

     (Exhibit 12 was marked.)

BY MR. GARTEN:

Q.   Do you see, on the first page of this exhibit down in small text, the coordinates it lists?

A.   Yes.

Q.   And do those coordinates match the coordinates you just wrote down?

A.   Yes.

Q.   Okay.  And you see in the map image, it has a red arrow on top of a building with a pinkish roof?

A.   Yes.

Q.   And so you agree that these coordinates match what you had in your table?

A.   That's correct.

Q.   Okay, let's go to Tab 34.  I'll mark this as Defendant's Exhibit No. 13.

(Exhibit 13 was marked.)

BY MR. GARTEN:

Q.   On that third page, do you see the coordinates there?

A.   Yes.

Q.   And those coordinates match what you have written down on that piece of paper?

A.   Yes.

Q.   Okay, you see the image here, right?

A.   Yes.

Q.   The Ingeborg Nesbitt Clinic; is that right?

A.   Right.

Q.   And would you agree that this is not a residential property?

A.   Yes.

Q.   All right, let's go back to your -- save that piece of paper, that yellow one, yeah.  Let's go back to page 77.

A.   77 of?

Q.   Of the -- Table C-1 --

A.   What tab?

Q.   That would be Tab 6.  About fifteen rows down from the top, do you see there's a property listed with

13,287 square feet of roof area?

A.   Yes.

Q.   And the cistern -- estimated cistern volume is 199,305 gallons?

A.   Yes.

Q.   Will you write down the coordinates of that property on the piece of paper.

Got 'em?

A.   Uh-huh.

Q.   All right, let's go to Tab 36.  I'll mark Tab 36 as Defendant's Exhibit No. 14.

(Exhibit 14 was marked.)

BY MR. GARTEN:

Q.   Do you see the coordinates on the bottom of page 1 of Exhibit 14?

A.   Yes.

Q.   Do those coordinates match what you have written down?

A.   Yes.

Q.   And so these are the same coordinates of the property you listed in Table C-1?

A.   Yes.

Q.   And do you see the Google pinpoint image on the Street View?

A.   Yes.

Page 141

Q.   And next to it, it says "Kingdom Hall of Jehovah's Witnesses", correct?

A.   It's very small, but yes.

Q.   Okay, and so would you agree that that's a church, and not a residential properties?

A.   I would agree that it's a Kingdom Hall of Jehovah's Witnesses.  I don't know if they call them churches.  I don't...

Q.   Fair.  Would you agree that it's not a residential property?

A.   Yes.

Q.   All right, let's go back to Exhibit 6.  We will go to page 86.  Midway down the page, do you see a property with area square foot of 8,862?

A.   Page 86?

Q.   Yes, ma'am.

A.   Yes.

Q.   Okay.  And that has an estimated cistern volume of 88,620, correct?

A.   Yes.

Q.   Will you write down those coordinates on that piece of paper for me.  Got 'em?

A.   Yes.

Q.   Okay.  Let's go to Tab 37.  I will mark Tab 37 as Defendant's Exhibit No. 15.

(Exhibit 15 was marked.)

BY MR. GARTEN:

Q. Do you see the coordinates on the first page of Exhibit 15?

A. Yes.

Q. Do those coordinates match the coordinates you just wrote down on your piece of paper?

A. Yes.

Q. And we agree that these are the same coordinates in Table C-1 that we just looked at?

A. Yes.

Q. Do you see the image above that with a red arrow on it?

A. The map?

Q. Yes.

A. Yeah.

Q. And in small text, it says "Straight Outta CJM", correct?

A. Yes.

Q. Let's go to Tab 38. We'll mark Tab 38 as Defendant's Exhibit No. 16.

(Exhibit 16 was marked.)

BY MR. GARTEN:

Q. This is a Google search for "Straight Outta CJM", which appears to be an educational institution;

would you agree?

A.    That's what it says.

Q.    And would you agree with me that this is not a residential dwelling?

A.    Yes.

Q.    And so we agree that at least three properties in Table C-1 of your reply report are not residential dwellings, correct?

A.    Correct.

Q.    Did you do anything to investigate whether properties with unusually large footprints might be commercial institution or multi-family properties, rather than single-family residential dwellings?

A.    I can't recall.  I'd have to go back and talk to somebody.  I'd have to go talk to my team.

Q.    And so are they the ones who would have done that verification?

A.    No.

Q.    So you would have?

A.    Yes.

Q.    Okay, so why would you need to talk to them?

A.    Because I don't remember every single thing I've done.  There may be notes about that.

If I want to take an Advil, do I have to call for a break, or can I dig through my bag?

Page 144

MR. CHAREST:  Take a break.  We can take a break.  Want to take a break?

THE WITNESS:  Yeah.

VIDEOGRAPHER:  All right, we're off the record at 1:52 p.m.  That's the end of media 5.

(Short recess was taken.)

VIDEOGRAPHER:  All right, we're back on the record at 2:09 p.m.  This is the beginning of media 6.

BY MR. GARTEN:

Q.   Let's go back to your reply report, which is Exhibit 6.  In Section A2, you did a secondary technical audit which identified the 313 duplicates?

A.   Yes.

Q.   And you state that those duplicates were resolved by isolating the duplicates and reverifying building heights against the 2018 USGS LiDAR, correct?

A.   Yes.

Q.   And then you state that this better ensured that each unique property was correctly classified as single or multi-story per VI Code Title 29, Section 301, (2019), and that no property was double-counted, correct?

A.   Correct.

Q.   So, at this point, you agree that there should be no duplicates in Table C-1 of your reply report,

right?

A.   I agree that I removed these 313 duplicates that were a result of -- or an artifact of the overlapping parcels.  There may have been another duplication error for some other reason.

Q.   And did you do anything to check or search for any other duplication errors?

A.   I looked at the duplicates as they were in this; in this instance.

Q.   Isolated to that 313?

A.   Yes.

Q.   Okay, but did you check the whole dataset to see if there were other duplicates?

A.   I checked for this pattern of duplication against the entirety of the set.

Q.   Uh-huh.  But did you do anything with the whole universe of the dataset to determine whether there was any other duplicate patterns?

A.   I looked for this duplicate pattern.

Q.   And this is basic math, but you agree that if a property were counted twice, its cistern volume would be double-counted in your aggregate figure, right?

A.   Yes.

Q.   Let's go to page 95 of your reply, which is Exhibit 6, Table C-1?

Page 146

A.    95.

Q.    You see the entry about 15 rows down indicating 11,019 square feet?

A.    Yes.

Q.    It's classified as multi-story?

A.    Yes.

Q.    And it has a estimated cistern volume of 165,285?

A.    Yes.

Q.    And do you see the exact same entry directly underneath it?

A.    Yes.

Q.    And it has -- that entry underneath it has the exact same coordinates?

A.    Correct.

Q.    And the exact same area?

A.    Yes.

Q.    And the exact same cistern volume?

A.    Yes.

Q.    You agree this is a duplicate?

A.    Yes.

Q.    Let's go to page -- sorry, still on page 95, third of the way up from the bottom, 3,520?

A.    Yes.

MR. CHAREST:  What number?  There it is.

MR. GARTEN:  You got it?

MR. CHAREST:  Yeah.

BY MR. GARTEN:

Q.  Can you -- do you still have that piece of paper?  Can you write down those coordinates and the area?

Good?

A.  Yes.

Q.  Okay, let's go to page 111.  About 13 rows down, you'll see an entry with 3,520 square feet; you see that?

A.  Yes.

Q.  And do the latitude and longitude match with the numbers you wrote down on your paper?

A.  Yes.

Q.  Do you agree that this is a duplicate?

A.  Yeah, that's likely, yes.

Q.  Because it has the same latitude and longitude?

A.  Yes.

Q.  Do you know how many more exact duplicate sets there are in Table C-1?

A.  No.

Q.  Let's go to page 87.  About a third of the way up from the bottom of the page, you should see an entry with 1,705 square feet.

Page 148

A.   Yes.

Q.   Okay.  Can you write down the latitude, the longitude, the area in square feet, and the estimated cistern volume for me there?

Will you also write down whether it's a single or multi-story?  I think it's multi-story.

Got it?

A.   Uh-huh.

Q.   All right, let's go to page 115.  About halfway down the page, you'll see an entry, 1,705 square feet. Let me know when you see that.

A.   Oh, I see that, sorry.

Q.   Okay.  And do the latitude and longitude match with the numbers that you wrote down on your sheet of paper?

A.   Yes.

Q.   Would you agree with me that this is a duplicate?

A.   Other than the cistern values are not the same.

Q.   Yes, but this is indicating the same latitude and longitude, so it's the same building, right?

A.   Yes.

Q.   But it's not an exact duplicate because this entry is listed as a single-story instead of a multi-story, right?

A.   Yes.

Q.   The other entry, it's listed as a multi-story, correct?

A.   Yes.

Q.   And this entry is listed as 17,050 estimated cistern volume gallons.  What is the other listed as?

A.   25,575.

Q.   So it's a duplicate.  It's just a conflicting duplicate, right?

A.   Yes.

Q.   And so here, because the classification is different between single-story and multi-story, we don't just have a double count; we also have conflicting data in estimated cistern capacity?

A.   Correct.

Q.   Let's go to page 120.  The fifth row, the longitude is -64.825613; you see that one?

A.   Yes.

Q.   Okay.

MR. CHAREST:  What page, I'm sorry?

MR. GARTEN:  Oh, I'm sorry, page 120.

MR. CHAREST:  Oh, I'm on the wrong page, I apologize.

MR. GARTEN:  Five down.  2,376.

MR. CHAREST:  Switched up the method.

Page 150

MR. GARTEN:  Yeah, I didn't have it written down.

BY MR. GARTEN:

Q.   Will you write down the latitude, longitude, area, single-story, and estimated cistern volume for me.

Got it?

A.   Yes.

Q.   Let's go to page 95.  About 19 rows up from the bottom, you should see a property with 2,376 square feet; you see that?

A.   Yes.

Q.   Will you compare the latitude and longitude and tell me if it's the same as the property we just looked at?

A.   Yes.

Q.   And so we agree that it has the same latitude and longitude and the same area, correct?

A.   Yes.

Q.   So that means that this is a duplicate?

A.   Yes.

Q.   But it's a conflicting duplicate, because this one is listed as a multi-story, right?

A.   Correct.

Q.   And the one that we looked at before was a single-story?

A.   Yes.

Q.   And the one we looked at before had an estimated cistern volume of 23,760 gallons?

A.   Yes.

Q.   And this one has an estimated cistern volume of 35,640?

A.   Yes.

Q.   Do you know how many more conflicting duplicates Table C-1 of your reply report contains?

A.   No.

Q.   And you agree with me that the duplicates we've identified would require you to revise your estimated cistern gallon capacity, correct?

MR. CHAREST:   Form.

A.   I think that it would be reasonable to refine the data in order to come to a more accurate -- or a more precise estimate.

Q.   And if we did that, we refined the data and we took out duplicates, the number would be smaller, right?

A.   Yes.

Q.   Let's go to Appendix A of your initial report, which is Tab 2, Defendant's Exhibit 2.

Appendix A is heat maps that you contend show the results of community impact survey results; is that right?

Page 163

Q.    This is Chris Garten on behalf of defendant Limetree Bay Terminals.

Let me ask you this:  You don't know how many exact duplicates are included in Table C-1, right?

A.    No.

Q.    You don't know how many conflicting duplicates are included in Table C-1?

A.    No.

Q.    Okay, so it's possible that there are a lot more than the few that we identified today, correct?

A.    Yes, but in the exact same manner we did, it would be simple enough to go in, now that you've pointed out the pattern, and address those duplicates.

Q.    For that pattern; but what if there are patterns that are not clear to me or you?

A.    I think that's still an issue of data refinement and doesn't discount the methodology.

Q.    And I -- so you've changed your numbers one, two -- two times, three if we count the refinement that Mr. Charest is talking about so far, and we still don't know if there are other errors, correct?

MR. CHAREST:  Form.

A.    I believe that you could refine and refine and refine data forever, but to what end?

Q.    Well, to eliminate duplicate errors, right?  To

Page 164

that end.  What Mr. Charest just named were all duplicate errors.

A.   Is that a question?

Q.   Well, do you disagree or were they duplicate errors?

MR. CHAREST:  Asked and answered.

A.   Yes, they were duplicate errors.

Q.   And do you know why those duplicate errors were included in your Table C-1 in your reply report?

A.   I'd have to go back and look at the data.

Q.   Okay.  And would you have to go back and look at each individual data entry?

A.   No.

Q.   What would you have to do?

A.   I would sort the data and probably run a Python script to go in and grab anything that had the exact same lat/longs, and then we would -- if they were the perfect duplicates, we would remove them.  If they were the non-perfect duplicates, we would verify them.

Q.   Okay, but you didn't do that process prior to your initial report?

A.   I did not.

Q.   And you didn't do that process prior to your supplemental report?

A.   I did not.

A Veritext Division
877-370-3377                                              www.veritext.com

D. App. 0437

Q.   And you did not do that process prior to your reply report?

A.   I did not.

Q.   That's all the questions I have.  Thanks.

FURTHER EXAMINATION BY MR. CHAREST:

Q.   You could do that before trial, right?

A.   Oh, yeah.

EXAMINATION BY MR. MEDINA:

Q.   Question.  You never calculated an error rate for any of your reports, correct?

MR. CHAREST:  No.  That is outside the scope.  You already passed on that.  You can talk about the thing that I raised --

BY MR. MEDINA:

Q.   The .65 error rate that counsel calculated for you for the select data points that we discussed, that's not your error rate for any of your reports, correct?

MR. CHAREST:  Form.

A.   No, I did not -- there's -- no.

MR. MEDINA:  Done.

MR. CHAREST:  Thanks, everybody.

VIDEOGRAPHER:  All right, we're off the record at 2:53 p.m.  That's the end of media 7.

(Deposition was concluded.)

Page 167

REPORTER CERTIFICATION

VIDEO DEPOSITION of EMILY FUCILE SANCHEZ, taken on February 13, 2026.

I, Sarah B. Townsley, CCR, RPR, CSR, hereby certify to the following:

That the witness, EMILY FUCILE SANCHEZ, was duly sworn by me, and that the transcript of the deposition is a true record of the testimony given by the witness;

That examination and signature of the witness to the deposition transcript was reserved by the witness at the time of the deposition;

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and, further, that I am not financially or otherwise interested in the outcome of this action.

Certified by me on this 26th day of February, 2026.

_____

Sarah B. Townsley CRR CCR CSR RPR

Certified Realtime Reporter

TX CSR #5746; LA CCR #92016; RPR 814558